IN THE

# United States Court of Appeals for the Federal Circuit

SONOS, INC.,

*Appellant,*

*v.*

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

GOOGLE LLC,

*Intervenor.*

-------------------------------------------------------

GOOGLE LLC,

*Appellant,*

*v.*

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

SONOS, INC.,

*Intervenor.*

On Appeal from the United States International
Trade Commission No. 337-TA-1191

## NON-CONFIDENTIAL JOINT APPENDIX

Richard P. Hadorn
Office of the General Counsel
U.S. International Trade
Commission
500 E Street, SW
Washington, DC 20436
(202) 205-3179

*Counsel for International Trade
Commission*

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street,
New York, NY 10019
(212) 506-5000

*Counsel for Sonos, Inc.*

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, NH 03755
(602) 351-8250

*Counsel for Google LLC*

# TABLE OF CONTENTS

## VOLUME I

Commission Opinion, filed January 6, 2022
**(Filed Under Seal; Contains Confidential Materials)** ............................................................... Appx1-36

Limited Exclusion Order, filed January 6, 2022 ...................... Appx37-40

Cease and Desist Order, filed January 6, 2022 ........................ Appx41-48

Notice of a Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order and a Cease and Desist Order; Termination of Investigation, filed January 6, 2022 ..................................... Appx49-52

Notice of a Commission Determination to Review in Part a Final Initial Determination Finding a Violation of Section 337, filed November 19, 2021 ............... Appx53-57

Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, filed August 13, 2021
**(Filed Under Seal; Contains Confidential Materials)** .......................................................... Appx58-257

Order 19: Denying Complainant Sonos, Inc.'s Motion to Strike Hypothetical Redesigns, filed September 4, 2020
**(Filed Under Seal; Contains Confidential Materials)** ....................................................... Appx258-262

Order 20: Construing the Terms of the Asserted Claims of the Patents at Issue, filed September 25, 2020
**(Filed Under Seal; Contains Confidential Materials)** ....................................................... Appx264-316

Docket for ITC Inv. No. 337-TA-1191 ................................... Appx348-384

Verified Complaint of Sonos, Inc. Under Section 337 of
the Tariff Act of 1930, as Amended, filed January 7,
2020 ........................................................................ Appx387, 396-449

Exhibits 1 to 8 to Google's Initial Markman Brief, filed
July 2, 2020 .................................. Appx670, 682-683, 690-699, 731-771

Complainant Sonos, Inc.'s Motion to Strike
Hypothetical Redesigns and Request to Shorten
Time, filed August 18, 2020
**(Filed Under Seal; Contains Confidential
Materials)** .............................................................. Appx845, 858, 862

Exhibit 6 to Sonos, Inc.'s Motion to Strike Hypothetical
Redesigns: Respondents' Seventh Supplemental
Objections and Responses to Complainant's First
Set of Interrogatories (No. 20), filed August 18, 2020
**(Filed Under Seal; Contains Confidential
Materials)** .......................................................... Appx876, 1037-1042

Exhibits 7-15 to Sonos, Inc.'s Motion to Strike
Hypothetical Redesigns, filed August 18, 2020
**(Filed Under Seal; Contains Confidential
Materials)** ....................................................... Appx1135, 1290-1300

## VOLUME II

Respondent Google's Pre-Trial Brief, filed January 22,
2021
**(Filed Under Seal; Contains Confidential
Materials)** .................... Appx1411, 1435-1458, 1468-1549, 1555-1624,
1629-1695, 1704-1780, 1790-1820, 1832-1912

Respondent Google's Petition for Review of the Initial
Determination on Violation of Section 337, filed
August 27, 2021
**(Filed Under Seal; Contains Confidential
Materials)** .................... Appx1927, 1946-1969, 1973-1979, 1985-1990

Google's Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337, filed September 7, 2021 **(Filed Under Seal; Contains Confidential Materials)** ........................................ Appx2033, 2074-2076, 2117-2118

Respondents' Response to the Complaint and Notice of Investigation, filed February 27, 2020 .......................... Appx2501-2544

Respondents' Initial Markman Brief, filed July 2, 2020 ................................ Appx2547, 2591-2594, 2948-2976, 3121-3149

Complainant Sonos, Inc.'s Opening Claim Construction Brief, filed July 2, 2020 .................................................. Appx3587-3645

Complainant Sonos, Inc.'s Rebuttal Claim Construction Brief, filed July 20, 2020 ................................................. Appx3681-3713

Complainant Sonos, Inc.'s Pre-Hearing Brief, filed January 22, 2021 **(Filed Under Seal; Contains Confidential Materials)** ........................................ Appx3714, 3966-3972, 4134-4135

Respondent Google's Post-Hearing Brief, filed March 12, 2021 **(Filed Under Seal; Contains Confidential Materials)** ........................... Appx4227, 4241, 4371, 4394, 4397-4398, 4416, 4446, 4475-4478, 4492-4493

Respondent Google's Reply Post-Hearing Brief, filed March 19, 2021 **(Filed Under Seal; Contains Confidential Materials)** ............................. Appx4516, 4594, 4635-4636, 4637, 4649

Complainant Sonos, Inc.'s Reply Post-Hearing Brief, filed March 19, 2021 **(Filed Under Seal; Contains Confidential Materials)** ................................................. Appx4671, 4757, 4771, 4803

# VOLUME III

Complainant Sonos, Inc.'s Petition and Contingent
Petition for Review of the Initial Determination on
Violation of Section 337, filed August 27, 2021
**(Filed Under Seal; Contains Confidential
Materials)** ................................................................... Appx4819-4939

Complainant Sonos, Inc.'s Response to Respondent's
Petition for Review of the Initial Determination on
Violation of Section 337, filed September 7, 2021
**(Filed Under Seal; Contains Confidential
Materials)** ..................... Appx4940, 4967-4968, 4976-4979, 4985-4988

Respondent Google's Notice of Prior Art, filed July 10,
2020 ............................................................................... Appx5056-5105

Complainant Sonos, Inc.'s Post-Hearing Brief, filed
March 12, 2021
**(Filed Under Seal; Contains Confidential
Materials)** .......................................................... Appx5106, 5374-5377

JX-1: U.S. Patent No. 9,195,258 issued 11/24/2015
(Millington) (Certified)............................................... Appx10001-10035

JX-2: U.S. Patent No. 10,209,953 issued 2/19/2019
(Millington) (Certified)............................................... Appx10036-10082

JX-3: U.S. Patent No. 8,588,949 issued 11/19/2013
(Lambourne, et al.) (Certified)................................... Appx10083-10110

JX-4: U.S. Patent No. 9,219,959 issued 12/22/2015
(Kallai, et al.) (Certified) .......................................... Appx10111-10153

JX-5: U.S. Patent No. 10,439,896 issued 10/8/2019
(Millington, et al.) (Certified) ................................... Appx10154-10191

JX-9: File history re U.S. Patent No. 9,219,959 (Kallai,
et al.) (Certified)......................................... Appx10192, 10602, 11224,
16367-16375, 16386-16388

JX-12: File history re Reexamination Application No. 90/013,756 re U.S. Patent No. 9,219,959 (Certified) ........................................ Appx16657, 16995, 17192-17193, 17197-17198, 25506-25516, 39996-40022,

JX-130: Bose Lifestyle 50 System Owner's Guide, dated 10/17/2001 .............................. Appx43294, 43301, 43305, 43309-43310

JX-253: NBC News webpage: Tiny $199 Sonos Play:1 speaker fills a room with wireless tunes, dated 10/14/2013 (https://www.nbcnews.com/technolog/tiny-199-sonos-play-1-speakerfills-room-wireless-tunes-8C11387714)............................................................ Appx43349-43350

JX-258: Gizmodo webpage: Google's Home Max Goes After HomePod With a Big Ass Sonos Clone, dated 10/04/2017 (https://gizmodo.com/home-max-google-goes-after-homepodwith-a-big-ass-sono-1819143218) ............................................................ Appx43353-43355

JX-259: An Audio Hub that Actually Works, Easily, Bill Howard, First Looks, Entertainment Technology, PC Magazine, dated 3/22/2005. ....................... Appx43358

JX-266: Bloomberg webpage: How Sonos and John MacFarlane Built the Perfect Wireless Speaker for Streaming Music ........................................... Appx43359, 43369-43370

JX-284C: Notes on Handling Audio, Nick Millington, dated 04/14/2003 **(Filed Under Seal; Contains Confidential Materials)** .................................................... Appx43376-43377, 43379

JX-466C: Deposition Designations of Ken Mackay, deposition taken on 10/01/2020 Background; Infringement; Rebuttal **(Filed Under Seal; Contains Confidential Materials)** .................................................... Appx43380, 43622-43626

JX-474C: Deposition Designations of Jenny Wong,
deposition taken on 09/24/2020
**(Filed Under Seal; Contains Confidential
Materials)** ................................................... Appx43684, 43869, 43871

CX-7C: Direct Witness Statement of Nicholas
Millington
**(Filed Under Seal; Contains Confidential
Materials)** .................. Appx43901, 43931, 43933-43935, 44005-44007

CX-11C: Direct Witness Statement of Kevin C.
Almeroth
**(Filed Under Seal; Contains Confidential
Materials)** ................. Appx44031, 44080-44082, 44254, 44368-44369,
44696-44697, 44831-44832, 44861-44862

CX-14C: Rebuttal Witness Statement of Kevin C.
Almeroth
**(Filed Under Seal; Contains Confidential
Materials)** ................................................... Appx44943, 45657-45659

CX-15C: Rebuttal Witness Statement of Jon B.
Weissman
**(Filed Under Seal; Contains Confidential
Materials)** ...... Appx45679, 45766, 45768-45769, 45791-45792, 45860
46074-46075, 46153-46154, 46260, 46287-46293, 46297, 46383

CX-1015: What Hi-Fi? webpage: Sonos multi-room
system review, dated 5/14/2019
(https://www.whathifi.com/us/reviews/sonos-multi-
room-system) ............................................................ Appx46416-46417

CX-1018: Top 300 Organizations Granted U.S. Patents
in 2017, IPO, dated 06/18/2018 ................................. Appx46433-46442

CX-1019: IEEE Spectrum webpage: Interactive: Patent
Power 2017, The technology world's most valuable
patent portfolios .................................................................. Appx46443

CX-1046: SlashGear webpage: Sonos adds new stereo
pair mode to ZonePlayer S5, dated 5/10/2010
(https://www.slashgear.com/sonos-adds-new-stereo-
pair-mode-to-zoneplayer-s5-1084909/) ...................... Appx46444-46445

CX-1048: Consumer Reports webpage: Wireless
speaker shootout: Sonos Play:1 vs. the Bose
SoundTouch 20 and Samsung Shape M7, dated
03/12/2014
(https://www.consumerreports.org/cro/news/2014/03/
wireless-speaker-shootout-sonos-play-1-vs-the-bose-
soundtouch-20-and-samsung-shape-m7/index.htm) ........... Appx46448

CX-1050: Sonos Play:1 review, What Hi-Fi, dated
10/14/2013 ............................................................... Appx46454, 46457

CX-1051: Sonos Play:5 review: The best-sounding
wireless speaker system we've ever used, Mark
Walton, Ars Technica, dated 11/08/2015 ................. Appx46461, 46463

CX-1052: Sonos Play:5 Review:Wireless Music Made
Elegant, Mario Aguilar, Gizmodo, dated
10/29/2015 ............................................................... Appx46481, 46486

CX-1097: MacWorld webpage: Sonos Play:1 wireless
speaker, dated 10/15/2013 ........................................ Appx46498-46499

CDX-5C: Demonstratives for the Direct Witness
Statement of Kevin C. Almeroth
**(Filed Under Seal; Contains Confidential
Materials)** ............................................................... Appx46502, 46581

RX-1470C: Direct Witness Statement of Ken Mackay
**(Filed Under Seal; Contains Confidential
Materials)** .............................. Appx46583, 46605-46608, 46612-46627

RX-1517C: Rebuttal Witness Statement of Ken Mackay
**(Filed Under Seal; Contains Confidential
Materials)** .................................................... Appx46631, 46638-46639

RX-1522C: Rebuttal Witness Statement of Dan
    Schonfeld, Ph.D.
    **(Filed Under Seal; Contains Confidential**
    **Materials)** ...................................................... Appx46647, 46669-46671

JX-250: Google webpage: Set up your Google Home
    device ........................................................................ Appx46730-46731

CX-767: Google webpage: Set up your Google Nest or
    Google Home speaker or display on Android............ Appx46732-46734

CX-993: Google webpage: Set up Google Home ............ Appx46735-46736

CX-994: Google webpage: Set Up Chromecast for
    Android ..................................................................... Appx46737-46738

CX-1119: PC Magazine webpage: Sonos ZonePlayer
    ZP100 review, dated 2/3/2005.................................. Appx46739-46740

CDX-6C: Demonstratives for the Direct Witness
    Statement of Jon B. Weissman
    **(Filed Under Seal; Contains Confidential**
    **Materials)** ....................................... Appx46744, 47133, 47144, 47147

CX-12C: Direct Witness Statement of Jon B. Weissman
    **(Filed Under Seal; Contains Confidential**
    **Materials)** ............................. Appx50040, 50562-50564, 50566-50568,
               50570-50571, 50575-50583, 50595-50598, 50608-50610

CX-314: Set up your Google Nest or Google Home
    speaker or display
    (https://support.google.com/googlenest/answer/70294
    85?hl=en) (last visited Oct. 22, 2020)........................ Appx50706-50707

**VOLUME IV**

JX-8: U.S. Patent No. 8,588,949 prosecution history ... Appx56319-57034

**VOLUME V**

JX-8: U.S. Patent No. 8,588,949 prosecution history ... Appx57035-57747

# VOLUME VI

JX-8: U.S. Patent No. 8,588,949 prosecution history ... Appx57748-58277

JX-442: U.S. Patent Application No. 2002/0124097 ..... Appx58278-58296

JX-476C: Deposition Transcript of Paul Hainsworth, dated September 23, 2020 **(Filed Under Seal; Contains Confidential Materials)** ............................................................. Appx58297, 58420

RDX-19: Demonstratives for the Rebuttal Witness Statement of Kevin Jeffay **(Filed Under Seal; Contains Confidential Materials)** .............................. Appx58533, 58544-58546, 58551-58557

RX-321: Transmission Control Protocol DARPA Internet Program Protocol Specification (September 1981) ................................................. Appx58690, 58705, 58724, 58772

# VOLUME VII

RX-1469C: Direct Witness Statement of Chris Chan **(Filed Under Seal; Contains Confidential Materials)** ..................................................... Appx58779, 58802-58803

RX-1472C: Direct Witness Statement of Esther Cho **(Filed Under Seal; Contains Confidential Materials)** ............................. Appx58807, 58814-58822, 58828-58830, 58832, 58834-58839

RX-1473C: Direct Witness Statement of Shangliang Jiang **(Filed Under Seal; Contains Confidential Materials)** ............................................................. Appx58843, 58850

RX-1474C: Direct Witness Statement of Leon Li **(Filed Under Seal; Contains Confidential Materials)** ..................................................... Appx58857, 58866-58867

RX-1476C: Direct Witness Statement of James Scanlan
**(Filed Under Seal; Contains Confidential Materials)** .................................................... Appx58870, 58897-58898

RX-1478C: Direct Witness Statement of Matthew Shoemake
**(Filed Under Seal; Contains Confidential Materials)** ...... Appx58917, 59041-59042, 59381-59391, 59413-59415, 59418-59440, 59444-59445, 59453-59456, 59504

RX-1480C: Direct Witness Statement of Marin Rinard
**(Filed Under Seal; Contains Confidential Materials)** .............................................................. Appx59563, 59689

RX-1515C: Direct Witness Statement of Kevin Jeffay, Ph.D.
**(Filed Under Seal; Contains Confidential Materials)** ............................... Appx59780, 59827-59843, 59869-59871

RX-1518C: Rebuttal Witness Statement of Esther Cho
**(Filed Under Seal; Contains Confidential Materials)** .................................................... Appx60062, 60067-60074

RX-1520C: Rebuttal Witness Statement of Martin Rinard
**(Filed Under Seal; Contains Confidential Materials)** ....................................... Appx60083, 60101, 60103-60105, 60137-60138, 60156-60160

RX-1521C: Rebuttal Witness Statement of Kevin Jeffay, Ph.D.
**(Filed Under Seal; Contains Confidential Materials)** ...... Appx60167, 60194-60210, 60226-60230, 60234-60235, 60292-60301, 60308-60309, 60314-60322, 60328-60331, 60360-60363

RX-1888C: Captures from Dr. Jeffay's Testing of the Google Home App (Bluetooth-Based Setup)
**(Filed Under Seal; Contains Confidential Materials)** .............................................................. Appx60427-60429

CDX-6C: Demonstratives for the Direct Witness
Statement of Jon B. Weissman
**(Filed Under Seal; Contains Confidential
Materials)** .................................................................. Appx60501-60504

February 22, 2021 Trial Transcript
**(Filed Under Seal; Contains Confidential
Materials)** .............................................................. Appx70001, 70009

February 23, 2021 Trial Transcript
**(Filed Under Seal; Contains Confidential
Materials)** ....... Appx70039, 70071-70073, 70078-70080, 70088-70090

February 24, 2021 Trial Transcript
**(Filed Under Seal; Contains Confidential
Materials)** ........................... Appx70099, 70103, 70106, 70113-70115,
70118-70122, 70127, 70130

February 25, 2021 Trial Transcript .............................. Appx70176, 70216

February 26, 2021 Trial Transcript
**(Filed Under Seal; Contains Confidential
Materials)** ................. Appx70234, 70246, 70251-70253, 70258-70262,
70267-70270, 70273-70274

JX-10: U.S. Patent No. 10,439,896 prosecution
history ............... Appx71001, 99088-99089, 99093-99097, 99325-99336

## Statement Regarding Confidential Material Omitted

Pursuant to Federal Circuit Rule 25.1(e)(1)(B) and the Protective Orders filed in the International Trade Commission on February 11, 2020 and April 28, 2020, materials has been redacted from Appx5-7, Appx27, Appx30-31, Appx63, Appx84-90, Appx92, Appx94-100, Appx102-111, Appx126-151, Appx159-168, Appx171-175, Appx183-186, Appx190-191, Appx194-197, Appx200, Appx213, Appx225, Appx227, Appx230-234, Appx246, Appx251, Appx254, Appx258, Appx260-261, Appx862, Appx876, Appx1037-1042, Appx1135, Appx1290-1300, Appx1435-1458, Appx1468-1549, Appx1555-1624, Appx1629-1695, Appx1704-1780, Appx1790-1820, Appx1832-1912, Appx1946, Appx1949, Appx1955-1957, Appx1960-1963, Appx1973-1974, Appx1977-1978, Appx1986-1990, Appx2117-2118, Appx3966-3972, Appx4134-4135, Appx4241, Appx4371, Appx4394, Appx4397-4398, Appx4416, Appx4446, Appx4475-4478, Appx4492-4493, Appx4594, Appx4635-4636, Appx4637, Appx4649, Appx4757, Appx4771, Appx4803, Appx4839-4840, Appx4842-4846, Appx4856-4860, Appx4863-4865, Appx4868-4886, Appx4888, Appx4895-4907, Appx4910-4918, Appx4920, Appx4925, Appx4932-4936, Appx4967-4968, Appx4985, Appx4987-4988, Appx5374-

5377, Appx43376-43377, Appx43379, Appx43622-43626, Appx43869,

Appx43871, Appx43931, Appx43933-43935, Appx44005-44007,

Appx44080-44082, Appx44254, Appx44368-44369, Appx44696-44697,

Appx44831-44832, Appx44861-44862, Appx45657-45659, Appx45766,

Appx45768-45769, Appx45791-45792, Appx45860, Appx46074-46075,

Appx46153-46154, Appx46260, Appx46287-46293, Appx46297,

Appx46383, Appx46502, Appx46581, Appx46605-46608, Appx46612-

46627, Appx46638-46639, Appx46669-46671, Appx46744, Appx47133,

Appx47144, Appx47147, Appx50562-50564, Appx50566-50568,

Appx50570-50571, Appx50575-50583, Appx50595-50598, Appx50608-

50610, Appx58420, Appx58551-58557, Appx58802-58803, Appx58814-

58822, Appx58828-58830, Appx58832, Appx58834-58839, Appx58850,

Appx58866-58867, Appx58897-58898, Appx59041-59042, Appx59381-

59391, Appx59413-59415, Appx59418-59440, Appx59444-59445,

Appx59453-59456, Appx59504, Appx59689, Appx59827-59843,

Appx59869-59871, Appx60067-60074, Appx60101, Appx60103-60105,

Appx60137-60138, Appx60156-60160, Appx60194-60210, Appx60226-

60230, Appx60234-60235, Appx60292-60301, Appx60308-60309,

Appx60314-60322, Appx60328-60331, Appx60360-60363, Appx60427-

60429, Appx60501-60504, Appx70009, Appx70071-70072, Appx70118-70122, Appx70246, Appx70258, Appx70260-70262, Appx70267-70270, and Appx70273-70274. The redacted materials contain the confidential business information and source code of Sonos and Google.

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN AUDIO PLAYERS AND**
**CONTROLLERS, COMPONENTS**
**THEREOF, AND PRODUCTS**
**CONTAINING THE SAME**

**Investigation No. 337-TA-1191**

# COMMISSION OPINION

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 2
II.    BACKGROUND ........................................................................................................... 2
      A.     Procedural History ........................................................................................... 2
      B.     The Asserted Patents........................................................................................ 9
      C.     The Products at Issue ..................................................................................... 10
           1.     Networked Audio Players ................................................................... 10
           2.     Controllers ......................................................................................... 11
III.   COMMISSION REVIEW OF THE FINAL ID.......................................................... 12
IV.   ANALYSIS................................................................................................................. 13
      A.     Infringement by the '258 and '953 Accused Products at the Time of Importation
         ...............................................................................................................14
           1.     Background ......................................................................................... 14
           2.     The ID ................................................................................................ 17
           3.     Analysis.............................................................................................. 18
      B.     Correction of Typographical Errors............................................................... 22
V.     REMEDY, THE PUBLIC INTEREST, AND BONDING............................................ 22
      A.     Limited Exclusion Order................................................................................ 22
      B.     Cease and Desist Order.................................................................................. 26
      C.     Public Interest ............................................................................................... 28
           1.     Public Health and Welfare ................................................................. 29
           2.     Competitive Conditions in the United States......................................... 31
           3.     The Production of Like or Directly Competitive Articles in the United
           States.................................................................................................. 32
           4.     United States Consumers ................................................................... 32
      D.     Bond.............................................................................................................. 33
VI.   CONCLUSION........................................................................................................... 34

## I.     INTRODUCTION

On November 19, 2021, the Commission determined to review in part the final initial determination ("ID") issued on August 13, 2021, by the presiding chief administrative law judge ("CALJ").  86 Fed. Reg. 67492 (Nov. 26, 2021).  On review, the Commission affirms the ID's findings that there is a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"), with respect to U.S. Patent Nos. 9,195,258 ("the '258 patent") and 10,209,953 ("the '953 patent"), for the reasons stated in the ID, as supplemented herein.  The Commission further affirms the ID's findings that there is a violation of Section 337 with respect to U.S. Patent Nos. 8,588,949 ("the '949 patent"), 9,219,959 ("the '959 patent"), and 10,439,896 ("the '896 patent"), for the reasons stated in the ID.  The Commission also corrects two typographical errors on pages 24 and 84 of the ID.

The Commission has determined to issue a limited exclusion order ("LEO") and cease and desist order ("CDO") against respondent Google LLC ("Google"), and it finds the public interest does not preclude issuing such a remedy.  The Commission has also determined to set a bond in the amount of 100 percent of the entered value of subject imports during the period of Presidential review.  This opinion sets forth the Commission's reasoning in support of its final determination.

## II.    BACKGROUND

### A.     Procedural History

On January 7, 2020, complainant Sonos, Inc. ("Sonos") filed a complaint with the Commission alleging violations of Section 337 in the importation into the United States, the sale for importation, and the sale within the United States after importation of certain audio players and controllers, components thereof, and products containing the same.  *See* 85 Fed. Reg. 2147-48 (Jan. 14, 2020).  On January 21-22, 2020, the Commission received nine submissions on the

public interest from members of the public in response to the Commission's *Federal Register* notice. *See id*. at 2148.[1]

On February 11, 2020, the Commission instituted this investigation based on the complaint filed by Sonos to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 17, 21-24, and 26 of the '258 patent; claims 7, 12-14, and 22-24 of the '953 patent; claims 1, 2, 4, and 5 of the '949 patent; claims 5, 9, 10, 29, and 35 of the '959 patent; and claims 1, 3, 5, 6, and 12 of the '896 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337[.]

85 Fed. Reg. 7783 (Feb. 11, 2020).

The notice of investigation named two respondents: Google and Alphabet Inc., both of Mountain View, California. *Id*. The Office of Unfair Import Investigations ("OUII") is also named as a party to this investigation. *Id*.

On September 21, 2020, the Commission terminated the investigation as to Alphabet Inc. based on withdrawal of the allegations in the complaint directed to Alphabet Inc. Order No. 18 (Sept. 1, 2020), *unreviewed by* Comm'n Notice (Sept. 21, 2020). On November 24, 2020, the Commission determined that the importation requirement has been satisfied. Order No. 27 (Oct. 27, 2020), *unreviewed by* Comm'n Notice (Nov. 24, 2020). On February 2, 2021, the Commission determined that the technical prong of the domestic industry ("DI") requirement has

---

[1] *See* EDIS Doc. IDs 699706 (Submission of Champions Community Foundation); 699787 (Submission of United Spinal Association ("USA Sub.")); 699838 (Submission of Center for Democracy & Technology); 699918 (Submission of William & Deborah Weis); 699942 (Submission of R Street Institute); 699955 (Submission of Champions Community Foundation); 699962 (Submission of American Foundation for the Blind); 699975 (Submission of American Council of the Blind); and 699976 (Submission of Computer & Communications Industry Association).

been satisfied as to the '949 patent. Order No. 32 (Jan. 4, 2021), *unreviewed by* Comm'n Notice (Feb. 2, 2021). On February 16, 2021, the Commission determined that the economic prong of the DI requirement has been satisfied as to all Asserted Patents.[2] Order No. 35 (Jan. 14, 2021), *reviewed and aff'd by* Comm'n Notice (Feb. 16, 2021).

On March 12, 2021, the Commission partially terminated the investigation based on withdrawal of the allegations in the complaint as to the following asserted claims: claims 22 and 23 of the '258 patent; claims 12 and 13 of the '953 patent; claims 5, 9, 29, and 35 of the '959 patent; and claim 3 of the '896 patent. Order No. 58 (Feb. 23, 2021), *unreviewed by* Comm'n Notice (Mar. 12, 2021).

On July 23, 2020, the parties submitted a joint proposed claim construction chart. On September 25, 2020, the CALJ issued a *Markman* Order construing the claim terms in dispute. *See* Order No. 20 (Sept. 25, 2020).[3]

A five-day evidentiary hearing took place from February 22-26, 2021. *See* Tr. 1-1138. Sonos asserted the following claims at the hearing, each of which remains at issue in this investigation:

| Asserted Patent | Remaining Asserted Claim(s) |
|---|---|
| '258 patent | 17, 21, 24, and 26 |
| '953 patent | 7, 14, and 22-24 |
| '959 patent | 10 |
| '949 patent | 1, 2, 4, and 5 |
| '896 patent | 1, 5, 6, and 12 |

ID at 180-82; *see also id.* at 13, 56, 91, 120, 150.

---

[2] "Asserted Patents" refers, collectively, to the '258 patent, '953 patent, '959 patent, '949 patent, and '896 patent.

[3] No *Markman* hearing was held due to the COVID-19 pandemic. Order No. 20 at 1.

On August 13, 2021, the CALJ issued the final ID, finding a violation of Section 337 with respect to all five Asserted Patents. *Id.* at 180-82. More specifically, the ID finds as follows:

- Regarding the '258 patent (ID at 180):

  (i)    the '258 Accused Products and '258 NIA[4] Nos. 2 and 3 infringe each of asserted claims 17, 21, 24, and 26;

  (ii)   '258 NIA No. 1 does not infringe any asserted claim[5];

  (iii)  the asserted claims are not invalid as obvious; and

  (iv)   Sonos satisfied the technical and economic prongs of the DI requirement with respect to the '258 patent.

- Regarding the '953 patent (ID at 180-81):

  (i)    the '953 Accused Products and '953 NIA Nos. 2 and 3 infringe each of asserted claims 7, 14, and 22-24;

  (ii)   '953 NIA No. 1 does not infringe any asserted claim[6];

---

[4] For each Asserted Patent, Google developed several redesign products (or alleged non-infringing alternatives ("NIAs")) and submitted them for adjudication.

[5] The ID finds that '258 NIA No. 1 does not practice limitations 17.2 and 17.7 of asserted claim 17 of the '258 patent, and thus does not practice any asserted claim of the patent. ID at 26-34. The ID finds that, as to the relevant modifications in '258 NIA No. 1, the parties agree that ███████████████████████████████████████████████████████████████████ *Id.* (citing CIPHB at 21-22; RIPHB at 31; SIPHB at 25). The ID also finds that the evidence shows that "███████████████████████████████████████████████" *Id.* (citing RX-1470C at Q/As 62-63; JX-0466C at 244:14-21). Instead, the evidence shows that "███████████████████████████████████████████████████████████████ ██████████████████████████████" *Id.* (citing JX-0466C at 245:10-22; RX-1522C at Q/A 70). Therefore, ████████████████████████████████████████ ████████████████████████████ *Id.* (citing RX-1522C at Q/A 70).

[6] The ID finds that '953 NIA No. 1 does not practice limitations 7.7 and 7.8 of asserted claim 7 of the '953 patent, and thus does not practice any asserted claim of the patent. ID at 73-74. The ID finds that "Sonos does not assert that the '953 NIA No. 1 infringes the '953 patent." *Id.* at 73. The ID also finds that, as to the relevant modifications in '953 NIA No. 1, the parties agree that

(iii)    the asserted claims are not invalid as obvious; and

(iv)    Sonos satisfied the technical and economic prongs of the DI requirement with respect to the '953 patent.

- Regarding the '959 patent (ID at 180-81):

(i)    the '959 Accused Products and '959 NIA No. 3 infringe asserted claim 10;

(ii)    '959 NIA No. 4 does not infringe asserted claim 10[7];

(iii)    asserted claim 10 is not invalid as obvious or for improper inventorship; and

(iv)    Sonos satisfied the technical and economic prongs of the DI requirement with respect to the '959 patent.

- Regarding the '949 patent (ID at 129, 180-81):

(i)    the accused Hub and Pixel Controllers installed with the Google Home application infringe asserted claims 1, 2, and 5;

(ii)    Google induces the infringement of asserted claims 1, 2, and 5;

(iii)    the accused Pixel Controllers installed with either the YouTube Music or Google Play Music application do not infringe asserted claims 1, 2, or 5;

(iv)    none of the '949 Accused Products infringe asserted claim 4;

(v)    Google's redesign products for the '949 patent do not infringe any asserted

---

"█████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████." *Id.* (citing CIPHB at 21-22; RIPHB at 31; SIPHB at 25). Therefore, "██████████████
██████████████████████████████████████████████████████" *Id.* (citing *id.* § VI.B.3.a).

[7] The ID finds that '959 NIA No. 4 does not practice limitations 10.8 and 10.9 of asserted claim 10 of the '959 patent. ID at 107-08. The ID finds that, as to the relevant modifications in '959 NIA No. 4, it "██████████████████████████████████████████████████████
████████████████████████████" *Id.* at 108; *see id.* at 107 ("█████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████").

6

claim[8];

    (vi)     the asserted claims are not invalid as anticipated or obvious;

    (vii)    the asserted claims are not directed to patent-ineligible subject matter; and

    (viii)   Sonos satisfied the technical and economic prongs of the DI requirement with respect to the '949 patent.

- Regarding the '896 patent (ID at 180-82):

    (i)      the '896 Accused Products and '896 NIA No. 3 infringe each of asserted claims 1, 5, 6, and 12;

    (ii)    Google induces the infringement of asserted claims 1, 5, 6, and 12,

    (iii)   '896 NIA No. 2 does not infringe any asserted claim[9];

    (iv)   the asserted claims are not invalid as anticipated, as obvious, or for improper inventorship;

    (v)    Sonos satisfied the technical and economic prongs of the DI requirement with respect to the '896 patent.

The recommended determination ("RD") recommends that, should the Commission

determine that a violation of Section 337 occurred, the Commission should: (i) issue an LEO

against Google's infringing products; (ii) issue a CDO against Google; and (iii) set a 100 percent

---

[8] The ID finds that Google's redesign products for the '949 patent do not practice any asserted claim of the '949 patent. ID at 132; *id*. at 132 n.69 (noting that "Google does not provide names for the[se] redesigned products, as it does for the other patents"); *id*. at 181 (referring to these redesigns collectively as "The 949 NIAs"). The ID notes that Google explains that it "████████████████████████████████████████████████████████████'" *Id*. at 132 (citing RIPHB at 166). The ID also notes that neither Sonos nor OUII disputes that Google's redesign products "remove the infringing functionality" present in the '949 Accused Products. *Id*. The ID also finds that "the evidence shows that the redesigned products do not infringe the '949 patent." *Id*. (citing RX-1520C at Q/As 161-172).

[9] The ID finds that '896 NIA No. 2 does not practice limitation 1.7 of asserted claim 1 of the '896 patent, and thus does not practice any asserted claim of the patent. ID at 162-65. The ID finds that, as to the relevant modifications in '896 NIA No. 2, it "███████████████████████████████████████████████████████████████████████████████████" *Id*. at 164 (citing RX-1521C at Q/A 503).

bond for any importations of infringing products during the period of Presidential review. *Id*. at 182-88. The Commission did not direct the CALJ to take public interest evidence or provide findings and recommendations concerning the public interest (*see* 85 Fed. Reg. at 7783), a nd the RD does not address the public interest (*see* ID at 182-88).

On August 27, 2021, Sonos and Google each filed a petition seeking review of certain findings in the ID.[10] On September 7, 2021, Sonos and Google filed responses to each other's petitions, and OUII filed a joint response to both petitions.[11]

On September 13, 2021, the Commission received eight submissions on the public interest from members of the public in response to the Commission's *Federal Register* notice. *See* 86 Fed. Reg. 46715 (Aug. 19, 2021).[12] The Commission did not receive submissions on the public interest from the parties pursuant to Commission Rule 210.50(a) (4) ( 19 C.F.R. 210.50(a) (4)).

On November 19, 2021, the Commission determined to review the ID in part with respect to the ID's analysis of whether the products accused of infringing the '258 and '953 patents are articles that infringe at the time of importation. 86 Fed. Reg. at 67492. The Commission also

---

[10] Complainant Sonos Inc.'s Petition and Contingent Petition for Review of the Initial Determination on Violation of Section 337 (Aug. 27. 2021); Respondent Google's Petition for Review of the Initial Determination on Violation of Section 337 (Aug. 27, 2021) ("RPet.").

[11] Complainant Sonos Inc.'s Response to Respondent's Petition for Review of the Initial Determination on Violation of Section 337 (Sept. 7, 2021); Google's Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337 (Sept. 7, 2021) ("RPResp."); Response of the Office of Unfair Import Investigations to the Private Parties' Petitions for Review of the Initial Determination on Violation of Section 337 (Sept. 7, 2021).

[12] *See* EDIS Doc. IDs 751551 (Submission of Seattle Musicians Access to Sustainable Healthcare); 751556 (Submission of Sound Board Engineers); 751560 (Submission of Project: Music Heals Us); 751562 (Submission of U.S. Startups & Inventors for Jobs); 751563 (Submission of Innovation Alliance ("IA Sub.")); 751564 (Submission of Urban Arts Partnership); 751565 (Submission of Centripetal Networks, Inc.); and 751568 (Submission of American Economic Liberties Project ("AELP Sub.")).

determined to correct two typographical errors on pages 24 and 84 of the ID.  *Id.*  The

Commission did not request briefing on any issue under review.  The Commission's notice also

requested written submissions from the parties, interested government agencies, and interested

persons on remedy, the public interest, and bonding.  *Id.*

On December 2, 2021, Sonos, Google, and OUII each filed initial submissions on

remedy, the public interest, and bonding.[13]  That same day, the Commission also received four

additional submissions on the public interest from members of the public in response to the

Commission's *Federal Register* notice.[14]  On December 10, 2021, Sonos, Google, and OUII each

filed reply submissions on remedy, the public interest, and bonding.[15]

### B.    The Asserted Patents

The technology at issue relates to audio systems built from a network of playback devices

(*e.g.*, speakers) a nd controllers through which users interact with those systems (*e.g.*, mobile

phones, tablets, and laptops).  ID at 2.  The five Asserted Patents concern techniques relating to

syncing audio playback among multiple audio devices ('258 and '953 patents);  pairing audio

---

[13] Complainant Sonos, Inc.'s Initial Written Submission on Remedy, Bonding, Public Interest, and Requested Information (Dec. 2, 2021) ("CRemBr."); Respondent Google's Submission on Remedy, Bond, and Public Interest (Dec. 2, 2021) ("RRemBr."); and Response of the Office of Unfair Import Investigations to Commission's Request for Written Submissions on Remedy, the Public Interest, and Bonding (Dec. 2, 2021) ("ORemBr.").

[14] *See* EDIS Doc. IDs 757760 (Submission of American Foundation for the Blind ("AFB Sub.")); 757762 (Submission of Computer & Communications Industry Association ("CCIA Sub.")); 757769 (Submission of Software & Information Industry Association); and 757782 (Submission of Computer & Communications Industry Association ("CCF Sub.")).

[15] Complainant Sonos, Inc.'s Reply to Initial Written Submissions on Remedy, Bonding, Public Interest, and Requested Information (Dec. 10, 2021) ("CReplyRemBr."); Respondent Google's Reply Submission on Remedy, Bond, and Public Interest (Dec. 10, 2021) ("RReplyRemBr."); and Reply Submission of the Office of Unfair Import Investigations to the Private Parties' Written Submissions on Remedy, the Public Interest, and Bonding (Dec. 10, 2021) ("OReplyRemBr.").

devices to generate different listening environments ('959 patent); user interfaces for volume control of multiple audio devices ('949 patent); and setting up devices on wireless networks ('896 patent).

### C. The Products at Issue

At issue are (1) "networked audio players" and (2) "controllers," devices—*e.g.*, mobile phones, tablets, and laptops—capable of controlling players. 85 Fed. Reg. at 7783.

### 1. Networked Audio Players

The '258, '953, and '959 patents are directed to networked audio players (also referred to as "smart speakers"). For each patent, the following chart lists: (i) Google's players (*i.e.*, "Chromecast-enabled audio players") accused of practicing the asserted claims; (ii) Google's NIA/redesign products submitted for adjudication as to the asserted claims; and (iii) Sonos' players upon which it relies to satisfy the technical prong of DI:

| Patent (Asserted Claims) | Google's Accused Products | Google's NIAs | Sonos' DI Products |
|---|---|---|---|
| '258 patent (claims 17, 21, 24, and 26) | Home Mini, Nest Mini, Home, Nest Audio, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, and Chromecast with Google TV ("the '258 Accused Products") | '258 NIA No. 1 '258 NIA No. 2 '258 NIA No. 3 | Play:1, Play:3, Play:5, One, One SL, Move, Five, Playbar, Playbase, Beam, Arc, Connect, Connect:Amp, Port, Amp, SYMFONISK table lamp WiFi speaker, and SYMFONISK bookshelf WiFi speaker |
| '953 patent (claims 7, 14, and 22-24) | Home Mini, Nest Mini, Home, Nest Audio, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, and Chromecast with Google TV ("the '953 Accused Products") | '953 NIA No. 1 '953 NIA No. 2 '953 NIA No. 3 | Play:1, Play:3, Play:5, One, One SL, Move, Five, Playbar, Playbase, Beam, Arc, Sub, Connect, Connect:Amp, Port, Amp, SYMFONISK table lamp WiFi speaker, and SYMFONISK bookshelf WiFi speaker |

| '959 patent (claim 10) | Home Max[16] and Nest Audio ("the '959 Accused Products") | '959 NIA No. 3 '959 NIA No. 4 | Play:1, Play:3, Play:5, One, One SL, Move, Five, Playbar, Playbase, Beam, Arc, SYMFONISK table lamp, WiFi speaker, and SYMFONISK bookshelf WiFi speaker |
|---|---|---|---|

ID at 2-3.

### 2. Controllers

The '949 and '896 patents are directed to controllers that are configured in a particular manner (*e.g.*, via the installation of one or more apps). For each patent, the following chart lists: (i) Google's configured controllers accused of practicing the asserted claims; (ii) Google's NIA/redesign products submitted for adjudication as to the asserted claims; and (iii) Sonos' players upon which it relies to satisfy the technical prong of DI:

---

[16] According to the ID, Google discontinued the Home Max in the fourth quarter of 2018, and the device is no longer available for sale through Google's online store. ID at 2 n.2. Thus, any remedy to which Sonos is entitled against the Home Max "will be of no consequence." *Id*.

| Patent (Asserted Claims) | Google's Accused Products | Google's NIAs | Sonos' DI Products |
|---|---|---|---|
| '949 patent (claims 1, 2, 4, and 5) | (i) Pixel smartphones (*i.e.*, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones)[17]; (ii) the Pixel Slate tablet; (iii) Pixel computers (*i.e.*, the Pixelbook and Pixelbook Go laptops installed with the Google Home application, the YouTube Music application, and/or the Google Play Music application); and (iv) Google's Hub displays (*i.e.*, the Home Hub, Nest Hub, and Nest Hub Max installed with Home/Nest software) ("the '949 Accused Products") | The '949 NIAs | Computing devices (such as smartphones, tablets, or computers) installed with the Sonos S1 or S2 application for iOS, Android, FireOS, macOS, or Windows ("the '949 DI Products" and "the '896 DI Products") |
| '896 patent (claims 1, 5, 6, and 12) | (i) Pixel smartphones (*i.e.*, The Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones); (ii) the Pixel Slate tablet; and (iii) Pixel computers (*i.e.*, the Pixelbook and Pixelbook Go laptops installed with the Google Home application) ("the '896 Accused Products") | '896 NIA No. 2 '896 NIA No. 3 | |

ID at 2-3.

## III.     COMMISSION REVIEW OF THE FINAL ID

When the Commission reviews an initial determination, in whole or in part, it reviews the

determination *de novo*. *Certain Soft-Edged Trampolines & Components Thereof*, Inv. No. 337-

TA-908, Comm'n Op. at 4 (May 1, 2015).  Upon review, the "Commission has 'all the powers

---

[17] According to the ID, although Sonos included the Pixel 4a (5G) and Pixel 5 smartphones in its list of accused products for the '949 patent, Sonos' infringement expert did not offer testimony on these products.  ID at 3 n.3 (citing CX-0012C at Q/A 26).

which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 9-10 (July 1997) (q uoting *Certain Acid-Washed Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)) . With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

## IV.    ANALYSIS

For the reasons set forth below, the Commission has determined to affirm the ID's finding of violation with respect to claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent. In particular, the Commission affirms, with supplemental reasoning, the ID's rejection of Google's argument that the products accused of infringing the '258 and '953 patents are "not capable of infringing at the time of importation" and that they "are not capable of infringement if used without another accused product present and configured for allegedly infringing use." ID at 16-17, 58. The Commission has also determined to correct two typographical errors on pages 24 and 84 of the ID. The Commission otherwise affirms and adopts the ID's findings, conclusions, and supporting analyses that are not inconsistent with this opinion.

### A.  Infringement by the '258 and '953 Accused Products at the Time of Importation

The Commission determined to review the ID with respect to only its analysis of whether the products accused of infringing the '258 and '953 patents are articles that infringe at the time of importation.  ID at 16-17, 58; 86 Fed. Reg. at 67492.  The Commission did not request further briefing from the parties on this issue.  *See* 86 Fed. Reg. at 67491-93.

#### 1.  Background

The '258 patent relates generally to "the field of arrangements that synchronize output generated by a number of output generators, including audio output, video output, combinations of audio and video, as well as other types of output . . . provided by a common channel."  '258 patent, 1:44-49.

Sonos asserted a single independent claim (claim 17) of the '258 patent against Google, which recites as follows:

| Claim 17 of the '258 Patent | |
|---|---|
| 17.0[18] | A first zone player comprising: |
| 17.1 | a network interface configured to interface the first zone player with at least a local area network (LAN); |
| 17.2 | a device clock configured to generate clock time information for the first zone player; |
| 17.3 | one or more processors; and |
| 17.4 | a tangible, non-transitory computer-readable memory having instructions stored thereon that, when executed by the one or more processors, cause the first zone player to: |
| 17.5 | receive control information from any one of a plurality of controllers over the LAN via the network interface, wherein the received control |

---

[18] Reference numbers follow from the ID.

| | information comprises a direction for the first zone player to enter into a synchrony group with at least a second zone player; |
|---|---|
| 17.6 | in response to the direction, enter into the synchrony group with the second zone player, |
| 17.7 | wherein in the synchrony group, the first and second zone players are configured to playback audio in synchrony based at least in part on (i) audio content, (ii) playback timing information associated with the audio content, wherein the playback timing information is generated by one of the first or second zone players, and (iii) clock time information for the one of the first or second zone players, and wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players, wherein the first and second zone players remain independently clocked while playing back audio in synchrony; and |
| 17.8 | transmit status information to at least one of the plurality of controllers over the LAN via the network interface, wherein the status information comprises an indication of a status of the synchrony group. |

*Id.*, 39:59–40:25. Sonos also asserted dependent claims 21, 24, and 26 of the '258 patent. ID at 13.

The '953 patent relates generally to "the field of digital data processing devices, and more particularly to systems and method for synchronizing operations among a plurality of independently-clocked digital data processing devices." '953 patent, 1:30-34.

Sonos asserted a single independent claim (claim 7) from the '953 patent against Google, which recites as follows:

| Claim 7 of the '953 Patent | |
|---|---|
| 7.0 | A first zone player comprising: |
| 7.1 | a network interface that is configured to provide an interconnection with at least one data network; |
| 7.2 | a clock that is configured to provide a clock time of the first zone player; |
| 7.3 | at least one processor; |

| 7.4 | a tangible, non-transitory computer-readable medium; and program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform functions comprising: |
| 7.5 | receiving a request to enter into a synchrony group with at least a second zone player that is communicatively coupled with the first zone player over a local area network (LAN); |
| 7.6 | in response to receiving the request to enter into the synchrony group, entering into the synchrony group with the second zone player, wherein the first zone player is selected to begin operating as a slave of the synchrony group and the second zone player is selected to begin operating as a master of the synchrony group, and wherein the clock time of the first zone player differs from a clock time of the second zone player; after beginning to operate as the slave of the synchrony group: |
| 7.7 | receiving, from the second zone player over the LAN, clock timing information that comprises at least one reading of the clock time of the second zone player; |
| 7.8 | based on the received clock timing information, determining a differential between the clock time of the first zone player and the clock time of the second zone player; |
| 7.9 | receiving, from the second zone player over the LAN, (a) audio information for at least a first audio track and (b) playback timing information associated with the audio information for the first audio track that comprises an indicator of a first future time, relative to the clock time of the second zone player, at which the first and second zone players are to initiate synchronous playback of the audio information for the first audio track; |
| 7.10 | updating the first future time to account for the determined differential between the clock time of the first zone player and the clock time of the second zone player; and |
| 7.11 | when the clock time of the first zone player reaches the updated first future time, initiating synchronous playback of the received audio information with the second zone player. |

*Id.*, 39:37–40:21. Sonos also asserted dependent claims 14 and 22-24 of the '953 patent. ID at 56.

## 2. The ID

Before the CALJ, Google asserted that the '258 and '953 Accused Products do not infringe as imported. RIPHB at 24, 75. With respect to the '258 Accused Products, Google argued:

> The Accused Products are imported into the United States as ***standalone devices***. RX-1522C.6 (Schonfeld) at Q25. Claim 17 (and claims 21, 24, and 26, which depend from claim 17) ***require a "first zone player" that enters into a synchrony group with a "second zone player" as well as a "plurality of controllers."*** As such, the Accused Products are not capable of infringing at the time of importation. Nor are they capable of infringement if used without another Accused Product present and configured for allegedly infringing use.

*Id*. at 24 (emphasis added). Google's post-hearing brief included a similar paragraph with respect to the '953 Accused Products:

> The Accused Products are imported into the United States as ***standalone devices***. RX- 1522C (Schonfeld) at Q107. Claim 7 (and claims 14, 22, 23, and 24, which depend from claim 7) ***require a "first zone player" that is caused to enter into a synchrony group with a "second zone player."*** As such, the Accused Products are not capable of infringing at the time of importation. Nor are they capable of infringement if used without another Accused Product present and configured for allegedly infringing use.

*Id*. at 75 (emphasis added).

Sonos asserted that infringement need not take place at the time of importation. CRPHB at 1. In addition, Sonos argued that Google's Accused Products are capable of infringement (and do infringe) at the time of importation because they have software installed rendering them "functionally capable of carrying out the operations recited in the Asserted Claims." *Id*. Sonos explained that the claims in the '258 and '953 patents are apparatus claims that recite computer-readable memory having instructions stored thereon that, when executed, cause the apparatus to engage in the recited operations. *Id*. at 1-2. Sonos therefore asserted that, like the products at issue in *Finjan*, "the Accused Products include the software necessary to carry out the functions

recited by the claims," and thus infringe. *Id.* at 3 (citing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010)).

OUII submitted that "[t]he Commission has previously recognized that the [Federal Circuit] already twice rejected a time-of-importation requirement." ORPHB at 1 n.1. OUII, therefore, asserted that Google's "time-of-importation" argument should also be rejected. *Id.*

The ID's finding on this issue with respect to the '258 Accused Products is as follows:

> The Federal Circuit has rejected the argument that there is no violation because products do not infringe at the time of importation. *See Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1348-1352 (Fed. Cir. 2015) (en banc); *Comcast Corp. v. Int'l Trade Comm'n*, 951 F.3d 1301, 1308-09 (Fed. Cir. 2020) ("The Commission correctly held that Section 337 applies to articles that infringe after importation."); *see also Certain Blood Cholesterol Testing Strips*, Inv. No. 337-TA-1116, Comm'n Op. at 25-26 (May 1, 2020). The undersigned therefore rejects Google's argument that there is no violation because the '258 Accused Products are not capable of infringing at the time of importation.

ID at 16-17. The ID refers back to this finding when rejecting Google's same "time-of-importation" argument with respect to the '953 Accused Products:

> Google argues that the '953 Accused Products do not infringe because they are imported as standalone devices. RIB at 75. As previously discussed with respect to the '258 patent, the undersigned rejects this argument. *See supra* at Section VI.B.1.

*Id.* at 58.

### 3. Analysis

In its petition for review of the final ID, Google argued that the ID errs by rejecting Google's argument that there is no violation with respect to the '258 and '953 patents because the '258 and '953 Accused Products "are not capable of infringing at the time of importation." RPet. at 94-96. More specifically, Google argued:

> For the '258 [and '953] Accused Products, the products are imported as standalone devices, incapable of infringing at the time of importation, and incapable of infringing *unless used with another Accused Product that has been configured by an end-user for allegedly infringing use*. The ID's ruling is also

18

erroneous because the evidence shows that the vast majority of imported accused devices are never incorporated into an allegedly infringing system and thus do not infringe even after importation.

*Id*. at 94-95 (emphasis added).

We find Google's argument to be legally meritless. As a threshold matter, Google fails to articulate how the Commission is to evaluate this argument, *e.g.*, as a question of infringement versus statutory construction. Regardless, as properly construed, the '258 and '953 Accused Products meet the limitations of the asserted claims consistent with the requirements of Section 337. Thus, we reject Google's argument that the '258 and '953 Accused Products are not capable of infringing at the time of importation. We provide supplemental reasoning to explain that Google's argument lacks merit because it is inconsistent with the language of the Asserted Patents.

The core of Google's time-of-importation arguments regarding the '258 and '953 Accused Products is that they are "standalone devices, incapable of infringing at the time of importation, and incapable of infringing unless used with another Accused Product that has been configured by an end-user for allegedly infringing use." RPet. at 94-95. Specifically, Google argues that, to infringe the asserted claims of the '258 and '953 patents, "one or more additional Accused Products [must be purchased] and us[ed] in combination." *Id*. at 96. These arguments rely on Google's representation of (i) asserted independent claim 17 of the '258 patent—which, per Google, requires "a 'first zone player' that enters into a synchrony group with a 'second zone player' as well as a 'plurality of controllers'" (*see* RIPHB at 24), and (ii) asserted independent claim 7 of the '953 patent—which, per Google, requires "a 'first zone player' that is caused to enter into a synchrony group with a 'second zone player'" (*see id*. at 75).

The Commission disagrees with Google's characterization of claim 17 of the '258 patent and claim 7 of the '953 patent. Claim 17 of the '258 patent requires a "first zone player" (*i.e.*,

the accused device) with "tangible, non-transitory computer-readable memory *having instructions stored thereon* that, *when executed* . . . cause the first zone player to" perform the required steps, including interacting with a "second zone player" in a synchrony group. '258 patent, 39:59–40:25 (emphasis added). The same is true with respect to the "plurality of controllers" element of claim 17 of the '258 patent: a "first zone player" need only have "*instructions stored thereon* that, *when executed*" cause the device to "receive control information from any one of a plurality of controllers" and "transmit status information to at least one of the plurality of controllers." *See* '258 patent, 39:65–40:2, 40:22-23 (emphasis added). Similarly, claim 7 of the '953 patent requires a "first zone player" (*i.e.*, the accused device) with "program *instructions stored on the tangible, non-transitory computer-readable medium* that are *executable* . . . to cause the first zone player to perform functions," including interacting with a "second zone player" in a synchrony group. '953 patent, 39:37–40:21 (emphasis added).

In other words, these claims are directed to a device that is programmed to be able to perform certain functions; the actual presence of, and interaction with, a "second zone player" is not required for the "first zone player" to practice these claims. *See Finjan*, 626 F.3d at 1204 ("[T]o infringe a claim that recites capability and not actual operation, an accused device need only be capable of operating in the described mode.") (quotations omitted). Nor is there any limitation of the asserted dependent claims that recites actual operation, rather than mere capability. In addition, Google does not dispute that the '258 and '953 Accused Products, when imported into the United States, are pre-installed with software that the ID finds reads on the claim language at issue (ID at 16-24, 58-72). *See* RPet. at 94-96.

Finally, with respect to Google's time-of-importation arguments, the Federal Circuit has found:

> Section 337 contemplates that infringement may occur *after* importation. The statute defines as unlawful "the sale within the United States after importation . . . of articles that—(i) infringe . . . ." § 337(a)(1)(B)(i). The statute thus distinguishes the unfair trade act of importation from infringement by defining as unfair the importation of an article that will infringe, *i.e.*, be sold, "after importation." *Id.* Section 337(a)(1)(B)'s "sale . . . after importation" language confirms that the Commission is permitted to focus on post-importation activity to identify the completion of infringement.

*Suprema*, 796 F.3d at 1349 (emphasis and ellipses in original). The Commission has found a Section 337 violation in its investigations consistent with this precedent, and whether an imported article is an article that infringes is based on the facts of each investigation and the asserted type(s) of infringement. *See, e.g.*, *Certain Digital Video Receivers & Hardware & Software Components Thereof*, Inv. No. 337-TA-1001, Comm'n Op., 2017 WL 11249982 at *12 (Dec. 6, 2017), *aff'd*, *Comcast Corp. v. Int'l Trade Comm'n*, 951 F.3d 1301, 1308 (Fed. Cir. 2020); *Certain Blood Cholesterol Testing Strips*, Inv. No. 337-TA-1116, Comm'n Op. at 25-32 (May 1, 2020). Neither Section 337 nor Federal Circuit precedent supports Google's blanket assertion that articles must be "capable of infringing" at the time of importation in order to be subject to Section 337.

The Commission thus affirms, with the supplemental reasoning set forth above, the ID's rejection of Google's argument that there can be no violation with respect to the '258 and '953 patents because the '258 and '953 Accused Products are not capable of infringing at the time of importation.

As all limitations of the asserted claims are met with respect to claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent, and Sonos has proven

all other required elements of a Section 337 violation, the Commission affirms the ID's finding of a violation of Section 337 by Google.

## B.    Correction of Typographical Errors

The Commission has determined to correct the following two typographical errors in the ID as indicated:

(i)    In the 16th line of page 24 of the ID, inserting the following underlined text: "Accordingly, the undersigned finds that the '258 Accused Products infringe claims 17, 21, **24,** and 26."

(ii)    In the 8th line of page 84 of the ID, inserting the following underlined text: "According, the undersigned finds that the '953 DI Products**, except the Sonos Sub,** meet the limitations of claim 23."

## V.    REMEDY, THE PUBLIC INTEREST, AND BONDING

Having found a violation of Section 337 in this investigation, the Commission provides its determinations as to the appropriate remedy to address the violation found, how the public interest considerations may be affected, and the amount of bond to be imposed on infringing imports during the period of Presidential review.  The Commission has "broad discretion in selecting the form, scope, and extent of the remedy."  *Viscofan, S.A. v. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986).

## A.    Limited Exclusion Order

Section 337(d)(1) provides that "[i]f the Commission determines, as a result of an investigation under this section, that there is a violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded

from entry into the United States, unless, after considering the [public interest], it finds that such articles should not be excluded from entry." 19 U.S.C. § 1337(d)(1).

Google agrees that an LEO is the appropriate remedy, but requests several modifications to the Commission's standard LEO. RRemBr. at 11-17; RReplyRemBr. at 4-7. Sonos and OUII both submit that the Commission should issue its standard LEO. CRemBr. at 2-12; CReplyRemBr. at 3-13; ORemBr. at 5; OReplyRemBr. at 1-3.

The Commission, having found a violation of Section 337 with respect to each of the Asserted Patents, has determined to issue an LEO precluding the importation of audio players and controllers, components thereof, and products containing the same that infringe one or more of claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent, pursuant to Section 337(d)(1).

The Commission is including in the LEO an exemption for Google's redesign products that were adjudicated in this investigation and found to be non-infringing as to a particular Asserted Patent, specifically:

- As to the '258 patent, the redesign '258 NIA No. 1;

- As to the '953 patent, the redesign '953 NIA No. 1;

- As to the '959 patent, the redesign '959 NIA No. 4;

- As to the '949 patent, the redesigns submitted for adjudication by Google with respect to the '949 patent; and

- As to the '896 patent, the redesign '896 NIA No. 2.

ID at 26-34, 73-74, 107-08, 132, 162-65; *Certain Elec. Devices Including Streaming Players, Televisions, Set Top Boxes, Remote Controllers, & Components Thereof* ("*Streaming Players*"),

Inv. No. 337-TA-1200, Comm'n Op. at 36 (Dec. 3, 2021) (exempting two revised Roku products that were adjudicated and found to be non-infringing).

The Commission is also including in the LEO a certification provision allowing U.S. Customs and Border Protection ("CBP"), at its discretion, to require an importer seeking to import to certify that, to the best of its knowledge and after having obtained a determination from the Commission, that the articles it seeks to import are not excluded from entry under the LEO. The Commission recognizes Sonos' valid concerns regarding the possible difficulty CBP may have in identifying Google's redesign products that were adjudicated and found to be non-infringing. *See* CReplyRemBr at 8. Accordingly, the Commission is including in the LEO the following language to address these concerns:

> At the discretion of CBP and pursuant to the procedures it establishes, persons seeking to import audio players and controllers, components thereof, and products containing the same that are potentially subject to this Order may be required to certify that they are familiar with the terms of this Order, that they have made appropriate inquiry, and thereupon state that, to the best of their knowledge and belief, the products being imported are not excluded from entry under paragraph 1 of this Order, including because the products incorporate the features or functionalities of a redesigned product adjudicated by the Commission in the violation investigation not to infringe, and thus such products do not fall within the scope of this Order. At its discretion, CBP may require persons who have provided the certification described in this paragraph to furnish such records or analyses as are necessary to substantiate the certification.

The Commission, as is customary, does not limit the LEO to covered products that were actually adjudicated to infringe the Asserted Patents, thus ensuring that the exclusion order affords Sonos "complete relief" and cannot be "easily circumvented." *Streaming Players*, Inv. No. 337-TA-1200, Comm'n Op. at 36 (citing *Certain Graphics Sys., Components Thereof, & Consumer Prods. Containing Same*, Inv. No. 337-TA-1044, Comm'n Op. at 66 (Sept. 18, 2018) (LEO covers any of respondents' products that infringe the patent at issue and is not limited to particular models); *Certain Human Milk Oligosaccharides & Methods of Producing Same*

("*Human Milk Oligosaccharides*"), Comm'n Op. at 19-20, 2020 WL 3073788 at *11 (June 20, 2020) (redesigned products may still fall within the scope of the remedial orders even if they were not adjudicated for infringement in the original investigation), *aff'd*, *Jennewein Biotechnologie GmbH v. Int'l Trade Comm'n*, 2021 WL 4250784 (Fed. Cir. Sept. 17, 2021) (unpublished); *Certain Hardware Logic Emulation Sys. & Components Thereof*, Inv. No. 337-TA-383, Comm'n Op. at 15-17, 1998 WL 307240 at *9 (March 1998) (Commission's remedial orders typically extend to products covered by the patent claims at issue and are not limited only to specific models selected for the infringement analysis in order to avoid easy circumvention)).[19]

The Commission declines Google's request to include in the LEO an exemption for warranty, repair, and replacement of the Accused Products sold prior to the effective date of the remedial orders. "The Commission has granted such exemptions when unopposed, in view of the public interest, or upon some showing of a need for service and repair." *Certain Robotic Vacuum Cleaning Devices*, Inv. No. 337-TA-1057, Comm'n Op. at 58-59 (Feb. 1, 2019); *see id.* at nn.25-27 (collecting cases). Sonos opposes Google's request. CRemBr. at 7. Google further failed to provide evidence that the public interest supports this request, or that there otherwise is

---

[19] A Commission order is typically not limited to the accused products, but includes all products within the scope of the investigation that are covered by the patent claims as to which a violation has been found. *See Certain Road Construction Machines & Components Thereof*, Inv. No. 337-TA-1088 (Modification), Comm'n Op. at 22-34 (Aug. 31, 2020). Where a product has not been accused by the complainant, it is incumbent upon a respondent to put a particular product at issue during discovery, and in its substantive arguments before the ALJ, if it wants a particular product to be explicitly adjudicated as not infringing. *Human Milk Oligosaccharides*, Inv. No. 337-TA-1120, Comm'n Op. at 18-19. To the extent that Google seeks to import a product that has not been adjudicated as non-infringing in this proceeding, Google may take advantage of procedures offered by the Commission to obtain such an adjudication under Commission Rules 210.76 (modification) and 210.79 (advisory opinion) or may request a ruling from CBP under 19 C.F.R. Part 177. Google cannot utilize the certification provision in the order for non-accused products because it applies only to products that have been explicitly adjudicated to be non-infringing.

a need for such a provision.  In addition, the necessity for such a provision in order for Google to comply with its warranty obligations is questionable given the existence of adjudicated non-infringing redesigns and Google's apparent ability to comply with its warranty obligations by replacing an infringing product with a functionally equivalent product or refunding the purchase price of the infringing product.  CReplyRemBr. at 11 (citing https://support.google.com/product-documentation/troubleshooter/3070579#ts=11052496 (Google has the "sole discretion . . . [to] replace your Google Product with a new or refurbished Google Product functionally at least equivalent to yours, or accept the return of your Google Product in exchange for a refund of the purchase price you paid for your Google Product.")).

## B.      Cease and Desist Order

Section 337(f)(1) provides that in addition to, or in lieu of, the issuance of an exclusion order, the Commission may issue a CDO as a remedy for violation of Section 337.  *See* 19 U.S.C. § 1337(f)(1).  CDOs are generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order.[20] *See, e.g.*, *Certain Table Saws Incorporating Active Injury Mitigation Tech. & Components Thereof* ("*Table Saws*"), Inv. No. 337-TA-965, Comm'n Op. at 4-6 (Feb. 1, 2017); *Certain Protective Cases & Components Thereof*, Inv. No. 337-TA-780, USITC Pub. No. 4405, Comm'n Op. at 28 (Nov. 19, 2012).  Complainants bear the burden on this issue.  "A complainant seeking

---

[20] When the presence of infringing domestic inventory or domestic operations is asserted as the basis for a CDO under Section 337(f)(1), Commissioner Schmidtlein does not adopt the view that the inventory or domestic operations needs to be "commercially significant" in order to issue the CDO.  *See, e.g.*, *Certain Magnetic Tape Cartridges & Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 65, n.24 (Mar. 25, 2019); *Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 6-7, n.2.  In Commissioner Schmidtlein's view, the presence of some infringing domestic inventory or domestic operations, regardless of its commercial significance, provides a basis to issue a CDO.  *Id.*

a cease and desist order must demonstrate, based on the record, that this remedy is necessary to address the violation found in the investigation so as to not undercut the relief provided by the exclusion order." *Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 5 (collecting cases); *see also* H.R. REP. No. 100-40, at 160 (1987).

The Commission has determined to issue a CDO directed to respondent Google, with the standard language and the exemption noted above for the Google redesigned products adjudicated to be non-infringing. The Commission finds that a CDO is warranted in view of Google's domestic inventory of ███████ units of products that infringe the Asserted Patents as of October 1, 2020. RD at 184-85.

Google does not dispute that its domestic inventory of accused products is "commercially significant." For the first time in these proceedings, however, Google argues that any CDO should include an exemption "that permits Google to donate to non-profit organizations Accused Products that are still in domestic inventory as of the effective date of the order." RRemBr. at 18. Per Google, such an exemption "would greatly benefit the public at no cost or harm to Sonos" and "forcing Google to dispose of these products is wasteful, serves no public interest purpose, and would needlessly deprive at-need communities from free and very much needed access to these products." *Id.*

The Commission declines to include an exemption to permit Google to donate to non-profit organizations the infringing products in its domestic inventory as of the CDO's effective date. Sonos raises a number of questions regarding the scope of the requested exemption that remain unanswered because Google did not request this exemption until remedy briefing before the Commission. CReplyRemBr. at 13-14. On the sparse record available at this stage, the Commission agrees with Sonos that the proposed, unbounded exemption could enable Google to

flood the market with infringing devices, thus inflicting harm on Sonos notwithstanding the LEO and CDO, and Google has failed to provide any evidence to support its assertion that the exemption it seeks would result in "no cost or harm to Sonos." *See id.*

The Commission also declines, as with the LEO, to limit the CDO to covered products that were actually adjudicated to infringe the Asserted Patents, or to include an exemption for the warranty, repair, and replacement of the covered products sold prior to the effective date of the remedial orders.

### C. Public Interest

Section 337 requires the Commission, upon finding a violation of Section 337, to issue an LEO "unless, after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry." 19 U.S.C. § 1337(d)(l). The Commission must also consider these public interest factors before issuing a CDO. 19 U.S.C. § 1337(f)(1).

Under appropriate facts and circumstances, the Commission may determine that no remedy should issue because of the adverse impacts on the public interest. *See, e.g.*, *Certain Fluidized Supporting Apparatus & Components Thereof*, Inv. Nos. 337-TA-182/188, USITC Pub. 1667, Comm'n Op. at 1-2, 23-25 (Oct. 1984) (finding that the public interest warranted denying complainant's requested relief). Moreover, when the circumstances of a particular investigation so require, the Commission has tailored its relief in light of the statutory public interest factors.

The statute requires the Commission to consider and make findings on the public interest in every case in which a violation is found regardless of the quality or quantity of public interest information supplied by the parties. 19 U.S.C. § 1337(d)(l), (f)(l). The Commission publishes a

notice inviting the parties as well as interested members of the public and interested government agencies to gather and present evidence on the public interest at multiple junctures in the proceeding.[21] *See, e.g.*, 19 C.F.R. § 210.50(a)(4); 86 Fed. Reg. 67491-93 (Nov. 26, 2021).

In this investigation, the Commission received comments on the public interest from Google, Sonos, and OUII.[22]  The Commission also received comments on the public interest from 17 third parties.[23]  The Commission finds that neither the parties nor the third parties raise concerns that would preclude the issuance of relief in this investigation.

### 1.    Public Health and Welfare

The first public interest factor is the effect of the remedy on "the public health and welfare."  19 U.S.C. § 1337(d)(1), (f)(1).  The Commission has historically examined a remedy's effect on the public health and welfare by looking to whether "an exclusion order would deprive the public of products necessary for some important health or welfare need[.]"  *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1360 (Fed. Cir. 2010).  Google contends that excluding its infringing products would harm the health and welfare of people with disabilities, such as blind or paralyzed individuals, whose daily activities are improved by the "unaccused functionality" of the accused products that "allow[s] users to control . . . actions on compatible smart home devices using voice commands."  RReplyRemBr. at 9.  Similar concerns were expressed by several third parties.  *See, e.g.*, AFB Sub. at 2, EDIS Doc. ID 757760 ("Smart home devices, including speakers, still serve as a tool for improving daily living opportunities and access to the

---

[21] The Commission did not ask the CALJ to make findings regarding the public interest when it instituted the investigation.  *See* 85 Fed. Reg. at 7783.

[22] RRemBr. at 4-11; RReplyRemBr. at 9-11; CRemBr. at 18-22; CReplyRemBr. at 20-32; ORemBr. at 6-8; OReplyRemBr. at 4-7.

[23] *See supra* notes 1, 12, and 14.

home environment for people who are blind or have low vision."); CCF Sub. at 2, EDIS Doc. ID 757782 ("[A]ny action that would impact the availability of [Google's] products would have a negative impact on the public welfare of the young adults we serve, as well as the many thousands of young adults with physical disabilities living in the United States."); CCIA Sub. at 2, EDIS Doc. ID 757762 ("[S]mart speakers are used as part of home control systems for disabled people, allowing them to control their physical environment via voice and helping mitigate their disabilities. Excluding these devices directly impacts the health and welfare of disabled individuals."); USA Sub. at 1, EDIS Doc. ID 699787 ("[T]he alleged Infringing Products have enhanced and become part of the lifestyles of tens of thousands of people with disabilities. Many tasks easily performed by those without disabilities can be performed without assistance by people with disabilities, eliminating the need for personal assistance and emancipating the users.").

However, there is no evidence of record to suggest that Google's devices are uniquely capable of assisting people with disabilities. *See* CReplyRemBr. at 26 ("Google does not even attempt to argue that the supposed benefits offered by its infringing devices are distinct from those offered by competitors like Apple, Amazon, Nokia, Motorola, and HTC. . . . [And] there is no dispute that, like countless other devices from competing manufacturers, Sonos speakers incorporate voice assistant technologies, including Google's voice assistant, and can thus also operate lights, locks, thermostats, *etc.*"); *cf. Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 9 ("[P]roducts need not be identical to serve as reasonable substitutes for each other."). Nor does Google contend that the adjudicated non-infringing redesigns are insufficient in this respect. In fact, in September 2021, Google represented that it " ██████████████████████████ ███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████" RPResp. at 8; *id.* at 8 n.6.  Accordingly, the Commission finds

that the evidence does not indicate that the issuance of a remedy in this investigation would be

contrary to the public health and welfare.

## 2.    Competitive Conditions in the United States

The second public interest factor is the effect of the remedy on "competitive conditions in

the United States economy."  19 U.S.C. § 1337(d)(1), (f)(1).  Google argues, without explanation

or evidentiary support, that a remedy in this case would hamper innovation.  RRemBr. at 7.

Some comments submitted in this investigation, however, argue that effective enforcement of

legitimate patent rights encourages competition among providers and innovation in new

technologies and competing products.  *See* AELP Sub. at 3, EDIS Doc. ID 751568 ("[I]ssuing an

exclusion order against the infringing Google devices is a necessary step in upholding the rights

of independent innovators to fairly compete in global markets."); IA Sub. at 2, EDIS Doc. ID

751563 ("Vigorous enforcement and protection of intellectual property rights are essential to the

competitive viability of innovative companies within the United States."); *see also Streaming*

*Players*, Inv. No. 337-TA-1200, Comm'n Op. at 40.  OUII suggests that this is particularly true

where, as here, there are a number of other competitors that sell smart speakers in the United

States.  *See* ORemBr. at 7 ("The evidence further shows that competitive speakers exist in the

United States (*e.g.*, from Bose Corporation, Harman International, and Yamaha Corporation).").

Moreover, as discussed above, the availability of Google's adjudicated non-infringing redesigns

offsets any concerns regarding Sonos and its licensees' ability to supply the market.  Thus, the

evidence of record shows that excluding Google's infringing products would not adversely affect

competitive conditions in the United States or the ability of other companies to innovate or

compete in this space.

### 3. The Production of Like or Directly Competitive Articles in the United States

The third public interest factor is the effect of the remedy on "the production of like or directly competitive articles in the United States." 19 U.S.C. § 1337(d)(1), (f)(1). No party has argued that this factor weighs against issuing a remedy, and, as OUII notes, "[n]o party disputes the absence of evidence that the requested remedial orders would have a negative effect on the production of like or directly competitive articles in the United States." OReplyRemBr. at 6. Accordingly, the Commission finds that the evidence of record as to this factor does not counsel against issuing a remedy.

### 4. United States Consumers

The fourth and final public interest factor is the effect of the remedy on "United States consumers." 19 U.S.C. § 1337(d)(1), (f)(1). Google's only argument as to the effect of the exclusion of its products on U.S. consumers is that the price of Sonos' speakers is "higher than any Google or other home speaker products" and "puts them beyond the reach of many Americans." RRemBr. at 9. Importantly, however, Google does not provide evidence of a direct price comparison between and among the competing home speaker products in the United States to support this argument. Nor could it, given the testimony of its own economic expert, Ms. Mulhern, in this investigation. Google's expert testified that she agreed with Sonos' expert that no price differential between the Google and Sonos products can be made on the basis of the record evidence in this investigation, thus undermining Google's price argument as to the Sonos products here. *See* RX-1524C at Q/A 88-95. Moreover, the evidence shows that consumers have available many choices in competitive products other than those produced by Sonos, *see* OReplyRemBr. at 6, including Google's adjudicated non-infringing redesigns. The Commission

thus finds that the evidence of record as to this factor does not weigh against the issuance of a remedy.

### D. Bond

If the Commission enters an exclusion order or a cease and desist order, a respondent may continue to import and sell its products during the 60-day period of Presidential review under a bond in an amount determined by the Commission to be "sufficient to protect the complainant from any injury." 19 U.S.C. § 1337(j)(3); *see also* 19 C.F.R. § 210.50(a)(3).

When reliable price information is available in the record, the Commission has often set the bond in an amount that would eliminate the price differential between the domestic product and the imported, infringing product. *See Certain Microsphere Adhesives, Processes for Making Same, & Prods. Containing Same, Including Self-stick Repositionable Notes*, Inv. No. 337-TA-366, USITC Pub. No. 2949, Comm'n Op. at 24 (Jan. 16, 1996). The Commission has also used a reasonable royalty rate to set the bond amount where a reasonable royalty rate could be ascertained from the evidence in the record. *See, e.g.*, *Certain Audio Digital-to-Analog Converters & Prods. Containing Same*, Inv. No. 337-TA-499, Comm'n Op. at 25 (Mar. 3, 2005). Where the record establishes that the calculation of a price differential is impractical or there is insufficient evidence in the record to determine a reasonable royalty, the Commission has imposed a 100 percent bond. *See, e.g.*, *Certain Liquid Crystal Display Modules, Prods. Containing Same, & Methods Using the Same* ("*Liquid Crystal Display Modules*"), Inv. No. 337-TA-634, Comm'n Op. at 6-7 (Nov. 24, 2009). The complainant bears the burden of establishing the need for a bond. *Certain Rubber Antidegradants, Components Thereof & Prods. Containing Same*, Inv. No. 337-TA-533, USITC Pub. No. 3975, Comm'n Op. at 40 (July 21, 2006).

The Commission has determined to impose a bond in the amount of 100 percent of entered value during the period of Presidential review. The RD finds, and the Commission

agrees, that "Google's continued importation of infringing goods during the presidential review period would injure Sonos" because the record indicates that (i) Sonos competes with Google in the relevant product market and (ii) "Google offers lower priced speaker offerings that can adversely affect Sonos' ability to counter price erosion." RD at 186.

With respect to determining the bond amount, "[b]oth parties' economic experts agree that a bond rate cannot be based on a price differential between the infringing and domestic industry products." *Id*. at 187. Furthermore, the Commission agrees with the RD's finding that neither of the two Sonos portfolio license agreements in the record provides a basis to calculate a bond. *See id*. at 187-88; CReplyRemBr. at 20 (discussing issues with proposed "industry royalty rate" of 4.5%). Absent the ability to determine a price differential or a reasonable royalty, imposition of a bond of 100 percent is appropriate. *See Liquid Crystal Display Modules*, Inv. No. 337-TA-634, Comm'n Op. at 6-7 ("We see no reason to deviate from our practice of imposing a 100 percent bond where there is insufficient evidence in the record to determine a reasonable royalty rate, and the record indicates that the calculation of a price differential is impractical.").

## VI.  CONCLUSION

For the reasons set forth herein and in the ID, the Commission determines that Sonos has established a violation of Section 337 by Google with respect to claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent. Accordingly, the investigation is terminated with a finding of violation of Section 337. The Commission determines that the appropriate remedy is a limited exclusion order and cease and desist order, and further finds that the public interest does not preclude issuance of a remedy. The

Commission sets a bond in the amount of 100 percent of the entered value of imports during the

Presidential review period.

By order of the Commission.

Issued: February 1, 2022.

**Lisa R. Barton**,
*Secretary to the Commission*.

Page Intentionally Omitted

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1191** |

## <u>LIMITED EXCLUSION ORDER</u>

The United States International Trade Commission ("Commission") has determined that there is a violation of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), in the unlawful importation, sale for importation, or sale within the United States after importation by respondent Google LLC ("Respondent") of certain audio players and controllers, components thereof, and products containing the same (as defined in paragraph 2 below) that infringe one or more of claims 17, 21, 24, and 26 of U.S. Patent No. 9,195,258 ("the '258 patent"); claims 7, 14, and 22-24 of U.S. Patent No. 10,209,953 ("the '953 patent"); claim 10 of U.S. Patent No. 9,219,959 ("the '959 patent"); claims 1, 2, and 5 of U.S. Patent No. 8,588,949 ("the '949 patent"); and claims 1, 5, 6, and 12 of U.S. Patent No. 10,439,896 ("the '896 patent") (collectively, the "Asserted Patents").

Having reviewed the record in this investigation, including the written submissions of the parties, the Commission has made its determinations on the issues of remedy, the public interest, and bonding. The Commission has determined that the appropriate form of relief includes a limited exclusion order prohibiting the unlicensed entry into the United States of infringing audio players and controllers, components thereof, and products containing the same manufactured by or on behalf of Respondent or any of its affiliated companies, parents, subsidiaries, agents, or other related business entities, or its successors or assigns.

The Commission has also determined that the public interest factors enumerated in 19 U.S.C. § 1337(d) do not preclude the issuance of the limited exclusion order, and that the bond during the period of Presidential review shall be in the amount of 100 percent of the entered value of the articles subject to this Order.

Accordingly, the Commission hereby **ORDERS** that:

1.      Audio players and controllers, components thereof, and products containing the same that infringe one or more of claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent and are manufactured abroad by or on behalf of, or imported by or on behalf of Respondent or any of its affiliated companies, parents, subsidiaries, agents, or other related business entities, or its successors or assigns, are excluded from entry for consumption into the United States, entry for consumption from a foreign-trade zone, or withdrawal from a warehouse for consumption, for the remaining terms of the Asserted Patents, except under license from, or with the permission of, the patent owner or as provided by law.

2.      The audio players and controllers, components thereof, and products containing the same that are subject to this Order (the "covered articles") are as follows:  networked speaker devices and devices (for example, mobile phones and laptops) capable of controlling these devices that incorporate the infringing technology.  Covered articles shall not include the Google redesign products that were adjudicated in this investigation and found to be non-infringing (*i.e.*, (i) as to the '258 patent, the redesign '258 NIA No. 1; (ii) as to the '953 patent, the redesign '953 NIA No. 1; (iii) as to the '959 patent, the redesign '959 NIA No. 4; (iv) as to the '949 patent, the redesigns submitted for adjudication by Google with respect to the '949 patent; and (v) as to the '896 patent, the redesign '896 NIA No. 2).

3.    Notwithstanding paragraph 1 of this Order, covered articles are entitled to entry into the United States for consumption, entry for consumption from a foreign-trade zone, or withdrawal from a warehouse for consumption, under bond in the amount of 100 percent of their entered value, pursuant to 19 U.S.C. § 1337(j) and the Presidential Memorandum for the United States Trade Representative of July 21, 2005 (70 Fed. Reg. 43,251), from the day after this Order is received by the United States Trade Representative until such time as the United States Trade Representative notifies the Commission that this Order is approved or disapproved but, in any event, not later than sixty (60) days after the receipt of this Order.  All entries of covered articles made pursuant to this paragraph are to be reported to U.S. Customs and Border Protection ("CBP"), in advance of the date of the entry, pursuant to procedures CBP establishes.

4.    At the discretion of CBP and pursuant to the procedures it establishes, persons seeking to import audio players and controllers, components thereof, and products containing the same that are potentially subject to this Order may be required to certify that they are familiar with the terms of this Order, that they have made appropriate inquiry, and thereupon state that, to the best of their knowledge and belief, the products being imported are not excluded from entry under paragraph 1 of this Order, including because the products incorporate the features or functionalities of a redesigned product adjudicated by the Commission in the violation investigation not to infringe, and thus such products do not fall within the scope of this Order. At its discretion, CBP may require persons who have provided the certification described in this paragraph to furnish such records or analyses as are necessary to substantiate the certification.

5.    In accordance with 19 U.S.C. § 1337(l), the provisions of this Order shall not apply to covered articles that are imported by and for the use of the United States, or imported for, and to be used for, the United States with the authorization or consent of the Government.

3

6.    The Commission may modify this Order in accordance with the procedures described in Rule 210.76 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.76).

7.    The Secretary shall serve copies of this Order upon each party of record in this investigation and upon CBP.

8.    Notice of this Order shall be published in the Federal Register.

By order of the Commission.

Issued: January 6, 2022.

**Lisa R. Barton**,
*Secretary to the Commission*.

| In the Matter of | |
|---|---|
| **CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | Investigation No. 337-TA-1191 |

## <u>CEASE AND DESIST ORDER</u>

**IT IS HEREBY ORDERED THAT RESPONDENT** Google LLC of Mountain View, California, cease and desist from conducting any of the following activities in the United States: importing, selling, offering for sale, marketing, advertising, distributing, transferring (except for exportation), soliciting United States agents or distributors, and aiding or abetting other entities in the importation, sale for importation, sale after importation, transfer (except for exportation), or distribution of audio players and controllers, components thereof, and products containing the same (as defined in Definition (G) below) that infringe one or more of claims 17, 21, 24, and 26 of U.S. Patent No. 9,195,258 ("the '258 patent"); claims 7, 14, and 22-24 of U.S. Patent No. 10,209,953 ("the '953 patent"); claim 10 of U.S. Patent No. 9,219,959 ("the '959 patent"); claims 1, 2, and 5 of U.S. Patent No. 8,588,949 ("the '949 patent"); and claims 1, 5, 6, and 12 of U.S. Patent No. 10,439,896 ("the '896 patent") (collectively, the "Asserted Patents") in violation of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337).

## I.
## Definitions

As used in this order:

(A)     "Commission" shall mean the United States International Trade Commission.

(B)     "Complainant" shall mean Sonos, Inc. of Santa Barbara, California.

(C)     "Respondent" shall mean Google LLC ("Google") of Mountain View, California.

(D)     "Person" shall mean an individual, or any non-governmental partnership, firm, association, corporation, or other legal or business entity other than Respondent or its majority-owned or controlled subsidiaries, successors, or assigns.

(E)     "United States" shall mean the fifty States, the District of Columbia, and Puerto Rico.

(F)     The terms "import" and "importation" refer to importation for entry for consumption under the Customs laws of the United States.

(G)     The term "covered products" shall mean audio players and controllers, components thereof, and products containing the same that infringe one or more of claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent. The audio players and controllers, components thereof, and products containing the same that are subject to this Order are as follows: networked speaker devices and devices (for example, mobile phones and laptops) capable of controlling these devices that incorporate the infringing technology. Covered products shall not include articles for which a provision of law or license avoids liability for infringement. Covered products also shall not include the Google redesign products that were adjudicated in this investigation and found to be non-infringing (*i.e.*, (i) as to the '258 patent, the redesign '258 NIA No. 1; (ii) as to the '953 patent, the redesign '953 NIA No. 1; (iii) as to the '959 patent, the redesign '959 NIA No. 4; (iv) as to the '949 patent,

2

the redesigns submitted for adjudication by Google with respect to the '949 patent; and (v) as to the '896 patent, the redesign '896 NIA No. 2).

## II.
## Applicability

The provisions of this Cease and Desist Order shall apply to Respondent and to any of its principals, stockholders, officers, directors, employees, agents, distributors, controlled (whether by stock ownership or otherwise) and majority-owned business entities, successors, and assigns, and to each of them, insofar as they are engaging in conduct prohibited by section III, *infra*, for, with, or otherwise on behalf of, Respondent.

## III.
## Conduct Prohibited

The following conduct of Respondent in the United States is prohibited by this Order. For the remaining terms of the Asserted Patents, Respondent shall not:

(A) import or sell for importation into the United States covered products;

(B) market, distribute, sell, offer to sell, or otherwise transfer (except for exportation) in the United States imported covered products;

(C) advertise imported covered products;

(D) solicit U.S. agents or distributors for imported covered products; or

(E) aid or abet other entities in the importation, sale for importation, sale after importation, transfer, or distribution of covered products.

## IV.
## Conduct Permitted

Notwithstanding any other provision of this Order, specific conduct otherwise prohibited by the terms of this Order shall be permitted if:

3

(A)    in a written instrument, the owner of the Asserted Patents licenses or authorizes such specific conduct; or

(B)    such specific conduct is related to the importation or sale of covered products by or for the United States.

**V.**
**Reporting**

For purposes of this requirement, the reporting periods shall commence on January 1 of each year and shall end on the subsequent December 31.  The first report required under this section shall cover the period from the date of issuance of this Order through December 31, 2022.  This reporting requirement shall continue in force until such time as Respondent has truthfully reported, in two consecutive timely filed reports, that it has no inventory (whether held in warehouses or at customer sites) of covered products in the United States.

Within thirty (30) days of the last day of the reporting period, Respondent shall report to the Commission:  (a) the quantity in units and the value in dollars of covered products that it has (i) imported and/or (ii) sold in the United States after importation during the reporting period, and (b) the quantity in units and value in dollars of reported covered products that remain in inventory in the United States at the end of the reporting period.

When filing written submissions, Respondent must file the original document electronically on or before the deadlines stated above.  Submissions should refer to the investigation number ("Inv. No. 337-TA-1191") in a prominent place on the cover pages and/or the first page.  *See* Handbook for Electronic Filing Procedures, http://www.usitc.gov/secretary/fed_reg_notices/rules/handbook_on_electronic_filing.pdf. Persons with questions regarding filing should contact the Secretary (202-205-2000).  If Respondent desires to submit a document to the Commission in confidence, it must file the

4

original and a public version of the original with the Office of the Secretary and must serve a copy of the confidential version on Complainant's counsel.[1]

Any failure to make the required report or the filing of any false or inaccurate report shall constitute a violation of this Order, and the submission of a false or inaccurate report may be referred to the U.S. Department of Justice as a possible criminal violation of 18 U.S.C. § 1001.

## VI.
## Record-Keeping and Inspection

(A)    For the purpose of securing compliance with this Order, Respondent shall retain any and all records relating to the sale, marketing, or distribution in the United States of covered products, made and received in the usual and ordinary course of business, whether in detail or in summary form, for a period of three (3) years from the close of the fiscal year to which they pertain.

(B)    For the purposes of determining or securing compliance with this Order and for no other purpose, subject to any privilege recognized by the federal courts of the United States, and upon reasonable written notice by the Commission or its staff, duly authorized representatives of the Commission shall be permitted access and the right to inspect and copy, in Respondent's principal offices during office hours, and in the presence of counsel or other representatives if Respondent so chooses, all books, ledgers, accounts, correspondence, memoranda, and other records and documents, in detail and in summary form, that must be retained under subparagraph VI(A) of this Order.

---

[1] Complainant must file a letter with the Secretary identifying the attorney to receive reports and bond information associated with this Order. The designated attorney must be on the protective order entered in the investigation.

# VII.
## Service of Cease and Desist Order

The Secretary shall serve copies of this Order upon each party of record in this investigation that has retained counsel or otherwise provided a point of contact for electronic service and upon CBP. While temporary remote operating procedures are in place in response to COVID-19, the Office of the Secretary is not able to serve parties that have not retained counsel or otherwise provided a point of contact for electronic service. Accordingly, pursuant to Commission Rules 201.16(a) and 210.7(a)(1) (19 CFR 201.16(a), 210.7(a)(1)), the Commission orders that Complainant complete service of this Order for any party without a method of electronic service noted on the attached Certificate of Service and shall file proof of service on the Electronic Document Information System (EDIS).

Respondent is ordered and directed to:

(A)     Serve, within fifteen (15) days after the effective date of this Order, a copy of this Order upon each of its respective officers, directors, managing agents, agents, and employees who have any responsibility for the importation, marketing, distribution, transfer, or sale of imported covered products in the United States;

(B)     Serve, within fifteen (15) days after the succession of any persons referred to in subparagraph VII(A) of this Order, a copy of the Order upon each successor; and

(C)     Maintain such records as will show the name, title, and address of each person upon whom the Order has been served, as described in subparagraphs VII(A) and VII(B) of this Order, together with the date on which service was made.

The obligations set forth in subparagraphs VII(B) and VII(C) shall remain in effect until the expiration of the Asserted Patents.

6

## VIII.
## Confidentiality

Any request for confidential treatment of information obtained by the Commission pursuant to section VI of this Order should be made in accordance with section 201.6 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 201.6). For all reports for which confidential treatment is sought, Respondent must provide a public version of such report with confidential information redacted.

## IX.
## Enforcement

Violation of this Order may result in any of the actions specified in section 210.75 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.75), including an action for civil penalties under section 337(f) of the Tariff Act of 1930 (19 U.S.C. § 1337(f)), as well as any other action that the Commission deems appropriate. In determining whether Respondent is in violation of this Order, the Commission may infer facts adverse to Respondent if it fails to provide adequate or timely information.

## X.
## Modification

The Commission may amend this Order on its own motion or in accordance with the procedure described in section 210.76 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.76).

## XI.
## Bonding

The conduct prohibited by section III of this Order may be continued during the sixty-day period in which this Order is under review by the United States Trade Representative, as delegated by the President (70 Fed. Reg. 43,251 (Jul. 21, 2005)), subject to Respondent's posting

7

of a bond in the amount of 100 percent of the entered value of the covered products.  This bond

provision does not apply to conduct that is otherwise permitted by section IV of this Order.

Covered products imported on or after the date of issuance of this Order are subject to the entry

bond as set forth in the exclusion order issued by the Commission and are not subject to this

bond provision.

By order of the Commission.

Issued: January 6, 2022.

**Lisa R. Barton**,
*Secretary to the Commission*.

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| In the Matter of | |
| --- | --- |
| **CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1191** |

**NOTICE OF A FINAL DETERMINATION FINDING A VIOLATION OF SECTION 337; ISSUANCE OF A LIMITED EXCLUSION ORDER AND A CEASE AND DESIST ORDER; TERMINATION OF INVESTIGATION**

**AGENCY**:     U.S. International Trade Commission.

**ACTION**:     Notice.

**SUMMARY**:  Notice is hereby given that the U.S. International Trade Commission has determined that respondent Google LLC ("Google") has violated section 337 of the Tariff Act of 1930, as amended, by importing, selling for importation, or selling in the United States after importation certain audio players and controllers, components thereof, and products containing the same that infringe one or more claims of U.S. Patent Nos. 9,195,258; 10,209,953; 9,219,959; 8,588,949; and 10,439,896.  The Commission has determined that the appropriate remedies are a limited exclusion order and a cease and desist order against Google.  The Commission has also determined to set a bond in the amount of 100 percent of the entered value of the infringing products imported during the period of Presidential review.  This investigation is hereby terminated.

**FOR FURTHER INFORMATION CONTACT**:  Richard P. Hadorn, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-3179.  Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*.  For help accessing EDIS, please email *EDIS3Help@usitc.gov*.  General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*.  Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION**:  On February 11, 2020, the Commission instituted this investigation based on a complaint filed by Sonos, Inc. ("Sonos") of Santa Barbara, California. 85 FR 7783 (Feb. 11, 2020).  The complaint alleges violations of section 337 of the Tariff Act of

1

1930, as amended (19 U.S.C. 1337) ("section 337"), based on the importation into the United States, the sale for importation, or the sale within the United States after importation of certain audio players and controllers, components thereof, and products containing the same by reason of infringement of certain claims of U.S. Patent Nos. 9,195,258 ("the '258 patent"); 10,209,953 ("the '953 patent"); 8,588,949 ("the '949 patent"); 9,219,959 ("the '959 patent"); and 10,439,896 ("the '896 patent"). *Id.* The complaint further alleges that a domestic industry exists. *Id.* The notice of investigation named as respondents Google and Alphabet Inc. ("Alphabet"), both of Mountain View, California. *Id.* The Office of Unfair Import Investigations ("OUII") is also named as a party. *Id.*

On September 21, 2020, the Commission terminated the investigation as to Alphabet based on withdrawal of the allegations in the complaint directed to Alphabet. Order No. 18 (Sept. 1, 2020), *unreviewed by* Comm'n Notice (Sept. 21, 2020). On November 24, 2020, the Commission determined that the importation requirement has been satisfied. Order No. 27 (Oct. 27, 2020), *unreviewed by* Comm'n Notice (Nov. 24, 2020). On February 2, 2021, the Commission determined that the technical prong of the domestic industry requirement has been satisfied as to the '949 patent. Order No. 32 (Jan. 4, 2021), *unreviewed by* Comm'n Notice (Feb. 2, 2021). On February 16, 2021, the Commission determined that the economic prong of the domestic industry requirement has been satisfied as to all asserted patents. Order No. 35 (Jan. 14, 2021), *reviewed and aff'd by* Comm'n Notice (Feb. 16, 2021). On March 12, 2021, the Commission partially terminated the investigation based on withdrawal of the allegations in the complaint as to the following asserted claims: claims 22 and 23 of the '258 patent; claims 12 and 13 of the '953 patent; claims 5, 9, 29, and 35 of the '959 patent; and claim 3 of the '896 patent. Order No. 58 (Feb. 23, 2021), *unreviewed by* Comm'n Notice (Mar. 12, 2021).

On August 13, 2021, the CALJ issued a combined initial determination ("ID") on violation and a recommended determination ("RD") on remedy and bonding. The ID finds violations of section 337 with respect to the following claims of the asserted patents: claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent. ID at 180-82. The RD recommends that, should the Commission determine that violations of section 337 occurred, the Commission should: (i) issue a limited exclusion order against Google; (ii) issue a cease and desist order against Google; and (iii) set a 100 percent bond for any importations of infringing products during the period of Presidential review. RD at 182-88.

On August 27, 2021, Sonos and Google each filed a petition seeking review of certain findings in the ID. On September 7, 2021, the private parties filed responses to each other's petitions, and OUII filed a combined response to both petitions.

On September 13, 2021, the Commission received eight submissions on the public interest from members of the public in response to the Commission's *Federal Register* notice. *See* 86 FR 46715 (Aug. 19, 2021). The Commission did not receive submissions on the public interest from the parties pursuant to Commission Rule 210.50(a)(4) (19 CFR 210.50(a)(4)).

2

On November 19, 2021, the Commission determined to review the ID in part with respect to the ID's analysis of whether the products accused of infringing the '258 and '953 patents are articles that infringe at the time of importation. 86 FR 67492 (Nov. 26, 2021). The Commission also determined to correct two typographical errors on pages 24 and 84 of the ID. *Id*. The Commission did not request briefing on any issue under review. *Id*. The Commission's notice also requested written submissions on remedy, the public interest, and bonding. *Id*.

On December 2, 2021, Sonos, Google, and OUII each filed initial submissions on remedy, the public interest, and bonding. That same day, the Commission also received four additional submissions on the public interest from members of the public. On December 10, 2021, Sonos, Google, and OUII each filed reply submissions on remedy, the public interest, and bonding.

The Commission, having reviewed the record in this investigation, including the final ID, the parties' petitions and responses thereto, has determined that Google has violated section 337 by importing into the United States, selling for importation, or selling in the United States after importation certain audio players and controllers, components thereof, and products containing the same that infringe one or more of claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent.

The Commission has determined that the appropriate remedy is: (i) a limited exclusion order prohibiting the importation of certain audio players and controllers, components thereof, and products containing the same that infringe one or more of claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent; and (ii) a cease and desist order against Google. The Commission has determined that the public interest factors do not preclude issuance of a remedy. The Commission has also determined to set a bond in the amount of 100 percent of the entered value of the infringing products imported during the period of Presidential review (19 U.S.C. 1337(j)).

The Commission issues its opinion herewith setting forth its determinations on certain issues. This investigation is hereby terminated.

The Commission's orders and opinion were delivered to the President and United States Trade Representative on the day of their issuance.

The Commission vote for this determination took place on January 6, 2022.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

3

By order of the Commission.

Issued: January 6, 2022.

Lisa R. Barton,
*Secretary to the Commission*.

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

In the Matter of

**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME**

Investigation No. 337-TA-1191

**NOTICE OF COMMISSION DETERMINATION TO REVIEW IN PART A FINAL INITIAL DETERMINATION FINDING A VIOLATION OF SECTION 337; SCHEDULE FOR FILING WRITTEN SUBMISSIONS ON REMEDY, THE PUBLIC INTEREST, AND BONDING; EXTENSION OF THE TARGET DATE**

**AGENCY**:    U.S. International Trade Commission.

**ACTION**:    Notice.

**SUMMARY**:  Notice is hereby given that, on August 13, 2021, the presiding chief administrative law judge ("CALJ") issued a combined final initial determination ("ID") finding a violation of section 337 and a recommended determination ("RD") on remedy and bonding in the above-captioned investigation.  The Commission has determined to review the final ID in part. The Commission requests briefing from the parties, interested government agencies, and interested persons on the issues of remedy, the public interest, and bonding.  The Commission has also determined to extend the target date for completion of the investigation to January 6, 2022.

**FOR FURTHER INFORMATION CONTACT**:  Richard P. Hadorn, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-3179.  Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*.  For help accessing EDIS, please email *EDIS3Help@usitc.gov*.  General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*.  Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION**:  On February 11, 2020, the Commission instituted this investigation based on a complaint filed by Sonos, Inc. ("Sonos") of Santa Barbara, California. 85 FR 7783 (Feb. 11, 2020).  The complaint alleges violations of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337) ("section 337"), based on the importation into the United

1

States, the sale for importation, or the sale within the United States after importation of certain audio players and controllers, components thereof, and products containing the same by reason of infringement of certain claims of U.S. Patent Nos. 9,195,258 ("the '258 patent"); 10,209,953 ("the '953 patent"); 8,588,949 ("the '949 patent"); 9,219,959 ("the '959 patent"); and 10,439,896 ("the '896 patent"). *Id*. The complaint further alleges that a domestic industry exists. *Id*. The notice of investigation named as respondents Google LLC ("Google") and Alphabet Inc. ("Alphabet"), both of Mountain View, California. *Id*. The Office of Unfair Import Investigations ("OUII") is also named as a party. *Id*.

On September 21, 2020, the Commission terminated the investigation as to Alphabet based on withdrawal of the allegations in the complaint directed to Alphabet. Order No. 18 (Sept. 1, 2020), *unreviewed by* Comm'n Notice (Sept. 21, 2020). On November 24, 2020, the Commission determined that the importation requirement has been satisfied. Order No. 27 (Oct. 27, 2020), *unreviewed by* Comm'n Notice (Nov. 24, 2020). On February 2, 2021, the Commission determined that the technical prong of the domestic industry requirement has been satisfied as to the '949 patent. Order No. 32 (Jan. 4, 2021), *unreviewed by* Comm'n Notice (Feb. 2, 2021). On February 16, 2021, the Commission determined that the economic prong of the domestic industry requirement has been satisfied as to all asserted patents. Order No. 35 (Jan. 14, 2021), *reviewed and aff'd by* Comm'n Notice (Feb. 16, 2021).

On March 12, 2021, the Commission partially terminated the investigation based on withdrawal of the allegations in the complaint as to the following asserted claims: claims 22 and 23 of the '258 patent; claims 12 and 13 of the '953 patent; claims 5, 9, 29, and 35 of the '959 patent; and claim 3 of the '896 patent. Order No. 58 (Feb. 23, 2021), *unreviewed by* Comm'n Notice (Mar. 12, 2021).

The following claims remain at issue: claims 17, 21, 24, and 26 of the '258 patent; claims 7, 14, and 22-24 of the '953 patent; claim 10 of the '959 patent; claims 1, 2, 4, and 5 of the '949 patent; and claims 1, 5, 6, and 12 of the '896 patent.

On August 13, 2021, the CALJ issued the subject final ID on violation and RD on remedy and bonding. The ID finds violations of section 337 with respect to certain claims of each asserted patent. The RD recommends that, should the Commission determine that violations of section 337 occurred, then the Commission should: (i) issue a limited exclusion order against Google's infringing products; (ii) issue a cease and desist order against Google; and (iii) set a bond of 100 percent for any importations of infringing products during the period of Presidential review.

On August 27, 2021, Sonos and Google each filed a petition for review of certain findings in the final ID. On September 7, 2021, the private parties filed responses to each other's petitions, and OUII filed a combined response to both petitions.

On September 13, 2021, the Commission received eight submissions on the public interest in response to the Commission's Federal Register notice. *See* 86 FR 46715 (Aug. 19,

2021). The Commission did not receive any submissions on the public interest from the parties pursuant to Commission Rule 210.50(a)(4) (19 CFR 210.50(a)(4)).

The Commission has determined to review the ID in part with respect to the ID's analysis of whether the products accused of infringing the '258 and '953 patent are articles that infringe at the time of importation. The Commission has also determined to correct two typographical errors on pages 24 and 84 of the ID. The Commission has determined not to review the remaining findings in the ID.

The Commission has also determined to extend the target date for completion of the investigation to January 6, 2022.

In connection with the final disposition of this investigation, the statute authorizes issuance of: (1) an exclusion order that could result in the exclusion of the subject articles from entry into the United States, and/or (2) a cease and desist order that could result in the respondent being required to cease and desist from engaging in unfair acts in the importation and sale of such articles. Accordingly, the Commission is interested in receiving written submissions that address the form of remedy, if any, that should be ordered. If a party seeks exclusion of an article from entry into the United States for purposes other than entry for consumption, the party should so indicate and provide information establishing that activities involving other types of entry either are adversely affecting it or likely to do so. For background, see *Certain Devices for Connecting Computers via Telephone Lines*, Inv. No. 337-TA-360, USITC Pub. No. 2843, Comm'n Op. at 7-10 (December 1994).

The statute requires the Commission to consider the effects of any remedy upon the public interest. The public interest factors the Commission will consider include the effect that an exclusion order and/or cease and desist order would have on: (1) the public health and welfare; (2) competitive conditions in the U.S. economy; (3) U.S. production of articles that are like or directly competitive with those that are subject to investigation; and (4) U.S. consumers. The Commission is therefore interested in receiving written submissions that address the aforementioned public interest factors in the context of this investigation.

If the Commission orders some form of remedy, the U.S. Trade Representative, as delegated by the President, has 60 days to approve, disapprove, or take no action on the Commission's determination. *See* Presidential Memorandum of July 21, 2005. 70 FR 43251 (July 26, 2005). During this period, the subject articles would be entitled to enter the United States under bond, in an amount determined by the Commission and prescribed by the Secretary of the Treasury. The Commission is therefore interested in receiving submissions concerning the amount of the bond that should be imposed if a remedy is ordered.

**WRITTEN SUBMISSIONS**: The parties, interested government agencies, and any other interested parties are invited to file written submissions on the issues of remedy, the public interest, and bonding. Such submissions should include views on the recommended determination by the CALJ on remedy and bonding.

3

In their initial written submissions, Sonos and OUII are requested to submit proposed remedial orders for the Commission's consideration. Sonos is further requested to identify the dates the Asserted Patents expire, to provide the HTSUS subheadings under which the subject articles are imported, and to supply identification information for all known importers of the subject articles. Sonos is additionally requested to identify and explain, from the record, articles that are "components of" and "products containing" the subject articles, and thus covered by the proposed remedial orders, if imported separately from the subject articles.

Initial written submissions, including proposed remedial orders, must be filed no later than close of business on **December 2, 2021**. Reply submissions must be filed no later than the close of business on **December 10, 2021**. No further submissions on any of these issues will be permitted unless otherwise ordered by the Commission.

Persons filing written submissions must file the original document electronically on or before the deadlines stated above. The Commission's paper filing requirements in 19 CFR 210.4(f) are currently waived. 85 FR 15798 (Mar. 19, 2020). Submissions should refer to the investigation number (Inv. No. 337-TA-1191) in a prominent place on the cover page and/or the first page. (*See* Handbook for Electronic Filing Procedures, *https://www.usitc.gov/documents/handbook_on_filing_procedures.pdf*). Persons with questions regarding filing should contact the Secretary (202-205-2000).

Any person desiring to submit a document to the Commission in confidence must request confidential treatment by marking each document with a header indicating that the document contains confidential information. This marking will be deemed to satisfy the request procedure set forth in Rules 201.6(b) and 210.5(e)(2) (19 CFR 201.6(b) & 210.5(e)(2)). Documents for which confidential treatment by the Commission is properly sought will be treated accordingly. A redacted non-confidential version of the document must also be filed simultaneously with any confidential filing. All information, including confidential business information and documents for which confidential treatment is properly sought, submitted to the Commission for purposes of this investigation may be disclosed to and used: (i) by the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or (ii) by U.S. government employees and contract personnel,[1] solely for cybersecurity purposes. All contract personnel will sign appropriate nondisclosure agreements. All nonconfidential written submissions will be available for public inspection on EDIS.

The Commission vote for this determination took place on November 19, 2021.

---

[1] All contract personnel will sign appropriate nondisclosure agreements.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: November 19, 2021

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME** | **Inv. No. 337-TA-1191** |

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND

Chief Administrative Law Judge Charles E. Bullock

(August 13, 2021)

Pursuant to the Notice of Investigation, this is the final Initial Determination in the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing Same, Investigation No. 337-TA-1191.

For the reasons stated herein, the undersigned has determined a violation of section 337 of the Tariff Act of 1930, as amended, has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain audio players and controllers, components thereof, and products containing same alleged to infringe U.S. Patent Nos. 9,195,258; 10,209,953; 9,219,959; 8,588,949; and 10,439,896.

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ - 1 -

    A.  Procedural History .................................................................................... - 1 -

    B.  The Private Parties ................................................................................... - 1 -

        1.  Complainant Sonos, Inc. ................................................................ - 1 -

        2.  Respondent Google LLC ............................................................... - 2 -

    C.  Overview of the Technology ...................................................................... - 2 -

    D.  Products at Issue ....................................................................................... - 2 -

        1.  The Accused Products .................................................................... - 2 -

        2.  The Domestic Industry Products .................................................... - 3 -

II.  IMPORTATION ............................................................................................... - 4 -

III.  JURISDICTION .............................................................................................. - 4 -

IV.  ORDINARY SKILL IN THE ART ................................................................. - 4 -

V.  RELEVANT LAW ............................................................................................ - 4 -

    A.  Infringement ............................................................................................. - 4 -

        1.  Literal Infringement ...................................................................... - 5 -

        2.  Doctrine of Equivalents ................................................................. - 5 -

        3.  Indirect Infringement .................................................................... - 6 -

            a)  Induced Infringement ........................................................ - 6 -

    B.  Validity .................................................................................................... - 7 -

        1.  35 U.S.C. § 101 (Subject Matter Eligibility) ................................. - 7 -

        2.  35 U.S.C. § 102 (Anticipation) ..................................................... - 8 -

        3.  35 U.S.C. § 103 (Obviousness) ..................................................... - 8 -

        4.  35 U.S.C. § 112 (Written Description) .......................................... - 10 -

        5.  35 U.S.C. § 102(f) (Inventorship) ................................................. - 10 -

    C.  Domestic Industry ..................................................................................... - 11 -

        1.  Economic Prong ............................................................................ - 11 -

        2.  Technical Prong ............................................................................ - 12 -

VI.  U.S. PATENT 9,195,258 ................................................................................- 13 -

   A.  Overview .......................................................................................- 13 -

     1.  Asserted Claims ........................................................................- 13 -

     2.  Claim Construction ...................................................................- 15 -

   B.  Infringement .................................................................................- 15 -

     1.  Infringement at Importation ......................................................- 15 -

     2.  The '258 Accused Products .......................................................- 17 -

       a)  Claim 17 ..............................................................................- 17 -

         i)  Limitations 17.5 and 17.6 .............................................- 17 -

         ii)  Limitation 17.7 ............................................................- 19 -

         iii) Conclusion ..................................................................- 24 -

       b)  Claims 21, 24, and 26 ........................................................- 24 -

     3.  Google's Redesigns ..................................................................- 24 -

       a)  258 NIA No. 1 .....................................................................- 26 -

         i)  Limitations 17.2 and 17.7 .............................................- 26 -

           (A)  Literal Infringement ...........................................- 27 -

           (B)  Doctrine of Equivalents ......................................- 30 -

         ii)  Limitations 17.5 and 17.6 ............................................- 33 -

         iii) Conclusion ..................................................................- 34 -

         iv) Claims 21, 24, and 26 .................................................- 34 -

       b)  258 NIA No. 2 .....................................................................- 34 -

         i)  Limitations 17.5 and 17.6 .............................................- 34 -

         ii)  Limitation 17.7 ............................................................- 35 -

         iii) Conclusion ..................................................................- 38 -

         iv) Claims 21, 24, and 26 .................................................- 38 -

       c)  258 NIA No. 3 .....................................................................- 38 -

         i)  Limitations 17.5 and 17.6 .............................................- 38 -

         ii)  Limitation 17.7 ............................................................- 39 -

         iii) Conclusion ..................................................................- 40 -

         iv) Claims 21, 24, and 26 .................................................- 40 -

   C.  Technical Prong of the Domestic Industry Requirement.......................- 40 -

     1.  Claim 17 ...................................................................................- 41 -

       a)  Limitations 17.5 and 17.6 ...................................................- 41 -

       b)  Limitation 17.7 ...................................................................- 42 -

  c) Conclusion ................................................................................................- 44 -

 2. Claims 21, 24, and 26 ...................................................................................- 44 -

D. Validity ................................................................................................................- 45 -

 1. Balassanian ....................................................................................................- 45 -

  a) Claim 17 ...................................................................................................- 45 -

   i) Limitations 17.5 and 17.6 ..................................................................- 45 -

   ii) Limitation 17.7 .................................................................................- 49 -

   iii) Limitation 17.8 ...............................................................................- 51 -

   iv) Conclusion ......................................................................................- 54 -

  b) Claims 21, 24, and 26 .............................................................................- 54 -

 2. Balassanian with Goldberg ............................................................................- 54 -

  a) Claim 17 ...................................................................................................- 54 -

  b) Claims 21 and 24 ....................................................................................- 55 -

 3. Conclusion ......................................................................................................- 55 -

 4. Secondary Considerations .............................................................................- 55 -

VII. U.S. PATENT 10,209,953 ......................................................................................- 55 -

A. Overview ..............................................................................................................- 55 -

 1. Asserted Claims .............................................................................................- 56 -

 2. Claim Construction .........................................................................................- 58 -

B. Infringement .........................................................................................................- 58 -

 1. The '953 Accused Products ............................................................................- 58 -

  a) Claim 7 .....................................................................................................- 58 -

   i) Limitations 7.5 and 7.6 .....................................................................- 59 -

   ii) Limitation 7.8 ...................................................................................- 62 -

   iii) Limitation 7.10 ...............................................................................- 65 -

   iv) Limitation 7.11 ...............................................................................- 66 -

   v) Conclusion .......................................................................................- 68 -

  b) Claims 14 and 22 ....................................................................................- 68 -

  c) Claim 23 ...................................................................................................- 68 -

   i) Limitation 23.1 ..................................................................................- 68 -

   ii) Conclusion .......................................................................................- 70 -

  d) Claim 24 ...................................................................................................- 71 -

   i) Limitation 24.1 ..................................................................................- 71 -

   ii) Conclusion .......................................................................................- 72 -

2. Google's Redesigns ........................................................................ - 72 -

   a) 953 NIA No. 1 ........................................................................ - 73 -

   b) 953 NIA No. 2 ........................................................................ - 74 -

      i) Claim 7 ........................................................................ - 74 -

      ii) Claims 14 and 22-24 ........................................................ - 75 -

   c) 953 NIA No. 3 ........................................................................ - 75 -

      i) Claim 7 ........................................................................ - 75 -

      ii) Claims 14 and 22-24 ........................................................ - 76 -

C. Technical Prong of the Domestic Industry Requirement ................... - 77 -

  1. Claim 7 ........................................................................................ - 77 -

   a) Limitations 7.5 and 7.6 .......................................................... - 77 -

   b) Limitation 7.8 ........................................................................ - 78 -

   c) Limitation 7.10 ...................................................................... - 80 -

   d) Limitation 7.11 ...................................................................... - 81 -

   e) Conclusion ............................................................................ - 82 -

  2. Claims 14, 22, and 24 .................................................................. - 82 -

  3. Claim 23 ...................................................................................... - 83 -

   a) Limitation 23.1 ...................................................................... - 83 -

   b) Conclusion ............................................................................ - 84 -

D. Validity ............................................................................................ - 84 -

  1. Balassanian ................................................................................. - 84 -

   a) Claim 7 .................................................................................. - 84 -

      i) Limitations 7.5 and 7.6 ................................................... - 84 -

      ii) Limitation 7.9 .................................................................. - 86 -

      iii) Limitations 7.10 and 7.11 ................................................. - 87 -

      iv) Conclusion ...................................................................... - 89 -

   b) Claims 12-14 and 22-24 ........................................................ - 89 -

  2. Balassanian with Goldberg .......................................................... - 89 -

   a) Claim 7 .................................................................................. - 89 -

   b) Claim 23 ................................................................................ - 89 -

  3. Balassanian with Van Hulle ......................................................... - 90 -

  4. Conclusion .................................................................................. - 90 -

  5. Secondary Considerations ............................................................ - 90 -

iv

VIII.   U.S. PATENT 9,219,959 ................................................................- 90 -

A.  Overview .....................................................................................- 90 -

1.  Asserted Claim ...................................................................- 91 -

2.  Claim Construction .............................................................- 92 -

B.  Infringement ................................................................................- 92 -

1.  Claim 10 ..............................................................................- 92 -

a)  Infringement Argument No. 1: ████████████.......- 93 -

i)  Home Max Devices................................................- 93 -

ii)  Nest Audio Devices ..............................................- 98 -

b)  Infringement Argument No. 2: ███████████..........- 100 -

c)  Conclusion ...........................................................- 106 -

2.  Google's Redesigns ...........................................................- 106 -

a)  959 NIA No. 3 – ████████████...............- 106 -

b)  959 NIA No. 4 – ██████████████
████████ ...........................................................- 107 -

C.  Technical Prong of the Domestic Industry Requirement......................- 108 -

D.  Validity .......................................................................................- 109 -

1.  Obviousness ......................................................................- 109 -

a)  Limitation 10.5......................................................- 110 -

b)  Limitations 10.8 and 10.9 .....................................- 112 -

c)  Conclusion ...........................................................- 115 -

d)  Secondary Considerations.....................................- 115 -

2.  Improper Inventorship .......................................................- 116 -

IX.   U.S. PATENT 8,588,949 ................................................................- 119 -

A.  Overview .....................................................................................- 119 -

1.  Asserted Claims ................................................................- 120 -

2.  Claim Construction .............................................................- 121 -

B.  Infringement ................................................................................- 121 -

1.  Claim 1 ..............................................................................- 121 -

a)  Limitation 1.1........................................................- 122 -

b)  Limitation 1.2........................................................- 125 -

i)  Undisputed Products ..............................................- 125 -

ii)  GPM and YTM ......................................................- 125 -

c)  Limitations 1.3 and 1.4 .........................................- 126 -

d) Conclusion ................................................................- 129 -

2. Claims 2 and 5 .............................................................- 129 -

3. Claim 4 ......................................................................- 129 -

4. Indirect Infringement ...................................................- 130 -

5. Google's Redesigns ......................................................- 132 -

C. Technical Prong of the Domestic Industry Requirement .............- 132 -

D. Validity ..........................................................................- 132 -

1. Anticipation ...............................................................- 133 -

a) Bose Lifestyle 50 System ..........................................- 133 -

i) Limitation 1.2 ...................................................- 133 -

b) Isely ......................................................................- 135 -

2. Obviousness ...............................................................- 137 -

a) Bose .......................................................................- 137 -

b) Bose and Isely .........................................................- 139 -

c) Bose and Crestron ...................................................- 141 -

d) Bose and Farinelli ...................................................- 142 -

e) Isely and Bose ........................................................- 143 -

f) Isely and Crestron ...................................................- 144 -

g) Isely and Farinelli ...................................................- 145 -

h) cd3o and Isely ........................................................- 146 -

i) Conclusion .............................................................- 147 -

j) Secondary Considerations ........................................- 147 -

3. 35 U.S.C. § 101(a) .......................................................- 148 -

X. U.S. PATENT 10,439,896 .....................................................- 150 -

A. Overview .........................................................................- 150 -

1. Asserted Claims ..........................................................- 150 -

2. Claim Construction ......................................................- 151 -

B. Infringement ....................................................................- 152 -

1. Claim 1 ......................................................................- 152 -

a) Limitations 1.5 and 1.6 ...........................................- 152 -

b) Conclusion .............................................................- 161 -

2. Dependent Claims ........................................................- 161 -

3. Indirect Infringement ...................................................- 161 -

4. Google's Redesigns ......................................................- 162 -

a) NIA No. 2.........................................................................- 163 -

b) NIA No. 3.........................................................................- 165 -

C. Technical Prong of the Domestic Industry Requirement....................- 167 -

D. Validity ........................................................................................- 168 -

1. Representative Computer.....................................................- 168 -

2. Anticipation.........................................................................- 172 -

a) Limitation 1.6...................................................................- 172 -

b) Limitation 1.8...................................................................- 174 -

c) Conclusion .......................................................................- 175 -

3. Obviousness .........................................................................- 175 -

a) cd3o.................................................................................- 175 -

b) cd3o and Isely .................................................................- 177 -

c) cd3o and Balassanian.......................................................- 177 -

d) Conclusion .......................................................................- 178 -

e) Secondary Considerations................................................- 178 -

4. Improper Inventorship ..........................................................- 179 -

XI. ECONOMIC PRONG OF THE DOMESTIC INDUSTRY REQUIREMENT ............- 180 -

XII. CONCLUSIONS OF LAW ...........................................................................- 180 -

XIII. RECOMMENDED DETERMINATION ON REMEDY AND BOND ......................- 182 -

A. Limited Exclusion Order..................................................................- 182 -

B. Cease and Desist Order....................................................................- 183 -

C. Bonding..........................................................................................- 185 -

XIV. INITIAL DETERMINATION........................................................................- 188 -

## LIST OF ABBREVIATIONS

The following abbreviations may be used in this Initial Determination:

| CDX | Complainant's demonstrative exhibit |
|-----|-------------------------------------|
| CPX | Complainant's physical exhibit |
| CX | Complainant's exhibit |
| CIB | Complainant's initial post-hearing brief |
| CRB | Complainant's reply post-hearing brief |
| CPHB | Complainant's pre-hearing brief |
| Dep. | Deposition |
| JX | Joint Exhibit |
| RDX | Respondent's demonstrative exhibit |
| RPX | Respondent's physical exhibit |
| RX | Respondent's exhibit |
| RIB | Respondent's initial post-hearing brief |
| RRB | Respondent's reply post-hearing brief |
| RPHB | Respondent's pre-hearing brief |
| Tr. | Transcript |
| RLUL | Respondent's List of Undisputed Limitations |
| CLUL | Complainant's List of Undisputed Limitations |

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME** | **Inv. No. 337-TA-1191** |

**INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND
RECOMMENDED DETERMINATION ON REMEDY AND BOND**

Chief Administrative Law Judge Charles E. Bullock

(August 13, 2021)

Pursuant to the Notice of Investigation, this is the final Initial Determination in the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing Same, Investigation No. 337-TA-1191.

For the reasons stated herein, the undersigned has determined a violation of section 337 of the Tariff Act of 1930, as amended, has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain audio players and controllers, components thereof, and products containing same alleged to infringe U.S. Patent Nos. 9,195,258; 10,209,953; 9,219,959; 8,588,949; and 10,439,896.

# I. INTRODUCTION

## A. Procedural History

Complainant Sonos, Inc. ("Sonos") filed a complaint on January 7, 2020. 85 Fed. Reg. 7783 (Feb. 11, 2020). The complaint alleged violations of section 337 based on the importation and sale of certain audio players and controllers, components thereof, and products containing the same that purportedly infringe U.S. Patent Nos. 9,195,258 ("the '258 patent"); 10,209,953 ("the '953 patent"); 9,219,959 ("the '959 patent"); 8,588,949 ("the '949 patent"); and 10,439,896 ("the '896 patent"). *Id*. The Investigation was instituted on February 11, 2020. *Id.* Google LLC ("Google") is the named Respondent.[1] The Office of Unfair Import Investigations is also a party to the Investigation.

On February 23, 2021, claims 22 and 23 of the '258 patent; claims 12 and 13 of the '953 patent; claims 5, 9, 29, and 35 of the '959 patent; and claim 3 of the '896 patent were terminated from the Investigation. *See* Order No. 58, *not reviewed* by Comm'n Notice (Mar. 12, 2021).

The evidentiary hearing was held February 22–26, 2021.

## B. The Private Parties

### 1. Complainant Sonos, Inc.

Sonos, Inc. is a Delaware corporation headquartered at 614 Chapala Street, Santa Barbara, CA 93101. CIB at 3; Compl. at ¶ 7.

---

[1] Alphabet Inc. was also named as a Respondent. 85 Fed. Reg. 7783 (Feb. 11, 2020). On September 1, 2020, Alphabet, Inc. was terminated from the Investigation. *See* Order No. 18, *not reviewed* by Comm'n Notice (Sept. 21, 2020).

## 2. Respondent Google LLC

Google LLC is a Delaware limited liability company with its principal place of business and headquarters at 1600 Amphitheatre Parkway, Mountain View, CA 94043. SIB at 6-7; Compl. at ¶ 18; CX-0242C at ¶ 2.

## C. Overview of the Technology

The technology at issue in this Investigation relates to audio systems built from a network of playback devices (*e.g.*, speakers) and controllers through which users interact with those systems (*e.g.,* mobile phones, tablets, and laptops). CIB at 3; RIB at 10; SIB at 7.

## D. Products at Issue

The products at issue are "networked speaker devices, and devices (for example, mobile phones and laptops) capable of controlling these devices." 85 Fed. Reg. 7783 (Feb. 11, 2020).

## 1. The Accused Products

The Google products accused of infringement include the following:

| Accused Products | Asserted Patents and Claim(s) |
|---|---|
| Home Mini, Nest Mini, Home, Nest Audio, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, and Chromecast with Google TV ("the '258 Accused Products") | '258 patent, claims 17, 21, 24, and 26 |
| Home Mini, Nest Mini, Home, Nest Audio, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, and Chromecast with Google TV ("the '953 Accused Products") | '953 patent, claims 7, 14, and 22-24 |
| Home Max[2] and Nest Audio ("the '959 Accused Products") | '959 patent, claim 10 |

---

[2] Google discontinued the Home Max in the fourth quarter of 2018. *See* RX-1471C at Q/A 11. The device is no longer available for sale through Google's online store. *Id.* Thus, any remedy Sonos is entitled to against the Home Max will be of no consequence.

| Accused Products | Asserted Patents and Claim(s) |
|---|---|
| (i) Pixel smartphones (*i.e.*, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones)[3]; (ii) the Pixel Slate tablet; (iii) Pixel computers (*i.e.*, the Pixelbook and Pixelbook Go laptops installed with the Google Home app, the YouTube Music app, and/or the Google Play Music app); and (iv) Google's Hub displays (*i.e.*, the Home Hub, Nest Hub, and Nest Hub Max installed with Home/Nest software) ("the '949 Accused Products") | '949 patent, claims 1, 2, 4, and 5 |
| (i) Pixel smartphones (*i.e.*, The Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones); (ii) the Pixel Slate tablet; and (iii) Pixel computers (*i.e.*, the Pixelbook and Pixelbook Go laptops installed with the Google Home app) ("the '896 Accused Products") | '896 patent, claims 1, 5, 6, and 12 |

CIB at 7-8; SIB at 10-11 RIB at 15.

### 2. The Domestic Industry Products

Sonos' domestic industry products ("DI Products") include the following:

| Asserted Patent | DI Products |
|---|---|
| '258 patent | Play:1, Play:3, Play:5, One, One SL, Move, Five, Playbar, Playbase, Beam, Arc, Connect, Connect:Amp, Port, Amp, SYMFONISK table lamp WiFi speaker, and SYMFONISK bookshelf WiFi speaker ("the '258 DI Products") |
| '953 patent | Play:1, Play:3, Play:5, One, One SL, Move, Five, Playbar, Playbase, Beam, Arc, Sub, Connect, Connect:Amp, Port, Amp, SYMFONISK table lamp WiFi speaker, and SYMFONISK bookshelf WiFi speaker ("the '953 DI Products") |
| '959 patent | Play:1, Play:3, Play:5, One, One SL, Move, Five, Playbar, Playbase, Beam, Arc, SYMFONISK table lamp, WiFi speaker, and SYMFONISK bookshelf WiFi speaker ("the '959 DI Products") |
| '949 patent | Computing devices (such as smartphones, tablets, or computers) installed with the Sonos S1 or S2 app for iOS, Android, FireOS, macOS, or Windows ("the '949 DI Products") |
| '896 patent | Computing devices (such as smartphones, tablets, or computers) installed with the Sonos S1 or S2 app for iOS, Android, FireOS, macOS, or Windows ("the '896 DI Products") |

---

[3] While Sonos included the Pixel 4a (5G) and Pixel 5 smartphones in its list of accused products for the '949 patent, Sonos' infringement expert did not offer testimony on these products. *See* CX-0012C at Q/A 26.

CIB at 7-8; SIB at 10.

## II.    IMPORTATION

The undersigned previously found that "Sonos [] satisfied the importation requirement of section 337 with respect to Respondent Google and its Accused Products, and that each of these Accused Products are subject to the Commission's jurisdiction." Order No. 27 (Oct. 27, 2020), *unreviewed* by Comm'n Notice (Nov. 24, 2020)

## III.    JURISDICTION

Google does not contest that the Commission has jurisdiction – subject matter, personal, and *in rem* – over this Investigation. RIB at 16; *see also* Section II.

## IV.    ORDINARY SKILL IN THE ART

The undersigned previously determined that: "a person of ordinary skill in the art with respect to the asserted patents would have at least (a) a Bachelor's degree in computer science, computer engineering, electrical engineering, or an equivalent thereof, and (b) 2-4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience." Order No. 20 at 6 (Sept. 25, 2020). The undersigned also found that additional graduate education could substitute for professional experience and significant work experience could substitute for formal education. *Id*.

## V.    RELEVANT LAW

### A.    Infringement

In a section 337 investigation, the complainant bears the burden of proving infringement of the asserted patent claims by a preponderance of the evidence. *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1349 (Fed. Cir. 2010). This standard "requires proving that infringement

was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

### 1. Literal Infringement

Literal infringement is a question of fact. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s). If any claim limitation is absent, there is no literal infringement of that claim as a matter of law. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

### 2. Doctrine of Equivalents

"[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997). "[T]he proper time for evaluating equivalency . . . is at the time of infringement, not at the time the patent issued." *Id.* at 37.

"The 'essential inquiry' in determining whether there has been infringement under this doctrine is whether 'the accused product or process contains elements identical or equivalent to each claimed element of the patented invention.'" *Am. Calcar, Inc. v. Am. Honda Motor Co.,* 651 F.3d 1318, 1338 (Fed. Cir. 2011) (quoting *Warner–Jenkinson,* 520 U.S. at 40). An element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial to one of ordinary skill in the art. *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1360 (Fed. Cir. 2009); *AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005). In order to assess insubstantiality, a court considers whether an element of the accused product "performs substantially the same function in substantially the same way to obtain

- 5 -

the same result" as the patented invention. *Am. Calcar,* 651 F.3d at 1338; *see also Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008). A patentee alleging infringement under the doctrine of equivalents must submit particularized evidence as to equivalence and must explain specifically why the difference between the claimed invention and what the accused product actually does is "insubstantial." *Am. Calcar,* 651 F.3d at 1338.

Prosecution history estoppel can prevent a patentee from relying on the doctrine of equivalents when the patentee relinquished subject matter during prosecution of the patent, either by amendment or argument. *AquaTex*, 419 F.3d at 1382. In particular, "[t]he doctrine of prosecution history estoppel limits the doctrine of equivalents when an applicant makes a narrowing amendment for purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments made to an examiner." *Id*.

### 3.    Indirect Infringement

Indirect infringement may be either induced or contributory. Direct infringement must first be established in order for a claim of indirect infringement to prevail. *BMC Res. v. Paymentech,* 498 F.3d 1373, 1379 (Fed. Cir. 2007).

#### a)    Induced Infringement

Section 271(b) of the Patent Act provides: "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. §271(b) (2008). To establish liability, the patent holder must prove that "once the defendants knew of the patent, they 'actively and knowingly aid[ed] and abett[ed] another's direct infringement.'" *DSU Med. Corp. v. JMS Co., Ltd*. 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc) (citations omitted). A finding of induced infringement requires "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306. Although

§271(b) requires knowledge that the induced acts constitute patent infringement, the Supreme Court has held that liability will also attach when the defendant is willfully blind. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-2069 (2011). The burden is on the complainant to prove that the respondent had the specific intent and took action to induce infringement. *DSU*, 471 F.3d at 1305-06. Intent may be proven by circumstantial evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009).

### B. Validity

A patent is presumed valid. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). A respondent who has raised patent invalidity as an affirmative defense has the burden of overcoming this presumption by clear and convincing evidence. *See Microsoft,* 564 U.S. at 95.

### 1. 35 U.S.C. § 101 (Subject Matter Eligibility)

Section 101 states:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. To determine patent eligibility under § 101, courts apply the two-step *Alice* test and first, "determine whether the claims at issue are directed to a patent-ineligible concept" and then if so, "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice Corp. Pty. v. CLS Bank Intern.*, 573 U.S. 208, 217-18, 221 (2014). "The 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (citing *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d

1343, 1346 (Fed. Cir. 2015); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016)). To save a patent at the second step, an inventive concept must be evident in the claims. *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151-52 (Fed. Cir. 2016).

### 2.  35 U.S.C. § 102 (Anticipation)

Under 35 U.S.C. § 102, a claim is anticipated and therefore invalid when "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 904 (2001). To be considered anticipatory, the prior art reference must be enabling and describe the applicant's claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention. *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).

### 3.  35 U.S.C. § 103 (Obviousness)

Under 35 U.S.C. §103, a patent may be found invalid for obviousness if "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. §103. Because obviousness is determined at the time of invention, rather than the date of application or litigation, "[t]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011) ("*Star II*").

When a patent is challenged as obvious, the critical inquiry in determining the differences between the claimed invention and the prior art is whether there is an apparent reason to combine

the known elements in the fashion claimed by the patent at issue. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417-418 (2007). The Federal Circuit has since held that when a patent is challenged as obvious, based on a combination of several prior art references, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007) (citations omitted).

Obviousness is a determination of law based on underlying determinations of fact. *Star II*, 655 F.3d at 1374. The factual determinations behind a finding of obviousness include: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of non-obviousness. *KSR,* 550 U.S. at 399 (citing *Graham v. John Deere Co*., 383 U.S. 1, 17 (1966)). These factual determinations are referred to collectively as the "*Graham* factors." Secondary considerations of non-obviousness include commercial success, long felt but unresolved need, and the failure of others. *Id.* When present, secondary considerations "give light to the circumstances surrounding the origin of the subject matter sought to be patented," but they are not dispositive on the issue of obviousness. *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l.*, 618 F.3d 1294, 1304-06 (Fed. Cir. 2010). A court must consider all of the evidence from the *Graham* factors before reaching a decision on obviousness. For evidence of secondary considerations to be given substantial weight in the obviousness determination, its proponent must establish a nexus between the evidence and the merits of the claimed invention. *W. Union Co. v. MoneyGram Payment Sys. Inc.*, 626 F.3d 1361, 1372-73 (Fed. Cir. 2010) (citing *In re GPAC Inc.,* 57 F.3d 1573, 1580 (Fed. Cir. 1995)).

### 4. 35 U.S.C. § 112 (Written Description)

The hallmark of the written description requirement is the disclosure of the invention. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). The test for determining the sufficiency of the written description in a patent requires "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Id.* Compliance with the written description requirement is a question of fact and "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.*

### 5. 35 U.S.C. § 102(f) (Inventorship)

A patent is invalid under pre-AIA 35 U.S.C. § 102(f) if it fails to name the proper inventors. *See Pannu v. Iolab Corp.*, 155 F. 3d 1344, 1348-49 (Fed. Cir. 1998). An inventor is one "who conceived the subject matter at issue." *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994); *see also Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009) ("Conception is the touchstone of inventorship . . .."). In contrast, "one who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor." *Nartron Corp. v. Schukra U.S.A. Inc.*, 558 F.3d 1352, 1359 (Fed. Cir. 2009) (citations omitted); *see also StoneEagle Servs., Inc. v. Gillman*, 746 F.3d 1059, 1063 (Fed. Cir. 2014) ("assistance in reducing an invention to practice generally does not contribute to inventorship."). A party must prove incorrect inventorship by clear and convincing evidence and "provide evidence to corroborate the alleged joint inventor's conception." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir.

2004); *see also Ethicon, Inc. v. U. S. Surgical Corp.,* 135 F.3d 1456, 1461 (Fed. Cir. 1998) (holding that "an alleged co-inventor must supply evidence to corroborate his testimony" of conception).

## C.    Domestic Industry

For a patent-based complaint, a violation of section 337 can be found "only if an industry in the United States, relating to the articles protected by the patent . . . concerned, exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). This domestic industry requirement of section 337 is often described as having an economic prong and a technical prong. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1298 (Fed. Cir. 2013); *Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-586, USITC Pub. 4120, 2009 WL 5134139 (Dec. 2009), Comm'n Op. at 12-14. The complainant bears the burden of establishing that the domestic industry requirement is satisfied. *See Certain Set-Top Boxes & Components Thereof*, Inv. No. 337-TA-454, ID at 294, 2002 WL 31556392 (June 21, 2002) (unreviewed by Commission in relevant part).

### 1.    Economic Prong

Section 337(a)(3) sets forth the following economic criteria for determining the existence of a domestic industry in such investigations:

> (3)  For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –
> > (A)  significant investment in plant and equipment;
> > (B)  significant employment of labor or capital; or
> > (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). Thus, section 337(a)(3) requires that investments be either "significant" or "substantial." The Federal Circuit has clarified that a quantitative analysis must be performed in order to make this determination. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 883 (Fed. Cir.

2015) ("The plain text of § 337 requires a quantitative analysis in determining whether a [complainant] has demonstrated a 'significant investment in plant and equipment' or 'significant employment of labor or capital.'"). There is no threshold amount that a complainant must meet. *See Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 25-26 (May 16, 2008) ("We emphasize that there is no minimum monetary expenditure that a complainant must demonstrate to qualify as a domestic industry under the 'substantial investment' requirement of this section."); *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 39 (Aug. 1, 2007) ("*Male Prophylactic Devices*") ("[T]here is no mathematical threshold test."). Rather, the inquiry depends on "the facts in each investigation, the article of commerce, and the realities of the marketplace." *Certain Printing & Imaging Devices & Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27 (Feb. 17, 2011). As such, "[t]he determination takes into account the nature of the investment and/or employment activities, the industry in question, and the complainant's relative size." *Id.*

### 2. Technical Prong

The technical prong of the domestic industry requirement is satisfied when the complainant in a patent-based section 337 investigation establishes that it is practicing or exploiting the patents at issue. *See* 19 U.S.C. § 1337(a)(2) and (3); *Certain Microsphere Adhesives, Process for Making Same & Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 8, 1996 WL 1056095 (Jan. 16, 1996). "The test for satisfying the 'technical prong' of the industry requirement is essentially [the] same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). To prevail, the patentee must establish by a preponderance of the evidence that the domestic product practices one or more claims of the patent. It is sufficient

- 12 -

to show that the products practice any claim of that patent, not necessarily an asserted claim of that patent. *See Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 38 (Aug. 1, 2007).

## VI.    U.S. PATENT 9,195,258

### A.    Overview

The '258 patent, entitled "System and Method for Synchronizing Operations Among a Plurality of Independently Clocked Digital Data Processing Devices," issued on November 24, 2015 to Nicholas A. J. Millington. The '258 patent is assigned to Sonos. *See* Compl. Ex. 9. The '258 patent generally relates to "the field of arrangements that synchronize output generated by a number of output generators, including audio output, video output, combinations of audio and video, as well as other types of output . . . provided by a common channel." JX-0001 at 1:44-49.

#### 1.    Asserted Claims

Sonos is asserting claims 17, 21, 24, and 26 of the '258 patent against Google. CIB at 2. These claims read as follows[4]:

17.    [17.0] A first zone player comprising:

[17.1] a network interface configured to interface the first zone player with at least a local area network (LAN);

[17.2] a device clock configured to generate clock time information for the first zone player;

[17.3] one or more processors; and

[17.4] a tangible, non-transitory computer-readable memory having instructions stored thereon that, when executed by the one or more processors, cause the first zone player to:

[17.5] receive control information from any one of a plurality of controllers over the LAN via the network interface, wherein the received control information comprises a direction for the first zone player to enter into a synchrony group with at least a second zone player;

---

[4] The parties use different numbers/letters to refer to the same claim limitation. The undersigned has adopted Sonos' numbering system for the Asserted Patents. *See* CIB at xviii-xix.

[17.6] in response to the direction, enter into the synchrony group with the second zone player,

[17.7] wherein in the synchrony group, the first and second zone players are configured to playback audio in synchrony based at least in part on (i) audio content, (ii) playback timing information associated with the audio content, wherein the playback timing information is generated by one of the first or second zone players, and (iii) clock time information for the one of the first or second zone players, and wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players, wherein the first and second zone players remain independently clocked while playing back audio in synchrony; and

[17.8] transmit status information to at least one of the plurality of controllers over the LAN via the network interface, wherein the status information comprises an indication of a status of the synchrony group.

21.     The first zone player of claim 17, wherein the status information further comprises one or both of (a) an identification of a zone player that is operating as a master device of the synchrony group and (b) an identification of at least one zone player that is operating as a slave device of the synchrony group.

24.     [24.0] The first zone player of claim 23, wherein the tangible computer-readable memory further has instructions stored thereon that, when executed by the one or more processors, cause the first zone player to:

[24.1] receive audio content via the network interface; and

[24.2] while the first zone player is operating as the master device of the synchrony group, transmit the received audio content, via the network interface, to at least one zone player that is operating as a slave device of the synchrony group.

26.     [26.0] The first zone player of claim 17,

[26.1] wherein the first zone player is a master zone player of the synchrony group,

[26.2] wherein the audio content comprises a plurality of frames,

[26.3] wherein the playback timing information associated with the audio content comprises a playback time for each frame of the audio content, and

[26.4] wherein the first zone player is configured to play back audio in synchrony with the second zone player based at least in part on (i) the audio content, (ii) playback timing information associated with the audio content, wherein the playback timing information is generated by the first zone player, and (iii) clock time information for the first zone player,

and wherein the generated playback timing information and the clock time information are transmitted from the first zone player to the second zone player; and

[26.5] wherein the first zone player playing back audio in synchrony comprises, for each frame of the audio content, the first zone player playing back the frame when the device clock of the first zone player is the same as the playback time for the frame.

### 2. Claim Construction

The undersigned construed the following terms from the asserted claims as follows:

| TERM | CLAIM(S) | CLAIM CONSTRUCTION |
|---|---|---|
| "zone player" | 17, 21, 24, 26 | "data network device configured to process and output audio" |
| "network interface" | 17, 24 | "physical component of a device that provides an interconnection with a data network" |
| "playback timing information" | 17, 26 | "information indicating when the audio information [content] is to be played back" |
| "clock time information" | 17, 26 | "information representing a time value indicated by a device's clock" |
| "a synchrony group" | 17, 21, 24, 26 | "a set of two or more zone players that are to play the same audio program synchronously" |
| "independently clocked" | 17 | "operating in accordance with their own respective clocks during synchronous playback" |
| "local area network" | 17 | "a data communications network spanning a limited geographical area, such as an office, an entire building, or industrial park" |

Order No. 20 at 15-20.

### B. Infringement

### 1. Infringement at Importation

Sonos contends that infringement does not need to take place at the time of importation. CRB at 1. In addition, Sonos argues that Google's Accused Products are capable of infringement (and do infringe) at the time of importation because they have software installed rendering them "functionally capable of carrying out the operations recited in the Asserted Claims." *Id*. Sonos

explains that the claims in the '258 and '953 patents are apparatus claims that recite computer-readable memory having instructions stored thereon that when executed, cause the apparatus to engage in the recited operations. *Id.* at 1-2. Sonos therefore asserts that, like the products at issue in *Finjan*, "the Accused Products include the software necessary to carry out the functions recited by the claims." *Id.* at 3 (citing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010)).

Google asserts that the '258 Accused Products are imported into the United States as "standalone devices." RIB at 24. Google therefore argues that because claim 17 of the '258 patent requires a "first zone player" that enters into a synchrony group with a "second zone player" as well as a "plurality of controllers," the '258 Accused Products are not capable of infringing at the time of importation. *Id.* Google also argues that the '258 Accused Products are not capable of infringement if used without another accused product present and configured for allegedly infringing use. *Id.*

Staff submits that "[t]he Commission has previously recognized that the [Federal Circuit] already twice rejected a time-of-importation requirement." SRB at 1 n.1. Staff therefore maintains that Google's "time-of-importation" argument should also be rejected here. *Id.*

The Federal Circuit has rejected the argument that there is no violation because products are not articles that infringe at the time of importation. *See Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1348-1352 (Fed. Cir. 2015) (en banc); *Comcast Corp. v. Int'l Trade Comm'n*, 951 F.3d 1301, 1308-09 (Fed. Cir. 2020) ("The Commission correctly held that Section 337 applies to articles that infringe after importation."); *see also Certain Blood Cholesterol Testing Strips*, Inv. No. 337-TA-1116, Comm'n Op. at 25-26 (May 1, 2020). The undersigned therefore rejects

Google's argument that there is no violation because the '258 Accused Products are not capable of infringing at the time of importation.

## 2. The '258 Accused Products

Sonos asserts that claims 17, 21, 24, and 26 of the '258 patent are infringed by the '258 Accused Products. CIB at 7.

### a) Claim 17

Sonos asserts that the '258 Accused Products meet every limitation of claim 17 of the '258 patent. CIB at 10. Google contends that the '258 Accused Products do not meet limitations 17.5, 17.6, or 17.7. RLUL at 1-2. Google does not dispute that the '258 Accused Products meet the remaining limitations of claim 17. *Id*. Staff agrees with Sonos that the '258 Accused Products meet every limitation of claim 17. SIB at 1, 13, 17.

#### i) Limitations 17.5 and 17.6

Claim 17 includes the limitations "receive control information from any one of a plurality of controllers over the LAN via the network interface, wherein the received control information comprises a direction for the first zone player to enter into a synchrony group with at least a second zone player" and "in response to the direction, enter into the synchrony group with the second zone player." JX-0001, cl. 17.

Sonos argues that each '258 Accused Product is capable of receiving control messages from any Chromecast-enabled controller connected to a Google audio system that directs and causes the '258 Accused Product to enter into a "multizone group"[5] configured to playback audio in synchrony. CIB at 10. Sonos asserts that the accused control messages each constitute a

---

[5] With respect to the claimed "synchrony group," Sonos' expert, Dr. Almeroth, submits that "████████ ████████████████." CX-0011C at Q/A 81 (citing JX-0019C; CX-0868C; JX-0466C at 18:22-21:14, 34:20-35:8; JX-0473C at 63:4-12).

"direction . . . to enter into a synchrony group." *Id.* at 11. According to Sonos, this includes a

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████. *Id.*

While Google contends that limitations 17.5 and 17.6 are disputed, Google does not dispute that under the plain meaning of the term "direction," the accused messages constitute the claimed "direction." *Compare* RLUL at 1, *with* RIB at 27. Google, however, argues that those messages cannot satisfy both the "request" in the '953 patent and the "direction" in the '258 patent. *Id.* Thus, Google contends that if the Accused Products satisfy the "request to enter into a synchrony group" limitation in claim 7 of the '953 patent, then they cannot satisfy the "direction . . . to enter into a synchrony group" limitation in claim 17 of the '258 patent. *Id.*

Staff contends that the parties agree that the ███████████████████████████ ████████ in the '258 Accused Products meet these limitations.[6] SIB at 15. In addition, Staff submits that "Google concedes that the '258 Accused Products meet the claimed 'direction.'" SRB at 2.

The evidence shows that that '258 Accused Products are capable of receiving control information (*i.e.,* ██████████████████████████████) from any Chromecast-enabled controller connected to a Google audio system. *See* CX-0011C at Q/As 242-251, 254-259. These messages are a direction for the '258 Accused Products to enter into a multizone group with a second zone player configured to playback audio in synchrony. *Id.* In addition, the parties agree that the ███████████████████████████████ constitute a "direction," under the plain

---

[6] Staff addresses Google's argument that these messages cannot be both a "direction" as required by claim 17 of the '258 patent and a "request" as required by claim 7 of the '953 patent with respect to the '953 patent. SIB at 15.

meaning of the term.[7] *See* CIB at 11; RIB at 27; SIB at 15. The undersigned therefore finds that the '258 Accused Products meet limitations 17.5 and 17.6.[8]

### ii)    Limitation 17.7

Claim 17 includes the limitation "wherein in the synchrony group, the first and second zone players are configured to playback audio in synchrony based at least in part on (i) audio content, (ii) playback timing information associated with the audio content, wherein the playback timing information is generated by one of the first or second zone players, and (iii) clock time information for the one of the first or second zone players, and wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players, wherein the first and second zone players remain independently clocked while playing back audio in synchrony." JX-0001, cl. 17.

Sonos submits that this limitation is undisputed except for "playback timing information." CIB at 11-12. Sonos contends that in the '258 Accused Products, the future timestamps for the audio frames constitute the claimed "playback timing information."[9] *Id*. at 12. According to Sonos, Google's own documents and witnesses state that the timestamps generated by the leader provide an indication of when the audio frames are to be played back or when they should be played. *Id*. at 12-13. In fact, Sonos argues that Google's timestamps are the preferred embodiment of the '258 patent's "playback timing information" – *i.e.*, frame-by-frame time stamps that each indicate a future time, relative to the sender's local clock, at which time the frame is to be played. *Id*. at 13.

---

[7] None of the parties sought to construe the term "direction" during the claim construction phase of the Investigation. *See generally* Order No. 20.

[8] As to whether the ████████████████████████ messages can also meet the "request" limitation in claim 7 of the '953 patent, that is discussed infra in Section VII.B.1.a.i.

[9] Sonos notes that Google does not dispute that the timestamps sent from the leader to the follower are the "playback timing information" for the '953 patent. CRB at 4. Sonos contends that this is likewise dispositive for the '258 patent because "the 'playback timing information' of the '258 and '953 Patents have the *exact same construction* and the exact same timestamps are accused of being the 'playback timing information' of both the '258 and '953 Patents." *Id*. (emphasis in original).

Sonos explains that (i) that the timestamps indicate when the audio content is to be played back at the leader and (ii) that each follower is configured to playback audio at the same time as the leader based on the timestamps. *Id.* at 13 Sonos therefore argues that the timestamps must indicate when the audio content is played back by a follower. *Id.* at 13-14. Sonos disputes Google's assertion that the timestamps do not indicate when audio content is played back at the follower because ███

████████████████████████████████████. *Id.* Sonos argues that Google improperly imports a requirement into the claim that the only adjustment to the timestamps is one that accounts for a difference in clock times between the leader and the follower and can only be calculated by using an equation of $\Delta T = T_S - T_C$. *Id.* at 15. Sonos contends that the claim language only requires that the synchronous playback be "based at least in part on" the playback timing information. *Id.*

In addition, Sonos claims that Google is attempting to rewrite the construction of "playback timing information" to require that it "specify when the 'zone players' release audio information from the output buffer." CRB at 5-6. Sonos argues that this is untimely as that definition was never proposed during claim construction, and was never articulated in Google's discovery contentions, expert reports, or witness statements. *Id.* Sonos also argues that Google's non-infringement contentions never mentioned the "rendering pipeline delay." *Id.* at 17.

Google argues that the claim construction of this term in conjunction with the surrounding claim language requires the first and second zone players to play back the audio content in synchrony (*i.e.*, at the same time). RIB at 24-25. According to Google, the claimed "playback timing information" controls the timing of playback for both zone players. *Id.* at 25; RRB at 13-14. Google argues that the '258 Accused Products do not meet this requirement because ███

████████████████████████████████████████████████

████████████████████████████████. RIB at 25 Google disputes

Sonos' assumption that the leader and follower must play back audio sound at the same time because the term "play back audio in synchrony" refers to the time at which content of an audio buffer is released into the audio output pipeline, not the time when the sound is emitted from the speaker. *Id.* at 26. Google argues that ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ *Id.* Specifically, Google alleges that ████████ ████████████████████████████████████████████████████████ ████████████████████. RRB at 12.

Google asserts that the correct interpretation of "play back" is the time the zone player releases audio data from an output buffer into the audio output pipeline. *Id.* at 14. Under that interpretation, Google contends that ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████. *Id.*

According to Staff, the parties agree that when the '258 Accused Products ████████ ████████████████████████████████████████████████████████ ████████████████████████. SIB at 15-16. Similarly, Staff contends that the parties agree that when the '258 Accused Products ████████████████████████ ██████████████████████████. *Id.* at 16. Staff argues that Google is misinterpreting the limitation because Google "improperly attempts to import a limitation from the specification into the claims by arguing that the 'playback timing information' can only be adjusted by the time differential value $\Delta T = TS-TC$." *Id.* at 16-17; SRB at 3. Staff argues that the claim language only requires that the "first and second zone players are configured to playback audio in synchrony based at least in part on . . . playback timing information." SIB at 16-17. Thus, under a proper

interpretation of the claims, Staff submits that the evidence shows that the '258 Accused Products meet this claim limitation. *Id*. at 17; SRB at 3.

As to Google's new argument that "playback timing information" must specify when the zone players release audio information from the output buffer, Staff contends that to the extent this new argument has not been waived, it has no support in the claim language and lacks merit. SRB at 3-4. Staff asserts that the undersigned adopted the parties' agreed-to construction for the term "playback timing information" which, in combination with the claim language, shows that it is not limited to information indicating when the audio information is released from an output buffer. *Id*. at 4. Moreover, Staff argues that even if Google's interpretation is correct, Google "██████████

████████████████████████████████████████████████████████████████████

███████████████████." *Id*.

The parties' dispute centers on whether the timestamps in the '258 Accused Products constitute the claimed "playback timing information." The term "playback timing information" was construed as "information indicating when the audio information [content] is to be played back."[10] Order No. 20 at 15. Google argues that "██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████." *See* RIB at 25. Instead, Google contends that

████████████████████████████████████████████████████████████████████

██████████████████████████████. *See id*. at 25-26. The undersigned disagrees. Claim 17 recites that the "first and second zone players are configured to playback audio in synchrony based at least in part on . . . playback timing information."[11] JX-0001, cl. 17. Thus, the playback timing

---

[10] The parties agreed to this construction, which was adopted by the undersigned. *See* Order No. 20 at 15.

[11] Google argues that the terms "playback audio in synchrony" in the '258 patent and "initiating synchronous playback" in the '953 patent refer to the time at which content of an audio buffer is released into the audio output pipeline, not the time when the sound is emitted from the speaker. *See* RIB at 17, 26. Google, however, fails to provide

information need not be the only thing that that allows the leader and follower to playback audio in synchrony; rather, the leader and follower must be configured to playback audio in synchrony *based at least in part on* the playback timing information. *See id.* at cl. 17, 24:19-25:43. Because the claim language uses the phrase "based at least in part on," it does not foreclose a scenario where the follower adjusts the timestamp after receiving it from the leader. This is further supported by the fact that the claim recites that the "first and second zone players are configured to playback audio in synchrony based at least in part on . . . clock time information for the one of the first or second zone players." *See id.* at cl. 17.



In the '258 Accused Products, ████████████████████████████ ████████████████████████████████████████████████████. *See* JX-0019C at 5-6, 9-10 ("████████████████████████████████████████████ ████████"); RX-1470C at Q/A 33 ("████████████████████████████ ████████████████████████████████████████████████████."); JX-0466C at 210:14-211:2; JX-0025C at 1; CX-0258C at 2; CX-0842C at 3; CX-0011C at Q/As 263-271. Thus, that timestamp is the claimed "playback timing information." Then, ████████ ████████████████████████████████████████████████████ ████████████████████████. *See* JX-0019C at 5-8; CX-0258C at 2; JX-0025C at 1; CX-0842C at 3; RX-1517C at Q/A 12; RX-1470C at Q/As 32-33; JX-0473C at 198:5-200:10; CX-0011C at Q/As 263-271; RX-1522C at Q/A 38. Although ████████████████████████████████ ████████████████████████████████████████ is still "at least based on"

---

sufficient support for such a proposed construction and thus, it is rejected. Therefore, the terms "playback audio in synchrony" in the '258 patent and "initiating synchronous playback" in the '953 patent will be construed according to their plain and ordinary meaning.

the timestamp from the leader. *See* CX-0011C at Q/As 263-271; Schonfeld, Tr. at 1032:11-1033:6. It therefore follows that the zone players (*i.e.*, leader and follower) play back audio in synchrony "based at least in part on" the playback timing information. *See* CX-0011C at Q/As 263-271; JX-0466C at 97:17-98:5. Thus, the undersigned finds that the '258 Accused Products meet this limitation.[12]

### iii) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the '258 Accused Products infringe claim 17 of the '258 patent.

### b) Claims 21, 24, and 26

Sonos asserts that the additional limitations of claims 21, 24, and 26 are met. CIB at 17-19. Staff agrees. SIB at 17-20. Google does not dispute that the additional limitations of the dependent claims are met. RLUL at 2-3. Additionally, the evidence shows that the additional limitations of claims 21, 24, and 26 are met. *See* CX-0011C at Q/As 290-91, 300-301, 307-308, 312-333; JX-181C at 1-10; JX-0019C at 2, 5-6; JX-0176C at 4; JX-0179C at 1. Accordingly, the undersigned finds that the '258 Accused Products infringe claims 17, 21, and 26.

### 3. Google's Redesigns[13, 14]

As an initial matter, Sonos argues that Google has failed to prove that its NIAs are ripe for adjudication. CIB at 19. Sonos contends that the evidence confirms that the redesigns will not be imported and sold. *Id.* Sonos also claims that the redesigns are not sufficiently fixed in design as they are not ready to be released, and Google has no plans to test, further develop, or import the

---

[12] As Sonos notes, Google does not dispute that the accused timestamps are the "playback timing information" for the '953 patent, which has the same construction as the '258 patent. *See* RLUL at 8.

[13] Google developed three allegedly "non-infringing alternative designs" for the '258 patent ("NIAs" or "redesigns"). *See* RIB at 30. The NIAs will be referred to as "258 NIA No. 1," "258 NIA No. 2," and "258 NIA No. 3." *See id.*

[14] Staff states that, "[i]n light of Order No. 19, the Staff addresses only whether the redesigns avoid infringement of the Asserted Claims of the Asserted Patents." SIB at 23 n.6 (citing Order No. 19 at 3-4 (Sept. 4, 2020)).

designs. *Id*. at 19-20. In addition, Sonos argues that Google only produced ███████████████ ████████ after expert reports of infringement were due, which weighs against adjudicating the redesigns. *Id*. at 20.

Google, on the other hand, contends that each redesign is within the scope of the Investigation, has been imported, is sufficiently fixed in design, and was sufficiently disclosed during discovery. RIB at 30. According to Google, ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. *Id*. Google therefore asserts that "there is nothing preventing these redesigns from adjudication" and that Sonos should not be allowed to relitigate Order No. 19. *Id*.; *see also* RRB at 15-17.

In Order No. 19, the undersigned found that Google's redesigns satisfied each of the four factors of the Commission's test for determining whether a respondent has met its burden for adjudication of a redesigned product. Order No. 19 at 4-5 (citing *Certain Human Milk Oligosaccharides and Methods of Producing the Same*, Inv. No. 337-TA-1120, Comm'n Op. at 18 (Jun. 8, 2020)). Sonos has not provided any evidence to justify a different outcome from Order No. 19, particularly given that Sonos was in possession of sufficient discovery with which to form infringement allegations for the redesigns, as shown below. The undersigned therefore finds nothing preventing adjudication of the redesigns.[15]

---

[15] As in Order No. 19, the undersigned notes that the Commission's policy is "in favor of adjudicating redesigns to prevent subsequent and potentially burdensome proceedings that could have been resolved in the first instance in the original Commission investigation." *See Certain Human Milk Oligosaccharides*, Inv. No. 337-TA-1120, Comm'n Op. at 18-19 (internal citations omitted).

### a) 258 NIA No. 1

Sonos asserts that the 258 NIA No. 1 meets every limitation of claim 17 of the '258 patent. CIB at 20. Google contends that the 258 NIA No. 1 does not meet limitations 17.2, 17.5, 17.6, or 17.7. RLUL at 1-2. Google does not dispute that the 258 NIA No. 1 meets the remaining limitations of claim 17. *Id*. Staff contends that the 258 NIA No. 1 does not meet limitations 17.2 and 17.7. SIB at 25.

### i) Limitations 17.2 and 17.7

Claim 17 includes the limitations "a device clock configured to generate clock time information for the first zone player" and "wherein in the synchrony group, the first and second zone players are configured to playback audio in synchrony based at least in part on (i) audio content, (ii) playback timing information associated with the audio content, wherein the playback timing information is generated by one of the first or second zone players, and (iii) clock time information for the one of the first or second zone players, and wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players, wherein the first and second zone players remain independently clocked while playing back audio in synchrony." JX-0001, cl. 17.

Sonos argues that the 258 NIA No. 1 meets these limitations both literally and under the doctrine of equivalents. CIB at 23. Google contends that the 258 NIA No. 1 does not meet these limitations under either theory of infringement. RIB at 32-38. Staff agrees with Google. SIB at 23-25.

### (A) Literal Infringement

Sonos asserts that in the 258 NIA No. 1, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. CIB at 21-22.

Sonos submits that the construction of the term "clock time information" does not require a

particular form of the information and does not require the information itself to be generated by

the device's clock. *Id*. at 23. Sonos argues that ████████████████████████

████████████████████████████████████████████████.

*Id*. According to Sonos, ████████████████████████████████████

████████████████████████████████████████████████████

█████. *Id*. Sonos also argues that Google's view of "clock time information" is too narrow

because something representing a time value need not take the form of a time value. *Id*. at 23-24.

In addition, Sonos disagrees with Google's contention that the "clock time information" has to be

generated by the device clock. *Id*. at 24-27.

Google contends that in the 258 NIA No. 1, ████████████████████████

████████████████. RIB at 30-31. Google explains that ████████████████

████████████████████████████████████████████████████

████████████████. *Id*. at 31. Google therefore argues that ████████████████

████████████████████████████████████████████ *Id*. at 32. Google

asserts that ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *Id*. (quoting

Schonfeld, Tr. at 1040:17-1041:3); RRB at 19-20. Thus, Google claims that ████████████

- 27 -

██████████████████████████████████████████████████████. RIB at

32-33. In addition, Google argues that ████████████████████████████

███████████████████████████. *Id*. at 33.

According to Staff, the parties agree that the 258 NIA No. 1 ███████████

███████████████████████████. SIB at 25. Staff also asserts that

in the 258 NIA No. 1, ████████████████████████████████████████████

████. *Id*. Staff therefore argues that the 258 NIA No. 1 does not meet these limitations.

The parties agree that the 258 NIA No. 1 incorporates the following changes: ███████

████████████████████████████████████████████████████████████████

████████████████████████████. *See* CIB at 21-22; RIB at 31;

SIB at 25. The evidence also shows that ███████████████████████████████

███████████████. *See* RX-1470C at Q/As 62-63; JX-0466C at 244:14-21. Instead, the

████████████████████████████████████████████████████████████████

████████████████████. *See* JX-0466C at 245:10-22; RX-1522C at Q/A

70. The term "clock time information" was construed as "information representing a time value

indicated by a device's clock."[16] Order No. 20 at 15. Because ████████████████████

████████████████████████████████████████████████████████████████

████████████████████[17, 18] *See* RX-1522C at Q/A 70. This makes sense

---

[16] The parties agreed to this construction, which was adopted by the undersigned. *See* Order No. 20 at 15.

[17] ████████████████████████████████████████████████████████████████
████████████████████. *See* MacKay, Tr. at 435:4-13 ("
████."").

[18] Sonos asserts that Google's expert characterized ████████████████████████████████. CIB
at 23; CRB at 19. Sonos, however, misrepresents the expert's testimony. Google's expert has consistently maintained
that ████████████████████████████████████. *See* Schonfeld, Tr. at 1040:8-16, 1052:22-1053:2,
1058:18-21; RX-1522 at Q/A 70.

in the context of how the 258 NIA No. 1 operates because ███████████████████

████████████████████████████████████████████████████████. *See*

CX-0011C at Q/A 358; RX-1470C at Q/A 62; RX-1522C at Q/A 65; JX-0466C at 245:10-22.

Indeed, ████████████████████████████████████████████████████

████████████████████████████████. *See* RX-1470C at Q/A 62.

In addition, the language of claim 17 recites "a device clock configured to generate clock

time information for the first zone player."[19, 20] JX-0001, cl. 17. The ████████████████

████████████████████████████████████████████████████████

████.[21] *See* RX-1522C at Q/As 64-79; Schonfeld, Tr. at 1058:8-14; MacKay, Tr. at 434:25-

435:13. This is supported by the fact that ████████████████████████████████

████████████████████████. *See* RX-1470C at Q/A 62; JX-0466C at 243:9-20.

---

[19] Sonos argues that the claim language does not require the "clock time information" of limitation 17.7 to be generated by the "device clock" of limitation 17.2. *See* CIB at 24-26. The undersigned disagrees. The language of claim 17 makes clear that the zone player that transmits the "playback timing information" is the zone player that transmits the "clock time information." *See* JX-0001, cl. 17 ("wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players"). This understanding is supported by the specification, which discloses that the audio information channel device 23 transmits both the clock time information and the playback timing information. *See, e.g.*, JX-0001 at 7:58-8:18 ("As will be described below in more detail, the audio information channel device 23 obtains the audio information for the audio program from an audio information source, adds playback timing information, and transmits the combined audio and playback timing information to the master device 21 and slave devices 22(g) over the network 12 for playback. The playback timing information that is provided with the audio information, together with clock timing information provided by the audio information channel device 23 as will be described below, enables the master device 21 and slave devices 22(g) of the synchrony group 20 to play the audio information simultaneously."), 8:19-37 ("The master device 21 and the slave devices 22(g) receive the audio and playback timing information, as well as the clock timing information, that are provided by the audio information channel device 23, and play back the audio program defined by the audio information.").

[20] Sonos also argues that the construction for "clock time information" allows for it to be generated by a component that takes an input from a device clock and then converts that input into some representation of the time value indicated by the device clock. CRB at 20. The undersigned finds this unpersuasive. Claim 17 recites "a device clock configured to generate clock time information," which makes clear that the clock time information is generated by a device clock. *See* JX-0001, cl. 17.

[21] Sonos proffers an alternative theory of infringement "where the 'device clock' is mapped to ███████████████ ██████████████" *See* CIB at 27 n.9. However, neither Sonos nor its expert cite to any evidence supporting this theory. *See id.*; CX-0011C at Q/A 367. The undersigned therefore finds this alternative theory unpersuasive.

Thus, the undersigned finds that the 258 NIA No. 1 does not literally infringe these limitations.

### (B)   Doctrine of Equivalents

Sonos argues that the 258 NIA No. 1 meets limitation 17.7 under the doctrine of equivalents because ███████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████. CIB at 27-28. Sonos claims that Google fails to provide any support for its assertion that simplifying the communication between the leader and follower escapes equivalency. *Id*. at 28. In addition, Sonos argues that there is no benefit to ███████████ ████████████████████████████████████████. CRB at 23. Sonos also disputes Google's argument that Sonos is estopped from asserting infringement by equivalency because the rationale behind the claim amendment during prosecution bears no more than a "tangential relation" to the equivalent in question. CIB at 29. Specifically, Sonos asserts that the amendment had nothing to do with the form of the "clock time information" or ████████████. *Id*.

Google first argues that because Sonos added the "clock time information" limitation during prosecution to overcome prior art, it is now "estopped from asserting infringement of the narrowed aspect of the claims under the doctrine of equivalents." RIB at 34-35. Google also asserts that "Sonos merely asserts in conclusory fashion that the redesign performs substantially the same function, in substantially the same way, to achieve substantially the same result as the 'clock time information' claim requirement," which is inadequate to meet Sonos' burden. *Id*. at 35-36. Google claims that ██████████████████████████████████████████████ ████████████████████████████████████████████████. *Id*. at 36. In addition, Google argues that "the redesign provides substantial functional benefits that the current

implementation does not." *Id*. Contrary to Sonos' assertion, Google contends that the redesign

████████████████████████████████████. *Id*. at 36-37. Google also argues that ████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id*. at 37-38.

Staff asserts that Sonos fails to show that the 258 NIA No. 1 meets limitations 17.2 and 17.7 under the doctrine of equivalents. SIB at 25.

As an initial matter, the undersigned finds that Sonos is not precluded from asserting infringement under the doctrine of equivalents for this limitation. The "clock time information" of limitation 17.7 was added during prosecution of the '258 patent. *See* JX-0006 at 4303. During prosecution, the applicant stated that "[t]he addition of Mosig would not overcome the deficiencies of Goldberg, Spurgat, and Meade for at least the reason that Mosig also fails to teach or suggest 'clock time information for the one of the first or second zone players transmitted from the one of the first or second zone players to the other of the first or second zone players.'" *Id*. at 4311. In distinguishing the claims from Mosig, the applicant argued that Mosig did not disclose "clock time information" because (i) the "play-out time offset" is an offset added to a timestamp, and (ii) the "common play-out time" is the time at which a particular media data packet plays out. *Id*. at 4312. Thus, while there was a narrowing amendment during prosecution, the rationale underlying the amendment "bear[s] no more than a tangential relation to the equivalent in question," *i.e.*, the incrementing counter. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 740-41 (2002). The undersigned therefore finds that Sonos has overcome the presumption that prosecution history estoppel bars a finding of equivalence for this limitation. *See id*. at 741.

As to infringement under the doctrine of equivalents, the undersigned finds that the alleged equivalent, *i.e.*, ████████████████████████████████████████████████████,

does not perform substantially the same function in substantially the same way to achieve substantially the same result as the claim limitation. *See Am. Calcar,* 651 F.3d at 1338. First, the ██████████████████████████████████████████████████████████ does not perform the same function as the claimed "clock time information." *See* RX-1470C at Q/As 62-63; JX-0466C at 244:14-21. As noted above, the ████████████████ is not information representing a time value.[22] *See supra* at Section VI.B.3.a.i.A; RX-1522C at Q/As 70-71; MacKay, Tr. at 435:4-13. Thus, instead of performing the function of representing a time value, the ██████████████████████ performs the function of ████████████████████████████ ████████████████████. *See* MacKay, Tr. at 435:4-13 ("█████████████████████ ████████████████"). Indeed, █████████████████████████████████████████ ████████████████████████████████. *See* RX-1470C at Q/A 62. The undersigned therefore finds that the 258 NIA No. 1 does not perform substantially the same function as the claimed limitation. *See* RX-1522C at Q/A 77.

Similarly, the 258 NIA No. 1 does not operate in substantially the same way as the claimed limitation. Sonos asserts that it does "█████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████." CIB at 28. However, Sonos' argument fails yet again because, as previously discussed, ██████████████████████████████████████ ████████████████████. Instead, in the 258 NIA No. 1, ██████████████████████ ██████████████████████████████████████████████████. *See* RX-1470C at Q/A 62; Schonfeld, Tr. at 1061:24-1062:22, 1063:4-8, 1049:22-1050:3; RX-1522C at Q/A 78. Rather,

---

[22] Sonos' argument regarding function relies on ██████████████████████████████. *See* CIB at 28; CX-0011C at Q/A 368. As previously discussed, the undersigned rejected this argument. *See supra* at Section VI.B.3.a.i.A.

in the 258 NIA No. 1, ███████████████████████████. *See id*. The undersigned therefore finds that the 258 NIA No. 1 does not operate in substantially the same way as the claimed limitation.

Lastly, the 258 NIA No. 1 does not achieve the same result as the claimed limitation. In the 258 NIA No. 1, ████████████████████████████████████████████████████████████████████████████████████████████████.” *See* RX-1470C at Q/A 62. Thus, ████████████████████████████████████████████████████████████████████████████████████████. *See id*.; RX-1522C at Q/A 79.

Thus, the undersigned finds that Sonos has failed to demonstrate that the 258 NIA No. 1 performs substantially the same function in substantially the same way to obtain the same result as these limitations, and thus the 258 NIA No. 1 does not infringe these limitations under the doctrine of equivalents.[23]

### ii) Limitations 17.5 and 17.6

Although Google contests that the 258 NIA No. 1 meets limitations 17.5 and 17.6, Google does not separately brief this issue apart from the '258 Accused Products. *See* RLUL at 1; RIB at 30-38; RRB at 17-22. Nor is there any indication that the 258 NIA No. 1 operates differently from the '258 Accused Products as it relates to limitations 17.5 and 17.6. Thus, for the same reasons as the '258 Accused Products, the undersigned finds that the 258 NIA No. 1 meets limitations 17.5 and 17.6. *See supra* at Section VI.B.2.a.i.

---

[23] In addition, Sonos' brief discusses the function, way, result test using conclusory statements with a mere cite to its expert's testimony. *See* CIB at 28. Thus, the undersigned finds that Sonos also failed to "submit particularized evidence as to equivalence." *See Am. Calcar*, 651 F.3d at 1338.

### iii) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the 258 NIA No. 1 does not infringe claim 17 of the '258 patent.

### iv) Claims 21, 24, and 26

Because the undersigned has found that independent claim 17 is not infringed by the 258 NIA No. 1, it is not necessary to determine whether dependent claims 21, 24, and 26 are infringed. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim.").

### b) 258 NIA No. 2

Sonos asserts that the 258 NIA No. 2 meets every limitation of claim 17 of the '258 patent. CIB at 20. Google contends that the 258 NIA No. 2 does not meet limitations 17.5, 17.6, or 17.7. RLUL at 1-2. Google does not dispute that the 258 NIA No. 2 meets the remaining limitations of claim 17. *Id*. Staff agrees with Sonos that the 258 NIA No. 2 meets the limitations of claim 17. SIB at 25.

### i) Limitations 17.5 and 17.6

Although Google contests that the 258 NIA No. 2 meets limitations 17.5 and 17.6, Google does not separately brief this issue apart from the '258 Accused Products. *See* RLUL at 1; RIB at 38-41; RRB at 22. Nor is there any indication that the 258 NIA No. 2 operates differently from the '258 Accused Products as it relates to limitations 17.5 and 17.6. Thus, for the same reasons as the '258 Accused Products, the undersigned finds that the 258 NIA No. 2 meets limitations 17.5 and 17.6. *See supra* at Section VI.B.2.a.i.

### ii) Limitation 17.7

Sonos asserts that in the 258 NIA No. 2, ███████████████████ ██████ constitutes the "playback timing information," which is confirmed by ███████ ██████████████████████████████████████ ████████████████████ CIB at 31. Contrary to Google's position, Sonos argues that ██████████████████████████████████████ . *Id.* Sonos contends that "████████ ██████████████████████████████████ ." *Id.* In addition, Sonos contends that a person of ordinary skill in the art would consider the combination of ███████████████ ████████████████████ to collectively amount to "playback timing information." *Id.* at 31 n.11. Similar to the '258 Accused Products, Sonos argues that the ████████ indicates when audio content is to be played back at both the leader and follower. *Id.* at 31-32.

Google argues that the 258 NIA No. 2 does not meet this limitation because "████ ██████████████████████████████████████ ." RIB at 38-39. Google contends that "████████████ ██████████████████████████████████████ ." *Id.* at 39. Google argues that because ███████ ██████████████████████████ . *Id.* In addition, Google argues that the ██████████████████████████████████ . *Id.* Because ████████████████████ ████████████████████ , Google asserts that it does not

constitute "playback timing information." *Id*. at 39-40. Google disagrees with Sonos' attempt to combine ███████████████████████████ as the "playback timing information." *Id*. at 40. Google argues that "[n]othing in the claim language, specification, or the adopted construction that allows 'playback timing information' to span entirely different messages that are sent at entirely different times." *Id*.

Staff submits that in the 258 NIA No. 2, ██████████████████████ ███████████████████████████████████ SIB at 26. Staff asserts that ████████████████████████████████████ ██████████████████████. *Id*. Staff argues that similar to its non-infringement arguments for the '258 Accused Products, Google's non-infringement arguments are based on an improper interpretation of the claims, and under a proper interpretation, the evidence shows that ████████████ in the 258 NIA No. 2 meets limitation 17.7. *Id*. at 26-27.

The parties agree that in the 258 NIA No. 2, █████████████████████ ██████████████████████. *See* CIB at 30; RIB at 38; SIB at 26. ████████████████████████████████ ████████████. *See* RX-1470C at Q/A 65. Then, ██████████ ████████████████████. *See id*. at Q/A 67. ████████████████████████████████████ ██████████████ *See id*. Then, ███████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████. *See id*. While the ████████ that

Sonos alleges is the claimed "playback timing information" indicates ████████████

████████████████████████, it alone does not indicate ████████████████████████

████████████████████████████████████ *See* RX-1470C at Q/As 65-67;

JX-0001, cl. 17. Thus, the ██████████ alone cannot be the claimed "playback timing

information."

Sonos also alleges that the combination of ██████████████████████████████

████████████████████████ can amount to the "playback timing information." In that

regard, Google asserts that "[n]othing in the claim language, specification, or the adopted

construction . . . allows 'playback timing information' to span entirely different messages that are

sent at entirely different times." *See* RIB at 40. This, however, is the wrong inquiry. Instead, the

question is whether the claims limit "playback timing information" to information sent in one

message. They do not. According to claim 17, the "playback timing information" must be

"associated with the audio content," "generated by one of the first or second zone players," and

"transmitted from the one of the first or second zone players to the other of the first or second zone

players." *See* JX-0001, cl. 17. In addition, "playback timing information" was construed as

"information indicating when the audio information [content] is to be played back."[24] Order No.

20 at 15. In the 258 NIA No. 2, ████████████████████████████████████████

████████████████████████████████████. *See* RX-1470C at Q/As 65-67. Thus,

those amount to the "playback timing information." *See* CX-0011C at Q/As 386-88. Once again,

Google's argument that there is no infringement because ████████████████████████

---

[24] The parties agreed to the construction for "playback timing information," which was adopted by the undersigned. *See* Order No. 20 at 15. Google did not propose a construction for that term requiring it to be contained in one message. Thus, any attempt by Google to introduce such a limitation now is rejected as untimely.

████████████████████████ is not persuasive. *See supra* at Section VI.B.2.a.ii. Accordingly, the undersigned finds that the 258 NIA No. 2 meets this limitation.

### iii) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the 258 NIA No. 2 infringes claim 17 of the '258 patent.

### iv) Claims 21, 24, and 26

Google does not dispute that the 258 NIA No. 2 meets the additional limitations of claims 21, 24, and 26. RLUL at 2-3. Nor is there any indication that the 258 NIA No. 2 operates differently from the '258 Accused Products as it relates to the additional limitations in claims 21, 24, and 26. Thus, for the same reasons as the '258 Accused Products, the undersigned finds that the 258 NIA No. 2 infringes claims 21, 24, and 26 of the '258 patent. *See supra* at Sections VI.B.2.b.

### c) 258 NIA No. 3

Sonos asserts that the 258 NIA No. 3 meets every limitation of claim 17 of the '258 patent. CIB at 20. Google contends that the 258 NIA No. 3 does not meet limitations 17.5, 17.6, or 17.7. RLUL at 1-2. Google does not dispute that the 258 NIA No. 3 meets the remaining limitations of claim 17. *Id*. Staff agrees with Sonos that the 258 NIA No. 3 meets the limitations of claim 17. SIB at 27.

### i) Limitations 17.5 and 17.6

Although Google contests that the 258 NIA No. 3 meets limitations 17.5 and 17.6, Google does not separately brief this issue apart from the '258 Accused Products. *See* RLUL at 1; RIB at 41-42; RRB at 22. Nor is there any indication that the 258 NIA No. 3 operates differently from the '258 Accused Products as it relates to limitations 17.5 and 17.6. Thus, for the same reasons as the

'258 Accused Products, the undersigned finds that the 258 NIA No. 3 meets limitations 17.5 and

17.6. *See supra* at Section VI.B.2.a.i.

### ii)     Limitation 17.7

Sonos contends that the 258 NIA No. 3 is ████████████████████████

████████████████████████████████████████████████████████

██████████████. CIB at 32. Sonos claims that, similar to the 258 NIA No. 2, the information

generated and transmitted by the leader in the 258 NIA No. 3, including the ███████████, meets

the construction of "playback timing information." *Id*.

Google argues that the 258 NIA No. 3 ██████████████████████████████

████████████████████████████████████████████████████████

██████████████████. RIB at 41. Google asserts that ███████████████████████

████████████████████████████████████████████████████████

████████████ *Id*. Google therefore argues that, because ███████████████████

████████████████████████████████████████████████████, there

is no transmission of "playback timing information associated with the audio content." *Id*. at 41-

42. Google contends that "the alleged 'playback timing information' is ██████████████████

█████████ and is further based on ████████████ which—like ████████████████

████████████—does not indicate when audio content is to be played back and is not associated

with audio content." *Id*. at 42.

Staff asserts that the parties agree that ██████████████████████████████

████████████████████████████████████████████████████. SIB at

27. Therefore, Staff argues that ████████████████████████████████████████

similar to the 258 NIA No. 2 and therefore, Sonos has met its burden to show that the 258 NIA No. 3 infringes the '258 patent. *Id*.

Similar to the 258 NIA No. 2, . *See* RX-1470C at Q/A 69. In addition, . *See id*. This does not change the determination above, with respect to the 258 NIA No. 2, that amount to the "playback timing information." *See supra* at Section VI.B.3.b.ii. Thus, for the same reasons as the 258 NIA No. 2, the undersigned finds that the 258 NIA No. 3 meets this limitation.

### iii)    Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the 258 NIA No. 3 infringes claim 17 of the '258 patent.

### iv)    Claims 21, 24, and 26

Google does not dispute that the 258 NIA No. 3 meets the additional limitations of claims 21, 24, and 26. RLUL at 2-3. Nor is there any indication that the 258 NIA No. 3 operates differently from the '258 Accused Products as it relates to the additional limitations of claims 21, 24, and 26. Thus, for the same reasons as the '258 Accused Products, the undersigned finds that the 258 NIA No. 3 infringes claims 21, 24, and 26 of the '258 patent. *See supra* at Sections VI.B.2.b.

## C.    Technical Prong of the Domestic Industry Requirement

Sonos asserts that the '258 DI Products satisfy the technical prong of the domestic industry requirement for claims 17, 21, 24, and 26 of the '258 patent. CIB at 7, 32.

### 1. Claim 17

Sonos asserts that the '258 DI Products meet every limitation of claim 17 of the '258 patent. CIB at 32. Google contends that the '258 DI Products do not meet limitations 17.5, 17.6, or 17.7. RLUL at 4. Google does not dispute that the '258 DI Products meet the remaining limitations of claim 17. *Id*. Staff agrees with Sonos that the '258 DI Products practice claim 17. SIB at 29.

#### a) Limitations 17.5 and 17.6

Sonos argues that it is undisputed that the '258 DI Products meet limitations 17.5 and 17.6. CIB at 33. For example, Sonos claims that each '258 DI Product is capable of receiving control messages from any Sonos-enabled controller connected to a Sonos audio system that direct and cause it to enter into a zone group or bonded zone[25] configured to playback audio in synchrony. *Id*. In this zone group or bonded group, Sonos contends that one '258 DI Product is designated as the group coordinator and every other '258 DI Product is designated as a group member. *Id*. Sonos also asserts that it is undisputed that the control messages (*i.e.,* ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ) each constitute a "direction . . . to enter into a synchrony group." *Id*. at 33-34.

Google disputes these limitations "to the extent the 'request' limitation of the '953 patent is found to be satisfied by the DI Products." *See* RLUL at 4. Thus, Google contends that if the '258 DI products satisfy the "request to enter into a synchrony group" limitation in claim 7 of the '953 patent, then they cannot satisfy the "direction . . . to enter into a synchrony group" limitation in claim 17 of the '258 patent. RIB at 44.

---

[25] In a Sonos system, there are two types of synchrony groups: a zone group and a bonded zone. CX-0011C at Q/A 80. A zone group refers to "a set of two or more Sonos audio players that are to play the same audio program synchronously, where each Sonos audio player in the set is configured to play the same components, such as both the right and left channels, of the audio program." *Id*. A bonded zone refers to "a set of two or more Sonos audio players that are to play the same audio program synchronously, where each Sonos audio player in the set is configured to play back a respective component, such as only the left or right channel or a particular frequency range, of the audio program." *Id*.

Staff contends that the parties agree that the '258 DI Products meet limitations 17.5 and 17.6. [26] SIB at 28. In addition, Staff submits that Google does not dispute that the '258 DI Products meet these limitations. SRB at 6.

The evidence shows that that '258 DI Products are capable of receiving control information from any Sonos-enabled controller connected to a Sonos audio system. *See* CX-0011C at Q/As 80, 112-30; CX-1002 at 10. These messages direct and cause the '258 DI Products to enter into a zone group or bonded zone with one or more other '258 DI Products configured to playback audio in synchrony. *See id*. Thus, the control messages (*i.e.*, ███████████████████████

████████████████████████████████████████████████) each constitute a "direction . . . to enter into a synchrony group." *See id*. Therefore, the undersigned finds that the '258 DI Products meet limitations 17.5 and 17.6. [27]

####     b)     Limitation 17.7

Sonos argues that the future timestamps for the audio frames constitute the claimed "playback timing information." [28] *Id*. In fact, Sonos contends that ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████. *Id*. at 36. Sonos disagrees with Google's argument that these timestamps do not meet this limitation because they do not indicate when audio content is to be played back at the member. *Id*. Sonos asserts that the timestamps indicate when audio content is to be played back at the

---

[26] Staff addresses Google's argument that the messages cannot be both a "direction" as required by claim 17 of the '258 patent and a "request" as required by claim 7 of the '953 patent with respect to the '953 patent. *Id*.

[27] As to whether the control messages in the '258 DI Products can also satisfy the "request" limitation in claim 7 of the '953 patent, that is discussed *infra* in Section VII.B.1.a.i.

[28] Sonos contends that with respect to the '953 patent, Google dropped its argument that the timestamps sent from the Sonos coordinator to a Sonos member are not the claimed "playback timing information." CRB at 24. Sonos argues that this concession is dispositive as to the '258 patent because the term "playback timing information" in the '258 and '953 patents has the same construction and the same timestamps are accused of being the "playback timing information" for both patents. *Id*.

coordinator and each member is configured to playback audio at the same time as the coordinator based on the timestamps. *Id*. In addition, Sonos argues that Google's "improper importation of limitations" into the construction of "playback timing information" are contrary to the claim language, which only requires that synchronous playback be "based at least in part on" the "playback timing information." *Id*. at 36-37. Lastly, Sonos contends that ███████████████ ████████████████ is "merely part of the internal processing that the member performs in order to prepare itself to playback the audio frames *at the times indicated by the timestamps* received from the coordinator, so that the member is able to playback audio 'in synchrony' with the coordinator." *Id*. at 37 (emphasis in original).

Google argues that the '258 DI Products fail to meet this limitation because the timestamp sent by the coordinator does not represent when the audio frame associated with the timestamp is to be played at the member. RIB at 42-43. Instead, Google contends that the ████████████ ███████████████████████████████████. *Id*. at 43. Google asserts that once it ████████████████████████████ ███████████████████████████████████████ ███████. *Id*. Similar to its non-infringement position, Google disputes Sonos' contention that nothing in the construction of "playback timing information" requires it to be represented according to the local clock of the member device. *Id*.

Staff asserts that there is no dispute that the "coordinator" in the '258 DI Products generates "timestamps" that are transmitted to the "member" of a "zone group" or "bonded zone." SIB at 28. Staff contends that Google's argument is flawed in the same way as its non-infringement argument, and that based on a proper interpretation of the claims, the evidence shows that the '258 DI Products practice limitation 17.7. *Id*. at 28-29; SRB at 6-7.

Similar to infringement, the central dispute is whether the future timestamps for the audio frames constitute the claimed "playback timing information." The evidence shows that in the '258 DI Products, the leader generates timestamps that are transmitted to the follower. *See* CX-0011C at Q/As 131-144. The timestamps indicate when audio content is to be played back at the leader and each follower is configured to playback audio at the same time as the leader based on the timestamps. *See id.* at Q/As 141-42. Google's argument that the timestamps cannot be the claimed "playback timing information" because each ███████████████████████████████████ was previously rejected. *See supra* at Section VI.B.2.a.ii. Thus, in the '258 DI Products, the timestamps sent from the leader are the claimed "playback timing information." Although the follower ███████████████████████████████████████████████████████████████ ████████ is still "at least based on" the timestamp from the leader. *See* CX-0011C at Q/As 131-144. Thus, the '258 DI Products play back audio in synchrony "based at least in part on" the playback timing information. Therefore, the undersigned finds that the '258 DI Products meet this limitation.[29]

### c) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the '258 DI Products satisfy the technical prong of the domestic industry requirement for claim 17 of the '258 patent.

### 2. Claims 21, 24, and 26

Sonos asserts that the additional limitations of claims 21, 24, and 26 are met. CIB at 37-39. Staff agrees. SIB at 29. Google does not dispute that the additional limitations of these dependent claims are met. RLUL at 5-6. In addition, the evidence shows that the '258 DI Products

---

[29] As Sonos notes, Google does not dispute that these timestamps are the "playback timing information" for the '953 patent, which has the same construction as the '258 patent. *See* RLUL at 8.

meet the additional limitations of claim 21, 24, and 26. *See* CX-0011C at Q/As 162-63, 170-207; JX-0337C at 1; JX-0290C.

Accordingly, the undersigned finds that the '258 DI products practice claims 17, 21, and 26.

## D.     Validity[30]

Google argues that the asserted claims are rendered obvious by: (1) U.S. Patent No. 7,391,791 ("Balassanian"); and (2) Balassanian in combination with U.S. Patent Application Publication No. 2007/0142944A1 ("Goldberg").  RIB at 44-45.

### 1.     Balassanian

#### a)     Claim 17

Google argues that the asserted claims of the '258 patent are obvious in view of Balassanian. RIB at 44-45. For purposes of obviousness, Sonos does not dispute Limitations 17.0-17.4 as to Balassanian. CLUL at 3. Staff contends that Google failed to present clear and convincing evidence that any asserted claim of the '258 patent is rendered obvious. SIB at 30.

#### i)     Limitations 17.5 and 17.6

Google claims that Balassanian discloses a synchronization system that designates rendering devices as either a master or slave in a synchrony group that are nodes on a network, which use communication links such as the local area network. *Id*. at 50. According to Google, when a device receives a designation to start operating as a slave, it meets these claim limitations. *Id*. Google asserts that Mr. Millington, the sole inventor of the '258 patent, describes designating devices to be either a master or slave as precisely how a zone group is formed according to his

---

[30] The parties agree that the asserted claims of the '258 patent are entitled to a priority date of April 1, 2004. *See* CIB at 39 n.14; SIB at 30; JX-0001 at 35. The parties also agree that Google's invalidity references quality as prior art. *See* SIB at 30.

invention. *Id*.; RRB at 25. Google also contends that Balassanian discloses that the claimed "control information" is received from the user interface, which operates as the claimed "controller." RIB at 50. Although Balassanian does not disclose a plurality of user interfaces, Google claims that it would have been trivial for a person of ordinary skill in the art to utilize Balassanian's system so that the user interface is installed on other computers connected to the same network. *Id*. at 50-51.

Google argues that Balassanian's disclosures are not limited to a user interface integrated with a rendering device, but rather, Balassanian's user interface is on a personal computer connected via LAN to video and audio rendering devices, which themselves are standalone computer devices with their own processors, and are physically separate and distinct from the rendering devices. *Id*. at 52. Google submits that Sonos' position is undermined by Dr. Almeroth's admission that the controller could be software. *Id*. Google also argues that the '258 patent specification does not require the controller to be in any particular physical form. *Id*. at 52-53. In fact, Google asserts that "the patent specifically teaches that the claimed zone player may include a user interface, and that a user interface is a controller." RRB at 23-24.

Sonos argues that there is no receipt of control information from a controller because Balassanian has no controller. CIB at 56. Sonos contends that, at most, Balassanian teaches the fundamentally different approach of a rendering device that might have an integrated user interface that can accept certain inputs. *Id*. According to Sonos, the only reference in Balassanian to a user interface is a single rendering device with an integrated user interface "that can accept certain inputs, none of which controls any other rendering device." CRB at 26. Sonos also argues that Balassanian does not disclose a "direction . . . to enter into a synchrony group" because its rendering devices are pre-programmed to synchronize with one another. CIB at 56. Sonos contends

that Google's assertion regarding designating devices as master or slave of a group is irrelevant because assigning roles within a formed synchrony group is distinct from zone players entering into a synchrony group. CRB at 28-29. Moreover, Sonos argues that the instructions Google points to are referring to the software stored in the memory of a rendering device and has nothing to do with a rendering device receiving an instruction over a LAN to perform some action. *Id*. at 29.

According to Staff, the parties agree that Balassanian discloses that the synchronization system designates a master rendering device and designates all other rendering devices as slave rendering devices. SIB at 39. Staff, however, argues that a person of ordinary skill would not have understood that to disclose the claimed "direction . . . to enter into a synchrony group." *Id*. at 40. In addition, Staff asserts that Google failed to present clear and convincing evidence that one of ordinary skill would have been motivated to make the proposed modifications to Balassanian's user interface. *Id*. Staff submits that Google's argument - that the rendering devices in Balassanian must receive instructions via a user interface in the synchronization system - is unsupported and does not rise to the level of clear and convincing evidence. SRB at 9.

The undersigned finds that Balassanian does not disclose that the claimed "control information" is received from the user interface, which operates as the claimed "controller." Even if the user interface in Balassanian amounted to the claimed "any one of a plurality of controllers," Balassanian does not disclose that a rendering device (which Google alleges reads on the claimed "zone player") receives control information from the user interface that "comprises a direction . . . to enter into a synchrony group." *See* CX-0014C at Q/As 464-66. Balassanian only generally teaches that the "synchronization system" designates the rendering devices as a master or slave rendering device. *See* JX-0448 at Abstract ("The synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave

rendering devices."), 2:28-32 ("To help ensure synchronization of rendering devices, the synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices."). In addition, Balassanian does not teach that the user interface sends control information that "comprises a direction . . . to enter into a synchrony group." Rather, Balassanian teaches that the user interface is for a user to "indicate the difference in the rendering times." *See id.* at 3:12-18.

Google's expert also claims that "a POSITA would have readily modified Balassanian's user interface to enable a user to provide the master/slave designation and thereby provide a direction for a rendering device to enter into a synchrony group as a slave." *See* RX-1479C at Q/As 458-59. Specifically, Google's expert states:

> Balassanian expressly teaches that the rendering devices are connected via communications links including a LAN and that a user interface is displayed on a "personal computer." Balassanian at 3:12-26. And, as Sonos admits, "precisely *how* one device sends information to another device over a LAN via a network interface was within the general knowledge of one of ordinary skill in the art at the time of the invention." RX-0665C (Sonos's Fourth Supp. Response To Google's First Set of Interrogatories at 154). Thus, it would have been trivial for a POSITA to allow a user to transmit control information to certain rendering devices to designate them as master and slaves over a LAN via a network interface, such as by using a web application from any plurality of computers that controls Balassanian's rendering devices.

*Id.* at Q/A 459. This, however, is not supported by Balassanian's disclosure, given that Balassanian only teaches that the user interface is for a user to "indicate the difference in the rendering times." *See* JX-0448 at 3:12-18. Moreover, Google does not point to any evidence in Balassanian or elsewhere demonstrating that a person of ordinary skill in the art would have a reason to modify Balassanian in that way. *See* CX-0014C at Q/As 470-72. Thus, the undersigned finds that Google has not met its burden to prove that Balassanian renders these limitations obvious.

### ii) Limitation 17.7[31]

Google argues that Balassanian discloses a master device that sends the slave devices a message containing the master rendering time, which indicates when the master device renders content. RIB at 53. Google claims that this master rendering time is sent on a periodic basis, and upon receiving the master's rendering time, each slave device determines whether a time domain differential exists between the rendering times and adjusts the rendering of the content in proportion to the time domain differential so that the content can be rendered at the same time. *Id*. Google argues that the "master rendering time" in Balassanian is an indication of when the master device renders content, and is not limited to a point in the past, present, or future. *Id*. at 53-54; RRB at 25-26. In addition, Google contends that Balassanian discloses delaying the rendering of content into the future or buffering the audio. RIB at 54. Google submits that its expert, Dr. Schonfeld, explained that buffering delays playback into the future. *Id*. Lastly, Google argues that "Balassanian discloses that, after receiving the master rendering time, the slave devices may skip frames to 'speed up' to the master device, in which case the master rendering time must indicate a future time to which a slave device advances its playback." *Id*.

Sonos argues that Balassanian does not disclose "playback timing information" because the "master rendering time" in Balassanian is the time represented by the amount of content that has been rendered by the master rendering device. CIB at 57; CRB at 30. Sonos claims that this is "backward-looking" because "a measure of how much content has *already been rendered* by the master rendering device is information about that device's *prior* playback, rather than a *forward-looking* indication of 'when audio content is *to be played back*' in the future." CIB at 57 (emphasis in original); CRB at 31. Sonos argues that Balassanian "refers uniformly to information about *prior*

---

[31] Staff does not discuss whether Balassanian renders limitation 17.7 obvious. *See* SIB at 39-41.

playback." CIB at 57-58 (emphasis in original). Sonos also argues that the "indication" in Balassanian that Google points to is not the master rendering time, but rather a separate indication that corresponds to the master rendering time. CRB at 31. Sonos claims that a person of ordinary skill in the art would understand this claimed "indication" to refer to the device time of the master. *Id*. In addition, Sonos argues that "Balassanian's mere disclosure of a rendering device buffering content neither erases the unequivocal definition and explanation of rendering time nor suddenly transforms the master rendering time into the claimed 'playback timing information.'" *Id*. at 32. According to Sonos, many devices buffer content before playback without use of "playback timing information." *Id*. In addition, Sonos argues that in Balassanian, re-aligning the rendering of the master and slave devices is different than prospectively scheduling future playback so that the zone players do not get out of synchronization. *Id*. at 33.

The undersigned finds that the master rendering time in Balassanian cannot be the claimed "playback timing information," which was construed as "information indicating when the audio information [content] is to be played back." Order No. 20 at 15. As opposed to indicating when audio is to be played back, either at the master or the slave, the master rendering time in Balassanian is the time represented by the amount of content that has already been rendered by the master. *See* JX-0448 at 2:18-22 ("The rendering time is the time represented by the amount of content that has been rendered by that rendering device. For example, if a rendering device is displaying 30 frames of video per second, then the rendering time will be 15 seconds after 450 frames are displayed."). As Sonos' expert points out, the master rendering time does not indicate when the audio content was played back by the master rendering device, but rather, indicates how much content the master rendering device has played back. *See id*.; CX-0014C at Q/A 484.

In addition, Google argues that the master rendering time is not limited to a point in the past, present, or future by pointing to Balassanian's disclosure of delaying the rendering of content into the future, buffering the audio, or skipping frames. *See* RIB at 53-54. The portions of Balassanian cited by Google, however, do not teach that the master rendering time indicates a future time to render content. *See* CX-0014C at Q/A 499. Instead, Balassanian discloses that the slave rendering device adjusts the rendering of its content to compensate for the difference between the slave rendering time and the master rendering time. *See* JX-0448 at 3:60-4:45 ("For example, if the video rendering device was one second behind the master audio rendering device, then it might skip the display of every other frame for the next two seconds to "speed up" to the master audio rendering device."). Thus, the undersigned finds that Google has not met its burden to prove that Balassanian renders this limitation obvious.

### iii) Limitation 17.8

Google contends that Balassanian discloses displaying a dial or slider on a user interface that the user can adjust to indicate the difference in rendering times. RIB at 54. According to Google, the difference in rendering times constitutes the claimed "status information" because it informs the user of the status of the synchrony group. *Id*. In addition, Google asserts that because the rendering devices operate in a network utilizing communication links such as the LAN, then the status information is transmitted to the user interface over the LAN. *Id*.; RRB at 27. To the extent the dial or slider is found not to represent "status information" transmitted from a rendering device over the LAN, Google argues that a person of ordinary skill in the art would have found it obvious to modify Balassanian's user interface to receive status information, such as the identify and/or timing information of rendering devices engaged in the synchronization system. RIB at 55. Google contends that such a modification would have benefited Balassanian's system by providing

a means for a user to monitor the status of the synchronization system. *Id.* In addition, Google claims that it would have been a trivial modification because Balassanian's system already includes a user interface and communication links. *Id.*

Google reiterates that there is no requirement for a standalone controller and that the '258 patent specifically teaches that the claimed zone player may include a user interface that is a controller. RRB at 27. In addition, Google argues that "[t]o display the current 'difference in the rendering times' (*i.e.*, the claimed 'status information') in a form of a 'dial' or 'slider' that the user can adjust, the user interface must receive an indication from the rendering devices of the current status of the 'difference in the rendering times.'" *Id.*

Sonos again asserts that Balassanian does not have a controller. CIB at 58. Sonos argues that having a rendering device that may have an integrated user interface is "a fundamentally different type of system." *Id.* In addition, Sonos contends that Google fails to identify the required "status information" as it only points to "a disclosure that describes the *user manually inputting* a value into one of the rendering device's user interface," which is not transmitted over the LAN via the network interface. *Id.* (emphasis in original). Sonos argues that in Balassanian, a user provides, via a dial or slider, an input to indicate the difference in the rendering times. CRB at 33-34. Moreover, Sonos argues that Google's argument regarding a motivation to modify Balassanian is "purely conclusory." *Id.* at 34.

Staff asserts that the evidence shows that the difference in rendering times is not transmitted from one rendering device over the network to the user interface of another rendering device. SIB at 41. In addition, Staff argues that Google failed to present clear and convincing evidence that a person of ordinary skill would have been motivated to make the proposed modifications to Balassanian's user interface. *Id.* Staff contends that "Google provides only

unsupported attorney argument in an attempt to overcome the lack of disclosure in Balassanian." SRB at 10.

The undersigned finds that Balassanian does not teach this limitation. Google claims that the difference in rendering times constitutes the claimed "status information" and that because the rendering devices operate in a network utilizing communication links, then the status information is transmitted to the user interface (which Google alleges is the claimed "at least one of the plurality of controllers") over the LAN. *See* RIB at 54. However, even if the user interface in Balassanian amounted to the claimed "at least one of the plurality of controllers," Balassanian does not support this understanding. Balassanian discloses a synchronization system where a user manually accounts for variation. *See* JX-0448 at 3:12-14. Balassanian states:

> For example, if the video and audio are rendered via a personal computer, the synchronization system may display a dial or a slider on a user interface that the user can adjust to indicate the difference in the rendering times. If the video is rendered five seconds after the corresponding audio, then the user can indicate via the user interface that the offset is five seconds.

*Id*. at 3:14-20. Thus, instead of a rendering device (or zone player) transmitting the difference in rendering times to the user interface, Balassanian discloses that the user indicates the difference in rendering times on the user interface. *See id*. at 3:14-20; CX-0014C at Q/A 519.

In addition, Google alleges that a person of ordinary skill in the art would have modified Balassanian's user interface to receive status information, such as the identity and/or timing information of rendering devices engaged in the synchronization system. *See* RIB at 55. Google claims that this modification "would have beneficially supplemented Balassanian's system by providing a means for a user to monitor the status of the synchronization system." *See id*. However, Google makes this claim without providing any evidence that a person of ordinary skill in the art at the time of the invention would have a reason to modify Balassanian in that way. *See* CX-0014C

at Q/A 525. Thus, the undersigned finds that Google has not met its burden to prove that Balassanian renders this limitation obvious.

### iv) Conclusion

The undersigned found that Google has not met its burden to prove that Balassanian renders limitations 17.5-17.8 obvious. Accordingly, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that claim 17 of the '258 patent is rendered obvious by Balassanian.

### b) Claims 21, 24, and 26

Claims 21, 24, and 26 depend from claim 17. Because claim 17 is not rendered obvious by Balassanian, then claims 21, 24, and 26 are also not rendered obvious by Balassanian.

## 2. Balassanian with Goldberg

### a) Claim 17

Google argues that the asserted claims of the '258 patent are obvious in view of Balassanian in combination with Goldberg. RIB at 44-45. Specifically, Google states that to the extent that "Balassanian alone does not disclose or render obvious claim limitation 17.8 and claims 21 and 24, they are rendered obvious by Balassanian in view of Goldberg." *Id.* at 60. Because the undersigned found above that Balassanian did not render limitations 17.5-17.8 obvious, Goldberg cannot cure the deficiencies of Balassanian. Accordingly, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that claim 17 of the '258 patent is rendered obvious by Balassanian in combination with Goldberg.

### b) Claims 21 and 24

Claims 21 and 24 depend from claim 17. Because claim 17 is not rendered obvious by Balassanian in combination with Goldberg, then claims 21 and 24 are also not rendered obvious by Balassanian in combination with Goldberg.

### 3. Conclusion

For the reasons set forth above, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that any asserted claim is rendered obvious.

### 4. Secondary Considerations

Google contends that Sonos has not met its burden and is barred from arguing that so-called copying supports secondary considerations of nonobviousness. RIB at 66. Secondary considerations of nonobviousness may rebut a *prima facie* case of obviousness. Here, where Google has not made out a *prima facie* case of obviousness, there is no showing to rebut. Accordingly, the undersigned need not consider any secondary considerations of nonobviousness.

## VII. U.S. PATENT 10,209,953

### A. Overview

The '953 patent, entitled "Playback Device," issued on February 19, 2019 to Nicholas A. J. Millington. The '953 patent is assigned to Sonos. *See* Compl. Ex. 4. The '953 patent generally relates to "the field of digital data processing devices, and more particularly to systems and method for synchronizing operations among a plurality of independently-clocked digital data processing devices." JX-0002 at 1:30-34.

### 1. Asserted Claims

Sonos is asserting claims 7, 14, and 22-24 of the '953 patent against Google. CIB at 2.

These claims read as follows:

7.   [7.0] A first zone player comprising:

[7.1] a network interface that is configured to provide an interconnection with at least one data network;

[7.2] a clock that is configured to provide a clock time of the first zone player;

[7.3] at least one processor;

[7.4] a tangible, non-transitory computer-readable medium; and program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform functions comprising:

[7.5] receiving a request to enter into a synchrony group with at least a second zone player that is communicatively coupled with the first zone player over a local area network (LAN);

[7.6] in response to receiving the request to enter into the synchrony group, entering into the synchrony group with the second zone player, wherein the first zone player is selected to begin operating as a slave of the synchrony group and the second zone player is selected to begin operating as a master of the synchrony group, and wherein the clock time of the first zone player differs from a clock time of the second zone player;

after beginning to operate as the slave of the synchrony group:

[7.7] receiving, from the second zone player over the LAN, clock timing information that comprises at least one reading of the clock time of the second zone player;

[7.8] based on the received clock timing information, determining a differential between the clock time of the first zone player and the clock time of the second zone player;

[7.9] receiving, from the second zone player over the LAN, (a) audio information for at least a first audio track and (b) playback timing information associated with the audio information for the first audio track that comprises an indicator of a first future time, relative to the clock time of the second zone player, at which the first and second zone players are to initiate synchronous playback of the audio information for the first audio track;

[7.10] updating the first future time to account for the determined differential between the clock time of the first zone player and the clock time of the second zone player; and

[7.11] when the clock time of the first zone player reaches the updated first future time, initiating synchronous playback of the received audio information with the second zone player.

14.    The first zone player of claim 13, wherein the playback timing information further comprises, for each subsequent frame in the series of frames:

an indicator of a respective future time, relative to the clock time of the second zone player, at which the frame is to be synchronously played back by the first and second zone players.

22.    The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions while operating as the slave of the synchrony group:

[22.1] receiving, from the second zone player over the LAN, a command to adjust an individual volume of the first zone player; and
[22.2] in response to receiving the command, adjusting the individual volume of the first zone player.

23.    The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions:

[23.1] while operating as the slave of the synchrony group, receiving, from the second zone player over the LAN, control information that enables the first zone player to begin operating as the master of the synchrony group; and

[23.2] in response to receiving the control information, transitioning from operating as the slave of the synchrony group to operating as the master of the synchrony group.

24.    The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions:

[24.1] while operating as the slave of the synchrony group, receiving a request to disengage from the synchrony group;

[24.2] in response to receiving the request to disengage from the synchrony group, disengaging from the synchrony group and transitioning from operating as the slave of the synchrony group to operating as a standalone zone player.

### 2. Claim Construction

The undersigned construed the following terms from the asserted claims as follows:

| TERM | CLAIM(S) | CLAIM CONSTRUCTION |
|---|---|---|
| "zone player" | 7, 14, 22-24 | "data network device configured to process and output audio" |
| "network interface" | 7 | "physical component of a device that provides an interconnection with a data network" |
| "playback timing information" | 7, 14 | "information indicating when the audio information [content] is to be played back" |
| "clock timing information" | 7 | "information representing a time value indicated by a device's clock" |
| "a synchrony group" | 7, 22-24 | "a set of two or more zone players that are to play the same audio program synchronously" |
| "local area network" | 7, 22, 23 | "a data communications network spanning a limited geographical area, such as an office, an entire building or industrial park" |

Order No. 20 at 15-20.

### B. Infringement

Google argues that the '953 Accused Products do not infringe because they are imported as standalone devices. RIB at 75. As previously discussed with respect to the '258 patent, the undersigned rejects this argument. *See supra* at Section VI.B.1.

### 1. The '953 Accused Products

Sonos asserts that claims 7, 14, and 22-24 of the '953 patent are infringed by the '953 Accused Products. CIB at 7.

#### a) Claim 7

Sonos asserts that the '953 Accused Products meet every limitation of claim 7 of the '953 patent. CIB at 71. Google contends that the '953 Accused Products do meet limitations 7.5, 7.6,

7.8, 7.10, or 7.11. RLUL at 7-8. Google does not dispute that the '953 Accused Products meet the remaining limitations of claim 7. *Id*. Staff agrees with Sonos that the '953 Accused Products infringe the asserted claims of the '953 patent. SIB at 51.

### i) Limitations 7.5 and 7.6

Claim 7 includes the limitations "receiving a request to enter into a synchrony group with at least a second zone player that is communicatively coupled with the first zone player over a local area network (LAN)" and "in response to receiving the request to enter into the synchrony group, entering into the synchrony group with the second zone player, wherein the first zone player is selected to begin operating as a slave of the synchrony group and the second zone player is selected to begin operating as a master of the synchrony group, and wherein the clock time of the first zone player differs from a clock time of the second zone player." JX-0002, cl. 7.

Sonos contends that the "request" limitation is the only part of limitations 7.5 and 7.6 that is in dispute. CIB at 72. Sonos argues that the following messages in the '953 Accused Products amount to the claimed "request": ██████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████. *Id*. at 72-73. Sonos claims that ████████████

██████████████████████████████ and a person of ordinary skill in the art would commonly refer to analogous messages as "requests." *Id*. at 73; CRB at 43-44. Sonos disputes Google's assertion that a request requires mutual agreement between two devices. CIB at 73. Instead, Sonos argues that a person of ordinary skill in the art "would understand 'request' to be a broader term that covers both non-obligatory messages and also obligatory messages that direct a recipient to take an action." *Id*. at 73-74; CRB at 41. According to Sonos, this is confirmed

by several dictionary definitions as well as usage of that term in the industry. CIB at 74. In addition, Sonos claims that dictionaries cited by Google confirm that "request" and "direction' have overlapping meanings. CRB at 42. Sonos also argues that Google does not point to anything in the '953 patent that limits "request" to requiring mutual agreement between two devices. *Id*. at 42.

Google argues that  requests, but rather, are directions or commands. RIB at 80. According to Google, a person of ordinary skill in the art would understand that the plain meaning of the term "request" requires mutual agreement between two devices, but that the plain meaning of "direction" or "command" does not. *Id*. Google claims that numerous dictionary definitions support this understanding of the terms. *Id*. at 81. Google therefore argues that                                    , they are "directions," not "requests." *Id*. Moreover, Google contends that

. *Id* at 82-83.

Staff submits that if the undersigned determines that "request" can include a command or direction, then Google does not dispute that                          meet these limitations. SIB at 53. Staff contends that one of ordinary skill in the art would not understand the plain and ordinary meaning of "request" to be limited to mutual acceptance. *Id*. Staff argues that        Sonos'            engineers commonly use the term "request" to refer to messages that direct a recipient to take action. *Id*. Staff further argues that at least one industry standard uses the term "request" in that same way. *Id*. Staff also asserts that several computer-related dictionary definitions equate the term "request" to a command or instruction. *Id*. at 53-54.

None of the parties sought to construe the term "request" during the claim construction phase of the investigation. *See generally* Order No. 20. Nevertheless, the parties' dispute rests on whether the plain and ordinary meaning of "request" requires mutual agreement between two devices. In the context of the '953 patent, the term "request" is recited in the claims whereby a zone player receives "a request to enter into a synchrony group" and then "in response to receiving the request to enter into the synchrony group," the zone player "[enters] into the synchrony group." *See, e.g.*, JX-0002, cl. 7. The language of the claims does not recite that the zone player can deny or accept the "request," but rather, recites that, in response to the "request," the zone player enters into the synchrony group. *See id*. Thus, the '953 claims do not suggest that the plain meaning of "request" requires mutual agreement. Moreover, Google has not cited to any evidence from the specification indicating that the zone player has the option to deny or accept that request.

Extrinsic evidence also demonstrates that the plain and ordinary meaning of "request" need not require mutual agreement. For example, engineers from ██████ Sonos ██████████ use the term "request" to refer to messages that direct or command a recipient to take action. *See* Millington, Tr. at 65:25-68:6; CX-0415C; CX-0007C at Q/As 43-44; JX-0466C at 152:1-154:3; JX-0473C at 90:18-91:19, 94:23-95:23, 96:2-11; JX-0467C at 128:13-23; JX-0017C at 14-16; CX-0254C at 19-21; CX-0011C at Q/A 443. While not dispositive on its own, the undersigned finds that this is evidence of how that term is used in the industry. Moreover, several computer-related dictionary definitions equate the term "request" to a command or instruction. *See* JX-0381; JX-0380. While Google cites to dictionary definitions that allegedly define "request" as asking for something, those definitions are not provided in the computer context, and thus carry less weight. *See* RX-1792; RX-1793; RX-1789. In fact, in the computer context, one of the dictionaries cited by Google equates "request" to "instruction." *See* RX-1791 (defining "request" as "an instruction to a

computer to provide information or perform another function."). The undersigned therefore finds that the plain and ordinary meaning of "request" in the '953 patent does not require mutual agreement between devices. *See* CX-0011C at Q/As 443, 574, 577.

Similar to the '258 patent, the evidence shows that ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████. CX-0011C at Q/As 568-574, 577. These messages are a request or direction for the '953 Accused Products to enter into a synchrony group with a second zone player. *Id*. In addition, the parties agree that ███████████████

████████████████████ constitute a "direction," under the plain meaning of the term. *See* CIB at 11; RIB at 27; SIB at 15. The undersigned therefore finds that the '953 Accused Products meet limitations 7.5 and 7.6

### ii)   Limitation 7.8

Claim 7 includes the limitation "based on the received clock timing information, determining a differential between the clock time of the first zone player and the clock time of the second zone player." JX-0002, cl. 7.

Sonos argues that ███████████████████████████████████

███████████████████████████████. CIB at 75. Sonos contends that ████████████

████████████████████████████████████████████████. *Id*.

According to Sonos, ████████████████████████████████████████

████████████████████████████. *Id*. Sonos argues that the reference to $\Delta T = T_S - T_C$ in the '953 patent does not define a specific equation for determining the time differential, but rather, "is merely intended to conceptually describe what a 'time differential' between two devices is." *Id*. at 76. In addition, Sonos asserts that the claims are not limited to any particular formula for

- 62 -

determining the differential. *Id*. at 76-77. Sonos also contends that "the specification expressly contemplates that the 'differential' can be determined based on multiple samples over time." *Id*. at 77.

Google argues that ███████████████ is not a "differential." RIB at 75. Google contends that a person of ordinary skill in the art would understand, from the claims and specification of the '953 patent, that "differential" refers to the difference between the local clock of the first zone player and the local clock of the second zone player. *Id*. Accordingly, Google argues that ████████████████ in the '953 Accused Products cannot be the claimed "differential" because "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.mmmm." *Id*. at 76; RRB at 33. Google also argues that each ████████████████ is not the claimed "differential" because the '953 Accused Products do not update the accused "first future time" to account for any ████████████████. RRB at 34.

Staff contends that the parties agree that when the '953 Accused Products ████████████████████████████████████████████████████████████████. SIB at 54. Staff, however, argues that Google is improperly attempting to import a limitation into the claims by limiting the claimed "differential" to $\Delta T = T_S - T_C$. *Id*. Thus, Staff asserts that under a proper interpretation of the claims, the evidence shows that ████████████ in the '953 Accused Products meets this limitation. *Id*. at 54-55.

None of the parties sought to construe the term "differential" during the claim construction phase of the investigation. *See generally* Order No. 20. Nevertheless, the parties' dispute rests on

whether the term "differential" is limited to any particular formula for determining the differential. Google argues that the meaning of "differential" is limited to the embodiment where $\Delta T = T_S - T_C$. However, it "is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *GE Lighting Sols., Inc. v. AgiLight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004)). Google has not cited to evidence in the intrinsic record to support limiting the claim, and without such a clear indication, the undersigned declines to limit "differential" in the manner proposed by Google.[32] This is particularly true where the specification mentions SNTP with respect to obtaining clock time information and determining the time differential. *See* JX-0002 at 11:48-12:16, 24:50-25:16. In addition, the specification discloses that members periodically obtain current time values and periodically update the time stamps. *See id*. at 33:46-57. Thus, the term "differential" is not limited to a particular formula for determining the differential, and does not exclude that the differential can be determined based on multiple samples over time.

The parties agree that in the '953 Accused Products, ███████████████████████████

███████████████████. *See* RX-1522C at Q/A 134; CX-0011C at Q/As 593-94.

Furthermore, the evidence shows that ██████████████████████████████████████

████████████████████ *See* CX-0011C at Q/As 593-94. ████████████████████

███████████████████████████████████████████████████████████████,

---

[32] In addition, to the extent that Google is arguing that the patentee was acting as his own lexicographer in defining the term "differential," *see* RX-1522C at Q/A 133, the undersigned also finds this unpersuasive. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *GE Lighting Sols.*, 750 F.3d at 1309 (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). Google has not cited to evidence in the intrinsic record that supports a finding that the patentee was acting as his own lexicographer.

██████████████████████████████████████████████████

██████████ . *See* CX-0011C at Q/As 587-89, 593-94; RX-1522C at Q/As 130-148; JX-0019C

at 6-8; JX-0466C at 154:9-169:18; Schonfeld, Tr. at 1034:12-1037:6. Accordingly, the

undersigned finds that this ██████████████ amounts to the claimed "differential" and that

the '953 Accused Products meet limitation 7.8.

### iii)   Limitation 7.10

Claim 7 includes the limitation "updating the first future time to account for the determined

differential between the clock time of the first zone player and the clock time of the second zone

player." JX-0002, cl. 7.

Sonos argues that it is undisputed that ████████████████████████████████

████████████████████████████████████████████ . CIB at 78. In

addition, Sonos claims it is undisputed that █████████████████████ constitutes an

indicator of the "first future time." *Id*. at 78-79; CRB at 44. Sonos also contends that when the

follower █████████████████████████████ , the follower also

accounts for █████████████ that are the "determined differential." CIB at 79. Sonos argues

that contrary to Google's position, the claim only requires the follower to account for the

differential, not adjust the future time by the differential. *Id*. at 79-80; CRB at 45.

Google argues that the alleged first future time is █████████████████████

████████████████████ . RIB at 77-78. According to Google, "█████████████

████████████████████████████████████████████████

███████████████████████████ " *Id*. at 78. In addition, Google argues

that "█████████████ " refers to the original determined differential and therefore Sonos

cannot read "a differential" on the ████████ while reading "the determined differential" on the
████████████ *Id*.

Staff contends that for the same reasons as limitation 7.8, the evidence shows that the '953
Accused Products determine the claimed "differential." SIB at 55. Thus, Staff argues that the '953
Accused Products meet this limitation. *Id*.

As discussed above, the undersigned determined that the ████████████ amounts
to the claimed "differential." In addition, it is undisputed that ████████████████
████████████ is the claimed "first future time."[33] *See* CX-0011C at Q/As 601-03. Thus,
the evidence shows that the first future time is adjusted by ████████████. *See* CX-
0011C at Q/As 607-08; RX-1522C at Q/As 150-55. Accordingly, the undersigned finds that the
'953 Accused Products meet limitation 7.10.

### iv)   Limitation 7.11

Claim 7 includes the limitation "when the clock time of the first zone player reaches the
updated first future time, initiating synchronous playback of the received audio information with
the second zone player." JX-0002, cl. 7.

Sonos claims that it is undisputed that ████████████████████
████████████████████████████████. CIB at 80. In
addition, Sonos contends that ████████████████████████
████████████████████████████████
████████████████. *Id*. at 81. Sonos argues that Google's
arguments as to this limitation fail for the same reasons as its arguments in connection with
"playback timing information" in the '258 patent. CRB at 45.

---

[33] Google does not dispute that the '953 Accused Products meet limitation 7.9. RLUL at 8.

Google argues that even if ██████████████ is the claimed "determined differential," this limitation is still not infringed because ████████████████████ ██████████████████████████████████████████████. RIB at 78-79. Google contends that under the correct interpretation of "initiating synchronous playback," the followers do not meet the limitation because ██████████████████████ ████████████████████████████████████████████████████ ██████████████. *Id*. at 79. For example, Google asserts that ██████████████████ ██████████████████████. *Id*.; RRB at 36.

Staff contends that for the same reasons as limitation 7.8, the evidence shows that the '953 Accused Products determine the claimed "differential." SIB at 55. Thus, Staff argues that the '953 Accused Products meet this limitation. *Id*.

As discussed above with respect to limitation 7.10, the follower adjusts the first future time (*i.e.*, ██████████████████████████████) by ████████████████. *See supra* at Section VII.B.1.a.iii. The follower is also configured to initiate synchronous playback of audio frames from an audio track with the leader. *See* JX-0019C at 5-8; JX-0025C at 1; CX-0868C at 1; JX-0179C at 1; CX-0842C at 1-3; CX-0011C at Q/As 615-616. The follower does this when the local clock time of the follower reaches the updated first future time. *See* CX-0011C at Q/As 615-616; JX-0466C at 210:11-235:4; JX-0473C at 198:5-200:10. In addition, Google's argument that there is no infringement because ████████████████████████ is not persuasive. Even if ██████████████████████, the evidence shows that ████████████ ██████████████████████████████████████████████████████████

████████. *See* CX-0011C at Q/As 266, 269-70, 615-18; *see also* Almeroth, Tr. at 242:21-245:23. Thus, the undersigned finds that the '953 Accused Products meet this limitation.[34]

### v)    Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the '953 Accused Products infringe claim 7 of the '953 patent.

### b)    Claims 14 and 22

Sonos asserts that the additional limitations of claims 14 and 22 are met. CIB at 81. Staff agrees. SIB at 57. Google does not dispute that the additional limitations of these dependent claims are met. RLUL at 8-9. Additionally, the evidence shows that the additional limitations of claims 14 and 22 are met. *See* CX-0011C at Q/As 263, 265, 601-602, 622-23, 628-29, 634-35, 640-46; JX-0019C at 6-10; CX-0258C; JX-0025C; CX-0980; CX-0747; JX-0019C at 84. Accordingly, the undersigned finds that the '953 Accused Products infringe claims 14 and 22.

### c)    Claim 23

Sonos asserts that the '953 Accused Products infringe claim 23. CIB at 81. Google contends that the '953 Accused Products do not meet any of the limitations of claim 23. RLUL at 9. Staff agrees with Sonos that the '953 Accused Products infringe claim 23. SIB at 58-59.

### i)    Limitation 23.1

Claim 23 includes the limitation "while operating as the slave of the synchrony group, receiving, from the second zone player over the LAN, control information that enables the first zone player to begin operating as the master of the synchrony group." JX-0002, cl. 23.

---

[34] As previously noted with respect to the '258 patent, Google argues that "initiating synchronous playback" refers to the time at which content of an audio buffer is released into the audio output pipeline, not the time when the sound is emitted from the speaker. *See* RIB at 79. Again, the undersigned rejects Google's unsupported proposed construction, and instead, "initiating synchronous playback" will be construed according to its plain and ordinary meaning. *See supra* at Section VI.B.2.a.ii.

Sonos contends that the '953 Accused Products █████████████████████
████████████████████████████████████████████. CIB at 81. Sonos claims
that █████████████████████████████████████████████████████████████
██████████████████████████████, which is the claimed "control information." *Id.* at 81-82.
According to Sonos, ███████████████████████████████████████████
███████████████████████████████████████████████████████████████
*Id.* at 82. Sonos argues that ████████████████████████████████████
███████████████████████████████████████████████████." *Id.*

Google argues that "███████████████████████████████████████████
███████████████████████████████████████████████████████████████
████." RIB at 83-84. According to Google, █████████████████████████
████████████████████. *Id.* at 84. Google asserts that ████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████. *Id.* Google contends that ██████████
███████████████████████████████████████████████████████████████
████████████. *Id.* Google argues that ████████████████████████████
███████████████████████████████. *Id.* In addition, Google argues that ████████
███████████████████████████████████████████████████████████████
████████. *Id.*

Staff contends that █████████████████████████████ contains the ████████████
██████████████████. SIB at 58. Staff argues that █████████████████████
███████████████████████████████████████████████████████████████

███████████████████████. *Id*. According to Staff, this enables the follower to being

operating at the leader. *Id*.

The parties' dispute rests on whether the ████████████████████ that the follower

receives from the current leader amounts to the claimed "control information." The evidence

shows that each '953 Accused Product ███████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████ *See* CX-0011 at Q/As 653-54, 658; JX-0019C at 3-5; JX-0467 at 175:4-

176:4, 200:6-205:25. These ██████████████████ contain ████████████, which

the follower can receive from the current leader. *See id*. The follower ████████████████

████████████████████████████████████████████████████████████

████████████. *See id*. If so, then ████████████████████████████. *See id*. Thus,

the undersigned finds that ████████████████████████████████ is "control

information that enables the first zone player to begin operating as the master of the synchrony

group." *See id*. Accordingly, the undersigned finds that the '953 Accused Products meet this

limitation.

### ii)    Conclusion

Google's briefing only addresses limitation 23.1. *See* RIB at 83-84. However, because

Google stated that limitations 23.0 and 23.2 were disputed (*see* RLUL at 9), Google was "expected

to substantively address the issue in its brief and not rely on conclusory statements." *See* G.R. 13.3.

In addition, the evidence shows that the '953 Accused Products meet the "in response to receiving

the control information, transitioning from operating as the slave of the synchrony group to

operating as the master of the synchrony group" limitation. *See* CX-0011 at Q/As 653-54, 658;

JX-0019C at 3-5; JX-0467 at 175:4-176:4, 200:6-205:25. Accordingly, the undersigned finds that the '953 Accused Products infringe claim 23 of the '953 patent.

### d)    Claim 24

Sonos asserts that the '953 Accused Products infringe claim 24. CIB at 82. Google contends that the '953 Accused Products do not meet any of the limitations of claim 24. RLUL at 9. Staff agrees with Sonos that the '953 Accused Products infringe claim 24. SIB at 60.

### i)    Limitation 24.1

Claim 24 includes the limitation "while operating as the slave of the synchrony group, receiving a request to disengage from the synchrony group." JX-0002, cl. 24.

Sonos contends that each '953 Accused Product, ██████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████. CIB at 82-83.

Google argues that none of the messages identified by Sonos are a "request" under the plain and ordinary meaning of that term. RIB at 84-85. Instead, Google contends that those messages are commands, and "████████████████████████████████████

████████████████████████." *Id*. at 85.

Staff contends that one of ordinary skill in the art would not understand the plain and ordinary meaning of "request" to be limited to mutual acceptance. SIB at 59-60.

As previously discussed, the plain meaning of "request" does not require mutual agreement between two devices. *See supra* at Section VII.B.1.a.i. In addition, the evidence shows that a follower receives ████████████████████████████████████

██████████████████████████████████████████████████

████ *See* CX-0011C at Q/As 661-66; CX-0254C at 1-2; JX-0014C at 30-31; JX-0181C at 5-7;

JX-0021C at 2-3. Thus, the undersigned finds that the '953 Accused Products meet this limitation.

### ii) Conclusion

Google's briefing only substantively addresses limitation 24.1. *See* RIB at 84-85. With

respect to limitation 24.2, Google merely states that "Sonos has also failed to provide any evidence

or analysis showing that upon receiving these messages, a follower 'transition[s] . . . to operating

as a standalone zone player,' as required by claim 24." However, because Google stated that

limitations 24.0 and 24.2 were disputed, *see* RLUL at 9, Google was "expected to substantively

address [those issues] in its brief and not rely on conclusory statements." *See* G.R. 13.3. In addition,

the evidence shows that the '953 Accused Products are capable of receiving the request to

disengage from the synchrony group and transition to operating in a standalone mode. *See* CX-

0011C at Q/As 661-66; CX-0254C at 1-2; JX-0014C at 30-31; JX-0181C at 5-7; JX-0021C at 2-

3. Accordingly, the undersigned finds that the '953 Accused Products infringe claim 24 of the '953

patent.

### 2. Google's Redesigns[35, 36]

Sonos asserts that Google's redesigns for the '953 patent are the same as for the '258 patent.

CIB at 83. Sonos also asserts that at least the 953 NIA No. 2 and the 953 NIA No. 3 infringe the

'953 patent. *Id*. Google contends that these redesigns do not infringe the '953 patent. RIB at 86-

87. Staff asserts that the 953 NIA Nos. 2 and 3 infringe the '953 patent, but that the 953 NIA No.

1 does not. SIB at 62.

---

[35] As the undersigned previously determined, there is nothing preventing adjudication of the Google redesigns. *See supra* at Section VI.B.3.

[36] Google developed three allegedly "non-infringing alternative designs" for the '953 patent ("NIAs" or "redesigns"). *See* RIB at 85. The NIAs will be referred to as "953 NIA No. 1," "953 NIA No.2," and "953 NIA No. 3." *See id*. Google asserts that these are the same as the 258 NIA Nos. 1-3. *Id*.

### a) 953 NIA No. 1

Sonos does not assert that the 953 NIA No. 1 infringes the '953 patent. *See* CIB at 83 ("[E]ven if considered, at least 'NIA No. 2' and 'NIA No. 3' still infringe the '953 Patent because the ███████████ constitutes 'playback timing information' for the reasons explained above.").

Google submits that the 953 NIA No. 1 is the same redesign as the 258 NIA No. 1. RIB at 86. Google argues that the 953 NIA No. 1 does not meet limitations 7.7 and 7.8 because ███ ████████████████████████████████████████████████████████████████ ███████████ *Id.* Google contends that Sonos' expert concedes that the 953 NIA No. 1 does not literally meet the claim limitation. *Id.* In addition, Google contends that neither Sonos nor its expert has alleged that ████████████████████████████████████████████████████████ ██████████████████████████████ *Id.* at 86-87

Staff asserts that the 953 NIA No. 1 is the same as the 258 NIA No. 1. SIB at 62. According to Staff, the 953 NIA No. 1 ████████████████████████████████████████████████ ████████████████████. *Id.* Thus, Staff argues that Sonos has failed to meet its burden to show that the 953 NIA No. 1 infringes the asserted claims of the '953 patent. *Id.*

As previously discussed, the parties agree that the 258 NIA No. 1 (and thus, the 953 NIA No. 1) incorporates the following changes: ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████ *See* CIB at 21-22; RIB at 31; SIB at 25. The undersigned previously determined, with respect to the '258 patent, that because ████████████████████████ ████████████████████████████████████████████████████████████ and thus, cannot be the claimed "clock time information." *See supra* at Section VI.B.3.a. The term "clock timing information" in the '953 patent has the same construction as "clock time information" in

the '258 patent, and therefore, for the same reasons, ███████████████████ claimed "clock timing information." *See* Order No. 20 at 15. Thus, the undersigned finds that the 953 NIA No. 1 does not meet limitations 7.7 and 7.8.[37] Accordingly, the undersigned finds that the 953 NIA No. 1 does not infringe claim 7 of the '953 patent.

Because the undersigned has found that independent claim 7 is not infringed by the 258 NIA No. 1, it is not necessary to determine whether dependent claims 14 and 22-24 are infringed. *See Wahpeton Canvas Co.*, 870 F.2d at 1552 n.9.

### b) 953 NIA No. 2

#### i) Claim 7

Sonos states that "even if considered, at least 'NIA No. 2' and 'NIA No. 3' still infringe the '953 Patent because ██████████████ constitutes 'playback timing information' for the reasons explained above." CIB at 83.

Google submits that the 953 NIA No. 2 is the same redesign as the 258 NIA No. 2. RIB at 87. Google argues that this redesign does not meet limitation 7.9 because ██████████████████ ██████████████████████████████████████████████████████. *Id.*

Staff asserts that the 953 NIA No. 2 is the same as the 258 NIA No. 2. SIB at 63. Therefore, Staff argues that for at least the same reasons as for the '258 patent, the 953 NIA No. 2 infringes the asserted claims of the '953 patent. *Id.*

As previously discussed, in the 258 NIA No. 2 (and thus, the 953 NIA No. 2), ██████████ ████████████████████████████████████████████████████████████ ████████████████ and therefore, those amount to the claimed "playback timing information." *See supra* at Section VI.B.3.b.ii. Thus, the undersigned similarly finds that the 953 NIA No. 2 meets

---

[37] Unlike the '258 patent, Sonos does not allege that these limitations are met under the doctrine of equivalents. *See* CIB at 83.

limitation 7.9. Accordingly, the undersigned finds that the 953 NIA No. 2 infringes claim 7 of the '953 patent.

### ii) Claims 14 and 22-24

Google does not dispute that the 953 NIA No. 2 meets the additional limitations of claims 12-14 and 22. RLUL at 8-9. Nor is there any indication that the 953 NIA No. 2 operates differently from the '953 Accused Products as it relates to the additional limitations of claims 12-14 and 22. In addition, while Google disputes that the 953 NIA No. 2 meets the additional limitations of claims 23 and 24, Google does not brief this issue nor provide any evidence that the 953 NIA No. 2 operates differently from the '953 Accused Products as it relates to the additional limitations of claims 23 and 24. *Compare* RLUL at 9, *with* RIB at 87. Thus, for the same reasons as the '953 Accused Products, the undersigned finds that the 953 NIA No. 2 infringes claims 14 and 22-24 of the '953 patent. *See supra* at Sections VII.B.1.b-d.

### c) 953 NIA No. 3

### i) Claim 7

Sonos states that "even if considered, at least 'NIA No. 2' and 'NIA No. 3' still infringe the '953 Patent because ███████████████ constitutes 'playback timing information' for the reasons explained above." CIB at 83.

Google submits that the 953 NIA No. 3 is the same redesign as the 258 NIA No. 3. RIB at 87. Like the 953 NIA No. 2, Google argues that the 953 NIA No. 3 does not meet limitation 7.9 because ███████████████████████████████████████████████████████ ████████████████. *Id.*

Staff asserts that the 953 NIA No. 3 is the same as the 258 NIA No. 3. SIB at 63. Therefore, Staff argues that for at least the same reasons as for the '258 patent, the 953 NIA No. 3 infringes that asserted claims of the '953 patent. *Id.*

As previously discussed, in the 258 NIA No. 3 (and thus the 953 NIA No. 3), ███████ ██████████████████████████████████████ amount to the "playback timing information." *See supra* at Section VI.B.3.c.ii. Thus, the undersigned finds that the 953 NIA No. 3 meets limitation 7.9. Accordingly, the undersigned finds that the 953 NIA No. 3 infringes claim 7 of the '953 patent.

### ii)    Claims 14 and 22-24

Google does not dispute that the 953 NIA No. 3 meets the additional limitations of claims 12-14 and 22. RLUL at 8-9. Nor is there any indication that the 953 NIA No. 3 operates differently from the '953 Accused Products as it relates to the additional limitations of claims 12-14 and 22. In addition, while Google disputes that the 953 NIA No. 3 meets the additional limitations of claims 23 and 24, Google does not brief this issue nor provide any evidence that the 953 NIA No. 3 operates differently from the '953 Accused Products as it relates to the additional limitations of claims 23 and 24. *Compare* RLUL at 9, *with* RIB at 87. Thus, for the same reasons as the '953 Accused Products, the undersigned finds that the 953 NIA No. 3 infringes claims 14 and 22-24 of the '953 patent. *See supra* at Sections VII.B.1.b-d.

### C. Technical Prong of the Domestic Industry Requirement

Sonos asserts that the '953 DI Products satisfy the technical prong of the domestic industry requirement for claims 7, 14, and 22-24 of the '953 patent. CIB at 7.

#### 1. Claim 7

Sonos asserts that the '953 DI Products meet every limitation of claim 7 of the '953 patent. CIB at 84. Google contends that the '953 DI Products do meet limitations 7.5, 7.6, 7.8, 7.10, or 7.11. RLUL at 10. Google does not dispute that the '953 DI Products meet the remaining limitations of claim 7. *Id*. Staff contends that Sonos has met its burden of showing that the '953 DI Products practice the asserted claims of the '953 patent. SIB at 66.

#### a) Limitations 7.5 and 7.6

Sonos argues that the control messages include a "███████████████" message from a Sonos-enabled controller or coordinator of a zone group that directs a '953 DI Product to enter into the zone group. CIB at 85. In addition, Sonos argues that the control messages include an "█████████████" or "█████████████" message from a coordinator of a bonded zone group that directs a '953 DI Product to enter into the bonded zone group. *Id*. Sonos contends that each of these messages are a "request to enter into a synchrony group." *Id*. Sonos also asserts that a person of ordinary skill in the art would understand that "request" covers both non-obligatory messages and obligatory messages. *Id*.

Google argues that the '953 DI Products do not receive the claimed "request to enter into a synchrony group," but rather, a member receives a direction or command from the group coordinator to join the group. RIB at 88. Google contends that, under the plain meaning of "request," none of the messages identified by Sonos constitute a "request to enter into a synchrony group" because they do not require mutual acceptance. *Id*.

Staff asserts that, similar to infringement, the evidence shows that a person of ordinary skill in the art would not understand the plain and ordinary meaning of "request" to be limited to mutual acceptance. SIB at 64. Thus, Staff contends that the evidence shows that the '953 DI Products practice these limitations. *Id*.

Google's position rests on the plain meaning of the term "request." *See* RIB at 88. As previously discussed, the plain meaning of "request" does not require mutual agreement between two devices. *See supra* at Section VII.B.1.a.i. In addition, the evidence shows that the '953 DI Products can receive a " ▮▮▮▮▮▮▮ " message that directs the '953 DI Product to enter into a zone group, and an " ▮▮▮▮▮▮▮ " or " ▮▮▮▮▮▮ " message that directs the '953 DI Product to enter into a bonded zone. *See* CX-0011C at Q/As 435-39; CX-0007C at Q/As 129-30, 133-34. Thus, these messages are a "request to enter into a synchrony group." Accordingly, the undersigned finds that the '953 DI Products meet limitations 7.5 and 7.6.

### b) Limitation 7.8



Sonos argues that a member in a zone group or bonded zone ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. CIB at 85-86. Sonos contends that the member ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. *Id*. at 86. To do this, Sonos asserts that the member ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. *Id*. Sonos contends that in certain '953 DI Products that have the capability to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. *Id*.; CRB at 47. In other '953 DI Products, Sonos asserts that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮. CIB at 86; CRB at 47. Sonos argues that similar to infringement, Google improperly imports limitations into the claims as to how the

- 78 -

"differential" must be determined. CIB at 86-87. In addition, Sonos claims that Google's expert admits that the ████████████████████████████████████████ is within the scope of this limitation. *Id*. at 87.

Google asserts that under the plain meaning of "differential," ████████████ in the '953 DI Products does not amount to the claimed "differential." RIB at 89. Google argues that the '953 DI Products ████████████████████████ ████████████████████████████████████. *Id*. Google contends that none of the variables can be the claimed "differential." *Id*. at 89-90. Google argues that the ████████████████████████████████████████ ████████████████████████. RRB at 33. Instead, Google argues that it is a ████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████." *Id*.

Staff argues that, similar to infringement, Google improperly attempts to import a limitation into the claims by limiting the claimed "differential" to $\Delta T = TS\text{-}TC$. SIB at 64-65. Staff therefore contends that under a proper interpretation of the claims, the evidence shows that the '953 DI Products practice this limitation. *Id*. at 65.

As previously discussed with respect to infringement, the undersigned finds that the term "differential" is not limited to a particular formula for determining the differential, and does not exclude determining the differential based on multiple samples over time. *See supra* at Section VII.B.1.a.ii. In addition, the evidence shows that each '953 DI Product, when acting as a member, ████████████████████████████████████████ ████████████████████████████████. *See* CX-0011C at Q/As 458-59,

463. ██████████████████████████████████████████████████

*See id.* ███████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████. *See id.* This meets the claimed "determining a

differential" limitation.[38] *See id.* Thus, the undersigned finds that the '953 DI Products meet this

limitation.

### c) Limitation 7.10

Sonos argues that a member of a zone group or bonded zone ████████████████

███████████████████████████. CIB at 88. Sonos submits that in

certain '953 DI Products, this is performed using ██████████████████████████

███████████████, while in other '953 DI Products, this is performed using ████████

██████████████████. *Id.* Sonos argues that the ████████ is the "determined

differential" regardless of whether it is ██████████████████████████████

██████████. *Id.* at 89. Sonos contends that Google's expert even confirmed that a ████████

determined ████████ falls within the scope of the "differential" limitation. *Id.*

Google asserts that the local playtime is not adjusted by the ████████. RIB at 90.

Instead, Google contends that the ████████ is only used as an additional data point to ████████

████████████████. *Id.* at 90-91. Google also asserts that the ████████████████

████████████████████████████. *Id.* at 91. Google argues that the

████████████████████████████████████████████████████████

████. *Id.*

---

[38] Google's expert agrees that ████████████████████████████████████████
████████████████████████████ and that a clock difference determined using such protocols falls within the scope
of the "differential" limitation. *See* Schonfeld, Tr. at 1035:20-1036:14.

Staff argues that, similar to limitation 7.8, under a proper interpretation of the claims, the evidence shows that the '953 DI Products practice this element. SIB at 65.

As discussed above, the undersigned determined that each '953 DI Product, when acting as a member, receives  ██████████, which the member uses to determine ████████. In addition, the evidence shows that the ████████████████ ██. *See* CX-0011C at Q/As 472-73, 477. Then, ████████████████ ████████████. *See id*. Thus, the undersigned finds that the '953 DI Products meet this limitation.

#### d) Limitation 7.11

Sonos argues it is undisputed that a member of a zone group or bonded zone is configured to initiate synchronous playback with the coordinator. CIB at 89. Sonos also argues that the follower does this "  ████████████ ██████" *Id*. Sonos contends that the ████████████ ████████████" *Id*.

Google argues that the limitation is not met because there is no ████████████ ████████████. RIB at 91. Google contends that a group member does not initiate playback ████████████ ████████. *Id*.

Staff argues that, similar to limitation 7.8, under a proper interpretation of the claims, the evidence shows that the '953 DI Products practice this element. SIB at 65.

As discussed above, the member . In addition, the evidence shows that each '953 DI Product

. *See* CX-0011C at Q/As 480-81; JX-0290C; JX-0285C. Thus, the undersigned finds that the '953 DI Products meet this limitation.

### e) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the '953 DI Products satisfy the technical prong of the domestic industry requirement for claim 7 of the '953 patent.

### 2. Claims 14, 22, and 24[39]

Sonos asserts that the '953 DI Products practice the additional limitations of claims 14 (which depends from claims 7, 12, and 13) and 22. CIB at 89-90. Sonos also asserts that the '953 DI Products, except the Sonos Sub, practice the additional limitations of claim 24. *Id*. at 90. Google does not dispute that the additional limitations of those dependent claims are met. RLUL at 11-12. In addition, the evidence shows that the '953 DI Products meet the additional limitations of claims 12-14 and 22. *See* CX-0011C at Q/As 487-88, 493-94, 499-500, 505-14; JX-0290C; JX-0285C. The evidence also shows that the '953 DI Products, except the Sonos Sub, meet the additional limitations of claim 24. *See* CX-0011C at Q/As 526-29; CX-0007C at Q/As 82-83, 131-32, 135-36.

Accordingly, the undersigned finds that the '953 DI Products practice claims 14 and 22, and the '953 DI Products, except the Sonos Sub, practice claim 24.

---

[39] Other than limitation 23.1, Staff does not explicitly address limitations in the dependent claims, but states that "Sonos has met its burden of showing that the '953 DI Products practice the asserted claims of the '953 patent." SIB at 66.

### 3. Claim 23

Sonos asserts that the '953 DI Products, except the Sonos Sub, meet the additional limitations of claim 23, which depends from claim 7. CIB at 90. Google contends that the '953 DI Products do not practice any of the limitations of claim 23. *See* RLUL at 11.

#### a) Limitation 23.1

Sonos argues that after a zone group is formed, each product is operable to engage in a ████████████ where the coordinator role is transferred to a member of the zone group. CIB at 90. Sonos contends that this ██████████ involves a member receiving a message carrying control information that enables it to begin operating as the new coordinator, and in response to receiving the message, transitioning to operating as the new coordinator. *Id*.

Google argues that Sonos "has not set forth any evidence or analysis to show that a member device receives the asserted '████████████████████' 'from the second zone player' (i.e., the coordinator)." RIB at 91.

Staff argues that the evidence shows that the coordinator transmits the "████████████████" message to the member. SIB at 66. Thus, Staff contends that Sonos has met its burden of showing that the '953 DI Products practice claim 23. *Id*.

The evidence shows in the '953 DI Products, the coordinator role can be transferred to a member of the zone group. *See* CX-0011C at Q/As 518-19, 522; CX-0007C at Q/As 146-48; CX-1299C; JX-0293C. To do this, a member receives a "████████████████████████" message from the current coordinator with control information that enables it to begin to operate as the new coordinator. *See id*. Then, in response to receiving the message, the member transitions to operating as the new coordinator. *See id*. Thus, the undersigned finds that the '953 DI Products, except the Sonos Sub, meet this limitation.

b)    **Conclusion**

Google's brief only addresses limitation 23.1. *See* RIB at 91. However, because Google stated that limitations 23.0 and 23.2 were disputed (*see* RLUL at 9), Google was "expected to substantively address the issue in its brief and not rely on conclusory statements." *See* G.R. 13.3. In addition, the evidence shows that in response to receiving the "█████████████████████████" message, the member transitions to operating as the new coordinator. *See* CX-0011C at Q/As 510-12; CX-0057C at Q/As 146-48; CX-1299C; JX-0293C. Accordingly, the undersigned finds that the '953 DI Products meet the limitations of claim 23.

D.    **Validity**[40]

Google argues that the asserted claims are rendered obvious by: (1) Balassanian; (2) Balassanian in combination Goldberg; and (3) Balassanian in combination with U.S. Patent No. 5,313,524 ("Van Hulle"). RIB at 93.

1.    **Balassanian**

a)    **Claim 7**

Google argues that Balassanian renders claim 7 of the '953 patent obvious. RIB at 93. For purposes of obviousness, Sonos does not dispute limitations 7.0-7.4 and 7.7-7.8 as to Balassanian. CLUL at 4. Staff asserts that Google failed to present clear and convincing evidence that Balassanian renders claim 7 of the '953 patent obvious. SIB at 78.

i)    **Limitations 7.5 and 7.6**

Google claims that the only disputed element of these limitations is whether Balassanian discloses a first zone player "receiving a request to enter into a synchrony group" with a second

---

[40] The parties agree that the claims of the '953 patent are entitled to a priority date of July 28, 2003. *See* SIB at 67; JX-0002 at 2-3.

zone player. RIB at 94. Google argues that Balassanian discloses a synchronization system that designates rendering devices as either a master device or a slave device. *Id*. Google further argues that when a rendering device receives a designation to start operating as a slave device, this meets the "receiving a request to enter into a synchrony group" element. *Id*. at 94-95. Similar to the '258 patent, Google contends that there is no requirement in the claims for the devices to have the ability to dynamically group. *Id*. at 95. In addition, Google asserts that even if there was such a requirement, Balassanian discloses that the same device may operate as a slave at one time and as a master at another time, thus requiring a dynamic designation of the role. *Id*.

Sonos argues that like limitations 17.5 and 17.6 of the '258 patent, the rendering devices in Balassanian are pre-programmed to synchronize their rendering without receiving the claimed "request to enter into a synchrony group." CIB at 99.

Staff contends that like elements 17.5 and 17.6 of the '258 patent, one of ordinary skill in the art would not have understood Balassanian's disclosure of designating rendering devices as a master or slave to necessarily disclose or render obvious the claimed "request to enter into a synchrony group." SIB at 76. Staff points to evidence that the rendering devices in Balassanian are pre-programmed to synchronize by default. *Id*. Staff therefore argues that Google failed to present clear and convincing evidence that Balassanian renders these limitations obvious. *Id*. at 76-77.

As previously discussed, Balassanian does not disclose that a rendering device (which Google alleges reads on the claimed "zone player") receives control information that "comprises a direction . . . to enter into a synchrony group." *See supra* at Section VI.D.1.a.i. In addition, Balassanian only generally teaches that the "synchronization system" designates the rendering devices as a master or slave rendering device. *See* JX-0448 at Abstract ("The synchronization

system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices."), 2:28-32 ("To help ensure synchronization of rendering devices, the synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices."). That does not amount to clear and convincing evidence that Balassanian teaches a rendering device receiving a request to enter into a synchrony group, and then in response to such a request, entering into the synchrony group. *See id.*; CX-0014C at Q/As 619-21; Almeroth, Tr. at 806:1-15. Thus, the undersigned finds that Google has not met its burden to prove that Balassanian renders these limitations obvious.

### ii)    Limitation 7.9

Google argues that Balassanian discloses a master device sending a message containing the master rendering time, which is "an indication of when the master device renders content." RIB at 97. Google contends that upon receiving this, each slave device determines whether a time domain differential exists and adjusts the rendering of the content proportional to the time domain differential so that content can be rendered at the same time. *Id.* As with the '258 patent, Google asserts that the master rendering time is an indication of when the master device renders content, and the rendering can be delayed into the future by buffering the audio. *Id.* at 98.

Sonos argues that "Balassanian's backward-looking 'master rendering time' does not qualify as the claimed 'playback timing information.'" CIB at 99. Sonos also argues that Google fails to explain how Balassanian's master rendering time "comprises an indicator of a first future time, relative to the clock time of the second zone player, at which the first and second zone players are to initiate synchronous playback of the audio information for the first audio track." CRB at 49.

According to Sonos, Balassanian discloses that the master rendering time does not even exist until after the rendering is initiated. *Id*. at 49-50.

Staff argues that similar to claim 24 of the '258 patent, Google failed to present clear and convincing evidence that a person of ordinary skill in the art would have been motivated to modify Balassanian such that the slaves receive audio content from the master, rather than from the source device. SIB at 77. Staff therefore contends that Google failed to present clear and convincing evidence that one of ordinary skill would have been motivated to modify Balassanian to meet this limitation. *Id*. In addition, Staff argues that because Balassanian fails to disclose or render obvious receiving "audio information for at least a first audio track," it fails to disclose or render obvious "playback timing information associated with the audio information for the first audio track that comprises an indicator of a first future time." *Id*. at 77-78.

As previously discussed with respect to limitation 17.7 of the '258 patent, Balassanian's master rendering time does not amount to the claimed "playback timing information."[41] *See supra* at Section VI.D.1.a.ii. Thus, at least for the same reasons as the '258 patent, the undersigned finds that Google has not met its burden to prove that Balassanian renders this limitation obvious.

### iii)  Limitations 7.10 and 7.11

Google argues that Balassanian discloses a slave device determining a time domain differential between its clock and the master device's clock. RIB at 98. Google also argues that Balassanian discloses that the slave device uses the time domain differential to convert the master device time to the time domain of the slave when synchronizing the rendering of content. *Id*. at 98-99. Google contends that "Sonos fails to provide any explanation as to why converting of the master device time diminishes the express disclosure that the slave device adjusts its rendering

---

[41] Again, the term "playback timing information" in the '953 patent has the same construction as in the '258 patent. *See* Order No. 20 at 15.

time to account for the time differential." *Id*. at 99. Google asserts that the master time is converted to the time domain of the slave device precisely so that the slave device can adjust its rendering by the amount of the time domain differential. *Id*.

Sonos asserts that because Balassian does not disclose the transmission of "audio information" and "playback timing information" in limitation 7.9, Balassian does not teach limitations 7.10 and 7.11. CIB at 100. Sonos contends that Balassian instead explains that the slave rendering device adjusts the received master device time to account for the time domain differential. CRB at 50. Sonos argues that the claim language Google points to does not suggest that the slave adjusts the received master rendering time. *Id*. Sonos claims that "a slave rendering device adjusting its own rendering time is not the same thing as a slave adjusting the received master rendering time." *Id*. Sonos also argues that Balassian does not disclose a slave rendering device "updating [a] first future time" or "initiating synchronous playback" when its "clock time . . . reaches the update first future time." CIB at 100.

Staff argues that because Balassian fails to disclose or render obvious "playback timing information associated with the audio information for the first audio track that comprises an indicator of a first future time," Google failed to present clear and convincing evidence that Balassian discloses or renders obvious "updating the future time" and "the updated first future time." SIB at 78.

As discussed above, Balassian's master rendering time does not amount to the claimed "playback timing information associated with the audio information for the first audio track that comprises an indicator of a first future time" in limitation 7.9. Thus, at least for the same reasons as limitation 7.9, the undersigned finds that Google has not met its burden to prove that Balassian renders these limitations obvious.

### iv)    Conclusion

The undersigned found that Google has not met its burden to prove that Balassanian renders limitations 7.5-7.6 and 7.9-7.11 obvious. Accordingly, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that claim 7 of the '953 patent is rendered obvious by Balassanian.

### b)    Claims 12-14 and 22-24

Claims 12-14 and 22-24 depend from claim 7. Because claim 7 is not rendered obvious by Balassanian, then claims 12-14 and 22-24 are also not rendered obvious by Balassanian.

## 2.    Balassanian with Goldberg

### a)    Claim 7

Google asserts that to the extent that "Balassanian alone does not disclose or render obvious claim limitation 7.9(a) and claim 23, they are rendered obvious by Balassanian in view of Goldberg." RIB at 104. Because the undersigned found above that Balassanian did not render limitations 7.5-7.6 and 7.9-7.11 obvious, Goldberg cannot cure the deficiencies of Balassanian. Accordingly, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that claim 7 of the '953 patent is rendered obvious by Balassanian in combination with Goldberg.

### b)    Claim 23

Claim 23 depends from claim 7. Because claim 7 is not rendered obvious by Balassanian in combination with Goldberg, then claim 23 is also not rendered obvious by Balassanian in combination with Goldberg.

### 3. Balassanian with Van Hulle

Google asserts that "to the extent the CALJ finds that Balassanian does not render obvious claim 22, the claim is rendered obvious by Balassanian in view of Van Hulle." RIB at 108. Claim 22 depends from claim 7. Because claim 7 is not rendered obvious by Balassanian, Van Hulle cannot cure the deficiencies of Balassanian. Accordingly, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that claim 22, which depends from claim 7, of the '953 patent is rendered obvious by Balassanian in combination with Van Hulle.

### 4. Conclusion

For the reasons set forth above, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that any asserted claim is rendered obvious.

### 5. Secondary Considerations

Secondary considerations of nonobviousness may rebut a *prima facie* case of obviousness. Here, where Google has not made out a *prima facie* case of obviousness, there is no showing to rebut. Accordingly, the undersigned need not consider any secondary considerations of nonobviousness.

## VIII. U.S. PATENT 9,219,959

### A. Overview

The '959 patent, entitled "Multi-Channel Pairing in a Media System," issued on December 22, 2015 to Christopher Kallai; Michael Darrell Andrew Ericson; Robert A. Lambourne; Robert Reimann; and Mark Triplett. JX-0004. The '959 patent is assigned to Sonos. *Id*. An *Ex Parte* Reexamination Certificate issued on April 5, 2017 in response to Reexamination Request No. 90/013,756 (filed May 25, 2016). Compl. at ¶ 78. As a result of the reexamination, original claims 1 and 14 were cancelled, claims 2-13 and 15-22 were determined to be patentable as amended, and

- 90 -

new claims 23-48 were added and determined to be patentable. *Id.*; *see also* Compl. Ex. 7. The '959 patent relates generally to "devices and methods for providing audio in a multi-channel listening environment (*e.g.*, a stereo sound or home theater surround sound environment)." *Id.* at ¶ 81; *see also* JX-0004 at 1:54-63, 3:32-46.

### 1. Asserted Claim

Sonos is only asserting claim 10, which reads as follows:[42]

10.0 [The playback device of claim 1, wherein the playback device is further configured to] *A playback device configured to output audio in a multi-channel listening environment, the playback device comprising:*

10.1 *a network interface configured to receive audio data over a network;*
10.2 *a plurality of speaker drivers configured to output audio based on the audio data;*

10.3 *one or more processors; and*

10.4 *tangible, non-transitory, computer readable memory comprising instructions encoded therein, wherein the instructions, when executed by the one or more processors, cause the playback device to*

10.5 *(i)* receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices,

10.6 *(ii) process the audio data before the playback device outputs audio from the plurality of speaker drivers,*

10.7 *(iii) determine that a type of pairing of the playback device comprises one of at least a first type of pairing or a second type of pairing,*

10.8 *(iv) configure the playback device to perform a first equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing, and*

10.9 (v) *configure the playback device to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing.*

---

[42] The claim language has been copied directly from the reexamination certificate. As such, matter enclosed in brackets [ ] originally appeared in the '959 patent, but has been deleted and matter printed in italics indicates additions made to the '959 patent during reexamination.

### 2. Claim Construction

The undersigned has construed the following terms from claim 10 of the '959 patent:

| TERM | CLAIM CONSTRUCTION |
|---|---|
| equalization [of the audio data] | "alteration of the relative strength of certain frequency ranges in the audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" |
| type of pairing / first type of pairing / second type of pairing | Plain and ordinary meaning |
| zone player / playback device / player | "data network device configured to process and output audio" |
| network interface | "physical component of a device that provides an interconnection with a data network" |
| pairing | "configuration involving two or more playback devices that have different playback roles" |

Order No. 20 at 15, 40-50.

### B. Infringement

Sonos asserts that the '959 Accused Products meet every limitation of claim 10 of the '959 patent. CIB at 105-117. Google disagrees and asserts that these products do not meet the "first equalization" and "second equalization" elements of limitations 10.8 and 10.9. RIB at 115-116. Google does not contest that the '959 Accused Products meet the remaining limitations of claim 10. RLUL at 13-14; *see* RIB at 115-116 ("The Google Home Max and Nest Audio devices do not infringe asserted claim 10 of the '959 Patent because they are not configured to perform a "first equalization" for one pairing configuration and a "second equalization" for another configuration.").

### 1. Claim 10

Sonos asserts that each of the '959 Accused Products is ██████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████. CIB at 106-107

(emphasis in original); *see also* CRB at 55. Google insists the Home Max and Nest devices do not

infringe under either theory. RIB at 114-116. Staff submits that the '959 Accused Products only

infringe under ████████████████. SIB at 86-88; SRB at 29.

### a) Infringement Argument No. 1: Driver Matrix Coefficients

### i) Home Max Devices

Sonos contends that the Home Max performs equalization of audio data by ████████████

████████████████████████████████████████████████. CIB

at 107-110. Sonos explains: ████████████████████████

█████████████████████████████████████████████████████

████████████████████████." *Id*. at 107. "████████████████

█████████████████████████████████████████████████████

███████████████████████████." *Id*. According to Sonos, ████████

█████████████████████████████████████████████████████

████████████. *Id*.

Google asserts that the Home Max is configured to ████████████████

████████████████████████████████████████████.[43] RIB at

116-123; RRB at 40. In other words, the Home Max does the "exact opposite" of what Sonos

alleges. *Id*. at 116.

---

[43] Sonos attacks Google's noninfringement argument as being based on an improper claim construction. CIB at 110-113. Sonos writes: "Google asserts a very narrow claim scope that extends only to when, ***in the aggregate***, 'the strength of high-frequency' ranges are 'altered relative to low-frequency ranges' – not simply to when there are frequency-range changes to speaker drivers more generally." *Id*. at 111 (emphasis in original). For the reasons discussed *infra*, the undersigned disagrees.

Staff agrees with Google. SIB at 80-83. In Staff's view, Sonos has failed to meet its burden of showing that the Home Max practices elements 10.8 and 10.9 under this infringement theory. *Id.*

███████████████████████████████████████████████. RX-1521C at Q/A 90; RDX-0019C.19; RX-1471C at Q/As 22-24; RDX-0003.4C; CX-3788C.████████████████████████ █████████████████████████████. RX-1521C at Q/As 91-92; RX-1471C at Q/As 25-26.

████████████████████████████████████████████████████████████████████

██████████████████████. *Id.*██████████████████████████████████████████

█████████████████████████████████████████████. *Id.*███████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████. *Id.*

The diagram below explains ████████████████████████████████████████ ██████████████████:

CX-0011C at Q/A 975; CDX-0005C.45. As shown in the diagram, . *Id*.; *see also* RX-1471C at Q/A 29; JX-0474C at 83:10-91:4.

. CX-0011C at Q/A 975; RX-1471C at Q/As 29-30; JX-0474C at 83:10-91:4.

It is undisputed that ██████████████████████████ ██████████████████████████. CX-0011C at Q/As 973-978; RX-1521C at Q/As 90-103; CIB at 107-110; RIB at 116-119. It is also undisputed that ██████████████████████████ ██████████████████████████. RX-1521C at Q/As 104-125; CX-0011C at Q/As 980-986; RDX-0019C.21.



RDX-0019C.21 (███████████████████████████████████████

██████████); *see also* RX-1471C at Q/A 32; RDX-0003C.6.

Thus, as Staff noted in its briefing, the parties' dispute centers on "████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████." SIB at 90. Google

and Staff submits that it does not. The undersigned agrees with Google and Staff.

"[E]qualization [of the audio data]" requires "*alteration of **the relative strength** of certain frequency ranges in the audio data . . ..*" Order No. 20 at 47 (emphasis added). To determine if changes to the driver output levels alter the relative strength of frequency ranges in the audio data, a person of skill in the art would compare the driver levels for each configuration. RX-1521C at Q/As 101-111; RX-1471C at Q/As 32-36. The strength of low-frequency audio content for each

configuration can be calculated by summing the values of the left and right woofers, and the strength of high-frequency audio content for each configuration can be calculated by summing the values of the left and right tweeters. RX-1521C at Q/A 104. From this information, a person of skill in the art can then determine whether the strength of low-frequency audio is altered relative to the strength of high-frequency audio when the device transitions from a non-paired to a stereo-paired configuration.

██████████████████████████████████████████████████. *Id.* at Q/As 104-111.

████████████████████████████████████████████████████████████████

RDX-0019C.23 (████████████████████████████████████████████████

████████████████████████████████████); *see also* RX-1521C at Q/As 104-125;

RDX-0019C.25. As can be seen, ████████████████████████████████████

███████████████████████████████████████████. *Id.*; *see also* RX-

████████████████████████████████████████████████████

████████████████████████████████████████ ██ ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.

Accordingly, the undersigned finds that the Home Max device does not meet limitations 10.8 and 10.9 of claim 10 under the "matrix coefficients" theory

### ii) Nest Audio Devices

Sonos asserts that it is "unaware of anything that suggests the Nest Audio operates differently from the Home Max ████████████████████████████████████

███████████████████████" CIB at 107 n.65. Neither Google nor Staff believe Sonos has met its burden to show that the "matrix coefficients" theory applies to the Nest Audio Devices. RIB at 123-124; RRB at 42-43; SIB at 88 n.16.

---

[44] Sonos and Dr. Almeroth do not dispute that the Home Max device is configured to maintain (not alter) the relative strength of frequency ranges in the audio data when switching from non-paired to stereo-paired configurations. *See, e.g.,* CIB at 107-110; CX-0011C at Q/A 975; *see also* Almeroth, Tr. at 204:11-205:16 (admitting that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See, e.g.,* CIB at 108-110 (████████████████████████████); CX-0011C at Q/A 977; *see also* RX-1512C at Q/As 113-118; RDX-0019C.24. Analyzing drivers in isolation, however, is not consistent with the claim language. Claim 10 does not focus on changes to individual drivers; rather, it requires a "playback device" configured to perform a "first equalization" and "second equalization of the audio data." JX-0004, cl. 10. As Dr. Jeffay explained: "This makes sense from a practical perspective because what the user hears is audio from the device as a whole, not just the output of a single driver in isolation." RX-1512C at Q/A 120; *see also id.* at Q/A 85 ("████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ██████████████).

The undersigned agrees with Google and Staff that Sonos has failed to show that this theory applies to the Nest Audio Devices. Sonos' analysis consists of a single sentence in a footnote of its initial brief and a cite to Dr. Almeroth's testimony. *See* CIB at 107 n.65. Dr. Almeroth's testimony is similarly conclusory. *See* CX-0011C at Q/A 979 ("█████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████."). Conclusory assertions without additional evidence cannot support a finding of infringement. *See, e.g., TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019) ("Conclusory expert testimony does not qualify as substantial evidence."); *Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1319-20 (Fed. Cir. 2006) ("[W]e agree with the district court that Kim did not prove infringement because she presented no testimony based on the accused products themselves that supported a finding of infringement.").

In addition, the evidence shows that the Home Max and Nest Audio devices operate differently. *See, e.g.*, RX-1471C at Q/As 10, 54-57; RX-1521C at Q/As 42-44, 47-49. For example, ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ RX-1521C at Q/A 87; *see also* RX-1471C at Q/A 60 ("████████████████████████ ██████████████████████████████████████████████████."). This is because ██████████████████████████████████████. RX-1521C at Q/As 88-89; RX-1471C at Q/As 10-36, 54-60; CX-3328C. ██████████████████ ████████████████████████████████████████████████████████



. *See, e.g.*, CX-3328C.

. RX-1471C at Q/As 14-16, 56.

. *Id*; *see also* RDX-0019C.13-14.

For these reasons, the undersigned finds that Sonos has failed to prove by a preponderance of the evidence that the Nest Audio devices infringe claim 10 under the "matrix coefficients" theory.

> **b)** **Infringement Argument No. 2: Synchronizing User Bass and Treble Settings**

Sonos asserts that the '959 Accused Products also meet the equalization limitations because they are programmed to be able to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. CIB at 113-117. Sonos contends that "when a product's determined stereo-pairing state corresponds to an unpaired state, it configures itself to have settings as specified in the 'Equalizer Settings' GUI menu displayed by the Google Home app for the product." *Id*. at 114. Sonos further explains that "when the product's determined stereo-pairing state corresponds to that of a follower in a stereo pair, it configures itself to have settings matching those of the product operating as the leader of the stereo pair." *Id*. According to Sonos, this satisfies "equalization of the audio data" under the undersigned's claim construction. *Id*. Staff concurs with Sonos, stating: "[T]he evidence clearly shows that the '959 Accused Products meet Elements 10.8 and 10.9 under this theory." SRB at 29-31; *see also* SIB at 90-92.

Google argues that Sonos' infringement theory centers on the accused products being capable of being modified in a way that forces their bass and treble settings to change when two devices are paired. RIB at 124-128; RRB at 47-50. Google submits that the Accused Products do not infringe because, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." RIB at 127.

- 100 -

Google explains that when the Home Max and Nest Audio devices are manufactured and imported
into the United States, they have ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████. *Id*. at 124. Google contends that ██████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████. *Id*.

Google also criticizes Sonos' reliance on certain screenshots of Dr. Almeroth's, as well as a
"lawyer created" demonstrative, to demonstrate infringement by the '959 Accused Products. RIB
at 129 (arguing that in Dr. Almeroth's screenshots, the treble and bass settings have the same
relative strength before and after pairing, and that Sonos tried to correct "this deficiency" through
the use of a demonstrative); RRB at 50.

The parties agree that the Home Max and Nest Audio devices have default bass and treble
settings when manufactured and imported into the United States. RX-1521C at Q/A 129; CX-
0011C at Q/A 987; *see also* CRB at 57-60; RIB at 124-128. Likewise, they all agree that the Home
Max and Nest Audio devices allow a user to adjust bass or treble to suit their listening preferences.
*See, e.g.*, Almeroth, Tr. at 232:21-233:2; RX-1521C at Q/A 128; CX-0011C at Q/As 987
(testifying that a user of the '959 Accused Products can adjust the relative strength of the lower
range of frequencies (*i.e.*, bass) or higher range of frequencies (*i.e.*, treble) in the audio data), 991;
*see also* Almeroth, Tr. at 233:3-22. These settings are referred to as "user eq" settings. RX-1521C
at Q/A 128; CX-0011C at Q/A 987.

It is also undisputed that when two Home Max or Nest Audio devices are joined as a stereo
pair, the "leader" device maintains its "user eq" settings and sends those settings to the "follower"

device, which then changes its "user eq" settings to match those of the "leader." *See* Almeroth, Tr. at 236:1-4; RX-1521C at Q/A 128; CX-0011C at Q/As 987-996; CX-3658C. An example of this functionality is set forth below:



CDX-0011 (showing a follower's treble increasing relative to its bass when entering a stereo pair); *see also* Jeffay, Tr. at 991:14-992:23.

The screenshots demonstrate that after entering a stereo pair, the "follower" device changes its bass and treble settings to match those of the "leader". *Id*. The evidence therefore shows that the '959 Accused Products alter their bass and treble settings depending on their type of pairing (*e.g.*, unpaired vs. stereo paired), as required by limitations 10.8 and 10.9.[45] *See, e.g.,* CX-0011C at Q/As 991-992, 994; Jeffay, Tr. at 992:14-23 ("Q. You would agree then that in this example the treble level has increased relative to the bass, correct? A. If this is a real example, I mean, to the extent this is a real example, that's what appears to happen."); Almeroth, Tr. at 234:22-235:25, 236:17-237:10 ("Q. And, again, depending on how the bass and treble settings are set before pairing, when the speaker adopts the leader's bass and treble settings, the relative strengths of the frequencies for the bass and treble would change; is that correct? A. That's correct. In -- in all situations, except for where they were identical on the master -- or sorry, on the leader versus the follower. In the one instance where they were identical, then there wouldn't be a change in the relative frequencies, but all the other cases there would be."); CDX-0011.

As noted above, Google does not dispute that the Home Max and Nest Audio are capable of the infringing functionality. RX-1521C at Q/As 128-129. Google nonetheless argues that the '959 Accused Products do not infringe because the functionality is not active unless actions are taken by a user. RIB at 124-128. (arguing that Dr. Almeroth had to modify the device from its default configuration in order to prove infringement.). This argument is contrary to Federal Circuit precedent.[46] The Federal Circuit has stated:

---

[45] The undersigned notes that Google is no longer disputing that similar "user eq" settings in the '959 DI Products practice these limitations. RLUL at 13-14; *see also* CIB at 122-123 (detailing how the '959 DI Products meet limitations 10.8 and 10.9).

[46] Google cites a couple of Federal Circuit cases to "support" its argument. *See* RIB at 127 (citing *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) and *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011)). Those cases are inapposite. As Sonos correctly noted, "the 'modification' in these cases was modifying the ***underlying source code*** to ***add*** infringing functionality – not a change to default product settings." CRB at 58 (emphasis in original).

Software is a set of instructions, known as code, that directs a computer to perform specified functions or operations. Thus, the software underlying a computer program that presents a user with the ability to select among a number of different options must be written in such a way as to enable the computer to carry out the functions defined by those options when they are selected by the user. Therefore, although a user must activate the functions programmed into a piece of software by selecting those options, the user is only activating means that are *already present in the underlying software.* Otherwise, the user would be required to alter the code to enable the computer to carry out those functions.

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) (emphasis in original). Thus, in order for the Home Max and Nest Audio devices to infringe the '959 patent, the source code "must be written in such a way as to enable a user of that software to utilize the function of [█████████████████████,] without having to modify that code." *Id.*

The evidence clearly demonstrates that the Home Max and Nest Audio devices are manufactured with software that enables these products to alter the relative strength of frequency ranges in the audio data. *See, e.g.*, *Finjan,* 626 F.3d at 1197 ("The fact that users needed to 'activate the functions programmed' by purchasing keys does not detract from or somehow nullify the existence of the claimed structure in the accused software."). In other words, the '959 Accused Products are programmed with software (limitation 10.4) that, when executed, performs the claimed operations (limitations 10.8 and 10.9). CX-0011C at Q/A 987 (showing built-in ability for user to switch settings); Almeroth, Tr. at 209:25-210:7, 212:7-215:3. A user need not modify the software to render the '959 Accused Products capable of carrying out the operations recited by limitations 10.8 and 10.9. That capability is present at the time of importation by virtue of the software installed on the devices.

Google next contends that the "lawyer-created" demonstrative exhibit(s) relied upon by Sonos and Staff to show infringement "is not evidence" and "should be afforded no weight." RIB

at 128-129.[47] First, neither Sonos nor the Staff has argued that the demonstrative is evidence. Dr. Almeroth's screenshots are merely examples of the infringing functionality present in the Home Max and Nest Audio devices. More specifically, Dr. Almeroth's screenshots illustrate how the "follower" in a stereo pair adopts the bass and treble settings of the "leader" and how the bass and treble of the "follower" and/or "leader" can be set at different relative strengths such that the "follower's" bass and/or treble settings can be adjusted relative to one another when the "follower" adopts the settings of the "leader". Almeroth, Tr. at 232:24-237:11; *see also* Jeffay, Tr. at 992:14-24; CX-0011C at Q/A 987. Second, Google ignores the testimony and other evidence in the record confirming this functionality. For example, Dr. Almeroth testified that, in the Home Max and Nest Audio devices, the bass and treble of the follower and/or leader can be set at different relative strengths – via separate sliding bars from "less" to "more" across configurations – such that the follower's bass and/or treble settings can be adjusted relative to one another when the follower adopts the settings of the leader. Almeroth, Tr. at 232:24-237:11. Ken MacKay, a Google software engineer, similarly testified that █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████ MacKay, Tr. at 433:6-434:2; *see also* JX-0466C at 287:5-288:19; CX-3658C; Jeffay, Tr. at 990:9-992:24.

---

[47] To the extent Google is claiming that adjusting the bass and treble do not satisfy the undersigned's construction of "equalization [of the audio data]," such a claim is without merit. The patent specification expressly describes "equalization" in terms of adjusting bass and treble. JX-0004 at 12:15-16; *see also* Order No. 20 at 44. In addition, Google has conceded that adjusting bass and treble can equalize. *See, e.g.*, EDIS Doc ID 713880 (Google's Initial *Markman* Brief) at 10; EDIS Doc ID at 715080 (Google's Rebuttal *Markman* Brief) at 4; Jeffay, Tr. at 990:9-991:13 ("Yes, I understand that the specification says that adjusting bass and treble may result in an equalization.");CX-0011C at Q/As 987, 991.

Accordingly, the undersigned finds that the '959 Accused Products meet limitations 10.8 and 10.9 of claim 10 under the "user eq" theory of infringement

### c) Conclusion

For the reasons set forth above, the undersigned finds that the '959 Accused Products infringe claim 10 of the '959 patent under the "user eq" theory, but do not infringe claim 10 under the "matrix coefficients" theory.

### 2. Google's Redesigns[48]

Google has developed redesigned versions of the Home Max and Nest Audio devices to remove or modify certain functionality that Sonos alleged meet the limitations of claim 10. RIB at 131.

### a) 959 NIA No. 3 – Maintaining Driver Output Levels



Google contends that this redesign ███████████████████████████████████

████████████████████████████████████████████████████

███████████. RIB at 132-133. Sonos does not dispute that "███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████" CIB at 118-119. Sonos, however, asserts that the redesign would still infringe under its

other theory of infringement related to synchronizing user bass and treble settings ███████████

████). *Id.* In Staff's view, this redesign does not remove the '959 Accused Products' ability to

████████████████████████████████ and thus, infringes claim 10. SIB at 96-97.

---

[48] Sonos contends that these redesigns are "hypothetical and thus not ripe for adjudication." CIB at 117. And, if they are determined to be "fixed and definite," Sonos asserts that they still infringe. *Id.* The undersigned previously found that the redesigned products are fixed and definite. *See* Section VI.B.3.

As discussed above, Sonos has alleged that the Home Max performs a "first equalization" and "second equalization" of audio data because ██████████████████████████████ ████████████████████████████████████████████████████████████████████████████████. *See* Section VIII.B.1.a.; *see also* CIB at 107-113. The parties do not dispute that 959 NIA No. 3 modifies the Home Max to remove this behavior. RX-1521C at Q/As 240-249; RX-1471C at Q/As 50-53; CX-0011C at Q/As 1093-1102; RX-1491C. There is also no dispute that this redesign retains the ability to change its bass and treble settings when it transitions from an unpaired to a stereo-paired state. RIB at 132-133; CIB at 118-119; SIB at 96.

The undersigned found hereinabove that the '959 Accused Products do not infringe under Sonos' "matrix coefficients" theory (*see* Section VIII.B.1.a) but do infringe under the ██████ theory (*see* Section VIII.B.1.b). Because 959 NIA No. 3 does not remove the infringing functionality (*i.e.*, ████████████████████████████████████████████████████), it infringes claim 10 of the '959 patent.

> **b) 959 NIA No. 4 – Removing Synchronization of User Bass and Treble Settings**

Google contends that this redesign removes the functionality of the '959 Accused Products that synchronizes the user bass and treble settings between the "leader" and "follower" in a stereo pair. RIB at 133-134; RRB at 52. More specifically, this redesign "██████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████" RIB at 133. Sonos does not dispute that this redesign removes the functionality that synchronizes the user bass and treble settings between the "leader" and "follower" in a stereo home pair. CIB at 119. Sonos, however, asserts that the 959 NIA No. 4 would still infringe under its other theory of infringement related to changing the matrix

coefficients for specific drivers (the "matrix coefficients" theory). *Id*. Staff submits that this redesign does not infringe claim 10 of the '959 patent. SIB at 97; SRB at 32.

As discussed above, Sonos has alleged that the Home Max and Nest Audio devices perform a "first equalization" and "second equalization" of audio data through a follower device's adoption of a leader device's bass and treble settings. *See* Section VIII.B.1.b; *see also* CIB at 113-117. The parties do not dispute that 959 NIA No. 4 modifies the Home Max and Nest Audio devices to remove this functionality. RX-1521C at Q/As 250-259; RX-1470C at Q/As 71-83; RX-1492C; CX-0011C at Q/As 1103-13; Jeffay, Tr. at 998:3-999:3. There is also no dispute that this redesign retains the ability to change its bass and treble settings when it transitions from an unpaired to a stereo-paired state. RIB at 133-134; CIB at 119; SIB at 97.

The undersigned found hereinabove that the '959 Accused Products do not infringe under Sonos' "matrix coefficients" theory (*see* Section VIII.B.1.a) but do infringe under the "████" theory (*see* Section VIII.B.1.b). Because the 959 NIA No. 4 removes the infringing functionality (*i.e.*, ████████████████████████████████████████), it does not infringe claim 10 of the '959 patent.

### C. Technical Prong of the Domestic Industry Requirement

Sonos asserts that the '959 DI Products practice all limitations of claim 10 of the '959 patent. CIB at 119-123. Staff concurs. SIB at 98-99. Google does not dispute that Sonos' '959 DI Products practice claim 10 of the '959 patent. RLUL at 15. Additionally, the evidence shows that Sonos' '959 DI Products practice claim 10. CX-0011C at Q/As 734-787, 792-800, 804-806, 815, 816, 822, 823, 899-903; CX-1002.10; JX-0336C; JX-0251.101; CX-2662.118; CX-2630.4; JX-290C.1-4; CX-0007C at Q/As 155-156; CDX-0001.14; CDX-0005C.36-37.

Accordingly, the undersigned finds that Sonos has satisfied the technical prong of the domestic industry requirement for the '959 patent.

## D. Validity[49]

Google asserts two invalidity grounds. First, Google contends that U.S. Patent No. 8,423,893 ("Ramsay") combined with U.S. Patent No. 8,509,463 ("Goh 463") renders the asserted claim obvious.[50, 51] RIB at 135-148. Second, Google alleges that the '959 patent is invalid for improper inventorship. *Id*. at 153-157.

### 1. Obviousness

Google asserts that claim 10 is rendered obvious by Ramsay in view of Goh 463.[52] RIB at 134-148. Specifically, Google contends that Ramsay teaches networked audio devices that form different pairing configurations, including stereo and surround sound, and that Goh 463 teaches the benefit of applying different equalizations for stereo and surround sound. RIB at 135. Google therefore submits that "[a] person of ordinary skill in the art would have been motivated to apply the teachings of Goh 463 to the multi-speaker system of Ramsay to improve its sound quality and enhance its different listening configurations." *Id*.

---

[49] The '959 patent issued from a continuation of Application No. 13/083,499, which was filed on April 8, 2011. *See* JX-0004. The parties agree that the effective filing date of the '959 patent is April 8, 2011, and that Sonos has alleged an invention date of May 18, 2010. CIB at 124; RIB at 134; SIB at 100.

[50] Google contends that U.S. Patent No. 8,423,893 ("Ramsay") is prior art under pre-AIA 35 U.S.C. § 102(e) because it was filed as an international application on January 7, 2009, and that Ramsay also qualifies as prior art under pre-AIA 35 U.S.C. § 102(b) because it was published on July 6, 2009. RIB at 134. Google similarly contends that U.S. Patent No. 8,509,463 ("Goh 463") qualifies as prior art under pre-AIA 35 U.S.C. § 102(e) because it was filed in the United States on November 9, 2007, and that Goh 463 also qualifies as prior art under pre-AIA 35 U.S.C. § 102(b) because it was published on May 14, 2009. *Id*. Sonos does not dispute this. *See generally* CIB at 135-139; CPHB at 247-251.

[51] Ramsay is directed to "systems and methods for managing the operation of networked media playback devices." JX-0447 at Abstract. It focuses on a "drag and drop" configuration and control of its networked multimedia devices through a graphical user interface. *Id*. at 2:33-47, Fig. 2B; *see also* CX-0014C at Q/A 910; RX-1515C at Q/A 661. Goh 463 is directed to "a multi-mode sound reproduction system for reproduction of both stereophonic signals and multi-channel audio signals." JX-0189 at Abstract. In Goh 463, "the arrangement of electronic components forms a device like, for example, low pass filter, high pass filter, band-pass filter, crosstalk canceller and any combination of the aforementioned." *Id*. at 3:53-56.

[52] Ramsay was before the USPTO during prosecution of the '959 patent. *See* JX-0004.3

- 109 -

Sonos disputes that Ramsay discloses limitation 10.5 and 10.7.[53] CIB at 135-137; CLUL at 5. Sonos also disputes that Ramsay in view of Goh 463 discloses limitations 10.8 and 10.9. CIB at 137; CLUL at 5. Staff does not believe that Ramsay in combination with Goh 463 renders obvious elements 10.5 and/or elements 10.8 and 10.9. SIB at 109; SRB at 35.

### a) Limitation 10.5

Element 10.5 requires that the playback device "receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices." *See* JX-0004, cl. 10. Google does not contend that Goh 463 discloses or renders obvious this limitation. RIB at 136-140; RRB at 53-58.

Google submits that the speakers in Ramsay are configured to "receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices." RIB at 138. According to Google, the "controller" is the "PC" with a graphical user interface, the "signal" is "the control signal issued from the PC and received at the interface of the master device," and the "instruction for the playback device to pair" is "the instruction for each device in the group to adopt a specific role." *Id*. Google explains that a user may define a surround sound configuration by assigning specific playback roles to specific speakers and that after the roles are assigned, "the controller issues a control signal with instructions for each speaker in the group to playback the audio channel corresponding to its

---

[53] The undersigned need not reach whether the asserted combination discloses limitation 10.7 because as discussed *infra*, Ramsay in view of Goh 463 fails to disclose limitations 10.5, 10.8, and 10.9. Nevertheless, the undersigned finds that the evidence demonstrates that the wireless speakers in Ramsay are configured to determine that a type of pairing of the playback device comprises at least a first type of pairing or a second type of pairing, as recited by limitation 10.7. As Dr. Jeffay explained, the master device receives a control signal from the PC and determines the configuration selection (*i.e.,* type of pairing) as a predicate to issuing instructions to the slave devices. RX-1515C at Q/As 588-603; *see also* JX-0447 at 12:20-21, 14:59-15:3; 15:39-16:2, 18:65-19:11, Fig. 10. The slave devices then process these instructions to determine the type of pairing and adopt an appropriate playback role. *Id*. On cross-examination, Dr. Almeroth agreed that the master device does indeed perform an assessment to determine the type of configuration. Almeroth, Tr. at 826:18-827:23.

location. RIB at 137; RRB at 54. Google further explains: "The control signal is received at an interface defined on the master speaker of the group. And the master device issues the instructions to slave devices in the group." RIB at 137-138.

Sonos asserts that Ramsay does not disclose a signal from a controller instructing a playback device to pair with another playback device. CIB at 135; CRB at 62. Sonos also asserts that Ramsay "discloses a user configuring speakers into a five-channel surround arrangement by manually identifying the location of each speaker subsystem on the speaker itself – not by sending a signal from a controller." CIB at 135-136. Staff concurs. SIB at 110; SRB at 35-37.

The evidence shows that Ramsay teaches away from having the claimed "controller" that transmits an instruction to pair, as required by Element 10.5. More specifically, the speaker subsystems in Ramsay automatically configure themselves without the need for an instruction from a controller. *See, e.g.,* JX-0447 at 10:3-11:65, Fig. 5; CX-0014C at Q/A 1023; Almeroth, Tr. at 794:12-796:15. As shown and described with reference to Figure 5, Ramsay discloses that: (1) a plurality of audio devices discover each other on a network (step 501); (2) the plurality of audio devices then autonomously determines which audio device is the relative master/leader (step 502); and (3) the leader then defines the wireless audio system (step 503). JX-0447 at 10:3-11:65, Fig. 5. It is only *after* the system is defined that the leader device provides a system control interface for receiving control signals (step 504).[54] *Id.* at 10:53-64 (emphasis added); *see also id.* at Fig. 5; CX-0014C at Q/A 1023. The control signals are <u>not</u> "an instruction for the playback device to pair." Rather, as Google's own expert testifies, the control signals are sent "[a]fter the group is defined."[55] *See, e.g.,* RX-1515C at Q/As 670, 673; *see also* Almeroth Reb., Tr., 795:19-796:15.

---

[54] Nowhere in this discussion does Ramsay mention the use of a "controller." *See* JX-0447 at 10:3-11:65.
[55] Stated differently, to the extent a "controller" is used to make operational changes, this only occurs <u>after</u> the speakers have been configured to operate together. CX-0014C at Q/A 1023.

Google nevertheless contends that Ramsay's "surround group configuration" teaches limitation 10.5. RIB at 136-140. However, as Dr. Almeroth explained: "In Ramsay, these 'wireless speaker subsystems' include 'a physical or digital switch that is progressed between a plurality of positions to allow such identification' of the speaker's location in the surround sound system," and, as such, "a user manually identifies the location of the 'wireless speaker subsystem' via a switch on the speaker itself—not by sending a signal from a 'controller' to the 'wireless speaker subsystem.'" CX-0014C at Q/A 1023. "In other words, a user manually identifies the location of the 'wireless speaker subsystem' via a switch on the speaker itself—not by sending a signal from a 'controller' to the 'wireless speaker subsystem.'" *Id.*

The undersigned therefore finds that Google has failed to present clear and convincing evidence that Ramsay renders obvious limitation 10.5.

### b) Limitations 10.8 and 10.9

Claim 10 includes the limitations: the playback device "to perform a first equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing" and "to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing." *See* JX-0004, cl. 10. The parties address these limitations together.

Google contends that "it would have been obvious to modify the wireless speakers of Ramsay to meet [elements 10.8 and 10.9] based on the teachings of Goh 463." RIB at 145; RRB at 61-63. Google explains that Ramsay teaches networked audio devices that form different pairing configurations, while Goh 463 teaches the benefit of applying different equalizations for stereo and surround sounds. RIB at 144-146. Google therefore claims a person of ordinary skill in the art

would have been "motivated to apply the teachings of Goh 463 to the multi-speaker system of Ramsay to improve its sound quality and enhance its different listening configurations." *Id*. at 135

Sonos argues that because Ramsay does not disclose a "playback device" that is configured to determine and implement different types of pairing, Google has not shown that elements 10.8 and 10.9 would be satisfied, even if the teachings of Goh 463 made it obvious to modify Ramsay to perform equalization generally. CIB at 137; CRB at 64-65. Next, Sonos asserts that Google (and its expert) did not "sufficiently describe the proposed modification to Ramsay." CIB at 137.

Staff agrees with Sonos that Google has failed to show that it would have been obvious to modify the speakers in Ramsay, based on the teachings of Goh 463, to perform different equalizations based on type of pairing, as required by elements 10.8 and 10.9. SIB at 110-111; SRB at 37-38.

Limitations 10.8 and 10.9 require a "playback device" with a "network interface" that is configured to perform a first and second equalization depending on type of pairing. It is undisputed that Ramsay does not disclose performing a first and second equalization. RIB at 144 ("Although Ramsay does not disclose performing a first and second equalization under the CALJ's construction, the record evidence demonstrates that it would have been obvious to modify the wireless speakers of Ramsay to meet this requirement based on the teachings of Goh 463."); CX-0014C at Q/A 1006; RX-1515C at Q/A 559. And, the speakers in Goh 463 are not playback devices nor do they have a network interface, as required by the claim. *See* JX-0189 at Abstract, 3:53-58, Figs. 2 & 3; CX-0014C at Q/As 922-923 (confirming that the Goh 463 speakers do not operate on a data network or process audio). Thus, as Sonos correctly noted in its briefing, "it is not enough for Google to simply point to teachings of equalization in Goh 463; it is Google's burden to show—

as it contends—that it would have been obvious to ***apply*** Goh 463 to Ramsay." CRB at 65 (emphasis in original).

Google claims that Dr. Jeffay detailed "exactly how a person of ordinary skill in the art would integrate Goh's equalization settings into Ramsay's software." RRB at 41. The undersigned disagrees. The mere fact that Ramsay and Goh 463 can be combined or modified does not render the resultant combination obvious, unless the results would have been predictable to a person of ordinary skill in the art. While Dr. Jeffay asserts that a person of skill in the art would have been motivated "to modify the networked playback devices in Ramsay to perform a first equalization or second of audio data depending on the system's pairing configuration," he failed to articulate a sufficient rationale for why a person of skill in the art would have been motivated to combine these references.[56] *See, e.g.*, RX-1515C at Q/As 633, 650. For example, when asked how a person of ordinary skill in the art would combine the teachings of Ramsay and Goh 463, Dr. Jeffay responded: "[T]he person of ordinary skill in the art would have been motivated to implement the techniques using software and digital signal processing." *Id.* at Q/A 650. He did not describe his proposed modification or explain how this could have been implemented with a reasonable expectation of success. *See, e.g., id.* at Q/As 641-643, 650-651; *see also* CX-0014C at Q/A 1029 ("For example, as discussed previously, in Goh 463, the electronic components that perform equalization are separate and distinct components from the primary and secondary speakers. *See, e.g.*, JX-0189 at Figs. 1 & 2. Dr. Jeffay does not explain where such processing would be performed if implemented in software and whether that would constitute configuring the 'playback device' itself to perform

---

[56] In reaching his conclusion, Dr. Jeffay relied on at least one piece of prior art (U.S. Patent Publication No. 2005/0100174 ("Howard")) that is no longer being asserted against the '959 patent. *See, e.g.*, RX-1515C at Q/As 645-649.

equalization, as required by the Asserted Claims of the '959 Patent."). Such a conclusory assertion with no explanation is inadequate to support a finding that there would have been a motivation to combine. *See TQ Delta, LLC*, 942 F.3d at 1359 ("Conclusory expert testimony does not qualify as substantial evidence."). The Federal Circuit has cautioned against the type of reasoning employed by Dr. Jeffay, stating: "This type of finding, without more, tracks the *ex post* reasoning *KSR* warned of and fails to identify any actual *reason* why a skilled artisan would have combined the elements in the manner claimed." *In re Van Os*, 844 F.3d 1359, 1361 (Fed. Cir. 2017). The Federal Circuit has also emphasized that it is important to clearly articulate why a person of ordinary skill in the art would have been motivated to combine the references "because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 991-92 (Fed. Cir. 2017) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)).

The undersigned therefore finds that Google has failed to show by clear and convincing evidence that it would have been obvious to modify Ramsay based on Goh 463 to perform different equalizations based on type of pairing, as required by limitations 10.8 and 10.9.

### c) Conclusion

For the reasons set forth above, Google has not shown that Ramsay in combination with Goh discloses limitations 10.5, 10.8, and 10.9. Accordingly, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that claim 10 is rendered obvious.

### d) Secondary Considerations

Secondary considerations of nonobviousness may rebut a *prima facie* case of obviousness. Here, where Google has not made out a *prima facie* case of obviousness, there is no showing to

- 115 -

rebut. Accordingly, the undersigned need not consider any secondary considerations of nonobviousness.

### 2. Improper Inventorship

Google asserts that the '959 patent is invalid for failing to name the proper inventors. RIB at 153-157; RRB at 67-69. According to Google, during development of the stereo pairing feature of the Sonos S5 device, Sonos identified ███████████████████ █████

███████████████████. RIB at 154. Google claims that ██████████████████

██████████████████████████. *Id*. at 154-156. ██████

████████████████████████████████████████████

██████████████████████████████████. *Id*. Google therefore contends that ████

████████████████████████████████████████████

████████████████████████████████████████████

██████████.[58] RIB at 156-157; RRB at 67-68.

Sonos disputes Google's assertion, arguing that the named inventors had already conceived of the subject matter of the '959 patent before ████████████████████████

████████████████████████████. CIB at 144-146; CRB at 67-68. While Sonos acknowledges that ██████████████████████

████, Sonos maintains that ██████████████████████████████

████. CIB at 144.

---

[57] In Mr. Kallai's testimony, ████████████████████ *See, e.g.*, CX-0009C at Q/As 56, 60, 61, 67, 75, 77.
[58] Google also contends that ████████████
████████████. RIB at 154, 157 (██████████████████████
████████████); RRB at 68-69.

Staff agrees with Sonos. SIB at 112-114. In Staff's view, the evidence shows that the named inventors ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███. *Id.* at 113-114; SRB at 38-39.

The claims of the '959 patent recite using different equalizations and techniques for performing equalization. More specifically, the "second equalization" limitation of claim 10 requires configuring the playback device to "perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing." *See* JX-0004, cl. 10. None of the claims require specific EQ profiles. *Id.* In other words, because no claims of the '959 patent recite specific EQ profiles, the evidence does not support Google's allegation that ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. *See, e.g.,* Kallai, Tr. at 172:22-185:6; CX-0009C at Q/As 56-109; CX-0014C at Q/As 1129-1138.

The fact that Sonos ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████. CX-0009C at Q/As 60-71, 104, 108; CX-0004 at Q/A 1133; CX-0625C (██████

████████████████████████); CX-0626C.5 ("███████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████"); JX-0435C; JX-0033C; Kallai, Tr. at 173:4-175:3. ██████████████████████████████████████████. He testified:

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

CX-0009C at Q/A 108.

Google contends that "████████████████████████████
████████████████████████████████. RIB at 154. To the contrary, ████

████████████████████████████████████████████████

████████████████s. CX-0009C at Q/A 64. ████████████████

████████████████████████████ *Id*. In addition, ████████████

████████████████████████████████████████████████████

*Id*. at Q/As 62-70; *see also* Kallai, Tr. at 176:3-24 (████████████████

████████████████████████).

Google also claims that using pass filters to perform the second equalization was ████████

████████████████████████ RIB at 157. Google points to dependent claims 23, 26, 30,

32, 34, 38, 42, and 46 of the '959 patent. *Id*.; *see also* RRB at 68-69. First, these claims recite a

"first type of pass filter" and a "second type of pass filter." *See id.* They do not ████████████

████████████████████████████████. CX-0014C at Q/A 1135. Second, the

evidence shows that ████████████████████████████████████[59], that

████████████████████████████████████████, and that ████████

████████████████████████. *See* CX-0009C at Q/As 78, 86, 108; JX-0108C;

JX-0109C; JX-0110C.3; CX-0014C at Q/A 1135.

---

[59] Google's expert, Dr. Jeffay, agrees that equalization techniques, including pass filters, were known in the industry (and thus, not something new). RX-1515C at Q/As 49-50.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████. *StoneEagle Servs.*, 746 F.3d at 1063. Stated differently, ███████████

███████████████████████████████████████████████████████████

████████.[60] *Shatterproof Glass Corp. v. Libbey-Owns Ford Co.*, 758 F.2d 613,

624 (Fed. Cir. 1985) ("An inventor may use the services, ideas, and aid of other in the process of

perfecting his invention without losing his right to a patent.") (internal quotations and citation

omitted).

Accordingly, the undersigned finds that Google has failed to present clear and convincing

evidence that the '959 patent is invalid for lack of improper inventorship.

## IX.     U.S. PATENT 8,588,949

### A.       Overview

The '949 patent, entitled "Method and Apparatus for Adjusting Volume Levels in a Multi-

Zone System," issued on November 19, 2013 to Robert A. Lambourne and Nicholas A. J.

Millington. The '949 patent is assigned to Sonos. The '949 patent relates to "user interfaces for

controlling or manipulating a plurality of multimedia players in a multi-zone system." JX-0003 at

1:27-30. An *Ex Parte* Reexamination Certificate issued November 5, 2015 in response to

Reexamination Request No. 90/013,423 (filed January 5, 2015). Compl. at ¶ 68. The

Reexamination Certificate states: "Claims 1, 3, 4, 5, 6, 8, 10, 11, 13, 14, 15 and 17-20 are

---

[60] The undersigned notes that Dr. Jeffay failed to ████████████████████████████████████
████████. *See* RX-1515 at Q/As 1029-1082. Dr. Almeroth opined that this failure undermined Dr. Jeffay's
(and Google's) assertion that the inventorship for the '959 patent is incorrect. *See* CX-0014C at Q/A 1138. The
undersigned agrees.

determined to be patentable as amended. Claims 2, 5, 9, 12, and 16, dependent on an amended claim, are determined to be patentable." *Id*; *see also* Compl. Ex. 5.

### 1. Asserted Claims

Sonos is asserting claims 1, 2, 4, and 5, which read as follows[61]:

1.  [1.0] A multimedia controller including a processor, the controller configured to:

    [1.1] provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source;

    [1.2] accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that a least two of the plurality of players in the local area network are to be included in the player group *for synchronized playback of a multimedia output from the same multimedia source*;

    [1.3] for [each of the plurality of players within] *any individual player in* the player group, accept via the user interface [an] *a player-specific* input to adjust a volume [associated with the] *of that individual* player, wherein the *player-specific* input to adjust the volume [associated with the] *of that individual* player causes [the corresponding independent playback device] *that individual player* to adjust its volume; and

    [1.4] accept via the user interface [an] *a group-level* input to adjust a volume associated with the player group, wherein the *group-level* input to adjust the volume associated with the *player* group causes [the corresponding independent playback devices] *each of the players* in the player group to adjust [their volumes] *its respective volume*.

2.  The multimedia controller of claim 1, wherein the controller is further configured to accept via the user interface an input to remove one of the plurality of players from the player group.

4.  The multimedia controller of [claim 3] *claim 1*, wherein the *group-level* input to [mute] *adjust the volume associated* with the player group *further* causes [the players in the player group to adjust their volumes further comprises]: the controller [sending] *to send* an instruction to one of the players in the player group, the instruction indicating that the volume of each of the players in the player group should be adjusted in scale.

5.  The multimedia controller of claim 1, wherein the controller is further configured to accept via the user interface an input to name the player group.

---

[61] The claim language has been copied directly from the reexamination certificate. As such, matter enclosed in brackets [ ] originally appeared in the '949 patent, but has been deleted and matter printed in italics indicates additions made to the '949 patent during reexamination.

### 2. Claim Construction

The undersigned has construed the following terms from the asserted claims:

| TERM | CLAIM(S) | CLAIM CONSTRUCTION |
|---|---|---|
| "playback device" | 1 | "data network device configured to process and output audio" |
| "multimedia" | 1, 2, 4, 5 | "any type of media that comprises audio (including audio alone)" |
| "local area network" | 1 | "a data communications network spanning a limited geographical area, such as an office, an entire building, or industrial park" |
| "independent playback device" | 1 | "data network device configured to process and output audio that is capable of independent operation" |

Order No. 20 at 15, 19-20, 26.

### B. Infringement

Sonos asserts that the '949 Accused Products infringe claims 1, 2, 4, and 5 of the '949 patent. Sonos also alleges that Google induces infringement of the asserted claims. *Id.* at 161. Google and Staff disagree that any of the claims of the '949 patent are infringed.[62] RIB at 159; SIB at 115.

### 1. Claim 1

Sonos asserts that the '949 Accused Products infringe claim 1 of the '949 patent. Google disputes that the '949 Accused Products meet limitations 1.1, 1.2, and 1.3.[63] RLUL at 16. Google does not dispute that the '949 Accused Products meet the remaining limitations of claim 1. *Id.* Staff asserts that "Sonos has failed to meet its burden of showing direct infringement of the asserted claims of the '949 patent." SIB at 115.

---

[62] Google also asserts that the '949 Asserted Products, as imported, do not infringe the '949 patent. RIB at 159. As explained, *supra*, with respect to the '258 patent, the undersigned is not persuaded by this argument. *See* Section VI.B.1.

[63] In its brief, Google also disputes that limitation 1.4 is met. *See* RIB at 162-163.

### a) Limitation 1.1

Claim 1 includes the limitation: "provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source." JX-0003, cl. 1.

Sonos explains that most of this limitation is undisputed, but that Google contends that the Chromecast-enabled audio players in the player group are not "independent playback devices." CIB at 150-151. Sonos notes that this term was construed as "data network device configured to process and output audio that is capable of independent operation" and that "[t]he Chromecast-enabled audio players satisfy this construction." *Id.* at 151. Sonos acknowledges that the term "independent playback device" was added to distinguish the invention from U.S. Patent Application Publication No. 2002/0124097 ("Isely"), but asserts that "the leader/follower technique employed by Chromecast-enabled audio players is fundamentally different." CIB at 152. Sonos explains that, in Isely, "the audio devices in a group are 'tethered' and 'interdependent' because the volume of one individual device cannot be adjusted without also adjusting the volume of other devices in the group." *Id.* In the '949 Accused Products, however, "each Chromecast-enabled audio player in a player group is capable of adjusting its own volume individually without also adjusting the volumes of other players in the player group." *Id.* at 153.

Google asserts that, during prosecution of the '949 patent, Sonos added the term "independent playback device" to distinguish the pending claims "over the tethered or interdependent operation" of Isely. RIB at 160. Google argues: "In view of this prosecution history, any system that controls player volumes in a 'tethered' or 'interdependent' manner is outside the

scope of the claims." *Id.* Because Google asserts that the '949 Accused Products operate in this manner, Google contends there is no infringement. *Id.*

Staff argues that, in adopting Staff's proposed construction of "independent playback device," the undersigned recognized that the invention was different than the "tethered and interdependent operation of Isely." SIB at 117. Staff further argues that "the evidence shows that, in the '949 Accused Products, each 'follower' device has its volume changed in a tethered or interdependent manner." *Id.* at 117-118.

The parties agree that the '949 Accused Products work ██████████████████████ ██████ CIB at 153; RIB at 160; SIB at 118. ████████████████████████ ████████████████████████████████ CX-0012C at Q/As 324-352, 359-360; RX-1520C at Q/As 46, 111. ██████████████████████████████ ██████████████████████████████████████████ *Id.* ████████████ ████████████████████████████. *Id.; see also* Weissman, Tr. at 272:2-274:9; Fisher, Tr. at 390:11-391:11; JX-0018C.

The dispute between the parties is centered on whether this ███████████ technique was specifically disclaimed during prosecution of the patent. The undersigned finds that it was not. The term "independent playback device" was added to distinguish the invention over the prior art. JX-0008 at .01747-01750. In a telephone interview with the Examiner, Sonos "[d]iscussed support for the independent operation of the claimed individual player" and "distinguished the individual operation over the tethered or interdependent operation of Isley [sic]." *Id.* at .01751. In allowing the amended claims, the Examiner noted that, "where Isley [sic] controls volume in an interdependent manner[,] the instant application s [sic] teaches the system functional to provide

groupwise and individual control of each of the groupwise addressable and independently addressable playback devices." *Id.* at .01749.

The undersigned finds that these statements do not demonstrate a clear disavowal of devices that operate according to ██████████████. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012) (explaining that "it is particularly important not to limit claim scope based on statements made during prosecution absent a clear disavowal or contrary definition"). While the Examiner used the language "tethered or interdependent operation," there is not a clear intent to disavow *all* systems that can be characterized as either "tethered" or "interdependent." Rather, the patentee disclaimed the devices as described in Isely – a system in which the volume of one individual device could not be adjusted without also adjusting the volume of other devices in the group. JX-0008 at .01751. The '949 Accused Products do not operate in such a manner. Instead, ████████████████

████████████████████████████████████████

██████████████████. CX-0012C at Q/As 324-325, 330-332; Rinard, Tr. at 930:23-931:3.

Having found that Sonos did not disclaim devices that operate according to ██ ██████████████, the undersigned finds that the '949 Accused Products meet this limitation. The evidence shows that '949 Accused Products provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network. CX-0012C at Q/As 243-261; Weismann, Tr. at 327:15-24. The evidence also shows that each player is a data network device configured to process and output audio that is capable of independent operation configured to playback a multimedia output from a multimedia source. *Id.* Specifically, Chromecast-enabled audio players can play audio independently when not in a group and, when

- 124 -

grouped, their individual volume can be independently adjusted without changing the volume of any other player. Rinard, Tr. at 930:23-931:8. Thus, the undersigned finds that the '949 Accused Products meet this limitation.

### b) Limitation 1.2

Claim 1 includes the limitation "accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group for synchronized playback of a multimedia output from the same multimedia source." JX-0003, cl. 1. For the Hub Controller and Pixel Controllers installed with the Google Home app, Google disputes this limitation only to the extent that players are not "independent playback devices." RLUL at 16. For the Pixel Controllers installed with either the GPM or YTM apps, Google disputes that these applications "facilitate formation of the player group." RIB at 162.[64]

### i) Undisputed Products

Google does not dispute that this limitation is met for the Hub Controllers and Pixel controllers installed with the Google Home App, if the undersigned finds that the devices are "independent playback devices." RIB at 162. As noted above, the undersigned made such a finding. As such, the Hub Controllers and the Pixel controllers installed with the Google Home App meet this limitation.

### ii) GPM and YTM

The claim requires "an input to facilitate formation of the player group." Sonos acknowledges that the GPM and YTM apps cannot "define a static or dynamic group." CIB at 155. Sonos instead argues that the GPM and YTM apps do "precisely what [this] limitation requires."

---

[64] Staff does not address this limitation. *See* SIB at 115-120; SRB at 39-44.

*Id.* at 156. Specifically, the Chromecast-enabled players will "stop whatever they are doing . . . and coordinate with each other to play in synchrony." *Id.* Sonos also disagrees that formation is an event that can only occur once. *Id.* Sonos explains that Google "mistakenly conflates 'creation' (which is not required by the claim) with 'facilitating formation.'" *Id.*

Google argues that the GPM and YTM apps do not allow users to form groups, but instead "allow users to 'cast' audio to pre-existing groups." RIB at 162. Google explains that "casting to a pre-formed group does not constitute forming a group." *Id.* Google also notes that there is nothing in the intrinsic record to support an interpretation that "every time a pre-formed group plays music, that counts as a re-'formation' of the group." RRB at 74.

The undersigned finds that the evidence shows that a person of ordinary skill in the art would understand that the concept of "formation" in the claim requires that a player group must be formed by the controller, and cannot be pre-existing. The '949 patent describes group formation as the user selecting which players to include in a group. JX-0003 at 2:56-58, 5:35-36; 10:55-67. Sonos does not point to anything in the intrinsic record to support the idea that the groups can be pre-formed, and the user interface must simply select one of the pre-formed groups. Because the GPM and YTM apps do not allow users to form groups, the undersigned finds that this limitation is not met. Thus, the undersigned finds that this limitation is not met for the Pixel Controllers installed with either the GPM or YTM apps.

### c) Limitations 1.3 and 1.4

Claim 1 includes the limitations: (1) "for any individual player in the player group, accept via the user interface a player-specific input to adjust a volume of that individual player, wherein the player-specific input to adjust the volume of that individual player causes that individual player to adjust its volume" and (2) "accept via the user interface a group-level input to adjust a volume

- 126 -

associated with the player group, wherein the group-level input to adjust the volume associated with the player group causes each of the players in the player group to adjust its respective volume." JX-0003, cl. 1. Sonos and Google address these limitations together in their briefs, whereas Staff only addresses limitation 1.3. *See* CIB at 156; RIB at 162; SIB at 119-120.

Sonos explains that Google "repeats its argument that Chromecast-enabled audio players in a group are no[t] 'independent playback devices' because they allegedly make individual volume adjustments." CIB at 158. Sonos argues that "Google's players are not subject to tethered or interdependent volume control as in Isely." *Id.* ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████." *Id.* Sonos also asserts that Google's argument on noninfringement as it relates to the Pixel Controller with GPM and YTM "is premised on the notion that the Google Home app . . . is required for an Accused Pixel Controller to facilitate formation of the player group." *Id.* at 157 n.86.

Google disputes these limitations are met on the ground that player-specific volume control is "tethered and interdependent." RLUL at 16; RIB at 162. Google further asserts that the YTM and GPM applications cannot infringe for an additional reason. *Id.* at 163. "Specifically, claim 1 requires that the same user interface used to form the group in limitation 1(b) must also accept the volume of limitations 1(c) and 1(d)." *Id.* Google notes that "neither [GPM] or [YTM] can form a group." *Id.*

Staff agrees that Sonos has failed to establish that this limitation is infringed on the grounds that "████████████████████████████████████████

████████████████████████." SIB at 119. According to Staff, this is because ████████████████



.'" *Id.*

As noted above, the undersigned found that Sonos did not disclaim ▬▬▬▬▬▬▬. Nor does the undersigned find that the way that the volume message is provided to the player results in noninfringement. In the '949 Accused Products, ▬▬▬▬▬▬▬. CX-0012C at Q/As 324-352, 359-360. Thus, ▬▬▬▬▬▬▬

The undersigned agrees with Google, however, that the Pixel Controllers with YTM or GPM cannot infringe because they do not use the same "user interface" to accept the player specific and group level volume inputs and to facilitate formation of a player group. As noted above, the undersigned found that neither the YTM nor GPM apps facilitate formation of a player group. Accordingly, the undersigned finds that this limitation is not met for the Pixel Controllers with YTM or GPM.

Accordingly, the undersigned finds that the Hub and Pixel Controllers installed with the Google Home app meet these limitations, but that Pixel Controllers installed with either the YTM or GPM apps do not.

### d) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the Hub and Pixel Controllers installed with the Google Home app infringe claim 1, but that Pixel Controllers installed with either the YTM or GPM apps do not.

### 2. Claims 2 and 5

Google does not dispute that the additional limitations of claim 2 and 5 are met. RLUL at 16, 17. Additionally, the evidence shows that the Hub and Pixel Controllers installed with the Google Home app meet these limitations. CX-0012C at Q/As 324-360. 374-400. Accordingly, the undersigned finds that the Hub and Pixel Controllers installed with the Google Home app meets claims 2 and 5.

### 3. Claim 4

Claim 4 states: "The multimedia controller of claim 1, wherein the group-level input to adjust the volume associated with the player group further causes the controller to send an instruction to one of the players in the player group, the instruction indicating that the volumes of each of the players in the player group should be adjusted in scale." JX-0003, cl. 4. Google disputes that the additional limitations of claim 4 are met.[65] RLUL at 16-17.

Sonos asserts that "each Hub Controller, and each Pixel Controller installed with either Google Home, YTM, or GPM, is configured to accept a 'group-level input.'" CIB at 159. Sonos explains that each leader device has ████████████████████████████████. *Id.*

Google argues that "the accused 'instruction' in the accused products does not 'indicat[e]' that the volumes of each of the players in the player group should be adjusted in scale.'" RIB at 163. Google explains that "the claim requires that the instruction itself indicate that volumes should

---

[65] Staff does not address this argument, other than noting that it believes that Sonos has not met its burden to show that independent claim 1 is infringed. SIB at 121; SRB at 44.

be adjusted in scale, and ████████████████████████████████.” RRB at 76. Google

also notes that ████████████████████████████████████.” *Id.*

Google further argues that ████████████████████████████████████████████

████████. RIB at 164. Google explains: ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████” *Id.*

  The undersigned agrees with Google that this claim is not met. The claim language requires

that the instruction "indicat[es] that the volumes of each of the players in the player group should

be adjusted in scale." JX-0003, cl. 4. In the '949 Accused Products, the instruction does not so

indicate. Both Sonos and Google agree that ████████████████████████████████.

CIB at 159; RIB at 163. ████████████████████████████████████

████████████████████████████. RX-1517C at Q/As 39, 42; RX-1520C at Q/As 128-129. ████

████████████████████████████████████████████████████████

████████████. RX-1517C at Q/As 30, 34-38; RX-1520C at Q/As 130-131. Because ██

████████████████████████████████████████████████████████

████████████████████ it does not meet the limitation.[66] Accordingly, the undersigned

finds that the '949 Accused Products do not infringe claim 4.

  **4. Indirect Infringement**

  Sonos asserts that Google actively induces infringement. CIB at 161. Sonos explains that

"third parties have directly infringed the '949 Claims." *Id.* Sonos further states that Google "had

---

[66] Although Google argues that this limitation is likewise not met under the doctrine of equivalents, Sonos does not make an argument regarding the doctrine of equivalents in its brief. CIB at 158-160; CRB at 74-75. As such, it is waived.

knowledge of the '949 Patent and the infringement allegations at least as early as October 13, 2016 and no later than when Sonos provided Google" a copy of the complaint. *Id.* According to Sonos, "Google encouraged third parties to infringe." *Id.*

Google argues that "Sonos has failed to demonstrate that Google encourages the user of any of the accused products to directly infringe any claim of the '949 patent." RIB at 164. Google also notes that "no accused 949 Pixel Device is pre-installed with the Google Home App at the time that it is imported" and that "Sonos has not shown that Google encourages each purchaser . . . to install the Home App even after purchase." *Id.*[67, 68]

The undersigned first disagrees with Google that there can be no induced infringement because certain activities take place after importation. The fact that the Google Home app is not installed at the time of importation is not dispositive. The Commission does not require that all acts occur before importation in order for there to be induced infringement. *See* Section VI.B.1.

The undersigned also finds that there is evidence that Google encourages purchasers to install the Google Home app. Google "instructs its customers to download the Google Home app to set up speaker devices." Chan, Tr. at 416:5-8. The evidence further shows that all 34,480,450 Google Home Mini devices that were online in a 28-day period were setup using the Google Home App. *Id.* at 416:9-417:4; JX-0400C.

As for the Hub Controllers, Google argues that "Sonos has not demonstrated that any purchaser . . . will ultimately use that device to form and control player groups as required by the asserted claims." RIB at 166. The asserted claims of the '949 patent are apparatus claims. Thus, Sonos is not required to show that consumers actually use the software in an infringer manner.

---

[67] Google does not dispute Sonos' allegations that: (1) resellers have offered to sell and have sold the Hub and Pixel controllers; (2) consumers have installed or updated the relevant software or firmware, and (3) Google had knowledge of the '949 patent. RIB at 165-166; RRB at 77.
[68] Staff does not address induced infringement in its briefs. *See* SIB at 121; SRB at 41.

Rather, "to infringe a[n] apparatus claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode." *Finjan,* 626 F.3d at 1204. As such, the undersigned finds that Google induced infringement of claims 1, 2, and 5 of the '949 patent.

### 5. Google's Redesigns

Google explains that it "has redesigned every accused device such that their user interfaces cannot accept the 'group-level' volume input required by limitation 1(d)."[69] RIB at 166. Staff states that "there is no dispute that Google's redesigns would remove the infringing functionality." SIB at 122.

Sonos does not dispute that the redesigned products do not infringe.[70] Additionally, the evidence shows that the redesigned products do not infringe the '949 patent. RX-1520C at Q/As 161-172.

### C. Technical Prong of the Domestic Industry Requirement

The undersigned previously determined that the technical prong of the domestic industry requirement is met for the '949 patent. Order No. 32 (Jan. 21, 2021), *aff'd* by Comm'n Notice (Feb. 2, 2021).

### D. Validity[71]

Google argues that claims 1, 2, 4, and 5 of the '949 patent are invalid due to anticipation and that all of the asserted claims are invalid due to obviousness. RIB at 168-198. Google also asserts that the patent is invalid under 35 U.S.C. § 101(a). *Id.* at 199.

---

[69] Google does not provide names for the redesigned products, as it does for the other patents (*i.e.*, '258 NIA No. 2). *See* RIB at 167 (describing the modifications).

[70] The undersigned previously found that the redesigned products are fixed and definite. *See* Section VI.B.3.

[71] Sonos asserts that claims 1, 2, and 4 have an effective priority date of June 5, 2004 and claim 5 has a priority date of February 21, 2008. CIB at 164. Sonos further asserts that claims 1 and 2 were conceived at least by July 11, 2003 and reduced to practice at least by October 24, 2003. *Id.* Staff agrees and Google does not dispute these dates. SIB at 123-124; RIB at 168.

1. **Anticipation**

   a) **Bose Lifestyle 50 System**

Google argues that claims 1 and 2 are anticipated by the Bose Lifestyle 50 System and the Bose Lifestyle 50 Owner's Guide (collectively, "Bose").[72] RIB at 168. Sonos disputes that Bose discloses any limitation of claim 1 in full, but does not dispute that Bose discloses "a multimedia controller." CLUL at 6. Sonos also disputes that Bose discloses claim 2. *Id.* Staff argues that "Google failed to present clear and convincing evidence that [the] asserted claims of the '949 patent are invalid as anticipated by Bose." SIB at 124.

   i) **Limitation 1.2**

Claim 1 includes the limitation "accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group for synchronized playback of a multimedia output from the same multimedia source." JX-0003, cl. 1.

Google notes that "Sonos contends that simultaneous audio playback is not 'synchronized' because the plain meaning of 'player group for synchronized playback' requires that the players be 'configured to coordinate' by sending signals to achieve synchronization." RIB at 171. According to Google, "[n]either the claims nor the specification require 'coordination.'" *Id.* Google explains that one of the inventors of the '949 patent testified that "the word 'synchronized' does not require 'coordination' or any other engineering technique" but instead "requires only that from the user's perspective, sound is played back at the same time (in synchrony)." *Id.* at 172.

---

[72] Google contends that the Bose LifeStyle 50 System, ███████████████████████████████████████████████████████████████ RIB at 168-169. Sonos does not dispute this. CIB at 165-169; CRB at 76-82.

Google also asserts that "both 949 inventors and Sonos' expert testified that sending the same audio signal over speaker wires is 'synchronized.'" *Id.* at 174.

Sonos asserts that "[t]he record overwhelmingly establishes that Bose is not configured for 'synchronized playback.'" CIB at 167. Sonos argues that "Dr. Rinard's unfounded insistence that Bose teaches synchronized playback . . . is entirely unpersuasive – and certainly not the clear and convincing evidence that § 102 requires." *Id.*

Staff argues that "[t]he evidence shows that a person of ordinary skill in the art would understand 'synchronized playback' to require more than just playing the same source at the same time." SIB at 124. Staff therefore asserts that "the evidence shows that one of ordinary skill would not have understood the 'Acoustimass modules' in Bose to be in a 'player group for synchronized playback' as required by Element 1.2." *Id.* at 125.

The undersigned agrees that this limitation is not present in Bose. Bose features a type of speaker called an "Acoustimass module," which can be connected to one or more "Jewel Cube" speakers. JX-0130.11-12. The speakers do not have any capacity to communicate with each other and instead play whatever signal arrives from the multi-room interface. CX-0015C at Q/A 239. The evidence shows that a person of ordinary skill in the art would not consider this to be "synchronized playback." For example, Paul Hainsworth, a former Bose employee, testified that "no one in the industry would call" what the Bose speakers do "synchronized." *See* JX-0476C at 36:2-13.[73] Dr. Weissman further explained that a person of ordinary skill in the art would expect to see something more than just the same signal being sent to different players in a hard-wired setting to conclude that the system was synchronized. Weissman, Tr. at 861:20-862:6; *see also*

---

[73] Google asserts that Mr. Hainsworth initially testified: "Of course it's synchronized." RIB at 173 (quoting JX-0476C at 34:11-35:1). As Sonos explains, however, Mr. Hainsworth misspoke and then corrected himself to say "I wouldn't call that synchronized." JX-0467C at 34:18-35:4; *see also id.* at 35:14-22.

CX-0015C at Q/As 239-245. The testimony of other witnesses similarly supports the idea that Bose does not teach "synchronized playback." *See* JX-0491C at 26:7-21; Millington, Tr. at 78:3-79:19. Because Bose does not disclose limitation 1.2, the undersigned finds that Bose does not anticipate claim 1 of the '949 patent. Additionally, because Bose does not anticipate claim 1, it cannot anticipate dependent claim 2.

### b)    Isely

Google argues that claims 1, 2, and 4 are anticipated by Isely. RIB at 179. Sonos disputes that Isely discloses any limitation of claim 1 in full, but does not dispute that Isely discloses "a multimedia controller," "a processor," or "a plurality of players in a local area network." CLUL at 6. Sonos also disputes that Isely discloses claim 2 or 4. *Id.* Staff argues that "Google failed to present clear and convincing evidence that [the] asserted claims of the '949 patent are invalid as anticipated by Isely." SIB at 126.

Google states that "Sonos asserted that Isely did not anticipate claim 1 for three reasons." RIB at 180. "Two were repeats of flawed arguments that Sonos made with respect to Bose." *Id.* The third reason argued that "Isely does not teach the 'player-specific' volume control of limitation 1(c)." *Id.* According to Google, "[t]hat assertion is incorrect." *Id.* Google argues that Isely discloses a "player-specific" volume control. *Id.* Specifically, "[i]n Isely, to issue a player-specific volume command, the user can configure the controller such that only one player in a group will respond to volume commands, while the volume of every other player remains static." *Id.* Google also asserts that "[t]he user can . . . change which player in the group is to receive the player-specific volume adjustment." *Id.*

Sonos asserts that "[t]he USPTO thoroughly reviewed Isely during prosecution of the '949 Patent and concluded that it did not anticipate the asserted claims." CIB at 169. Sonos further

argues that "Isely fails to disclose several core Sonos innovations embodied in claim 1." *Id.* at 170. Sonos explains that Isely's "controller is not configured to accept 'a player-specific input to adjust a volume of that individual player." *Id.* Sonos also asserts that the hypothetical example upon which Google relies is flawed and notes that "Google cannot argue that something 'not disclosed' anticipates." CRB at 85.

Staff asserts that "Google failed to present clear and convincing evidence that [the] asserted claims of the '949 patent are invalid as anticipated by Isely." SIB at 126. Staff notes that the undersigned had already determined that Isely does not disclose "independent playback devices" and that it controls volume in an interdependent manner. *Id.*

Isely was considered by the PTO during prosecution of the '949 patent. JX-0008.1748-51. "[A] party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by [the PTO]." *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011). Google has not met this burden.

The evidence shows that the volume control in Isely is always a type of group volume control. JX-0442 at ¶¶ 15, 49, 53, 56; CX-0015C at Q/A 78. As Dr. Rinard conceded, "when you change the volume of the reference device[], the volume of the other devices change." Rinard, Tr. at 952:7-19. As such, Isely does not disclose an "independent playback device" or the elements of limitation 1.3.

Google does not introduce clear and convincing evidence that this understanding is incorrect. Instead, Google introduces a hypothetical scenario in which a user could create a zone with just two players, designate one player as the "reference device," and program the other player to have a "static" relationship. RX-1480C at Q/A 213. In this scenario, according to Google, the static device would maintain a steady volume in response to the reference device's changes. *Id.*

- 136 -

Then, if the user wishes to change the volume of the static device, he would designate that device to be the reference device. *Id.* at Q/A 214. This scenario is not disclosed in Isely. CX-0015C at Q/As 397-398; *see also* Rinard, Tr. at 530:2-18. Additionally, as explained by Dr. Weissman, "the configuration in Dr. Rinard's hypothetical would result in a more complicated, impractical variation of the configuration described at paragraphs 15 and 53 of Isely, and thus Isely would not teach this hypothetical to a POSITA and a POSITA would not be motivated to modify Isely's teachings in this fashion." CX-0015C at Q/A 399. Further, Dr. Weissman testified that "Isely teaches away from Dr. Rinard's hypothetical." *Id.* at Q/A 396. Thus, the undersigned finds this hypothetical does not provide the clear and convincing evidence that Isely does, in fact, disclose an "independent playback device" and the limitations of claim 1.3.

Because Isely does not disclose these claim limitations, it does not anticipate claim 1 of the '949 patent. Additionally, because Isely does not anticipate claim 1, it cannot anticipate dependent claims 2 and 4.

## 2. Obviousness

Google argues that the asserted claims are rendered obvious by: (1) Bose alone; (2) Bose and Isely; (3) Bose and Crestron; (4) Bose and U.S. Patent No. 5,761,320 ("Farinelli"); (5) Isely and Bose; (6) Isely and Crestron; (7) Isely and Farinelli; and (8) the cd3o Network mp3 Player ("cd3o") and Isely. RIB at 183-196.

### a) Bose

Google asserts that Bose alone renders obvious claims 1, 2, 4, and 5 of the '949 patent. RIB at 184. Google explains that, if the undersigned finds that Bose does not anticipate claims 1-2 because it fails to disclose a 'player group' or a 'local area network,' . . . 'it would be obvious to modify Bose to operate on a two-way network such as wired Ethernet or wireless 802.11" *Id.*

Google asserts that "[i]n the years preceding the alleged invention (2003-04), home networks were exploding in popularity, leading to the development of numerous audio systems built to operate on such networks." *Id.* Thus, "a POSITA would have been motivated to modify the Bose system to operate over wired Ethernet or Wi-Fi and to implement a coordination-based synchronization mechanism based on known techniques." *Id.* at 184.

Sonos argues that Bose "is a fundamentally different type of multi-room audio system" and that a person of ordinary skill in the art would not "have been motivated to reinvent the entire system." CIB at 173. Specifically, Sonos explains that one of skill would not have been motivated to replace "Bose's discrete 'hard wires' – which do not constitute a 'data communications network,' - with a more complex 'network protocols such as Ethernet, Wi-Fi, TCP/IP, or UDP.'" *Id.* at 174. Sonos asserts that "Bose discourages such a change." *Id.* Sonos also notes that "a POSITA would need to redesign the Acoustimass modules to incorporate a network interface – a prohibitively burdensome enterprise in its own right . . . and one that would introduce new technical challenges like jitter and drift." *Id.*

Staff agrees with Sonos and argues that "[t]he evidence shows that a person of ordinary skill would not have been motivated to make the proposed modifications to Bose." SIB at 128.

Even assuming that the proposed modification of Bose would result in a system that met all of the limitations of the asserted claims,[74] the undersigned finds that Google has not demonstrated that one of ordinary skill in the art would have motivation to modify Bose to operate on a two-way network such as wired Ethernet or wireless 802.11. To successfully invalidate the asserted claims, Google must provide "an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418; *see also InTouch Techs. v. VGO*

---

[74] Sonos disputes that the modified version of Bose discloses the missing limitations of claim 1. CRB at 83.

*Commcn's*, 751 F.3d 1327, 1351 (Fed. Cir. 2014) ("A reason for combining disparate prior art references is a critical component of an obviousness analysis.") Here, the evidence shows that to modify the Bose system to allow for individual volume control "would require a wholesale redesign of the Bose system." CX-0015C at Q/A 271. Bose teaches a proprietary communication protocol which is "not compatible" with other Bose systems, let alone open standards such as Ethernet or 802.11 WiFi. *See* JX-129C.4; *see also* CX-0015C at Q/A 277. For example, while Dr. Rinard contends that a person of ordinary skill in the art would have replaced Bose's "hard wires" with more complex "network protocols such as Ethernet, Wi-Fi, TCP/IP, or UDP," Bose discourages such a modification. Instead, "Bose emphasizes its propriety communication protocol." CX-0015C at Q/A 277; JX-0129C.00004 ("The demands of both transmitting and receiving data necessary to convey all the information on the Personal music center required that Bose develop a different and new two-way radio frequency protocol.").

The evidence further shows that the Acoustimass modules of the Bose system would need to be redesigned to incorporate a network interface. CX-0015C at Q/A 274. This would have required a person of ordinary skill in the art to either "try to design the system to create its own data network" or "redesign the system so that it could join a user's home data network." *Id.* Both options would have been "technologically challenging" and expensive. *Id.*

For these reasons, the undersigned finds that there is not clear and convincing evidence that a person of ordinary skill in the art would have been motivated to modify Bose. As such, the undersigned finds that claims 1, 2, 4, and 5 are not rendered obvious by Bose.

### b) Bose and Isely

Google asserts that Bose in combination with Isely renders obvious claim 4 of the '949 patent. RIB at 186. Google explains that "Isely itself anticipates claim 4." *Id.* It asserts: "A person

of ordinary skill would be motivated to add this feature into Bose because of the benefit of Isely's 'in-scale' volume adjustments." *Id.* According to Google, "[a] person of ordinary skill would have looked to combine Isely with Bose because both are in the same field of endeavor, offering residential multi-zone audio systems that allow users to create and control player groups." *Id.* According to Google, "implementing the group-level command called for by claim 4 is a mere design choice." *Id.*

Sonos asserts that "Google offers no argument that [Isely] include[s] a type of player that 'adjusts its volume' as required by limitation 1.3." CIB at 175. Sonos further notes: "As for the features Google does identify in Isely, there is no clear and convincing evidence that a POSITA would have been motivated to combine them with Bose." *Id.* For example, "even if Isely's system uses a 'digital network,'. . . Google points to no disclosure that addresses or overcomes the specific reasons not to implement such a network in Bose." *Id.* at 176. Sonos also asserts that "Google points to no disclosure that provides a reason to retrofit Bose with" the leader/follower technique. *Id.*

Staff argues that "[t]he evidence shows that a person of ordinary skill in the art would not have been motivated to modify the Bose system in order to incorporate the teaching of Isely and/or could not have done so without undue experimentation." SIB at 129.

The undersigned finds that Google has not introduced clear and convincing evidence of a motivation to combine. As Dr. Weissman testified:

> [R]eplacing the hard-wired connections in Bose and, introducing Wi-Fi or some other form of a data communications network would introduce a host of new problems, such as jitter and echo, that a POSITA would have to attempt to solve. While it may be possible that a POSITA might eventually be able to use what Dr. Rinard calls Isely's leader/follower technique, to attempt to do so would require a fundamental change to the Bose system and substantial work and experimentation and there is no evidence that a POSITA would be able to accomplish it.

CX-0015C at Q/A 322. While Mr. Rinard offers some evidence that a person of ordinary skill in the art would have motivation, he does not address why one of skill would fundamentally change the Bose system. *See* RX-1480C at Q/As 171-173. Without such testimony, the undersigned finds that Google has failed to meet its burden.

As such, the undersigned finds that claim 4 is not rendered obvious by this combination.

### c)     Bose and Crestron

Google asserts that Bose in combination with Crestron[75] renders obvious claim 5 of the '949 patent. RIB at 186. Google explains that "Crestron is a home-based multi zone entertainment system with audio players set up throughout the home." *Id*. Google contends that "Crestron teaches the ability to create player groups and assign them custom names." *Id.* According to Google, "a person of ordinary skill would be motivated to add the 'naming' feature into Bose because the user benefits from a custom-naming feature and because it is common sense to allow users to assign intuitive names to custom player groups." *Id.* at 187. Google also asserts that "[a] person of ordinary skill would have looked to Crestron for the solution because, like Bose, Crestron is a consumer-facing multi-zone audio system that allow users to control multiple audio players throughout the home." *Id.*

Sonos notes that "Google does not allege that [Crestron] disclose[s] the limitations of claim 1 missing from Bose." CIB at 177. "Thus, [this] combination [cannot] invalidate claim 5." *Id.* Sonos also asserts that "Google has failed to establish a clear and convincing motivation to combine Bose with [Crestron], offering no evidence that addresses or overcomes the specific reasons not to implement this distinct technology within Bose." *Id.*

---

[75] Google asserts that Crestron's "functionality is described in an Operations Guide with a 2007 copyright date." RIB at 186. Google therefore contends that Crestron qualifies as prior art under U.S.C. § 102(a). *Id.* Sonos disagrees that Crestron qualifies as prior art. CIB at 177.

Staff argues that "the evidence shows that Bose fails to disclose or render obvious elements of claim 1 of the '949 patent. Yet, Google failed to demonstrate that Bose in combination with Crestron renders obvious claim 1." SIB at 132. Staff also argues that "the evidence shows that a person of ordinary skill in the art would not have been motivated to modify the Bose system in order to incorporate the teachings of Crestron." *Id.* at 133.

The undersigned finds that Google has failed to show that Bose in combination with Crestron invalidates claim 5. The undersigned previously found that Bose did not disclose all of the elements of claim 1, on which claim 5 depends. Google does not assert that Crestron discloses the missing elements. *See* RIB at 186-187; RRB at 86-88. As such, this combination cannot invalidate dependent claim 5.

### d) Bose and Farinelli

Google asserts that Bose in combination with Farinelli[76] renders obvious claim 5 of the '949 patent. RIB at 187. Google argues that "Farinelli teaches a residential multi-zone audio system in which a given zone may have multiple speakers." *Id.* Google contends that "Farinelli teaches the ability to 'customize' the name of each zone, such as by 'label[ing] a zone as any alphanumeric seven-digit name.'" *Id.* According to Google, "[a] POSITA would be motivated to add the 'naming' feature into Bose" and "would have looked to Farinelli for the solution because, like Bose, Farinelli teaches a home-based audio system that sends audio to different rooms in the home." *Id.* at 187-188.

Sonos notes that "Google does not allege that [Farinelli] disclose[s] the limitations of claim 1 missing from Bose." CIB at 177. "Thus, [this] combination [cannot] invalidate claim 5." *Id.* Sonos also asserts that "Google has failed to establish a clear and convincing motivation to

---

[76] Google asserts that Farinelli was filed June 26, 1995 and issued June 2, 1998. RIB at 187. Google therefore contends that Farinelli qualifies as prior art under U.S.C. § 102(b). Sones does not dispute this. CIB at 177, 180.

combine Bose with [Farinelli], offering no evidence that addresses or overcomes the specific reasons not to implement this distinct technology within Bose." *Id.*

Staff argues that "the evidence shows that Bose fails to disclose or render obvious elements of claim 1 of the '949 patent. Yet, Google failed to demonstrate that Bose in combination with Farinelli renders obvious claim 1." SIB at 133-134. Staff also argues that "Google failed to present clear and convincing evidence that one of ordinary skill in the art would have been motivated to modify the Bose system in order to incorporate the teachings of Farinelli." *Id.* at 134.

The undersigned finds that Google has failed to show that Bose in combination with Farinelli invalidates claim 5. The undersigned previously found that Bose did not disclose all of the elements of claim 1, on which claim 5 depends. Google does not assert that Farinelli discloses the missing elements. *See* RIB at 187-188; RRB at 86-88. As such, this combination cannot invalidate dependent claim 5.

### e) Isely and Bose

Google asserts that Isely in combination with Bose renders obvious claims 1, 2, and 4 of the '949 patent. RIB at 188. According to Google, even if Isely does not disclose the player-specific volume adjustment required by claim limitation 1(c), "Isely renders this feature obvious in view of Bose, which discloses player-specific volume control." *Id.* Google asserts that "[a] POSITA would be motivated to add player-specific control into Isely, and would have had a reasonable expectation of success given that every Isely player[] is individually addressable and therefore able to receive player-specific changes." *Id.* Google also argues that "[a] POSITA would look to combine Bose with Isely because they share the same field of endeavor, multi-zone audio systems." *Id.*

Sonos asserts that "[l]ike Google's Bose and Isely combination, the Isely and Bose combination cannot supply the features missing in both references." CIB at 179. Sonos further argues that "Google still offers no meaningful (let alone clear and convincing) evidence that a POSITA would have been motivated to import" player-specific control volume into Isely. *Id.*

Staff argues that the combination of Isely and Bose does not render the '949 patent obvious for the same reasons as Staff argued for the combination of Bose and Isely. SIB at 135.

The undersigned finds that there is not clear and convincing evidence of a motivation to combine. Dr. Rinard testified that "[a] person of ordinary skill would recognize the value to users of allowing the user to adjust the volume of only one specific player." RX-1480C at Q/A 220. Merely recognizing the value in a feature does not, however, constitute clear and convincing evidence that one would be motivated to add the feature. Indeed, Dr. Rinard calls "[t]he decision to implement a 'defined relationship' between the volumes of audio devices" a "design choice." *Id.* at Q/A 221. Having made such a design choice, there is no evidence that a person of ordinary skill in the art would then alter this design choice by removing a feature entirely or making an option without any additional motivation to do so.

Accordingly, the undersigned finds that there is not clear and convincing evidence that a person of ordinary skill in the art would have been motivated to combine Isely and Bose. As such, the undersigned finds that claims 1, 2, and 4 are not rendered obvious by this combination.

### f) Isely and Crestron

Google asserts that Isely in combination with Crestron renders obvious claim 5 of the '949 patent. RIB at 189. Google argues that "Crestron discloses accepting an input to name a player group" and "a POSITA would recognize the need to assign names to easily distinguish" the

multiple player groups of Isely. *Id.* Google also asserts that "Isely and Crestron are in the same field of endeavor, residential multi-zone audio systems." *Id.*

Sonos notes that Google does not contend that Crestron supplies the limitations missing from Isely. CIB at 180. Sonos further asserts that "Google . . . lacks clear and convincing evidence of a motivation to combine the references, given that various differences in their architectures . . . would have made integration difficult." *Id.*

Staff argues that "the evidence shows that Isely fails to disclose or render obvious elements of claim 1 of the '949 patent." SIB at 139. Staff notes that "Google failed to demonstrate that Isely in combination with Crestron . . . renders obvious claim 1." *Id.* Staff also argues that "Google failed to present clear and convincing evidence that a person of ordinary skill would have been motivated to modify Isely's system in order to incorporate the teachings of Crestron." *Id.*

The undersigned finds that Google has failed to show that Isely in combination with Crestron invalidates claim 1. The undersigned previously found that Isely did not disclose all of the elements of claim 1. Google does not assert that Crestron discloses the missing elements. *See* RIB at 189-190; RRB 86-88. As such, this combination cannot invalidate dependent claim 5.

### g) Isely and Farinelli

Google asserts that Isely in combination with Farinelli renders obvious claim 5 of the '949 patent. RIB at 190. Google explains that "Farinelli discloses accepting an input to name a player group, and because Isely allows users to create multiple player groups, a POSITA would recognize the need to assign names to easily distinguish those groups." *Id.* Google also notes that "Isely and Farinelli are in the same field, residential multi-zone audio systems." *Id.*

Sonos notes that Google does not contend that Farinelli supplies the limitations missing from Isely. CIB at 180. Sonos further asserts that "Google . . . lacks clear and convincing evidence

of a motivation to combine the references, given that various differences in their architectures . . . would have made integration difficult." *Id.*

Staff argues that "the evidence shows that Isely fails to disclose or render obvious elements of claim 1 of the '949 patent." SIB at 139. Staff notes that "Google failed to demonstrate that Isely in combination with . . . Farinelli renders obvious claim 1." *Id.* Staff also argues that "Google failed to present clear and convincing evidence that a person of ordinary skill would have been motivated to modify Isely's system in order to incorporate the teachings of . . . Farinelli." *Id.*

The undersigned finds that Google has failed to show that Isely in combination with Farinelli invalidates claim 1. The undersigned previously found that Isely did not disclose all of the elements of claim 1. Google does not assert that Farinelli discloses the missing elements. *See* RIB at 190; RRB 86-88. As such, this combination cannot invalidate dependent claim 5.

### h) cd3o and Isely

Google asserts that cd3o[77] combined with Isely renders obvious claims 1, 2, 4, and 5 of the '949 patent. RIB at 191. Google explains that cd3o "is a portable, networked MP3 player, one or more of which could be placed anywhere throughout a residence and used to play audio streamed over a home network from a personal computer." RIB at 191. Google states that it is undisputed that "[e]ach cd3o player is an independent playback device." *Id.* at 192. Google notes that the cd3o player "could not be synchronized," but that such a modification "was obvious in view of Isely, which discloses player groups as well as group-level volume instruction." *Id.*

---

[77] Google asserts "[t]he cd30 player was made publicly available in February 2003" and "[t]he company sold its first player in the United States on ▮▮▮▮▮▮▮." RIB at 191. Google further explains that "cd30 released a software update, to version 2.2.9.1, on June 7, 2003" and "[t]he operation of the cd30 player is described by its Product Manual, published in 2003." *Id.* Google therefore contends that cd30 qualifies as prior art under 35 U.S.C. § 102(a) and (b). *Id.* Sonos disputes that cd30 qualifies as prior art. CIB at 181.

Sonos argues that "even if Isely teaches the formation of a 'player group' . . . it does not disclose the 'player group for synchronized group playback' or the 'player-specific input' that is also missing from cd3o." CIB at 184. "Thus, it could not possibly fill the gaps in cd3o's teachings." *Id.* Sonos further argues that "Google . . . fails to make a clear and convincing showing that a POSITA would be motivated to combine the two in any event." *Id.*

Staff argues that "the evidence shows that Isely fails to disclose or render obvious . . . claim 1 of the '949 patent." SIB at 135, 141. Staff notes that "Google failed to demonstrate that Isely in combination with cd3o renders obvious Element 1.1." *Id.*

The undersigned finds that Google has failed to show that Isely in combination with cd3o invalidates claim 1. As noted above, the undersigned found that Isely did not disclose the limitations of element 1.3, which requires that an individual player accept a player-specific input to adjust a volume. Google does not assert that cd3o discloses this element. *See* RIB at 191-195; RRB 86-88. As such, this combination cannot invalidate claim 1.

### i) Conclusion

For the reasons set forth above, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that any asserted claim is rendered obvious.

### j) Secondary Considerations

Secondary considerations of nonobviousness may rebut a *prima facie* case of obviousness. Here, where Google has not made out a *prima facie* case of obviousness, there is no showing to rebut. Accordingly, the undersigned need not consider any secondary considerations of nonobviousness.

### 3. 35 U.S.C. § 101(a)

Google asserts that the patent is invalid under 35 U.S.C. § 101(a). RIB at 199. First, Google asserts that "[t]he asserted claims of the '949 patent are directed to the abstract idea of configuring and controlling an audio system." *Id.* Google explains that "[a]s a replacement for the traditional hard-wired audio system, the '949 patent places conventional audio devices on a conventional network and controls them using a conventional computing device with a conventional user interface." *Id.* According to Google, "[w]hile the software-based controller eliminates the need to physically re-write an audio system, this type of improvement is not patentable as a matter of law." *Id.* Second, Google argues that "[e]very component in the claims [is] conventional and routine." *Id.* at 200. Google states: "The computing device claimed by the patent is not even 'arguably an advance over conventional computer and network technology.'" *Id.* (quoting *Elec. Power Grp. LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016)).

Sonos asserts that the claims of the '949 patent are not directed to an abstract idea and, even if they were, they include an "inventive concept." CIB at 187. Sonos further asserts that "Google has not met its burden. As a district court held, the claimed invention 'represents a substantial improvement over existing technology' and the '949 Patent 'claim[s] patent eligible subject matter under § 101.'" CRB at 90-91 (quoting CX-0969.12-.13).

Staff argues that "the claims of the '949 patent are not directed to an abstract idea under step one of *Mayo/Alice* analysis, but rather to a tangible implementation comprised of more than a generic computer." SIB at 147. According to Staff, "Google has oversimplified the scope of the claims of the '949 patent." *Id.*at 146. Staff instead argues that "the claims of the '949 patent are directed to specific improvements to existing multi-zone audio system technology, not an abstract

idea." *Id.* at 147. Staff further asserts that "even if the CALJ determines that the patent claims are directed to an abstract idea, the claims of the '949 patent include an 'inventive concept.'" *Id.*

The undersigned finds that Google has failed to establish that the claims of the '949 patent are directed to a patent-ineligible concept. The undersigned agrees with Staff that "[t]he claims . . . do not cover all methods of configuring and controlling an audio system." SIB at 146. Instead, the claims are directed to specific improvements in multi-zone audio system technology. For example, the claims are directed to a controller for a networked audio system in which "independent playback devices" interact over a "local area network." JX-0003 at 4:55-6:11; CX-0015C at Q/As 683-691. The claims are further directed to a user interface for "a player group" of "independent playback devices" that accept individual and groupwise volume control for dynamically-formed groups. JX-0003 at 2:65-3:3, 5:32-36, 6:56-60; CX-0015C at Q/As 683-701.

The invention of the '949 patent also solves a problem with the existing technology. The specification explains that "it can be difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups," which created "a need for dynamic control of the audio players as a group" and "for user interfaces that may be readily utilized to group and control the audio players." JX-0003 at 2:7-16. The '949 patent addresses these issues through an "interactive graphic user interface for forming, managing, and controlling groups in the system, de-grouping a group or adjusting audio volume of individual players or a group of players." *Id.* at 2:65-3:3.

Accordingly, because the claims of the '949 patent are directed to specific improvements and not an abstract idea, the undersigned finds that the claims are not unpatentable under the first step of the *Alice* test. As such, the undersigned finds that the '949 patent is not invalid pursuant to 35 U.S.C. § 101(a).

## X.    U.S. PATENT 10,439,896

### A.    Overview

The '896 patent, entitled "Playback Device Connection," issued on October 8, 2019 to Nicholas A. J. Millington and Paul V. Hainsworth. The '896 patent is assigned to Sonos. The '896 patent relates to "techniques for connecting various devices to a network for secure communications with a minimum of human interaction and technical ability." JX-0005 at 1:29-32.

### 1.    Asserted Claims

Sonos is asserting claims 1, 5, 6, and 12, which read as follows:

1.    [1.0] A computing device comprising:

[1.1] a user interface;

[1.2] a network interface;

[1.3] at least one processor;

[1.4] a non-transitory computer-readable medium; and program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:

[1.5] while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup;

[1.6] after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point;

[1.7] transmitting, to the given playback device via the initial communication path, at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN;

[1.8] after transmitting at least the second message containing the network configuration parameters, detecting an indication that the given playback device has successfully received the network configuration parameters; and

[1.9] after detecting the indication, transitioning from communicating with the given playback device via the initial communication path to communicating with the given playback device via the secure WLAN that is defined by the access point.

5. The computing device of claim 1, wherein communicating with the given playback device via the secure WLAN comprises transmitting a command to the given playback device related to playback of audio content.

6. The computing device of claim 5, wherein the command comprises a command to retrieve audio content for playback form an audio source that is accessible via a communication path that includes the secure WLAN.

12. The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising: after transitioning to communicating with the given playback device via the secure WLAN, transmitting a command to the given playback device to form a group with at least a first playback device of a networked audio system such that the given playback device is configured to play back audio content in synchrony with at least the first playback device.

### 2. Claim Construction

The undersigned has construed the following terms from the asserted claims:

| TERM | CLAIM(S) | CLAIM CONSTRUCTION |
|---|---|---|
| "playback device" | 1, 5, 12 | "data network device configured to process and output audio" |
| "network interface" | 1 | "physical component of a device that provides an interconnection with a data network" |
| "security key" | 1 | Plain and ordinary meaning |
| "while operating . . ."/ "after receiving . . ." | 1 | Plain and ordinary meaning, which includes a sequence of steps |
| "program instructions . . ." | 1 | Plain and ordinary meaning |
| "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" | 1 | "at least one second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" |

Order No. 20 at 15, 29, 32, 36, 40.[78]

## B.    Infringement

Sonos asserts that the '896 Accused Products infringe claims 1, 5, 6, and 12 of the '896

patent. CIB at 195; *see also id.* at 8. Sonos also alleges that Google induces infringement of the

asserted claims. *Id.* at 209.

Staff agrees with Sonos that claims 1, 5, 6, and 12 are infringed. SIB at 150. Google

disputes that any asserted claim is infringed. RIB at 207.

### 1.    Claim 1

Sonos asserts that the '896 Accused Products infringe claim 1 of the '896 patent. CIB at

195. Google disputes that claim limitations 1.5 and 1.6 are met.[79] RLUL at 19. Google does not

dispute that the '258 Accused Products meet the remaining limitations of claim 1. *Id.* Staff agrees

with Sonos that claim 1 is infringed. SIB at 150.

#### a)    Limitations 1.5 and 1.6

Claim 1 includes the limitations: (1) "while operating on a secure wireless local area

network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface

(GUI) associated with an application for controlling one or more playback devices, user input

indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b)

receiving a first message indicating that a given playback device is available for setup"; and (2)

"after receiving the user input and receiving the first message, transmitting a response to the first

---

[78] The parties also propose that the undersigned construe two additional terms in this Initial Determination: (1) "a graphical user interface (GUI) associated with an application for controlling one or more playback devices"; and (2) "configured to play audio content in synchrony." CIB at 188-195; RIB at 203-207; SIB at 149. Each of these terms is relevant only to invalidity. *See* CIB at 188; SIB at 149. Given the undersigned's below rulings with respect to invalidity, it is unnecessary to construe these terms.

[79] Google also asserts that the '896 Accused Products, as imported, do not directly infringe the '896 patent. As explained *supra*, with respect to the '258 patent, the undersigned is not persuaded by this argument. *See* Section VI.B.1.

message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point." JX-0005, cl. 1.

The parties agree that the step set forth in claim limitation 1.5 must come before the step set forth in claim limitation 1.6. CIB at 197; RIB at 208; SIB at 151. The parties further agree as to the sequence of screens presented by the Google Home app during setup protocols. CIB at 197; RIB at 212; SIB at 152-154. Specifically, the Google Home app allows a user to select an option "[s]et up new devices in your home," which results in the '896 Accused Products "[l]ooking for devices" that are available to be set up. *See, e.g.*, CDX.0006C (depicting series of screenshots from CPX-0016); *see also* CX-0012C at Q/As 806-807. Once a Chromecast-enabled audio player is found, the below screen is presented:



CDX-0006C.00418 (hereinafter, the "Device Found Screen"); *see also* CX-0012C at Q/A 806. In

the Device Found Screen, the device is identified (here, a Google Home Mini), and the user is

asked: "Would you like to set up this device?" *Id.* The user can then select "Yes" or select "Set up

a different device." *Id.* After a user, clicks "Yes," the below screens are presented:



*Id.* at CDX-0006C.419-.420 (hereinafter, the "Device Connected Screen"). After the device is

connected, the Google Home app presents the following screen:



*Id.* at CDX.0006C.00424 (hereinafter, the "Connect to Wi-Fi Screen"). This screen lists the Wi-Fi networks available to the audio player. *Id*. The network that the '896 Accused Product was already connected to when the user tapped "Yes" on the Select Device screen is highlighted in blue. *Id.*; CX-0012C at Q/As 808-809. Finally, the parties further agree that claim limitation 1.6 is met during the Device Connected Screen. CX-0012C at Q/As 858-859; RIB at 209 n.46 ("For purposes of infringement, the parties agree when the 'initial communication path' is established.").

The dispute centers around when the first step occurs. Sonos and Staff asserts that the first step occurs when a user selects "Yes" on the Device Found Screen. CIB at 200; SIB at 155. Google

assert that the first step does not occur until *after* the second step; specifically, when a user selects "Next" on the "Connect to Wi-Fi Screen." RIB at 209-210.

Sonos argues that "[w]hen the user taps 'Yes,' [on the Device Found Screen], the Google Home app saves the Wi-Fi network that the '896 Accused Product is currently connected to." CIB at 198. Sonos also explains that "without any user selection on [the "Connect to Wi-Fi Screen"], the '896 Accused Product has already preselected and highlighted in blue a particular network: the same Wi-Fi network that the '896 Accused Product was already connected to when the user tapped 'Yes'" on the Device Found Screen. *Id.* When the user clicks "Next," he "simply 'confirm[s] that the network that [he] wanted to use was highlighted or selected,' without the need to 'make another selection." *Id.* at 199 (quoting Jeffay, Tr. at 977:4-25).

According to Google, "Sonos is forced to rely on [Device Found Screen] . . . for the 'user input' limitation because that screen appears before the accused initial communication path is established between the device with the Google Home app . . . and the device being set up through the Google Home app." RIB at 209. Google explains: "But, in reality, the first time the Google Home app receives an objectively verifiable 'indicat[ion] that a user wishes to set up' the to [sic] operate on any 'secure WLAN' is when the user taps the 'Next' button on the 'Connect to Wi-Fi' screen." *Id.* at 209-210. "Thus, if the CALJ agrees that the 'Connect to Wi-Fi' screen . . . is the first time where the Google Home app can receive an objectively verifiable 'user input' that the user wishes to set up the Smart Speaker to operate on the same secure WLAN as the Phone, then there is no further dispute." *Id.* at 210.

Staff asserts that the evidence shows that the selection of 'yes' on the Select Device Screen "meets the claimed 'user input.'" SIB at 155. "First, the claimed 'user input' requires only '[a]n indicat[ion] that a user wishes to set up a playback device to operate on the secure WLAN.'" *Id.*

- 157 -

(quoting JX-0005, cl. 1.) "Second, after the user presses 'yes' on the [Select Device Screen], the Google Home App is programmed to select and highlight (in blue) the network a user's mobile device was connected to when the user pressed 'yes.'" *Id.* at 156. Finally, "'[i]f a user adds the smart speaker to a Wi-Fi network that is different from the Wi-Fi network that the Google Home app device was using prior to starting the setup process, the Google Home app will ask whether a user wants to switch the Google Home app device to the same network that the smart speaker was setup on.'" *Id.* (quoting RX-1518C at Q/A 38).

The undersigned finds that claim limitation 1.5 is met when a user selects "Yes" on the Device Found Screen. While the user does not explicitly indicate that he wants to use the same Wi-Fi network as his computing device, as the Staff recognizes, "[t]he plain and ordinary meaning of the claimed 'user input' does not require that the user select the secure WLAN." SIB at 155; *see also* Jeffay, Tr. at 973:4-9 (indicating agreement to this point). Instead, the '896 Accused Products are designed to assume that the user wishes to set up the playback device on the same Wi-Fi network. *See* CX-0012C at Q/A 845 ("[T]he Google Home app absolutely 'assumes' that the user wishes to set up the 'Google Home device' on the same secure WLAN that the Chromecast-enabled computing device installed the Google Home app is initially connected to.").

This is confirmed by three pieces of evidence. First, in the "Connect to Wi-Fi Screen," the Wi-Fi network that the '896 Accused Product was connected to when the user clicked "Yes," on the Device Found screen is preselected. CX-0012C at Q/As 808-809. ██████████████████████
████████████████████████████████████████████████████████████████████.[80]

Cho, Tr. at 454:2-5. Additionally, as Dr. Jeffay admitted, when the user clicks "Next," the user

---

[80] Google asserts that the highlighting occurs after an initial communication path has been established. RIB at 219. While this is true, it is also irrelevant. ████████████████████████████████████
████████████████████████████. *See* Cho, Tr. at 452:4-454:5.

"confirm[s] that the network [he] wanted to use was highlighted or selected," without the user needing to "make another selection." Jeffay, Tr. at 977:4-25.

Second, Google's instructions provide evidence that the "user input" occurs once the user selects "Yes," on the Device Found Screen.[81] The instructions inform the user to "[c]onnect your mobile device to the Wi-Fi network that you'll use for your speaker or display" before launching the Google Home app:

## Get started

Use the guided setup tool or follow the instructions below.

**Click here for the guided setup tool**

1. Plug in your speaker or display.
   - If the device has been used before, factory reset your speaker or display before you continue.
2. Connect your mobile device to the Wi-Fi network that you'll use for your speaker or display.
3. On your phone or tablet, open the Google Home app 🏠.
4. Tap **Set up devices** ❯ follow the in-app steps.
   a. If the **Set up devices** button is not on the screen:
      i. To set up your first device in the Home app, tap **Get started** ❯ **Set up new devices** ❯ **Create another home** ❯ **Next** ❯ enter a home nickname and address.
         - **Note:** You'll need to enter a nickname, but you can choose not to enter your address.
      ii. To set up all other devices, at the top left, tap **Add** ➕ ❯ **Set up device** ⊕ ❯ **Set up new devices in your home** 🏠.
      iii. Follow the remaining steps.
5. You'll be able to opt out of some settings, like Voice Match or Personal results. You can change these settings at any time after you complete setup.

CX-0314. These instructions thus confirm that the '896 Accused Products were designed to assume that the playback device should be connected to the same network as the computing device.

Third, "[i]f a user adds a device to a Wi-Fi network that is different from the Wi-Fi network that the Google Home app device was using prior to starting the setup process, the Google Home

---

[81] Prior to the hearing, Google deleted the second step from its instructions. Cho, Tr. at 468:2-9. Google also argues that following the instructions is "optional" and there "is no evidence whether users even see [them]." RIB at 217. Whether or not users see or follow the instructions is of no consequence. Instead, the instruction is important for confirming how the system was designed to work.

- 159 -

app will ask whether a user wants to switch the Google Home app device to the same network that the smart speaker was setup on." RX-1518C at Q/A 11. A user does not receive this message if the user follows Google's setup instructions and connects the Google Home speaker to the Wi-Fi network fetched after a user selects "Yes" in the Device Found screen. Jeffay, Tr. at 980:5-10. Additionally, in order for the smart speaker to be visible, the user would need to connect the smart speaker and the device running the Google Home app to the same network. RX-1521C at Q/As 411-412, 416-420.

Google makes several arguments for why the "Device Found Screen" cannot constitute the claimed user input. First, Google asserts that "this screen has nothing to do with Wi-Fi networks." RIB at 214. ██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████. Cho, Tr. at 452:7-453:2. ████████████████████████████████████████

████████. *Id.* at 453:3-5

Google also argues that the '896 Accused Products later ██████████████████

███████████████████████. *See* RIB at 210-212. ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████. As Sonos notes, "the fact that the '896 Accused Products have additional unclaimed functionality that allows a user to override the '896 Accused Products' preselected network and proceed with a different network does not avoid infringement." CIB 204 n.101 (citing *Vivid Techs., Inc. v. Am Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999)).

Google also argues that "if the CALJ agrees with Sonos on invalidity, the 896 Accused Products establish an initial communication path even before the [Device Found Screen] is displayed and thus do not infringe even under Sonos' theory for the 'user input' limitation." RIB at 209 n.46. As explained in Section X.D.2 below, the undersigned found that connecting the cable in the cd3o system to the playback device establishes an "initial communication path." The '896 Accused Products do not involve connecting cables and thus this finding is irrelevant to infringement.

For the above reasons, the undersigned finds that the '896 Accused Products meet limitations 1.5. and 1.6.

### b) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the '896 Accused Products infringe claim 1.

### 2. Dependent Claims

Sonos asserts that the additional limitations of claims 5, 6, and 12 are met. CIB at 208-209. Google does not dispute that the additional limitations of the dependent claims are met. RLUL at 20. Additionally, the evidence shows that the '896 Accused Products meet these limitations. CX-0012C at Q/A 914-930; JX-0017C; JC-0179C; JX-0176C; CX-3853; CX-3721; CX-3711- CX-3712; CX-3715; CX-3328; CX-3719C. Accordingly, the undersigned finds that the '896 Accused Products infringe claims 5, 6, and 12.

### 3. Indirect Infringement

Sonos asserts that Google actively induces infringement. CIB at 209. Sonos explains that consumers have downloaded/installed the Google Home App on Pixel devices and used these devices. *Id.* at 210. Sonos further states that Google "had knowledge of the '896 Patent and the

infringement allegations no later than January 6, 2020." *Id.* According to Sonos, "Google encouraged third parties to infringe." *Id.*

Google asserts that there "is no induced infringement because Sonos cannot show that, at the time of importation, any specific imported Pixel device subject to the ITC's *in rem* jurisdiction will land in the hands of a customer who (a) will load the Google Home app on the device and then complete the installation process so that the customer can operate the app on the device; and (b) was induced by Google to download the Google Home app." RIB at 223-224.

Staff asserts that "[t]he evidence shows that Google's activities induce infringement of the asserted claims of the '896 patent by users." SIB at 159. Staff further asserts that Google's "time-of-importation argument" should be rejected. SRB at 56 n. 13 (citing *Certain Blood Cholesterol Testing Strips*, Inv. No. 337-TA-1116, Comm'n Op. at 25-26 (May 1, 2020).

As noted above, the undersigned disagrees with Google that there can be no induced infringement because certain activities take place after importation. *See* Section VI.B.1. Google does not dispute any of the other allegations with respect to induced infringement. *See* RIB at 223-224; RRB at 99. As such, the undersigned finds that Google induced infringement of the '896 patent.[82]

### 4. Google's Redesigns

Sonos asserts that both the NIA No. 2 and NIA No. 3 infringe the '896 patent. CIB at 211. Google disagrees that either product infringes. RIB at 226. Staff argues that the NIA No. 3 infringes, but the NIA No. 2 does not. SIB at 161, 163.

The undersigned previously found that the redesigned products are fixed and definite. *See* Section VI.B.3.

---

[82] Google does not dispute Sonos' allegations that: (1) consumers have installed the Google Home app on Pixel devices, and (2) Google had knowledge of the '896 patent. *See* RIB at 223-224; RRB at 99.

### a) NIA No. 2

Sonos asserts that the NIA No. 2 infringes under the doctrine of equivalents. CIB at 211. Sonos explains that limitation 1.7 requires that the second message transmit two pieces of information. *Id.* "████████████████████████████████████████ ████████████████████████████████████████." *Id.* Sonos asserts that "NIA 2 'performs substantially the same function, in the substantially the same way, with substantially the same result.'" *Id.* at 212.

Google argues that Sonos "attempts to circumvent the CALJ's construction through the doctrine of equivalents." RIB at 227. Google also argues that "[t]here are substantial differences between NIA No. 2 and the [sic] claim 1 of the '896 patent." *Id.* Google notes that "████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████." *Id.* Google further asserts that "████████████ ████████████████████████████████████████ ████████████████████" *Id.*

Staff asserts that the NIA No. 2 does not meet limitation 1.7. SIB at 161. Staff explains that ████████████████████████████████████████ ████████████████████████████████████████." *Id.* Staff further asserts that "████████████████████████████████████████ ████████████████████████████████." *Id.* at 162.

Claim 1 includes the limitations: "transmitting, to the given playback device via the initial communication path, at least a second message containing network configuration parameters,

wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN." JX-0005, cl. 1.

The '896 Accused Products █████████████████████████████████ ██████████████████████████████. CX-0012C at Q/As 873-886. NIA ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████. RX-1521C at Q/A 503. Dr. Weissman testifies that ████ ████████████████████████████████████████████████ ████████████████████. CX-0012C at Q/As 1012-1014. As Dr. Jeffay explains, however, ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████." RX-1521C at Q/A 513 (emphasis in original). The undersigned agrees and finds that Dr. Weissman provides an overly simplistic view of the purported function, way, and result of transmitting the message.

The undersigned instead agrees with Dr. Jeffay's opinion. Dr. Jeffay testifies that ████ ████████████████████████████████████████████████ ████████████████████████" *Id.* at Q/A 516 (emphasis in original). Dr. Jeffay explains that, in contrast, the NIA No. 2 ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████." *Id.* Similarly, "the 'way' of NIA No. 2 is to ████████████████████████████

████████████████████████████████████████████████████

███████████████████████" *Id.* at Q/A 517. Finally,

The 'result' in claim 1 is that, ███████████████████████
███████████████████████████████ In contrast, the 'result' of
NIA No. 2 is to ███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████

*Id.* at Q/A 518. Accordingly, because the undersigned finds that the NIA No. 2 does not perform substantially the same function in substantially the same way to obtain the same result, the undersigned finds that the NIA 2 does not meet this limitation.

Accordingly, the undersigned finds that the NIA No. 2 does not infringe claim 1.

### b) NIA No. 3

Sonos asserts that the NIA No. 3 infringes claim 1. CIB at 218. Sonos explain that "both the original '896 Accused Products and NIA 3 ████████████████████████████
████████████████████████████████████████████████." *Id.* Sonos asserts: "████████████████████████████████████. *Id.* ████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████" *Id.* at 218-219.

Google asserts that the NIA No. 3 "████████████████████████████
█████████████████████." RIB at 229. Google explains that the NIA No. 3 "████████
████████████████████████████████████████████████████
████████████████ *Id.* Google disagrees with Sonos' contention that ████████████

████████████████████████████████████████████████.'" *Id.* According to

Google, ██████████████████████████████████████████████████

███████████████." *Id.*

Staff agrees with Sonos that ████████████████████████████." SIB

at 163. Staff explains that ██████████████████████████████████

█████████████████████████████████████████████████████████

████████████" *Id.* at 163.

In the '896 Accused Products, █████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████ CX-0012C

at Q/A 1023. Dr. Weissman testifies that the NIA No. 3 ████████████████████:



CX-0012C at Q/A 1023. Dr. Weissman notes that ████████████████████████

██████████████

*Id.* Dr. Weissman further explains:



*Id.* at Q/A 1024. The evidence shows that, ███████████████████████████████

██████████████████████████████. CX-0012C at Q/A 1028; Weissman, Tr. at

319:18-320:20. As Dr. Jeffay acknowledged, ███████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████." RX-1521C

at Q/A 526. Accordingly, the evidence shows that the NIA No. 3 includes limitation 1.7.

Accordingly, the undersigned finds that the NIA No. 3 infringes claim 1.

### C. Technical Prong of the Domestic Industry Requirement

Sonos asserts that the '896 DI Products practices claims 1, 5, 6, and 12 of the '896 patent.

CIB at 220. Staff agrees with Sonos that the technical prong is satisfied. SIB at 163-164. Google

argues that the technical prong is not met for the same reasons it asserts that there is no

infringement. RIB at 230 (noting that "Sonos' DI theories mirror their infringement theories for

the 896 Accused Products").

As noted above, the undersigned agreed with Sonos' theory of infringement. As such, the

undersigned finds that the technical prong is likewise met.

### D. Validity[83]

Google argues that claims 1, 5, 6, and 12 of the '896 patent are invalid due to anticipation and obviousness. RIB at 231-267. Google also alleges that the '896 patent is invalid for improper inventorship. *Id.* at 268-270.

#### 1. Representative Computer

As an initial matter, Sonos notes that all of Google's evidence as to how Linksys and cd3o operate "comes from testing conducted by its expert Dr. Shoemake." CIB at 234 (Linksys); *id.* at 246 (cd3o). According to Sonos, "Dr. Shoemake inexplicably used a 2007 computing device for those tests with hardware (including a 2007 network card) and software (including a 2008/2009 operating system) that post-date the 2004 priority date by as much as half a decade." *Id.* at 234. Sonos asserts: "This failure is particularly damning in view of the asserted claims," which "are directed to 'a computing device.'" *Id.* Sonos asserts: "Absent clear and convincing proof that Dr. Shoemake's computer nonetheless functioned exactly as a prior-art computer would have in all relevant respects," Google's invalidity arguments fail. *Id.* at 235.

Google argues that "Dr. Weissman has no evidence to support his speculation" that "the cd3o software that Dr. Shoemake tested may have functioned differently on an operating system that was available prior to the June 5, 2004 priority and conception date of the '896 patent." RIB at 234. Google explains: "Moreover, it is the cd3o software that provides the programming instructions that control what actions the representative computer takes, not the other way around." *Id.*; *see also id.* at 248 (asserting some arguments for Linksys). Google also asserts: "If Dr. Weissman was right that the software behaved differently on older computers, then the software would be unable to communicate with the prior-art C300 players from 2003." *Id.* at 234-235.

---

[83] Sonos asserts that the '896 patent's claims are entitled to a priority date of June 5, 2004. CIB at 233. Staff agrees and Google does not dispute this date. SIB at 166; RIB at 231 n.53.

Google notes that "Dr. Shoemake's testing shows that the cd3o software installed on his representative test computer successfully interacts with the cd3o C300 devices." *Id.* at 235.

Staff argues that "Google's invalidity arguments based on Linksys [and] cd3o fail because they depend on a computer that Google admits is not prior art." SIB at 168. Staff asserts: "Because the claims of the '896 patent are directed to a 'computing device,' the Representative Computer is an essential component of the claimed prior art systems." *Id.* Staff also asserts that Google's contention that Sonos has failed to introduce evidence "that tends to indicate any of the prior art software . . . would behave any differently" on a prior art computer "impermissibly seeks to place the burden on Sonos to prove validity of the '896 patent." *Id.* at 169.

There is no dispute that the computing device used by Dr. Shoemake (referred to as the "Representative Computer") post-dates the priority date of the '896 patent. *See* RX-1478C at Q/A 138 (testifying that he was not disputing the dates set forth in Dr. Weissman's report). The Representative Computer was configured with Windows XP Operating System, version 2002, with Service Pack 3, but this version of Windows XP, as configured, "was released in May 2008 and updated as recently as May 2009." CX-0015C at Q/A 864. The Representative Computer itself was a Dell Latitude D830 computer that appears to have been released in 2007. *Id.* at Q/A 865. The wireless network card of the Representative Computer used a driver dated August 8, 2007. *Id.*

Google asserts that the age of the computer is irrelevant as Dr. Shoemake relied on other evidence, such as the "cd3o product manual, the software itself, technical specifications, and the testimony of one of the engineers (Mr. Scanlan) responsible for designing the cd3o." RRB at 110. For some of the disputed limitations, however, Dr. Shoemake relies only on his testing of the system. *See, e.g.*, RX-1478 at Q/As 846-849 (testimony regarding whether cd3o discloses limitation 1.8); *id.* at Q/As 211-216 (testimony as to whether Linksys discloses limitation 1.6).

- 169 -

Because the way that the software operates on the Representative Computer is central to Google's invalidity case, the undersigned finds that Google must introduce evidence that the results would be the same on a pre-June 5, 2004 computing device in order to prevail in its invalidity case.

It is Google's burden to prove this by clear and convincing evidence. *Microsoft,* 564 U.S. at 95. Despite this burden, Dr. Shoemake dedicates only one paragraph to his assertion that the age of the computing device used would not impact how the prior art software operates. He testifies:

> Every prior art product I tested came with a CD or had downloadable software that does qualify as prior art. These CDs or downloads contain program instructions that caused the representative computer to perform the functions relevant to my analysis. In my opinion, the prior art products were designed to cause any prior art computer meeting the system requirements of these products to perform the same functions. This is necessarily true because the ultimate purpose of the user computer was to configure and communicate with the player devices that actually output the audio, and the prior art products would not have worked if the software behaved differently on different user computers. For that reason, the age of the representative computer does not matter, older computers meeting the system requirements would have behaved in exactly the same way.

RX-1478C at Q/A 139. This testimony is conclusory. It does not offer any details or cite to other evidence which would confirm Dr. Shoemake's opinion. Additionally, Dr. Shoemake's own deposition testimony casts doubt on his conclusion. In his deposition, Dr. Shoemake testified:

> So first, in response to this question, context is very important. The question is very broad. So could I imagine running a software application on two different systems and something different happening? Yes. I could imagine a software program that asked the operating system, what is the size of the display? And based on the size of the display, decides to put a button or an icon on the screen in a different place based on the size of the display or the orientation of the display. And that's why I said context is very important, because I don't think that we have any of those situations here, and that's why I wanted to get the claim limitations again. Because if you go through the limitations that have to do with program instructions, I don't think we're going to run into any of those scenarios where you say, Ah yes, if you were to upgrade the operating system with some new fonts, the program instructions coming from the Linksys CD are going to change behavior. I don't think that's the situation here. And I think, when we go into the specific context and look at what those program instructions are causing to happen, there's no reason to believe that if the operating system were a slightly newer version, we would see any different behavior.

Weissman Tr. at 918:11-919:24 (reading Dr. Shoemake's deposition testimony into the record). Rather than stating unequivocally that the age of the computer would not affect the way the software operated, Dr. Shoemake instead testified that he doesn't "think that we have any of those situations here." *Id.* Such caveats hinder rather than help Dr. Shoemake's already conclusory testimony.

As for cd3o, however, Google introduced additional evidence that the cd3o software would have operated in the same manner on an older computer. Specifically, Google introduced the testimony of James Scanlan, one of the co-founders of cd3o. RX-1476C at Q/A 4. Mr. Scanlan testified that he watched Dr. Shoemake's testing videos and that they accurately show how the software worked in 2003. *Id.* at Q/A 27. In response, Sonos did not introduce any evidence to contradict this testimony. As such, the undersigned finds that there is clear and convincing evidence that the cd3o software would have operated in the same manner on an older computer.

For the Linksys software, Google does not introduce any further evidence to support its contention that the software would have operated in the same way. As such, the undersigned finds that Google cannot meet its burden to show that Linksys invalidates the '896 patent. As such, the undersigned need not consider Google's arguments as to whether Linksys anticipates the '896 patent or whether the asserted claims are rendered obvious by the following combinations: (1) cd30 in combination with Linksys; (2) Linksy in combination with Weast; (3) Linksys in combination with Isely; and (4) Linksys in combination with Balassanian.

### 2. Anticipation

Google argues that the asserted claims are anticipated by cd3o.[84] RIB at 231. Sonos disputes that cd3o discloses limitations 1.6 and 1.8. CLUL at 7. Sonos also disputes that cd3o discloses claim 12. *Id.* Staff does not specifically address claim 1, but argues that "Google failed to present clear and convincing evidence that cd3o anticipates at least claim 12 of the '896 patent." SIB at 174.

#### a) Limitation 1.6

Claim 1 includes the limitation "after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point." JX-0005, cl. 1.

Google asserts that cd3o discloses this limitation. RIB at 238. Google notes that Sonos' contention that the initial communication path is established before the user input and first message are received is based on a "mistaken" premise. *Id.* at 239. Google disagree with Sonos that merely plugging in the PC with the Ethernet cable is sufficient to establish an initial communication path. *Id.* Google explains: "Just because two devices have physical wires running between them does not mean a communication path exists – otherwise, all computers world-wide connected via wires would always have 'communication paths.'" *Id.*

Sonos argues that "[t]he system's computing device and audio player are directly connected via a physical Ethernet cable before any user input." CIB at 246. "[T]hat means, the initial communication path is established too early to satisfy the temporal requirement of limitation

---

[84] Google explains that the specific software version on which Dr. Shoemake relies was publicly available on or around February 7, 2003. RIB at 232. Google asserts that cd30 qualifies as prior art under at least 35 U.S.C. § 102(a). *Id.* at 233. Sonos disputes that cd30 qualifies as prior art. CIB at 181.

1.6." *Id.* at 246-247. Sonos also asserts that Google is incorrect that "establishing a wired initial communication path requires more." *Id.* at 245. Instead, Sonos asserts that "the claim only requires that the computing device establish an initial communication path with the playback deice." *Id.* "It does not require connection with a particular application or on a specific layer of the network stack." *Id.*

The undersigned agrees with Sonos. The claim language requires that the initial communication path is established "after receiving the user input and receiving the first message." JX-0005, cl. 1. In the cd3o system, the cable is connected before any setup can begin. Once the cable is plugged in, an initial communication path is established between the devices. CX-0015C at Q/A 1162, 1240. Additionally, one of cd3o's co-founders confirmed that a communication path is formed between the computing device and the cd3o player once the device is plugged in. Mr. Scanlan testified that the cd3o device "can then send data to the computer" and "the computer is able to send messages to the [cd3o] device." Scanlan, Tr. at 489:17-490:20.

The undersigned is not persuaded that adopting Sonos' argument would mean that "[n]umerous computers world-wide" would be considered connected or that any two wireless devices within range of each other would have an initial communication path. *See* RX-1478C at Q/As 659, 660. As Dr. Weissman explains, the scenario involved here is whether a device connected to a computer via a single Ethernet cable results in the establishment of an initial communication path. This does not mean that *all* computers that are connected to the internet or any two wireless devices somehow would have "communication paths" between them. CX-0015C at Q/As 1164-1165, 1242-1243.

Accordingly, the undersigned finds that cd3o does not disclose this limitation.

- 173 -

### b)    Limitation 1.8

Claim 1 includes the limitation: "after transmitting at least the second message containing the network configuration parameters, detecting an indication that the given playback device has successfully received the network configuration parameters." JX-0005, cl. 1.

Google identifies the TCP FIN-ACK message as the claimed indication. RIB at 241. Google explains that "[a]fter successful transmission of the network configuration parameters (which is undisputed), the cd3o software displays a message . . . and the user computer running the cd3o software receives a TCP FIN-ACK message from the cd3o player." *Id.* Google explains: "It is an undisputed fact that the cd3o player always and only transmits the TCP FIN-ACK message in response to a 'Configuration Request' if the player successfully received the network configuration parameters." *Id.*

Sonos asserts that "Google offers only unsupported speculation, not clear and convincing evidence, that cd3o includes such an indication." CIB at 247. According to Sonos, "the system could display [the message] with or without receiving a specific indication from the audio device that it received network parameters." *Id.* Sonos asserts that the TCP-FIN-ACK message "says nothing whatsoever about . . . the receipt of the UDP protocol message containing the network parameters." *Id.*

The undersigned agrees that this limitation has been met. Google introduced evidence that, after the cd3o software transmits the network configuration parameters to the cd3o player, the cd3o software displays a message stating "The Network MP3 Player is now set up for wireless use. Please disconnect the Ethernet cable and click 'Ok.'" RX-1478C at Q/A 846. After successfully receiving the network configuration parameters, the cd3o player closes the TCP connection and reboots itself. *Id.* The cd3o player then sends a TCP FIN-ACK message to the computer running

the cd3o software. *Id.* As Dr. Shoemake explains: "This message is sent after and in response to the cd3o player successfully receiving the claimed 'network configuration parameters' and therefore indicates that those parameters were successfully received." *Id.* Dr. Shoemake also notes that the computer running the cd3o software detects the indication because "it receives the TCP FIN-ACK message, as shown by at least the fact that the TCP FIN-ACK message is captured by the Wireshark software also running on the computer." *Id.* at Q/A 849.

Accordingly, the undersigned finds that this limitation is met.

### c) Conclusion

As noted above, the undersigned found that cd3o does not disclose limitation 1.6. Accordingly, the undersigned finds that cd3o does not anticipate claim 1 of the '896 patent. Additionally, because cd3o does not anticipate claim 1, it cannot anticipate dependent claims 5, 6, or 12.

### 3. Obviousness

Google argues that the asserted claims are invalid as obvious due to the following combinations: (1) cd3o; (2) cd3o in combination with Linksys; (3) cd3o in combination with Isely; and (4) cd3o in combination with Balassanian. RIB at 255-264.

### a) cd3o

Google argues that cd3o alone renders the asserted claims obvious. RIB at 255. Google asserts that Sonos' arguments for why cd3o does not disclose limitation 1.6 "disappear with a simple change: instead of using the UDP communication path to send the 'indication' of limitation [1.8] the cd3o could instead use a TCP connection to send a 'Configuration Request.'" *Id.* Google notes: "Both of these features already exist within the cd3o . . . and it would have been obvious to use them." *Id.* Google explains: "Choosing between two well-known interchangeable protocols

like TCP and UDP is a simple design choice (especially because both are available in the cd3o)." *Id.* at 256.

Sonos argues that "Google unpersuasively contends that a POSITA would have been motivated to supply some of the missing disclosures simply from looking just at cd3o." CIB at 259. Sonos notes that, even if a person of ordinary skill in the art "re-engineered the existing set-up related messages . . . to establish an ostensibly distinct 'TCP connection' along the same cable . . . the existing UDP messaging would still travel over the same communication path previously established by the Ethernet cable." *Id.*

Staff does not specifically address claim 1, but argues that "Google failed to present clear and convincing evidence that cd3o renders obvious claim 12 of the '896 patent." SIB at 187.

The undersigned agrees that Google has not introduced clear and convincing evidence that switching to a TCP connection would prevent the initial communication path from being established before the user input and message are received. Google asserts that the TCP specification "defines a TCP connection as 'a logical communication path' that is 'establish[ed]' via an 'exchange of three messages' over an existing Ethernet cable, not when the cable is first plugged in." RRB at 126. In support, Google cites to the testimony of Dr. Shoemake. *Id.* (citing RX-1478C at Q/A 865); *see also* RIB at 256 (citing RX-1478C at Q/As 831-832). While Dr. Shoemake's opinion does mention TCP, he does not actually opine that switching to a TCP protocol would prevent an initial communication path from being established when the player was connected to the computing device. *See* CX-0015C at Q/A 1250 (testimony from Dr. Weissman acknowledging that Dr. Shoemake's testimony does not address his concerns). Instead, in the cited testimony, Dr. Shoemake opines as to whether the TCP connection is another example of an "initial

communication path." RX-1478C at Q/A 831; *see also id.* at Q/A 865. Without such testimony, Google has not met its burden in establishing that cd3o renders the asserted claims obvious.

### b) cd3o and Isely

Google asserts that cd3o combined with Isely[85] renders claim 12 obvious. RIB at 257. Google explains that "Isely discloses all limitations of claim 12." *Id.* at 258. Google also asserts that "[a] POSITA would be motivated to combine cd3o (alone or also combined with Linksys) and it would have been obvious to combine the speaker groups in Isely with the groups of synchronized speaker[s] of cd3o." *Id.*

Sonos asserts that "Google does not contend, let alone demonstrate, that [Isely] teach[es] the limitations of claim 1 that cd3o lacks." CIB at 260.

Staff argues that "Google failed to present clear and convincing evidence that a person of ordinary skill would have been motivated to modify cd3o in order to incorporate the teachings of Isely." SIB at 189.

The undersigned finds that Google has failed to show that cd3o in combination with Isely invalidates the asserted claims. The undersigned previously found that cd3o did not disclose all of the elements of claim 1. Google does not assert that Isely discloses the missing limitation. *See* RIB at 257-259; RRB at 125-127. As such, this combination cannot invalidate dependent claim 12.

### c) cd3o and Balassanian

Google asserts that cd3o combined with Balassanian[86] renders claim 12 obvious. RIB at 259. Google explains that Balassanian discloses the additional limitations of claim 12. *Id.* Google

---

[85] As noted above with respect to the '949 patent, Google explains that Isely was published on September 5, 2002 and qualifies as prior art under 35 U.S.C. §§ 102(a) and (b). RIB at 257.

[86] As noted above with respect to the '258 and '953 patents, the parties agree that Balassanian qualifies as prior art. *See supra* Section VI.D.1.

further argues that "[a] POSITA would find it obvious to combine cd3o (and any other secondary references combined with cd3o) with Balassanian." *Id.* at 260.

Sonos asserts that "Google does not contend, let alone demonstrate, that . . . Balassanian teach[es] the limitations of claim 1 that cd3o lacks." CIB at 260.

Staff argues that Google failed to present clear and convincing evidence that this combination discloses the limitations of claim 12. SIB at 190. Staff also argues that "Google failed to present clear and convincing evidence that a person of ordinary skill would have been motivated to modify cd3o in order to incorporate the teachings of Balassanian." *Id.* at 191.

The undersigned finds that Google has failed to show that cd3o in combination with Balassanian invalidates the asserted claims. The undersigned previously found that cd3o did not disclose all of the elements of claim 1. Google does not assert that Balassanian discloses the missing limitation. *See* RIB at 259-260; RRB at 125-127. As such, this combination cannot invalidate dependent claim 12.

### d) Conclusion

For the reasons set forth above, the undersigned finds that Google has failed to establish, by clear and convincing evidence, that any asserted claim is rendered obvious.

### e) Secondary Considerations

Secondary considerations of nonobviousness may rebut a *prima facie* case of obviousness. Here, where Google has not made out a *prima facie* case of obviousness, there is no showing to rebut. Accordingly, the undersigned need not consider any secondary considerations of nonobviousness.

### 4. Improper Inventorship

Google argues that "[t]he '896 patent is invalid under 35 U.S.C. § 102(f) for failure to name all contributors to the conception of the Asserted Claims as co-inventors on the '896 patent." RIB at 268. Google also asserts that "Sonos lacks standing to maintain this Investigation without joining the missing co-inventor(s) of the '896 patent." *Id.* According to Google, ██████████████ ████████████████████████████████████████████████████████." *Id.*

Google asserts that "██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████" *Id.*

Sonos asserts that "[a] fundamental precept of patent law is that an inventor 'may use the services, ideas, and aid of others' from the prior art to 'perfect[] his invention without losing his right to a patent." CIB at 266 (quoting *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 981 (Fed. Cir. 1997). Sonos further argues that "██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████" *Id.* at 267.

Staff argues that "██████████████████████████████████████████████████ ██████████████████████████████████ SIB at 191. "Accordingly, Google failed to present clear and convincing evidence that the '896 patent is invalid for lack of improper inventorship." *Id.* at 192.

The undersigned agrees with Sonos and Staff that there is not clear and convincing evidence of incorrect inventorship. Here, the evidence shows that ████████████████████ ████████████████████████████████████ CX-1245C; RX-1443C at 109:20-110:4, 121:3-122:20; CX-0015C at Q/As 1472-1484. Additionally, as Sonos notes: "A contribution of

information in the prior art cannot give rise to a joint inventorship because it is not a contribution to conception." CIB at 266 (quoting *Narton Corp v. Schukra U.S.A. Inc.*, 558 F.3d 1352, 1357 (Fed. Cir. 2009)).

Accordingly, the undersigned finds that the patent is not invalid under 35 U.S.C. § 102(f).

## XI. ECONOMIC PRONG OF THE DOMESTIC INDUSTRY REQUIREMENT

The undersigned previously determined that Sonos has established that it satisfies the economic prong of the domestic industry requirement under § 337(a)(3)(B). Order No. 35 (Jan. 14, 2021), *aff'd* by Comm'n Notice (Feb. 16, 2021).

## XII. CONCLUSIONS OF LAW

1.      The importation or sale requirement of section 337 has been satisfied.

2.      The '258 Accused Products infringe claims 17, 21, 24, and 26 of U.S. Patent No. 9,195,258.

3.      The 258 NIA No. 1 does not infringe claims 17, 21, 24, and 26 of U.S. Patent No. 9,195,258.

4.      The 258 NIA Nos. 2 and 3 do infringe claims 17, 21, 24, and 26 of U.S. Patent No. 9,195,258.

5.      The technical prong of the domestic industry requirement for U.S. Patent No. 9,195,258 has been satisfied.

6.      Claims 17, 21, 24, and 26 of U.S. Patent No. 9,195,258 are not invalid under 35 U.S.C § 103 for obviousness.

7.      The '953 Accused Products infringe claims 7, 14, and 22-24 of U.S. Patent No. 10,209,953.

8.      The 953 NIA No. 1 does not infringe claims 7, 14, and 22-24 of U.S. Patent No. 10,209,953.

9.      The 953 NIA Nos. 2 and 3 do infringe claims 7, 14, and 22-24 of U.S. Patent No. 10,209,953.

10.     The technical prong of the domestic industry requirement for U.S. Patent No. 10,209,953 has been satisfied.

11.  Claims 7, 14, and 22-24 of U.S. Patent No. 10,209,953 are not invalid under 35 U.S.C § 103 for obviousness.

12.  The '959 Accused Products infringe claim 10 of U.S. Patent No. 9,219,959.

13.  The 959 NIA No. 3 infringes claim 10 of U.S. Patent No. 9,219,959.

14.  The 959 NIA No. 4 does not infringe claim 10 of U.S. Patent No. 9,219,959

15.  The technical prong of the domestic industry requirement for U.S. Patent No. 9,219,959 has been satisfied.

16.  Claim 10 of U.S. Patent No. 9,219,959 is not invalid under 35 U.S.C § 103 for obviousness.

17.  Claim 10 of U.S. Patent No. 9,219,959 is not invalid under 35 U.S.C. § 102(f) for improper inventorship.

18.  The '949 Accused Products infringe claims 1, 2 and 5 of U.S. Patent No. 8,588,949.

19.  The '949 Accused Products do not infringe claim 4 of U.S. Patent No. 8,588,949.

20.  The 949 NIAs do not infringe the claims 1, 2, 4, and 5 of U.S. Patent No. 8,588,949.

21.  Google induces infringement of claims 1, 2, and 5 of U.S. Patent No. 8,588,949

22.  The technical prong of the domestic industry requirement for U.S. Patent No. 8,588,949 has been satisfied.

23.  Claims, 1, 2, 4, and 5 of U.S. Patent No. 8,588,949 are not invalid under 35 U.S.C. § 102 for anticipation.

24.  Claims, 1, 2, 4, and 5 of U.S. Patent No. 8,588,949 are not invalid under 35 U.S.C. § 103 for obviousness.

25.  Claims 1, 2, 4, and 5 of U.S. Patent No. 8,588,949 are not invalid under 35 U.S.C. § 101(a).

26.  The '896 Accused Products infringe claims 1, 5, 6, and 12 of U.S. Patent No. 10,439,896.

27.  Google induces infringement of claims 1, 5, 6, and 12 of U.S. Patent No. 10,439,896.

28.  The 896 NIA No. 2 does not infringe claims 1, 5, 6, and 12 of U.S. Patent No. 10,439,896.

29.     The 896 NIA No. 3 does infringe claims 1, 5, 6, and 12 of U.S. Patent No. 10,439,896.

30.     The technical prong of the domestic industry requirement for U.S. Patent No. 10,439,896 has been satisfied.

31.     Claims, 1, 5, 6, and 12 of U.S. Patent No. 10,439,896 are not invalid under 35 U.S.C. § 102 for anticipation.

32.     Claims, 1, 5, 6, and 12 of U.S. Patent No. 10,439,896 are not invalid under 35 U.S.C. § 103 for obviousness.

33.     Claims, 1, 5, 6, and 12 of U.S. Patent No. 10,439,896 are not invalid under 35 U.S.C. § 102(f) for improper inventorship.

## XIII.   RECOMMENDED DETERMINATION ON REMEDY AND BOND

The Commission's Rules provide that subsequent to an initial determination on violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, the administrative law judge shall issue a recommended determination concerning the appropriate remedy in the event that the Commission finds a violation of section 337, and the amount of bond to be posted by respondents during Presidential review of the Commission action under section 337(j). *See* 19 C.F.R. § 210.42(a)(1)(ii). The Commission has broad discretion in selecting the form, scope, and extent of the remedy in a section 337 proceeding. *Viscofan, S.A. v. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986).

### A.      Limited Exclusion Order

Under section 337(d), if the Commission determines that there is a violation of section 337, the Commission may issue a limited exclusion order ("LEO") directed to a respondent's infringing products. 19 U.S.C. § 1337(d). A limited exclusion order instructs the U.S. Customs and Border Protection to exclude from entry all articles that are covered by the patent at issue that originate from a named respondent in the investigation. *Fuji Photo Film Co. Ltd. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1286 (Fed. Cir. 2007).

The parties agree that, if a violation is found, a limited exclusion order should issue. CIB at 270-271; RIB at 270-271; SIB at 194. Google requests that any LEO include "a certification provision to allow for the importation of (a) products within the scope of the Investigation that have not been found to infringe, (b) 'networked speaker devices, and devices (for example, mobile phones and laptops) capable of controlling these devices' incorporating the design arounds found to be non-infringing, and (c) products that are imported for purposes of research, development, testing, service, repair, or warranty replacement." RIB at 270-271. While Sonos does not oppose the inclusion of a certification provision, Sonos, like Staff, believes that "the typical certification provision will be sufficient in this Investigation." SIB at 194 n.30; CRB at 129.

Should the Commission determine there is a violation, the undersigned recommends the issuance of a limited exclusion order covering Sonos' products and components found to infringe the Asserted Patents. As Staff notes, at the request of U.S. Customs and Border Protection, all exclusion orders now contain a certification provision. To the extent Google seeks additional modifications or carve-outs to the LEO, the undersigned agrees with Sonos and Staff the standard certification provisions will be sufficient.

### B. Cease and Desist Order

Under section 337(f)(1), the Commission may issue a cease-and-desist order ("CDO") in addition to, or instead of, an exclusion order. 19 U.S.C. § 1337(f)(1). The Commission generally issues a CDO directed to a domestic respondent when there is a "commercially significant" amount of infringing, imported product in the United States that could be sold, thereby undercutting the remedy provided by an exclusion order. *See Certain Crystalline Cefadroxil Monohydrate*, Inv. No. 337-TA-293 USITC Pub. 2391, Comm'n Op. on Remedy, the Public Interest and Bonding at 37-42 (June 1991); *Certain Condensers, Parts Thereof & Prods. Containing Same, Including Air*

- 183 -

*Conditioners for Automobiles*, Inv. No. 337-TA-334 (Remand), Comm'n Op. at 26-28, 1997 WL 817767 at *11-12 (U.S.I.T.C. Sept. 10, 1997).

Sonos requests issuance of a CDO "because Google has significant domestic operations that could undercut an LEO and it maintains commercially significant inventories." CIB at 271. Sonos notes that at the close of discovery, "Google maintained an inventory of over 3.1 million Accused Products." *Id*. Staff supports Sonos' request. SIB at 194-195. Google does not contest that it maintains commercially significant inventory of the Accused Products in the United States. RIB at 271. Google again requests that any CDO include a certification provision "as discussed above in connection with an LEO." *Id*.

If the Commission finds a violation, the undersigned recommends that a CDO issue directed to Google. The evidence demonstrates that Google's inventory of Accused Products in the United States is commercially significant. *See, e.g.,* CX-242C at ¶¶ 10-11; CX-0013C at Q/As 155-158; CX-4995C. As of October 1, 2020, Google's inventory of the Accused Products was as follows:



CDX-0007.6C. To the extent Google is seeking additional modifications or carve-outs to CDO, the undersigned agrees with Staff that the Commission's typical CDO will be sufficient.

### C. Bonding

Pursuant to section 337(j)(3), the Administrative Law Judge and the Commission must determine the amount of bond to be required of a respondent during the 60-day Presidential review period following the issuance of permanent relief, in the event that the Commission determines to issue a remedy. 19 U.S.C. § 1337(j)(3). The purpose of the bond is to protect the complainant from any injury. 19 C.F.R. § 210.42(a)(1)(ii), § 210.50(a)(3).

When reliable price information is available, the Commission has often set the bond by eliminating the differential between the domestic product and the imported, infringing product. *See Microsphere Adhesives, Processes for Making Same, & Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, USITC Pub. 2949, Comm'n Op. at 24 (Dec. 8, 1995). In other cases, the Commission has turned to alternative approaches, especially when the level of a reasonable royalty rate could be ascertained. *See, e.g., Certain Integrated Circuit Telecomm. Chips & Prods. Containing Same, Including Dialing Apparatus*, Inv. No. 337-TA-337, Comm'n Op. at 41, 1993 WL 13033517, at *24 (U.S.I.T.C. June 22, 1993). A 100 percent bond has been required when no effective alternative existed. *See, e.g., Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 26-27 (July 1997) (imposing a 100% bond when price comparison was not practical because the parties sold products at different levels of commerce, and the proposed royalty rate appeared to be *de minimis* and without adequate support in the record).

Sonos requests that the Commission impose a 100% bond. CIB at 272. Sonos contends that "Google's continued importation of infringing goods during the presidential review period would

injure Sonos." *Id*. Sonos further contends that "Google sells speakers at significantly lower prices; these lower-priced speaker offerings can adversely impact Sonos' ability to counter ongoing price erosion that frequently affects consumer products." *Id*.

Google asserts that Sonos has not shown "any cognizable and quantifiable injury." RIB at 272-274 (claiming that Sonos did not perform any lost sales, lost profits, or price erosion analysis). Google also asserts that Sonos (and its expert) have failed to explain why a 100% bond rate should apply. *Id*. Google therefore believes the bond rate should be zero; however, if the Commission determines that a non-zero bond rate is appropriate, Google submits that it should be no more than 4.5%. *Id*. at 275.

Staff recommends that a bond of 100% of the entered value of the infringing articles be imposed during the Presidential review period. SRB at 68.

The undersigned finds that imposition of 100% bond is appropriate. Google's continued importation of infringing goods during the presidential review period would injure Sonos. The evidence shows that Sonos competes with Google. CX-0013C at Q/As 99-101; CX-2997.13. For example, Sonos' business records identify Google as a "key competitor". CX-3029C.2, .30, .33; CX-2209C.7; CX-2997; CX-3028C.7; CX-3030C; CX-5075C; CX-0013C at Q/As 99-124; CX-3188C; CX-3083; CX-3167; CX-3183; CX-3184; CX-3191; CX-3192; CX-3194; CX-3195; CX-3196; CX-3197; CX-3199. The evidence also shows that Google offers lower priced speaker offerings that can adversely affect Sonos' ability to counter price erosion. CX-2997 ("Even if we are able to efficiently develop and offer innovative products at competitive selling prices, our operating results and financial condition may be adversely impacted if are unable to effectively anticipate and counter the ongoing price erosion that frequently affects consumer products or if

the average selling prices of our products decrease faster than we are able to reduce our manufacturing costs."); CX-3188C; CX-3083; CX-3192; CX-3195; CX-3196.

Both parties' economic experts agree that a bond rate cannot be based on a price differential between the infringing and domestic industry products. *See* CX-0013C at Q/As 125-135; RX-1524C at Q/As 92-95. In addition, neither of the Sonos license agreements provide a basis to calculate a bond.[87] CX-0013C at Q/As 137-149; *see also* SIB at 196 ("[T]he evidence shows the absence of any licensing information relating to the Asserted Patents that would allow for establishing a bond rated based on a royalty in this Investigation.") The first license (*i.e.*, Sonos' patent covenant with DEI Sales, Inc.) is a ██████████████████████████ ███████. JX-0324C. Mr. Milani explained: "[T]he agreement calls for ████████████████ ██████████████████████████████████████████. So, no running royalty amount can be derived from the license." CX-0013C at Q/A 143. The second license is Sonos' patent license with Lenbrook Industries Limited. JX-0358C. Google's expert, Ms. Mulhern, relied on this license to determine a bond; however, the Lenbrook License does not include ██████████████████████████, like Ms. Mulhern opined. CX-0013C at Q/A 148. Mr. Milani further explained:

> Rather, the Lenbrook License ██████████████████. Ms. Mulhern converts those ██████████████ into percentage of sales royalty rates by dividing a per unit royalty of ████ by the retail price of the Lenbrook products. . .. But those conversion calculations are improper and significantly understate the actual percentage of sales royalty rates called for in the agreement. This is because (at a bare minimum) the ██████████████ in the Lenbrook Agreement should be converted based on Lenbrook's pricing to *its* customers (i.e., retailers of audio products), not the retail price that end customers pay.

---

[87] Google claims that Mr. Milani "did not even attempt" to calculate a bond rate based on licensing. *See* RIB at 274. This is incorrect. Mr. Milani testified in detail about why the two Sonos portfolio license agreements do not provide a basis for calculating bond. CX-0013C at Q/As 137-152. And, a review of Ms. Mulhern's calculations demonstrates the difficulty in determining a bond rate based on a royalty. *See, e.g.*, RX-1524C at Q/As 114, 120.

- 187 -

CX-0013C at Q/A 148; *see also id*. at Q/A 149 (setting forth other reasons why the Lenbrook License cannot be relied upon to set a bond rate). In addition, Google is not a "similarly situated licensee" as defined in the Lenbrook License. *Id*. at Q/A 149; JX-0493C at 88:17-94:21. When a bond rate cannot be determined based on the price differential or a royalty, the Commission has set the bond rate at 100%.

Accordingly, if a violation of section 337 is found, the undersigned recommends that the Commission set the bond value at 100%.

## XIV. INITIAL DETERMINATION

Based on the foregoing, it is the Initial Determination of the undersigned that Respondent Google LLC infringes the asserted claims of U.S. Patent Nos. 9,195,258; 10,209,953; 9,219,959; and 10,439,896. The undersigned has also determined that Google infringes claims 1, 2, and 5 of U.S. Patent No. 8,588,949. The undersigned further determines that none of the Asserted Patents are invalid and that the domestic industry requirement has been satisfied for the Asserted Patents.[88]

The undersigned hereby certifies to the Commission this Initial Determination and the Recommended Determination. The parties' briefs, which include the final exhibits lists, are not certified as they are already in the Commission's possession in accordance with Commission rules. 19 C.F.R. § 210.38(a).

The Secretary shall serve the confidential version of this Initial Determination upon counsel who are signatories to the Protective Order issued in this Investigation. A public version will be served at a later date.

---

[88] Any arguments from the parties' pre-hearing briefs incorporated by reference into the parties' post-hearing briefs are stricken, unless otherwise discussed herein, as an improper attempt to circumvent the page limits imposed for post-hearing briefing.

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission unless a party files a petition for review pursuant to 19 C.F.R. § 210.43(a) or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion a review of the Initial Determination or certain issues therein.

Within ten days of the date of this document, the parties must jointly submit a statement to Bullock337@usitc.gov stating whether they seek to have any portion of this document redacted from the public version. The parties shall attach to the statement a copy of a joint proposed public version of this document indicating with red brackets any portion asserted to contain confidential business.[89] To the extent possible, the proposed redacting should be made electronically, in a PDF of the issued order, using the "Redact Tool" within Adobe Acrobat, wherein the proposed redactions are submitted as "marked" but not yet "applied." The parties' submission concerning the public version of this document should not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock
Chief Administrative Law Judge

---

[89] If the parties submit excessive redactions, they may be required to provide an additional written statement, supported by declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in Commission Rule 201.6(a). 19 C.F.R. § 201.6(a).

Page Intentionally Omitted

CONFIDENTIAL MATERIAL OMITTED

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

<table>
<tr><td>In the Matter of<br><br>CERTAIN AUDIO PLAYERS AND<br>CONTROLLERS, COMPONENTS<br>THEREOF, AND PRODUCTS<br>CONTAINING SAME</td><td>Inv. No. 337-TA-1191</td></tr>
</table>

ORDER NO. 19:     DENYING COMPLAINANT SONOS, INC.'S MOTION TO STRIKE HYPOTHETICAL REDESIGNS

(September 4, 2020)

On August 18, 2020, Complainant Sonos, Inc. ("Sonos") filed a motion (1191-011) to strike Respondents Google, LLC's ("Google") and Alphabet, Inc.'s[1] supplemental responses to Interrogatory No. 20 and the alleged redesigns disclosed therein.[2, 3] On August 27, 2020 the Commission Investigative Staff ("Staff") filed a response opposing the motion and on August 28, 2020, Google filed a response opposing the motion.

Sonos claims that on June 19, 2020, Google supplemented its interrogatory responses to identify ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ modifications that it "might or might not make at some unspecified time in the future" and that on August 3, 2020, Google supplemented its interrogatory responses to identify ▮▮▮▮ hypothetical alternative and further alternative designs that could be made to the Accused Products. Mem at 5 (citing Mot. Ex. 5 at 153-57; Mot. Ex. 6 at 161-66). Sonos argues that Google did not produce samples, source code[4], documents, supplement

---

[1] Since the filing of Sonos' motion, Respondent Alphabet, Inc. has been terminated from the Investigation. *See* Order No. 18 (Sept. 1, 2020).

[2] Sonos requested an order shortening the time for responding to this motion, which was denied. *See* Order No. 16 (Aug. 20, 2020).

[3] On September 2, 2020, Sonos filed a Supplemental Brief in support of this Motion. *See* Doc ID 718720. Because Sonos failed to file a motion for leave, the pleading is procedurally improper and will not be considered by the undersigned.

[4] According to Sonos, Google eventually produced source code for the hypothetical redesigns on August 6, 2020. *Id.*

its response to Interrogatory No. 21, identify any redesign as an Accused Product, or supplement any discovery directed to the Accused Products. *Id.* at 6-7. Sonos therefore contends that Google has not met its burden for adjudication of a redesigned product. *Id.* at 11 (citing *Certain Human Milk Oligosaccharides and Methods of Producing the Same*, Inv. No. 337-TA-1120, Comm'n Op. at 18 (Jun. 8, 2020)).

Sonos argues that the redesigns are not fixed or definite. *Id.* at 11-13. Sonos also asserts that the redesigns have not been sufficiently disclosed because Google has not provided a response to Interrogatory No. 21 as to how the alleged redesigns are non-infringing. *Id.* at 15-16 (citing Mot. Ex. 1; Mot. Ex. 2 at 29; Mot. Ex. 6; Mot. Ex. 9). Sonos further contends that Google has failed to prove that the alleged redesigns are within the scope of the Investigation because Google has not identified any alleged redesign as an Accused Product. *Id.* at 16. In addition, Sonos submits that Google has not met its burden to prove that the redesigns have been imported. *Id.* Sonos contends that it would be unfair and prejudicial to allow Google to introduce the redesigns at this late stage. *Id.* at 18.

Google asserts that its disclosures regarding the redesigns are timely because they were served well in advance of deadlines in the procedural schedule. Opp. at 9. According to Google, it made the entirety of its redesign source code available for review on August 6 and made products incorporating that code available for inspection on August 7. *Id.* (citing Mot. Ex. 10). Google also argues that its redesigns are sufficiently fixed and definite because they are embodied in actual source code that has been implemented in physical working products made available for inspection. *Id.* at 10 (citing Mot. Ex. 10). Google claims that it has produced sufficient technical discovery on its redesigns to put Sonos on notice and provide Sonos an opportunity to seek further discovery. *Id.* at 12 (citing Mot. Exs. 5, 6, 9-11). In addition, Google contends that Sonos still has

at 8-9.

ample opportunity to request testimony from a corporate representative regarding the redesigns. *Id*. (citing Opp. Ex. E). Google asserts that its redesigns are within the scope of this Investigation as they are the exact same products that Sonos has accused. *Id*. at 14-15. As to importation, Google submits that ████████████████████████████████. *Id*. at 16 (citing Opp. Ex. F). Lastly, Google argues that Sonos is not unfairly prejudiced by the inclusion of these redesigns because Google disclosed them well in advance of the close of fact discovery. *Id*. at 16-17.

According to Staff, there appears to be no dispute that the alleged redesigns fall within the scope of this Investigation. Staff Resp. at 5-6 (citing Mot. at 10; 85 Fed. Reg. 7783 (Feb. 11, 2020)). Staff submits that Google has represented that it will ████████████████ ██████████████. *Id*. at 6 (citing Staff Ex. A). In addition, Staff argues that Google's redesigns are sufficiently fixed in design because Google has produced source code for each of the alleged redesigns and has made physical devices incorporating the source code available for inspection. *Id*. at 7 (citing Mot. at 7-8; Mot. Ex. 6, 9-10). Lastly, Staff contends that Google's redesigns have been sufficiently disclosed during discovery because Google has identified its alleged redesigns in its supplemental response to Interrogatory No. 20, made source code for each of the identified redesigns available for review, and made physical devices incorporating the redesigned source code available for inspection. *Id*. at 8 (citing Mot. at 7-8; Mot. Ex. 6, 9-10; Staff Ex. A). Staff notes that the close of fact discovery is more than a month away and that to date, no fact depositions or expert discovery has occurred and thus, "there can be no real dispute that Sonos will have an opportunity to engage in fulsome discovery concerning Google's alleged redesigns." *Id*. at 9.

The Commission's test for determining whether a respondent has met its burden for adjudication of a redesigned or alternative product includes four factors: (1) whether the product

- 3 -

is within the scope of the investigation; (2) whether it has been imported; (3) whether it is sufficiently fixed in design; and (4) whether it has been sufficiently disclosed by respondent during discovery. *Certain Human Milk Oligosaccharides*, Inv. No. 337-TA-1120, Comm'n Op. at 18 (citing *Certain Two-Way Radio Equipment and Systems, Related Software and Components Thereof*, Inv. No. 337-TA-1053, Comm'n Op., 2018 WL 8648379 at *13-14 (Nov. 16, 2018)).

Having reviewed the pleadings and exhibits attached thereto, the undersigned finds that Google's redesigns satisfy each of these four factors. First, the Notice of Institution defines the scope of this Investigation as "networked speaker devices, and devices (for example, mobile phones and laptops) capable of controlling these devices." *See* 85 Fed. Reg. at 7783 (Feb. 11, 2020). This clearly encompasses Google's redesigns, which are the same products as the accused products with modified software. Opp. at 14; Staff Resp. at 5-6. Second, Google has represented that ████████████████████████████████████████████. *See* Opp. Ex. F at 227, 229, 231; Staff Ex. A. Thus, because actual importation of redesigns is not mandatory, the undersigned finds that this factor is satisfied. *See Certain Human Milk Oligosaccharides*, Inv. No. 337-TA-1120, Comm'n Op. at 18 n. 21 (internal citations omitted). Third, Google has produced source code for the alleged redesigns and has made physical devices incorporating the source code available for inspection. *See* Mot. Exs. 6, 9, 10. The evidence therefore shows that the redesigns are sufficiently fixed such that an infringement determination can be made. *Certain Microfluidic Devices*, Inv. No. 337-TA-1068, Comm'n Op. at 21-22 (Jan. 10, 2020) (internal citation omitted). Lastly, the redesigns have been sufficiently disclosed by Google because Google has supplemented its interrogatory responses, made source code for the redesigns available, and made physical devices incorporating the source code for the redesigns available for inspection.[5] *See* Mot. Exs. 6,

---

[5] According to the Commission, "extensive discovery" is not required, but rather, "discovery that is sufficient for the complainant to assess the features relevant to the asserted patent claims." *See Certain Human Milk Oligosaccharides*, Inv. No. 337-TA-1120, Comm'n Op. at 20 n. 22. In addition, the undersigned notes that no fact depositions or expert

9, 10. Thus, for the foregoing reasons, the undersigned finds that Google's redesigns should not be stricken.[6]

Accordingly, Sonos' motion (1191-011) is hereby denied.

Within seven days of the date of this document, the parties shall submit to the Office of the Administrative Law Judges a joint statement as to whether or not they seek to have any portion of this document deleted from the public version. If the parties do seek to have portions of this document deleted from the public version, they must submit to this office a copy of this document with red brackets indicating the portion or portions asserted to contain confidential business information. The submission may be made by email and/or hard copy by the aforementioned date and need not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock
Chief Administrative Law Judge

---

discovery has occurred yet, and fact discovery does not close until October 2, 2020. *See* Order No. 17 (Aug. 26, 2020); *see also* Staff Resp. at 9.

[6] The undersigned notes that the Commission's policy is "in favor of adjudicating redesigns to prevent subsequent and potentially burdensome proceedings that could have been resolved in the first instance in the original Commission investigation." *See Certain Human Milk Oligosaccharides*, Inv. No. 337-TA-1120, Comm'n Op. at 18-19 (internal citations omitted).

PUBLIC VERSION

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME** | **Inv. No. 337-TA-1191** |

**ORDER 20:  CONSTRUING THE TERMS OF THE ASSERTED CLAIMS OF THE PATENTS AT ISSUE**

(September 25, 2020)

I.    INTRODUCTION ........................................................................................- 1 -

II.   IN GENERAL ............................................................................................- 1 -

III.  RELEVANT LAW ......................................................................................- 2 -

IV.  LEVEL OF ORDINARY SKILL IN THE ART .......................................- 5 -

V.   THE ASSERTED PATENTS .....................................................................- 6 -

    A.  The '258 Patent .................................................................................- 6 -

    B.  The '949 Patent .................................................................................- 8 -

    C.  The '953 Patent .................................................................................- 9 -

    D.  The '959 Patent ...............................................................................- 11 -

    E.  The '896 Patent ...............................................................................- 13 -

VI.  CLAIM CONSTRUCTION .....................................................................- 15 -

    A.  Agreed-Upon Constructions ..........................................................- 15 -

    B.  Disputed Constructions ..................................................................- 15 -

        1.  "local area network" / "wireless local area network" ........- 15 -

        2.  '949 patent ..........................................................................- 20 -

           a)  "independent playback device"..............................- 20 -

        3.  '896 patent ..........................................................................- 26 -

           a)  "security key"..........................................................- 26 -

           b)  "while operating . . ." and "after receiving . . ." .........- 30 -

           c)  "program instructions . . ."........................................- 33 -

           d)  "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN"..........................- 36 -

        4.  '959 patent ..........................................................................- 40 -

           a)  "equalization [of the audio data]" ............................- 40 -

           b)  "type of pairing" / "first type of pairing" / "second type of pairing" .........- 47 -

i

## I. INTRODUCTION

The Commission voted to institute this Investigation on February 6, 2020 to determine whether the importation, sale for importation, or sale within the United States after importation of certain audio players and controllers, components thereof, and products containing the same[1] violates section 337 of the Tariff Act of 1930, as amended, due to infringement of U.S. Patent No. 9,195,258 (''the '258 patent''); U.S. Patent No. 10,209,953 (''the '953 patent''); U.S. Patent No. 8,588,949 (''the '949 patent''); U.S. Patent No. 9,219,959 (''the '959 patent''); and U.S. Patent No. 10,439,896 (''the '896 patent'') (collectively, the "Asserted Patents"). *See* 85 Fed. Reg. 7783 (Feb. 11, 2020). Complainant Sonos, Inc. ("Sonos") is the Complainant. The Notice of Investigation named Alphabet Inc. and Google LLC ("Google") as Respondents; however, Google is the only remaining Respondent.[2] The Commission Investigative Staff ("Staff") is participating in this Investigation.

Due to the COVID-19 pandemic, a *Markman* hearing was not held in this Investigation.[3]

## II. IN GENERAL

The claim terms construed in this Order are done so for the purposes of this section 337 Investigation. Those terms not in dispute need not be construed. *See Vanderlande Indus.*

---

[1] The plain language description of the accused products is "networked speaker devices, and devices (for example, mobile phones and laptops) capable of controlling these devices." 85 Fed. Reg. 7783 (Feb. 11, 2020).

[2] Alphabet Inc. was terminated from this Investigation on September 1, 2020. *See* Order No. 18.

[3] For convenience, the briefs and chart submitted by the parties are referred to as:

| CMIB | Sonos' Initial *Markman* Brief |
|------|--------------------------------|
| CMRB | Sonos' Reply *Markman* Brief |
| RMIB | Google's Initial *Markman* Brief |
| RMRB | Google's Reply *Markman* Brief |
| SMIB | Staff's Initial *Markman* Brief |
| JC | Updated Joint Proposed Claim Construction Chart |

*Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1323 (Fed. Cir. 2004) (noting that the administrative law judge need only construe disputed claim terms).

## III.    RELEVANT LAW

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) (internal citations omitted), *aff'd*, 517 U.S. 370 (1996). Claim construction is a "matter of law exclusively for the court." *Id.* at 970-71. "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).

Claim construction focuses on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *see also Markman*, 52 F.3d at 979. As the Federal Circuit has explained, courts must analyze each of these components to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "Quite apart from the written description and the prosecution history, the claims

themselves provide substantial guidance as to the meaning of particular claims terms." *Id*. at 1314; *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'"). The context in which a term is used in an asserted claim can be "highly instructive." *Phillips*, 415 F.3d at 1314. Additionally, other claims in the same patent, asserted or unasserted, may also provide guidance as to the meaning of a claim term. *Id.*

The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *Id.* at 1323. In the end, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa´ per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

In addition to the claims and the specification, the prosecution history should be examined, if in evidence. *Id.* at 1317; *see also Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 913 (Fed. Cir. 2004). The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'").

When the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence (*i.e.*, all evidence external to the patent and the prosecution history, including dictionaries, inventor testimony, expert testimony, and learned treatises) may be considered. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* at 1317. "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

If, after a review of the intrinsic and extrinsic evidence, a claim term remains ambiguous, the claim should be construed so as to maintain its validity. *Phillips*, 415 F.3d at 1327. Claims, however, cannot be judicially rewritten in order to fulfill the axiom of preserving their validity. *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999). Thus, "if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then the axiom does not apply and the claim is simply invalid." *Id.*

A claim must also be definite. Pursuant to 35 U.S.C. § 112: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). In *Nautilus, Inc. v. Biosig Instruments, Inc.*, the Supreme Court held that § 112 requires "that a

patent's claims, viewed in light of the specification and prosecution history inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. 898, 910 (2014). A claim is required to "provide objective boundaries for those of skill in the art," and a claim term is indefinite if it "might mean several different things and no informed and confident choice is among the contending definitions." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). A patent claim that is indefinite is invalid. 35 U.S.C. § 282(b)(3)(A).

## IV. LEVEL OF ORDINARY SKILL IN THE ART

Sonos proposes that "a person of ordinary skill in the art has the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or an equivalent thereof, and approximately 2-4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience." CMIB at 8 n.4.

Google did not propose a level of ordinary skill in the art in its briefs. Its experts, however, address the issue in their expert declarations, submitted as exhibits. For example, Dr. Shoemake states:

> I understand that Respondents contend that a person of ordinary skill in the art in the '258, '953, '896, and '949 patents at the time of the alleged invention would have had the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or an equivalent thereof, and approximately 4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience. A person with slightly less technical education but slightly more practical experience, or more technical education (e.g., a Master degree in the same fields) but less practical experience (e.g., 2 years), could have met that standard.

RMIB Ex. 9 at ¶ 15; *see also* RMIB Ex. 6 at ¶ 26; RMIB Ex. 7 at ¶ 49; RMIB Ex. 8 at ¶ 34.

Staff agrees with Sonos' proposed level of ordinary skill in the art because it requires slightly less experience. SMIB at 4.

The undersigned finds Sonos' proposal best reflects the level of skill in the art at the time of the asserted patents.[4] Accordingly, the undersigned finds that a person of ordinary skill in the art with respect to the asserted patents would have at least (a) a Bachelor's degree in computer science, computer engineering, electrical engineering, or an equivalent thereof, and (b) 2-4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience. The undersigned also finds that additional graduate education could substitute for professional experience and significant work experience could substitute for formal education.

## V.      THE ASSERTED PATENTS

### A.      The '258 Patent

The '258 patent, entitled "System and Method for Synchronizing Operations Among A Plurality of Independently Clocked Digital Data Processing Devices," issued on November 24, 2015 to Nicholas A. J. Millington. The '258 patent is assigned to Sonos. The '258 patent relates to "the field of arrangements that synchronize output generated by a number of output generators, including audio output, video output, combinations of audio and video, as well as other types of output . . . provided by a common channel." '258 patent at 1:44-49.

The '258 patent has 26 claims. Claims 17, 21-24, and 26 are asserted in this Investigation. The asserted claims read as follows (with the first instance of the agreed-upon terms underlined and the disputed terms in **bold**):

---

[4] The undersigned notes that while the parties have proposed slightly different levels of skill in the art, the differences do not appear to be material to claim construction. CMIB at 8 n.4; SMIB at 4; RMIB Ex. 7 at ¶ 51; RMIB Ex. 8 at ¶ 36; RMIB Ex. 9 at ¶ 17.

17.   A first <u>zone player</u> comprising: a <u>network interface</u> configured to interface the first zone player with at least a **local area network (LAN)**; a device clock configured to generate <u>clock time information</u> for the first zone player; one or more processors; and a tangible, non-transitory computer-readable memory having instructions stored thereon that, when executed by the one or more processors, cause the first zone player to: receive control information from any one of a plurality of controllers over the LAN via the network interface, wherein the received control information comprises a direction for the first zone player to enter into <u>a synchrony group</u> with at least a second zone player; in response to the direction, enter into the synchrony group with the second zone player, wherein in the synchrony group, the first and second zone players are configured to playback audio in synchrony based at least in part on (i) audio content, (ii) <u>playback timing information</u> associated with the audio content, wherein the playback timing information is generated by one of the first or second zone players, and (iii) clock time information for the one of the first or second zone players, and wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players, wherein the first and second zone players remain <u>independently clocked</u> while playing back audio in synchrony; and transmit status information to at least one of the plurality of controllers over the LAN via the network interface, wherein the status information comprises an indication of a status of the synchrony group.

21.   The first zone player of claim 17, wherein the status information further comprises one or both of (a) an identification of a zone player that is operating as a master device of the synchrony group and (b) an identification of at least one zone player that is operating as a slave device of the synchrony group.

22.   The first zone player of claim 17, wherein the first zone player comprises a master device of the synchrony group.

23.   The first zone player of claim 17, wherein the tangible computer-readable memory further has instructions stored thereon that, when executed by the one or more processors, cause the first zone player to determine whether the first zone player is operating as a master device of the synchrony group, and wherein the instructions that cause the first zone player to transmit status information to the at least one of the plurality of controllers comprise instructions that cause the first zone player to transmit status information to the at least one of the plurality of controllers only while the first zone player is operating as the master device of the synchrony group.

24.   The first zone player of claim 23, wherein the tangible computer-readable memory further has instructions stored thereon that, when executed by the one or more processors, cause the first zone player to: receive audio content via the network interface; and while the first zone player is operating as the master device of the synchrony group, transmit the received audio content, via the network interface, to at least one zone player that is operating as a slave device of the synchrony group.

26.     The first zone player of claim 17, wherein the first zone player is a master zone player of the synchrony group, wherein the audio content comprises a plurality of frames, wherein the playback timing information associated with the audio content comprises a playback time for each frame of the audio content, and wherein the first zone player is configured to play back audio in synchrony with the second zone player based at least in part on (i) the audio content, (ii) playback timing information associated with the audio content, wherein the playback timing information is generated by the first zone player, and (iii) clock time information for the first zone player, and wherein the generated playback timing information and the clock time information are transmitted from the first zone player to the second zone player; and wherein the first zone player playing back audio in synchrony comprises, for each frame of the audio content, the first zone player playing back the frame when the device clock of the first zone player is the same as the playback time for the frame.

**B.      The '949 Patent**

The '949 patent, entitled "Method and Apparatus for Adjusting Volume Levels in a Multi-Zone System," issued on November 19, 2013 to Robert A. Lambourne and Nicholas A. J. Millington. The '949 patent is assigned to Sonos. The '949 patent relates to "user interfaces for controlling or manipulating a plurality of multimedia players in a multi-zone system." '949 patent at 1:27-30. An Ex Parte Reexamination Certificate issued November 5, 2015 in response to Reexamination Request No. 90/013,423 (filed January 5, 2015). Compl. at ¶ 68. The Reexamination Certificate states: "Claims 1, 3, 4, 5, 6, 8, 10, 11, 13, 14, 15 and 17-20 are determined to be patentable as amended. Claims 2, 5, 9, 12, and 16, dependent on an amended claim, are determined to be patentable." *Id*; *see also* Compl. Ex. 5.

The '949 patent has a total of 20 claims. Claims 1, 2, 4, and 5 are asserted in this Investigation. The asserted claims[5] read as follows (with the first instance of the agreed-upon terms underlined and the first instance of the disputed terms in **bold**):

1.    A <u>multimedia</u> controller including a processor, the controller configured to: provide a user interface for a <u>player</u> group, wherein the player group includes a plurality of players in a **local area network**, and wherein each player is an **independent <u>playback device</u>**

---

[5] The language of claims 1 and 4 is copied directly from the reexamination certificate. As such, matter enclosed in brackets [ ] originally appeared in the '949 patent, but has been deleted and matter printed in italics indicates additions made to the '949 patent during reexamination.

configured to playback a multimedia output from a multimedia source; accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group *for synchronized playback of a multimedia output from the same multimedia source;* for [each of the plurality of players within] *any individual player in* the player group, accept via the user interface [an] *a player-specific* input to adjust a volume [associated with the] *of that individual* player, wherein the *player-specific* input to adjust the volume [associated with the] *of that individual* player causes [the corresponding independent playback device] *that individual player* to adjust its volume; and accept via the user interface [an] *a group-level* input to adjust a volume associated with the player group, wherein the *group-level* input to adjust the volume associated with the *player* group causes [the corresponding independent playback devices] *each of the players* in the player group to adjust [their volumes] *its respective volume.*

2. The multimedia controller of claim 1, wherein the controller is further configured to accept via the user interface an input to remove one of the plurality of players from the player group.

4. The multimedia controller of[claim 3] *claim 1,* wherein the *group-level* input to [mute] *adjust the volume associated with* the player group *further* causes [the players in the player group to adjust their volumes further comprises]: the controller [sending] *to send* an instruction to one of the players in the player group, the instruction indicating that the volumes of each of the players in the player group should be adjusted in scale.

5. The multimedia controller of claim 1, wherein the controller is further configured to accept via the user interface an input to name the player group.

## C.    The '953 Patent

The '953 patent, entitled "Playback Device," issued on February 19, 2019 to Nicholas A. J. Millington. The '953 patent is assigned to Sonos. The '953 patent relates generally to "the field of digital data processing devices, and more particularly to systems and methods for synchronizing operations among a plurality of independently-clocked digital data processing devices." '953 patent at 1:30-34.

The '953 patent has 30 claims. Claims 7, 12-14, and 22-24 are asserted in this Investigation. The asserted claims read as follows (with the first instance of the agreed-upon terms underlined and first instance of the disputed terms in **bold**):

- 9 -

7.    A first <u>zone player</u> comprising: a <u>network interface</u> that is configured to provide an interconnection with at least one data network; a clock that is configured to provide a clock time of the first zone player; at least one processor; a tangible, non-transitory computer-readable medium; and program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform functions comprising: receiving a request to enter into <u>a</u> <u>synchrony group</u> with at least a second zone player that is communicatively coupled with the first zone player over a **local area network (LAN)**; in response to receiving the request to enter into the synchrony group, entering into the synchrony group with the second zone player, wherein the first zone player is selected to begin operating as a slave of the synchrony group and the second zone player is selected to begin operating as a master of the synchrony group, and wherein the clock time of the first zone player differs from a clock time of the second zone player; after beginning to operate as the slave of the synchrony group: receiving, from the second zone player over the LAN, <u>clock timing</u> <u>information</u> that comprises at least one reading of the clock time of the second zone player; based on the received clock timing information, determining a differential between the clock time of the first zone player and the clock time of the second zone player; receiving, from the second zone player over the LAN, (a) audio information for at least a first audio track and (b) <u>playback timing information</u> associated with the audio information for the first audio track that comprises an indicator of a first future time, relative to the clock time of the second zone player, at which the first and second zone players are to initiate synchronous playback of the audio information for the first audio track; updating the first future time to account for the determined differential between the clock time of the first zone player and the clock time of the second zone player; and when the clock time of the first zone player reaches the updated first future time, initiating synchronous playback of the received audio information with the second zone player.

12.   The first zone player of claim 7, wherein receiving the audio information for the first audio track from the second zone player over the LAN comprises: receiving a series of frames that each include a respective portion of the obtained audio information for the first audio track.

13.   The first zone player of claim 12, wherein a first frame in the series of frames includes the indicator of the first future time.

14.   The first zone player of claim 13, wherein the playback timing information further comprises, for each subsequent frame in the series of frames: an indicator of a respective future time, relative to the clock time of the second zone player, at which the frame is to be synchronously played back by the first and second zone players.

22.   The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions while operating as the slave of the synchrony group: receiving, from the second zone player over the LAN, a command to adjust an individual volume of the first zone player; and in response to receiving the command, adjusting the individual volume of the first zone player.

- 10 -

23.     The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions: while operating as the slave of the synchrony group, receiving, from the second zone player over the LAN, control information that enables the first zone player to begin operating as the master of the synchrony group; and in response to receiving the control information, transitioning from operating as the slave of the synchrony group to operating as the master of the synchrony group.

24.     The first zone player of claim 7, further comprising program instructions stored on the tangible, non-transitory computer-readable medium that are executable by the at least one processor to cause the first zone player to perform the following functions: while operating as the slave of the synchrony group, receiving a request to disengage from the synchrony group; in response to receiving the request to disengage from the synchrony group, disengaging from the synchrony group and transitioning from operating as the slave of the synchrony group to operating as a standalone zone player.

### D.     The '959 Patent

The '959 patent, entitled "Multi-Channel Pairing in a Media System," issued on December 22, 2015 to Christopher Kalai; Michael Darrell Andrew Ericson; Robert A. Lambourne; Robert Reimann; and Mark Triplett. The '959 patent is assigned to Sonos. An *Ex Parte* Reexamination Certificate issued on April 5, 2017 in response to Reexamination Request No. 90/013,756 (filed May 25, 2016). Compl. at ¶ 78. As a result of the reexamination, original claims 1 and 14 were cancelled, claims 2-13 and 15-22 were determined to be patentable as amended, and new claims 23-48 were added and determined to be patentable. *Id.*; *see also* Compl. Ex. 7. The '959 patent relates generally to "devices and methods for providing audio in a multi-channel listening environment (e.g., a stereo sound or home theater surround sound environment)." *Id.* at ¶ 81; *see also* '959 patent at 1:54-63, 3:32-46.

The '959 Patent has a total of 48 claims. Claims 5, 9, 10, 29 and 35 are asserted in this Investigation. The asserted claims[6] read as follows (with the first instance of the agreed-upon terms underlined and the first instance of the disputed terms in **bold**):

5.    [The playback device of claim 1,] *A <u>playback device</u> configured to output audio in a multi-channel listening environment, the playback device comprising: a <u>network interface</u> configured to receive audio data over a network; a plurality of speaker drivers configured to output audio based on the audio data; one or more processors; and tangible, non-transitory, computer readable memory comprising instructions encoded therein, wherein the instructions, when executed by the one or more processors, cause the playback device to (i) process the audio data before the playback device outputs audio from the plurality of speaker drivers, (ii) determine that a **type of <u>pairing</u>** of the playback device comprises one of at least a **first type of pairing** or a **second type of pairing**,* wherein in the first type of pairing, the playback device is configured to output audio comprising two channel sound via the plurality of speaker drivers, and wherein in the second type of pairing, the playback device is configured to output audio comprising no more than one channel of the two channel sound via the plurality of speaker drivers, *(iii) configure the playback device to perform a first **equalization of the audio data** before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing, and (iv) configure the playback device to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing.*

9.    [The playback device of claim 1, wherein the playback device is further configured to (i)] *A playback device configured to output audio in a multi-channel listening environment, the playback device comprising: a network interface configured to receive audio data over a network; a plurality of speaker drivers configured to output audio based on the audio data; one or more processors; and tangible, non-transitory, computer readable memory comprising instructions encoded therein, wherein the instructions, when executed by the one or more processors. cause the playback device to (i) process the audio data before the playback device outputs audio from the plurality of speaker drivers, (ii) determine that a type of pairing of the playback device comprises one of at least a first type of pairing or a second type of pairing, (iii) configure the playback device to perform a first equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing, (iv) configure the playback device to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing,* (v) separate the audio data into separate audio channels, [(ii)] *(vi)* output audio based on audio data of at least one separate audio channel from the plurality of

_____
[6] The claim language has been copied directly from the reexamination certificate. As such, matter enclosed in brackets [ ] originally appeared in the '959 patent, but has been deleted and matter printed in italics indicates additions made to the '959 patent during reexamination.

speaker drivers, and [(ii)] *(vii)* transmit at least one additional separate audio channel over the network.

10.    [The playback device of claim 1, wherein the playback device is further configured to] *A playback device configured to output audio in a multi-channel listening environment, the playback device comprising: a network interface configured to receive audio data over a network; a plurality of speaker drivers configured to output audio based on the audio data; one or more processors; and tangible, non-transitory, computer readable memory comprising instructions encoded therein, wherein the instructions, when executed by the one or more processors, cause the playback device to (i)* receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices, *(ii) process the audio data before the playback device outputs audio from the plurality of speaker drivers, (iii) determine that a type of pairing of the playback device comprises one of at least a first type of pairing or a second type of pairing. (iv) configure the playback device to perform a first equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the first type of pairing, and* (v) *configure the playback device to perform a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers when the type of pairing is determined to comprise the second type of pairing.*

29.    *The playback device of claim 5, wherein the playback device is further configured to receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices.*

35.    *The playback device of claim 9, wherein the playback device is further configured to receive a signal from a controller over the network, wherein the signal comprises an instruction for the playback device to pair with one or more playback devices.*

### E.    The '896 Patent

The '896 patent, entitled "Playback Device Connection," issued on October 8, 2019 to Nicholas A. J. Millington and Paul V. Hainsworth.   The '896 patent is assigned to Sonos. The '896 patent relates to "techniques for connecting various devices to a network for secure communications with a minimum of human interaction and technical ability." '896 patent at 1:29-32.

The '896 patent has 20 claims. Claims 1, 3, 5-6, and 12 are asserted in this Investigation.

The asserted claims read as follows (with the first instance of the agreed-upon terms <u>underlined</u>

and the first instance of the disputed terms in **bold**):

1.      A computing device comprising: a user interface; a <u>network interface</u>; at least one processor; a non-transitory computer-readable medium; and **program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising: while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more <u>playback devices</u>, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup**; after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point**; transmitting, to the given playback device via the initial communication path, **at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN**; after transmitting at least the second message containing the network configuration parameters, detecting an indication that the given playback device has successfully received the network configuration parameters; and after detecting the indication, transitioning from communicating with the given playback device via the initial communication path to communicating with the given playback device via the secure WLAN that is defined by the access point.

3.      The computing device of claim 1, wherein the given playback device comprises a first playback device of a new networked audio system.

5.      The computing device of claim 1, wherein communicating with the given playback device via the secure WLAN comprises transmitting a command to the given playback device related to playback of audio content.

6.      The computing device of claim 5, wherein the command comprises a command to retrieve audio content for playback from an audio source that is accessible via a communication path that includes the secure WLAN.

12.     The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising: after transitioning to communicating with the given playback device via the secure WLAN, transmitting a command to the given playback device to form a group with at least a first playback device of a networked audio system such that the given playback device is configured to play back audio content in synchrony with at least the first playback device.

## VI.     CLAIM CONSTRUCTION

### A.     Agreed-Upon Constructions

The parties have agreed to the following constructions:

| TERM | PATENT(S) | AGREED-TO CONSTRUCTIONS |
|---|---|---|
| "zone player" / "playback device" / "player" | 8,588,949<br>9,195,258<br>9,219.959<br>10,209,953<br>10,439,896 | "data network device configured to process and output audio" |
| "network interface" | 9,195,258<br>9,219.959<br>10,209,953<br>10,439,896 | "physical component of a device that provides an interconnection with a data network" |
| "playback timing information" | 9,195,258<br>10,209,953 | "information indicating when the audio information [content] is to be played back" |
| "clock time information" / "clock timing information" | 9,195,258<br>10,209,953 | "information representing a time value indicated by a device's clock" |
| "a synchrony group" | 9,195,258<br>10,209,953 | "a set of two or more zone players that are to play the same audio program synchronously" |
| "independently clocked" | 9,195,258 | "operating in accordance with their own respective clocks during synchronous playback" |
| "multimedia" | 8,588,949 | "any type of media that comprises audio (including audio alone)" |
| "pairing" | 9,219,959 | "configuration involving two or more playback devices that have different playback roles" |

JC at 1-2. The undersigned hereby adopts the parties' proposed constructions and shall construe the terms set forth above according to their agreed-to definitions.

### B.     Disputed Constructions

#### 1.     "local area network" / "wireless local area network"

The term "local area network" appears in claim 1 of the '949 patent, claim 17 of the '258 patent, and claims 7, 12, 22, and 23 of the '953 patent. The term "wireless local area network" appears in claims 1, 5, 6, and 12 of the '896 patent. The parties disagree on the claim construction of these terms and have proposed the following constructions:

| SONOS | GOOGLE | STAFF |
|---|---|---|
| "data network that links devices within a limited area, such as a home or office" | Plain and ordinary meaning; no construction necessary | Plain and ordinary meaning; no construction necessary |

JC at 2.

Sonos argues that "'local area network' is a term of art that was (and still is) commonly understood to mean a data network (or computer network)." CMIB at 13. Sonos further asserts that "[i]t was also commonly understood that a data network was (and still is) a network for transferring digital data packets between networked devices." *Id.* According to Sonos, "the term 'local area network' does not cover a non-data 'network,' such as a 'network' for transferring analog audio between a conventional audio receiver and passive speakers over dedicated speaker wire." *Id.*

Google argues that "local area network" "is a well-known term in the field of networking." RMIB at 3. Google explains: "Because the patents do not ascribe any special meaning to this term . . . it [should] be construed to have its plain and ordinary meaning." *Id.* at 3-4. Google disagrees with Sonos' construction for two reasons. First, while Google does not object to the inclusion of the word "data" before "network," it argues that Sonos is attempting to use the word "data" to improperly limit a "local area network" to a "network that transfers 'digital data packets' between devices." *Id.* at 5. Second, Google asserts that Sonos' construction improperly limits "a LAN to a geographic scope of 'a home or office.'" *Id.* at 4.

Staff agrees that "local area network" should be given its plain and ordinary meaning. SMIB at 6. Staff explains that "[t]his term would have had a well understood meaning to one of ordinary skill in the art." *Id.* 6-7. Staff notes that "the key dispute amongst the parties is whether 'data network' is limited to a network transferring 'digital data packets' between networked

- 16 -

devices." *Id.* at 7 n.1. Staff asserts that limiting "data network" in this way is "inconsistent with the intrinsic evidence (and pertinent extrinsic evidence)." *Id.* at 7.

All parties agree that it is appropriate to include the term "data network" in the construction of "local area network." *See* RMIB at 5; RMRB at 1; SMIB at 7 n.1. The parties' main dispute centers around the application of this term; specifically, whether "data network" should be restricted to a "data network for transferring digital data packets between networked devices."

The undersigned finds that the intrinsic evidence does not support limiting the claims in this manner. While there are references in the specification to both "digital data" and "packets," the law is clear that limitations from the written description should not be read into the claims without other indicia that the patentee so intended to limit the invention. *See Phillips*, 415 F.3d at 1320; *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) ("Although claims must be read in light of the specification of which they are a part, it is improper to read limitations from the written description into a claim."). Here, there is no such evidence. First, there is nothing in the claims themselves that indicate that "local area network" is limited to the transfer of digital data packets. Neither the term "digital" nor "packets" appears in any of the patents' claims. *See* '949 patent, cl. 1; '258 patent, cl. 17; '953 patent, cls. 7, 12, 22, 23; '896 patent, cls. 1, 5, 6, 12.

Nor can Sonos point to anything in the patents' specifications indicating a clear intent to limit "local area network." Instead, Sonos asserts that "by repeatedly and consistently describing a 'local area network' as a 'data network' that transfers 'digital' data 'packets,' the specifications . . . demonstrate that the claimed 'local area network,' is a "data network.'" CMIB at 18; *see also id.* at 20. This alone is not sufficient to read limitations from the specification into the claims.[7] In

---

[7] Sonos cites to two cases in support of the proposition that, if a patent "repeatedly and consistently" describes a term in a certain manner, the claim construction should likewise construe the term that way. In the cited cases, however,

fact, the Federal Circuit has explained: "[I]t is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *GE Lighting Sols., Inc. v. AgiLight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014). Without such a clear indication, the undersigned declines to limit "local area network" in the manner proposed by Sonos.

The extrinsic evidence also supports this conclusion. The evidence shows that a person of ordinary skill in the art would understand that "local area network" is used to refer to a network that is limited by area. As Dr. Shoemake explains:

> Many network types are defined based on other geographic area. For example, a person of ordinary skill in the art would be familiar with the concepts of PAN, LAN, MAN and WAN, meaning personal area network, local area network, metropolitan area network and wide area network, respectively. A PAN is typically viewed as having a maximum range that is generally around a person's body. This may also be thought of as being consistent with a moderately sized room, office or a vehicle's cabin. A LAN has a maximum range that generally covers a portion of a building, a building, multiple buildings or a campus. A MAN covers a city or a portion of a city. A WAN covers a large area such as multiple cities, a state, country or globe.

RMIB Ex. 9 at ¶ 20. The general understanding of "local area network" thus does not concern the type of data (digital or analog) or manner of transmission (packet or non-packet form). *Id.* at ¶ 18.

Even the extrinsic evidence cited by Sonos does not support adding restrictions on the type or form of data transmitted over the network. Sonos lists definitions from five technical dictionaries in its brief, but four of these relate only to a "data network" generally and do not

---

the repeated and consistent use of a term was not the only evidence informing its construction. For example, in *In re Abbott Diabetes Care, Inc.* 696 F.3d 1142, 1149-1150 (Fed. Cir. 2012), the issue was whether the construction of "electrochemical sensor" could include external cables and wire connecting the sensors to its control unit. While the Federal Circuit noted that the patent "repeatedly, consistently, and exclusively" depicted an electrochemical sensor without external cables or wires, it also stated that the patent "simultaneously disparage[ed] sensors with external cables or wires." *Id.* at 1150; *see also ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368 (Fed. Cir. 2009) (noting that there was "no support from any intrinsic or extrinsic source" to support a reading of the claim term other than the one disclosed in the preferred embodiment).

address the more narrow definition at issue. *See* CMIB at 22 (citing definitions that refer to a "data communications network," "computer network," or "data network," but that do not mention "digital data" or "packets"). The fifth dictionary does define "local area network" as "a packet network . . ." *Id.* (quoting Webster's New World Telecom Dictionary). The fact that one dictionary definition includes a reference to packets does not, however, provide conclusive evidence that a person of ordinary skill in the art would generally understand a "local area network" to be limited to "a data network for transferring digital data packets between networked devices."

Nor does the testimony from Sonos' experts prove that "local area network" is understood in the manner proposed by Sonos. *See* CMIB Ex. 9 at ¶ 43; CMIB Ex. 10 at ¶ 62. As with the dictionaries, the opinions of these experts focus on whether "local area network" is understood as a "data network," and do not specifically address the narrower question. *See* CMIB Ex. 9 at ¶¶ 40-45; CMIB Ex. 10 at ¶¶ 52-63. Neither expert opines, for example, that a person of ordinary skill in the art would understand that "data network" excludes analog audio data or must be in packet form. *Id.* In contrast, Google's expert testifies that a person of ordinary skill in the art would understand that "data" can include either "digital data" or "audio data" and that "local area network" is not limited to data transmitted in packets. RMIB Ex. 9 at ¶¶ 29, 31, 34.

Having rejected Sonos' proposal, the undersigned turns to the question of the appropriate definition. All three experts who offered opinions on this term cite to the Modern Dictionary of Electronics (7th ed. 1999) as an example of how a person of ordinary skill in the art would understand the term. CMIB Ex. 9 at ¶ 42; CMIB Ex. 10 at ¶ 56; RMIB Ex. 9 at ¶ 36; *see also* SMIB at 9-10 (favorably citing to this definition). As such, the undersigned adopts the definition set forth in this dictionary. Accordingly, the undersigned hereby construes the term "local area network" as "***a data communications network spanning a limited geographical area, such as an***

- 19 -

*office, an entire building, or industrial park*" and "wireless local area network" *as "a wireless data communications network spanning a limited geographical area, such as an office, an entire building, or industrial park*."

### 2. '949 patent

#### a) "independent playback device"

The term "independent playback device" appears in claim 1 of the '949 patent. The parties disagree on the claim construction of this term and have proposed the following constructions:

| SONOS | GOOGLE | STAFF |
|---|---|---|
| "data network device configured to process and output audio that is capable of playing multimedia separately from other players" | Indefinite | "data network device configured to process and output audio that is capable of independent operation" |

JC at 4.

The claim term at issue was added during prosecution of the '949 patent to distinguish the invention over the prior art, specifically U.S. Patent Pub. No. 2004/0131192 ("Metcalf") and U.S. Patent Pub. No. 2002/0124097 ("Isley"). *See* CMIB Ex. 16 at *98-99[8], 118, 122-123, 130, 134.

Google argues that "[t]he plain claim language contradictorily requires the playback device to be in two distinct states at the same time: 'independent' and part of a 'group.'" RMIB at 25. Google further asserts that both the specification and prosecution history fail to provide any guidance as to "how a device can be in both states at the same time; indeed, it expressly distinguishes independent operation from grouped operation." *Id.* Google also disagrees that "an 'independent playback device' need only be 'capable' of operating independently." *Id.* at 28-29. Google notes: "The distinguishing factor between an independent and a grouped player is whether

---

[8] All citations to CMIB Exhibit 16 are citations to the page number in the corresponding PDF, unless the citation is preceded by the paragraph symbol. For example, this citation refers to pages 98-99 of the PDF. If the citation includes a paragraph symbol, the citation refers to paragraphs included in the declaration of Jon B. Weissman, which appears on pages 2-33 of CMIB Exhibit 16.

the player is playing the same audio in synchrony with other players – not merely whether it has the capability to do so in a different setting." *Id.* at 29. Google also contends that the requirement that the playback devices are independent was added to distinguish the invention over prior art, which disclosed "playback devices capable of playing multimedia separately from other players." *Id.* at 30.

Sonos argues that "an 'independent playback device' is a 'playback device' with certain 'independent' capabilities." CMIB at 36. Sonos asserts that both the claims and the specification describe the playback device in this manner. *Id.* at 37-42. According to Sonos, the "[t]he prosecution history further confirms that 'independent playback device' refers to the capability of a 'player'/'playback device' to play multimedia independently/separately from other 'players,' while also having the capability to be dynamically grouped for synchronized playback." *Id.* at 40.

Staff argues that "its proposed construction most accurately encompasses the capabilities of the independent playback device described in the intrinsic evidence." SMIB at 26. Staff explains that its construction is supported by the claim language, the specification, and the prosecution history. *Id.* at 27-34. Staff further notes that Google's "argument is based on an improper interpretation of claim 1 that its own expert. . . acknowledges renders the claims 'internally inconsistent.'" *Id.* at 34.

Google's argument is based on the premise that the limitation of "independent playback device" requires that playback devices simultaneously play media individually and as part of a group. As the parties acknowledge, doing so is impossible. *See* CMIB at 38 (arguing that these are "conflicting functions"); Rinard Dec. at ¶ 41 (opining that such requirements are "internally inconsistent"). In order for Google's argument to prevail, the undersigned must therefore find that the intrinsic evidence shows that Sonos intentionally added an impossible requirement into the

claims. *See, e.g.,* RMIB at 26 ("[T]he claim language that Sonos' prosecution counsel chose to add to distinguish the prior art during prosecution impossibly requires the devices to be in two distinct states at the same time – independent and grouped."). The evidence does not support such a finding. Instead, the intrinsic evidence is consistent with Sonos' and Staff's reading of the claim: that "independent playback devices" are devices with certain "independent" capabilities.[9]

First, the claim language supports this reading. Claim 1 requires a "player group . . . wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source." '949 patent, cl. 1. The plain language of the claim therefore requires that the playback devices be part of a "player group," but have the capability to play media independently as well. In contrast, a person of ordinary skill in the art would not read this claim as requiring the impossible: that a playback device "simultaneously" plays audio both independently and synchronously in a group. *See* CMIB Ex. 16 at ¶ 56.

The specification also describes the playback devices as having the capability to either play audio independently or to be grouped for synchronized audio playback with other playback devices: "One of the objects, features, and advantages of the present invention is to remotely control a plurality of multimedia players in a multi-zone system, playing and controlling the audio source synchronously if the players are grouped together, or playing and controlling the audio source individually if the players are disassociated with each other." '949 patent at 3:40-45. This concept is further illustrated in Figures 3C, 3D, and 3E. Figure 3C shows that the zone players can

---

[9] Google does not appear to disagree that the specification is consistent with Sonos' and Staff's reading that playback devices can operate either independently or in groups. Google writes: "[T]he '949 patent proposes a controller with a user interface that allows audio players in a multi-zone system to operate in one of two distinct states – individually or as part of a group." RMIB at 22 (citing '949 patent at 3:40-45); *see also id.* at 23 (explaining that Figure 3C describes "the players as playing 'independently,'" as well as linked in a group).

play independently (i.e., BEDROOM or DINING ROOM), while Figure 3E shows the zone players as part of groups (i.e., BEDROOM+DINING ROOM+LIVING ROOM+PATIO):



**FIG. 3C**

**FIG. 3E**

The specification explains:

> FIG. **3C** shows an exemplary user interface (UI) **330** to show all available individual zones in a house. Each zone player can play a type of media (such as music, photographs and video) independently. Each zone player in the U1 may be highlighted on the screen using either a touch screen or an input device such as a stylus, a scroll wheel, or arrow buttons. If a user wishes to link players in some rooms together to form a group so that players in these rooms are playing the same media in a synchronized fashion, the user may activate the grouping function by activating "link zones" **332** that leads to a user interface **340** as shown in FIG. 3D.

*Id.* at 9:49-59. Such descriptions clearly support Sonos' and Staff's understanding that the claims require only that playback devices have the capability of independent play, not that they must simultaneously play media independently and in groups.

Google argues that the prosecution history demonstrates that Sonos' and Staff's understanding is incorrect. Google asserts that "Metcalf and Isley disclose playback devices capable of playing multimedia separately from other players." RMIB at 30. Thus, in Google's view, the addition of the term "independent playback device" must mean something other than the mere capability of playing multimedia separately from other devices.

The evidence does not support the underlying premise of Google's argument. Rather, it shows that the Examiner agreed with Sonos that Metcalf and Isley do not disclose playback devices that are grouped together, but have the capability of independent operation. On April 10, 2013, the Examiner issued a Non-Final Office Action rejecting claims as invalid over Metcalf. CMIB Ex. 16 at *98. In response to this Office Action, Sonos argued that Metcalf "did not disclose or suggest independent playback devices." *Id.* at *117. Sonos therefore suggested adding "independent playback device" as a limitation. *Id.* at *118. The Examiner deemed the addition of this limitation "sufficent [sic] to obviate the anticipation rejections over Metcalf and the obviusness [sic] rejection over Metcalf in view of Aiso." *Id.* at *122-123. Thus, it is clear that the Examiner concluded that Metcalf did not disclose playback devices that can play both independently and in a group.

The record is also clear that the Examiner agreed with Sonos that Isley did not disclose playback devices with the capability of independent operation. During a telephone interview, Sonos "distinguished the individual operation [of the claimed invention] over the tethered or interdependent operation of Isley." *Id.* at *134. In allowing the amended claims, the Examiner noted that, "where Isley controls volume in an interdependent manner[,] the instant application s [sic] teaches the system functional to provide groupwise and individual control of each of the groupwise addressable and independently addressable playback devices." *Id.* at *132. In other words, the Examiner found that Isley controlled volume in an interdependent manner, while the claimed playback devices had both individual and groupwise volume control. The Examiner did not, therefore find, that Isley disclosed the independent operation of the playback devices as claimed in the '949 patent.

Having found that Sonos' and Staff's interpretation of the claim is correct, the undersigned must now choose between the two proposals. Both Sonos and Staff agree that an "independent playback device" is a "data network device configured to process and output audio . . ." JC at 4. Sonos proposes that the audio be "capable of playing multimedia separately from other players," while Staff proposes "audio that is capable of independent operation." *Id.* Staff explains that "the phrase 'independent operation' is taken directly from the Examiner's summary of the interview discussing the 'claimed individual players' as distinct from Isley." SMIB at 34 n.7. The undersigned finds Staff's proposal to be the better one. As noted above, the Examiner appeared to distinguish the claimed invention over Isley because of the capability to control volume individually and not specifically because Isley failed to disclose a capability of playing multimedia

- 25 -

separately from other players. As such, Staff's proposal more accurately reflects the reasons for allowing the amended claim language.[10]

Accordingly, the undersigned hereby construes the term "independent playback device" as "*data network device configured to process and output audio that is capable of independent operation*."

### 3. '896 patent

#### a) "security key"

The term "security key" appears in claim 1 of the '896 patent. The parties disagree on the claim construction of this term and have proposed the following constructions:

| SONOS | GOOGLE | STAFF |
|---|---|---|
| Plain and ordinary meaning; no construction necessary | "a string used in encryption to make data unreadable, or in decryption to render encrypted data readable" | Plain and ordinary meaning; no construction necessary |

JC at 2.

Sonos argues that the '896 patent makes clear that "security key" refers to "any information for facilitating access to, or subsequent communication on, a secure network, such as a secure WLAN" but places no limitation on the type of "security key." CMIB at 23 (citing '896 patent, cl. 1). Sonos contends that the specification does not require the "security key" to be used for encryption or decryption. *Id*. at 24 (citing '896 patent at 3:24-29, 3:46-53, 4:12-23, 14:32-35). Moreover, Sonos submits that, when referring to encryption, the specification uses narrower terms like "public key" or "private key." *Id*. at 24-25 (citing '896 patent at 13:21-23, 13:31-32, 13:62-63, 14:59-61, 15:13-32). Sonos also contends that a person of ordinary skill in the art would have understood that the term "security key" would not have been limited to an encryption or decryption

---

[10] Sonos notes that "Staff's construction and the analysis of this term is consistent with that of Sonos" and that there is no "conflict between the two proposals." CMRB at 15; CMIB at 37 n.9.

key that is in binary format. *Id.* (citing CMIB Ex. 14 at ¶¶ 14-44). Sonos criticizes Google's reliance on cases that do not construe the specific term "security key" at issue in the '896 patent. CMRB at 6 (citing *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005)). Sonos contends that the '896 patent is not limited to "encryption" or "decryption" because the '896 claims do not explicitly recite "encryption" and/or "decryption." *Id.* at 6-7 (internal citations omitted). In addition, Sonos argues that, contrary to basic claim construction principles, Google improperly reads a preferred embodiment into the claims. *Id.* at 7-8.

Google argues that the '896 patent teaches that secure communications can be achieved by encrypting information using security keys. RMIB at 43. Google contends that "security key" has a well-accepted plain meaning to those of ordinary skill in the art of being used in encryption or decryption and that courts regularly construe the term to be used to encrypt or decrypt data. *Id.* at 43-44 (citing RMIB Ex. 6 at ¶ 29; case citations omitted). Google argues that the specification equates "security key" and "WEP key" and that "WEP" is a form of cryptography used to make data unreadable using a string of bits referred to as a WEP key. *Id.* at 44 (citing '896 patent at 9:30-35; RMIB Ex. 30 at Appendix p. 3, 8, 9, 14; RMIB Ex. 6 at ¶¶ 51-58; RMIB Ex. 14 at 118:17-119:12, 122:6-8). Google also argues that every instance of "key" in the '896 patent refers to actual strings of bits that encrypt or decrypt data. *Id.* at 45 (citing '896 patent at 13:21-23, 13:31-32, 13:62-63, 15:26-27; RMIB Ex. 30 at Appendix p. 8, 10; RMIB Ex. 6 at ¶¶ 48-49). In addition, Google submits that numerous dictionary definitions support its proposed construction and verify that it is consistent with the intrinsic record. *Id.* at 46 (citing RMIB Ex. 31; RMIB Ex. 6 at ¶ 70). Google argues that claim 1 distinguishes the claimed "security key for the secure WLAN" from "an identifier of the secure WLAN" and Sonos' interpretation of "security key" deletes the word

"key" from the claims and erases the distinction between different types of information in the specification and claim. *Id*. at 47.

Staff agrees with Sonos that this term should be given its plain and ordinary meaning. SMIB at 39. According to Staff, Google improperly imports limitations into the claims because the claim language places no limitation on the format of the security key nor limits its use to encryption or decryption. *Id*. (citing '896 patent at cl. 1; *Phillips*, 415 F.3d at 1323). Moreover, Staff argues that Google is improperly reading an embodiment into the claims as a limitation. *Id*. at 39-40 (citing '896 patent at 3:11-4:24, 14:32-35, 9:28-41; RMIB at 44; *Tate*, 222 F.3d at 966). Staff also claims that Google is attempting to encompass all instances of the word "key" in the specification in its proposed construction of "security key," contrary to the specification's use of different terms. *Id*. at 40 (citing '896 patent at 12:21-23, 13:31-32, 13:62-63, 15:26-27; RMIB at 45-46). In addition, Staff argues that Google's extrinsic evidence "fails to address how a POSITA would have understood the term at issue." *Id*. at 41. Rather, Staff contends that various technical dictionary definitions of "security key" support the position that a person of ordinary skill in the art would have understood the term to be "broader than just keys in binary format used for encryption and decryption." *Id*. (citing CMIB at 26-27; CMIB Ex. 9 at ¶¶ 22-24).

The central dispute is whether the term "security key" should be limited to encryption or decryption. Claim 1 recites "a security key for the secure WLAN." '896 patent, cl. 1. Thus, as an initial matter, the claim language itself does not limit "security key" to any particular format or limit its use to encryption or decryption. *See id*.; *Phillips*, 415 F.3d at 1312, 1314. While the specification describes "WEP keys" as "wired equivalent privacy, or simply security keys" that is only with respect to one embodiment. *See* '896 patent at 9:28-35. Therefore, although the '896 patent discloses a "WEP key" that may be used for encryption, it does not necessarily follow that

- 28 -

the "security key" must be used for encryption. Instead, it would be improper to read a limitation from a particular embodiment into the claims. *See Tate Access Floors*, 222. F.3d at 966 ("Although claims must be read in light of the specification of which they are a part, it is improper to read limitations from the written description into a claim."). Moreover, when describing encryption, the specification uses other terms such as "public key" or "private key" instead of "security key." *See, e.g.*, '896 patent at 13:21-23, 13:31-32, 13:62-63, 14:56-61, 15:13-30. Thus, the intrinsic evidence does not support limiting the term "security key" to encryption or decryption.

The undersigned also finds that the extrinsic evidence does not support Google's proposed construction. Google relies on dictionary definitions for "key" and not "security key." *See* RMIB at 46; RMIB Ex. 31; RMIB Ex. 6 at ¶ 70. In addition, some of the extrinsic evidence suggests that one of ordinary skill in the art would have understood the term "security key" to be broader than just keys used for encryption or decryption. *See* CMIB Ex. 14 at ¶¶ 22-24. Moreover, the undersigned is not persuaded by Google's reliance on constructions of terms used in patents unrelated to the '896 patent, especially when they are not the same as the term at issue (*e.g.*, "key," "key information," "cryptographic key"). *See* RMIB at 43-44; *Tristrata, Inc. v. Microsoft Corp.*, 11-cv-03797-JST, 2013 WL 5645984, at *10 (N.D. Cal. Oct. 16, 2013); *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1377 (Fed. Cir. 2011); *Achates Reference Pub., Inc. v. Symantec Corp.*, 2:11-cv-294-JRG-RSP, 2013 WL 2357172, at *10 (E.D. Tex. Jan. 3, 2013); *Walker Digital, LLC v. Google, Inc.*, 66 F. Supp. 3d 501, 513 (D. Del. 2014).

Accordingly, the undersigned hereby construes the term "security key" according to its plain and ordinary meaning.

b)   **"while operating . . ." and "after receiving . . ."**

The terms "while operating . . ." and "after receiving . . ." appear in claim 1 of the '896 patent. The parties disagree on the claim construction of these terms and have proposed the following constructions:

| CLAIM TERMS | SONOS/STAFF | GOOGLE |
|---|---|---|
| "while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup;<br><br>after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point" | Plain and ordinary meaning; no construction necessary | "while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup"<br><br>***must happen before***<br><br>"after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point"[11] |

JC at 3.

Sonos submits that a construction is not necessary for these terms because the meaning is readily apparent from the claim language. CMIB at 28. Sonos argues that Google improperly adds

---

[11] Google submits that it has "no objection to a construction requiring that 1[g] happens *after* 1[f], to the extent that the CALJ prefers using 'after' instead of 'before.'" RMRB at 16. Google also seems amenable to a "formal construction or a finding that the plain meaning includes an order of steps." *Id.* at 16-17.

an unnecessary limitation that the "receiving" functions must happen before the "transmitting" function. *Id*. at 29. Sonos contends that this is improper because the claim language is clear on its face and the specification does not deviate from the clear language of the claims. *Id*.; CMRB at 12 (citing *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)). In addition, Sonos argues that Google's proposed construction "runs the risk of improperly importing a limitation into the claims that requires the claimed 'receiving' functions to actually 'happen,' *i.e.*, be performed by the 'computer device.'" CMRB at 12. Sonos submits this would be incorrect because the '896 patent covers a "computing device" that is merely capable of performing the claimed "receiving" functions and does not require their actual performance. *Id*.

Google submits that the claim language requires an "order of the steps" such that the computing device be configured to perform the "transmitting a response to the first message" step "after receiving the user input and receiving the first message" steps. RMIB at 35. According to Google, the specification confirms this "order of steps." *Id*. at 36 (citing '896 patent at Fig 3B, 13:43-14:17, 12:67-13:4). Google therefore requests adoption of its proposed construction "[t]o remove any doubt and potential for confusion." *Id*. at 37; *see also* RMRB at 17 (citing *Oak Tech., Inc. v. Int'l Trade Comm'n*, 248 F.3d 1316, 1324 (Fed. Cir. 2001)).

Staff asserts that Google has not explained why its construction is necessary nor how it differs from the clear language of the claim. SMIB at 43-44. Therefore, Staff contends that because the claim language is clear on its face and the specification does not deviate from the clear language of the claims, Google's proposed construction should be rejected and these terms should be given their plain and ordinary meaning. *Id*. at 44.

It is clear that the plain language of these terms requires a sequence of steps – first, receiving user input and a first message that a given playback device is available for setup, and then, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device. *See* '896 patent, cl. 1; *TALtech Ltd. v. Esquel Apparel, Inc.*, 279 Fed. Appx. 974, 978 (Fed. Cir. 2008) (citing *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003)) ("[W]e we will find that the claim requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires such a narrow construction."). Moreover, the specification does not deviate from the plain language of the claims. *See* '896 patent at 12:63-14:17, Fig. 3B. The undersigned, however, finds that Google's proposed construction would be improperly narrow. As discussed below with respect to the "program instructions" term, infringement occurs when one makes, uses, offers to sell, or sells the claimed system. It would therefore not make sense to require that any step "must happen." *See infra* at Section VI.B.3.c. Rather, claim 1 recites a processor and program instructions stored on a computer-readable medium that are executed by the processor, making it capable of performing the claimed functions. *See id.*; '896 patent, cl. 1.

Accordingly, the undersigned hereby construes the terms "while operating . . ." and "after receiving . . ." according to their plain and ordinary meaning, which includes a sequence of steps.

### c) "program instructions . . ."

The term "program instructions stored on the non-transitory computer-readable medium that . . ." appears in claim 1 of the '896 patent. The parties disagree on the claim construction of this term and have proposed the following constructions:

| CLAIM TERM | SONOS/STAFF | GOOGLE |
|---|---|---|
| "program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:<br>while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup" | Plain and ordinary meaning; no construction necessary | Indefinite |

JC at 3.

Sonos asserts that no construction is necessary because the meaning of this term is readily apparent from the claim language. CMIB at 30. Sonos argues that the claim language does not require a person of ordinary skill in the art to make any subjective determination about the mental state of the user providing the "user input," but rather, that the "user input" of a particular type is received. *Id*. at 31. Therefore, Sonos contends that the claim language is clear that the "computing device" is operable to receive a particular type of "user input," which provides an objectively verifiable indication to a person of ordinary skill in the art. *Id*. Moreover, Sonos submits that the specification confirms that the claimed functionality of receiving "user input" does not depend on

any subjective opinion of a user, just that the "user input" of a particular type is received. *Id*. (citing '896 patent at 12:59-62, 16:21-24, 12:25-30, 15:65-16:4, 12:67-13:3); CMRB at 9-10 ("the claims clearly cover a 'computing device' with the ***capability*** to perform the recited functions"). Sonos contests Google's reliance on cases where the claims explicitly require user action. CMRB at 11.

Google asserts that these claim terms improperly combine system claim limitations with a method claim limitation. RMIB at 38; RMRB at 17-18. Google therefore argues that "claim 1 is indefinite because it is unclear if the alleged infringement occurs when the device is first created with 'program instructions' or only when those instructions are executed when using the device 'while operating on a secure wireless local area network (WLAN).'" RMIB at 38 (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005); *Certain Unmanned Aerial Vehicles & Components Thereof*, Inv. No. 337-TA-1133, Order No. 15 (Jun. 21, 2019)). According to Google, the "while operating on a secure wireless local area network (WLAN)" language describes a state of the computing device during actual use. *Id*. at 38-39 (citing '896 patent at 14:1-14). Thus, Google argues that it is not enough to show that the "computing device" is capable of "operating on a secure wireless local area network (WLAN)." *Id*. at 39. Rather, Google contends that the claim requires showing that the "computing device" is "operating on a secure wireless local area network (WLAN)." *Id*. Google therefore asserts that claim 1 and its dependent claims are indefinite because it is unclear whether infringement occurs when one creates the system or when the user actually uses the system. *Id*. (citing *IPXL Holdings*, 430 F.3d at 1384).

Staff argues that like other computer-readable medium claims, claim 1 defines the "computer-readable medium" in terms of the functions it enables the "computing device" to perform. SMIB at 45 (citing *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995)). According to Staff, the Federal Circuit made clear in *Finjan* that such claims are infringed when one makes, uses,

- 34 -

offers to sell, or sells the claimed apparatus, even if the claimed code is not executed. *Id*. at 45-46 (citing *Finjan v. Secure Computing Corp.*, 626 F.3d 1197, 1203-05 (Fed. Cir. 2010)). Staff contends that the phrase "while operating on a secure wireless local area network (WLAN)" is merely describing the functions the claimed "computer-readable medium" enables the "computing device" to perform. *Id*. at 46. Therefore, Staff argues that because infringement of such a claim occurs without actual use of the device, the phrase does not require an activity to be performed by the user. *Id*.

The undersigned finds Google's arguments unconvincing. In *IPXL Holdings*, the claim that was found to be invalid recited both a system and the method for using that system, and did not apprise a person of ordinary skill in the art of its scope. *See IPXL Holdings*, 430 F.3d at 1384. However, "[t]he conclusion of *IPXL Holdings* was based on the lack of clarity as to when the mixed subject matter claim would be infringed." *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008) (citing *IPXL Holdings*, 430 F.3d at 1384). In contrast, a claim clearly limited to a processor possessing the recited structure and capable of performing the recited functions is not indefinite under *IPXL Holdings*. *See id*. at 1375. Here, claim 1 of the '896 patent recites a processor and program instructions stored on a computer-readable medium that are executed by the processor, making it capable of performing the claimed functions. *See* '896 patent, cl. 1. Therefore, unlike the claims in *IPXL Holdings*, claim 1 uses permissible functional language to describe the capabilities of the claimed system and it is clear that infringement occurs when one makes, uses, offers to sell, or sells the claimed system. *See id*.; *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1316 (Fed. Cir. 2017). Because claim 1 informs one of skill in the art about the scope of the invention with reasonable certainty, the undersigned finds that Google has not proven that it is invalid as indefinite.

Accordingly, the undersigned hereby construes the term "program instructions stored on the non-transitory computer-readable medium that . . ." according to its plain and ordinary meaning.

> **d) "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN"**

The term "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" appears in claim 1 of the '896 patent. The parties disagree on the claim construction of this term and have proposed the following constructions:

| SONOS | GOOGLE | STAFF |
|---|---|---|
| one or more additional messages that collectively contain an identifier of the secure WLAN and a security | at least one second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN[12] | Plain and ordinary meaning; no construction necessary[13] |

JC at 4.

Sonos argues that the two "network configuration parameters" (*i.e.*, the secure WLAN identifier and the security key) are sent in "one or more additional messages" that collectively contain such parameters. CMIB at 33. Sonos argues that Google's proposed construction "impermissibly vitiates the claim language 'at least'" because there would be no reason to have any other messages beyond the second message since they would be redundant. *Id.*; CMRB at 12-

---

[12] Google would not object to Staff's proposed construction of plain meaning "as long as the CALJ also finds that Sonos' construction is inconsistent with plain and ordinary meaning in order to better address the parties' current dispute." RMRB at 18.

[13] While Staff submits that this term should be given its plain and ordinary meaning, Staff would not object to Google's proposed construction. SMIB at 47. Staff, however, contends that Sonos' proposed construction is inconsistent with the plain meaning of the claim language and should be rejected. *Id.*

13. Sonos contends that claims should be interpreted so that no term becomes meaningless or superfluous. CMIB at 33-34 (citing *In re Power Integrations, Inc.*, 884 F.3d 1370, 1376 (Fed. Cir. 2018); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005). In addition, Sonos submits that the specification confirms that the "at least a second message" is not limited to a single second message and nothing in the specification requires the "network configuration parameters" to be transmitted in a single message. *Id*. at 35-36 (citing '896 patent at 2:45-47, 3:24-30, 3:46-54, 4:17-24); CMRB at 13-14. Sonos contends that Google's and Staff's reliance on *TiVo* is misplaced because "the language of the '896 patent claims does not recite that the 'identifier' and 'security key' are 'assembled' into a single message or otherwise clearly indicate that these two network configuration parameters must be transmitted in a single message." *Id*. at 14-15 (citing *TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008)).

Google argues that the plain meaning of the claims requires a least one message containing both the "identifier" and the "security key." RMIB at 40-41 (citing '896 patent, cl. 1; *TiVo*, 516 F.3d at 1303; *CoStar Realty Info., Inc. v. CIVIX-DDI, LLC*, No. 12 C 4968, 12 C 7091 & 12 C 8632, 2013 WL 5346440, at *5 (N.D. Ill. Sept. 23, 2013)); RMRB at 18. According to Google, the only message disclosed by the specification that transmits network configuration parameters from the claimed "computing device" to the "playback device" is a single message that includes both the "identifier" and the "security key" (*i.e.*, the "SetNetParams" message). RMIB at 42 (citing '896 patent at 13:29-37, Fig. 3B, 14:15-17). Google notes that the specification lacks any embodiments where the "identifier" and "security key" are split into separate messages to be transmitted from the "computer device" to the "playback device." *Id*. at 42; RMRB at 19. Google argues that the

- 37 -

specification's discussion of "several messages" refers to the entire process of connecting a playback device to a secure WLAN and does not disclose breaking up the claimed "second message" into multiple messages. RMRB at 19 (citing '896 patent at Fig. 3B). Google contends that it is not ignoring the "at least" language because the '896 patent contemplates sending more than one "second message" with both the identifier and security key. *Id*. at 20 (citing '896 patent at 13:38-41, Fig. 3B; SMIB at 48).

Staff asserts that the meaning of the term is readily apparent from the claim language and that the plain meaning of the term requires that each second message contain the network configuration parameters. SMIB at 48 (citing '896 patent, cl. 1; *Phillips*, 415 F.3d at 1316; *CoStar Realty Info.*, 2013 WL 5346440, at *6; *TiVo*, 516 F.3d at 1303. In addition, Staff submits that the plain language of the claims allows the second message to contain additional information beyond the "network configuration parameters" and thus, the "at least a second message containing network configuration parameters" claim language is not meaningless nor superfluous. *Id*. at 48-49 (citing '896 patent, cl. 10). Staff also asserts that the specification supports its proposed construction by describing an "automatic configuration process" that causes several messages to be exchanged between devices wherein "some of the messages carry information pertaining to a transmission channel, an identifier of the network and a security key for subsequent communication, [and] at least some of the messages are encrypted." *Id*. at 49 (citing '896 patent at 3:11-4:24). According to Staff, the specification discloses the "SetNetParams" message – a single message – that contains both an identifier and a security key. *Id*. at 49-50 (citing '896 patent at Fig. 3B, 13:4-42, 13:29-37, 14:15-17).

The central issue is whether this term requires the "network configuration parameters" (*i.e.*, the "identifier" and the "security key") to be transmitted in one message. Claim 1 recites "at least

a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN." '896 patent, cl. 1. Thus, as an initial matter, the claim language itself makes clear that "at least a second message" has the network configuration parameters and that the network configuration parameters include both "an identifier of the secure WLAN" and "a security key for the secure WLAN." *See id.*; *Phillips*, 415 F.3d at 1312, 1314; *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). The specification also supports this understanding and discloses a "SetNetParams" message, which is a type of command message sent from the CP (*i.e.*, the control point function provided by a computer or handheld controller) to the ZP (*i.e.*, zone player). '896 patent at 13:29-37. That "SetNetParams" message includes "netConfig," which "includes the new configuration parameters" such as the "identifier" and "security key." *See id.* at Fig. 3B, 13:4-14:17, cl. 1. The specification therefore supports a construction where the second message includes both the identifier and the security key. The undersigned disagrees with Sonos that Google's and Staff's proposed constructions would render the "at least" language in the claim meaningless. As used in claim 1, the words "at least" refer to "a second message." *Id.* at cl. 1. Claim 1 therefore contemplates transmitting more than one "second message" containing network configuration parameters. *See id.* at cl. 1, 3:11-4:24 (specification describing several embodiments encompassing an "automatic configuration process" that causes "several messages to be exchanged" between devices wherein "some of the messages carry information pertaining to an appropriate transmission channel, an identifier of the network and a security key for subsequent communication").

- 39 -

Accordingly, the undersigned hereby construes the term "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" as "***at least one second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN***."

### 4. '959 patent

#### a) "equalization [of the audio data]"

The term "equalization [of the audio data] appears in independent claims 5, 9, and 10 of the '959 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

| SONOS | GOOGLE | STAFF |
|---|---|---|
| "modifying the output audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" | "alteration of the relative strength of certain frequency ranges in the audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" | "modifying the output audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" <br><br> ***or alternatively*** <br><br> "modifying the audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" |

JC at 5.

Sonos asserts that the intrinsic evidence supports its proposed construction. According to Sonos, "[b]y repeated use of non-limiting language . . . the '959 Patent makes clear that the inventors intended for 'equalization of the audio data' to have broad scope and that no particular one of the listed functions was required." *Id.* at 47. Sonos notes that its proposed construction is the construction adopted by the district court in Sonos' litigation against D&M Holdings Inc., where the court rejected a construction that focused on frequency as "too narrow." CMIB at 44-45 (citing *Sonos, Inc. v. D&M Holdings, Inc. et al.*, No. 1:14-CV-01330-RGA, 2017 WL 123456 (D. Del. Jan. 12, 2017) ("the *Denon*" litigation)). Sonos submits that Google's dictionary driven construction should also similarly be rejected as improperly restrictive. CMIB at 46; CMRB at 20-24. Staff concurs with Sonos' proposed construction.[14] SMIB at 15-20.

Google submits that the claim language, specification, and the understanding of persons skilled in the art confirm that its proposal is correct. RMIB at 11-17; RMRB at 4-8. Google explains: "Contrary to Sonos' proposed construction, the specification does not use the term 'equalization' to describe any 'modification' to audio data performed by adjusting parameters related to a speaker driver, such as amplifier gain or channel output." RMIB at 11. Thus, Google argues that by defining "equalization" to include these other modifications, Sonos' and Staff's proposed construction effectively reads the "equalization" requirement out of the claims. *Id.* Google also contends that Sonos' construction should be rejected because it replaces the claim

---

[14] As noted, Google objects to Sonos' proposal because of its usage of the term "output audio data." RMIB at 18. Staff does not agree that the use of this term renders the claims ambiguous. SMIB at 20. However, to the extent the undersigned agrees that the *Denon* court's construction creates ambiguity, Staff submits that "an appropriate solution would be to construe 'equalization [of the audio data]' as 'modifying *the audio data* by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters.'" *Id.* (emphasis in original).

term "audio data" with the term "output audio data," and a result, renders the claims ambiguous. RMIB at 18; RMRB at 9.

The parties agree that the specification describes various techniques that could be used to perform equalization of audio data. CMIB at 44; SMIB at 15-16; RMIB at 10. This is reflected in the parties' proposed constructions and include adjusting the gain or channel output of speaker drivers, adjusting amplifier gain of the playback device, and applying one or more filters to the audio data. JC at 5. The parties' dispute centers on whether "equalization of audio data" covers any "modifying the output audio data[15]," as Sonos and Staff propose[16], or whether these techniques must be performed in a way that alters the relative strength of certain frequency ranges in the audio data, as Google contends.

The undersigned finds Google's proposal to be consistent with the intrinsic evidence and the accepted meaning of "equalization" to persons of ordinary skill in the art. "Equalization" is a well-known technique that allows one to emphasize or diminish a specific range of frequencies.[17] RMIB Ex. 7 at ¶¶ 36-37; *see also* RMIB Ex. 33-36. As Dr. Jeffay, Google's expert explained: "High-frequency ranges can be increased relative to mid- and low-frequency ranges in order to introduce more treble into the audio signal. Or low-frequency ranges can be increased relative to high- and mid-frequency ranges to introduce more bass into the audio signal. The key to equalization is altering the relative strength of signals within certain frequency ranges in the audio data." *Id*. at ¶ 37.

---

[15] Sonos's proposed construction adds in the word "output" before "audio data." JC at 5. Sonos did not address this portion of its construction in its initial briefing. *See generally* CMIB at 44-48. However, in its reply brief, Sonos stated that it "has no objection to dropping the word 'output' if the CALJ believes that this would help clarify the construction." CMRB at 19 n.11.

[16] As discussed above, Sonos' and Staff's proposals mirror the construction adopted by the *Denon* court in Sonos' litigation against D&M Holdings Inc. CMIB at 44-45; SMIB at 18-20. Google was not a party to that litigation. The undersigned notes that while the *Denon* court's decision is informative, it is not binding on the Commission.

[17] Neither Sonos nor Staff appear to dispute that "equalization" has a well-known meaning to persons of ordinary skill in the art, at least outside the context of the patent itself. *See generally* CMIB at 44-48; SMIB at 15-20.

The specification similarly describes "equalization" in terms of frequency ranges of audio signals. *See, e.g.*, '959 patent at 8:28-39, 12:15-16; 14:29-32; 16:20-23; 16:48-59. For example, when describing the Sonos S5 device, the specification explains that when two sets of drivers have the "same equalization," those drivers have the "same frequencies." *Id*. at 8:28-39 ("Further, both mid-range drivers and both tweeters have the same equalization (or substantially the same equalization). That is, they are both sent the same frequencies, just from different channels of audio."); *see also* 16:28-33 (describing examples of adjusting the strengths of frequencies including strengths of frequencies within the audio data and by applying filters). This passage confirms that merely adjusting channel output (*e.g.*, switching between left-channel and right-channel audio) does not necessarily change the equalization of audio data, if the adjustment/switch does not affect the frequency ranges in the audio data. *See* RMIB Ex. 7 at ¶ 67 ("A person of ordinary skill in the art would understand that, in order to equalize the audio data, the channel output must be adjusted in a way that alters the relative strength of frequency ranges in the audio data."); *see also id.* at ¶¶ 53-55, 67. The specification also explains that equalization can be used to reduce interference by turning off specific drivers within a playback device. '959 patent at 16:48-59 ("In addition, the equalization of each S5 device is changed in an attempt to reduce or eliminate certain constructive or destructive interference. For example, one tweeter on each S5 device may be turned off or substantially muted."). It describes an embodiment where two S5 devices are used to form a stereo pair: "In this configuration, for example, the left and right audio data may be sent to both S5 devices, but the left audio data of the track is played out of the S5 device configured as left and the right audio data of a track is played out of the S5 device configured as right." *Id.* at 16:52-56. Such a configuration may lead to interference due to overlapping frequency ranges output from the two devices. *Id.* at 16:56-59. The patent then

explains that equalization of each device may be changed to account for the interference. *Id*. A person of ordinary skill in the art would understand that in this context, equalization refers to "reducing the relative strength of frequency ranges likely to cause interference." RMIB Ex. 7 at ¶ 56. In addition, the specification describes equalization in terms of adjusting bass and treble. '959 patent at 12:15-16 ("Set the music playback equalization of each zone (e.g., bass treble)). As Dr. Jeffay explained, a person of ordinary skill in the art would understand that bass refers to low frequency ranges, while treble refers to high frequency ranges. RMIB Ex. 7 at ¶ 57. Thus, when the specification discusses setting the playback equalization of a zone, it refers to adjusting the strength of high and low frequencies with that zone. *Id*. Based on these disclosures, the undersigned finds that the patentee used the term "equalization" in accordance with its accepted meaning in the art, which is adjusting the relative strength of frequency ranges in the audio data.[18]

The prior art cited during prosecution supports this conclusion. For example, Isley explains that "[e]qualization typically involves controlling the amplification or volume of individual frequency ranges of an audio output." RMIB Ex. 15 at [0006]. Likewise, U.S. Patent Publication No. 2005/0100174 ("Howard") explains that "[e]qualization signal processing operations, whether implemented in the digital or analog domain, should be designed to provide a smoother frequency response of the audio system in each mode of play as compared to the frequency response of the system with no equalization." RMIB Ex. 16 at [0064]. Both Isley and Howard confirm that

---

[18] The extrinsic evidence also shows that a person of ordinary skill in the art would understand that "equalization" refers to altering the strength of frequency ranges in audio data. *See, e.g.,* RMIB Ex. 33-36. For example, the Audio Dictionary describes equalization as follows: "An equalizer, contrary to what its name implies, alters or distorts the relative strength of certain FREQUENCY ranges of an audio SIGNAL." RMIB Ex. 33 at 139. Likewise, the *Modern Dictionary of Electronics* describes equalization as: "Reshaping the playback characteristics of a recording during playback mode. The simplest way is to adjust the treble and bass controls, but true equalization requires continuous adjustment of the playback frequency response curve at several points. A graphic equalizer is often used for this." RMIB Ex. 34 at 262. And *Webster's New World Dictionary of Media and Communications* defines it as "the process of altering the frequency response of an audio signal, as with a tone control or other device (equalizer)." RMIB Ex. 35 at 213.

equalization describes the relative strength of frequency ranges in audio data. RMIB Ex. 7 at ¶¶ 58-59.

Sonos and Staff contend that the asserted claims of the '959 patent each require a "playback device" that is operable to "configure [itself] to perform a [first/second] *equalization of the audio data* before outputting audio based on the audio data from the [playback device's] plurality of speaker drivers when the [playback device's] type of pairing is determined to comprises [a first/second] type of pairing." CMIB at 45 (citing '959 patent, cl. 10) (emphasis in original); SMIB at 16. They therefore submit that the plain language of the claims supports their construction of equalization as "modifying the output audio data." CMIB at 45-46; SMIB at 16-17. The undersigned disagrees. Claim 5 recites, in relevant part: "wherein in the first type of pairing, the playback device is configured to output audio comprising two channel sound via the plurality of speaker drivers, and wherein in the second type of pairing, the playback device is configured to output audio comprising no more than one channel of the two channel sound via the plurality of speaker drivers, … ." '959 patent, cl. 5. Claim 5 then describes performing a "first equalization" and a "second equalization" of the audio data. *Id*. Thus, contrary to Sonos' and Staff's assertion that equalization includes any type of modification, the claim language clearly distinguishes equalization from other types of modifications such as switching from two-channel to one-channel sound (*i.e.*, changing channel output). Furthermore, the fact that dependent claims 2, 26, and 34 use the phrases "equalization [of the audio data]" <u>and</u> "modify the audio data" strongly suggests that the patentees intended for these terms to have different meanings.[19] *See SimpleAir, Inc. v.*

---

[19] Sonos argues that dependent claims 2, 24, and 36 support its construction because they specify that "performing the first equalization comprises using a first type of pass filter to modify the audio data before outputting audio based on the audio data." CMIB at 45. Sonos believes that this language shows that equalization "involves modifying the audio data." *Id*. There is no dispute that equalization involves modifying audio data. The question is whether equalization covers *all* forms of modifying audio data, even modifications that do not alter the relative strength of frequency ranges. Contrary to Sonos' contention, the dependent claims actually support Google's proposal. These claims specify that

*Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 431 (Fed. Cir. Cir. 2016); *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.,* 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings.") (citation omitted).

Nor is the undersigned persuaded by Sonos' and Staff's argument that the specification's use of non-limiting language like "might" and "may" indicates that the inventors meant for "equalization of the audio data" to have broad scope. CMIB at 47; SMIB at 18. Sonos and Staff cite to the following passages from the specification in support:

> Changing the equalization of the playback device might include any of: turning on or off (or effectively muting) one or more specific speaker drivers, changing the channel output of one or more speaker drivers, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, changing the amplifier gain of the playback device as a whole.

'959 Patent at 16:20-27.

> In certain embodiments, changing the equalization of a playback device (e.g., changing the equalization of one or more speaker drivers of the playback device) may affect frequency dependent parameters. Examples might include the adjustment of the strength of frequencies within the audio data, a phase adjustment, and time-delay adjustment. In addition, a particular equalization may use a first type of pass filter, such as one that attenuates high, middle, or low frequencies, for example, while allowing other frequencies to pass unfiltered (or substantially unfiltered).

*Id*. at 16:28-47. However, these passages describe equalization of *the playback device*, not the audio data as recited in the claims. Sonos' and Staff's argument therefore presumes that the inventors equated equalization of the playback device to equalization of the audio data. The undersigned does not believe the specification is clear on this. What is clear is that these sections do not broadly define or characterize equalization as "modifying the output audio data," as Sonos and Staff suggest. Using non-limiting language is not enough to overcome the presumption that

---

equalization is accomplished through use of a pass filter, which a person of ordinary skill in the art would understand is one mechanism for altering the relative strength of frequency ranges in audio data. RMIB Ex. 7 at ¶ 38.

the plain and ordinary meaning of "equalization" applies. As Google notes, "[t]o act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plan and ordinary meaning." *Thorner v. Sony Comp. Entm't Amer. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). In addition, the cited sections appear to identify different techniques that **might** be used to perform equalization of audio data. For example, they could be used to perform other modifications – such as volume adjustments[20] – which the specification distinguishes from equalization. '959 patent at 12:10-11.[21] As Dr. Jeffay explained at length in his declaration, a person of ordinary skill in the art would understand that these techniques do not necessarily result in equalization of the audio data, but rather that they must be performed in a way that actually alters the relative strength of frequency ranges in the audio data. RMIB Ex. 7 at ¶¶ 65-78.

For these reasons, the undersigned hereby construes the term "equalization [of the audio data]" as "***alteration of the relative strength of certain frequency ranges in the audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters***."

> **b)** **"type of pairing" / "first type of pairing" / "second type of pairing"**

The terms "type of pairing," "first type of pairing," and "second type of pairing" appear in independent claims 5, 9, and 10 of the '959 patent. The parties disagree on the proper claim construction and have proposed the following constructions:

---

[20] Under Sonos' and Staff's construction, equalization would occur any time one or more speaker drivers are muted or turned off, any time the gain of an individual driver is adjusted, or any time audio data is modified by adjusting channel output. Their interpretation conflates equalization with any modification that results from performing techniques like adjusting driver gain or channel output and essentially reads out "equalization" from the claims. *See Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored.").

[21] This distinction is further evidence that the patentee did not intend for "equalization" to encompass **any** modification of the audio data.

| Sonos | Google | Staff |
|---|---|---|
| A "type of pairing" can be either a pairing configuration involving two or more playback devices that have different playback roles, such as a stereo pair or home theater configuration, or a 'no pairing' in which the playback device is not part of a pairing configuration involving two or more playback devices | The term "pairing" means "configuration involving two or more playback devices that have different playback roles." The terms "type", "first type", and "second type" should have their plain and ordinary meaning. | Plain and ordinary meaning; no construction necessary |

JC at 6.

The parties have agreed that the term "pairing" means a "configuration involving two or more playback devices that have different playback roles." *See* Section VI.A; JC at 2. Nor do they contest the meaning of the terms "type," "first type," and "second type." *See generally* CMIB at 48-50; CMRB at 24-25; RMIB at 19-21; RMRB at 10-11; SMIB at 21-22. Rather, the parties' disagreement centers on whether a "no pairing" is a "type of pairing." CMIB at 48-50; CMRB at 24; RMIB at 18-21; SMIB at 21-22.

The intrinsic evidence expressly discloses that a "no pairing" is a "type of pairing." Nonasserted claims 3 and 16 both recite "wherein the first type of pairing comprises no pairing":

3. The playback device of claim [1] *10,* wherein the first type of pairing comprises no pairing with another playback device and the second type of pairing comprises pairing with one or more additional playback devices.

16. The method of claim [14] *19,* wherein the first type of pairing comprises no pairing with another playback device and the second type of pairing comprises pairing with one or more additional playback devices.

'959 patent, cls. 3, 6. The specification likewise describes a "no pairing" as a "type of pairing":

Further, it is understood that going from a configuration of *no pairing (unpaired or non paired)* to a configuration of pairing or from one kind of pairing (e.g., a pairing used in a type of stereo mode or theater mode) to a different kind of pairing (e.g., another pairing used in a type of stereo mode or theater mode) *are all various types of "pairing" that can occur according to certain embodiments.* In addition,

disengaging a pairing between multiple playback devices might go from pairing to no pairing or from pairing of a first kind back to pairing of a previous kind, for example.

In one example, *a first type of pairing might include "no pairing" with another playback device* and a second type of pairing might include pairing with one or more additional playback devices.

*Id*. at 15:48-61 (emphasis added).

Google does not dispute the clear teachings of the patent. *See generally* RMIB at 18-21. Rather, Google argues: "[J]udicial estoppel bars Sonos from advancing a construction of 'pairing' that is inconsistent with its position in the *Denon* litigation." *Id*. at 21. The undersigned is not convinced by Google's argument. *See New Hampshire v. Maine,* 532 U.S. 742, 750 (2001) (listing factors that inform the decision of whether the doctrine of judicial estoppel applies). Staff (like Sonos) proposes that the term "type of pairing" covers "no pairing." SMIB at 21-22. Staff was not a party to the *Denon* litigation. Thus, Google's judicial estoppel argument cannot apply to Staff. Furthermore, the undersigned agrees with Sonos that construing the term "type of pairing" to include a "no pairing" is consistent with the parties' agreed upon construction of "pairing." As Sonos explained, "[i]n ordinary language, the concept of 'type' frequently covers both (1) a category of possible variations and (2) the alternative 'none of the above.'" CMIB at 50.

Having rejected Google's judicial estoppel argument, the undersigned must now decide between Sonos' and Staff's proposed constructions. Words of a claim are generally given their ordinary and customary meaning as understood by one of ordinary skill in the art. *Phillips*, 415 F.3d at 1312-13; *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012). Because the meaning on these terms is apparent from the plain language of the claims, as well as the specification, the undersigned agrees with Staff that no further construction is necessary.

- 49 -

For these reasons, the terms "type of pairing," "first type of pairing," and "second type of pairing" shall be construed in accordance with their plain and ordinary meaning.

Within seven days of the date of this document, the parties shall submit to the Office of the Administrative Law Judges a joint statement as to whether or not they seek to have any portion of this document deleted from the public version. If the parties do seek to have portions of this document deleted from the public version, they must submit to this office a copy of this document with red brackets indicating the portion or portions asserted to contain confidential business information. The submission may be made by email and/or hard copy by the aforementioned date and need not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock
Chief Administrative Law Judge

**CERTAIN AUDIO PLAYERS AND CONTROLLERS,
COMPONENTS THEREOF, AND PRODUCTS CONTAINING
SAME**

**Inv. No. 337-TA-1191**

## PUBLIC CERTIFICATE OF SERVICE

    I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served via EDIS upon the Commission Investigative Attorney, **Cortney Hoecherl, Esq**., and the following parties as indicated, on October 6, 2020.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**On Behalf of Complainant Sonos, Inc.:**

Jordan L. Coyle, Esq.
**ORRICK, HERRINGTON, & SUTCLIFF LLP**
Columbia Center
1152 15th Street, NW
Washington, DC 20005
Email: jcoyle@orrick.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**On Behalf of Respondents Google LLC:**

S. Alex Lasher, Esq.
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Email: alexlasher@quinnemanuel.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

| Official Received Date | Doc ID - Sec Level | Investigation Information (Document Type, Document Title, Filed by, Firm, on Behalf of) |
|---|---|---|
| 01/07/2020 | (698562 - Public) | Complaint, Public Complaints and Exhibits, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/07/2020 | (698563 - Confiden-tial) | Complaint, Confidential Exhibits to the Public Complaint, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/08/2020 | (698674 - Public) | Complaint, Appendix A, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/08/2020 | (698675 - Public) | Complaint, Appendix B, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/08/2020 | (698676 - Public) | Complaint, Appendix C, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/08/2020 | (698677 - Public) | Complaint, Appendix D, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/08/2020 | (698678 - Public) | Complaint, Appendix E, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/08/2020 | (698701 - Public) | Notice, Receipt of Complaint; Solicitation of Comments Relating to the Public Interest, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/09/2020 | (698680 - Public) | Complaint, Appendix G, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/09/2020 | (698679 - Public) | Complaint, Appendix F, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/09/2020 | (698810 - Public) | Complaint, Appendix H, Part 1, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698818 - Public) | Complaint, Appendix H, Part 4, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698812 - Public) | Complaint, Appendix H, Part 2, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698815 - Public) | Complaint, Appendix H, Part 3, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698819 - Public) | Complaint, Appendix H, Part 5, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698829 - Public) | Complaint, Appendix H, Part 6, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698830 - Public) | Complaint, Appendix H, Part 7, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698839 - Public) | Complaint, Appendix H, Part 8, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698841 - Public) | Complaint, Appendix H, Part 9, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698845 - Public) | Complaint, Appendix H, Part 10, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| 01/10/2020 | (698856 - Public) | Complaint, Appendix H, Part 11, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698860 - Public) | Complaint, Appendix H, Part 12, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698865 - Public) | Complaint, Appendix H, Part 13, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2020 | (698866 - Public) | Complaint, Appendix H, Part 14, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/15/2020 | (699373 - Public) | Notice, 85 FR 2147 F.R. Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/21/2020 | (699706 - Public) | Comments/Response to Comments, Submission in Public Interest from Champions Community Foundation, filed by Richard Thompson of Champions Community Foundation, Inc., on behalf of Champions Community Foundation, Inc. |
| 01/21/2020 | (699733 - Public) | Comments/Response to Comments, Submission in the Public Interest, filed by William Weis of William J. Weis and Deborah J. Weis, on behalf of William J. Weis and Deborah J. Weis |
| 01/21/2020 | (699763 - Public) | Complaint, CPX-1 - CPX-16, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/21/2020 | (699787 - Public) | Comments/Response to Comments, Statement on the Public Interest of the United Spinal Association, filed by James Weisman of United Spinal Association, on behalf of United Spinal Association |
| 01/22/2020 | (699838 - Public) | Comments/Response to Comments, Public Interest Comments from the Center for Democracy and Technology, filed by Avery Gardiner of Center for Democracy & Technology, on behalf of Center for Democracy & Technology |
| 01/22/2020 | (699918 - Public) | Comments/Response to Comments, Public Interest Comments from William J. Weis and Deborah J. Weis, filed by William Weis of William J. Weis and Deborah J. Weis, on behalf of William J. Weis and Deborah J. Weis |
| 01/22/2020 | (699942 - Public) | Comments/Response to Comments, Public Interest Comments from R Street Institute, Public Knowledge, and Innovation Defense Foundation, filed by K William Watson of R Street Institute, on behalf of R Street Institute, Public Knowledge, and Innovation Defense Foundation |
| 01/22/2020 | (699955 - Public) | Comments/Response to Comments, Public Interest Comments from Champions Community Foundation, Inc., filed by Richard Thompson of Champions Community Foundation, Inc., on behalf of Champions Community Foundation, Inc. |
| 01/22/2020 | (699962 - Public) | Comments/Response to Comments, Public Interest Comments from the American Foundation for the Blind, filed by Stephanie Enyart of American Foundation for the Blind, on behalf of American Foundation for the Blind |

| | | |
|---|---|---|
| 01/22/2020 | (699975 - Public) | Comments/Response to Comments, Public Interest Comments from American Council of the Blind, filed by Clark Rachfal of American Council of the Blind, on behalf of American Council of the Blind |
| 01/22/2020 | (699976 - Public) | Comments/Response to Comments, Public Interest Comments from the Computer & Communications Industry Association and Developer's Alliance, filed by Joshua Landau of Computer & Communications Industry Association, on behalf of Computer & Communications Industry Association and Developer's Alliance |
| 01/23/2020 | (700069 - Public) | Comments/Response to Comments, Request to File Public Interest Comments from Google LLC and Alphabet Inc. out of Time, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 01/24/2020 | (700251 - Public) | Correspondence - USITC, Letter to Google LLC and Alphabet Inc. Denying Request for Leave to File Public Interest Comment out of Time, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/27/2020 | (700416 - Public) | Comments/Response to Comments, Complainant's Reply to Written Submissions on the Public Interest, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/06/2020 | (701687 - Public) | Notice, Institution of Investigation, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/06/2020 | (701705 - Public) | Voting Sheet, OUII-20-001, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/06/2020 | (701740 - Public) | Notice, Notice of Assignment of CALJ Bullock, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/10/2020 | (701947 - Public) | Notice of Appearance, Notice of Appearance of Quinn Emanuel Urquhart & Sullivan LLP on Behalf of Google LLC and Alphabet Inc.; Designation of S. Alex Lasher as Lead Counsel, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 02/10/2020 | (702001 - Public) | Notice of Appearance, Notice of Appearance of Orrick, Herrington & Sutcliffe LLP on Behalf of Sonos, Inc.; Designation of Jordan Coyle as Lead Counsel, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/11/2020 | (702188 - Public) | Notice, 85 FR 7783 F.R. Notice Institution of Investigation, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/11/2020 | (702213 - Public) | Order, 1 Protective Order, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/11/2020 | (702215 - Public) | Order, 2 Notice of Ground Rules; Order Setting Date for Submission of Joint Discovery Statement, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |

| 02/13/2020 | (702561 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Clement S. Roberts, Bas de Blank, Jordan L. Coyle, Alyssa M. Caridis, Lillian J. Mao, Shane D. Anderson, Margaret Abernathy, George I. Lee, Sean M. Sullivan, Rory P. Shea, J. Dan Smith., Cole B. Richter, Michael P. Boyea, and Jae Y. Pak, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
|---|---|---|
| 02/19/2020 | (702881 - Public) | Notice of Appearance, Supplemental Notice of Appearance; Additional Attorneys from White and Case on Behalf of Google LLC, filed by Shamita Etienne-Cummings of White and Case, on behalf of Google LLC |
| 02/19/2020 | (702883 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Shamita Etienne-Cummings, filed by Shamita Etienne-Cummings of White and Case, on behalf of Google LLC |
| 02/19/2020 | (702895 - Public) | Request for Confidential Materials, Request for Confidential Materials on Behalf of Google LLC, filed by Shamita Etienne-Cummings of White and Case, on behalf of Google LLC |
| 02/19/2020 | (702956 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of S. Alex Lasher, Carl Spilly, Charles K. Verhoeven, Danielle Shrader-Frechette, Jared W. Newton, Justin C. Griffin, K. Kevin Chu, Kevin Jang, Lance Yang, Marissa R. Ducca, Ogi Zivojnovic, Patrick D. Curran, Sean S. Pak, and Seung Woo Ben Hur, filed by Joseph LeRoy of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 02/26/2020 | (703534 - Public) | Discovery Statement, The Parties' Joint Discovery Statement, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 02/27/2020 | (703623 - Public) | Answer to Complaint, Respondents' Response to the Complaint and Notice of Investigation, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 02/27/2020 | (703624 - Confidential) | Answer to Complaint, Confidential Appendix A to Respondents' Response to the Complaint and Notice of Investigation, filed by K. Kevin Chu of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 03/03/2020 | (703895 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of James Judah, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 03/04/2020 | (704095 - Public) | Memorandum, CO86-SS-002 Recusal, filed by Rhonda K. Schmidtlein of USITC, on behalf of Office of the Commissioners |
| 03/10/2020 | (704562 - Public) | Discovery Statement, Discovery Committee Report for February 2020, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |

| 03/10/2020 | (704586 - Confiden-tial) | Motion, 1191-001 Complainant's Motion to Strike Respondents' Affirmative Defenses, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
|---|---|---|
| 03/11/2020 | (704680 - Public) | ID/RD - Other Than Final on Violation, 3 Initial Determination Setting a 19-Month Target Date, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 03/13/2020 | (704875 - Public) | Order, 4 Setting Date for Submission of Joint Proposed Procedural Schedule, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 03/16/2020 | (705019 - Public) | Other, Stipulation among the Private Parties, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, and Alphabet Inc. |
| 03/17/2020 | (705106 - Public) | Motion, 1191-001 Complainant's Motion to Strike Respondents' Affirmative Defenses, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 03/19/2020 | (705407 - Public) | Motion, 1191-001 Complainant's Notice of Withdrawal of Its Motion to Strike Respondents' Affirmative Defenses, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 03/23/2020 | (705573 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Jeffrey W. Nardinelli, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 03/24/2020 | (705999 - Public) | Response/Submission to ALJ Order, 4 Joint Proposed Procedural Schedule, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 03/26/2020 | (706160 - Public) | Order, 5 Setting the Procedural Schedule, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 03/26/2020 | (706242 - Public) | Motion, 1191-002 6 Respondents' Unopposed Motion for Leave to Amend Their Response to the Complaint and Notice of Investigation, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 04/02/2020 | (706774 - Public) | Order, 1191-002 6 Granting Respondents' Unopposed Motion for Leave to Amend Their Response to the Complaint and Notice of Investigation, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 04/03/2020 | (706958 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Geoffrey Moss, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 04/03/2020 | (707003 - Public) | Answer to Complaint, Respondents' Amended Response to the Complaint and Notice of Investigation, filed by Joseph LeRoy of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |

**INVESTIGATION REPORT**      Date/Time: 05/3/2022, 12:00 PM
**Investigation No. 337-TA-1191**      Page 6 of 37
     **Total Records = 446**

| | | |
|---|---|---|
| 04/07/2020 | (707113 - Public) | Motion, 1191-003 The Private Parties' Unopposed Joint Motion to Conduct the First Settlement Conference via Telephone, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, and Alphabet Inc. |
| 04/08/2020 | (707259 - Public) | Order, 1191-003 7 Granting the Private Parties' Unopposed Joint Motion to Conduct the First Settlement Conference via Telephone, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 04/09/2020 | (707378 - Public) | Notice, 3 Commission Determination Not to Review an Initial Determination Setting a 19-Month Target Date, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 04/13/2020 | (707555 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Kevin C. Almeroth and Jon B. Weissman, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 04/13/2020 | (707672 - Public) | Discovery Statement, Discovery Committee Report for March 2020, filed by Joseph LeRoy of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 04/13/2020 | (707683 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Michael K. Milani, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 04/21/2020 | (708417 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Rabi Fiotto, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 04/23/2020 | (708727 - Public) | Voting Sheet, GC-20-105, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 04/23/2020 | (708788 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Joshua Goshorn, Kevin Jeffay, and Dan Schonfeld, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 04/24/2020 | (708823 - Public) | Witness List, Commission Investigative Staff's Identification of Expert Witnesses, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 04/24/2020 | (708897 - Public) | Witness List, Complainant's Identification of Expert Witnesses, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 04/27/2020 | (708989 - Public) | Witness List, Respondents' Initial Identification of Expert Witnesses, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 04/28/2020 | (709030 - Public) | Motion, 1191-004 Unopposed Joint Motion to Amend the Protective Order, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, and Alphabet Inc. |
| 04/29/2020 | (709148 - Public) | Order, 1191-004 8 Granting Unopposed Joint Motion to Amend the Protective Order, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |

| | | |
|---|---|---|
| 05/04/2020 | (709471 - Public) | Motion, 1191-005 Joint Motion to Extend Certain Claim Construction-Related Dates in the Procedural Schedule, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 05/05/2020 | (709551 - Public) | Order, 1191-005 9 Granting Joint Motion to Extend Certain Claim Construction-Related Dates in the Procedural Schedule, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 05/08/2020 | (709959 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Sarah Butler and Marc E. Levitt, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 05/11/2020 | (710111 - Public) | Discovery Statement, Discovery Committee Report for April 2020, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 05/18/2020 | (710581 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Nicole Amato, John Brown, Malik Burroughs, Carole Cleaver, Freddy Cuellar, Leslie Gibson, Nola Jose, Peter Keilty, Christina Ku, Ronald Lindsey, Justin Logan, David Mayo, Alcides Mulgrave, Miguel Ortiz, Michael Paul, and Vinod Shankar, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 05/22/2020 | (710943 - Public) | Motion, 1191-006 10 Respondents' Unopposed Motion for Leave to Amend Initial Identification of Expert Witnesses, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 05/26/2020 | (711002 - Public) | Motion, 1191-007 Joint Motion to Extend Certain Dates in the Procedural Schedule, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 05/27/2020 | (711106 - Public) | Order, 1191-006 10 Granting Respondents' Unopposed Motion for Leave to Amend Initial Identification of Expert Witnesses, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 05/27/2020 | (711107 - Public) | Order, 1191-007 11 Granting Joint Motion to Extend Certain Dates in the Procedural Schedule, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 05/27/2020 | (711168 - Public) | Witness List, Respondents' Amended Initial Identification of Expert Witnesses, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 06/01/2020 | (711522 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Olamide Olusesi, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| 06/08/2020 | (712164 - Public) | Order, 12 Canceling Markman Hearing, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
|---|---|---|
| 06/10/2020 | (712438 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Cole Hershkowitz and Erick Herring, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 06/10/2020 | (712439 - Public) | Motion, 1191-008 13 Joint Motion to Extend Certain Dates in the Procedural Schedule, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 06/11/2020 | (712448 - Public) | Discovery Statement, Discovery Committee Report for May 2020, filed by Jordan Coyle of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 06/11/2020 | (712482 - Public) | Order, 1191-008 13 Granting Joint Motion to Extend Certain Dates in the Procedural Schedule, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 06/18/2020 | (713006 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Carla Mulhern, Stephen Prowse, and Matthew Shoemake, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 06/19/2020 | (713021 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Evan Brewer, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 06/19/2020 | (713031 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Ryan Black and April Carter, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 06/23/2020 | (713223 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Richard Inthasoroth, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 06/25/2020 | (713393 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Christine Hotsko and Josh Boria, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 06/25/2020 | (713414 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Martin Rinard, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 07/02/2020 | (713880 - Public) | Brief Filed With ALJ, Respondents' Initial Markman Brief, filed by Joseph LeRoy of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 07/02/2020 | (713881 - Public) | Brief Filed With ALJ, Complainant Sonos, Inc.'s Opening Claim Construction Brief, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 07/10/2020 | (714290 - Public) | Notice of Prior Art, Office of Unfair Import Investigation's Notice of Prior Art, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |

| 07/10/2020 | (714336 - Public) | Notice of Prior Art, Complainant Sonos, Inc.'s Notice of Prior Art, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 07/10/2020 | (714359 - Public) | Notice of Prior Art, Respondents Google LLC and Alphabet Inc.'s Notice of Prior Art, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 07/13/2020 | (714442 - Public) | Brief Filed With ALJ, Commission Investigative Staff's Initial Markman Brief, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 07/13/2020 | (714477 - Public) | Discovery Statement, Discovery Committee Report for June 2020, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 07/20/2020 | (715080 - Confidential) | Brief Filed With ALJ, Respondents' Rebuttal Markman Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 07/20/2020 | (715086 - Public) | Brief Filed With ALJ, Complainant Sonos, Inc.'s Rebuttal Claim Construction Brief, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 07/23/2020 | (715473 - Public) | Other, Joint Proposed Claim Construction Chart, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 07/27/2020 | (715591 - Public) | Motion, 1191-009 14 Joint and Unopposed Motion to Extend the Mediation Deadlines, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, and Alphabet Inc. |
| 07/28/2020 | (715795 - Public) | Order, 1191-009 14 Granting Joint and Unopposed Motion to Extend the Mediation Deadlines, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 08/04/2020 | (716391 - Public) | Motion, 1191-010 Joint and Unopposed Motion to Extend Fact Discovery Deadlines, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, and Alphabet Inc. |
| 08/05/2020 | (716409 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Matthew Sampson, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/05/2020 | (716470 - Public) | Order, 1191-010 15 Granting Joint and Unopposed Motion to Extend, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 08/07/2020 | (716710 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of James Gagen and Emily Lipka, filed by Shamita Etienne-Cummings of White and Case, on behalf of Google LLC and Alphabet Inc. |

| 08/07/2020 | (716711 - Public) | Notice of Appearance, Supplemental Notice of Appearance; Additional Attorneys from White and Case on Behalf of Alphabet Inc., filed by Shamita Etienne-Cummings of White and Case, on behalf of Alphabet Inc. |
|---|---|---|
| 08/10/2020 | (716844 - Public) | Discovery Statement, Discovery Committee Report for July 2020, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 08/18/2020 | (717656 - Confidential) | Motion, 1191-011 19 Complainant Sonos, Inc.'s Motion to Strike Hypothetical Redesigns and Request to Shorten Time, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/20/2020 | (717739 - Confidential) | Motion Response/Reply, 1191-011 Respondents' Opposition to Complainant's Request for Shortened Time to Respond to its Motion to Strike Google's Redesigns, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc. |
| 08/20/2020 | (717740 - Public) | Order, 1191-011 16 Denying Complainant's Request for Shortened Response Time, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 08/21/2020 | (717868 - Public) | Motion, 1191-012 18 Complainant's Motion to Terminate the Investigation in Part as to Respondent Alphabet Inc. Based on Withdrawal of Allegations in Complaint, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/25/2020 | (718143 - Public) | Motion, 1191-013 17 Joint and Unopposed Motion to Extend Certain Deadlines, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, and Alphabet Inc. |
| 08/26/2020 | (718150 - Public) | Motion, 1191-011 19 Complainant Sonos, Inc.'s Motion to Strike Hypothetical Redesigns and Request to Shorten Time, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/26/2020 | (718165 - Public) | Order, 1191-013 17 Granting Joint and Unopposed Motion to Extend Certain Deadlines, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 08/26/2020 | (718173 - Public) | Motion Response/Reply, 1191-012 Commission Investigative Staff's Response to Complainant's Motion to Terminate the Investigation in Part as to Respondent Alphabet Inc. Based on Withdrawal of Allegations in Complaint, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 08/26/2020 | (718245 - Confidential) | Other, Joint Stipulation between Complainant and Google LLC regarding Importation, Jurisdiction, and Inventory, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |

08/27/2020 (718303 - Confiden-tial) Motion Response/Reply, 1191-011 Commission Investigative Staff's Response to Complainant Sonos, Inc.'s Motion to Strike, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations

08/27/2020 (718324 - Confiden-tial) Motion, 1191-014 Complainant Sonos, Inc.'s Motion for Summary Determination That the Importation Requirement Is Satisfied with Respect to Respondent Google, Inc. and the Accused Products, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

08/28/2020 (718408 - Confiden-tial) Motion Response/Reply, 1191-011 Respondents' Opposition to Complainant's Motion to Strike Google's Redesigns, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc.

09/01/2020 (718577 - Public) ID/RD - Other Than Final on Violation, 1191-012 18 Initial Determination Granting Complainant's Motion to Terminate the Investigation in Part as to Respondent Alphabet Inc. Based on withdrawal of Allegations in Complaint, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge

09/02/2020 (718720 - Confiden-tial) Motion, 1191-011 Supplemental Brief in Support of Complainant Sonos, Inc.'s Motion to Strike Hypothetical Redesigns, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

09/03/2020 (718851 - Public) Motion, 1191-014 Complainant Sonos, Inc.'s Motion for Summary Determination That the Importation Requirement Is Satisfied with Respect to Respondent Google, Inc. and the Accused Products, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

09/04/2020 (718874 - Confiden-tial) Motion Response/Reply, 1191-011 Respondents' Response to Complainant's "Supplemental Brief" in Support of Its Motion to Strike Google's Redesigns, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC and Alphabet Inc.

09/04/2020 (718880 - Confiden-tial) Order, 1191-011 19 Denying Complainant Sonos, Inc.'s Motion to Strike Hypothetical Redesigns, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge

09/04/2020 (718911 - Confiden-tial) Motion, 1191-014 Corrected Complainant Sonos, Inc.'s Motion for Summary Determination That the Importation Requirement Is Satisfied with Respect to Respondent Google, Inc. and the Accused Products, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

09/08/2020 (719111 - Public) PO Subscription, Agreement to Be Bound by the Protective Order of Michael C. Chow, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

| 09/10/2020 | (719275 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Christina Hotsko, Eliza Spikes, and Scott Forman, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/10/2020 | (719320 - Public) | Motion, Supplemental Brief in Support of Complainant Sonos, Inc.'s Motion to Strike Hypothetical Redesigns, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/10/2020 | (719327 - Public) | Discovery Statement, Discovery Committee Report for August 2020, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc., Google LLC, Alphabet Inc., and Office of Unfair Important Investigations |
| 09/15/2020 | (719623 - Public) | Motion, 1191-014 Corrected Complainant Sonos,, Inc.'s Motion for Summary Determination That the Importation Requirement Is Satisfied with Respect to Respondent Google, Inc. and the Accused Products, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/17/2020 | (719871 - Public) | Order, 1191-011 19 Denying Complainant Sonos, Inc.'s Motion to Strike Hypothetical Redesigns, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 09/21/2020 | (720100 - Public) | Notice, 18 Commission Determination Not to Review an Initial Determination Terminating the Investigation in Part as to Respondent Alphabet Inc., filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 09/22/2020 | (720203 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Elgin Lee, filed by Kevin Jang of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 09/22/2020 | (720231 - Confidential) | Motion, 1191-015 23 Complainant's Motion to Compel Responses to Interrogatory Nos. 2-7, 61-65, 67, and 70, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/23/2020 | (720276 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Jazzmin Musrati and Solomon Francis, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/23/2020 | (720350 - Confidential) | Motion, 1191-016 22 Complainant's Motion to Compel Production of Physical Samples of Alleged Redesigns, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/24/2020 | (720388 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Denise Brunet, Jeffrey Elam, Robyn Bosworth, and Tina Alfaro, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/24/2020 | (720439 - Confidential) | Motion, 1191-017 24 Complainant's Motion for Leave to Amend Infringement Contentions, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| | | |
|---|---|---|
| 09/25/2020 | (720491 - Confidential) | Order, 20 Construing the Terms of the Asserted Claims of the Patents at Issue, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 09/28/2020 | (720603 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Bonnie Russo, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/29/2020 | (720703 - Public) | Motion, 1191-015 23 Complainant's Motion to Compel Responses to Interrogatory Nos. 2-7, 61-65, 67, and 70, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/30/2020 | (720741 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Nancy Martin, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/30/2020 | (720821 - Public) | Motion, 1191-016 22 Complainant's Motion to Compel Production of Physical Samples of Alleged Redesigns, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 10/01/2020 | (720921 - Public) | Motion, 1191-017 24 Complainant's Motion for Leave to Amend Infringement Contentions, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 10/02/2020 | (721065 - Public) | Motion, 1191-018 21 Unopposed Motion for Leave to Conduct Deposition out of Time, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/02/2020 | (721076 - Confidential) | Motion Response/Reply, 1191-015 Google's Opposition to Complainant's Motion to Compel Responses to Interrogatory Nos. 2-7, 61-65, 67, and 70, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/05/2020 | (721103 - Confidential) | Motion Response/Reply, 1191-015 Commission Investigative Staff's Response to Complainant's Motion to Compel Responses to Interrogatory Nos. 2-7, 61-65, 67, and 70, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 10/05/2020 | (721173 - Confidential) | Motion Response/Reply, 1191-017 Commission Investigative Staff's Response to Complainant's Motion for Leave to Amend Infringement Contentions, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 10/05/2020 | (721175 - Confidential) | Motion Response/Reply, 1191-016 Commission Investigative Staff's Response to Complainant's Motion to Compel Physical Samples of Alleged Redesigns, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 10/05/2020 | (721198 - Confidential) | Motion Response/Reply, 1191-016 Respondent's Opposition to Complainant's Motion to Compel Production of Physical Samples of Alleged Redesigns, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |

| | | |
|---|---|---|
| 10/05/2020 | (721203 - Confidential) | Motion Response/Reply, 1191-017 Respondents' Opposition to Complainant's Motion for Leave to Amend Infringement Contentions, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/06/2020 | (721237 - Public) | Order, 1191-018 21 Granting Unopposed Motion for Leave to Conduct Deposition out of Time, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/06/2020 | (721265 - Public) | Order, 20 Construing the Terms of the Asserted Claims of the Patents at Issue, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/07/2020 | (721439 - Confidential) | Motion, 1191-019 Respondent Google's Motion to Compel Complainant Sonos to Produce Documents and Respond to Discovery Requests, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/08/2020 | (721574 - Public) | Order, 1191-016 22 Granting Complainant's Motion to Compel Production of Physical Samples of Alleged Redesigns, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/08/2020 | (721597 - Confidential) | Motion, 1191-020 24 Complainant's Motion for Leave to File Reply in Support of Motion to Amend Infringement Contentions, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 10/09/2020 | (721712 - Public) | Motion Response/Reply, 1191-015 Google's Opposition to Complainant's Motion to Compel Further Responses to Interrogatory Nos. 2-7, 61-65, 67 and 70, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/13/2020 | (721781 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Dave Nelson, filed by K. Kevin Chu of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/13/2020 | (721853 - Confidential) | Order, 1191-015 23 Granting Complainant Sonos, Inc.'s Motion to Compel Responses to Interrogatory Nos. 2-7, 61-65, 67, and 70, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/13/2020 | (721953 - Public) | Motion Response/Reply, 1191-017 Respondents' Opposition to Complainant's Motion for Leave to Amend Infringement Contentions, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/13/2020 | (721954 - Public) | Motion Response/Reply, 1191-016 Respondents' Opposition to Complainant's Motion to Compel Production of Physical Samples of Alleged Redesigns, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/13/2020 | (721962 - Public) | Motion, 1191-021 26 Joint and Unopposed Motion to Extend Expert Discovery Deadlines, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |

| 10/15/2020 | (722202 - Public) | Motion, 1191-019 25 Respondent Google's Motion to Compel Complainant Sonos to Produce Documents and Respond to Discovery Requests, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
|---|---|---|
| 10/16/2020 | (722339 - Public) | Motion, 1191-020 24 Complainant's Motion for Leave to File Reply in Support of Motion to Amend Infringement Contentions, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 10/19/2020 | (722508 - Confidential) | Motion Response/Reply, 1191-019 Complainant's Response to Respondent's Motion to Compel, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 10/20/2020 | (722612 - Public) | Order, 1191-015 23 Granting Complainant Sonos, Inc.'s Motion To Compel Responses to Interrogatory Nos. 2-7, 61-65, 67, and 70, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/20/2020 | (722615 - Confidential) | Order, 1191-017 24 Denying Complainant's Motion for Leave to Amend Infringement Contentions, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/20/2020 | (722655 - Confidential) | Motion, 1191-022 28 Google's Motion for Leave to Amend Its Response to the Complaint and Notice of Investigation, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/21/2020 | (722736 - Confidential) | Order, 1191-019 25 Granting in Part Respondent Google LLC's Motion to Compel Complainant Sonos to Produce Documents and Respond to Discovery Requests, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/23/2020 | (723077 - Public) | Witness List, Commission Investigative Staff's Tentative Witness List, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 10/23/2020 | (723109 - Public) | Witness List, Respondent's Tentative Witness List, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/23/2020 | (723135 - Public) | Witness List, Complainant Sonos, Inc.'s Tentative Witness List, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 10/26/2020 | (723281 - Public) | Motion Response/Reply, 1191-019 Complainant's Response to Respondent's Motion to Compel, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 10/27/2020 | (723361 - Public) | Order, 1191-021 26 Granting Joint and Unopposed Motion to Extend Expert Discovery Deadlines, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |

| | | |
|---|---|---|
| 10/27/2020 | (723367 - Confidential) | ID/RD - Other Than Final on Violation, 1191-014 27 Initial Determination Granting Complainant Sonos, Inc.'s Motion for Summary Determination That the Importation Requirement Is Satisfied with Respect to Respondent Google, Inc. and the Accused Products, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/28/2020 | (723418 - Public) | Motion, 1191-022 Google's Motion for Leave to Amend Its Response to the Complaint and Notice of Investigation, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 10/28/2020 | (723441 - Public) | Order, 1191-019 25 Granting in Part Respondent Google LLC's Motion to Compel Complainant Sonos to Produce Documents and Respond to Discovery Requests, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/30/2020 | (723758 - Confidential) | Motion Response/Reply, 1191-022 Commission Investigative Staff's Response to Google's Motion for Leave to Amend its Response to the Complaint and Notice of Investigation, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 10/30/2020 | (723782 - Confidential) | Motion Response/Reply, 1191-002 Complainant's Response to Respondent's Motion to Amend, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 11/03/2020 | (723922 - Public) | ID/RD - Other Than Final on Violation, 1191-014 27 Initial Determination Granting Complainant Sonos, Inc.'s Motion for Summary Determination That the Importation Requirement Is Satisfied with Respect to Respondent Google, Inc. and the Accused Products, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 11/05/2020 | (724248 - Public) | Voting Sheet, GC-20-260, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 11/06/2020 | (724349 - Public) | Motion Response/Reply, 1191-022 Complainant's Response to Respondent's Motion to Amend, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 11/09/2020 | (724370 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Sten Jensen and Johannes Hsu, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 11/10/2020 | (724512 - Confidential) | Order, 1191-022 28 Granting in Part Respondent Google LLC'S Motion for Leave to Amend Its Response to the Complaint and Notice of Investigation, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 11/16/2020 | (725276 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Scott L. Watson, filed by K. Kevin Chu of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |

**INVESTIGATION REPORT**       **Date/Time: 05/3/2022, 12:00 PM**
**Investigation No. 337-TA-1191**       **Page 17 of 37**
     **Total Records = 446**

| 11/24/2020 | (726239 - Public) | Motion, 1191-023 29 The Private Parties' Joint and Unopposed Motion to Amend the Procedural Schedule, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |
| 11/24/2020 | (726247 - Public) | Notice, 27 Commission Determination Not to Review an Initial Determination Granting Summary Determination That the Importation Requirement Is Satisfied with Respect to Respondent Google LLC and the Accused Products, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 11/24/2020 | (726326 - Public) | Order, 1191-023 29 Granting the Private Parties' Joint and Unopposed Motion to Amend the Procedural Schedule, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 11/30/2020 | (726641 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Richard Martinelli, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/02/2020 | (726999 - Confidential) | Motion, 1191-024 31 Google's Motion to Strike the Rebuttal Expert Report of Sarah Butler or in the Alternative for Leave to Submit Rebuttal Expert Report of David Reibstein, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 12/04/2020 | (727212 - Confidential) | Motion, 1191-025 Complainant Sonos, Inc.'s Motion for Summary Determination That the Economic Prong of Domestic Industry Is Satisfied, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/04/2020 | (727261 - Confidential) | Motion, 1191-026 32 Complainant Sonos, Inc.'s Unopposed Motion for Summary Determination That the Technical Prong of Domestic Industry Is Satisfied for U.S. Patent No. 8,588,949, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/08/2020 | (727417 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Lawrence Burns, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/08/2020 | (727489 - Public) | Motion, 1191-027 30 The Private Parties' Joint and Unopposed Motion to Amend the Procedural Schedule, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Sonos, Inc. and Google LLC |
| 12/09/2020 | (727547 - Public) | Order, 1191-027 30 Granting the Private Parties' Joint and Unopposed Motion to Amend the Procedural Schedule, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 12/10/2020 | (727604 - Public) | Voting Sheet, GC-20-316, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |

| | | |
|---|---|---|
| 12/11/2020 | (727783 - Public) | Motion, 1191-026 Complainant Sonos, Inc.'s Unopposed Motion for Summary Determination That the Technical Prong of Domestic Industry Is Satisfied for U.S. Patent No. 8,588,949, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/11/2020 | (727785 - Public) | Motion, 1191-025 Complaintant Sonos, Inc.'s Motion for Summary Determination That the Economic Prong of Domestic Industry Is Satisfied, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/14/2020 | (727924 - Confidential) | Motion Response/Reply, 1191-024 Commission Investigative Staff's Response to Google's Motion to Strike the Rebuttal Report of Sarah Butler or in the Alternative Leave to Submit Rebuttal Expert Report of David Reibstein, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 12/14/2020 | (727955 - Confidential) | Motion Response/Reply, 1191-024 Complainant Sonos, Inc.'s Opposition to Google's Motion to Strike the Rebuttal Expert Report of Sarah Butler or in the Alternative for Leave to Submit the Rebuttal Expert Report of David Reibstein, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/18/2020 | (728425 - Public) | Notice, Notice to the Parties regarding Amended Ground Rules, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 12/18/2020 | (728428 - Confidential) | Order, 1191-024 31 Granting in Part Respondent Google LLC'S Motion to Strike the Rebuttal Expert Report of Sarah Butler or in the Alternative, for Leave to Submit Rebuttal Expert Report of David Reibstein, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 12/21/2020 | (728671 - Public) | Motion Response/Reply, 1191-024 Complainant Sonos, Inc.'s Opposition to Google's Motion to Strike the Rebuttal Expert Report of Sarah Butler or in the Alternative for Leave to Submit the Rebuttal Expert Report of David Reibstein, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/23/2020 | (728813 - Public) | Exhibit List, Commission Investigative Staff's Proposed Direct Exhibits, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 01/04/2021 | (729364 - Confidential) | ID/RD - Other Than Final on Violation, 1191-026 32 Initial Determination Granting Complainant Sonos, Inc.'s Unopposed Motion for Summary Determination That the Technical Prong of Domestic Industry Is Satisfied for U.S. Patent No. 8,588,949, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 01/06/2021 | (729641 - Public) | Voting Sheet, GC-20-260, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |

| 01/06/2021 | (729682 - Public) | Motion, 1191-028 Google's Emergency Motion for Leave to Submit the Rebuttal Witness Statement of David Reibstein on January 15, 2021, and Request for Shortened Response Time, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
|---|---|---|
| 01/07/2021 | (729709 - Public) | Motion Response/Reply, 1191-028 Complainant Sonos, Inc's Opposition to Google's Request for Shortened Response Time, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/07/2021 | (729810 - Public) | Order, 1191-028 33 Shortening the Response Time to Respondent Google LLC's Emergency Motion, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 01/08/2021 | (729895 - Public) | Motion Response/Reply, 1191-028 Complainant Sonos, Inc.'s Opposition to Google's Motion for Leave to Submit Reibstein Witness Statement, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/08/2021 | (729962 - Public) | Order, 1191-028 34 Granting Emergency Motion for Leave to Submit Rebuttal Witness Statement of David Reibstein on January 15, 2021, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 01/12/2021 | (730319 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Dan L. Bagatell, filed by K. Kevin Chu of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 01/14/2021 | (730575 - Confidential) | ID/RD - Other Than Final on Violation, 1191-025 35 Initial Determination Granting Complainant Sonos, Inc.'s Unopposed Motion for Summary Determination That the Economic Prong of Domestic Industry Is Satisfied, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 01/19/2021 | (730906 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Joshua Rosenkranz, Edmund Hirschfeld, and Robert Manhas, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/21/2021 | (731374 - Public) | ID/RD - Other Than Final on Violation, 1191-026 32 Initial Determination Granting Complainant Sonos, Inc.'s Unopposed Motion for Summary Determination That the Technical Prong of Domestic Industry Is Satisfied for U.S. Patent No. 8,588,949, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 01/22/2021 | (731503 - Public) | Notice, Notice to the Parties regarding Supplemental Ground Rules for Video Hearings, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 01/22/2021 | (731571 - Confidential) | Pre-Hearing Statement, Respondent Google's Pre-Trial Statement, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |

| 01/22/2021 | (731578 - Confiden- tial) | Pre-Hearing Statement, Complainant Sonos, Inc.'s Pre-Trial Statement, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/22/2021 | (731606 - Confiden- tial) | Brief Filed With ALJ, Respondent Google's Pre-Hearing Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 01/22/2021 | (731610 - Confiden- tial) | Brief Filed With ALJ, Complainant Sonos, Inc.'s Pre-Hearing Brief, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/26/2021 | (731797 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Christopher R. Ottenweller, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/27/2021 | (731978 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of David Grosby, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/29/2021 | (732378 - Public) | Motion, 1191-029 36 Commission Investigative Staff's Unop- posed Motion for Extension of Time, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 01/29/2021 | (732420 - Public) | Notice, Notice of Errata to Supplemental Ground Rules, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/01/2021 | (732517 - Public) | Order, 1191-029 36 Granting the Commission Investigative Staff's Unopposed Motion for Extension of Time, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/01/2021 | (732610 - Public) | Motion, 1191-030 48 Complainant Sonos, Inc.'s Unopposed Re- quest for Receipt of Evidence without a Sponsoring Witness, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/02/2021 | (732749 - Public) | Notice, 32 Commission Determination Not to Review an Initial Determination Granting Complainant's Motion for Summary De- termination That the Technical Prong of the Domestic Industry Requirement Is Satisfied with Respect to U.S. Patent No. 8,588,949, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/04/2021 | (732945 - Public) | ID/RD - Other Than Final on Violation, 1191-025 35 Initial Deter- mination Granting Complainant Sonos, Inc.'s Unopposed Motion for Summary Determination That the Economic Prong of Domes- tic Industry Is Satisfied, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/05/2021 | (733093 - Confiden- tial) | Exhibit Objections, Commission Investigative Staff's High Priority Objections, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 02/05/2021 | (733114 - Public) | Pre-Hearing Statement, Commission Investigative Staff's Pre- Hearing Statement, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |

| | | |
|---|---|---|
| 02/05/2021 | (733118 - Confidential) | Brief Filed With ALJ, Commission Investigative Staff's Pre-Hearing Brief, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 02/05/2021 | (733130 - Confidential) | Motion, 1191-031 51 Complainant Sonos, Inc.'s Motion in Limine No. 2 to Strike All or Certain Sections of the Testimony of Dr. David Reibstein, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/05/2021 | (733131 - Confidential) | Motion, 1191-032 39 Complainant Sonos, Inc.'s Motion in Limine No. 1 to Exclude '896 Patent Invalidity Arguments Not Disclosed in Respondent's Invalidity Contentions, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/05/2021 | (733135 - Confidential) | Motion, 1191-033 40 Complainant Sonos, Inc.'s Motion in Limine No. 3 to Strike Testimony Previously Withheld as Privileged, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/05/2021 | (733150 - Confidential) | Motion, 1191-034 55 Complainant Sonos, Inc.'s Motion in Limine No. 4 to Exclude Dr. Schonfeld's Untimely Opinions regarding Infringement & Technical Domestic Industry of the '258 & '953 Patents, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/05/2021 | (733171 - Confidential) | Motion, 1191-035 Complainant Sonos, Inc.'s Motion in Limine No. 5 to Exclude Dr. Schonfeld's Untimely Opinions regarding Validity of the '258 & '953 Patents, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/05/2021 | (733182 - Confidential) | Motion, 1191-036 Complainant Sonos, Inc.'s Motion in Limine No. 6 to Exclude Ken Mackay's Testimony That Is outside the Scope of Google's Contentions, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/05/2021 | (733192 - Confidential) | Motion, 1191-037 41 Complainant Sonos, Inc.'s Motion in Limine No. 7 to Exclude Dr. Rinard's Untimely Opinions regarding Infringement of the '949 Patent, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/05/2021 | (733196 - Confidential) | Motion, 1191-039 Google's Motion in Limine No. 5 to Exclude Sonos' Untimely Technical Domestic Industry Theory regarding the '258 and '953 Patents, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/05/2021 | (733197 - Confidential) | Motion, 1191-038 50 Complainant Sonos, Inc.'s Motion in Limine No. 8 to Exclude Dr. Jeffay's Untimely Opinions regarding Invalidity of the '959 Patent, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/05/2021 | (733198 - Confidential) | Motion, 1191-040 42 Complainant Sonos, Inc.'s Motion in Limine No. 9 to Exclude Dr. Jeffa's Untimely Opinions regarding Infringement of the '896 Patent, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| 02/05/2021 | (733201 - Confiden- tial) | Motion, 1191-041 53 Google's Motion in Limine No. 1 to Exclude Sonos' Untimely Doctrine of Equivalents Theory regarding the '258 and '953 Patents, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/08/2021 | (733252 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Ryan Fisher, filed by K. Kevin Chu of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/08/2021 | (733280 - Confiden- tial) | Motion, 1191-042 37 Google's Unopposed Motion for Leave to Amend Its Motion in Limine Nos. 2, 3, and 4, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/08/2021 | (733309 - Confiden- tial) | Motion, 1191-043 38 Complainant Sonos, Inc.'s Unopposed Mo- tion for Leave to File Its High Priority Objections One Day Late, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on be- half of Sonos, Inc. |
| 02/09/2021 | (733379 - Public) | Order, 1191-042 37 Granting Google's Unopposed Motion for Leave to Amend Its Motion in Limine Nos. 2, 3, and 4, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/09/2021 | (733380 - Public) | Order, 1191-043 38 Granting Complainant Sonos, Inc.'s Unop- posed Motion for Leave to File Its High Priority Objections One Day Late, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/09/2021 | (733381 - Public) | Notice, Notice to the Parties, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/09/2021 | (733441 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of James Hoy, filed by Jordan Coyle of Orrick, Herrington & Sut- cliffe LLP, on behalf of Sonos, Inc. |
| 02/12/2021 | (733935 - Public) | Exhibit Objections, Google's Response to Staff's High Priority Objections, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733942 - Confiden- tial) | Motion Response/Reply, 1191-042 Complainant Sonos, Inc.'s Response to Google's Motion in Limine No. 3 Concerning Priority Date of Claim 5 of the '949 Patent, filed by Jordan Coyle of Or- rick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/12/2021 | (733943 - Confiden- tial) | Motion Response/Reply, 1191-041 Complainant Sonos, Inc.'s Opposition to Google's Motion in Limine No. 1, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/12/2021 | (733945 - Confiden- tial) | Motion Response/Reply, 1191-042 Complainant Sonos, Inc.'s Response to Google's Motion in Limine No. 4 Concerning the Va- lidity of Claim 1 of the '949 Patent, filed by Jordan Coyle of Or- rick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| | | |
|---|---|---|
| 02/12/2021 | (733946 - Confidential) | Motion Response/Reply, 1191-042 Complainant Sonos, Inc.'s Opposition to Google's Motion in Limine No. 2 regarding Reduction to Practice for the '959 Patent, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/12/2021 | (733950 - Confidential) | Motion Response/Reply, 1191-039 Complainant Sonos, Inc.'s Opposition to Google's Motion in Limine No. 5, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/12/2021 | (733957 - Confidential) | Motion Response/Reply, 1191-038 Google's Opposition to Sonos's Motion in Limine No. 8, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733958 - Confidential) | Motion Response/Reply, 1191-031 Commission Investigative Staff's Combined Response to the Private Parties' Motions in Limine and High Priority Objection, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 02/12/2021 | (733968 - Confidential) | Motion Response/Reply, 1191-032 Google's Response to Sonos Motion in Limine No. 1, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733970 - Confidential) | Motion Response/Reply, 1191-031 Google's Opposition to Sonos Motion in Limine No. 2, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733974 - Confidential) | Motion Response/Reply, 1191-037 Google's Opposition to Sonos Motion in Limine No. 7, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733979 - Confidential) | Motion Response/Reply, 1191-033 Google's Opposition to Sonos Motion in Limine No. 3 to Exclude Testimony and Videos Concerning Google's Design-Arounds, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733980 - Public) | Exhibit Objections, Complainant Sonos, Inc.'s Response to the Commission Investigative Staff's High Priority Objections, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/12/2021 | (733985 - Confidential) | Motion Response/Reply, 1191-031 Google's Omnibus Opposition to Sonos' Motions in Limine on the Basis of Its Violation of Ground Rule 9.4, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733989 - Confidential) | Motion Response/Reply, 1191-034 Google's Opposition to Sonos' Motion in Limine No. 4, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733992 - Confidential) | Motion Response/Reply, 1191-035 Google's Opposition to Sonos' Motion in Limine No. 5, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |

| | | |
|---|---|---|
| 02/12/2021 | (733993 - Confidential) | Motion Response/Reply, 1191-040 Google's Opposition to Sonos' Motion in Limine No. 6, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (733995 - Confidential) | Motion Response/Reply, 1191-036 Respondent Google's Opposition to Sonos' Motion in Limine No. 9, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/12/2021 | (734002 - Confidential) | Exhibit Objections, Google's Response to Sonos High Priority Objection #1:Exhibits RX-22C and RX-23C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/16/2021 | (734151 - Public) | Order, 1191-042 45 Denying Google's Motion in Limine No. 2 to Exclude New Evidence and Arguments regarding Reduction to Practice for the '959 Patent, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/16/2021 | (734152 - Public) | Order, 1191-036 46 Denying Complainant Sonos, Inc.'s Motion in Limine No. 6 to Exclude Ken Mackay's Testimony That Is outside the Scope of Google's Contentions, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/16/2021 | (734153 - Public) | Order, 1191-032 39 Denying Complainant Sonos, Inc.'s Motion in Limine No. 1 to Exclude '896 Patent Invalidity Arguments Not Disclosed in Respondent's Invalidity Contentions, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/16/2021 | (734155 - Public) | Order, 1191-033 40 Denying Complainant Sonos, Inc.'s Motion in Limine No. 3 to Strike Testimony Previously Withheld as Privileged, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/16/2021 | (734156 - Public) | Order, 1191-037 41 Granting Complainant Sonos, Inc.'s Motion in Limine No. 7 to Exclude Dr. Rinard's Untimely Opinions regarding Infringement of the '949 Patent, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/16/2021 | (734157 - Public) | Order, 1191-040 42 Denying Complainant Sonos, Inc.'s Motion in Limine No. 9 to Exclude Dr. Jeffay's Untimely Opinions regarding Infringement of the '896 Patent, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/16/2021 | (734159 - Public) | Order, 1191-042 43 Denying Google's Motion in Limine No. 3 to Strike Sonos' Reliance on a Late-Disclosed Priority Date for Claim 5 of the '949 Patent, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/16/2021 | (734160 - Public) | Order, 1191-042 44 Denying Google's Motion in Limine No. 4 Concerning the Validity of Claim 1 of the '949 Patent, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |

| | | |
|---|---|---|
| 02/16/2021 | (734186 - Public) | Notice, 35 Commission Determination to Review and Affirm an Initial Determination Granting Summary Determination That the Economic Prong of the Domestic Industry Requirement Is Satisfied, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/17/2021 | (734267 - Public) | Voting Sheet, GC-21-012, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/17/2021 | (734327 - Public) | Order, 47 Denying Complainant Sonos, Inc.'s High Priority Objection, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/17/2021 | (734329 - Public) | Order, 1191-030 48 Granting Complainant Sonos, Inc.'s Unopposed Request for Receipt of Evidence without a Sponsoring Witness, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/17/2021 | (734332 - Public) | Order, 49 Directing the Parties to Submit a Joint Hearing Schedule, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/17/2021 | (734333 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of David Reibstein, Ph.D., filed by K. Kevin Chu of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/17/2021 | (734335 - Public) | Order, 1191-038 50 Granting Complainant Sonos, Inc.'s Motion in Limine No. 8 to Exclude Dr. Jeffay's Untimely Opinions regarding Invalidity of the '959 Patent, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/17/2021 | (734336 - Public) | Order, 1191-031 51 Denying Complainant Sonos, Inc.'s Motion in Limine No. 2 to Strike All or Certain Sections of the Testimony of Dr. David Reibstein (RX-1523C), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/17/2021 | (734337 - Public) | Order, 1191-035 52 Denying Complainant Sonos, Inc.'s Motion in Limine No. 5 to Exclude Dr. Schonfeld's Untimely Opinions regarding Validity of the '258 and '953 Patents, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/17/2021 | (734338 - Public) | Order, 1191-041 53 Denying Respondent Google LLC's Motion in Limine No. 1 to Exclude Sonos' Untimely Doctrine of Equivalents Theory regarding the '258 and '953 Patents, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/17/2021 | (734339 - Public) | Order, 1191-039 54 Denying Respondent Google LLC's Motion in Limine No. 5 to Exclude Sonos' Untimely Technical Domestic Industry Theory regarding the '258 and '953 Patents, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |

| 02/17/2021 | (734375 - Confidential) | Order, 1191-034 55 Granting in Part Complainant Sonos, Inc's Motion in Limine No. 4 to Exclude Dr. Schonfeld's Untimely Opinions regarding Infringement & Technical Domestic Industry of the '258 and '953 Patents, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| --- | --- | --- |
| 02/19/2021 | (734535 - Confidential) | Motion, 1191-044 Google's Motion for Clarification and Reconsideration regarding Order No. 55, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 02/19/2021 | (734591 - Public) | Order, 56 Denying Commission Investigative Staff's High Priority Objections, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/19/2021 | (734592 - Confidential) | Order, 1191-044 57 Denying Respondent Google LLC's Motion for Clarification and Reconsideration regarding Order No. 55, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/22/2021 | (734687 - Public) | Motion, 1191-045 Complainant Sonos, Inc.'s Unopposed Motion for Partial Termination of the Investigation, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 02/23/2021 | (734908 - Public) | ID/RD - Other Than Final on Violation, 1191-045 58 Initial Determination Granting Complainant Sonos, Inc.'s Unopposed Motion for Partial Termination of the Investigation, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/24/2021 | (735008 - Public) | Transcript, Pre-Hearing Conference (Pages 1-68) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/24/2021 | (735009 - Confidential) | Transcript, Pre-Hearing Conference (Pages 1-68) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/24/2021 | (735010 - Confidential) | Transcript, Hearing (Pages 1-145) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/24/2021 | (735011 - Public) | Transcript, Hearing (Pages 1-145) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/25/2021 | (735220 - Confidential) | Transcript, Hearing (Pages 146-379) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/25/2021 | (735221 - Public) | Transcript, Hearing (Pages 146-379) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/25/2021 | (735222 - Confidential) | Transcript, Hearing (Pages 380-680) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |

| 02/25/2021 | (735223 - Public) | Transcript, Hearing (Pages 380-680) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 02/26/2021 | (735304 - Public) | Voting Sheet, GC-21-018, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/26/2021 | (735332 - Public) | Transcript, Hearing (Pages 681-905), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 03/01/2021 | (735463 - Confidential) | Transcript, Hearing (Pages 906-1138) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 03/01/2021 | (735464 - Public) | Transcript, Hearing (Pages 906-1138) (with excerpts), filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 03/03/2021 | (735852 - Public) | Motion, 1191-046 59 Joint Motion to Admit Trial Exhibits and Correct the Confidentiality Designation of One Exhibit, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |
| 03/03/2021 | (735864 - Public) | Notice, Notice to the Parties regarding Ground Rule 12, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 03/09/2021 | (736349 - Public) | Order, 1191-046 59 Granting Joint Motion to Admit Trial Exhibits and Correct the Confidentiality Designation of One Exhibit, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 03/12/2021 | (736845 - Confidential) | Brief Filed With ALJ, Commission Investigative Staff's Initial Post-Hearing Brief, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 03/12/2021 | (736849 - Public) | Notice, 58 Commission Determination Not to Review an Initial Determination Terminating the Investigation as to Certain Claims, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 03/12/2021 | (736902 - Confidential) | Brief Filed With ALJ, Complainant Sonos, Inc.'s Post-Hearing Brief, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 03/12/2021 | (736904 - Confidential) | Brief Filed With ALJ, Respondent Google's Post-Hearing Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 03/12/2021 | (736907 - Public) | Response/Submission to ALJ Order, Google's List of Undisputed Claim Limitations for Infringement and Technical Domestic Industry, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 03/17/2021 | (737263 - Public) | Voting Sheet, GC-21-064, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |

| | | |
|---|---|---|
| 03/18/2021 | (737463 - Confidential) | Motion, 1191-047 60 Unopposed Motion to Reopen the Evidentiary Record for Admission of a Corrected Witness Statement and One Exhibit, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 03/19/2021 | (737527 - Confidential) | Brief Filed With ALJ, Commission Investigative Staff's Reply Post-Hearing Brief, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 03/19/2021 | (737569 - Confidential) | Brief Filed With ALJ, Complainant Sonos, Inc.'s Reply Post-Hearing Brief, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 03/19/2021 | (737573 - Confidential) | Brief Filed With ALJ, Respondent Google's Reply Post-Hearing Brief, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 03/25/2021 | (737980 - Confidential) | Order, 1191-047 60 Granting Unopposed Motion to Reopen the Evidentiary Record for Admission of a Corrected Witness Statement and One Exhibit, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 04/16/2021 | (740110 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Mark Davies, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 05/05/2021 | (741615 - Public) | ID/RD - Other Than Final on Violation, 61 Initial Determination Extending the Target Date, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 05/18/2021 | (742823 - Public) | Notice, 61 Commission Determination Not to Review an Initial Determination Extending the Target Date for Completion of the Investigation, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 06/09/2021 | (744338 - Public) | Voting Sheet, GC-21-131, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 06/10/2021 | (744490 - Confidential) | Response/Submission to ALJ Order, Complainant Sonos, Inc.'s Statement of Undisputed Prior Art Validity Issues, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/03/2021 | (748600 - Public) | Notice of Appearance, Notice of Appearance of Orrick, Herrington & Sutcliffe LLP on Behalf of Sonos, Inc.; Updated Designation of Bas de Blank as Lead Counsel, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/13/2021 | (749546 - Confidential) | Exhibit List, Google's Final Admitted Exhibit List, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/13/2021 | (749547 - Confidential) | Exhibit List, The Parties' Master Joint Final Exhibit List, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| 08/13/2021 | (749548 - Confidential) | ID/RD - Final on Violation, Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 08/13/2021 | (749550 - Public) | Notice, Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 08/16/2021 | (749613 - Public) | Notice, Request for Submissions on the Public Interest, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 08/17/2021 | (749813 - Public) | Exhibit, Post-Trial, CPX-0001 - CPX-0046, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/17/2021 | (749814 - Public) | Exhibit, Post-Trial, CDX-0001 - CDX-0011, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/17/2021 | (749815 - Public) | Exhibit, Post-Trial, CX-0001 - CX-1122, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/17/2021 | (749823 - Public) | Exhibit, Post-Trial, CX-1123 - CX-1364, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/17/2021 | (749824 - Public) | Exhibit, Post-Trial, CX-1365 - CX-2671_Part 10, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749851 - Public) | Exhibit, Post-Trial, CX-2671_Part 11 - CX3253, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749852 - Public) | Exhibit, Post-Trial, CX-3254 - CX-5174, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749853 - Public) | Exhibit, Post-Trial, JX-0001 - JX-0010_Part 019, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |
| 08/18/2021 | (749855 - Public) | Exhibit, Post-Trial, JX-0010_Part 20 - JX-0012_Part 084, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |
| 08/18/2021 | (749857 - Public) | Exhibit, Post-Trial, JX-0012_Part 085 - JX-0457, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |
| 08/18/2021 | (749859 - Public) | Exhibit, Post-Trial, JX-0411 - JX-0457, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |
| 08/18/2021 | (749860 - Confidential) | Exhibit, Post-Trial, CDX-0004C - CDX-0012C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749861 - Confidential) | Exhibit, Post-Trial, CX-0007C - CX-1261C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| 08/18/2021 | (749867 - Confidential) | Exhibit, Post-Trial, CX-1262C - CX-3631C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749875 - Confidential) | Exhibit, Post-Trial, CX-1262C - CX-3631C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749885 - Confidential) | Exhibit, Post-Trial, CX-3632C - CX-4132C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749887 - Confidential) | Exhibit, Post-Trial, CX-4133C - CX-4534C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749889 - Confidential) | Exhibit, Post-Trial, CX-4542C - CX-5172C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749890 - Confidential) | Exhibit, Post-Trial, JX-0013C - JX-0493C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |
| 08/18/2021 | (749892 - Confidential) | Exhibit, Post-Trial, CX-4906C - CX-4996C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/18/2021 | (749893 - Confidential) | Exhibit, Post-Trial, JX-0389C - JX-0431C, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. and Google LLC |
| 08/19/2021 | (749937 - Confidential) | Exhibit, Post-Trial, RX-0005C - RX-1991C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/19/2021 | (749961 - Confidential) | Exhibit, Post-Trial, RDX-0001C - RDX-0029C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/19/2021 | (749968 - Public) | Notice of Appearance, Notice of Change of Address for Lead Counsel Law Firm Allen & Overy on Behalf of Alphabet Inc., filed by Shamita Etienne-Cummings of Allen & Overy, on behalf of Alphabet Inc. |
| 08/20/2021 | (750004 - Confidential) | Exhibit, Post-Trial, RPX-0008C - RPX-0137C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/20/2021 | (750005 - Confidential) | Exhibit, Post-Trial, RX-0007C - RX-1741C, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/20/2021 | (750006 - Public) | Exhibit, Post-Trial, RX-0017 - RX-1909, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |

| 08/20/2021 | (750016 - Public) | Exhibit, Post-Trial, RDX-0111 - RDX-0119, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/20/2021 | (750017 - Public) | Exhibit, Post-Trial, RPX-0001 - RPX-0139(2), filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/20/2021 | (750018 - Public) | Exhibit, Post-Trial, RX-0332 - RX-1494, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/24/2021 | (750216 - Public) | Notice, 86 FR 46715 F.R. Notice of Request for Submissions on the Public Interest, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 08/27/2021 | (750441 - Confidential) | Petition for Review; and Response to, Complainant Sonos, Inc.'s Summary of Its Petition and Contingent Petition for Review of the Initial Determination on Violation of Section 337, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/27/2021 | (750449 - Confidential) | Petition for Review; and Response to, Complainant Sonos, Inc.'s Petition and Contingent Petition for Review of the Initial Determination on Violation of Section 337, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 08/27/2021 | (750451 - Confidential) | Petition for Review; and Response to, Respondent Google's Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/27/2021 | (750453 - Confidential) | Petition for Review; and Response to, Summary of Respondent Google's Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 08/30/2021 | (750464 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Abigail Colella, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/07/2021 | (751111 - Public) | Petition for Review; and Response to, Summary of the Response of the Office of Unfair Import Investigations to the Private Parties' Petitions for Review of Initial Determination on Violation of Section 377, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 09/07/2021 | (751115 - Confidential) | Petition for Review; and Response to, Response of the Office of Unfair Import Investigations to the Private Parties' Petitions for Review of Initial Determination on Violation of Section 377, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |

09/07/2021   (751124 - Confidential)   Petition for Review; and Response to, Summary of Google's Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC

09/07/2021   (751126 - Confidential)   Petition for Review; and Response to, Google's Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC

09/07/2021   (751128 - Confidential)   Petition for Review; and Response to, Complainant Sonos, Inc.'s Response to Respondent's Petition for Review of the Initial Determination on Violation of Section 337, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

09/08/2021   (751253 - Public)   Petition for Review; and Response to, Respondent Google's Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC

09/08/2021   (751254 - Public)   Petition for Review; and Response to, Complainant Sonos, Inc.'s Petition and Contingent Petition for Review of the Initial Determination on Violation of Section 337, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

09/08/2021   (751256 - Public)   Petition for Review; and Response to, Summary of Respondent Google's Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC

09/08/2021   (751257 - Public)   Petition for Review; and Response to, Complainant Sonos, Inc.'s Summary of Its Petition and Contingent Petition for Review of the Initial Determination on Violation of Section 337, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

09/09/2021   (751322 - Confidential)   Correspondence, Complainant Sonos, Inc.'s Motion for Leave to File out of Time the Summary of Its Response to Respondent's Petition for Review of the Initial Determination on Violation of Section 337, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc.

09/10/2021   (751413 - Public)   Correspondence - USITC, Letter to Jordan L. Coyle Granting Request for Leave to File Summary of Response to Petition for Review, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary

09/13/2021   (751551 - Public)   Brief on Review/Remedy, Third Party Seattle Musicians Access to Sustainable Healthcare's Statement on the Public Interest, filed by Denise Burnside of Seattle Musicians Access to Sustainable Healthcare, on behalf of Seattle Musicians Access to Sustainable Healthcare

| | | |
|---|---|---|
| 09/13/2021 | (751556 - Public) | Brief on Review/Remedy, Sound Board Public Interest Submission, filed by Tom Elmhirst of Tom Elmhirst, on behalf of Tom Elmhirst |
| 09/13/2021 | (751560 - Public) | Brief on Review/Remedy, PMSU Letter regarding Public Interest Statement, filed by Andrew Janss of Project: Music Heals Us, on behalf of Project: Music Heals Us |
| 09/13/2021 | (751562 - Public) | Brief on Review/Remedy, Statement by USIJ regarding the Public Interest, filed by Chris Israel of Alliance of U.S. Startups and Inventors for Jobs, on behalf of Alliance of U.S. Startups and Inventors for Jobs |
| 09/13/2021 | (751563 - Public) | Brief on Review/Remedy, Innovation Alliance Submission, filed by Brian Pomper of Innovation Alliance, on behalf of Innovation Alliance |
| 09/13/2021 | (751564 - Public) | Brief on Review/Remedy, Third Party Urban Arts Partnership's Statement on the Public Interest, filed by Philip Courtney of Urban Arts Partnership, on behalf of Urban Arts Partnership |
| 09/13/2021 | (751565 - Public) | Brief on Review/Remedy, Third Party Centripetal Networks, Inc.'s Statement on the Public Interest, filed by Lisa Kobialko of Centripetal Networks, Inc., on behalf of Centripetal Networks, Inc. |
| 09/13/2021 | (751568 - Public) | Brief on Review/Remedy, Third Party American Economic Liberties Project's Statement on the Public Interest, filed by Sarah Miller of American Economic Liberties Project, on behalf of American Economic Liberties Project |
| 09/17/2021 | (752073 - Public) | Petition for Review; and Response to, Google's Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 09/17/2021 | (752074 - Public) | Petition for Review; and Response to, Summary of Google's Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 09/17/2021 | (752082 - Public) | Petition for Review; and Response to, Complainant Sonos Inc.'s Response to Respondent's Petition for Review of the Initial Determination on Violation of Section 337, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/17/2021 | (752083 - Public) | Petition for Review; and Response to, Complainant Sonos Inc.'s Summary of Response to Respondent's Petition for Review of the Initial Determination on Violation of Section 337, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| | | |
|---|---|---|
| 09/20/2021 | (752181 - Public) | Correspondence, Complainant Sonos, Inc.'s Motion for Leave to File out of Time the Summary of Its Response to Respondent's Petition for Review of the Initial Determination on Violation of Section 337, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 09/23/2021 | (752501 - Public) | ID/RD - Final on Violation, Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, filed by Charles E. Bullock of USITC, on behalf of Chief Administrative Law Judge |
| 10/14/2021 | (754159 - Public) | Notice, Commission Determination to Extend the Deadline for Determining Whether to Review an Initial Determination on Violation of Section 337, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 10/19/2021 | (754451 - Public) | Voting Sheet, GC-21-279, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 11/19/2021 | (757044 - Public) | Notice, Commission Determination to Review in Part a Final Initial Determination Finding a Violation of Section 337; Schedule for Filing Written Submissions on Remedy, the Public Interest, and Bonding; Extension of the Target Date, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 11/26/2021 | (757296 - Public) | Notice, 86 FR 67491 F.R. Notice of Commission Determination to Review in Part a Final Initial Determination Finding a Violation of Section 337; Schedule for Filing Written Submissions on Remedy, the Public Interest, and Bonding; Extension of the Target Date, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 11/26/2021 | (757313 - Public) | Voting Sheet, GC-21-316, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 12/02/2021 | (757754 - Confidential) | Brief on Review/Remedy, Response of the Office of Unfair Import Investigations to the Commission's Request for Written Submissions on Remedy, the Public Interest, and Bonding, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 12/02/2021 | (757760 - Public) | Brief on Review/Remedy, American Foundation for the Blind Public Interest Comment, filed by Stephanie Enyart of American Foundation for the Blind, on behalf of American Foundation for the Blind |
| 12/02/2021 | (757762 - Public) | Brief on Review/Remedy, Statement of Third Party Computer and Communications Industry Association in Response to the Commission's November 19, 2021, Notice of Request for Statements on the Public Interest, filed by Joshua Landau of Computer & Communications Industry Association, on behalf of Computer and Communications Industry Association |

| | | |
|---|---|---|
| 12/02/2021 | (757769 - Public) | Brief on Review/Remedy, Statement of the Software & Information Industry Association in the Public Interest, filed by Christopher Mohr of Software & Information Industry Association, on behalf of Software & Information Industry Association |
| 12/02/2021 | (757773 - Confidential) | Brief on Review/Remedy, Complainant Sonos, Inc.'s Initial Written Submission on Remedy, Bonding, Public Interest, and Requested Information, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/02/2021 | (757782 - Public) | Brief on Review/Remedy, Submission of Champions Community Foundation, Inc. in Response to the Commission's Request for Submissions on the Public Interest, filed by Richard Thompson of Champions Community Foundation, Inc., on behalf of Champions Community Foundation, Inc. |
| 12/02/2021 | (757789 - Confidential) | Brief on Review/Remedy, Respondent Google's Submission on Remedy, Bond, and Public Interest, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 12/10/2021 | (758309 - Confidential) | Brief on Review/Remedy, Reply Submission of the Office of Unfair Import Investigations to the Private Parties' Written Submissions on Remedy, the Public Interest, and Bonding, filed by Cortney C. Hoecherl of USITC, on behalf of Office of Unfair Import Investigations |
| 12/10/2021 | (758355 - Confidential) | Brief on Review/Remedy, Complainant Sonos, Inc.'s Reply to Initial Written Submissions on Remedy, Bonding, Public Interest, and Requested Information, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/10/2021 | (758370 - Confidential) | Brief on Review/Remedy, Respondent Google's Reply Submission on Remedy, Bond, and Public Interest, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 12/13/2021 | (758448 - Public) | Brief on Review/Remedy, Complainant Sonos, Inc.'s Initial Written Submission on Remedy, Bonding, Public Interest, and Requested Information, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 12/13/2021 | (758487 - Public) | Brief on Review/Remedy, Respondent Google's Submission on Remedy, Bond, and Public Interest, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 12/22/2021 | (759168 - Public) | Brief on Review/Remedy, Complainant Sonos, Inc.'s Reply to Initial Written Submissions on Remedy, Bonding, Public Interest, and Requested Information, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| 12/22/2021 | (759203 - Public) | Brief on Review/Remedy, Respondent Google's Reply Submission on Remedy, Bond, and Public Interest, filed by S. Alex Lasher of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 01/06/2022 | (759893 - Public) | Notice, Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order and a Cease and Desist Order; Termination of Investigation, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/06/2022 | (759894 - Confidential) | Opinion, Commission, Commission Opinion, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/06/2022 | (759895 - Public) | Correspondence - USITC, Letter to Dax Terrill of U.S. Customs and Border Protection Transmitting Limited Exclusion Order, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/06/2022 | (759897 - Public) | Order, Commission, Limited Exclusion Order, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/06/2022 | (759899 - Public) | Order, Commission, Cease and Desist Order for Google LLC, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/06/2022 | (759931 - Public) | PO Subscription, Agreement to Be Bound by the Protective Order of Alexandra Bursak, filed by Jordan Coyle of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |
| 01/10/2022 | (759949 - Public) | Voting Sheet, GC-21-402, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/11/2022 | (760184 - Confidential) | Correspondence - USITC, Letters from Chair Jason E. Kearns to the President of the United States, Janet L. Yellen, Secretary of the Treasury and Katherine Tai, United States Trade Representative Transmitting a Limited Exclusion Order and Cease and Desist Order, filed by Jason E. Kearns of USITC, on behalf of Office of the Chair |
| 01/11/2022 | (760185 - Public) | Correspondence - USITC, Letters from Chair Jason E. Kearns to the President of the United States, Janet L. Yellen, Secretary of the Treasury and Katherine Tai, United States Trade Representative Transmitting a Limited Exclusion Order and Cease and Desist Order, filed by Jason E. Kearns of USITC, on behalf of Office of the Chair |
| 01/13/2022 | (760462 - Public) | Correspondence - USITC, Letter to Bas de Blank Transmitting Limited Exclusion Order, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/19/2022 | (760933 - Public) | Notice of Appearance, Supplemental Notice of Appearance of Orrick, Herrington & Sutcliffe LLP on Behalf of Sonos, Inc.; Designation of Bas de Blank as Lead Counsel, filed by Bas de Blank of Orrick, Herrington & Sutcliffe LLP, on behalf of Sonos, Inc. |

| 01/21/2022 | (761139 - Public) | Notice, 87 FR 1784 F.R. Notice of Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order and a Cease and Desist Order; Termination of Investigation, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 01/24/2022 | (761160 - Public) | Notice, 87 FR 1784 F.R. Notice of a Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order and a Cease and Desist Order; Termination of Investigation, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 02/01/2022 | (762093 - Public) | Opinion, Commission, Commission Opinion, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 03/14/2022 | (762351 - Public) | Other, Certified List, 22-1241 – Sonos, Inc. v. International Trade Commission, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| 03/22/2022 | (766085 - Confidential) | Correspondence, Letter from K. Kevin Chu to Secretary Barton regarding Cease and Desist Order and Bond, filed by Kevin Chu of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 03/22/2022 | (766086 - Public) | Correspondence, Letter from K. Kevin Chu to Secretary Barton regarding Cease and Desist Order and Bond, filed by Kevin Chu of Quinn Emanuel Urquhart & Sullivan LLP, on behalf of Google LLC |
| 05/3/2022 | (769284 - Public) | Other, Certified List, 22-1573 – Google, LLC v. International Trade Commission, filed by Lisa R. Barton of USITC, on behalf of Office of the Secretary |
| Dated: | 5/3/2022 | |

Lisa R. Barton, Secretary
U.S. International Trade Commission

Certified to be a
true copy of the
Original ....
Secretary

January 7, 2020

*VIA HAND DELIVERY & EDIS*

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street SW, Room 112
Washington, D.C. 20436





**Orrick, Herrington & Sutcliffe LLP**
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005-1706

+1 202 339 8400
orrick.com

**Jordan L. Coyle**

E jcoyle@orrick.com
D +1 202 339 8601
F +1 202 339 8500

Re:  *Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same; Inv. No. 337-TA-____*

Dear Secretary Barton:

Enclosed for filing on behalf of Sonos, Inc. ("Sonos"), please find the following documents in support of Sonos's request that the Commission commence an investigation pursuant to the provisions of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. Please note that Confidential Exhibits 26 and 27 to the Complaint contain Confidential Business Information and pursuant to the Commission's Rules of Practice and Procedure, a request for confidential treatment of the information in those exhibits accompanies this filing. Accordingly, Sonos submits the following:

1.  One (1) original and eight (8) true paper copies of Sonos's Verified Complaint and the Public Interest Statement (Commission Rules 210.8(a)(1)(i) and 210.8(b));

2.  One (1) CD containing the non-confidential exhibits (Commission Rule 210.8(a)(1)(i));

3.  One (1) CD containing the confidential exhibits (Commission Rules 201.6(c) and 210.8(a)(1)(ii));

4.  Two (2) additional paper copies of the Verified Complaint, the Public Interest Statement and two (2) CDs of the non-confidential exhibits for service upon the Respondents and two (2) additional CDs of the confidential exhibits for service upon the Respondents' outside counsel after they have subscribed to the protective order (Commission Rules 201.6(c), 210.4(f)(2), and 210.8(a)(1)(iii));

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

|  |  |
|---|---|
| **In the Matter of**<br><br>CERTAIN AUDIO PLAYERS AND<br>CONTROLLERS, COMPONENTS<br>THEREOF, AND PRODUCTS<br>CONTAINING SAME | **Investigation No. 337-TA-___** |

## VERIFIED COMPLAINT OF SONOS, INC.
## UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED

**COMPLAINANT**

Sonos, Inc.
614 Chapala Street
Santa Barbara, CA 93101
Tel: 1-800-680-2345

**COUNSEL FOR COMPLAINANT**

Clement S. Roberts
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Tel: (415) 773-5700
Email: croberts@orrick.com

Bas de Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Tel: (650) 614-7343
Email: bdeblank@orrick.com

Jordan L. Coyle
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, NW
Washington, DC 20005
Tel: (202) 339-8400
Email: jcoyle@orrick.com

**RESPONDENTS**

Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043
Tel: (650) 253-0000

Alphabet Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043
Tel: (650) 253-0000

Alyssa M. Caridis
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017-5855
Tel: (213) 612-2372
Email: acaridis@orrick.com

George I. Lee (lee@ls3ip.com)
Sean M. Sullivan (sullivan@ls3ip.com)
Rory P. Shea (shea@ls3ip.com)
J. Dan Smith (smith@ls3ip.com)
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St, Floor 5W
Chicago, IL 60661
Tel: (312) 754-0002
Fax: (312) 754-0003

**TABLE OF CONTENTS**

I. INTRODUCTION ....................................................................................................... 1

II. COMPLAINANT ...................................................................................................... 3

III. RESPONDENTS ....................................................................................................... 6

    A. Google LLC ..................................................................................................... 6

    B. Alphabet Inc. .................................................................................................. 12

IV. THE PRODUCTS AT ISSUE ................................................................................ 12

V. THE ASSERTED PATENTS .................................................................................. 13

    A. Background .................................................................................................... 13

    B. U.S. Patent No. 9,195,258 ............................................................................ 16
        1. Identification of the '258 Patent and Ownership by Complainant .......... 16
        2. Foreign Counterparts to the '258 Patent .................................................. 17
        3. Non-Technical Description of the '258 Patent ......................................... 17

    C. U.S. Patent No. 10,209,953 .......................................................................... 20
        1. Identification of the '953 Patent and Ownership by Complainant .......... 20
        2. Foreign Counterparts to the '953 Patent .................................................. 20
        3. Non-Technical Description of the '953 Patent ......................................... 21

    D. U.S. Patent No. 8,588,949 ............................................................................ 22
        1. Identification of the '949 Patent and Ownership by Complainant .......... 22
        2. Foreign Counterparts to the '949 Patent .................................................. 23
        3. Non-Technical Description of the '949 Patent ......................................... 23

    E. U.S. Patent No. 9,219,959 ............................................................................ 25
        1. Identification of the '959 Patent and Ownership by Complainant .......... 25
        2. Foreign Counterparts to the '959 Patent .................................................. 26
        3. Non-Technical Description of the '959 Patent ......................................... 26

    F. U.S. Patent No. 10,439,896 .......................................................................... 28
        1. Identification of the '896 Patent and Ownership by Complainant .......... 28
        2. Foreign Counterparts to the '896 Patent .................................................. 29
        3. Non-Technical Description of the '896 Patent ......................................... 29

VI. SPECIFIC INSTANCES OF IMPORTATION AND SALE ................................. 31

VII. UNLAWFUL AND UNFAIR ACTS COMMITTED BY RESPONDENTS ................. 32

VIII. HARMONIZED TARIFF SCHEDULE ................................................................. 36

IX.     LICENSES ................................................................................................. 36

X.      THE DOMESTIC INDUSTRY ................................................................ 36

        A.      Complainant Satisfies the Technical Prong of the Domestic Industry
                Requirement ................................................................................. 36

        B.      Complainant Satisfies the Economic Prong of the Domestic Industry
                Requirement ................................................................................. 37
                1.      Significant Investments in Plant and Equipment ................. 38
                2.      Significant Investments in Plant and Equipment ................. 39
                3.      Significant Investment in the Exploitation of the Asserted Patents
                        Through Engineering and Research and Development ........... 39

XI.     RELATED LITIGATION ......................................................................... 40

XII.    RELIEF REQUESTED ............................................................................. 41

Appx399

**LIST OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | Certified copy of U.S. Patent No. 9,195,258 |
| 2 | Certified copy of Certificate of Correction to U.S. Patent No. 9,195,258 |
| 3 | Certified copy of U.S. Patent No. 10,209,953 |
| 4 | Certified copy of U.S. Patent No. 8,588,949 |
| 5 | Certified copy of Ex Parte Reexamination Certificate to U.S. Patent No. 8,588,949 |
| 6 | Certified copy of U.S. Patent No. 9,219,959 |
| 7 | Certified copy of Ex Parte Reexamination Certificate to U.S. Patent No. 9,219,959 |
| 8 | Certified copy of U.S. Patent No. 10,439,896 |
| 9 | Certified copy of recorded assignment for U.S. Patent No. 9,195,258 |
| 10 | Certified copy of recorded assignment for U.S. Patent No. 8,588,949 |
| 11 | Certified copy of recorded assignment for U.S. Patent No. 9,219,959 |
| 12 | Certified copy of recorded assignment for U.S. Patent No. 10,439,896 |
| 13 | Copy of recorded assignment for U.S. Patent No. 8,234,395, related application data for U.S. Patent No. 10,209,953 |
| 14 | Copy of recorded certificate of name change for U.S. Patent No. 8,234,395, related application data for U.S. Patent No. 10,209,953 |
| 15 | List of foreign counterparts |
| 16 | Representative Infringement Chart For U.S. Patent No. 9,195,258 |
| 17 | Representative Infringement Chart For U.S. Patent No. 10,209,953 |
| 18 | Representative Infringement Chart For U.S. Patent No. 8,588,949 |
| 19 | Representative Infringement Chart For U.S. Patent No. 9,219,959 |
| 20 | Representative Infringement Chart For U.S. Patent No. 10,439,896 |
| 21 | Representative Domestic Industry Chart For U.S. Patent No. 9,195,258 |
| 22 | Representative Domestic Industry Chart For U.S. Patent No. 10,209,953 |
| 23 | Representative Domestic Industry Chart For U.S. Patent No. 8,588,949 |
| 24 | Representative Domestic Industry Chart For U.S. Patent No. 9,219,959 |
| 25 | Representative Domestic Industry Chart For U.S. Patent No. 10,439,896 |
| 26 | [CONFIDENTIAL] List of Licensees |
| 27 | [CONFIDENTIAL] Declaration of Christine Squarey On Behalf Of Sonos, Inc. |
| 28 | Web page: https://store.google.com/us/category/connected_home?hl=en-US last accessed 12/4/2019 |
| 29 | Web page: https://support.google.com/googlenest/answer/7072284?hl=en last accessed 12/4/2019 |
| 30 | Web page: https://store.google.com/us/product/google_nest_mini_specs?hl=en-US last accessed 12/4/2019 |

## LIST OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 31 | Web page:  https://store.google.com/us/product/google_home_max_specs?hl=en-US last accessed 12/4/2019 |
| 32 | Web page:  https://www.ifixit.com/Teardown/Google+Home+Teardown/72684 last accessed 12/4/2019 |
| 33 | Web page:  https://support.google.com/googlenest/answer/7174267?hl=en last accessed 12/4/2019 |
| 34 | Web page as of 4/8/2019 accessed via the Internet Archive WayBack Machine:  http://web.archive.org/web/20190408185613/https://support.google.com/googlehome/answer/7030379 |
| 35 | Web page:  https://support.google.com/googlenest/answer/7559493?hl=en last accessed 12/4/2019 |
| 36 | Web page:  https://support.google.com/googlenest/answer/7181830?hl=en last accessed 12/4/2019 |
| 37 | Web page:  https://developers.google.com/cast/docs/reference/ios/interface_g_c_k_multizone_status last accessed 12/4/2019 |
| 38 | Web page:  https://support.google.com/chromecast/answer/6328714?hl=en last accessed 12/4/2019 |
| 39 | Web page:  https://store.google.com/product/pixel_3_specs last accessed 12/4/2019 |
| 40 | Web page:  https://store.google.com/product/pixel_3a_specs last accessed 12/4/2019 |
| 41 | Web page:  https://store.google.com/product/pixel_4_specs last accessed 12/4/2019 |
| 42 | Web page:  https://store.google.com/product/pixel_slate_specs last accessed 12/4/2019 |
| 43 | Web page:  https://store.google.com/product/google_pixelbook_specs last accessed 12/4/2019 |
| 44 | Web page:  https://store.google.com/product/pixelbook_go_specs last accessed 12/4/2019 |
| 45 | Web page:  https://support.google.com/chromecast/answer/7071794?co=GENIE.Platform%3DAndroid&hl=en last accessed 12/4/2019 |
| 46 | Web page:  https://play.google.com/store/apps/details?id=com.google.android.apps.chromecast.app&hl=en_US last accessed 12/4/2019 |

iv

**LIST OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 47 | Web page: https://play.google.com/store/apps/details?id=com.google.android.music&hl=en_US last accessed 12/4/2019 |
| 48 | "Sonos gets update, so you don't need a wired network connection" by Consumer Reports |
| 49 | Chromecast webpage: How to change the volume of an audio group |
| 50 | Google webpage: "Multi-room audio" |
| 51 | Google webpage: Google Home Max advertisement |
| 52 | Google webpage: "Pair Google Home Max speakers" |
| 53 | Google webpage: "Set up your Google Nest or Google Home speaker or display" |
| 54 | Google Home Max Importation |
| 55 | Google Pixel 3 Importation |
| 56 | Web page: https://support.google.com/googlehome/answer/7559493?hl=en |
| 57 | Web page: https://developers.google.com/cast/docs/mpl/streaming_protocols last accessed 12/4/2019 |
| 58 | Web page: https://support.google.com/googlehome/answer/7029485?hl=en&ref_topic=7196250 |
| 59 | Web page: https://support.google.com/googlenest/answer/7029485?hl=en&ref_topic=7196250 last accessed 12/4/2019 |
| 60 | Web page: https://support.google.com/chromecast/answer/2998456 last accessed 12/4/2019 |
| 61 | Web page: https://support.google.com/googlenest/answer/7030379?hl=en&ref_topic=7030084 last accessed 12/4/2019 |
| 62 | Web page: https://support.google.com/googlenest/answer/7060506?hl=en last accessed 12/4/2019 |
| 63 | Web page as of 6/18/2019 accessed via the Internet Archive WayBack Machine: https://web.archive.org/web/20190618141603/https://support.google.com/googlenest/answer/7174267?hl=en |
| 64 | Web page: https://www.sonos.com/support/en/sonos-user-guide/index.html#t=sonos-user-guide%2Fsonos-user-guide-en%2Fsonos-user-guide-en.htm |
| 65 | Web page: https://apps.apple.com/us/app/sonos-controller/id293523031 |
| 66 | Web page: https://play.google.com/store/apps/details?id=com.sonos.acr&hl=en_US |
| 67 | Web page: https://support.sonos.com/s/article/3391?language=en_US |
| 68 | Web page: https://musicpartners.sonos.com/sites/default/files/Sonos%20System%20Overview.pdf |

## LIST OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 69 | Web page: https://support.sonos.com/s/article/3521?language=en_US&languae=en_US |
| 70 | Web page:  https://www.sonos.com/en-us/easy-to-use |
| 71 | Web page:  https://developer.sonos.com/build/direct-control/connect/ |
| 72 | Web page:  https://support.sonos.com/s/article/1066?language=en_US |
| 73 | Web page: http://web.archive.org/web/20190623024655/https://www.spotify.com/us/sonos/ |
| 74 | Web page:  https://musicpartners.sonos.com/node/465 |
| 75 | Web page:  https://support.sonos.com/s/article/2627?language=en_US |
| 76 | "Tiny $199 Sonos Play:1 speaker fills a room with wireless tunes" by NBC News |
| 77 | "Brilliant Bluetooth Speakers" by Men's Journal |
| 78 | "An Audio Hub that Actually Words, Easily" by PC Magazine |
| 79 | Sonos User Guide |
| 80 | "Sonos vs. Bluesound: A Hi-fi, Wi-fi Speaker System Shootout" by Digital Trends |
| 81 | "Sonos multi-room system review" by What Hi Fi? |
| 82 | Sonos web page: Music services on Sonos |
| 83 | "Now You Can Stream Google Play Music Through Your Sonos System" by Wired |
| 84 | IPO Top 300 Organizations Granted U.S. Patents in 2017 |
| 85 | IEEE Interactive: Patent Power 2017 |
| 86 | Google web page: Create and manage speaker groups – Google Nest Help |
| 87 | "Google renames Home Hub to the Nest Hub and releases a 10-inch Nest Hub Max" by Tech Crunch |
| 88 | Google web page: Listen to music on Google Nest and Google Home speakers and displays - Google Nest Help |
| 89 | Google Play web page: Google Home and Chromecast Apps |
| 90 | Google Play web page: YouTube Music App |
| 91 | Google Play web page: Google Play Music App |
| 92 | Apple App Store web page: Google Home App |
| 93 | Apple App Store web page: Google Play Music |
| 94 | Apple App Store web page: YouTube Music |
| 95 | Google Store web page: Compare Google Pixel Phones |
| 96 | Google Store web page: Pixel Slate specifications |
| 97 | Google Store web page: Compare Pixelbook Laptops |
| 98 | "Google launches new Chromecast and Chromecast Audio streaming dongles" by The Guardian |

## LIST OF EXHIBITS

| Exhibit | Description |
|---|---|
| 99 | Google Chrome Blog: Even more to love about Chromecast Audio |
| 100 | "Google's Chromecast Audio Adapter Gets Multi-Room Support Similar to Sonos" by Variety |
| 101 | "New Chromecast Audio features let you play hi-res audio in every room at once" by Pocket-lint |
| 102 | "Google's hardware extravaganza: Ad giant takes on Sonos, Roku, Linksys, Amazon, Oculus... you name it" by The Register |
| 103 | "Google Home Review: Home is Where the Smart is" by The Verge |
| 104 | "Google's Home Max Goes After HomePod With a Big Ass Sonos Clone" by Gizmodo |
| 105 | "Google Home Max vs. Sonos" by Android Central |
| 106 | "An Audio Hub that Actually Works, Easily" by PC Magazine |
| 107 | "Sonos Offers Upscale Music System" by Playlist |
| 108 | "Sonos Audio System Brings Controller App to iPhone, Firmware 2.7 Update With Last.fm and 15,000+ Radio Stations" by Gizmodo |
| 109 | "Sonos Controller for Mac and PC (2012) pictures and hands-on" by Pocket-lint |
| 110 | "Gadget That 'Streams' Music Around House Is Terrific but Pricey" by The Wall Street Journal |
| 111 | "Sonos Play:1 wireless speaker" by Macworld |
| 112 | "Sonos adds new stereo pair mode to ZonePlayer S5" by Stash Gear |
| 113 | "Sonos Tips and Tricks" by Trusted Reviews |
| 114 | "Wireless speaker shootout: Sonos Play:1 vs. the Bose SoundTouch 20 and Samsung Shape M7" by Consumer Reports News |
| 115 | "How Sonos and John McFarlane Built the Perfect Wireless Speaker" by Businessweek |
| 116 | "Sonos Play:1 review" by What Hi-Fi? |
| 117 | "Sonos Play:5 review: The best-sounding wireless speaker system we've ever used" by Ars Technica |
| 118 | "Sonos Play:5 Review: Wireless Music Made Elegant" by Gizmodo |

# LIST OF PHYSICAL EXHIBITS

| Physical Exhibit | Description |
|---|---|
| CPX-1 | Sonos Beam |
| CPX-2 | Sonos One |
| CPX-3 | Sonos Play:5 |
| CPX-4 | Sonos Playbar |
| CPX-5 | Sonos Port |
| CPX-6 | Sonos Sub |
| CPX-7 | Google Chromecast |
| CPX-8 | Google Chromecast Ultra |
| CPX-9 | Google Home |
| CPX-10 | Google Home Hub |
| CPX-11 | Google Home Max |
| CPX-12 | Google Home Mini |
| CPX-13 | Google Nest Mini |
| CPX-14 | Google Pixel 3 |
| CPX-15 | Google Pixel 3XL |
| CPX-16 | Google Pixel 4 |

**LIST OF APPENDICES**

| Appendix | Description |
|---|---|
| A | One certified copy and three additional copies of U.S. Patent and Trademark Office prosecution history for U.S. Patent No. 9,195,258 |
| B | One certified copy and three additional copies of U.S. Patent and Trademark Office prosecution history for U.S. Patent No. 10,209,953 |
| C | One certified copy and three additional copies of U.S. Patent and Trademark Office prosecution history for U.S. Patent No. 8,588,949 |
| D | One certified copy and three additional copies of U.S. Patent and Trademark Office prosecution history for Reexamination Request No. 90/013,423 for U.S. Patent No. 8,588,949 |
| E | One certified copy and three additional copies of U.S. Patent and Trademark Office prosecution history for U.S. Patent No. 9,219,959 |
| F | One certified copy and three additional copies of U.S. Patent and Trademark Office prosecution history for Reexamination Request No. 90/013,756 for U.S. Patent No. 9,219,959 |
| G | One certified copy and three additional copies of U.S. Patent and Trademark Office prosecution history for U.S. Patent No. 10,439,896 |
| H | Four copies of each patent and applicable pages of each technical reference mentioned in the prosecution history of U.S. Patent Nos. 9,195,258; 10,209,953; 8,588,949; 9,219,959 and 10,439,896 |

# I.    INTRODUCTION

1.     Complainant Sonos, Inc. ("Sonos" or "Complainant") respectfully requests that the United States International Trade Commission commence an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"), to remedy the unlawful importation into the United States, the sale for importation into the United States, and/or the sale within the United States after importation of audio players and controllers, components thereof, and products containing same that infringe the asserted Sonos patents, which are practiced by Sonos products.

2.     The proposed Respondents are Alphabet Inc. and Google LLC (collectively, "Google" or "Respondents").

3.     Google has engaged in unlawful acts, including the unlicensed importation into the United States, sale for importation into the United States, and/or sale after importation into the United States of certain audio players and controllers, components thereof, and products containing same that infringe claims of U.S. Patent Nos. 9,195,258; 10,209,953; 8,588,949; 9,219,959; and 10,439,896 (collectively the "Asserted Patents").[1]  The '258 and '953 Patents are related and share essentially the same specification.  In this Investigation, Sonos asserts seven independent claims and 20 dependent claims:

| Patent No. | Asserted Claims |
|------------|-----------------|
| 9,195,258  | Independent claim 17 and dependent claims 21-24 and 26 |
| 10,209,953 | Independent claim 7 and dependent claims 12-14 and 22-24 |
| 8,588,949  | Independent claim 1 and dependent claims 2, 4 and 5 |
| 9,219,959  | Independent claims 5, 9, and 10 and dependent claims 29 and 35 |
| 10,439,896 | Independent claim 1 and dependent claims 3, 5, 6, and 12 |

---

[1] Certified copies of the Asserted Patents, together with the corresponding Certificate of Correction and *Ex Parte* Reexamination Certificates, accompany this Complaint as **Exhibits 1-8.**

1

4.     A domestic industry under 19 U.S.C. § 1337(a)(2), as defined by § 1337(a)(3)(A)-(C), exists in the United States as a result of Sonos's significant investments in plant, equipment, labor, and capital with respect to articles protected by the Asserted Patents and substantial investment in the Asserted Patents' exploitation, including engineering, research and development, or licensing.

5.     Respondents' activities with respect to the importation into the United States, the sale for importation into the United States, and/or the sale within the United States after importation of the Infringing Products, described more fully *infra*, are unlawful under 19 U.S.C. § 1337(a)(1)(B) because those products infringe one or more claims of the Asserted Patents.

6.     Sonos seeks relief from the Commission in the form of a permanent limited exclusion order excluding from entry into the United States Respondents' audio players and controllers, components thereof, and products containing the same that infringe the Asserted Patents.  Complainant further seeks cease and desist orders stopping Respondents and any of their principals, stockholders, officers, directors, employees, agents, licensees, distributors, controlled (whether by stock ownership or otherwise) and majority-owned business entities, successors, and assigns from conducting any of the following activities in the United States: importing, selling, marketing, advertising, distributing, transferring (except for exportation), or soliciting U.S. agents or distributors for audio players and controllers, components thereof, and products containing the same covered by one or more claims of the Asserted Patents.  Finally, Complainant requests the imposition of a bond pursuant to 19 U.S.C. § 1337(j) during the period the Commission's relief is under presidential review, and any additional relief that the Commission deems just and proper under the law.

2

## II.    COMPLAINANT

7.    Sonos, Inc. is a Delaware corporation with headquarters at 614 Chapala Street, Santa Barbara, CA 93101.

### SONOS'S INNOVATION

8.    Founded in 2002, Sonos invented what is known today as wireless multi-room audio. **Exhibit 76** (2013 *NBC News*: "If you're not familiar with Sonos, this company revolutionized the home audio world a decade ago…."); **Exhibit 77** (2015 *Men's Journal*: "Sonos almost singlehandedly established the stand-alone wireless home speaker system category….").

9.    Sonos engineers in the United States conducted the research, development, and engineering that created Sonos's wireless audio system. Today, engineers in Boston, MA, San Francisco, CA, Santa Barbara, CA, and Seattle, WA continue Sonos's commitment to innovation. Sonos's operating expenses directed to research and development have increased every year since at least 2014. In fact, Sonos's research and development expenses more than doubled from over $70 million in fiscal year 2014 to over $171 million in fiscal year 2019. A substantial amount of this investment occurs in the United States.

10.    In recognition of its innovations, the U.S. Patent & Trademark Office has granted Sonos more than 750 United States patents, including the Asserted Patents. The innovations in these patents are important to wireless audio systems and, in particular, multi-room audio systems.

11.    At the time of Sonos's founding, multi-room audio systems were dependent on a centralized receiver hard-wired to each individual passive speaker throughout a home or business. In sharp contrast, Sonos's system eliminated this dependency and, instead, relies on

3

intelligent, networked playback devices to deliver premium sound wirelessly throughout a home or business. While conquering the challenge of inventing a multi-room wireless audio system was difficult in its own right, Sonos also built a system that is easy to setup, easy to use, customizable, readily integrated with other technologies and services, and effective in delivering outstanding sound quality in any home or business environment. *See, e.g.*, **Exhibit 78** (2005 *PC Magazine*: describing one of Sonos's first products as "the iPod of digital audio" for the home and contrasting Sonos with conventional home audio systems that required "dedicated wiring").

    12.    An early sketch of Sonos's wireless audio architecture is shown below:



    13.    Sonos launched its first commercial products in 2005 and has since released a wide variety of wireless audio products, including, for example, the Play:1, Play:3, Play:5 (Gen 1 and Gen 2), One (Gen 1 and Gen 2), One SL, Move, Playbar, Playbase, Beam, Sub, Connect, Port, Connect:Amp, and Amp. *See, e.g.*, **Exhibit 79**. Sonos's products can be set up and controlled by the Sonos app. *Id*.

4

14.     A sampling of Sonos's product lineup is shown below.



15.     Sonos's products are consistently hailed as setting the standard for the industry. *See, e.g.*, **Exhibit 80** (2018 *Digital Trends*: "Sonos is the king of multiroom audio…."); **Exhibit 81** (2019 *What Hi-Fi*: "[N]o multi-room offering is as complete or as pleasurable to live with as Sonos.").

16.     Sonos's products are also compatible with many different third-party music streaming services and Sonos has entered into partnerships with dozens of them to integrate their services into the Sonos platform. For example, in 2013, Sonos started working closely with Google to integrate the Google Play Music streaming service and Google Play Music launched on the Sonos platform in 2014 (with Google's YouTube Music service added later). *See, e.g.*, **Exhibit 82**. As recognized at the time, Sonos's integration work with Google was especially "deep" and gave Google a wide aperture through which to view Sonos's proprietary technology. *See, e.g.*, **Exhibit 83** (2014 *Wired*: "Now, Google Play Music will be available as an option to Sonos owners via the Sonos controller app (iOS, Android, and web). And, for the first time, the Google Play Music Android app is getting updated with a button that lets users easily play music from any Sonos speaker in the house. This is the first time this sort of deep integration has happened between a third party music service and Sonos.").

5

17.     As a pioneer in wireless audio, Sonos has been and continues to be at the forefront of technological innovation and diligently protects its inventions. Leading outside organizations have recognized the value of Sonos's ingenuity. For example, Sonos earned a spot on the IPO list of "Top 300 Organizations Granted U.S. Patents" and the IEEE recognized Sonos as having one of "[t]he technology world's most valuable patent portfolios." *See* **Exhibits 84 and 85**. Currently, Sonos is the owner of more than 750 United States Patents related to audio technology, as well as more than 420 pending United States Patent Applications. Sonos's patents cover important aspects of wireless multi-room audio systems, such as setting up a playback device on a wireless local area network, managing and controlling groups of playback devices (*e.g.*, adjusting group volume of playback devices and pairing audio players together for stereo sound), and synchronizing playback of audio within groups of playback devices. These features are covered by the Asserted Patents.

## III.     RESPONDENTS

### A.     Google LLC

18.     Proposed respondent Google LLC ("Google LLC") is a Delaware corporation with its principal place of business and headquarters at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

### GOOGLE'S INFRINGEMENT

19.     In 2015, a decade after Sonos's first product launch, Google released its "Chromecast Audio" – an audio adapter/dongle that can turn a speaker with an auxiliary port into a wireless, networked speaker. While the Chromecast Audio product did not launch with Sonos's patented multi-room audio functionality, Google clearly understood the importance of this popular audio feature as it released a multi-room audio software update only a couple of

6

months after launch. *See* **Exhibit 98** (2015 The Guardian: "Google is also working on multi-room audio streaming using the Chromecast Audio, but it will not support the popular feature out of the box.").

20.     In announcing its multi-room software update, Google explained the importance of this added functionality:

> A couple of months ago we launched Chromecast Audio…. Today we're starting to add two new features to the latest software update to elevate your listening experience…. Now you can easily fill every room in your home—bedroom, kitchen, living room, or wherever you have a Chromecast Audio connected—with synchronous music. Multi-room lets you group Chromecast Audio devices together so you can listen to the same song on multiple speakers.

**Exhibit 99** (December 2015 *Google Chrome Blog*).

21.     As observed in a 2015 *Variety* article entitled "Google's Chromecast Audio Adapter Gets Multi-Room Support Similar to Sonos," Google's updated Chromecast Audio was considered a "major" advancement for Google and was recognized as competing directly with Sonos because of its similar multi-room audio functionality:

> Google's recently-launched Chromecast Audio adapter is getting a major feature update this week: Consumers will now be able to group multiple Chromecast audio adapters to stream their favorite music simultaneously in more than one room, similar to the multi-room support available for internet-connected loudspeakers like the ones made by Sonos.

**Exhibit 100**.

22.     To control the multi-room Chromecast Audio, Google also provided a Chromecast app with multi-room audio functionality similar to the Sonos app. As observed in a 2015 article by *Pocket-Lint*, Google's multi-room app "can pretty much do the same thing" as Sonos's app:

> [Chromecast Audio]'s been updated to make it more comparable to Sonos, a smart speaker system that wirelessly streams all your Hi-Fi music to any room, or

7

every room. You control your Sonos experience with one app. Well, thanks to a new software rollout, Chromecast Audio can pretty much do the same thing.

**Exhibit 101**.

23. The media comparisons between Google's Chromecast Audio and Sonos's products are a result of the fact that, on information and belief, Google copied key features from Sonos. These features include, for example, Sonos's patented technology for setting up a playback device on a wireless local area network, adjusting group volume of playback devices, and synchronizing playback of audio within groups of playback devices.

24. Moreover, as explained above, Google released the Chromecast Audio merely two years after partnering with Sonos to integrate Google Play Music into the Sonos platform. On information and belief, Google exploited the knowledge of Sonos's system that it gained from this integration work to develop its multi-room Chromecast Audio product and infringe Sonos's patents.

25. Over the next four years, Google aggressively expanded its line of multi-room wireless audio products through new product releases and software updates. On information and belief, with each iteration, Google's copying of Sonos's products and patented technology became even more blatant.

26. For example, on information and belief, in 2016, a year after Google launched the Chromecast Audio wireless adapter, Google escalated its copying of Sonos by releasing the Google Home multi-room audio player (which was controlled by Google's rebranded multi-room controller app – the Google Home app). Unlike the Chromecast Audio, the Google Home added an internal speaker driver, making it an "all-in-one" audio player akin to Sonos's prior Play:1, Play:3, and Play:5 products.

8

27.     As with the Chromecast Audio, the Google Home was recognized as a direct attack on Sonos.  When the Google Home was announced, for example, *The Register* observed that "[n]o market is safe from [the] search engine monster" and that Google was, in particular, "offering new products to compete with Sonos in the music streaming market." *See* **Exhibit 102**. *The Register* further noted the conspicuous similarity that multiple "Google Homes will work with one another, allowing music to be spread into different rooms on command – like the very popular Sonos music system." *Id.*

28.     Like *The Register*, *The Verge* also recognized the similarities between the new infringing Google Home and Sonos's prior products: "You can also group multiple Home units together and play music through all of them simultaneously, similar to how Sonos works." *See* **Exhibit 103**.

29.     Again, the media comparisons between Google's Home and Sonos's products reflected a darker truth that, on information and belief, Google had misappropriated Sonos's innovations.  These innovations include, for example, Sonos's patented technology for setting up a playback device on a wireless local area network, adjusting group volume of playback devices, and synchronizing playback of audio within groups of playback devices.

30.     On information and belief, the Google Home proved to be merely another forerunner to further copying by Google.  In 2017, Google released two additional "all-in-one" wireless multi-room products – the Google Home Max and the Google Home Mini.  Google's Home Max in particular was seen as a "Sonos Clone" and a "not-so-subtle copy of the [Sonos] Play:5 speaker…." **Exhibit 104**.  As explained by *Gizmodo*, "[i]t's also hard not to see the [Google Home Max] device as something of a jab at Sonos." *Id.*; *see also, e.g.,* **Exhibit 105**

(2017 *Android Central*: "You can't help but look at Google Home Max… and come to the conclusion that Google is sticking its nose where Sonos has been for years.").

31.     As with Google's other prior infringing products, on information and belief, Google also copied Sonos's patented technology for the Google Home Max. This patented technology includes, for example, Sonos's patented technology for setting up a playback device on a wireless local area network, adjusting group volume of playback devices, and synchronizing playback of audio within groups of playback devices. With the Google Home Max, however, Google copied even more of Sonos's patented technology than it did with Google's previous wireless audio products. For instance, the Google Home Max also copied Sonos's patented "pairing" technology, which allows two audio playback devices to be paired together for stereo sound.

32.     On information and belief, Google's pervasive copying of Sonos's products and patented technology has resulted in an infringing product line that now includes at least the Chromecast, Chromecast Ultra, Chromecast Audio, Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, and Nest Wifi Point (individually or collectively, "Google Audio Player(s)"), all of which can be controlled by, for example, the Google Home app, Google Play Music app, and YouTube Music app (individually or collectively, "Google App(s)"). *See, e.g.*, **Exhibits 86-94**.[2]

---

[2] Any reference to a "Google Audio Player" or a "Google App" includes each version and generation of such player and app, unless otherwise noted.

33.     The image below shows a few of the infringing Google Audio Players.



34.     In addition to providing the various software Google Apps for controlling the Google Audio Players, Google also offers various infringing hardware controller devices that are pre-installed with the Google Play Music app or YouTube Music app (and capable of downloading and executing the Google Apps that are not pre-installed). These infringing hardware controller devices include, for example, Google's "Pixel" phones, tablets, and laptops (*e.g.*, the Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, and Pixel 4 XL phones, the Pixel Slate tablet, and the Pixelbook and Pixelbook Go laptops) (individually or collectively, "Google Pixel Device(s)").[3] *See, e.g.*, **Exhibits 95-97**.

35.     On information and belief, Google LLC is in the business of developing, manufacturing, importing and selling audio players, controllers, components thereof and products containing same that infringe the Asserted Patents, including, but not limited to, the Google Audio Players, Google Apps, and Google Pixel Devices (the "Infringing Products").

36.     On information and belief, Google LLC markets the Infringing Products to consumers in the United States through its established sales channels. *See id.* Google LLC also

---

[3] Any reference to a "Google Pixel Device" includes each version and generation of such device unless otherwise noted.

11

imports into the United States, sell for importation, and/or sell within the United States after importation from China, if not elsewhere, the Infringing Products. *See id.*

**B.    Alphabet Inc.**

37.    Proposed Respondent Alphabet Inc. ("Alphabet") is a Delaware corporation with its principal place of business and headquarters at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

38.    On information and belief, Alphabet owns and/or controls Google LLC and is involved in developing, manufacturing, importing and/or selling Infringing Products.

**IV.    THE PRODUCTS AT ISSUE**

39.    Pursuant to Rules 210.10(b)(1) and 210.12(a)(12), 19 C.F.R. §§ 210.10(b)(1) and 210.12(a)(12), in plain English the categories of accused products are networked speaker devices, smart speaker devices, networked adapter devices with audio capabilities, networked dongle devices with audio capabilities, networked display devices with audio capabilities, networked hub devices with audio capabilities, networked node devices with audio capabilities, and mobile phones, tablets, and laptops capable of controlling such devices, and components thereof and products containing the same made by or on behalf of Respondents.

40.    The Infringing Products are imported into the United States, sold for importation into the United States, and/or sold within the United States after importation by or on behalf of Respondents.  On information and belief, commercially significant volumes of infringing products are maintained in inventory by Respondents in the United States.

41.    Sonos products practice claims of each asserted patent.  These "Domestic Articles" are Sonos audio players and the controller application, including the following: One, One SL, Play:5, Move, Beam, Playbar, Playbase, Port, Sub, and Amp, as well as the Sonos app.

12

42.     Pursuant to Commission Rule 210.12(b), 19 C.F.R. § 210.12(b), Complainant is submitting herewith the following physical samples of representative Domestic Articles and imported Infringing Products that are the subject of this complaint: Sonos Beam, Sonos One, Sonos Play:5, Sonos Playbar, Sonos Port, Sonos Sub, Google Chromecast, Google Chromecast Ultra, Google Home, Google Home Hub, Google Home Max, Google Home Mini, Google Nest Mini, Google Pixel 3, Google Pixel 3XL, and Google Pixel 4.

## V.     THE ASSERTED PATENTS

### A.     Background

43.     Sonos was founded to solve various shortcomings in existing conventional audio technology. At the time, a "conventional multi-zone audio system" was based on a centralized device that was hard-wired with dedicated speaker wire to audio players in different rooms. *See, e.g.,* '949 Patent at 1:41-47, 1:57-60; *see also, e.g.,* '959 Patent at 6:54-61. These "audio players" were basic "speakers" that passively received and outputted audio signals but lacked processing capabilities. *See, e.g.,* '949 Patent at 1:41-60.

44.     In this conventional hard-wired configuration, each audio player relied on a centralized device that managed and controlled the multi-zone audio system. Under this approach, audio sources were either hard-wired to the centralized device, which made playing different audio sources at different audio players difficult (if not impossible), or hard-wired locally at a given audio player, which "[made] source sharing difficult." *See, e.g.,* '949 Patent at 1:45-56. For example, before an audio player could play audio from a source, a user had to configure the centralized device to route audio to the audio player from the common source. *See, e.g., id.* at 1:50-60.

13

45.    In these conventional hard-wired systems, it was often difficult or impossible to play different audio sources on different audio players, group and control audio players, access and play networked-based audio sources (*e.g.,* Internet radio), and install and configure the system in the first instance, which required physically connecting every device to the centralized device. *See, e.g.,* '949 Patent at 1:34-2:13; '959 Patent at 6:52-61.

46.    As recognized in 2005 when Sonos released its first products, Sonos developed a series of new technologies to solve the many shortcomings of conventional hard-wired audio systems, thereby revolutionizing the field. In turn, Sonos's own introduction of paradigm-shifting technology created new technological opportunities and/or challenges that Sonos further solved.

47.    For starters, Sonos provided an unconventional system architecture comprising "zone players" (also referred to as "playback devices") on a computer data network that were controlled by physical "controller" devices. *See, e.g.,* '949 Patent at FIG. 1; '258 Patent at FIG 1. The following figure illustrates a simplified diagram of an exemplary Sonos audio system in accordance with this new system architecture, which comprises "zone players" 102, 104 and 106 and "controllers" 140 and 142 coupled to one another by a local data network 108 and two local audio sources 110 and 112 along with a connection to the Internet:



*FIG. 1*

14

'949 Patent at FIG. 1; *see also, e.g.*, '258 Patent at FIG. 1.

48.     Unlike audio players in conventional centralized, hard-wired multi-zone audio systems, Sonos's zone players were "independent playback devices" with a data network interface and processing intelligence enabling each zone player to independently access and play back any audio source available on a local data network or another data network coupled thereto (*e.g.*, the Internet) without a centralized device. *See, e.g.*, '949 Patent at 4:60-64, 5:2-36, 9:50-52, Claims 1, 8, 15; '258 Patent at 1:33-44, 2:40-3:22, Claims 1, 11, 17.

49.     The new, unconventional nature of Sonos's zone players introduced additional technological challenges to Sonos's system, which required Sonos's zone players to have new intelligence enabling the, to share information with one another so that they could reproduce audio information synchronously. *See, e.g.*, '258 Patent at 31:34-41. Thus, Sonos's new system featured zone players that could simultaneously play different audio from different sources but also be grouped together to play the same audio source in a synchronized manner. *See, e.g.*, '258 Patent at FIG. 1, 3:50-61, 4:22-50, 5:10-6:64, Claims 1, 11, 17; '949 Patent at 2:28-48, 9:49-59, Claims 1, 8, 15.

50.     Further, unlike the "pre-configured and pre-programmed controller[s]" used to control conventional centralized, hard-wired audio systems, Sonos's controller devices were capable of remotely controlling any zone player in a Sonos audio system from anywhere in a user's house or similar location via a data network. *See, e.g.*, '949 Patent at 6:43-60; *see also, e.g.*, '258 Patent at 5:27-29, 5:38-40, 6:37-46. Building on the intelligence of Sonos's new zone players, Sonos's controllers had new capabilities, including dynamically "grouping the zone players" and "control[ling] the volume of each of the zone players in a zone group individually

15

Appx421

or together." '949 Patent at 6:43-60; *see also, e.g.*, '258 Patent at FIG. 1, 3:50-61, 4:22-50, 5:10-6:64, 9:17-26, Claims 1, 11, 17.

51.     Thus, Sonos's audio system comprising networked zone players controlled by physical controllers over a data network provided an entirely new audio paradigm that overcame the technological deficiencies of conventional audio systems. Moreover, Sonos's unconventional system architecture created new technological challenges that needed to be solved and provided a new platform for further innovation. As discussed in further detail below, the Asserted Patents are directed to overcoming these technological challenges and building on this new platform.

**B.     U.S. Patent No. 9,195,258**

**1.     Identification of the '258 Patent and Ownership by Complainant**

52.     U.S. Patent No. 9,195,258 (the "'258 Patent") is entitled "System And Method For Synchronizing Operations Among A Plurality Of Independently Clocked Digital Data Processing Devices." The named inventor is Nicholas A.J. Millington. The '258 Patent's application was filed February 20, 2014, it claims priority to a provisional application filed July 28, 2003, the patent issued November 24, 2015 and is assigned to Sonos, Inc. *See,* **Exhibits 1 and 9.** The applicable maintenance fees have been paid and the '258 Patent is valid and enforceable. The '258 Patent will expire April 1, 2024.

53.     Pursuant to Commission Rule 210.12(a)(9)(i), 19 C.F.R. § 210.12(a)(9)(i), Complainant attaches as **Exhibit 1** a certified copy of the '258 Patent.[4] Pursuant to Commission Rule 210.12(c)(1), 19 C.F.R. § 210.12(c)(1), Complainant submits as **Appendix A** one certified

---

[4] Attached as **Exhibit 2** is a copy of the Certificate of Correction for the '258 Patent excerpted from the certified file wrapper for the '258 patent.

copy of the U.S. Patent and Trademark Office prosecution history for the '258 Patent, plus three additional copies thereof. Pursuant to Commission Rule 210.12(c)(2), 19 C.F.R. § 210.12(c)(2), Complainant submits as **Appendix H** each patent and the applicable pages of each technical reference mentioned in the prosecution history of the '258 Patent, plus three additional copies thereof.

### 2.      Foreign Counterparts to the '258 Patent

54.      Attached as **Exhibit 15** is an identification of the foreign patents, foreign patent applications (not already issued as a patent), and foreign patent applications that have been denied, abandoned or withdrawn and are known to Sonos to correspond to the '258 Patent.

### 3.      Non-Technical Description of the '258 Patent[5]

55.      The '258 Patent relates generally to devices, systems, and methods for synchronizing audio playback among a group of zone players.

56.      In conventional multi-zone audio systems, a centralized device (such as an audio receiver) would send an analog audio signal over dedicated speaker wires to multiple, passive speakers (which could be located in different zones). Those speakers would, in turn, merely output audio corresponding to the analog signal. In contrast, the unconventional nature of Sonos's intelligent audio players ("zone players" in the terminology of this patent), which communicated with one another over a data network, introduced technological challenges to achieving synchronized playback. *See, e.g.*, '258 Patent at 1:55-2:36.

---

[5] This description and other descriptions of the relevant technology within this Complaint are for illustrative purposes only. Nothing contained within this Complaint is intended to either implicitly or explicitly express any position regarding the proper construction of any claim of any Asserted Patent or to affect the scope of the investigation, discovery, or any remedy the Commission may order.

57. For instance, the '258 Patent recognized the technological challenge of how to "ensur[e] that, if two or more audio playback devices are contemporaneously attempting to play back the same audio program, they do so simultaneously." '258 Patent at 2:17-36. This was important because, as the '258 Patent recognized, "[s]mall differences in the audio playback devices' start times and/or playback speeds can be perceived by a listener as an echo effect, and larger differences can be very annoying." *Id*. at 2:20-22.

58. A main aspect of technological challenge was complicated by the fact that the "audio playback devices that are being developed have independent clocks, and, if they are not clocking at precisely the same rate, the audio playback provided by the various [playback] devices can get out of synchronization." *Id*. at 2:32-36. The '258 Patent also recognized that "differences in the audio playback devices' start times and/or playback speeds" "can arise… for a number of reasons, including delays in the transfer of audio information over the network," and that "[s]uch delays can differ as among the various audio playback devices for a variety of reasons, including where they are connected into the network, message traffic, and other reasons…." *Id*. at 2:20-27.

59. Thus, the '258 Patent recognized a need for "a new and improved system and method for synchronizing operations among a number of digital data processing devices that are regulated by independent clocking devices." *See, e.g.*, '258 Patent at 2:40-43. In the '258 Patent, each zone player is equipped with a data network interface and intelligence enabling it to independently access and play back audio from a variety of network-accessible audio sources and dynamically enter a group with one or more other zone players for synchronized audio playback based on an instruction from a controller. *See, e.g.*, '258 Patent at FIG. 1, 3:50-61, 4:22-50, 5:10-6:64, Claims 1, 11, 17. While grouped, the zone players are capable of sharing

18

particular information over a data network to facilitate "reproduc[ing] audio information synchronously" despite the fact that the "zone players operate with independent clocks" and exchange packets over a data network with "differing delays." '258 Patent at 31:34-41.

60. In this regard, the '258 Patent is directed to a zone player configured to enter into a synchrony group with another "zone player" in which the zone players are configured to playback audio in synchrony based at least on (i) audio content, (ii) playback timing information associated with the audio content, and (iii) clock time information for one of the "zone players." *See, e.g.,* '258 Patent at Claims 1, 11, 17.

61. The grouping and synchronization technology of the '258 Patent provides significant advantages that are important to wireless audio systems. The advantages of Sonos's patented grouping and synchronization technology are reflected in the recognition and praise it has received from the press. For example, in 2005, shortly after Sonos released its first commercial products, *PC Magazine* touted the Sonos system for its ability to "play the same music throughout the house, perfectly synchronized." *See* **Exhibit 106**. Similarly, in 2005, *The Wall Street Journal* praised Sonos's system for the ability to "play... the same songs, in each room simultaneously." *See* **Exhibit 110**. As another example, in 2013, *Macworld* exclaimed: "Sonos is the gold standard when it comes to multi-room audio... you can drive the system from any computer or handheld device, playing music in sync throughout the house...." *See* **Exhibit 111**. Likewise, in 2013, *NBC News* praised Sonos's patented synchronization technology as "mind blowing." *See* **Exhibit 76** ("If you're not familiar with Sonos, this company revolutionized the home audio world a decade ago when it launched the first (rather expensive) Sonos kits.... If you wanted the same song in every room, no problem, the tracks would be

19

perfectly in sync…. At the time, this was mind blowing. Never before could you get music in every room without drilling a bunch of holes for wires….").

### C.     U.S. Patent No. 10,209,953

#### 1.     Identification of the '953 Patent and Ownership by Complainant

62.     U.S. Patent No. 10,209,953 (the "'953 Patent") is entitled "Playback Device." The named inventor is Nicholas A.J. Millington. The '953 Patent's application was filed August 31, 2018, it claims priority to an application filed July 28, 2003, it issued 10,209,953, and is assigned to Sonos, Inc. *See,* **Exhibits 3** ('953 Patent identifying "Sonos, Inc." as the assignee), **13** (assignment of 10/816,217 application leading to the '953 Patent to "Rincon Networks, Inc.") and **14** (showing "Rincon Networks, Inc." changed its name to "Sonos, Inc."). The applicable maintenance fees have been paid and the '953 Patent is valid and enforceable. The '953 Patent will expire April 1, 2024.

63.     Pursuant to Commission Rule 210.12(a)(9)(i), 19 C.F.R. § 210.12(a)(9)(i), Complainant attaches as **Exhibit 3** a certified copy of the '953 Patent. Pursuant to Commission Rule 210.12(c)(1), 19 C.F.R. § 210.12(c)(1), Complainant submits as **Appendix B** one certified copy of the U.S. Patent and Trademark Office prosecution history for the '953 Patent, plus three additional copies thereof. Pursuant to Commission Rule 210.12(c)(2), 19 C.F.R. § 210.12(c)(2), Complainant submits as **Appendix H** each patent and the applicable pages of each technical reference mentioned in the prosecution history of the '953 Patent, plus three additional copies thereof.

#### 2.     Foreign Counterparts to the '953 Patent

64.     Attached as **Exhibit 15** is an identification of the foreign patents, foreign patent applications (not already issued as a patent), and foreign patent applications that have been denied, abandoned or withdrawn and are known to Sonos to correspond to the '953 Patent:

20

### 3. Non-Technical Description of the '953 Patent

65. The '953 Patent is related to the '258 Patent, described in § V(B)(3), *supra*, and the patents share essentially the same specification. The '953 Patent, however, is directed to functions performed by a zone player that has been designated as a "slave" zone player of a synchrony group. In this respect, the '953 Patent is directed to a zone player that, while operating as a slave of a synchrony group, receives particular information over a data network from a zone player designated as the master of the synchrony group. The slave zone player performs various functions based on such received information to facilitate engaging in synchronous playback of audio with the master zone player.

66. More specifically, the '953 Patent is directed to a zone player that, after beginning to operate as a slave of a synchrony group, functions to receive, from another zone player operating as a master of the synchrony group over a LAN, (a) audio information for an audio track and (b) playback timing information associated with the audio information for the audio track that comprises an indicator of a future time at which the zone players are to initiate synchronous playback of the audio information. *See, e.g.*, '953 Patent at Claims 1, 7, 25. The '953 Patent is also directed to a zone player that, after beginning to operate as a slave of a synchrony group, functions to perform the aforementioned operations as well as functions to (i) update the future time to account for a determined differential between the clock time of the zone player and the clock time of the master zone player and (ii) initiate synchronous playback of the received audio information with the master zone player when the clock time of the zone player reaches the updated future time. *See, e.g.*, '953 Patent at Claims 1, 7, 25.

21

**D.    U.S. Patent No. 8,588,949**

**1.    Identification of the '949 Patent and Ownership by Complainant**

67.    U.S. Patent No. 8,588,949 (the "'949 Patent") is entitled "Method And Apparatus For Adjusting Volume Levels In A Multi-Zone System." The named inventors are Robert A. Lambourne and Nicholas A.J. Millington. The '949 Patent's application was filed September 14, 2012, it claims priority to an application filed July 28, 2003, it issued November 19, 2013, and is assigned to Sonos, Inc. *See,* **Exhibits 4 and 10.** The applicable maintenance fees have been paid and the '949 Patent is valid and enforceable. The '949 Patent will expire April 1, 2024.

68.    An *Ex Parte* Reexamination Certificate issued November 5, 2015 in response to Reexamination Request No. 90/013,423, January 5, 2015. The Reexamination Certificate states that "Claims 1, 3, 4, 5, 6, 8, 10, 11, 13, 14, 15 and 17-20 are determined to be patentable as amended. Claims 2, 5, 9, 12, and 16, dependent on an amended claim, are determined to be patentable."

69.    Pursuant to Commission Rule 210.12(a)(9)(i), 19 C.F.R. § 210.12(a)(9)(i), Complainant attaches as **Exhibit 4** a certified copy of the '949 Patent and as **Exhibit 5** the reexamination certificate. Pursuant to Commission Rule 210.12(c)(1), 19 C.F.R. § 210.12(c)(1), Complainant submits as **Appendix C** one certified copy of the U.S. Patent and Trademark Office prosecution history for the '949 Patent, plus three additional copies thereof and submits as **Appendix D** one certified copy of the U.S. Patent and Trademark Office prosecution history for Reexamination Request No. 90/013,423 for U.S. Patent No. 8,588,949, plus three additional copies thereof. Pursuant to Commission Rule 210.12(c)(2), 19 C.F.R. § 210.12(c)(2), Complainant submits as **Appendix H** each patent and the applicable pages of each technical

reference mentioned in the prosecution history of the '949 Patent, plus three additional copies thereof.

### 2. Foreign Counterparts to the '949 Patent

70. There are no foreign patents, foreign patent applications (not already issued as a patent), or foreign patent applications that have been denied, abandoned or withdrawn and are known to Sonos to correspond to the '949 Patent.

### 3. Non-Technical Description of the '949 Patent

71. The '949 Patent relates generally to devices, computer-readable media, and methods for controlling a plurality of playback devices on a local area network.

72. The '949 Patent recognized problems with conventional multi-zone audio systems. For instance, the '949 Patent recognized that "conventional multi-zone audio system[s]" were undesirably based on a centralized device that was hard-wired to audio players in different rooms with dedicated speaker wire. *See, e.g.,* '949 Patent at 1:41-47, 1:57-60. Moreover, because these "conventional multi-zone audio system[s]" were "either hard-wired or controlled by a pre-configured and pre-programmed controller," it was "difficult for [a conventional] system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups," among other disadvantages of conventional multi-zone audio systems. *See, e.g., id.* at 1:57-2:12.

73. Thus, the '949 Patent recognized "a need for dynamic control of [] audio players as a group" and a solution that allowed "audio players [to] be readily grouped" with "minimum manipulation." *See, e.g., id.* at 2:13-15. In particular, the '949 Patent recognized "a need for user interfaces that may be readily utilized to group and control [] audio players." *See, e.g., id.* at 1:15-18.

23

74. The '949 Patent addressed this need through a controller capable of controlling a zone players in a networked audio system via a local data network. For example, such a controller could not only dynamically "group[] the zone players" but then also "control the volume of each of the zone players in a zone group individually or together." *See, e.g.,* '949 Patent at 6:43-60.

75. In this regard, the '949 Patent is directed to a controller configured to (i) provide a user interface for a player group that includes a plurality of players, each being an independent playback device, (ii) accept an input to facilitate formation of the player group for synchronized playback of a multimedia output from the same multimedia source, (iii) accept, for any individual player in the player group, a player-specific input to adjust the volume of that individual player, where the player-specific input causes that individual player to adjust its volume, and (iv) accept a group-level input to adjust a volume associated with the player group, where the group-level input causes each of the players in the player group to adjust its respective volume. *See, e.g.,* '949 Patent at Claims 1, 8, 15.

76. The group volume control technology of the '949 Patent provides significant advantages that are important to wireless audio systems. The advantages of Sonos's group volume control technology are reflected in the recognition and praise it has received from the press. For example, shortly after Sonos launched its first commercial product in 2005, *PC Magazine* exclaimed: "[Sonos] is the first digital audio hub we can recommend without reservation…. Once you're back to using the master volume control, the volume rises or falls relative to each room's existing setting. These are the brilliant touches…." *See* **Exhibit 106**. As another example, in 2005, *Playlist* lauded Sonos's "Controller" for its "stand[] out" interface that enables dynamic grouping of Sonos players and volume control. *See* **Exhibit 107**.

Likewise, in 2008, *Gizmodo* praised Sonos for the ability to "[c]hange the volume in a single room, or in all your rooms at once, all from the Sonos Controller." *See* **Exhibit 108**. A few years later, in 2012, *Pocket-lint* touted Sonos's patented group volume technology as "simple but clever." *See* **Exhibit 109**.

**E.    U.S. Patent No. 9,219,959**

**1.    Identification of the '959 Patent and Ownership by Complainant**

77.    U.S. Patent No. 9,219,959 (the "'959 Patent") is entitled "Multi-Channel Pairing In A Media System." The named inventors are Christopher Kallai, Michael Darrell Andrew Ericson, Robert A. Lambourne, Robert Reimann, and Mark Triplett. The '959 Patent's application was filed June 9, 2014, the patent issued December 22, 2015, and is assigned to Sonos, Inc. *See,* **Exhibits 6 and 11.** The applicable maintenance fees have been paid and the '959 Patent is valid and enforceable. The '959 Patent will expire September 11, 2027.

78.    An *Ex Parte* Reexamination Certificate issued April 5, 2017 in response to Reexamination Request No. 90/013,756, May 25, 2016. As a result of reexamination, original claims 1 and 14 were cancelled, claims 2-13 and 15-22 were determined to be patentable as amended, and new claims 23-48 were added and determined to be patentable.

79.    Pursuant to Commission Rule 210.12(a)(9)(i), 19 C.F.R. § 210.12(a)(9)(i), Complainant attaches as **Exhibit 6** a certified copy of the '959 Patent and as **Exhibit 7** the reexamination certificate. Pursuant to Commission Rule 210.12(c)(1), 19 C.F.R. § 210.12(c)(1), Complainant submits as **Appendix E** one certified copy of the U.S. Patent and Trademark Office prosecution history for the '959 Patent, plus three additional copies thereof and submits as **Appendix F** one certified copy of the U.S. Patent and Trademark Office prosecution history for Reexamination Request No. 90/013,756 for U.S. Patent No. 9,219,959, plus three additional copies thereof. Pursuant to Commission Rule 210.12(c)(2), 19 C.F.R. § 210.12(c)(2),

Complainant submits as **Appendix H** each patent and the applicable pages of each technical reference mentioned in the prosecution history of the '959 Patent, plus three additional copies thereof.

### 2. Foreign Counterparts to the '959 Patent

80.　　Attached as **Exhibit 15** is an identification of the foreign patents, foreign patent applications (not already issued as a patent), and foreign patent applications that have been denied, abandoned or withdrawn and are known to Sonos to correspond to the '959 Patent:

### 3. Non-Technical Description of the '959 Patent

81.　　The '959 Patent relates generally to devices and methods for providing audio in a multi-channel listening environment (*e.g.*, a stereo sound or home theater surround sound environment). '959 Patent at 1:54-63 and 3:32-46.

82.　　The '959 Patent recognized that conventional multi-zone audio systems based on a centralized device hard-wired to "individual, discrete speakers" in different rooms required "physically connecting and re-connecting speaker wire, for example, to individual, discrete speakers to create different configurations." *See, e.g.*, '959 Patent at 6:54-58. Because these conventional multi-zone audio systems were hard-wired to individual, discrete speakers, it was difficult (if not impossible) to group, consolidate, and pair the speakers into different desired configurations without connecting and re-connecting speaker wire. *See, e.g., id.*

83.　　Thus, the '959 Patent recognized a need to "provide a more flexible and dynamic platform through which sound reproduction can be offered to the end-user." '959 Patent at 6:58-61. The '959 Patent met this need with a controller with a control interface through which "actions of grouping, consolidation, and pairing [were] performed," and a playback device with processing intelligence capable of being dynamically "pair[ed]" with another playback device to simulate "a multi-channel listening environment." *Id.* at 2:16-19 and 6:54-58.

26

84. In the '959 Patent, if a playback device determines that it is to operate according to a particular type of pairing (*e.g.*, a "stereo pair"), it may perform a particular type of equalization corresponding to that type of pairing (*e.g.*, play only the left or right channel of audio). But, if the playback device determines that it is to operate according to a different type of pairing (*e.g.*, no pairing), it may perform a different type of equalization corresponding to that type of pairing (*e.g.*, play both the left and right channels of audio). '959 Patent, 1:64-2:16 and 4:26-37.

85. In this respect, the '959 Patent is directed to a playback device configured to (i) receive an instruction from a controller over a network for the playback device to pair with one or more other playback devices, (ii) process audio data before the playback device outputs audio, (iii) determine that a type of pairing of the playback device comprises one of at least a first type of pairing or a second type of pairing, (iv) perform a first equalization of the audio data before outputting audio based on the audio data when the type of pairing is determined to comprise the first type of pairing, and (v) perform a second equalization of the audio data before outputting audio when the type of pairing is determined to comprise the second type of pairing. *See, e.g.*, '959 Patent at Claims 4-7, 9-11, 17-20.

86. The multi-channel pairing technology of the '959 Patent provides significant advantages that are important to wireless audio systems. The advantages of Sonos's multi-channel pairing technology are reflected in the recognition and praise it has received from the press. For example, in 2010, around the time that Sonos released its multi-channel pairing technology, *SlashGear* praised Sonos's technology as "a slick way for users… to combine two speakers when they want better sound." *See* **Exhibit 112**. Similarly, in 2015, *Trusted Reviews* described Sonos's multi-channel pairing technology as "[o]ne particularly nifty feature," and

27

explained that it allows you to "[p]air up multiple speakers for better sound." *See* **Exhibit 113**; *see also* **Exhibit 114** (2014 *Consumer Reports*: praising Sonos's multi-channel pairing technology as providing "a richer, more detailed sound with wider soundstage."); **Exhibit 115** (2014 Businessweek: recognizing Sonos's pairing technology as appealing to the "audiophile"); **Exhibit 116** (2013 *What Hi-Fi*: praising Sonos's pairing technology because "performance is bolstered significantly. Bass is even more solid, instrument separation improves, smaller details are picked up with more confidence and sound can go noticeably louder without distortion.").

**F. U.S. Patent No. 10,439,896**

**1. Identification of the '896 Patent and Ownership by Complainant**

87.     U.S. Patent No. 10,439,896 (the "'896 Patent") is entitled "Playback Device Connection." The named inventors are Nicholas A.J. Millington and Paul V. Hainsworth. The '896 Patent's application was filed March 11, 2019, it claims priority to an application filed June 5, 2004, it issued October 8, 2019, and is assigned to Sonos, Inc. *See,* **Exhibits 8 and 12.** The applicable maintenance fees have been paid and the '896 Patent is valid and enforceable. The '896 Patent will expire June 6, 2025.

88.     Pursuant to Commission Rule 210.12(a)(9)(i), 19 C.F.R. § 210.12(a)(9)(i), Complainant attaches as **Exhibit 8** a certified copy of the '896 Patent. Pursuant to Commission Rule 210.12(c)(1), 19 C.F.R. § 210.12(c)(1), Complainant submits as **Appendix G** one certified copy of the U.S. Patent and Trademark Office prosecution history for the '896 Patent, plus three additional copies thereof. Pursuant to Commission Rule 210.12(c)(2), 19 C.F.R. § 210.12(c)(2), Complainant submits as **Appendix H** each patent and the applicable pages of each technical reference mentioned in the prosecution history of the '896 Patent, plus three additional copies thereof.

### 2. Foreign Counterparts to the '896 Patent

89.     There are no foreign patents, foreign patent applications (not already issued as a patent), or foreign patent applications that have been denied, abandoned or withdrawn are known to Sonos to correspond to the '896 Patent.

### 3. Non-Technical Description of the '896 Patent

90.     The '896 Patent relates generally to devices, methods, and computer-readable media for connecting a zone player (or playback device) to a secure wireless local area network (WLAN), thereby setting up the zone player for use in a networked audio system.

91.     The '896 Patent recognized problems with conventional device-setup technology for connecting "consumer electronic devices" (*e.g.*, "home entertainment products") to a network. *See, e.g.*, '896 Patent at 1:37-67. For instance, "[c]onsumer electronic devices that operate using wireless or wired Ethernet standards are often subject to the same complicated set-up process as a wireless computer network." *Id.* at 1:37-39.

92.     Indeed, a conventional setup process typically required "the person who sets up the wireless network [to] have at least some knowledge about IP (Internet Protocol) networking and Ethernet (*e.g.*, 802.3, 802.11), such as addressing, security, broadcast, unicast, etc." '896 Patent at 1:40-43. Thus, to connect a computer to a wireless network, "the user [had] to know what type of network the computer [was] going to be connected to," which was a "difficult question [for] the average consumers" to answer. *Id.* at 1:57-63. Moreover, there were additional "questions or options related to [] security settings [] which evidently require[d] some good understanding about the network security over the wireless network." *Id.* at 1:63-67. The '896 Patent recognized that it was "impractical to require average consumers to have such knowledge to hook up consumer electronic devices, such as home entertainment products that use wireless/wired Ethernet connectivity." *Id.* at 1:46-49.

29

93.     The '896 Patent also recognized that a device that has yet to be setup on a network has limited networking capability and is not addressable by other devices, which presents technical challenges as to how that device can receive information that facilitates the device's setup to operate on the network. *See, e.g.*, '896 Patent at 11:4-14.

94.     Thus, the '896 Patent recognized there was "a clear need to create simple methods of setting up and maintaining a secure wireless/wired in-home network with minimum human interventions." *Id.* at 2:1-4.

95.     In this regard, the '896 Patent is directed to a computing device comprising a graphical user interface (GUI) associated with an application for controlling one or more playback devices and that is configured to facilitate setting up a playback device to operate on a secure wireless local area network (WLAN). Further, the '896 Patent is directed to a computing device configured to (i) while operating on a secure WLAN defined by an access point, (a) receive user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receive a first message indicating that a given playback device is available for setup, (ii) transmit a response to the first message that facilitates establishing with the given playback device an "initial communication path" that does not traverse the access point, (iii) transmit, to the given playback device via the initial communication path, a second message containing network configuration parameters for the secure WLAN, and (iv) after detecting an indication that the given playback device has successfully received the network configuration parameters, transition from communicating with the given playback device via the initial communication path to communicating with the given playback device via the secure WLAN. *See, e.g.*, '896 Patent at Claims 1, 13, 20.

30

96.     The playback-device-setup technology of the '896 Patent provides significant advantages that are important to wireless audio systems.  The advantages of Sonos's patented playback-device-setup technology are reflected in the recognition and praise it has received from the press.  For example, in 2015, *Ars Technica* explained that with Sonos:

> There was no convoluted wireless setup, syncing issues, or complex software to decipher: I simply downloaded the Sonos app on the Google Play Store, pushed the sync button on the back of the speaker, and it did the rest.  When you can describe the entire setup procedure in a single sentence, that's special.

**Exhibit 117**.  Likewise, *Gizmodo* touted Sonos's patented playback-device-setup technology as "so easy that anybody can do it."  **Exhibit 118**.  And *Consumer Reports* explained that Sonos's playback-device-setup technology is "pretty simple."  **Exhibit 48**.


## VI.     SPECIFIC INSTANCES OF IMPORTATION AND SALE

97.     Respondents import, sell for importation, and/or sell within the United States after importation certain audio players and controllers, components thereof, and products containing the same that infringe the Asserted Patents.

98.     The specific instances of importation of the Respondents' products set forth below are illustrative and nonexhaustive examples of the Respondents' unlawful importation.

99.     The Google Home Max is an exemplary audio player that infringes the Asserted Patents and is imported, sold for importation, and/or sold after importation by Google.  Complainant ordered a Google Home Max from Google LLC and it was delivered to Chicago, IL.  The packaging for the Google Home Max delivered to Chicago says, "Designed by Google, Made in China."  *See* **Exhibit 54**.

100.     The Google Pixel 3 XL is an exemplary controller that infringes the Asserted Patents and is imported, sold for importation, and/or sold after importation by Google.

Complainant ordered a Google Pixel 3 XL from Google LLC and it was delivered to Chicago, IL. The packaging for the Google Pixel 3 XL delivered to Chicago says, "Designed by Google, Made in China." *See* **Exhibit 55**.

## VII.    UNLAWFUL AND UNFAIR ACTS COMMITTED BY RESPONDENTS

101.    On information and belief, Respondents unlawfully import, sell for importation, and sell after importation into the United States Infringing Products. These Infringing Products include, but are not limited to, (i) Google's Chromecast, Chromecast Ultra, Chromecast Audio, Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, and Nest Wifi Point audio players, (ii) the Google Home app, Google Play Music app, and YouTube Music app, and (iii) Google's "Pixel" phones, tablets, and laptops (*e.g.*, the Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, and Pixel 4 XL phones, the Pixel Slate tablet, and the Pixelbook and Pixelbook Go laptops) that are pre-installed with or capable of downloading and executing an app or other software (such as the Google Home app, Google Play Music app and/or YouTube Music app) and are controllers for audio players.

102.    On information and belief, the Infringing Products infringe, literally and/or under the doctrine of equivalents, directly and/or indirectly the following Asserted Claims of the Asserted Patents:

| Patent No. | Asserted Claims |
|---|---|
| 9,195,258 | Independent claim 17 and dependent claims 21-24 and 26 |
| 10,209,953 | Independent claim 7 and dependent claims 12-14 and 22-24 |
| 8,588,949 | Independent claim 1 and dependent claims 2, 4 and 5 |
| 9,219,959 | Independent claims 5, 9, and 10 and dependent claims 29 and 35 |
| 10,439,896 | Independent claim 1 and dependent claims 3, 5, 6, and 12 |

32

103. The claim charts attached as **Exhibits 16-20** apply each asserted independent claim of each involved U.S. patent to a representative involved article of Respondents.

104. On information and belief, Google directly infringes the Asserted Claims by making, using, offering to sell, or selling the Infringing Products in the United States and by importing the Infringing Products into the United States in violation of 35 U.S.C. § 271(a).

105. On information and belief, Google also actively, knowingly, and intentionally induces the infringement of the Asserted Claims by actively encouraging others to make, use, offer to sell, or sell the Infringing Products in the United States and/or import the Infringing Products into the United States in violation of 35 U.S.C. § 271 (b).

106. Google had actual knowledge of the Asserted Patents and the allegation that it infringed the Asserted Claims prior to the filing of this complaint. On January 6, 2020, Sonos served a copy of this complaint and **Exhibits 1-8** and **16-20** (the asserted patents and the charts illustrating how the Infringing Products infringe the asserted independent claims) on Corporation Service Company, Google's registered agent for service of process. That same day, Sonos provided Google with a courtesy copy of the complaint and **Exhibits 1-8** and **16-20** by electronic mail.

107. Despite knowing of the '258 and '953 Patents, Google actively, knowingly, and intentionally induced the infringement of the Asserted Claims by actively encouraging others to make, use, offer to sell, or sell the Infringing Products in the United States and/or import the Infringing Products into the United States in violation of 35 U.S.C. § 271 (b). For example, in advertising the "Multi-room audio" capability of its wireless audio products on its website, Google instructs its customers that they can "[g]roup any combination of Google Home, Chromecast Audio, or speakers with Chromecast together for synchronous music throughout the

33

home." *See, e.g.*, **Exhibit 50**. Likewise, Google's website includes a webpage entitled "Create and manage speaker groups," which encourages its customers to "Group any combination of Google Nest or Google Home speakers and displays, Chromecast devices, and speakers with Chromecast built-in together for synchronous music throughout the home." *See, e.g.*, **Exhibit 86**.

108.    Despite knowing of the '949 Patent, Google actively, knowingly, and intentionally induced the infringement of the Asserted Claims by actively encouraging others to make, use, offer to sell, or sell the Infringing Products in the United States and/or import the Infringing Products into the United States in violation of 35 U.S.C. § 271 (b).  For example, Google's website includes a webpage entitled "How to change the volume of an audio group," which teaches Google's customers "[t]o adjust the volume of **all speakers in a group**" and "[t]o adjust a **single speaker's volume** when it's part of a group". *See* **Exhibit 49** (emphasis in original).

109.    Despite knowing of the '959 Patent, Google actively, knowingly, and intentionally induced the infringement of the Asserted Claims by actively encouraging others to make, use, offer to sell, or sell the Infringing Products in the United States and/or import the Infringing Products into the United States in violation of 35 U.S.C. § 271 (b).  For example, Google instructs its Google Home Max customers to "[w]irelessly pair two for room-filling stereo separation" for "[a]n even wider stereo image." **Exhibit 51**.  As another example, Google's website includes a webpage entitled "Pair Google Home Max speakers," which encourages its customers to "pair two Google Home Max speakers (devices) for stereo sound and an immersive experience for music and casting," and explains how to "[p]air the speakers" and "[c]ontrol the speaker pair." **Exhibit 52**.

34

110.     Despite knowing of the '896 Patent, Google actively, knowingly, and intentionally induced the infringement of the Asserted Claims by actively encouraging others to make, use, offer to sell, or sell the Infringing Products in the United States and/or import the Infringing Products into the United States in violation of 35 U.S.C. § 271 (b).  For example, Google's website includes a webpage entitled "Set up your Google Nest or Google Home speaker or display," which instructs Google's customers that "[t]he Google Home app will walk you through the steps to set up your Google Nest or Google Home speaker or display." **Exhibit 53**.

111.     Pursuant to 35 U.S.C. § 271(c), Google contributorily infringes the Asserted Claims of the '949 Patent by offering to sell or selling within the United States or importing into the United States the Google Apps (where each of the Google Apps is or contains a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention), knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

112.     Pursuant to 35 U.S.C. § 271(c), Google contributorily infringes the Asserted Claims of the '896 Patent by offering to sell or selling within the United States or importing into the United States the Google Apps (where each of the Google Apps is or contains a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention), knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

35

## VIII. HARMONIZED TARIFF SCHEDULE

113. On information and belief, the Infringing Products fall within at least the following headings and subheadings of the United States Harmonized Tariff Schedule ("HTS"): 8515.10.80; 8515.21.00; 8515.22.00; 8517.12.00; 8517.62.00; 8517.62.50; 8517.62.00.90; 8517.70.00; 8471.30.01, 8471.41.01, 8471.49.00, and/or 8471.50.01. These HTS numbers are illustrative only and not intended to limit the scope of the investigation.

## IX. LICENSES

114. Pursuant to Commission Rule 210.12(a)(9)(iii), 19 C.F.R. § 210.12(a)(9)(iii), attached as **CONFIDENTIAL Exhibit 26** is a list of licenses relating to the Asserted Patents.

## X. THE DOMESTIC INDUSTRY

115. A domestic industry exists under 19 U.S.C. § 1337(a)(2) as defined by 19 U.S.C. § 1337(a)(3)(A)-(C), based on Sonos's significant investments in plant and equipment, significant employment of labor or capital, and/or substantial investment in the exploitation of the Asserted Patents through engineering and research and development.

### A. Complainant Satisfies the Technical Prong of the Domestic Industry Requirement

116. An industry in the United States exists relating to Sonos articles protected by the Asserted Patents ("Domestic Industry Products"). The claim charts attached as **Exhibits 21-25** apply exemplary claims of the Asserted Patents to a representative involved domestic article of Sonos. Additional information about Sonos's products is attached as **Exhibits 64-75**.

36

**B.      Complainant Satisfies the Economic Prong of the Domestic Industry Requirement**

117.      As required by Section 337(a)(3)(A)-(C), a domestic industry exists by virtue of Complainant's activities in the United States, including (i) significant investments in plant and equipment, (ii) significant employment of labor or capital, and (iii) substantial investment in the exploitation of the Asserted Patents for the engineering and research and development of Sonos domestic articles.

118.      Sonos is one of the world's leading sound experience brands.  As the inventor of wireless multi-room audio, Sonos's innovation helps the world experience audio better by giving people access to the content they love and allowing them to control it however they choose.  The research, development, and engineering that created Sonos's wireless multi-room audio system took place predominantly in the United States.

119.      Sonos debuted its first wireless multi-room audio system in 2005 and has since been a leading innovator in wireless audio.  Today, Sonos's products include audio players, components, and apps to address consumers' evolving audio needs.  In addition to new product launches, Sonos frequently introduces new features across its platform, providing its customers with enhanced functionality, improved sound and an enriched user experience.  Sonos is committed to continuous technological innovation, as evidenced by its growing global patent portfolio.  Sonos's innovative products, seamless customer experience and expanding global footprint have driven 14 consecutive years of growth since its first product launch.

120.      Sonos believes its patents comprise the foundational intellectual property for wireless multi-room audio technology.  Sonos has significantly expanded the size of its patent portfolio in recent years and holds over one thousand issued patents and is pursuing hundreds of

37

patent applications throughout the world.  In 2017, the strength of Sonos's patent portfolio placed it 2nd in Electronics and 19th overall in IEEE's Patent Power Report.

121.    The first element of Sonos's growth strategy is to consistently introduce innovative products.  To that end, Sonos has developed a long-term roadmap to deliver innovative products and software enhancements, and has been and intends to continue increasing the pace of product introductions across multiple categories.

122.    Sonos's research and development team develops new software and hardware products as well as improves and enhances its existing software and hardware products to address customer demands and emerging trends.  Sonos's team has worked on features and enhancements to the Sonos platform including development and improvements to the Sonos app, Trueplay tuning and the universal search function.  The products and software Sonos develops require significant technological knowledge and expertise to develop at a competitive pace. Sonos believes its research and development capabilities and its intellectual property differentiates it from its competitors.  Sonos intends to continue to invest significantly in research and development to bring new products and software to market and expand its platform and capabilities.

123.    Sonos's investments in the United States in the Domestic Industry Products is summarized below and detailed in the attached Declaration of Christine Squarey.  *See* **Exhibit 27**.  Complainant reserves the right to rely on additional investments during the investigation.

### 1.    Significant Investments in Plant and Equipment

124.    Sonos has made and continues to make significant investments in plant and equipment with respect to the Domestic Industry Products.  Sonos currently conducts research

38

and development and engineering relating to the Domestic Industry Products in facilities in Boston, MA, San Francisco, CA, Santa Barbara, CA, and Seattle, WA. Sonos utilizes a significant amount of space in each facility and has invested a significant amount in rent payments at these facilities. Sonos has also made significant investments in equipment used in the facilities for research and development and engineering related to the Domestic Industry Products. Sonos's domestic investments in plant and equipment relating to the Domestic Industry Products is quantitatively significant relative to Sonos's investments in plant and equipment relating to the Domestic Industry Products outside the United States. *See* **Exhibit 27** at ¶¶ 10-11.

### 2. Significant Investments in Plant and Equipment

125. Sonos engages in significant employment of labor and capital in the United States with respect to the Domestic Industry Products. Sonos employs over 1,000 people in the United States, a significant number of whom are involved in research, development, or engineering relating to the Domestic Industry Products. Sonos has invested hundreds of millions of dollars in compensation for U.S. employees who conduct research, development, and engineering relating to the Domestic Industry Products and this investment is a quantitatively significant portion of Sonos's worldwide investment in employees who conduct research, development, and engineering work relating to the Domestic Industry Products. *See* **Exhibit 27** at ¶¶ 12-13.

### 3. Significant Investment in the Exploitation of the Asserted Patents Through Engineering and Research and Development

126. Sonos further engages in exploitation of the Asserted Patents through its substantial domestic investments in engineering and research and development directed to the Domestic Industry Products. Substantially all of Sonos's research and development expenses are related to developing new products and services and improving existing products and services.

39

127. Sonos's operating expenses directed to research and development have increased every year since at least 2014. In fact, Sonos's research and development expenses more than doubled from over $70 million in fiscal year 2014 to over $171 million in fiscal year 2019. Research and development expenses consist primarily of personnel-related expenses, consulting and contractor expenses, tooling, test equipment and prototype materials and overhead costs. Sonos expects its research and development expenses to increase in absolute dollars as it continues to make significant investments in developing new products and enhancing existing products. Sonos's domestic investments in research, development and engineering are quantitatively significant in comparison to its investments in research, development and engineering outside the United States. *See* **Exhibit 27** at ¶¶ 9-13.

## XI.  RELATED LITIGATION

128. Sonos asserted the '959, '949, and '258 Patents in *Sonos Inc. v. D&M Holdings Inc. et al*, Case No. 1:14-cv-1330 (D. Del.). Sonos filed its complaint on October 21, 2014. On December 15, 2017, a jury found claims of the '258 and '949 Patents valid and infringed and awarded damages to Sonos. On May 21, 2018, the judge granted a stipulation of dismissal.

129. Sonos asserted the '959,' '949, and '258 Patents in *Sonos, Inc. v. Lenbrook Industries Limited, et al*, Case No. 2:19-cv-5411 (W.D. Cal.). Sonos filed its complaint on June 20, 2019. Defendants filed their original Answer and Counterclaims on October 14, 2019, and then filed an Amended Answer and Counterclaims on November 14, 2019. Sonos filed its Answer to the Counterclaims on December 2, 2019.

130. An *Ex Parte* Reexamination Certificate for the '959 Patent issued April 5, 2017 in response to Reexamination Request No. 90/013,756, May 25, 2016. The Reexamination

Certificate states that "Claims 1 and 14 are cancelled. Claims 2-13 and 15-22 are determined to be patentable as amended. New claims 23-48 are added and determined to be patentable." A copy of the *Ex Parte* Reexamination Certificate is attached as **Exhibit 7**.

131.    An *Ex Parte* Reexamination Certificate for the '949 Patent issued November 5, 2015 in response to Reexamination Request No. 90/013,423, January 5, 2015. The Reexamination Certificate states that "Claims 1, 3, 4, 5, 6, 8, 10, 11, 13, 14, 15 and 17-20 are determined to be patentable as amended. Claims 2, 5, 9, 12, and 16, dependent on an amended claim, are determined to be patentable." A copy of the *Ex Parte* Reexamination Certificate is attached as **Exhibit 5**.

132.    An Certificate Of Correction for the '258 Patent issued June 7, 2016. A copy of the Certificate Of Correction is attached as **Exhibit 2**.

## XII.    RELIEF REQUESTED

WHEREFORE, by reason of the foregoing, Sonos respectfully requests that the United States International Trade Commission:

(a)    institute an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, with respect to Respondents' violations of that section based on the importation into the United States, sale for importation, or the sale within the United States after importation of Respondents' audio players and controllers, components thereof, and products containing same that infringe the Asserted Patents;

(b)    schedule and conduct a hearing on permanent relief pursuant to 19 U.S.C. § 1337(c) for the purposes of receiving evidence and hearing argument

41

concerning whether there has been a violation of Section 337 and following the hearing to determine that there has been a violation of Section 337;

(c)     issue a permanent limited exclusion order, pursuant to 19 U.S.C. § 1337(d), forbidding entry into the United States of Respondents' audio players and controllers, components thereof, and products containing same that infringe one or more claims of the Asserted Patents;

(d)     issue permanent cease and desist orders, pursuant to 19 U.S.C. § 1337(f), prohibiting Respondents and their related companies or divisions from conducting any of the following activities in the United States: importing, selling, marketing, advertising, distributing, transferring (except for exportation), and soliciting U.S. agents or distributors for audio players and controllers, components thereof, and products containing same covered by one or more claims of the Asserted Patents;

(e)     impose a bond, pursuant to 19 U.S.C. § 1337(j), on importation of any audio players and controllers, components thereof, and products containing same that infringe one or more claims of the Asserted Patents during the Presidential Review Period; and,

(f)     issue such other and further relief as the Commission deems just and proper under the law based on the facts determined by the investigation and the authority of the Commission.

42

Dated: January 7, 2020

Respectfully submitted,

Clement S. Roberts
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Tel: (415) 773-5700
Email: croberts@orrick.com

Bas de Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Tel: (650) 614-7343
Email: bdeblank@orrick.com

Jordan L. Coyle
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, NW
Washington, DC 20005
Tel: (202) 339-8400
Email: jcoyle@orrick.com

Alyssa M. Caridis
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017-5855
Tel: (213) 612-2372
Email: acaridis@orrick.com

George I. Lee (lee@ls3ip.com)
Sean M. Sullivan (sullivan@ls3ip.com)
Rory P. Shea (shea@ls3ip.com)
J. Dan Smith (smith@ls3ip.com)
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St, Floor 5W
Chicago, IL 60661
Tel: (312) 754-0002
Fax: (312) 754-0003

*Attorneys for Complainant Sonos, Inc.*

43

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Inv. No. 337-TA-1191** |

**DECLARATION OF KEVIN JEFFAY, PH.D.**

much space.  When space is less restricted, and high-quality audio is desired, a speaker may include multiple drivers, each designed to accurately reproduce a limited *range of frequencies*. The image below shows a typical home stereo speaker with three drivers: a *tweeter* that plays higher frequencies, a *mid-range* driver that plays middle frequencies, and a *woofer* that plays lower frequencies.



35.     This type of arrangement typically improves sound quality because each type of driver is optimized to reproduce sound in its dedicated frequency range.  For example, tweeters are designed to play high frequency ranges, while woofers are designed to play low frequency ranges.  Furthermore, by spreading out frequency ranges across multiple drivers, the overall load on each individual driver is reduced.  Note that the right panel in the image above shows example frequency ranges each driver was designed to reproduce.  Across all three drivers, the speaker can output the entire spectrum of frequencies detectable by the human ear, which is approximately 20 Hz to 20,000 Hz.

### C.     Equalization

36.     Although speakers can be designed to play a broad spectrum of frequencies, it is often desirable to amplify or diminish specific frequency ranges.  When listening to jazz music, for example, the listener may wish to strengthen the lower frequency ranges to emphasize the

13

bass notes. When listening to spoken word, the listener may wish to reduce the lower frequency ranges—and thereby increase the relative strength of the mid- and high-frequency ranges—to eliminate unnecessary bass sounds. Another reason to alter the relative strength of certain frequency ranges is to account for room acoustics. *See* Exhibit 5, Lucasfilm Ltd., *Home THX Audio System Room Equalization Manual*, Rev. 1.5 (1998). Different room configurations and different objects and materials in the room may amplify or diminish certain frequency ranges, causing a speaker to sound different in one room compared to another. *See id*. Adjusting the relative strength of the frequency ranges provided to the speaker results in a uniform output from one location to another. *See id*.

37. The process of altering the relative strength of certain frequency ranges is called *equalization*. *See* Exhibit 2, White & Louie, *The Audio Dictionary*, Third Ed. (2003) at 139 ("**Equalizer, Equalization** An equalizer, contrary to what its name implies, alters or distorts the relative strength of certain FREQUENCY ranges of an audio SIGNAL."). Equalization allows the audio signal to be altered to emphasize or diminish a specific range of frequencies. High-frequency ranges can be increased relative to mid- and low-frequency ranges in order to introduce more *treble* into the audio signal. Or low-frequency ranges can be increased relative to high- and mid-frequency ranges to introduce more *bass* into the audio signal. The key to equalization is altering the *relative* strength of signals within certain frequency ranges in the audio data. If all of the frequency ranges are altered in the *same proportion*, then the audio signal does not change in terms of the relative degree of bass, treble, or mid-range frequencies.

38. Different techniques and mechanisms exist for adjusting the equalization of audio signal. Perhaps the most familiar example is bass and treble knobs on home stereo systems. These knobs allow users to alter the relative strength of signals in lower and higher frequency ranges, respectively. A more sophisticated technique is to apply *pass filters* (also known as

Appx683

two years) would also qualify as a person of ordinary skill in the art.

50.     I understand Sonos has contended that "a person of ordinary skill in the art for purposes of this Investigation is a person having the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or an equivalent thereof, and approximately 2-4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience." *See* Sonos's Response to Interrogatory No. 37.

51.     I have considered both definitions in my analysis set forth in this declaration. My opinions are the same regardless of which definition is used.

## VI.    ANALYSIS

### A.    Analysis of the Term "Equalization"

52.     I have been asked to analyze the meaning of the phrase "equalization of the audio data" as used in the context of the '959 Patent. In my opinion, a person of ordinary skill in the art at the time of the invention would have understood the phrase to mean "alteration of the relative strength of certain frequency ranges in the audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters." As explained below, this meaning is consistent with the intrinsic record's description of equalization and the widely accepted definition of the term known to persons of ordinary skill in the art.

53.     Beginning with the intrinsic evidence, the specification describes equalization in terms of frequency ranges of an audio signal. This is apparent from the patent's description of a Sonos S5 device in column 8 of the specification. *See* '959 Patent at 8:28-39. The specification

explains that "the S5 is a five-driver speaker system that includes two tweeters, two mid-range drivers, and one subwoofer." *Id*. at 8:29-31. When playing audio content, "the left audio data of a track is sent out of the left tweeter and left mid-range driver, the right audio data of a track is sent out of the right tweeter and the right mid-range driver, and mono bass is sent out of the subwoofer." *Id*. at 9:31-35. The image below illustrates the configuration of the S5 device, with the left drivers playing the left channel, the subwoofer playing the bass channel, and the right drivers playing the right channel:



54.     The specification then explains that "both mid-range drivers and both tweeters have the *same equalization* (or substantially the same equalization). That is, they are both sent the *same frequencies*, just from different channels of audio." *Id*. at 8:35-39 (emphasis added). This disclosure informs a person of skill in the art that the patentee used the term *equalization* to describe the *frequency ranges* of an audio signal. According to the patent specification, when two sets of drivers output the same frequency ranges, they have the same equalization. *Id*. The image below illustrates this point by showing example frequency ranges of the left drivers and right drivers:



55.     From the same disclosure, it follows that if the relative strength of frequency ranges for one set of drivers is *different* than the relative strength of frequency ranges for the other set of drivers, then the two sets of drivers would have *different equalizations*. *Id., see also* 16:28-33 (describing examples of adjusting the strengths of frequencies including strengths of frequencies within the audio data and by applying filters).

56.     Elsewhere, the patent specification explains that equalization can be used to reduce *interference*. *See* '959 Patent at 16:49-59.  It describes an embodiment where two S5 devices are used to form a stereo pair, with one device playing the left audio channel (using all its drivers) and the other device similarly playing the right audio channel.  *See id*.  ("In this configuration, for example, the left and right audio data may be sent to both S5 devices, but the left audio data of the track is played out of the S5 device configured as left and the right audio data of a track is played out of the S5 device configured as right.").  This configuration may lead to interference due to overlapping frequency ranges output from the two devices.  *Id*. at 16:56-59.  Thus, the equalization of each device may be changed to account for this interference.  *Id*. ("In addition, the equalization of each S5 device is changed in an attempt to reduce or eliminate certain constructive or destructive interference.").  A person of ordinary skill in the art would understand that equalization in this disclosure refers to altering the relative strength of certain

frequency ranges, and in particular reducing the relative strength of frequency ranges likely to cause interference. *Id.*

57.　　The specification also refers to equalization in terms of adjustments to bass and treble, which a person of ordinary skill in the art would understand to describe low and high frequency ranges, respectively. *Id.* at 12:15-16 ("Set the music playback equalization of each Zone (e.g., bass treble)."

58.　　Based on these disclosures, it is my opinion that the '959 Patent uses the term equalization to describe alteration of the relative strength of certain frequency ranges in the audio data. This conclusion is consistent with descriptions of equalization set forth in prior art references cited during prosecution of the '959 Patent. For example, U.S. Patent Publication No. 2002/0124097 (Exhibit 6, "Isely") explains that "Equalization typically involves controlling the amplification or volume of individual frequency ranges of an audio output," and "A typical equalizer allows the control of 10 or more frequency ranges, called bands, starting in the 40 Hertz (Hz) range and extending up to the 20,000 kHz range." Isely at [0006]. This disclosure confirms that equalization alters individual frequency ranges—ten or more ranges for a typical equalizer—to increase or decrease their strength relative to other frequency ranges.

59.　　Likewise, U.S. Patent Publication No. 2005/0100174 (Exhibit 7, "Howard") explains that "Equalization signal processing operations, whether implemented in the digital or analog domain, should be designed to provide a smoother frequency response of the audio system in each mode of play as compared to the frequency response of the system with no equalization." Howard at [0064]. A person of ordinary skill in the art would understand that smoothing the frequency response of an audio system would involve increasing or decreasing the strength of some frequency ranges relative to other frequency ranges.

60.　　I understand these references form part of the intrinsic record of the '959 Patent.

24

In my opinion, they provide further evidence that, in the context of the patent, equalization describes alteration of the relative strength of certain frequency ranges.

61.     Turning to the extrinsic evidence, the term equalization had a well-understood meaning to persons of skill in the art at the time of the invention. The *Audio Dictionary*, which is a scholarly treatise defining audio terminology, describes equalization as follows:

"**Equalizer, Equalization**  An equalizer, contrary to what its name implies, alters or distorts the relative strength of certain FREQUENCY ranges of an audio SIGNAL." Exhibit 2, White & Louie, *The Audio Dictionary*, Third Ed. (2003) at 139. *The Modern Dictionary of Electronics* defines equalization in the audio context as follows: "Reshaping the playback characteristics of a recording during playback mode. The simplest way is to adjust the treble and bass controls, but true equalization requires continuous adjustment of the playback frequency response curve at several points. A graphic equalizer is often used for this." Exhibit 3, Graf, *The Modern Dictionary of Electronics*, Seventh Ed. (1999) at 262. And *Webster's New World Dictionary of Media and Communications* defines equalization as "[t]he process of altering the frequency response of an audio signal, as with a tone control or other device (equalizer)." Exhibit 4, Weiner, *Webster's New World Dictionary of Media and Communications* (1996) at 213.

62.     In addition to technical dictionaries, reference manuals for audio systems describe techniques to adjust equalization in terms of altering the relative strength of frequency ranges in the audio data. *See* Exhibit 5, Lucasfilm Ltd., *Home THX Audio System Room Equalization Manual*, Rev. 1.5 (1998) at 10-12 ("When equalizing the Subwoofer Channel, you should concentrate on reducing the serious peaks. … One tip: a reduction of energy in the 20-30 Hz range will enable the subwoofer to play louder without before encountering excursion problems.").

63.     In my opinion, there is nothing in the intrinsic record of the '959 Patent that

deviates from the ordinary and customary meaning of the term equalization. Rather, the specification uses the term equalization consistent with its ordinary and customary meaning because it describes equalization in terms of altering the strength of certain frequency ranges in audio data relative to other frequency ranges. *See*, *e.g.*, '959 Patent at 8:28-39; 16:49-59.

### B. Analysis of Sonos's Proposed Construction

64. I understand Sonos has proposed the following construction for the terms equalization and equalization of the audio data: "modifying the output audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters." I understand Sonos's construction is the same as the construction adopted by the district court in *Sonos, Inc. v. D&M Holdings, Inc. et al.*, a 2017 litigation where Sonos asserted the '959 Patent against Denon and other defendants.

65. In my opinion, this construction does not describe "equalization" as the term would have been understood by a person of ordinary skill in the art at the time of the invention. The construction describes certain techniques that the patent specification says *might* be used to perform equalization of audio data. *See*, *e.g.*, '959 Patent at 16:16-27. But a person of ordinary skill in the art would understand that performing these techniques does not *necessarily* result in equalization of audio data. A few examples help illustrate this point.

66. *Adjusting Channel Output.* Under Sonos's proposed construction, equalization would occur any time audio data is modified by adjusting channel output. This would include, for example, switching from left-channel audio to right-channel audio. A person of skill in the art would understand that simply adjusting channel output in this way—*e.g.*, switching between left channel audio and right channel audio—does not change the equalization of the audio data. The specification of the '959 Patent confirms this point in two respects.

26

67. First, the specification explains that in the Sonos S5 device, the left-side drivers have the *same equalization* (or substantially the same) as the right-side drivers, *even though they output different audio channels*. *See* '959 Patent at 8:31-39. Thus, switching the channel output from left-channel audio to right-channel audio (*i.e.*, playing the left channel out of the right-side drivers and the right channel out of the left-side drivers) would not change the equalization of the audio data.

68. Second, the patent specification explains that transitioning from a non-paired configuration (which outputs left *and* right audio channels) to a stereo-paired configuration (which outputs the left *or* right audio channels) does not change the equalization of the audio data. *See id*. at 16:49-59. The specification describes equalization as an *additional step* that might be performed *after* the channel output is modified:

> In this configuration, for example, the left and right audio data may be sent to both S5 devices, but the left audio data of the track is played out of the S5 device configured as left and the right audio data of a track is played out of the S5 device configured as right. *In addition, the equalization* of each S5 device is changed in an attempt to reduce or eliminate certain constructive or destructive interference.

*Id*.

69. These disclosures make clear that adjusting the channel output of the speaker drivers does not *necessarily* equalize the audio data. A person of ordinary skill in the art would understand that, in order to equalize the audio data, the channel output must be adjusted in a way that alters the relative strength of frequency ranges in the audio data. Again, the specification of the '959 Patent supports this conclusion. *See*, *e.g.*, '959 Patent at 14:29-32. For example, a Sonos S5 device playing left-channel audio through the left tweeter and mid-range driver would have a *different equalization* than a Sonos S5 device playing left-channel audio through the left tweeter and mid-range driver *and* center-channel audio through the subwoofer. *See id*. The latter configuration—which the '959 Patent specification refers to as theater-mode—would have

27

relatively stronger low-frequency output due to the presence of the center-channel audio. Thus, switching from *left channel audio* to *left + center channel audio* is an example of how adjusting the channel output can change equalization.

70.     But that does not mean *any* adjustment of the channel output would equalize the audio data as contemplated by Sonos's proposed construction. The channel output must be adjusted in a way that alters the relative strength of frequency ranges in the audio data—*e.g.*, by increasing the low-end frequency ranges. Sonos's construction omits this important qualification and is therefore incorrect.

71.     *Muting or Turning Off Speaker Drivers.* Under Sonos's proposed construction, equalization would occur any time one or more speaker drivers are muted or turned off. This would include, for example, turning off the left-side drivers while leaving on the corresponding right-side drivers. It would also include turning off *all* of the drivers in a given playback device. A person of ordinary skill in the art would understand that disabling speaker drivers in this way does not change the equalization of the audio data. Again, the specification of the '959 Patent confirms this point.

72.     As discussed above, the specification explains that the left tweeter and left mid-range driver in the Sonos S5 device have the *same equalization* as the right tweeter and right mid-range driver. *See* '959 Patent at 8:31-39. From this disclosure, a person of ordinary skill in the art would understand that if the entire left side of the device is disabled, then the equalization does not change. The right side of the device continues to play the same frequency ranges in the same proportions as the left side and right side combined. The only difference is that the frequency ranges are played from the right side only, rather than the left and right.

73.     A person of ordinary skill in the art would understand that, in order to equalize the audio data, the drivers must be disabled in a way that alters the relative strength of frequency

ranges in the audio data. An example would be turning off the mid-range drivers, which would alter the relative strength of middle frequency ranges relative to high and low frequency ranges.

74. Again, that does not mean *any* time one or more drivers is turned off or muted, then equalization will change. The drivers must be turned off or muted in a manner that alters the relative strength of frequency ranges in the audio data—*e.g.*, by reducing the mid-range frequency ranges. This is why the specification explains that "[c]hanging equalization of the playback device might include … turning on or off (or effectively muting) one or more *specific* speaker drivers. *See* '959 Patent at 16:20-23. Sonos's proposed construction ignores this requirement and is therefore incorrect.

75. *Adjusting Gain.* Under Sonos's proposed construction, equalization would occur any time the *gain* of an individual driver is adjusted. In my opinion, a person of ordinary skill in the art would disagree with this conclusion because gain can be adjusted in ways that do not alter the relative strength of frequency ranges. For example, adjusting the gain of each driver in a speaker by the same proportion would produce the same balance of frequency ranges, simply at a lower or greater volume. A person of ordinary skill in the art would not consider this equalization of the audio signal because the relative strength of the frequencies do not change. Likewise, turning down the gain of every driver in a speaker device to zero would not be considered a form of equalization; it would simply turn off the overall output.

76. A person of ordinary skill in the art would understand that if the gain of a specific driver at one frequency range is adjusted, while the other drivers at other frequency ranges are held steady, then there would be a resulting change in equalization. In a three-driver device, for example, increasing the gain of the tweeter while holding the gain of the mid-range driver and woofer steady would change equalization by increasing the relative strength of the higher-end frequencies or treble. Indeed, a treble knob and bass knob are mechanisms for increasing the

29

gain of high-end frequencies and low-end frequencies, respectively. Another example would be the Sonos S5 device. The device has one subwoofer, two tweeters, and two mid-range drivers. If one were to increase the gain of each driver by the same amount, the strength of the tweeter and mid-range frequencies would become relatively stronger than the strength of the subwoofer frequencies (because of the 2:1 relationship).

77. So again, equalization might be performed by adjusting the gain of specific speaker drivers, but that does not mean that *any* gain adjustment for *any* speaker driver will necessarily equalize an audio signal.

78. To summarize, the *Denon* court's construction of equalization—which Sonos has proposed in this Investigation—identifies different techniques that *might* be used to perform equalization of audio data. A person of ordinary skill in the art would understand, however, that these techniques do not *necessarily* result in equalization of the audio data. A person of ordinary skill in the art would understand that the techniques must be performed in a way that actually alters the relative strength of frequency ranges in the audio data. This understanding is consistent with the specification of the '959 Patent and the accepted meaning of equalization to persons of ordinary skill in the art. Accordingly, it is my opinion that the proper construction of the term "equalization" of the audio data is "alteration of the relative strength of certain frequency ranges in the audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters."

# EXHIBIT 2

# THE AUDIO DICTIONARY

## Glenn D. White and Gary J. Louie



## THIRD EDITION
*Revised & Expanded*

# THE
# AUDIO
# DICTIONARY

**Glenn D. White**
and
**Gary J. Louie**

*Third Edition, Revised and Expanded*

**University of Washington Press**
Seattle and London

Third edition, revised and expanded © 2005 by the University of Washington Press
Printed in the United States of America
12 11 10 09 08 07 06 05    5 4 3 2 1

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage or retrieval system, without permission in writing from the publisher.

University of Washington Press
PO Box 50096
Seattle, WA 98145-5096
www.washington.edu/uwpress

Library of Congress Cataloging-in-Publication Data

White, Glenn D.,  1933–
  The audio dictionary  /  by Glenn D. White and Gary J. Louie.—3rd ed., rev. and
expanded.
      p.   cm.
  Includes bibliographical references.
  ISBN 0-295-98498-8 (pbk. : alk. paper)
    1. Sound—Recording and reproducing—Dictionaries.   I. Louie, Gary J.
II. Title.
  TK7881.4.W48   2004
  621.389'3—dc22                                                  2004029425

The paper used in this publication meets the minimum requirements of American National Standard for Information Sciences—Permanence of Paper for Printed Library Materials, ANSI Z39.48-1984.

This edition contains several entries from Larry Blake's Glossary of Film Sound terms. The complete version of which is only available on his Swelltonelabs website <www.swelltonelabs.com>.

**Epoxy Patent**   The epoxy patent is a clever method of avoiding the piracy of proprietary CIRCUIT designs. When someone designs a particularly innovative electronic circuit, it is likely that it will be copied by other designers. To protect the circuit against this, it can be totally encased in opaque epoxy plastic. Then, a would-be pirate would have to destroy the assembly completely in order to get it apart. This procedure is called an "epoxy patent" in the vernacular.

**EQ**   *See* EQUALIZER.

**Equalizer, Equalization**   An equalizer, contrary to what its name implies, alters or distorts the relative strength of certain FREQUENCY ranges of an audio SIGNAL. In a sense, it should probably be called an "unequalizer." However, the first equalizers were used to make the energy at all frequencies equal, or to achieve "flat response," in telephone lines, and this is where the term originated. Another early use of equalizers was in the motion picture sound industry, where they were used to improve intelligibility in film sound tracks. Later on, equalizers were found useful for creating special sound effects in the early days of radio and movies, where they are extensively used to this day. All equalizers are made up of various CIRCUITS called FILTERS, which are frequency-selective networks containing RESISTORS (R), CAPACITORS (C), and INDUCTORS (L). Normally, filters attenuate certain frequency ranges and do not boost them; however, some equalizers that boost the signal are called filters.

The first consumer-type equalizers were the tone controls on radios, the first one of which was simply a variable low-pass filter to reduce "static" and other high-frequency noise. The familiar BASS and TREBLE tone controls came later. Today, equalizers are also used in vast numbers in SOUND REINFORCEMENT systems and in recording and broadcast studios for various purposes.

An equalizer can boost or attenuate a certain frequency band, but in common usage, *equalize* means to boost. The preferred terminology for the actual process is boost/cut rather than equalize/attenuate. In Britain preferred usage is lift/dip.

Equalizers that can have peaks in their response curves (such as parametric and graphic equalizers) are characterized by the relative sharpness of the peaks. The Q of a filter is a measure of this sharpness and is defined as the center frequency divided by the half-power BANDWIDTH. For instance, a one-third OCTAVE filter centered at 1,000 HERTZ will be 232 Hz wide at its half-power points. Its Q is thus 1,000/232, or 4.31. Filters with Q values much higher than this tend to "ring," distorting transients, and call attention to themselves when used in sound systems. *See also* Q.

Some equalizers, such as ⅓-octave graphics, have a constant Q regardless of the amount of boost or cut, and they are sometimes called "constant Q" equalizers. Most parametrics, on the other hand, have higher Q values with high boost or cut levels. These are called "proportional Q" equalizers.

All equalizers cause the signal to be selectively PHASE shifted, and the more sharply defined the equalization, the steeper the phase shift curve will

be. For instance, an octave-band filter will have about a 90-degree phase shift spread over the octave band, while a $\frac{1}{10}$-octave filter will have the same 90-degree phase shift occurring in the narrow $\frac{1}{10}$-octave band. These phase shifts distort transient WAVEFORMS, for they really are variable time delays for different frequencies. In general, the more rapidly the phase is changing as a function of frequency, the more audible the effect is.

Many equalizers are integral parts of audio components and are not adjustable by the user. Such equalizers include DE-EMPHASIS, PRE-EMPHASIS, RIAA equalization, SHELVING, and NAB EQUALIZATION. Many other equalizers exist as stand-alone devices, and they can be roughly grouped as follows:

*Active and passive equalizers:* An active equalizer requires power to operate. It has active components in it such as TRANSISTORS and INTEGRATED CIRCUITS. A passive equalizer does not require any power to operate. Passive equalizers contain resistors, inductors, and capacitors, but no active components. Passive equalizers are essentially noiseless in operation and are very reliable and distortion-free, but they have INSERTION LOSS, which sometimes has to be compensated for by an amplifier. Active equalizers are very popular but suffer from noise, reduced dynamic range, and susceptibility to RFI. Many of the following types of equalizers exist as active or passive.

*Rotary equalizer:* An adjustable equalizer with several frequency bands with stepped rotary knobs to select the frequency range and the degree of boost or cut. The frequency bands are fixed.

*Parametric equalizer:* Somewhat like the rotary equalizer but with added control of the center frequencies and bandwidths of the frequency bands. Boost and cut and the other "parameters" are generally continuously variable rather than being stepped. An equalizer that does not allow variable control of all the parameters is sometimes called a quasi-parametric, and some units with slide controls rather than rotary are called para-graphic. Some parametrics allow cut only and are then called notch equalizers, band-reject equalizers, or cut-only equalizers. The Q values of most parametric equalizers increase at high boost or cut levels. Sometimes these equalizers are called proportional Q equalizers.

*Graphic equalizer:* A multiband variable equalizer that consists of a series of parallel filters, usually of the same bandwidth, that are capable of boosting the signal or cutting it. Each filter band is controlled by a slider knob, and these are arranged on the front panel of the equalizer so their positions show, at least approximately, the overall response curve for each setting. The band center frequencies are fixed for each band and are spaced proportionally to the logarithm of frequency. In other words, each filter controls a frequency span encompassing the same musical interval controlled by every other filter, such as octave bands or one-third octave bands. Some graphic equalizers do not have all the filter intervals equal, having the low-frequency bands narrower than the high-frequency ones. This makes a good deal of sense for applications such as the equalization of sound-

reproducing systems in listening rooms, where low-frequency anomalies are generally more numerous than high-frequency anomalies.

Probably the most common graphic equalizer has one-third octave bandwidths. It has been shown that filters narrower than this, especially when used to boost the signal, are quite audible because the filters themselves ring. The ringing is less audible for narrowband notch filters.

One-third octave graphic equalizers have a constant Q regardless of the amount of boost or cut. They are sometimes called constant Q equalizers.

If all the knobs on a graphic equalizer are at the same level, one would assume the overall frequency response would be flat, but this is usually not the case. With most such units, a flat curve can be attained only with the knobs set for no boost or cut. A level boost or cut causes "ripple," or peaks or dips at each filter center frequency. For this reason, any graphic equalizer should be operated with the controls as close to the zero boost line as possible.

*Transversal equalizer:* A special and uncommon type of equalizer that uses a tapped time-delay line as the active element. A signal fed through a time delay and then connected back to the delay input and recirculated through it many times will have peaks and dips in its frequency response curve depending on the delay time and the loop GAIN of the delay line. By selecting many different delay times and judiciously connecting the various feedback loops, many different frequency response curves may be attained. The transversal equalizer is an analog, not a digital, device and can use a BUCKET BRIGADE, charge-coupled device, or an all-pass filter as a delay line. A similar result can be attained with digitized signals. *See* DIGITAL EQUALIZER.

*Narrowband filter:* Early in the days of sound reinforcement system equalization, very narrow notch filters were used in an attempt to reduce the tendency for acoustic FEEDBACK. The technique was pioneered by C. P. Boner. He used very narrow filters, sometimes as little as 5-Hz wide at the –3dB points, and he used as many as 150 of them, all custom-tuned, at once. It was later realized that the narrowband technique is much more complex than need be and that similar results, without doing as much violence to the signal quality, can be achieved by one-third octave filters.

In the digital domain, including the use of DAWs, all the types of equalization are accomplished by mathematical manipulation of the digitized audio signal, in many cases at much less expense than using analog devices. Digital editing can be more sophisticated than analog editing; for instance, phase shift problems can be tamed by the use of Finite Impulse Response (FIR) filtering which can be implemented to have no relative phase shift as a function of frequency. However, FIR filters do have a time delay that must be compensated for in the overall equalization setup.

**Equivalent Circuit**    An electrical circuit that behaves like an ANALOG of a mechanical or acoustic system is called an equivalent circuit. It is interesting that mechanical quantities such as mass and stiffness can be modeled with electrical quantities such as inductance and capacitance. Theoretically, any mechanical system could be represented by an appropriately designed

# EXHIBIT 3

**MODERN
DICTIONARY
of
ELECTRONICS**

SEVENTH EDITION

REVISED AND UPDATED

**Rudolf F. Graf**



**Newnes**

Boston   Oxford   Auckland   Johannesburg   Melbourne   New Delhi

Newnes is an imprint of Butterworth-Heinemann.

Copyright © 1999 by Rudolf F. Graf

 A member of the Reed Elsevier Group.

All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher.

 Recognizing the importance of preserving what has been written, Butterworth-Heinemann prints its books on acid-free paper whenever possible.

 Butterworth-Heinemann supports the efforts of American Forests and the Global ReLeaf program in its campaign for the betterment of trees, forests, and our environment.

**Library of Congress Cataloging-in-Publication Data**

Graf, Rudolf F.
    Modern dictionary of electronics / Rudolf F. Graf. — 7th ed., revised and updated.
        p.    cm.
    ISBN 0-7506-9866-7 (alk. paper)
    1. Electronics — Dictionaries. I. Title
TK7804.G67    1999
621.381'03 — dc21                          99-17889
                                           CIP

**British Library Cataloguing-in-Publication Data**
A catalogue record for this book is available from the British Library.

The publisher offers special discounts on bulk orders of this book.
For information, please contact:
Manager of Special Sales
Butterworth-Heinemann
225 Wildwood Avenue
Woburn, MA 01801-2041
Tel: 781-904-2500
Fax: 781-904-2620

For information on all Butterworth-Heinemann publications available, contact our World Wide Web home page at: http://www.bh.com

10 9 8 7 6 5 4 3 2 1

Typeset by Laser Words, Madras, India
Printed in the United States of America

REF.
TK
7804
. G67
1999 - Oct.01

**epitaxial planar transistor — equalizing pulses**

substrate so that its lattice structure duplicates that of the substrate.

**epitaxial planar transistor** — A transistor in which a thin collector region is epitaxially deposited on a low-resistivity substrate, and the base and emitter regions are produced by gaseous diffusion with the edges of the junction under a protective oxide mask.

**epitaxial process** — The process of growing from the vapor phase a single-crystal semiconductor material with controlled resistivity and thickness.

**epitaxial transistor** — A transistor with one or more epitaxial layers.



*Epitaxial transistor (triple diffused).*

**epitaxy** — 1. The controlled growth on a crystalline substrate of a crystalline layer, called an epilayer. In homoepitaxy (e.g., silicon layers on a silicon substrate), the epilayer exactly duplicates the properties and crystal structure of the substrate. In heteroepitaxy (e.g., silicon on sapphire), the deposited epilayer is a different material with a different crystalline structure than that of the substrate. 2. The growth of a crystal on the surface of a crystal of another substance in such a way that the orientation of the atoms in the original crystal controls the orientation of the atoms in the grown crystal.

**E-plane** — The plane of an antenna containing the electric field. The principal E-plane also contains the direction of maximum radiation.

**E-plane bend** — Also called E-bend. The smooth change in direction of the axis of a waveguide. The axis remains parallel to the direction of polarization throughout the change.

**E-plane T-junction** — Also called series T-junction. A waveguide T-junction in which the structure changes in the plane of the electric field.

**epoxy** — 1. Pertaining to a family of thermosetting materials that are widely used for casting and potting and as adhesives. 2. A family of thermosetting resins used in the packaging of semiconductor devices. Epoxies form a chemical bond to many metal surfaces.

**EPROM** — Abbreviation for erasable programmable read-only memory. A type of nonvolatile memory device whose contents can be erased by exposure to ultraviolet light. *See also* EEPROM; PROM.

**epsilon** — The Greek letter E, or ε, frequently used to represent 2.71828, which is the base of the natural system of logarithms.

**equal-energy source** — A source of electromagnetic or sound energy that emits the same amount of energy at each frequency in the spectrum.

**equal-energy white** — The light produced by a source that radiates equal energy at all visible wavelengths.

**equalization** — 1. The process of reducing the frequency and/or phase distortion of a circuit by the introduction of networks to compensate for the difference in attenuation and/or time delay at the various frequencies in the transmission band. 2. A process of compensating for increases in attenuation (signal loss) with frequency. Different signal frequencies are attenuated differently over a given distance. 3. An intentional departure from response flatness to compensate for complementary characteristics introduced elsewhere in the system (as with discs, tape, and FM broadcasting). Also used to correct for response deficiencies in speakers and other components. 4. Different equalization characteristics are used in the recording and playback amplifiers of a tape recorder, to compensate for the magnetic characteristics of the tape and the heads. Playback equalization is standardized to give flat frequency response with any properly recorded tape, while recording equalization is a property of a particular machine, depending on its head design and the tape for which it was meant. 5. Reshaping the playback characteristics of a recording during playback mode. The simplest way is to adjust the treble and bass controls, but true equalization requires continuous adjustment of the playback frequency response curve at several points. A graphic equalizer is often used for this. 6. The selective amplification or attenuation of certain frequencies. Also refers to recognized industry standards for recording and reproducing characteristics, such as the NAB Standard. 7. The intentional increase in level of certain portions of the audio-frequency spectrum. The term is sometimes misapplied when actually referring to the attenuation of portions of the audio-frequency spectrum. 8. A technique used to compensate for distortions present on a communication channel. Equalizers add loss or delay to signals in inverse proportion to the channel characteristics. The signal response curve is then relatively flat and can be amplified to regain its original form.

**equalize** — To apply to a circuit an electrical network whose transmission characteristics are complementary to those of the line, so that when the loss (or delay) in the line and that in the equalizer are combined, the overall loss (or delay) is almost the same at all frequencies.

**equalizer** — 1. A passive device designed to compensate for an undesired amplitude-frequency and/or phase-frequency characteristic of a system or component. 2. A series of connections made in paralleled, cumulatively compound direct-current generators to give the system stability. 3. A network, usually adjustable, that corrects the transmission-frequency characteristics of a circuit to permit it to transmit all the frequencies that it passes in a uniform manner. 4. An electronic circuit that introduces compensation for frequency-discriminative effects of elements within a television system. 5. An electronic device that amplifies (boosts) and/or attenuates certain portions of the audio-frequency spectrum. There are many different types of equalizers. 6. A device to allow the frequency response of an audio-signal path to be adjusted in some way.

**equalizer circuit breaker** — A breaker that serves to control or to make and break the equalizer or the current-balancing connections for a machine field, or for regulating equipment, in a multiple-unit installation.

**equalize voltage** — A voltage applied to a battery for charging at installation and as a periodic boost charge, common in lead-antimony lead-acid battery systems.

**equalizing current** — A current circulated between two parallel-connected compound generators to equalize their output.

**equalizing network** — A network connected to a line to correct or control its transmission frequency characteristics.

**equalizing pulses** — 1. A series of pulses (usually six) occurring at twice the line frequency before and after the serrated vertical TV synchronizing pulse. Their purpose is to cause vertical retrace to occur at the correct

# EXHIBIT 4

# Webster's

# NEW WORLD

# DICTIONARY

## OF MEDIA AND

# COMMUNICATIONS

## RICHARD WEINER

### MACMILLAN • USA

Webster's New World™ Dictionary of Media and
Communications, Revised and Updated

Revised Edition

Copyright © 1996 by Richard Weiner

All rights reserved
including the right of reproduction
in whole or in part in any form

 Webster's New World

Macmillan General Reference
A Simon & Schuster Macmillan Company
1633 Broadway
New York, NY 10019

A Webster's New World™ Book

MACMILLAN is a registered trademark of Macmillan, Inc.

Webster's New World™ Dictionary is a
registered trademark of Simon & Schuster, Inc.

Manufactured in the United States of America

1 2 3 4 5 6 7 8 9

Library of Congress Cataloging-in-Publication Data

Weiner, Richard, 1927–
        Webster's New World Dictionary of Media and
Communications /
        Richard Weiner—Rev. and updated.
                p.   cm.
        ISBN 0–02–860611–6
              1. Mass media—Dictionaries.   2. Communication—
Dictionaries.
           I. Title
        P87.5.W45  1996

302.23'03—dc20                                    96-12949
                                                  CIP

**E.O.D.** EVERY OTHER DAY

**EOL** END OF LINE

**e.o.m.** end of month   On a bill, *e.o.m. terms* means that the cash discount and full payment begin on the first day of the following month instead of on the invoice date. For example, an invoice delivered on January 2 and marked *2/10, e.o.m.* indicates that a 2-percent cash discount may be taken up to February 10 and the full amount must be paid before the end of February.

**EOM** END OF MESSAGE

**EOP** END OF PARAGRAPH

**E.O.W.** EVERY OTHER WEEK

**ep** end paragraph, a typesetting command; envelope

**epenthesis** a change in the pronunciation of a word, in which a sound or syllable is accidentally or incorrectly inserted—for example, *athlete,* often mispronounced as ath-a-lete

**EPG** ELECTRONIC PROGRAM GUIDE

**ephemera** short-lived or transitory material, such as clippings   Librarians and collectors refer to miscellaneous printed matter, such as clippings, greeting cards, postcards, and programs, as ephemera. The plural is *ephemera, ephemeras,* or *ephemerae.*

**epic** a poem or other work narrating the adventures and deeds of a heroic character, often written in an exalted style   A *mock epic* is a work in which a trivial subject is satirized, or ridiculed, by being treated solemnly.

**epidiascope** an optical device for projecting on a screen a magnified image of an opaque or transparent object, not necessarily a transparency

**epigram** a short, witty poem or clever statement

**epigraph** a quotation at the beginning of a chapter, especially at the top of the page, and sometimes on a PART-TITLE page

**epilogue** or **epilog** a closing section added to a novel, play, or other work, providing further information or interpretation; a short speech at the end of a play; the final section of a speech (a *peroration*)   In TV, an epilogue sometimes is called a *tag.*

**epiphany** a moment of sudden intuitive understanding or insight, or a scene in a play or other work that occasions such a moment; pronounced eh-PIF-uh-nee

**episode** an incident; one of a series of related events, scenes, or sequences   *Episode* sometimes refers to individual programs on a TV station; thus a station's audience may be measured by episodes per 100 TV homes. An *episodic* film or other work is composed of a series of incidents and relatively little continuity or transitions.

**epistle** a letter, particularly a long, formal, instructive letter, sometimes in verse; pronounced eh-PIS-ull

**epistolary** of or suitable to letters or letter writing; written in the form of a series of letters, such as an *epistolary novel* (common in the 18th century)

**epitaph** an inscription on a tomb or gravestone in memory of the person buried there; a short composition, such as a tribute to a dead person, sometimes humorous

**epitasis** the part of a play, particularly a classical drama, between the opening *(protasis)* or exposition and the climax, as the action becomes more intense

**epithet** a word or phrase, sometimes added to a name or title, used to characterize a person or thing, such as *America the Beautiful*   Epithets can also be disparaging—for instance, *Jack the Ripper.*

**epitome** a short statement expressing the main points; also, a person or thing that is representative of the essence of a group; pronounced eh-PIT-oh-me

**eponym** a real or fictional person from whom the name of a city, company, or other entity is derived

**EPS** Encapsulated POSTSCRIPT

**eq** an abbreviation for *equal* used in copyediting, as in *eq#,* an indication to make the space (#) between words or lines equal; see EQUALIZER, EQUALIZATION

**EQ** EQUALIZATION

**equal time** a Federal Communications Commission provision that radio and TV stations must provide time impartially to all political candidates in a race and must sell or give time on an equal basis, exclusive of news coverage   This policy, also called the *Fairness Doctrine,* was abolished in 1987.

**equalization (EQ)** the process of altering the frequency response of an audio signal, as with a tone control or other device (*equalizer*)

Equalized sound (*EQ'd sound*) or sound with excessive reverberation is called *wet sound,* as different from *dry sound.*

**equalizer**  a system that normalizes an audio or video signal, such as a tone-control system that compensates for frequency distortion of an audio signal  An *equalizing amp* is an amplifier that automatically adjusts the signal. The process of adjusting the audio or video signal is called *equalizing, equalization,* or *filtering.* To *add eq in audio* is to reshape a frequency response to emphasize some frequency ranges and eliminate others.

**Equifax**  See ELRICK & LAVIDGE, INC.

**Equity**  short for ACTORS' EQUITY ASSOCIATION  An *Equity theater* abides by Actors' Equity Association contracts. An *Equity-waiver theater,* such as a community theater, does not pay the Equity scale rate.

**ER**  See ENTRANCE.

**Eras**  a *sans-serif* typeface—that is, one that does not have small decorative lines at the ends of letters

**erase**  to remove by rubbing, wiping, scraping, or other mechanical or electronic means, as from an audio or videotape  In computers, *erasing,* the removal of data, can be accomplished with an *erase character* (more commonly called *delete character*) in which BINARY data are replaced with zeros or other *null codes.* In audio- or videotapes, an *erase head* is a device on a magnetic tape drive that removes previously recorded material.

**eraser**  a device or an item for removing material, such as pencil or ink lines on paper, chalkmarks on a blackboard, or materials on a magnetic tape  A *kneaded eraser,* which is commonly used by commercial artists, is very soft and can be kneaded into various shapes so that it can fit in small areas, to make fine corrections and pick up specks. An *art gum eraser,* also used by artists, leaves a crumbly residue that picks up dirt and smudges. A *fiberglass eraser* is a bundle of glass fibers resembling a pencil, used to gently scratch and remove ink from paper. A *bulk eraser* demagnetizes an entire magnetic tape.

**erasing shield**  a small piece of metal with holes of various shapes and sizes, through which an artist erases material in a specific area, while the surrounding area is protected

**erect image**  a vertical image, such as seen through a lens, with the correct side on top  An

*erecting system* is a set of lenses or prisms in a camera that reverses the image so that it is not seen upside down in the viewfinder, but, rather, is seen correct side up.

**ERF**  ellipsoidal reflector floodlight, a curved spotlight capable of lighting a wide area

**erlang**  an international unit of telephone traffic, named after the Danish mathematician A. K. Erlang (1878–1929)  One erlang is one circuit occupied for one hour.

**erotica**  literature or other matter intended to be sexually arousing

**ERP**  EFFECTIVE RADIATED POWER; EFFECTIVE RATING POINT

**errata**  errors discovered after the printing of a publication and called to the attention of readers on a separate printed piece, inserted or bound in  A single mistake is an *erratum.*

**error line**  a line with an error; not the same as a CORRECTION LINE

**error message**  a statement flashed on a computer screen indicating that the user has done something wrong

**error rate**  in typing and typesetting, the ratio of *error words* (or *erroneous words*) to total words, or the ratio of lines with errors to total lines

**ESC**  EVEN SMALL CAPS

**escalator**  a clause or provision in a contract providing for changes—upward or downward—in wages, prices, royalties (authors' fees), or other items in relation to such factors as a change in the cost-of-living index or the number of copies sold

**E-scale**  [typography] a scale with the letter *E* in various sizes, used to calculate type size

**escape**  [computer] the change from one code or language to another, a common procedure in computerized typesetting and other processes  An *escape key* on a keyboard generates an *escape character,* which changes the subsequent character or characters. An *escape sequence* is a series of control characters, frequently used in computer graphics.

**escapement**  the mechanism that controls the lateral or horizontal movement of a typewriter carriage or typesetter and is responsible for the *spacing* before or between characters  Some typesetters print a character (letter or number), then allow for *(escape)* the width of that character; other typesetters provide for *(escape)*



# EXHIBIT 5



**Home THX® Audio System**
**Room Equalization Manual**
**Rev. 1.5**

This document is Copyright 1995 by Lucasfilm Ltd
THX and Home THX are Registered Trademarks of Lucasfilm Ltd
Dolby Stereo, Dolby Pro Logic, and Dolby AC-3 are trademarks of Dolby Laboratories Licensing Corporation

Appx748

# Table of Contents

**Introduction and Background: Why Room Equalization?** ...................................... 3

**Test Equipment Requirements** ............................................................ 4-5

**The Home THX Equalizer** .................................................................. 5

**Equalization Procedures** ................................................................ 5-22

**Section 1: EQ Procedure Using the THX R-2 Audio Analyzer** ........................... 6-13

**1.1 - 1.3**     **Test Equipment Set-Up** .................................................. 6-9

**1.4 - 1.7**     **LCR Equalization** ...................................................... 10-11

**1.8 - 1.10**    **Subwoofer Equalization** ............................................. 11-13

**1.11**          **Listening Tests** ...................................................... 13

**Section 2: EQ Procedure Using a Conventional RTA** ..................................... 14-21

**2.1 - 2.3**     **Test Equipment Set-Up** ............................................... 14-17

**2.4 - 2.6**     **LCR Equalization** ...................................................... 17-18

**2.7- 2.9**     **Subwoofer Equalization** ............................................. 19-21

**2.10**          **Listening Tests** ...................................................... 21

**Equalization Checklist** ................................................................. 22

**Appendix: "WOW!" A User's Guide to the Laser Disc** ................................... 23-24

Appx749

**Introduction and Background:**

The goal of the Home THX Audio Program is to reproduce in the home the film sound experience exactly as the director heard it on the film dubbing stage. Even with all the elements of a Home THX Audio System correctly installed, one challenge remains to our ability to perfectly "close the loop" connecting the dubbing stage to the home environment. That challenge is the almost infinite variability of room acoustics. To achieve a consistency of performance under varying acoustical conditions, some form of room equalization is necessary.

**Why Room Equalization?**

In the room volumes (under 6000 cu ft) for which the Home THX Audio System was designed, several problems exhibit themselves no matter how "flat" or "accurate" a speaker is designed. The first problem is the existence of room modes or standing waves. These modes are a function of each room's shape and dimensions, and cause uneven frequency response with peaks and dips in the low frequency range. Since these standing waves occur at fixed locations for fixed frequencies within a room, there is no way to completely avoid these artifacts. However, since the audience for a home theater remains generally in one specific area of a room, prudent equalization can usually level these peaks and troughs and produce smoother response in the listening area. The proper positioning of the Subwoofer elements of a Home THX Audio System can do much to minimize these standing wave artifacts (see the Home THX Newsletter #2), but even with careful placement, bass equalization is usually necessary to restore a flat and accurate bass response.

The second problem which room equalization is designed to correct is that of speaker/room boundary interactions. These boundary interactions are the same ones that make a loudspeaker appear to have more bass when placed in a corner versus the center of a room. As you can see, the placement (for example) of the screen LCR loudspeaker asymmetrically in a room can have serious repercussions. The speakers placed nearer to the room's boundaries will have a different tonal balance to those placed more centrally. The result of unequal tonal balance is that sounds can vary dramatically as they are panned across the three front channels, and dialogue from boundary-close loudspeakers may have poor intelligibility.

In both circumstances, with room modes or with room boundary problems, a properly set up room equalizer can restore the accurate spectral and inter-channel tonal balance of a home theatre system. Remember that these effects will vary from room to room and installation to installation.

As valuable as room equalization is in restoring correct spectral balance, the measurements required to obtain consistent and repeatable response are very tricky. During the 60's and 70's, graphic equalizers were introduced by the home audio industry. Unfortunately, these products were used for everything from tone controls to a means of forcibly obtaining flat frequency response from grossly inaccurate loudspeakers. One test method of the period was to use records with tracks separated into 1/3 octave pink noise bands and to plot a speaker's output band by band with an uncalibrated SPL meter! In most cases, the results were highly unsatisfactory. The concept of equalization to correct for room modes and boundary effects was, without accurate test procedures, almost forgotten in the consumer audio field.

However, within professional audio circles, and in particular the motion picture industry, the use of equalization to improve the accuracy of sound reproduction has been continuously refined and perfected. Over the past decade the Professional THX Theatre program has equalized over 600 motion picture auditoriums world-wide on a yearly basis. Since the inception of the THX Sound System program, records have been maintained of the thousands of auditorium analyses and equalizations that we have performed. It was from this experience that the standards for a Home THX Room Equalizer and the enclosed EQ procedure were developed.

3

# Test Equipment Requirements

## 1.) Real Time Analyzer

This procedure requires the use of a real-time (spectrum) analyzer and a pink noise source. The analyzer approved for use is the **R-2 THX Audio Analyzer**. The **R-2** analyzer contains the following:

- a 4 input real-time analyzer with measurement bands at ISO one-third octave and ISO octave intervals
- four calibrated omnidirectional microphones
- spatial averaging through microphone multi-plexing
- averaging over time (10 seconds up to 2 hours)
- a calibrated internal pink noise source

Along with real-time analysis, the **R-2** Analyzer can measure room reverberation (RT-60) and background noise (NC levels).

If the **R-2** Audio Analyzer is unavailable, the following equipment may be used with care:

- A real-time analyzer with measurement bands at ISO one-third octave intervals and a display range of ± 5 dB (minimum)
- A calibrated omni-directional microphone, or microphones.
- The analyzer must be capable of defeating any weighting which may be applied to the real-time display
- The real-time analyzer must be also capable of correctly storing and averaging a minimum of four measurements and have a slow response mode.

**The use of a single RTA, a large number of multiple measurements, and the averaging of these measurements is a time consuming process and can be subject to a high degree of operator error. It is therefore highly recommended that R-2 be employed whenever possible.**

## 2.) Pink Noise Sources

Pink Noise can be obtained from one of the following sources:

- the **R-2** analyzer
- the "Wow!" laser disc Chapters 8-10
- the Delos/Stereo Review Surround Sound Test CD
- any calibrated true pink noise source (this can be verified by measuring the noise source into the line input of the analyzer for flat response)

### Why Pink Noise

What is Pink Noise and why choose it over White Noise? Simply put, white noise is a random signal with equal *amplitude* per frequency, and pink noise is a random signal with equal *energy* per octave. Let's look at two octave bands; say from 500 Hz to 1 kHz and 1 kHz to 2 kHz. If each of these bands had equal amplitude per frequency, it's apparent that the 1-2 kHz band would contain more energy than the 500 Hz to 1 kHZ band because it contains twice the number of frequencies. Consequently white noise sounds very bright. Pink noise, however, containing equal energy per octave, closely reflects our psycho-acoustic expectations of flat response. Because of this perception of flat tonal balance, pink noise is a very useful tool when using a spectrum analyzer with 1/3 octave or octave measurement intervals, and when comparing loudspeakers for spectral similarity by ear .

One element of caution is necessary, though. Because pink noise has a random element to it, when you measure pink noise using a

Appx751

peak level meter or some RTAs you will notice peaks far above the average. This is more noticeable through a Subwoofer than through an LCR speaker. This is because a random bass peak can last for a longer time (lower frequency = longer period) than most RTAs or SPL meters average for. Higher frequency peaks last for a shorter period. This is why most measurements using pink noise are averaged for a long time or are made by averaging multiple measurements. That way these instantaneous peaks won't throw your readings off.

### 3.) The Home THX Room Equalizer

The Home THX Room Equalizer meets the exacting specifications of the Lucasfilm Home THX Audio program. It is specifically designed to have the wide dynamic range, low noise, and low distortion required by the demands of motion picture soundtracks. Careful attention was also paid to musical transparency.

The frequency centers of each channel's controls are carefully chosen to provide the precise control necessary for accurate room equalization, and the "constant Q" nature of each control assures the operator that corrections to one band don't "spill over" into adjacent bands. Parametric controls (where provided) allow for the pin-point correction of mid-frequency problems, and every equalizer is provided with a security cover to help keep a tuned system tuned.

## Equalization Procedure

**NOTE:** THE FOLLOWING TEST PROCEDURES ASSUME THAT A HOME THX AUDIO SYSTEM HAS BEEN PROPERLY INSTALLED, AIMED AT THE LISTENING AREA, AND LEVEL CALIBRATED. FAILURE TO CORRECTLY INSTALL A HOME THX AUDIO SYSTEM MAY RESULT IN INCORRECT ANALYZER READINGS, IMPROPER EQUALIZATION, AND AN ACTUAL REDUCTION IN THE OVERALL PERFORMANCE OF THE SYSTEM.

Please refer to the *Home THX Audio System Installation and Operation Manual* (available from any Home THX Licensee) for details on system design, setup, and calibration.

**For your convenience, an Equalization Procedure Checklist is located on page 22 of this Manual. We recommend that you use it as a handy reference only after thoroughly studying this Manual.**

Graphic Conventions: When referring to the THX R-2 Analyzer, specific, numbered function keys on the control computer are identified by the following graphics: F-7

Appx752

# SECTION 1: Room Analysis Using the R-2 Analyzer

## 1.1) Define The Listening Area:

   The first step in correctly equalizing a Home THX Audio System is to identify the listening area. The equalized response of the system will be averaged over this area to provide a balanced sound field for all listeners.  Equalizing for a single position can result in poor performance at other points in the listening area.  However, calibration of SPL (Sound Pressure Level) may be done from a single reference position using the internal test signals of the Home THX Controller.  These bandwidth limited signals minimize room mode effects.

   You should pay particular attention if the listening area is particularly deep (several rows) or wide. With some measurement positions very close to Left or Right screen speakers, care will be needed in averaging the RTA measurements to prevent unintentional weighting.

## 1.2) Choose Measurement Positions:



— Mic Positions

**Suggested Microphone Positions for 1 Row Seating**

**Fig 1**

Appx753

- Choose four positions that represent prime listening positions spaced equally throughout the listening area (Fig. 1).

- Position your analyzer's microphones at seated ear height (38" to 48" off finished floor). Place the microphone(s) on a stand.

- Do not attach any microphone directly to the analyzer or hold it in your hand. Your body is an acoustical object large enough to influence what is supposed to be a room measurement.

- Label in your notes each position and note any related information (e.g., Microphone 3 located under loft overhang) which can affect your interpretation of the measurements.

- Do not point any microphone directly at a loudspeaker. Point it straight up. You are looking for a room measurement, not just the direct field of the loudspeaker.

- If you are placing a microphone on any piece of furniture (i.e., a chair or couch), make sure that the mic is away from any cushion or seat back by at least 1 foot. This will improve the accuracy of measurements at that position above 800 Hz.

    For multiple rows of seats, see Fig. 2 below.



◇ **Mic Positions**

**Multiple Row Seating and Microphone Positions**
**Fig 2**

Appx754

## 1.3) Home Theatre and Test Equipment Set-Up

**Home Theatre Equipment:**

- ***Switch your Home THX Controller to the "Dolby Pro Logic Surround" mode.*** **The Home THX Cinema mode must be switched off for this procedure.** Note: For Controllers featuring Dolby AC-3 Decoders, there is no easy method to insert broad band pink noise into this signal path. Equalization should be done through the Dolby Pro Logic mode on these controllers as well.

- Calibrate the individual channel levels as usual using the internal test signals and a reliable SPL meter.

- Disconnect or disable the Subwoofer and the channels you are not measuring. You want to analyze each channel individually and disconnecting unused channels helps prevent assignment errors. One installer spent a frustrating hour trying to EQ a Center Channel speaker only to find that he had been playing pink noise through the Right Channel speaker.

- Set the System Volume at Reference.

**Pink Noise Sources:**

Pink Noise may be obtained from one of the following sources:

- The internal pink noise source of the **R-2** Audio Analyzer  F-7

- The "Wow!" laser disc, Chapters 8-10.

- The Delos/Stereo Review Surround Sound Test CD

- External calibrated pink noise source (200 mV RMS) placed into each channel's EQ input.

**R-2 Setup:**

Defeat any weighting on the RTA portion of R-2 (e.g., "C" weighting). Measurements are to be taken with flat response.



Set the analyzer to Slow Response.



Set your analyzer's scale to the appropriate SPL range, and the dB per division scale to 2 dB.

F-3 , F-2

Set the measurement time to a minimum of 20 seconds.

F-4 , F-2

Begin the multiplexing operation F-1 , F-5

### 1.4) Real-Time Analysis:

• Begin with the Center Channel

• Start your pink noise source. F-7 If using "Wow!" Chapters 9, put the appropriate track on A-B repeat so that it conveniently cycles automatically. (Note: "Wow!" pink noise chapters will allow for a maximum measurement interval of 20 seconds, so when using "Wow!" as a noise source the minimum and maximum measurement intervals are the same.)

• Begin your measurement interval. F-8 IF USING "WOW!" AS THE SOURCE, BE SURE THAT YOU BEGIN THE INTERVAL IMMEDIATELY AFTER THE CHAPTER HAS REPEATED! Any blank spot during the measurement interval will corrupt the data.

• Analyze your spatially and temporally averaged data.

**NOTE:** DISPERSION AND AIR ABSORPTION AT HIGHER FREQUENCIES WILL CAUSE A GENTLE ROLL OFF IN RESPONSE BEGINNING AROUND 6 kHz. *THIS IS NORMAL AND DOES NOT REQUIRE EQUALIZATION.* (Fig. 3)



Fig 3

9

Appx756

## 1.5)    Equalize:

The resulting spatial average will approximate the inverse of the correct EQ curve.  As a starting point, assume that a dip of -3 dB on the analyzer calls for an increase at the appropriate EQ frequency of +3 dB.  Remember the scale on the analyzer is 2 dB per division.

Since we will re-measure a number of times, any over correction or under correction will be caught.  When analyzing the averaged RTA curve, try to look for the mean SPL for all frequencies and adjust the peaks and dips to that mean.

Remember that we are trying to achieve a response in the LCR channels of ±1 to 2 dB from 100 Hz to 1 kHZ without drastic EQ shifts.  A boost of 6 dB places many demands on both amplifiers and loudspeakers.

## 1.6)    Re-analyze:

After applying the corrections to the appropriate channel frequency centers, re-run the procedure described in 1.4 to verify the corrections.  You will find that you will have to measure and correct several times to achieve a balanced and repeatable response.

**NOTE:** ABOVE 1 kHz, IN TYPICAL ROOM ENVIRONMENTS, THE SOUND FROM HOME THX LCR SPEAKERS IS DIRECT FIELD DOMINATED AND THE FREQUENCY RESPONSE MAY BE POSI-TION DEPENDENT.  AVOID DRAMATIC EQ CHANGES ABOVE 1 kHz.  SINCE WE ARE MORE SENSITIVE TO FREQUENCY PEAKS THAN DIPS, USE THE CONTROLS AVAILABLE SPARINGLY TO REDUCE HIGH FREQUENCY PEAKS, RATHER THAN TRYING FOR RULER FLAT RESPONSE



Fig 4

You will have achieved a correct EQ curve when successive measurements show the same flat response.

*Repeat this procedure for each remaining screen channel and the subwoofer. Use the appropriate track on "Wow!" or your pink noise source, and remember to connect only the speaker that you are testing.* Your front channels are now equalized.

## 1.7) Compare EQ Settings

**NOTE: IN INSTALLATIONS THAT ALLOW FOR SYMMETRICAL L/R SPEAKER ROOM PLACEMENT, CONFIRM THAT THE EQ SETTINGS FOR L & R CHANNELS ARE SIMILAR.** Small variations of 1 dB in individual 1/3 octave bands are tolerable. In asymmetrical L/R speaker placement, larger variations in EQ curves are acceptable; particularly at the lower frequencies where boundary effects are most common.

Using R-2, the comparison function compares the curve in memory to a curve on the disk drive. This means that the stored curve on the disk drive is always assumed to be the reference. The resulting difference curve shows the deviation of the curve in memory from the reference curve. To compare a curve on display to a stored curve, select F-2 , then select the reference curve from the items listed. You can save the resulting comparison by hitting F-9 .

## 1.8) Equalizing the Subwoofer

Measuring the Subwoofer is very similar to measuring the LCR channels with one exception. Because the pink noise source will exhibit larger instantaneous fluctuations in amplitude at lower frequencies (see the section on pink noise in the introduction), longer averaging times may be necessary to improve measurement consistency. If you are using "Wow!" as the pink noise source, use the Center Channel Pink Noise (Chapter 9). Otherwise connect your pink noise source into the both Left and Right channel inputs of your decoder.



Fig 5

11

**Appx758**

When equalizing the Subwoofer Channel, you should concentrate on reducing the serious peaks. You may find that because of the depth of the room modes a ruler flat response is not within the range of the equalizer. This not a major concern since a response within ± 3 or 4 dB is very acceptable. One tip; a reduction of energy in the 20-30 Hz range will enable the subwoofer to play louder without before encountering excursion problems.

### 1.9) Confirm the Subwoofer Splice: Center Channel

The next step is to activate the internal test signals present in your Home THX Controller and re-adjust all SPL's to their correct 75 dB C weighted levels. This will even out any level variations intro-duced by equalization.

After level check, return to your "Wow!" Center Channel pink noise; Chapter 9. Observe on your RTA the relative levels of the Subwoofer and the Center Channel. The overlap area is referred to as the splice point. Follow the same averaging procedure you used in Section 1.4. In particular, look at the crossover area between 80 Hz and 200 Hz. This area will usually appear uneven (Fig. 6).



Fig 6

The most common cause of an uneven Subwoofer splice is the relative difference in positions between the LCR speakers and the Subwoofer(s). These position differences can cause frequencies common to all the speakers to arrive at different times at the listening position, and partially cancel or reinforce themselves. **At this point use the Center Channel EQ to adjust the response at the splice. DO NOT use the Subwoofer EQ** .

### 1.10) Confirm Subwoofer Splice: Left and Right Channel

Next, in the Stereo or Bypass mode play both the Left and Right Pink Noise from "Wow!"; Chap-ters 8 & 10. Measure and analyze as described in Section 1.4. Adjust both the Left and Right Chan-

nel splices to the Subwoofer channel by using your Left and Right Channel EQs.

Remember, if the relative levels are off, use your Home THX Controller to adjust the levels **Use only the Left, Center, or Right EQ controls to adjust for uneven frequency response at the Subwoofer splice point.**

***WARNING! If a dip remains at the Subwoofer splice point even after drastic EQ, check for correct loudspeaker polarity. Subwoofers or LCR speakers connected out of phase can cause a "suck-out" at the crossover point. Subwoofers offset from the LCR plane by a large distance or multiple Subwoofers can do the same.*** If you are using a single Subwoofer and have a large offset, reverse the polarity of the Subwoofer signal. If multiple and offset Subwoofers are used, you should attempt to smooth the response by reversing the polarity of the Subwoofer furthest from the LCR speakers, or by repositioning the offset Subwoofer.

### 1.11) LISTEN!

When you have completed your room equalization, play the circulating pink noise from "Wow!" (Chapter 7). Each front channel, Left, Center, and Right, should tonally sound very similar within the listening area. *If the circulating noise sounds very different, go back and re-measure any offending screen channel.* **The reference channel for any timbre comparison is the CENTER CHANNEL.**



**Fig 7**

Please Note: The above curve represents a typical room EQ. Since rooms vary greatly **you should not expect every equalized room RTA to look like the above illustration.** A smooth curve, without radical peaks or dips, is what is desired. With difficult rooms, acceptable tolerances can be up to ±3 dB.

Your system is now correctly equalized.

## SECTION 2: Room Analysis with a Conventional RTA

This method of room analysis was written to *mimic* the spatial and temporal averaging of the R-2 THX Audio Analyzer. The procedures for choosing microphone positions and the techniques for equalization are identical with both types of instruments.

### 2.1) Define The Listening Area:

The first step in correctly equalizing a Home THX Audio System is to identify the listening area. The equalized response of the system will be averaged over this area to provide a balanced sound field for all listeners. Equalizing for a single position can result in poor performance at other points in the listening area. However, calibration of SPL (Sound Pressure Level) may be done from a single reference position using the internal test signals of the Home THX Controller. These bandwidth limited signals minimize room mode effects.

You should pay particular attention if the listening area is particularly deep (several rows) or wide. With some measurement positions very close to Left or Right screen speakers, care will be needed in averaging the RTA measurements to prevent unintentional weighting.

### 2.2) Choose Measurement Positions:



— **Mic Positions**

**Suggested Microphone Positions for 1 Row Seating**

**Fig 8**

14

- Choose four positions that represent prime listening positions spaced equally throughout the listening area (Fig. 8).

- Position your analyzer's microphone(s) at seated ear height (38" to 48" off finished floor).  Place the microphone(s) on a stand.

- Do not attach any microphone directly to the analyzer or hold it in your hand.  Your body is an acoustical object large enough to influence what is supposed to be a room measurement.

- Label in your notes each position and note any related information (e.g., Microphone 3 located under loft overhang) which can affect your interpretation of the measurements.

- Do not point any microphone directly at a loudspeaker.  Point it straight up.  You are looking for a room measurement; not measuring the direct field of the loudspeaker.

- If you are placing a microphone on any piece of furniture (i.e.,  a chair or couch), make sure that the mic is away from any cushion or seat back by at least 1 foot.  This will improve the accuracy of measurements at that position above 800 Hz.

  For multiple rows of seats, see Fig. 9 below.



◇ **Mic Positions**

**Multiple Row Seating and Microphone Positions**

**Fig 9**

Appx762

**2.3) Home Theatre and Test Equipment Set-Up**

**Home Theatre Equipment:**

- ***Switch your Home THX Controller to the "Dolby Pro Logic Surround" mode.*** **The Home THX Cinema mode must be switched off for this procedure.**

- Disconnect or disable the Subwoofer and the channels you are not measuring. You want to analyze each channel individually and disconnecting unused channels helps prevent assignment errors. One installer spent a frustrating hour trying to EQ a Center Channel speaker only to find that he had been playing pink noise through the Right Channel speaker.

- Calibrate the individual channel levels as usual using the internal test signals and a reliable SPL meter.

- Set the System Volume at Reference.

**RTA Equipment:**

- Defeat any weighting on the RTA portion of the analyzer (e.g., "C" weighting). Measurements are to be taken with flat response.

- Set the analyzer to Slow Response.

- Set your analyzer's scale to the appropriate SPL range, and the dB per division scale to 2 dB.

**Pink Noise Sources:**

Pink Noise can be obtained from one of the following sources:

- The "Wow!" laser disc, Chapters 8-10.

- An external calibrated pink noise source (200 mV RMS) placed into each channel's EQ input.

**2.4)    Real-Time Analysis:**

   Start your pink noise source. If using "Wow!" Chapters 8-10, put the appropriate track on A-B repeat so that it conveniently cycles automatically. Placing your microphone at a reference position (Microphone 1). Take three or four measurement samples and store each reading into a memory position of the analyzer. Average these readings and store the average in a memory location. Repeat the procedure at each of the other three locations chosen.

Appx763

**NOTE:** CHECK THE OVERALL SPLs AT EACH MICROPHONE LOCATION. IF THESE VARY BY MORE THAN ± 1 dB, ADJUST THE MASTER VOLUME ON THE CONTROLLER TO COMPENSATE THE SPL AT EACH LOCATION TO APPROXIMATE THE SPL AT THE REFERENCE POSITION (Microphone 1). FAILURE TO DO SO MAY RESULT IN SKEWED SPATIAL AVERAGES.

With the four positions stored in memory, now average to obtain the spatial response for the entire listening area. Notice that we have used the method of obtaining several samples for each microphone position to smooth out the stochastic effects of the pink noise.

**NOTE:** DISPERSION AND AIR ABSORPTION AT HIGHER FREQUENCIES WILL CAUSE A GENTLE ROLL OFF IN RESPONSE BEGINNING AROUND 6 kHz. *THIS IS NORMAL AND DOES NOT REQUIRE EQUALIZATION.* (Fig. 10)



Fig 10

### 2.5) Equalize:

The resulting spatial average will approximate the inverse of the correct EQ curve. As a starting point, assume that a dip of -3 dB on the analyzer calls for an increase at the appropriate EQ frequency of +3 dB. Since we will re measure a number of times, any over correction or under correction will be caught. When analyzing the averaged RTA curve try to look for the mean SPL for all frequencies and adjust the peaks and dips to that mean.

Remember that we are trying to achieve a response in the LCR channels of ± 1 to 2 dB, from 100 Hz to 1 kHZ, without drastic EQ shifts. A boost of 6 dB places many demands on both amplifiers and loudspeakers.

**2.6) Re-analyze:**

After applying the corrections to the appropriate channel frequency centers, re-run the above procedure to verify the corrections.  You will find that you will have to measure and correct several times to achieve a balanced and repeatable response.

**NOTE:** ABOVE 1 kHz, IN TYPICAL ROOM ENVIRONMENTS, THE SOUND FROM HOME THX LCR SPEAKERS IS DIRECT FIELD DOMINATED AND THE FREQUENCY RESPONSE MAY BE POSI-TION DEPENDENT.  AVOID DRAMATIC EQ CHANGES ABOVE 1 kHz.  SINCE WE ARE MORE SENSITIVE TO FREQUENCY PEAKS THAN DIPS, USE THE CONTROLS AVAILABLE SPARINGLY TO REDUCE HIGH FREQUENCY PEAKS, RATHER THAN TRYING FOR RULER FLAT RESPONSE.



Avoid radical EQ beyond this point.

**Typical Unequalized Room Response**

**Fig 11**

Repeat the above procedure for each front channel.  Use the appropriate track on "Wow!" or your pink noise source, and remember to connect only the speaker that you are testing.

Your LCR channels are now equalized.

**NOTE:  IN INSTALLATIONS THAT ALLOW FOR SYMMETRICAL L/R SPEAKER ROOM PLACE-MENT, CONFIRM THAT THE EQ SETTINGS FOR L & R CHANNELS ARE APPROXIMATELY THE SAME.**  Small variations of 1 dB in individual 1/3 octave bands are tolerable.  In asymmetrical L/R speaker placement, larger variations in EQ curves are acceptable; particularly at the lower frequencies where boundary effects are most common

Appx765

### 2.7) Subwoofer Equalization:

All Subwoofer measurements should be done using the Center Channel Pink Noise band on "Wow!" (Chap. 9) or with your pink noise source into the Left and Right inputs of the decoder. Disable or disconnect the LCR speakers.



Fig 12

Measuring the Subwoofer is very similar to measuring the LCR channels with one exception. Because the pink noise source will exhibit larger instantaneous fluctuations in amplitude at lower frequencies (see the section on pink noise in the introduction), more averages will be necessary to improve measurement consistency. It is therefore recommended that, rather than attempting to spatially average the microphone positions with a non-multiplexing RTA, you take the maximum number of readings at Position 1 that you can store and average them. Then adjust your EQ setting for flat response for that average.

If you are using "Wow!" as the pink noise source, use the Center Channel Pink Noise (Chapter 9). Otherwise connect your pink noise source into the both Left and Right channel inputs of your decoder.

When equalizing the Subwoofer Channel, you should concentrate on reducing the serious peaks. You may find that because of the depth of the room modes a ruler flat response is not within the range of the equalizer. This not a major concern since a response within ± 3 or 4 dB is very acceptable. One tip — a reduction of energy in the 20-30 Hz range will enable the subwoofer to play louder without before encountering excursion problems.

Reconnect your front speakers.

Appx766

## 2.8) Confirm the Subwoofer Splice: Center Channel

The next step is to activate the internal test signals present in your Home THX Controller and re-adjust all SPL's to their correct 75 dB C weighted levels.  This will even out any level variations intro-duced by equalization.

After level check, return to your "Wow!" Center Channel pink noise; Chapter 9.  Observe on your RTA the relative levels of the Subwoofer and the Center Channel.  The overlap area  is referred to as the splice point.  Follow the same averaging procedure you used for Subwoofer EQ.  In particular, look at the crossover area between 80 Hz and 200 Hz. This area will usually appear uneven (Fig. 13).



Fig 13

The most common cause of an uneven Subwoofer splice is the relative difference in positions between the LCR speakers and the Subwoofer(s).  These position differences can cause frequencies common to all the speakers to arrive at different times at the listening position, and partially cancel or reinforce themselves.  **At this point use the Center Channel EQ to adjust the response at the splice.  DO NOT use the Subwoofer EQ**.

## 2.9) Confirm Subwoofer Splice: Left and Right Channel

Next, in the Stereo or Bypass mode play both the Left and Right Pink Noise from "Wow!"; Chap-ters 8 & 10.  Adjust both the Left and Right Channel splices to the Subwoofer channel by using your Left and Right Channel EQs.

Remember, if the relative levels are off, use your Home THX Controller to adjust the levels. **Use the Left, Center, or Right EQ controls only to adjust for uneven frequency response at the splice point.**

**WARNING!  If a dip remains at the Subwoofer splice point even after drastic EQ, check for correct loudspeaker polarity.  Subwoofers or LCR speakers connected out of phase may cause a "suck-out" at the crossover point.  Subwoofers offset from the LCR plane by a large distance or multiple Subwoofers can do the same.**  If you are using a single Subwoofer and have a large offset, reverse the polarity of the Subwoofer signal.  If multiple and offset Subwoofers are used, you should attempt to smooth the response by reversing the polarity of the Subwoofer furthest from the LCR speakers, or by repositioning the offset Subwoofer.

## 2.10) LISTEN!

When you have completed your room equalization, play the circulating pink noise from "Wow!" (Chapter 7).  Each front channel, Left, Center, and Right, should tonally sound very similar within the listening area.

**Correct EQ with Subwoofer Splice**



**Fig 14**

Please Note:  The above curve represents a typical room EQ.  Since rooms vary greatly **you should not expect every equalized room RTA to look like the above illustration.**  A smooth curve, without radical peaks or dips, is what is desired.  With difficult rooms, acceptable tolerances can be up to ± 3 dB.

## Equalization Checklist:

**Set-UP**
- Set Up Home THX Audio System
- Aim L, C, R loudspeakers using pink noise on "Wow!" disc
- Calibrate individual channel levels with controller's internal test signals
- Set Up Microphone positions
- Set RTA weighting for Flat
- Set Up Scale Range and Divisions

**With** R-2 **Audio Analyzer only**
- Set Measurement interval for 20 sec. minimum
- Begin Microphone Multiplexing

**Analyze & Equalize**
- A) Disconnect Subwoofer, Left, and Right Channels
- B) Play Pink Noise through Center Channel
- C) Measure multiple locations, average readings, and equalize Center Channel
- D) Repeat C until measurements are consistent
- Repeat operations A,B,C, &D for Left, Right, and Subwoofer channels

Confirm EQ
- Reconnect System
- Confirm splice of Subwoofer with Center Channel by playing Center pink noise in Dolby Pro Logic mode
- Confirm splice of Subwoofer with Left and Right Channels by playing Left & Right Channel Pink Noise in Stereo or Bypass mode

Check System Set-up
- Re-calibrate individual channels with controller's internal test signals
- Listen to circulating Pink Noise on "Wow!" disc to compare timbre of LCR speakers
- Return to Home THX Cinema Mode and play*Wow!* demo listening for accurate Foley*, clear dialogue, precise localization, smooth pans, and overall detail

*Foley is a term used to describe the all of the "natural" sound effects which contribute to our sense of reality in motion pictures. These effects are created in a special sound stage in sync with the action of the film. The process was named after Jack Foley who invented the system of adding the sound of footsteps to early talking motion pictures in order to enhance their believability.

Appx769

# Appendix:
# "WOW!"— A User's Guide

The "WOW!" laser disc was created by Lucasfilm for use with Home THX Audio systems. "WOW!" consists of exciting demonstration, educational, and testing material to help you best appreciate the Home THX Audio System. "Wow!" is available to consumers with the purchase of a Home THX Audio System controller.

*"WOW!" should only be played through a Home THX Audio System, and should never be sold, rented, copied, broadcast, or used for any commercial purposes. Any unauthorized use of this copyrighted material is strictly prohibited, and violators <u>will</u> be prosecuted.*

The following table of contents outlines the various chapters on the WOW! laser disc, and provides some suggestions on their use.

## Side 1:

### Chapter 1: WOW!;

This is a remarkable thematic montage of various George Lucas films, with fast, tight editing to emphasize interest and excitement. All of the soundtracks are essentially unchanged with one exception: a new musical score was commissioned to tie the entire piece together. WOW! provides a short and complete movie going experience, and shows off all of the potential of the Home THX Audio System. WOW! contains a wide variety of sounds, from very quiet passages, to loud, explosive ones; there are sounds panning between Left and Right, and from front to back; there is soft dialog buried in the midst of competing, loud sound effects; there are powerful, deep bass sounds that make you feel fully involved in the action. The Home THX Audio System will deliver all of these sounds with startling realism, and unequaled clarity!

### Chapter 2: The Home THX Audio System;

Tomlinson Holman discusses the elements of the Home THX Audio System and what sets it apart from more conventional home theatre systems.

### Chapter 3: Mode Selections;

Five short selections illustrate the most appropriate use of the various modes of your THX controller. These selections show the best use of the Home THX Cinema, Dolby Pro Logic, and Stereo modes.

## Side 2:

### Chapter 4: Soundtrack;

This chapter outlines the process whereby the soundtrack of a movie is created. It gives you an appreciation of what you are missing when you watch a movie on a non-THX system. There is far more to making a film soundtrack than most people imagine.

### Alignment Test Signals:

### Chapter 5: Input Level Calibration Tone;

This 1 kHz tone is recorded at 0 dB (Dolby reference level), and can be used to calibrate the input level of your THX controller. Adjust the level so that the meter on the controller  reads

0 dB(reference level) when this signal is playing.

### Chapter 6: Pink Noise, Left & Right, In-Phase, -10 dB;

This signal is comprised of broad band noise and can be used to adjust the Center output level, or check the phase of the Left, Right, and Center speakers, as well as the Subwoofers. When played back through a correctly adjusted system, this signal should yield 75 dB SPL (Sound Pressure Level) on a sound level meter, C-weighted, slow mode.

## Chapter 7: Pink Noise, Circulating L-C-R-S, -10 dB;

This signal is comprised of broad band noise and can be used to calibrate all the individual output level controls after the input level controls have been calibrated. Set the level to read 75 dB SPL on a sound level meter, C-weighted, Slow mode in each channel in turn, measured from the primary listening position.

## Chapters 8-11: Pink Noise, Left, Center, Right, Surround Channels, 0 dB;

This signal is comprised of broad band noise and can be used to assist in aiming the Left, Center, or Right speakers directly at the primary listening area (especially in the vertical plane). Simply listen for the best high frequency response at your seated position. The Surround Channel Test Signal (Chapter 11) may be used to test the Surround Speaker positions for the best evenness and envelopment of the Surround Field. When played back through a correctly adjusted system, these signals should yield 85 dB SPL on a sound level meter, C-weighted, slow mode. These signals can also used for spectrum analysis if room equalization is performed.

## Chapters 12-15: Frequency Sweep, 20 Hz to 20 kHz, Left, Center, Right, & Surround Channels, 0 dB;

This sine wave sweep covers the entire audible range and can be used to measure the frequency response of the Left, Center, Right, or Surround channel electronics. Use in conjunction with a chart recorder set for a 3 mm/sec. pen speed. It is not recommended to use this test for loudspeaker adjustments since room standing waves make the results unreliable. *Warning: this signal can be damaging at high volumes. Care is required in setting the volume for this test.*

## Chapter 16: Rattle Test, Frequency Sweep, 20 Hz to 500 Hz, 0 dB;

This is an *extremely* slow low frequency sweep, intended to help pinpoint rattles, structural resonances and other potential problems in the bass. *Warning: this signal can be damaging at high volumes. Care is required in setting the volume for this test.*

## Chapters 17-18: Slap Echo Test, Center and Surround Channels;

This recording of a hand clap is repeated several times to facilitate the identification of "slap echoes" which might be stimulated by the system. Slowly walk around the room, listening for a fluttering, percussive echo following each clap. Treat room surfaces accordingly. For best results it is recommended to shut off the L, R, and S speakers on the Center Channel Test, and the L, C, and R speakers on the Surround Test.

## Chapter 19-20: Video Test Patterns;

These patterns will enable a video technician to correctly set you TV set, monitor, or video projector to the correct levels of color, hue, contrast, and brightness.

Copyright 1992 LucasArts Entertainment Company

©**Rane Corporation 10802 47th Ave.W., Mukilteo WA, 98275-5098 TEL (206)355-6000 FAX (206)347-7757**

Printed in the U.S.A. on Recycled Paper

520-333 AUG95

# UNITED STATES INTERNATIONAL TRADE COMMISSION
# WASHINGTON, D.C.

### Before the Honorable Charles E. Bullock
### Chief Administrative Law Judge

|  |  |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1191** |

## COMPLAINANT SONOS, INC.'S MOTION TO STRIKE HYPOTHETICAL REDESIGNS

### AND

### REQUEST TO SHORTEN TIME

| | |
|---|---|
| Dated: August 18, 2020 | Clement S. Roberts, Esq. |
| | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| George I. Lee, Esq. | The Orrick Building |
| Sean M. Sullivan, Esq. | 405 Howard Street |
| Rory P. Shea, Esq. | San Francisco, CA 94105-2669 |
| J. Dan Smith, Esq. | Tel.: (415) 773-5700 |
| Cole B. Richter, Esq. | Email: Sonos-1191-service@orrick.com |
| Michael P. Boyea, Esq. | |
| Jae Y. Pak, Esq. | Jordan L. Coyle, Esq. |
| LEE SULLIVAN SHEA & SMITH LLP | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| 656 W Randolph St, Floor 5W | Columbia Center |
| Chicago, IL 60661 | 1152 15th Street, NW |
| Tel.: (312) 754-0002 | Washington, DC 20005 |
| Email: Sonos-1191-service@orrick.com | Tel.: (202) 339-8400 |
| | Email: Sonos-1191-service@orrick.com |
| Bas de Blank, Esq. | |
| Lillian J. Mao, Esq. | Alyssa M. Caridis, Esq. |
| ORRICK, HERRINGTON & SUTCLIFFE LLP | Geoffrey Moss, Esq. |
| 1000 Marsh Road | Shane D. Anderson, Esq. |
| Menlo Park, CA 94025-1015 | Margaret Abernathy, Esq. |
| Tel.: (650) 614-7400 | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| Email: Sonos-1191-service@orrick.com | 777 South Figueroa Street, Suite 3200 |
| | Los Angeles, CA 90017-5855 |
| ***Attorneys for Complainant Sonos, Inc.*** | Tel.: (213) 629-2020 |
| | Email: Sonos-1191-service@orrick.com |

previously." *Id.* at 2. "Google's continued failure to provide complete discovery on this matter further prejudices Sonos." *Id.*

    **D.**    <u>**Google Once Again Supplemented Its Response To Interrogatory No. 20**</u>

    Google did not respond to Sonos's August 5 letter or provide the required information. Instead, on August 6, 2020, Google once again supplemented its response to Interrogatory No. 20. Ex. 9 (8/6/20 Supplemental Interrogatory Response) at 166-170. That response, however, did not specify that any alleged redesign was fixed and definite. *Id.* To the contrary, Google once again incorporated its earlier response that these were "possible redesigns, alterations, modifications or changes to the Accused Product" that "could" be made. *Id.* at 166 and 156.

    Google also did not respond to Sonos's questions. *Id.* Rather, the only additional information provided in the August 6 supplemental response was the representation that physical Google devices "have been produced" as physical exhibits 7-22 *Id.* at 167-170. That same day, however, Google sent a letter clarifying that, contrary to its interrogatory response, it had not and would not produce these devices to Sonos. Ex. 10 (8/6/20 O. Zivojnovic letter) (stating that devices would only be made available for inspection, only demonstrated by Respondents, and that Sonos could not change or otherwise test the alleged redesigns). Google did, however, confirm that none of the alleged redesigns were imported. *Id.* (contrasting PX-0001-06 [the "as imported" accused products] with PX-0007-22 ["implementing the modifications"]).

    On or around August 6, it appears that Google finally added source code for the hypothetical and alternative redesigns to the review computers.[3] Once again, Sonos promptly

---

[3] Sonos cannot confirm this date because Google did not timely update its source code manifest as required by the Amended Protective Order. Order 8 at ¶ 18(i) ("The producing party shall also be required to supplement this manifest each time source code is added to the Source Code Computers.") and Ex. 11 (8/6/20 B. de Blank email).

the future.[4]  *See,* Ex. 6 at 166-170 and 156.  These are not "fixed and definite."  Indeed, Google

concedes that it has not imported any of these redesigns, they have not been "released to

consumers" and that it "expects" they will not replace any Accused Products.  *See,* Ex. 7.

Google is seeking nothing more than an advisory opinion.

Despite this, Google argues that all of its redesigns are must be considered because

Google belatedly made some source code available for inspection mere weeks before final

infringement contentions are due.  *See*, Ex. 7 at 2.  But, the source code Google purports to rely

on, itself, makes clear that alleged redesigns are incomplete. ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████. There would be

no reason for Sonos to try to complete an exhaustive review of each of the █ possible redesigns

because Google would – indeed, must – change that code.

Google's description of its source code makes clear that the redesigns are not merely

hypothetical but actually mutually exclusive alternatives.  In other words, it is literally

impossible for Google to implement all of the redesign alternatives it seeks to adjudicate.

For example, Google references ████████████████████ for each of the '258

and '953 Patents.  But, these alternatives are, on their face, mutually exclusive. ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[4]  Even the number of redesigns is unclear.  Google identifies ████████████████████
██████████████████████████████████ in its August 6, 2020 supplemental
response to Interrogatory No. 20.  Ex. 9 at 167-170.  But, while Google lists and describes them
separately, it is possible that ████████████████████████████████████████████
█████████████████████.

████████████████████████████████████████████████

# UNITED STATES INTERNATIONAL TRADE COMMISSION
# WASHINGTON, D.C.

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

| |
|---|
| **In the Matter of** |
| **CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** |

**Inv. No. 337-TA-1191**

## RESPONDENTS' SEVENTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO COMPLAINANT'S FIRST SET OF INTERROGATORIES (NO. 20)

Pursuant to Commission Rules 210.27 and 210.29 and Ground Rule 3.4.2, Respondents Google, LLC and Alphabet Inc. (collectively, "Respondents") hereby supplement their objections and responses to Complainant Sonos, Inc.'s ("Complainant" or "Sonos") First Set of Interrogatories as follows:

















**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

In the Matter of

CERTAIN AUDIO PLAYERS AND
CONTROLLERS, COMPONENTS
THEREOF, AND PRODUCTS
CONTAINING THE SAME

Inv. No. 337-TA-1191

**RESPONDENTS' EIGHTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
COMPLAINANT'S FIRST SET OF INTERROGATORIES (NO. 20)**

Pursuant to Commission Rules 210.27 and 210.29 and Ground Rule 3.4.2, Respondents

Google, LLC and Alphabet Inc. (collectively, "Respondents") hereby supplement their objections

and responses to Complainant Sonos, Inc.'s ("Complainant" or "Sonos") First Set of

Interrogatories as follows:





















