Iɴ Tʜᴇ

# United States Court of Appeals for the Federal Circuit

Sᴏɴᴏs, Iɴᴄ.,

*Appellant,*

*v.*

Iɴᴛᴇʀɴᴀᴛɪᴏɴᴀʟ Tʀᴀᴅᴇ Cᴏᴍᴍɪssɪᴏɴ,

*Appellee,*

Gᴏᴏɢʟᴇ LLC,

*Intervenor.*

---------------------------------------------------------

Gᴏᴏɢʟᴇ LLC,

*Appellant,*

*v.*

Iɴᴛᴇʀɴᴀᴛɪᴏɴᴀʟ Tʀᴀᴅᴇ Cᴏᴍᴍɪssɪᴏɴ,

*Appellee,*

Sᴏɴᴏs, Iɴᴄ.,

*Intervenor.*

On Appeal from the United States International
Trade Commission No. 337-TA-1191

## NON-CONFIDENTIAL JOINT APPENDIX

Richard P. Hadorn
Office of the General Counsel
U.S. International Trade
Commission
500 E Street, SW
Washington, DC 20436
(202) 205-3179

*Counsel for International Trade
Commission*

E. Joshua Rosenkranz
Oʀʀɪᴄᴋ, Hᴇʀʀɪɴɢᴛᴏɴ &
  Sᴜᴛᴄʟɪꜰꜰᴇ LLP
51 West 52nd Street,
New York, NY 10019
(212) 506-5000

*Counsel for Sonos, Inc.*

Dan L. Bagatell
Pᴇʀᴋɪɴs Cᴏɪᴇ LLP
3 Weatherby Road
Hanover, NH 03755
(602) 351-8250

*Counsel for Google LLC*

# TABLE OF CONTENTS

Page

## VOLUME I

Commission Opinion, filed January 6, 2022
**(Filed Under Seal; Contains Confidential Materials)** ................................................................ Appx1-36

Limited Exclusion Order, filed January 6, 2022 ...................... Appx37-40

Cease and Desist Order, filed January 6, 2022 ........................ Appx41-48

Notice of a Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order and a Cease and Desist Order; Termination of Investigation, filed January 6, 2022 .................................... Appx49-52

Notice of a Commission Determination to Review in Part a Final Initial Determination Finding a Violation of Section 337, filed November 19, 2021 ............... Appx53-57

Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, filed August 13, 2021
**(Filed Under Seal; Contains Confidential Materials)** ......................................................... Appx58-257

Order 19: Denying Complainant Sonos, Inc.'s Motion to Strike Hypothetical Redesigns, filed September 4, 2020
**(Filed Under Seal; Contains Confidential Materials)** ....................................................... Appx258-262

Order 20: Construing the Terms of the Asserted Claims of the Patents at Issue, filed September 25, 2020
**(Filed Under Seal; Contains Confidential Materials)** ....................................................... Appx264-316

Docket for ITC Inv. No. 337-TA-1191 .................................... Appx348-384

i

Verified Complaint of Sonos, Inc. Under Section 337 of
the Tariff Act of 1930, as Amended, filed January 7,
2020 ......................................................................... Appx387, 396-449

Exhibits 1 to 8 to Google's Initial Markman Brief, filed
July 2, 2020 ................................. Appx670, 682-683, 690-699, 731-771

Complainant Sonos, Inc.'s Motion to Strike
Hypothetical Redesigns and Request to Shorten
Time, filed August 18, 2020
**(Filed Under Seal; Contains Confidential
Materials)** .............................................................. Appx845, 858, 862

Exhibit 6 to Sonos, Inc.'s Motion to Strike Hypothetical
Redesigns: Respondents' Seventh Supplemental
Objections and Responses to Complainant's First
Set of Interrogatories (No. 20), filed August 18, 2020
**(Filed Under Seal; Contains Confidential
Materials)** ........................................................ Appx876, 1037-1042

Exhibits 7-15 to Sonos, Inc.'s Motion to Strike
Hypothetical Redesigns, filed August 18, 2020
**(Filed Under Seal; Contains Confidential
Materials)** ....................................................... Appx1135, 1290-1300

**VOLUME II**

Respondent Google's Pre-Trial Brief, filed January 22,
2021
**(Filed Under Seal; Contains Confidential
Materials)** ................... Appx1411, 1435-1458, 1468-1549, 1555-1624,
1629-1695, 1704-1780, 1790-1820, 1832-1912

Respondent Google's Petition for Review of the Initial
Determination on Violation of Section 337, filed
August 27, 2021
**(Filed Under Seal; Contains Confidential
Materials)** .................... Appx1927, 1946-1969, 1973-1979, 1985-1990

Google's Response to Complainant's Petition for Review of the Initial Determination on Violation of Section 337, filed September 7, 2021 **(Filed Under Seal; Contains Confidential Materials)** ........................................Appx2033, 2074-2076, 2117-2118

Respondents' Response to the Complaint and Notice of Investigation, filed February 27, 2020..........................Appx2501-2544

Respondents' Initial Markman Brief, filed July 2, 2020 ................................Appx2547, 2591-2594, 2948-2976, 3121-3149

Complainant Sonos, Inc.'s Opening Claim Construction Brief, filed July 2, 2020..................................................Appx3587-3645

Complainant Sonos, Inc.'s Rebuttal Claim Construction Brief, filed July 20, 2020................................................Appx3681-3713

Complainant Sonos, Inc.'s Pre-Hearing Brief, filed January 22, 2021 **(Filed Under Seal; Contains Confidential Materials)** ........................................Appx3714, 3966-3972, 4134-4135

Respondent Google's Post-Hearing Brief, filed March 12, 2021 **(Filed Under Seal; Contains Confidential Materials)** ............................ Appx4227, 4241, 4371, 4394, 4397-4398, 4416, 4446, 4475-4478, 4492-4493

Respondent Google's Reply Post-Hearing Brief, filed March 19, 2021 **(Filed Under Seal; Contains Confidential Materials)** .............................. Appx4516, 4594, 4635-4636, 4637, 4649

Complainant Sonos, Inc.'s Reply Post-Hearing Brief, filed March 19, 2021 **(Filed Under Seal; Contains Confidential Materials)** ................................................. Appx4671, 4757, 4771, 4803

# VOLUME III

Complainant Sonos, Inc.'s Petition and Contingent
Petition for Review of the Initial Determination on
Violation of Section 337, filed August 27, 2021
**(Filed Under Seal; Contains Confidential
Materials)** .................................................................. Appx4819-4939

Complainant Sonos, Inc.'s Response to Respondent's
Petition for Review of the Initial Determination on
Violation of Section 337, filed September 7, 2021
**(Filed Under Seal; Contains Confidential
Materials)** ..................... Appx4940, 4967-4968, 4976-4979, 4985-4988

Respondent Google's Notice of Prior Art, filed July 10,
2020 .............................................................................. Appx5056-5105

Complainant Sonos, Inc.'s Post-Hearing Brief, filed
March 12, 2021
**(Filed Under Seal; Contains Confidential
Materials)** ......................................................... Appx5106, 5374-5377

JX-1: U.S. Patent No. 9,195,258 issued 11/24/2015
(Millington) (Certified).............................................. Appx10001-10035

JX-2: U.S. Patent No. 10,209,953 issued 2/19/2019
(Millington) (Certified).............................................. Appx10036-10082

JX-3: U.S. Patent No. 8,588,949 issued 11/19/2013
(Lambourne, et al.) (Certified).................................. Appx10083-10110

JX-4: U.S. Patent No. 9,219,959 issued 12/22/2015
(Kallai, et al.) (Certified) .......................................... Appx10111-10153

JX-5: U.S. Patent No. 10,439,896 issued 10/8/2019
(Millington, et al.) (Certified) ................................... Appx10154-10191

JX-9: File history re U.S. Patent No. 9,219,959 (Kallai,
et al.) (Certified).......................................... Appx10192, 10602, 11224,
16367-16375, 16386-16388

JX-12: File history re Reexamination Application
    No. 90/013,756 re U.S. Patent No. 9,219,959
    (Certified) ......................................... Appx16657, 16995, 17192-17193,
                              17197-17198, 25506-25516, 39996-40022,

JX-130: Bose Lifestyle 50 System Owner's Guide, dated
    10/17/2001 ............................. Appx43294, 43301, 43305, 43309-43310

JX-253: NBC News webpage: Tiny $199 Sonos Play:1
    speaker fills a room with wireless tunes, dated
    10/14/2013
    (https://www.nbcnews.com/technolog/tiny-199-sonos-
    play-1-speakerfills-room-wireless-tunes-
    8C11387714)............................................................. Appx43349-43350

JX-258: Gizmodo webpage: Google's Home Max Goes
    After HomePod With a Big Ass Sonos Clone, dated
    10/04/2017 (https://gizmodo.com/home-max-google-
    goes-after-homepodwith-a-big-ass-sono-
    1819143218) ............................................................. Appx43353-43355

JX-259: An Audio Hub that Actually Works, Easily,
    Bill Howard, First Looks, Entertainment
    Technology, PC Magazine, dated 3/22/2005. ....................... Appx43358

JX-266: Bloomberg webpage: How Sonos and John
    MacFarlane Built the Perfect Wireless Speaker for
    Streaming Music ........................................... Appx43359, 43369-43370

JX-284C: Notes on Handling Audio, Nick Millington,
    dated 04/14/2003
    **(Filed Under Seal; Contains Confidential
    Materials)** ................................................... Appx43376-43377, 43379

JX-466C: Deposition Designations of Ken Mackay,
    deposition taken on 10/01/2020 Background;
    Infringement; Rebuttal
    **(Filed Under Seal; Contains Confidential
    Materials)** ................................................... Appx43380, 43622-43626

JX-474C: Deposition Designations of Jenny Wong,
deposition taken on 09/24/2020
**(Filed Under Seal; Contains Confidential
Materials)** .................................................. Appx43684, 43869, 43871

CX-7C: Direct Witness Statement of Nicholas
Millington
**(Filed Under Seal; Contains Confidential
Materials)** .................. Appx43901, 43931, 43933-43935, 44005-44007

CX-11C: Direct Witness Statement of Kevin C.
Almeroth
**(Filed Under Seal; Contains Confidential
Materials)** ................. Appx44031, 44080-44082, 44254, 44368-44369,
44696-44697, 44831-44832, 44861-44862

CX-14C: Rebuttal Witness Statement of Kevin C.
Almeroth
**(Filed Under Seal; Contains Confidential
Materials)** .................................................. Appx44943, 45657-45659

CX-15C: Rebuttal Witness Statement of Jon B.
Weissman
**(Filed Under Seal; Contains Confidential
Materials)** ...... Appx45679, 45766, 45768-45769, 45791-45792, 45860
46074-46075, 46153-46154, 46260, 46287-46293, 46297, 46383

CX-1015: What Hi-Fi? webpage: Sonos multi-room
system review, dated 5/14/2019
(https://www.whathifi.com/us/reviews/sonos-multi-
room-system) ............................................................ Appx46416-46417

CX-1018: Top 300 Organizations Granted U.S. Patents
in 2017, IPO, dated 06/18/2018 ................................. Appx46433-46442

CX-1019: IEEE Spectrum webpage: Interactive: Patent
Power 2017, The technology world's most valuable
patent portfolios .................................................................. Appx46443

CX-1046: SlashGear webpage: Sonos adds new stereo
pair mode to ZonePlayer S5, dated 5/10/2010
(https://www.slashgear.com/sonos-adds-new-stereo-
pair-mode-to-zoneplayer-s5-1084909/) ...................... Appx46444-46445

CX-1048: Consumer Reports webpage: Wireless
speaker shootout: Sonos Play:1 vs. the Bose
SoundTouch 20 and Samsung Shape M7, dated
03/12/2014
(https://www.consumerreports.org/cro/news/2014/03/
wireless-speaker-shootout-sonos-play-1-vs-the-bose-
soundtouch-20-and-samsung-shape-m7/index.htm) ........... Appx46448

CX-1050: Sonos Play:1 review, What Hi-Fi, dated
10/14/2013 ............................................................... Appx46454, 46457

CX-1051: Sonos Play:5 review: The best-sounding
wireless speaker system we've ever used, Mark
Walton, Ars Technica, dated 11/08/2015 ................. Appx46461, 46463

CX-1052: Sonos Play:5 Review:Wireless Music Made
Elegant, Mario Aguilar, Gizmodo, dated
10/29/2015 .............................................................. Appx46481, 46486

CX-1097: MacWorld webpage: Sonos Play:1 wireless
speaker, dated 10/15/2013 ........................................ Appx46498-46499

CDX-5C: Demonstratives for the Direct Witness
Statement of Kevin C. Almeroth
**(Filed Under Seal; Contains Confidential
Materials)** .............................................................. Appx46502, 46581

RX-1470C: Direct Witness Statement of Ken Mackay
**(Filed Under Seal; Contains Confidential
Materials)** .............................. Appx46583, 46605-46608, 46612-46627

RX-1517C: Rebuttal Witness Statement of Ken Mackay
**(Filed Under Seal; Contains Confidential
Materials)** .................................................... Appx46631, 46638-46639

RX-1522C: Rebuttal Witness Statement of Dan
Schonfeld, Ph.D.
**(Filed Under Seal; Contains Confidential
Materials)** ..................................................... Appx46647, 46669-46671

JX-250: Google webpage: Set up your Google Home
device ...................................................................... Appx46730-46731

CX-767: Google webpage: Set up your Google Nest or
Google Home speaker or display on Android............ Appx46732-46734

CX-993: Google webpage: Set up Google Home ............ Appx46735-46736

CX-994: Google webpage: Set Up Chromecast for
Android ................................................................... Appx46737-46738

CX-1119: PC Magazine webpage: Sonos ZonePlayer
ZP100 review, dated 2/3/2005.................................... Appx46739-46740

CDX-6C: Demonstratives for the Direct Witness
Statement of Jon B. Weissman
**(Filed Under Seal; Contains Confidential
Materials)** ....................................... Appx46744, 47133, 47144, 47147

CX-12C: Direct Witness Statement of Jon B. Weissman
**(Filed Under Seal; Contains Confidential
Materials)** ............................. Appx50040, 50562-50564, 50566-50568,
50570-50571, 50575-50583, 50595-50598, 50608-50610

CX-314: Set up your Google Nest or Google Home
speaker or display
(https://support.google.com/googlenest/answer/70294
85?hl=en) (last visited Oct. 22, 2020)........................ Appx50706-50707

## VOLUME IV

JX-8: U.S. Patent No. 8,588,949 prosecution history ... Appx56319-57034

## VOLUME V

JX-8: U.S. Patent No. 8,588,949 prosecution history ... Appx57035-57747

# VOLUME VI

JX-8: U.S. Patent No. 8,588,949 prosecution history ... Appx57748-58277

JX-442: U.S. Patent Application No. 2002/0124097 ..... Appx58278-58296

JX-476C: Deposition Transcript of Paul Hainsworth,
dated September 23, 2020
**(Filed Under Seal; Contains Confidential
Materials)** ............................................................ Appx58297, 58420

RDX-19: Demonstratives for the Rebuttal Witness
Statement of Kevin Jeffay
**(Filed Under Seal; Contains Confidential
Materials)** .............................. Appx58533, 58544-58546, 58551-58557

RX-321: Transmission Control Protocol DARPA
Internet Program Protocol Specification (September
1981) ................................................. Appx58690, 58705, 58724, 58772

# VOLUME VII

RX-1469C: Direct Witness Statement of Chris Chan
**(Filed Under Seal; Contains Confidential
Materials)** .................................................... Appx58779, 58802-58803

RX-1472C: Direct Witness Statement of Esther Cho
**(Filed Under Seal; Contains Confidential
Materials)** ............................ Appx58807, 58814-58822, 58828-58830,
58832, 58834-58839

RX-1473C: Direct Witness Statement of Shangliang Jiang
**(Filed Under Seal; Contains Confidential
Materials)** .............................................................. Appx58843, 58850

RX-1474C: Direct Witness Statement of Leon Li
**(Filed Under Seal; Contains Confidential
Materials)** .................................................... Appx58857, 58866-58867

RX-1476C: Direct Witness Statement of James Scanlan
**(Filed Under Seal; Contains Confidential
Materials)** ..................................................... Appx58870, 58897-58898

RX-1478C: Direct Witness Statement of Matthew
Shoemake
**(Filed Under Seal; Contains Confidential
Materials)** ...... Appx58917, 59041-59042, 59381-59391, 59413-59415,
59418-59440, 59444-59445, 59453-59456, 59504

RX-1480C: Direct Witness Statement of Marin Rinard
**(Filed Under Seal; Contains Confidential
Materials)** ............................................................ Appx59563, 59689

RX-1515C: Direct Witness Statement of Kevin Jeffay,
Ph.D.
**(Filed Under Seal; Contains Confidential
Materials)** .............................. Appx59780, 59827-59843, 59869-59871

RX-1518C: Rebuttal Witness Statement of Esther Cho
**(Filed Under Seal; Contains Confidential
Materials)** ..................................................... Appx60062, 60067-60074

RX-1520C: Rebuttal Witness Statement of Martin
Rinard
**(Filed Under Seal; Contains Confidential
Materials)** ....................................... Appx60083, 60101, 60103-60105,
60137-60138, 60156-60160

RX-1521C: Rebuttal Witness Statement of Kevin
Jeffay, Ph.D.
**(Filed Under Seal; Contains Confidential
Materials)** ...... Appx60167, 60194-60210, 60226-60230, 60234-60235,
60292-60301, 60308-60309, 60314-60322, 60328-60331, 60360-60363

RX-1888C: Captures from Dr. Jeffay's Testing of the
Google Home App (Bluetooth-Based Setup)
**(Filed Under Seal; Contains Confidential
Materials)** ............................................................... Appx60427-60429

CDX-6C: Demonstratives for the Direct Witness
    Statement of Jon B. Weissman
    **(Filed Under Seal; Contains Confidential
    Materials)** ................................................................. Appx60501-60504

February 22, 2021 Trial Transcript
    **(Filed Under Seal; Contains Confidential
    Materials)** ............................................................ Appx70001, 70009

February 23, 2021 Trial Transcript
    **(Filed Under Seal; Contains Confidential
    Materials)** ....... Appx70039, 70071-70073, 70078-70080, 70088-70090

February 24, 2021 Trial Transcript
    **(Filed Under Seal; Contains Confidential
    Materials)** ........................... Appx70099, 70103, 70106, 70113-70115,
                                                    70118-70122, 70127, 70130

February 25, 2021 Trial Transcript .............................. Appx70176, 70216

February 26, 2021 Trial Transcript
    **(Filed Under Seal; Contains Confidential
    Materials)** ................. Appx70234, 70246, 70251-70253, 70258-70262,
                                                    70267-70270, 70273-70274

JX-10: U.S. Patent No. 10,439,896 prosecution
    history ............... Appx71001, 99088-99089, 99093-99097, 99325-99336

## Statement Regarding Confidential Material Omitted

Pursuant to Federal Circuit Rule 25.1(e)(1)(B) and the Protective

Orders filed in the International Trade Commission on February 11,

2020 and April 28, 2020, materials has been redacted from Appx5-7,

Appx27, Appx30-31, Appx63, Appx84-90, Appx92, Appx94-100,

Appx102-111, Appx126-151, Appx159-168, Appx171-175, Appx183-186,

Appx190-191, Appx194-197, Appx200, Appx213, Appx225, Appx227,

Appx230-234, Appx246, Appx251, Appx254, Appx258, Appx260-261,

Appx862, Appx876, Appx1037-1042, Appx1135, Appx1290-1300,

Appx1435-1458, Appx1468-1549, Appx1555-1624, Appx1629-1695,

Appx1704-1780, Appx1790-1820, Appx1832-1912, Appx1946, Appx1949,

Appx1955-1957, Appx1960-1963, Appx1973-1974, Appx1977-1978,

Appx1986-1990, Appx2117-2118, Appx3966-3972, Appx4134-4135,

Appx4241, Appx4371, Appx4394, Appx4397-4398, Appx4416, Appx4446,

Appx4475-4478, Appx4492-4493, Appx4594, Appx4635-4636, Appx4637,

Appx4649, Appx4757, Appx4771, Appx4803, Appx4839-4840,

Appx4842-4846, Appx4856-4860, Appx4863-4865, Appx4868-4886,

Appx4888, Appx4895-4907, Appx4910-4918, Appx4920, Appx4925,

Appx4932-4936, Appx4967-4968, Appx4985, Appx4987-4988, Appx5374-

5377, Appx43376-43377, Appx43379, Appx43622-43626, Appx43869, Appx43871, Appx43931, Appx43933-43935, Appx44005-44007, Appx44080-44082, Appx44254, Appx44368-44369, Appx44696-44697, Appx44831-44832, Appx44861-44862, Appx45657-45659, Appx45766, Appx45768-45769, Appx45791-45792, Appx45860, Appx46074-46075, Appx46153-46154, Appx46260, Appx46287-46293, Appx46297, Appx46383, Appx46502, Appx46581, Appx46605-46608, Appx46612-46627, Appx46638-46639, Appx46669-46671, Appx46744, Appx47133, Appx47144, Appx47147, Appx50562-50564, Appx50566-50568, Appx50570-50571, Appx50575-50583, Appx50595-50598, Appx50608-50610, Appx58420, Appx58551-58557, Appx58802-58803, Appx58814-58822, Appx58828-58830, Appx58832, Appx58834-58839, Appx58850, Appx58866-58867, Appx58897-58898, Appx59041-59042, Appx59381-59391, Appx59413-59415, Appx59418-59440, Appx59444-59445, Appx59453-59456, Appx59504, Appx59689, Appx59827-59843, Appx59869-59871, Appx60067-60074, Appx60101, Appx60103-60105, Appx60137-60138, Appx60156-60160, Appx60194-60210, Appx60226-60230, Appx60234-60235, Appx60292-60301, Appx60308-60309, Appx60314-60322, Appx60328-60331, Appx60360-60363, Appx60427-

60429, Appx60501-60504, Appx70009, Appx70071-70072, Appx70118-70122, Appx70246, Appx70258, Appx70260-70262, Appx70267-70270, and Appx70273-70274. The redacted materials contain the confidential business information and source code of Sonos and Google.

████████████████████████████████████████

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME** | **Inv. No. 337-TA-1191** |

**RESPONDENT GOOGLE'S PRE-TRIAL BRIEF**



11





13



14



15



16









20



21



22



23





25





27



28







31



32



33





44







47



48



49



50



51



52



53





55



56





58





60



61





63



64



65









69





71



72



73







Appx1500

















84



85



86





88







91



92



93



94



95



96



97





99





101



102



103



104



105





107









111



112





114



115



116



117





119





121



122



123



124



125



131





133



134



135



136



137



138



139



140



141



142



143



144



145



146



147



148



149



150



151



152



153



154



155



156



157



158



159



160



161



162



163



164



165





167



168



169



170



171



172



173



174



175



176



177



178



179





181





183



184



185





187



188



189



190



191



192



193



194



195



196



197



198



199



200



205



206



207



208





210



211



212



213



214



215



216





218



219



220



221



222



223



224



225



226



227



228



229



230



231



232



233



234



235



236



237



238



239



240



241



242



243



244



245



246



247



248





250



251



252



253



254



255



256



257



258



259



260



261





263



264



265



266



267



268



269



270



271





281



282



283





285



286



287



288





290



291



292



293



294



295



296



297



298



299



300



301



302



303



304



305



306



307



308



309



310



311



312



313



314



315



316



317



318



319



320



321



322



323



324



325



326



327



328



329



330



331



332



333



334



335



336





338



339



340



341



342



343



344



345



346



347



348



349



350



351



352



353



354



355



356



366



367



368



369



370



371



372



373



374



375



376



377



378



379



380



381



382



383



384



385



386



387



388



389



390



391



392



393



394



395



396



408



409



410



411



412



413



414



415



416



417



418



419



420



421



422



423



424



425



426



427



428



429



430



431



432



433



434



435



436



437



438



439



440



441



442



443



444



445



446



447



448



449





451



452



453



454



455



456



457



458



459



460



461



462



463





465



466



467



468



469



470



471



472



473



474



475



476



477



478



479



480



481



482



483



484



485



486



487



488

████████████████████████████████████████

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**In the Matter of**

**CERTAIN AUDIO PLAYERS AND**
**CONTROLLERS, COMPONENTS**
**THEREOF, AND PRODUCTS**
**CONTAINING SAME**

Investigation No. 337-TA-1191

**RESPONDENT GOOGLE'S PETITION FOR REVIEW OF THE**
**INITIAL DETERMINATION ON VIOLATION OF SECTION 337**

████████████████████████████████████████████████

## IV. THE '896 PATENT

With the '896 patent, Sonos seeks to deprive U.S. customers of Google's phones, tablets, and laptops based on functionality in the Google Home app, which is not even installed on the '896 Accused Devices before importation. RX-1469C (Chan) at Q42-43. The '896 patent covers an outdated way of setting up devices on wireless local area networks ("WLANs") that stems from

The '896 Accused Products use a different, non-infringing setup process designed for modern Wi-Fi networks. Google gives users the choice of setting up their Google smart devices on any available Wi-Fi network that the user wants to use, not just a single network like SonosNet. RX-1472C.11-14 (Cho) at Q19-22; Tr. (Weissman) at 308:1-5 (admitting users "can select any network … they wish"). The ability to choose from different Wi-Fi networks results in a fundamentally different setup process that does not—and cannot—infringe the '896 patent. Indeed, Sonos eventually switched to a setup process

RPost at 201, 266-67. Neither the '896 Accused Products nor Sonos' DI products practice the '896 patent for the same reasons.

Google respectfully submits that the ID's findings on non-infringement and validity of the '896 patent rest upon clearly erroneous findings of material fact and contain critical legal errors and irreconcilable inconsistencies that warrant the Commission's review and reversal, or at a minimum should be remanded for consideration of the entire evidentiary record.

### A. The Google Home App Does Not Infringe the Order of Steps Required by Claim 1

#### 1. The ID Erred by Adopting a Flawed Interpretation of the "User Input" Limitation

Claim 1 of the '896 patent requires "***receiving***, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, ***user input <u>indicating</u> that a user wishes to set up a playback device to operate on <u>the secure WLAN</u>***." '896 patent, Cl. 1. "[T]he secure WLAN" is not just any network; it refers to a specific secure WLAN—the ***same*** secure WLAN already being used by the "computing device" that presents the GUI. *Id.*

In construing claim terms, "the focus is on the ***objective test*** of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 908, (2014) ("Patent claims ... should be construed from an objective perspective of a [skilled artisan]"). Here, all parties agree that the claimed "user input" must be "***an objectively verifiable indication***, which is the receipt by the claimed 'computing device' of ***a particular type of 'user input*****.'**" Sonos Opening Markman Br. at 30 (argued by Sonos to overcome indefiniteness during the *Markman* process); RX-1521C.159-61 (Jeffay) at Q462-63. As Sonos' expert, Dr. Weissman, testified:

> Q. Now, we agree, sir, that ***the claim language this patent requires an objectively verifiable indication*** that the user wishes to set up a playback device to operate on the secure WLAN, correct?
>
> A. ***Correct***, with antecedent basis referring back to the secure WLAN that the player -- that the phone or controller is on.

Tr. (Weissman) at 392:21-393:2. It was thus undisputed that the particular type of "user input" must verifiably "indicat[e] that a user ***wishes*** to set up a playback device to operate on ***the secure WLAN***." '896 patent, cl. 1; *see also id*. As Sonos' expert testified, "it is important that you're able to understand the claim, that ***objective evidence be -- be provided that the user intends to put the player on the network***." Tr. (Weissman) at 306:10-15.

In determining that the "user input" in the Google Home app infringes, the ID did not require

objective evidence of users' intent to have a device operate on "the" particular network. Indeed, the ID never mentions the objectively-verifiable-indication requirement in performing the infringement analysis, only when summarizing Google's position. *Compare* ID at 157 *with* ID at 158. Instead, the ID reasons:

> While the user does not explicitly indicate that he wants to use the same Wi-Fi network as his computing device, as the Staff recognizes, "[t]he plain and ordinary meaning of the claimed 'user input' does not require that the user select the secure WLAN." SIB at 155; *see also* Jeffay, Tr. at 973:4-9 (indicating agreement to this point). Instead, the '896 Accused Products are designed to ***assume*** that the user wishes to set up the playback device on the same Wi-Fi network.

ID at 158. Rather than finding the accused "user input" objectively indicates the Wi-Fi network the user wishes to use, the ID recognizes that "the user ***does not explicitly indicate that he wants to use the same Wi-Fi network as his computing device***." ID at 158. And it does not address whether the accused "user input" ***implicitly*** indicates that a user wants to use a particular Wi-Fi network. The ID's failure to apply the plain and agreed meaning of claim 1 was reversible error. *See Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("Determining infringement requires … comparing the properly construed claims to the accused product").

The ID concludes that "the '896 Accused Products are designed to ***assume*** that the user wishes to set up the playback device on the same Wi-Fi network" that the user is currently using, ID at 158, but whether or not a computing device "assumes" what a user wants to do is irrelevant to claim 1. The plain and ordinary language of claim 1 focuses on the particular "user input" that the computing device of claim 1 actually "receiv[es]," and requires that the "user input" verifiably "indicat[e] that a user wishes to set up a playback device to operate on the secure WLAN."

Neither the ID nor the briefs from Sonos and the Staff provided any intrinsic or extrinsic evidence to support rewriting the "user input" limitation to look to an assumption made by the computing device rather than the "user input" itself. And none exists. The ID reasons that "the plain and ordinary meaning of the claimed 'user input' does not require that the user select the secure WLAN." ID at 158. But even if that is so, claim 1 expressly focuses on what that user input "indicat[es]." A user need not specifically and directly select a secure WLAN to provide an objective indication of an intent to do so, but the

███████████████████████████████████████████████████

computing device must receive some objectively verifiable indication of the user's wishes.[2]

Because the ID, Sonos' briefs, and the Staff's briefs based their entire infringement theory on this faulty interpretation of the "user input" limitation, the infringement finding should be reversed, or at a minimum, remanded to the extent the Commission determines additional findings are necessary. ID at 158; CReply at 94 ("As explained in Sonos' Opening Brief, the '896 Accused Products **are designed to assume** that a user is setting up a Google audio player on the same Wi-Fi network (e.g., the user's secure home Wi-Fi network) that the user's '896 Accused Product is already connected to"); SPost at 157 ("the evidence shows that the '896 Accused Products is **programmed to assume** that the user wishes to setup the '896 Accused Product on the same secure WLAN that the user's mobile device is operating on").

### 2. Overview of the Accused Google Setup Process

"The Google Home app allows users to set up and communicate with devices like Google Nest smart thermostats, smart locks, smart speakers, smart cameras, and Chromecast devices." RX-1472C.4 (Cho) at Q10. "Google's smart speakers and Chromecast devices can, among other things, wirelessly stream music by using a Wi-Fi network. In order to do so, the smart speaker would first need to be set up on a Wi-Fi network…. The Google Home app helps with that setup process by enabling users to provide that information to the smart speaker or Chromecast device so that these devices can join the Wi-Fi network selected by users" RX-1472C.6 (Cho) at Q13. The following example illustrates the relevant steps in the accused setup process using screens from the Google Home app that a user would typically see. A more complete walk through of the process can be found at RX-1472C.15-24 (Cho) at Q25-Q38.

---

[2] For example, '896 a computing device could receive a "user input" identifying the secure WLANs that the user does **not** wish to use. This "user input" would not be a selection of the secure WLAN the user wishes to use. But, in some products, such a "user input" could nevertheless provide an indication of the WLAN network the user wishes to use. As another example,



[redacted]

RX-1888C.0001 RX-1888C.0002

In the figure above, the Google Home app shows the user the screen on the left. After the user selects the "Set up new devices in your home" option, the Google Home app will wirelessly look for available devices while presenting the "Looking for devices" screen on the right.



RX-1888C.0002

RX-1888C.0002

As shown above, once the Google Home app finds a device, the app presents the user with the screen on the left to notify the user that it found a new device, in this case a Google Home Mini smart speaker. The Google Home app only asks whether the user would like to set up the Google Home Mini. Once the user taps "Yes" to confirm that the Google Home Mini is the right device, the Google Home app presents the screen on the right to tell the user that the Google Home app is "[c]onnecting to the Google Home Mini."

Appx1951



RX-1888C.0004

RX-1888C.0003

After the Google Home app connects to the Google Home Mini smart speaker, the Google Home app eventually presents the "Connect to Wi-Fi" screen on the left to the user. To choose the Wi-Fi network to use, the user chooses on one of the Wi-Fi networks (or they can manually add a network if the network they want is not listed on the screen) and then taps "Next." The Google Home app then presents the "Connecting to Wi-Fi" screen on the right, confirming that the Google Home Mini is connected to, in this case, the "Second SecureWLAN" Wi-Fi network.

### 3. The '896 Accused Products Do Not Infringe Under the Plain Meaning of the "User Input" Limitation

The '896 Accused Products do not infringe under the plain and ordinary meaning of the "user input" limitation, which focuses on what the accused "user input" verifiably indicates about a user's wish

to use a specific WLAN. Non-infringement stems from two steps in claim 1, which is the only asserted independent claim:

- Step 1: "receiving … user input indicating that a user wishes to set up a playback device to operate on the secure WLAN";

- Step 2: "after receiving the user input …, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device."

As the ID recognized, claim 1 requires a sequence of steps in which the initial communication path in Step 2 must be established after the "user input" is received. Order 20 at 32; RX-1521C.140-42 (Jeffay) at Q434-35. In other words, the "user input" in Step 1 must be received **before** the initial communication path is established. In Step 1, the "user input" undisputedly must "indicate[] that a user wishes to set up a playback device to operate on **the secure WLAN**"—the **same** secure WLAN that is already being used by the "computing device." RX-1521C.140-42 (Jeffay) at Q434-35; Tr. (Weissman) at 392:21-392:2. And, as discussed above, the claimed indication of the user's wish must be "objectively verifiable." Sonos Opening Markman Br. at 30. Put another way, in order to satisfy the claimed order of steps, the Google Home app must receive an objectively verifiable indication of the user's wish for a particular Wi-Fi network **before** the initial communication path is established with the playback device. By contrast, in the accused products, the computing device establishes a connection with the playback device, and **then** the user indicates the wish for a desired Wi-Fi network.

### (a) The User Input Received On The "Device Found Screen" Cannot Be The Claimed "User Input"

The ID's infringement analysis is incorrect because it relies on a "user input" that is not "an objectively verifiable indication" of the user's wish to use a particular Wi-Fi network. The ID's alleged "user input" therefore cannot be the "user input" required by claim 1. According to the ID, the "user

input" occurs when a user taps "Yes" on the "Device Found screen" on the right (taken from RX-1888). This screen only asks whether the user would like to set up the Google Home Mini smart speaker (*i.e.*, the accused "playback device), but it says nothing about which particular secure WLAN the user wishes to use. All the evidence—the prompts on the Device Found Screen, source code, and engineer testimony—compels the conclusion that hitting "Yes" on this screen is ***not*** an "objectively verifiable indication" of ***which network the user wants to set up the playback device on***. In fact, the ID concedes that when tapping "Yes," "the user ***does not explicitly indicate that he wants to use the same Wi-Fi network as his computing device***." ID at 158. And nothing in the prompt or a "Yes" tap ***implicitly*** indicates that intent.



There is no dispute that when a user is shown the Device Found Screen, the user has not yet told the Google Home app which Wi-Fi network the user wishes to use. There is no dispute that when a user sees the Device Found Screen, the user may wish to use any of multiple Wi-Fi networks, including a network different from the claimed "the secure WLAN." There is also no dispute that the "Connect to Wi-Fi," where the user is asked to "Choose the Wi-Fi network you would like to use" comes later in the setup process. Nothing about the Device Found Screen can be reasonably interpreted as eliciting or receiving an objectively verifiable "indicat[ion] that a user wishes to set up a playback device to operate on [a particular] secure WLAN." '896 patent, cl. 1. Tapping "Yes" merely indicates that the user wishes to set up the device, in this case a "Google Home Mini." The Device Found Screen never mentions anything about Wi-Fi networks, much less provides an objectively verifiable indication about which

████████████████████████████████████████████████████

network the user wishes to use. By Sonos' expert's own admission, a user must tap on "Yes" ***no matter which WLAN the user may wish to use*** because tapping "'Yes' is required to commence the setup process":

> Q. I'm asking you a yes-or-no question. If the user wishes to intend the network to be different than the network that is operating for the phone, with respect to the mini device, the user must still click on "yes," correct?
>
> A. "Yes" is required to commence the setup process.

Tr. (Weissman) at 394:8-13. A user input that is the same regardless of which WLAN the user wishes to use does not say anything about which Wi-Fi network the user actually wishes to use. Thus, such a user input cannot be an "objectively verifiable indication" of a wish to use a particular network.

The source code confirmed that the Google Home app does not and cannot receive an "indicat[ion] that a user wishes to set up a playback device to operate on the secure WLAN" when the user hits "Yes" on the Device Found Screen. ***Before*** the user can indicate which Wi-Fi network to use, the Google Home app first presents the user with a list of Wi-Fi networks that are available to the Google Home Mini. And ***before*** the Google Home app can present that list of Wi-Fi networks, the Google Home app must first ask the user what device to set up on the Device Found Screen. So when the Google Home

Sonos' expert, Dr. Weissman, did not dispute any of this. According to Dr. Weissman "[i]t

████████████████████████████████████████

was unnecessary" for him to "cite to any source code" when "performin[ing] [his] expert analysis of the Google Home app software with respect to the user input limitation." Tr. (Weissman) at 404:4-13.[3]

An internal Google flowchart of the setup process created before this litigation commenced further confirms that the Device Found Screen has nothing to do with the user's desire to use a particular WLAN. The flowchart calls the Device Found Screen

In response to the overwhelming evidence that the Device Found Screen has nothing to do with eliciting a user's wish for a particular Wi-Fi network, the ID instead relied on a different function that is not relevant, finding that:

ID at 160. But this function is irrelevant to the user's choice of Wi-Fi network; the ID ignored what

---

[3] At his deposition, Dr. Weissman could not "even recall if he looked at the Home app source code specifically or not." *Id*. at 404:22-405:1. And when asked "about what constitutes and what does not constitute an indication of a user input wishing to set up a playback device," Dr. Weissman responded "[s]itting here today, I'm not certain." *Id.* at 311:14-19.

███████████████████████████████████████████

Tr. (Cho) 469:22-470:5.  The Google Home app informs the user that this disconnection might happen, as shown on the "Connecting to Google Home Mini" screen on page 17 above, which states "Your phone or tablet may disconnect from Wi-Fi during setup."  *See* RX-1888C.0002; RX-1472C.18 (Cho) at Q. 28.  This was undisputed, and even Sonos' expert did not rely on ██████████████████████████ in his infringement opinions.    Because the ID legally and factually erred when relying on the ███████████████████████████████████, the ID's conclusion that the '896 Accused Products receive the claimed "user input" before establishing the "initial communication path" is also wrong.

For these reasons, the user input received at the Device Found Screen does not satisfy the "user input" limitation under the plain and ordinary meaning.

> **(b)**    **The Actual "User Input Indicating that a User Wishes" to Use a Particular WLAN is Not Received In The Claimed Sequence of Steps**

The dispositive question for the infringement analysis is whether the Google Home app receives the claimed, objectively verifiable "indicat[ion] that user wishes to set up a playback device to operate on the secure WLAN" ***before*** or ***after*** the "initial communication path" is established.  The evidence overwhelmingly showed that the Google Home app does not and cannot receive the required input until ***after*** establishing the "initial communication path."  That is the opposite order from the sequence of steps required by claim 1, and it follows that the '896 Accused Products do not infringe.

23

The first time the Google Home app receives an **objectively verifiable** "indicat[ion] that a user **wishes** to set up" and operate on any particular "secure WLAN" is when the user taps "Next" on the "Connect to Wi-Fi Screen" screen on the right (taken from RX-1888). The parties agree that the Google Home app receives the user input tapping "Next" only **after** "establishing an initial communication path." ID at 155-56. Unlike the Device Found Screen, the Connect to Wi-Fi Screen allows the user to choose the WLAN (or "Wi-Fi network") that the user wishes to use. This screen asks the user to "**Choose** the Wi-Fi network you **would like to use** with your Google Home Mini" and lists the Wi-Fi networks available to the Google Home Mini (*e.g.*, "Second SecureWLAN," "Second Secure WLAN_5G," "First SecureWLAN," "Zebra Empire," etc.). Sonos' expert confirmed this:



> Q. The connect to **WiFi screen** contains a list of networks available to the user to choose for the Mini device, correct?
>
> A. This is a confirmation screen **where they can select any network that -- that they wish at this point**.

Tr. (Weissman) at 308:1-5.

> Q. And if I were to take a look at what you said about this screen in your expert report, paragraph 390, page 151, what you said in your expert report was "**I was prompted by the Google Home app to choose the secure WiFi network**." That's what you wrote in your expert report, correct?
>
> A. **Correct. I'm just quoting what's on the -- on the screen itself**.

Tr. (Weissman) at 403:5-13.

Choosing one of the many Wi-Fi networks and tapping "Next" provides an objectively verifiable indication of the user's wish to use a particular Wi-Fi network. If a user chooses the "Zebra Empire" network and taps "Next," that indicates the user wishes to use the "Zebra Empire" network. If the user chooses the "First SecureWLAN" network and taps "Next," that indicates that the user wishes to use the "First SecureWLAN" network. And if the user wishes to use the originally highlighted network—e.g., "Second SecureWLAN"—and just taps "Next," that indicates that the user wishes to use the "Second SecureWLAN" network. The user provides a different user input on the Connect to Wi-Fi Screen depending on which network the user wishes to use, making each user input an objectively verifiable indication of the user's intent. Sonos' expert does not dispute this. Tr. (Weissman) at 396:9-16 ("Q. What I'm getting at, sir, is if I want to select Zebra Empire to the screen to the right, I click on Zebra Empire, push 'next.' If I want to select first secure WLAN, I click on first secure WLAN and push 'next.' Those are different sets of actions, correct? A. Those are different sets of actions…").

In contrast, the user input on the earlier Device Found Screen cannot indicate the user's wish because the user input is the same regardless of whether the user wishes to use the network "Zebra Empire," "First SecureWLAN," or "Second SecureWLAN." In fact, tapping "'Yes' on the Device Found Screen is required to commence the setup process" whenever a device is set up, no matter what network the device will eventually be set up on. Tr. (Weissman) at 394:8-13.

The "Yes" button on the Device Found Screen and the "Next" button on the Connect to Wi-Fi Screen are the only two "user inputs" at issue with respect to the "user input" limitation. Google respectfully submits that a comparison of the two screens themselves can show the error in the ID's findings. The Device Found Screen asks the user "Would you like to setup this device?" The Connect to Wi-Fi Screen asks the user "*Choose* the Wi-Fi network you *would like to use* with your Google Home Mini." Only the latter question elicits a response that constitutes an objectively verifiable "user input indicating that a user wishes to set up a playback device to operate on the secure WLAN." '896 patent, cl. 1. The Device Found Screen has nothing to do with Wi-Fi networks. And there is no dispute that the

25

████████████████████████████████████████

Connect to Wi-Fi Screen appears only **after** an initial communication path is established. RX-1521C.149-50 (Jeffay) at Q437-43; Tr. (Weissman) at 300:7-23 (agreeing the Google Home Mini scans for available networks and the Google Home app displays the "Connect to Wi-Fi" screen "**after** the initial communication path has been established"). In short, the '896 Accused Products do not infringe any asserted claim of the '896 patent because the claimed "user input" (which must indicate **which network** the user wishes to use) is received after the accused initial communication path is established, rather than before, as required by claim 1.

The source code again confirms this. The only two witnesses to analyze and testify about the Google Home app source code were Ms. Cho

and Dr. Jeffay (Google's expert), and both witnesses explained that the first, objectively verifiable "indicat[ion] that a user wishes to set up a playback device to operate on" a particular network, as claimed, is when the user taps "Next" in the "Connect to Wi-Fi" screen. RX1472C.4-5, 11-12 (Cho) at Q11, 19-20; RX-1521C.144-49 (Jeffay) at Q440-47; Tr. (Jeffay) at 1000:18-1001:25. As Ms. Cho and Dr. Jeffay explained, the Google Home app, by design, uses the opposite order of steps from what claim 1 discloses: it requires the initial communication path to be established **before** the claimed "user input" is received. RX-1521C.141-46 (Jeffay) at Q435-43.

modern devices are typically surrounded by multiple Wi-Fi networks, often including multiple networks belonging to the users themselves (*e.g.*, business vs. entertainment; upstairs vs. downstairs; staff vs. guests). RX-1472C.6-7, 15 (Cho) at Q12-14, 25; RX-1521C.124-27, 175-76 (Jeffay) at Q413-15, 477; RX-1829C

); RX-1724 (infographic showing evolution of Wi-Fi); Tr. (Cho) at 463:8-19; Tr. (Jeffay) at 1008:12-1009:5. The Google Home app was designed to give users the flexibility to choose the Wi-Fi network they prefer to use. RX-1472C.11-14 (Cho) at Q19-22. On the Connect to Wi-Fi screen, users can choose either the same network that the device is currently using or a different network. *Id.*; *see also* Tr. (Cho) at 457:18-459:3.

████████████████████████████████████████████████

To do so, the Google Home app must establish the claimed "initial communication path" with the playback device.

RX-1472C.8-10 (Cho) at Q15-18; RDX-0004.4C; RX-1521C.146-47 (Jeffay) at Q444; Tr. (Jeffay) at 1010:3-18; JX-0014C at 14 (                                                                 ).  This communication path is the accused "initial communication path."  *Id.*  Thus, by design, the Google Home app does not—and cannot—present the Connect to Wi-Fi Screen to the user to elicit the claimed "user input" (an indication of the user's choice of Wi-Fi network) until *after* it establishes the accused initial communication path and receives the list of visible Wi-Fi networks—the opposite order from what claim 1 of the '896 patent requires.  RX-1472C.14 (Cho) at Q23-24; RX1518C.4-5 (Cho) Q9-11; RX-1521C.144-49 (Jeffay) at Q440-47.

For these reasons, the '896 Accused Products do not infringe the order of steps required by the '896 patent, and the ID's infringement finding should be reversed.

> **4.      The '896 Accused Products Do Not Infringe Under the ID's "Assumes" Theory**

Even if the ID were correct that claim 1 *could* be infringed based on what a computing device "assumes" about the user's desired Wi-Fi network (ID at 15), the Google Home app would not infringe because it does not make any assumptions about the Wi-Fi network the user wishes to use.  As Ms. Cho, a software engineer on the team that designs the accused Home App setup process, testified:

> The Google Home app *does not expect or otherwise assume* that a user will start up the setup process with the Google Home app connected to a specific Wi-Fi network.  The Google Home app also *does not guess or assume* which Wi-Fi network a user will want to set up their device on.  As I explained in response to Questions 29-35 of RX-1472C, *the Google Home app has no idea which Wi-Fi network the user will use for the speaker until the user tells the Google Home app what that network is*.  This happens at the [Connect to Wi-Fi Screen] by the user hitting the "Next" button.  This was the first time the Google Home app will receive an indication of the Wi-Fi network that a user wants to use for the device-being set up.

27

███████████████████████████████████████████

RX-1518C.8 (Cho) at Q15. In coming to the opposition conclusion, the ID disregarded the mountain of evidence in the Google Home app software, source code, and uncontroverted testimony from Google's software developer for the Home App. As explained below, the ID's infringement analysis was premised on an incorrect understanding the "three pieces of evidence" that supposedly established infringement.

First, the ID found that "in the 'Connect to Wi-Fi Screen,' the Wi-Fi network that the '896



RX-1888C.0003

Accused Product was connected to when the user clicked 'Yes,' on the Device Found screen is ***preselected***" because it might be initially highlighted in blue. ID at 158. In some (but not all) instances, a Wi-Fi network is highlighted in blue before the user taps on a network. RX-1518C.12 (Cho) at Q21. This preselection is insignificant because Sonos' expert, Dr. Weissman, admitted that the existence of this highlighting did not affect his infringement analysis "whatsoever":

> Q: But, sir, ***if Google were to take out that blue highlighting, that would not change your infringement analysis whatsoever for this patent, correct***?
>
> A: ***That's correct***.

Tr. (Weissman) at 302:5-10; *see also* CReply at 99 n.60 ("removing the automatic highlighting on the 'Connect to Wi-Fi' screen … does not change or eliminate the infringing functionality").

Moreover, the evidence conclusively demonstrated that there is no preselection of the Wi-Fi network that the user should use or wishes to use. The blue highlighting is merely "the Google Home app's way of telling" the user which network the "phone was last connected to." RX-1472C (Cho) at Q32-33; RX-1518C.10-11 (Cho) at Q17-18. It does not indicate that the Google Home app has preselected the highlighted Wi-Fi network to use for set up—the whole purpose of the "Connect to Wi-Fi" screen is to allow the user to choose any network. RX-1472C.20-21 (Cho) at Q33; RX-1518C.11 (Cho) at Q19-20.

28

███████████████████████████████████████████

RX-1521C.151-52, 164-65 (Jeffay) at Q451, 467.

The ID states that "as [Google's expert] Dr. Jeffay admitted, when the user clicks 'Next,' the user 'confirm[s] that the network [he] wanted to use was highlighted or selected,' without the user needing to 'make another selection.'" ID at 158-59. The ID, however, mischaracterizes Dr. Jeffay's testimony. Dr. Jeffay specifically **rejected** the notion that the user "simply confirms" a preselected Wi-Fi network:

> Q. Now, Dr. Jeffay, if you had followed Google's setup instructions that we discussed earlier, *you would have simply confirmed that the Google Home app highlighted the network that you wanted to use by tapping the "next" icon*, correct?
>
> A. *No, I disagree with that*.

Tr. (Jeffay) at 976:8-13. Instead, Dr. Jeffay testified that in a particular scenario where "the Pixel device was connected to first secure wireless LAN, that that was the LAN that I wanted to use for the speaker or display," then "I would have confirmed that the network that I wanted to use was highlighted or selected, and then I would have hit "next." Tr. (Jeffay) at 977:11-25. The confirmation Dr. Jeffay was referring to was the visual check that a user performs to confirm identification of the right Wi-Fi network before hitting "Next" on the Connect to Wi-Fi Screen. This is a far cry from an admission that the Google Home app preselects a Wi-Fi network to use.

Second, the ID concludes that Google's instructions provide evidence that the "user input" occurs once the user selects "Yes," on the Device Found Screen." But the alleged "instructions" come from "marketing/advertising material" (CX-0012C.549-50 (Weissman) at Q838), and Sonos' expert admitted that "marketing documents are not intended to be relied upon for technical details of the operation of a product." Tr. (Weissman) at 839:8-16. Moreover, this alleged "instruction" has no bearing on how the setup process actually works, as conclusively demonstrated by the fact that Google removed that "instruction" before the start of the evidentiary hearing. Tr. (Cho) at 468:2-9; Tr. (Jeffay) at 1003:22-1004:3. In any event, the alleged "instruction" was merely optional (Tr. (Cho) at 466:25-467:13) and located on a separate webpage. Google does not include this optional "instruction" with any the

instructions that are actually provided in the box with Google Home products. And the in-the-box instructions do not tell users to visit this separate webpage that includes the alleged "instruction." This alleged "instruction" is not even shown by the Google Home app during setup. Tr. (Cho) at 467:14-468:1; *id*. (Jeffay) at 1003:3-15. There was no evidence of users viewing it.

More importantly, the source code, which shows how the Google Home app actually works, confirms that the Google Home app does not know or make any assumptions regarding whether a user has seen this "marketing/advertisement" material. Tr. (Cho) at 467:14-468:1; Tr. (Jeffay) at 1002:13-1003:3. Instead, as Ms. Cho testified, the Google Home app is designed so users do not need to refer to any other instructions outside of the box the product arrives in. RX-1518C.3-9 (Cho) at Q5-16.

When confronted with these facts on cross examination, Dr. Weissman was forced to admit that whether this purported instruction exists "would have no impact on [his] infringement analysis" and that adding or removing "instruction[s]" on a webpage would not "change a single line of source code in the Google products." Tr. (Weissman) at 304:11-20. The ID erroneously relies on this optional "instruction" in finding of infringement despite it being inconsistent with how the source code actually works and Dr. Weissman's admission that the instruction has no effect on his analysis. *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc*., 491 F.3d 1342, 1351 (Fed. Cir. 2007) (affirming that "the evidence of the defendants' advertising and other materials did not provide a sufficient basis for a finding of infringement.").

Third, the ID reasoned that "'[i]f a user adds a device to a Wi-Fi network that is different from the Wi-Fi network that the Google Home app device was using prior to starting the setup process, the Google Home app will ask whether a user wants to switch the Google Home app device to the same network that the smart speaker was setup on.'" ID at 159. But the message asking which Wi-Fi network the user wants to select for the ***device running the Google Home app*** is irrelevant. Claim 1 is about the Wi-Fi network to use for the ***playback device***. '896 patent, cl. 1 ("user input indicating that a user wishes to set up ***a playback device to operate on the secure WLAN***). If the user ever receives this message about changing the Wi-Fi network for the device running the Google Home app, it is only after the relevant

playback device has already been successfully set up on a Wi-Fi network chosen by the user. Tr. (Cho) at 464:17-24. It cannot and does not affect the nature of the earlier user inputs received by the Google Home app to select a Wi-Fi network for the **playback device**; and it was error for the ID to rely on it as part of its infringement analysis.

Finally, the ID quotes Sonos' expert, Dr. Weissman, who testified that the Google Home App "absolutely 'assumes'" things about a user's intent. ID at 158. But Dr. Weissman testimony was sheer speculation and should be given no weight because he failed to even review the source code for the Google Home App for this limitation. Tr. at 404:4-13.

The Google Home app does not infringe the order of steps required by the asserted claims under either the plain and ordinary meaning of the "user input indicating that a user wishes to set up a playback device to operate on the secure WLAN" or the ID's "assumes" theory. The ID erred by failing to apply the plain and ordinary meaning and also by finding that the Google Home app "assumes" that the user wants to use a particular Wi-Fi network before the user even has a chance to choose a Wi-Fi network. The ID's clearly erroneous factual findings regarding the Google Home App and misapplication of the claim language to the facts necessitate reversal of the finding that Google infringes the '896 patent.

**B.      The ID Erred In Finding the '896 Patent Neither Anticipated Nor Obvious**

The record demonstrates that the asserted claims of the '896 patent were anticipated and/or rendered obvious in view of two prior art systems: cd3o and Linksys. RPost at 48-66. For each reference, the ID effectively makes a single argument. For cd3o, the ID erroneously found that cd3o did not receive the required "user input" before the "initial communication path" was established. Based on this error, the ID held that cd3o did not perform the asserted claims in the order of steps required by claim 1. ID at 173. But that ruling failed to apply the plain meaning of "initial communication path" and is premised on incorrect claim interpretation and is contradicted by the factual record. For Linksys, the ID held that Google's evidence came from a demonstration test computer that does not predate the patent and so "Google cannot meet its burden to show that Linksys invalidates the '896 patent." ID at 171. As demonstrated below, whether Google's **test computer** post-dates the patent is irrelevant. Google

presented actual Linksys devices, user manuals, and software CDs that all predated the '896 patent and qualify as prior art. Because these were the only reasons for finding the claims valid, the ID's determination should be reversed. To the extent the Commission determines additional findings are necessary for either cd3o or Linksys, the ID's determination should be vacated and remanded.

### 1. Cd3o

The C300 was a wireless playback device sold in the early 2000s by a start-up company named cd3o. The cd3o system allowed users to wirelessly stream music to speakers in different rooms in their home before Sonos introduced its first product. To set up a cd3o playback device on a user's home Wi-Fi network, a user installed the cd3o "Control Center" app on a computer. The cd3o user would input the name and password of the Wi-Fi network into the "Control Center" app on the user's computer. The Wi-Fi network name and password were then transmitted to the cd3o playback device over an Ethernet cable or Wi-Fi network. The cd3o playback device then connected to the selected Wi-Fi network using the parameters it received, thereby enabling the cd3o play device to wirelessly play songs or playlists from the Control Center app in the user's computer. *See* RPost at 231-232. Videos located at RDX-0108 and RDX-0110 show the setup and operation of a cd3o C300 and provide helpful, non-exhaustive comparisons of the cd3o setup process to the asserted claims.

The ID found against invalidity—both based on anticipation and obviousness—assuming a single allegedly lacking claim limitation. As discussed above in Section IV.A, claim 1 requires that the "receiving … user input" step be performed ***before*** the initial communication path is established. The ID held that cd3o received the claimed "user input" ***after*** the creation of the initial communication path. ID at 173. But that finding was based on clear legal and factual errors.

### (a) Cd3o Anticipates the Asserted Claims

In cd3o, the claimed "user input" occurred when the user clicked the "Ok" button in the "New Player" window in the cd3o software. After receiving that input, cd3o "transmitt[ed] a response to the first message that facilitates establishing a [UDP] communication path with the given playback device." The UDP communication path is one that uses UDP messages directed to specific devices. RX-

1478C.503-7 (Shoemake) at Q822-23, 825. The ID did not doubt the existence of the UDP communication path or the timing of its establishment relative to the "user input." For this reason alone, the ID should be reversed and cd3o should be found to anticipate or at least render obvious the asserted claims.

The ID's only reason for finding that the UDP communication did not qualify as the claimed "initial communication path" was that a *different* communication path using a cable was established earlier in the setup process. ID at 173 ("In the cd3o system, the cable is connected before any setup can begin. Once the cable is plugged in, an initial communication path is established between the devices."). The ID misconstrued "initial communication path" to require that it be the *first* communication path established between the computing device and the playback device. The intrinsic evidence and the ID's infringement and domestic industry findings all compel a contrary result. Indeed, as explained below, if it is correct that the "initial communication path" must be the first communication path, the accused Google devices cannot infringe either.

As for the claim language, claim 1 requires that the computing device receive a "first message indicating that a given playback device is available for setup" from the playback device. '896 patent, cl. 1. To be received, this first message must have passed over some sort of communication path. Step 2 requires establishing the initial communication only "*after … receiving the first message*." Thus the claim language itself *requires* that there be some earlier communication path before the claimed "initial communication path" is established. Adopting the ID's construction that the "initial communication path" must be the first communication path between the "computing device" and the "playback device" would render the claim irreconcilably inconsistent and indefinite. The correct reading is that claim 1 refers to an "initial communication path" to distinguish that path from the different communication path in the last step of claim 1—a path over "*the secure WLAN that is defined by the access point*." This is confirmed by the '896 patent specification, which only describes a "rudimentary communication path …. used for initial device configuration." RX-1478C.125-26 (Shoemake) at Q215; JX-0005 at 10:9, 10:26-27.

The ID's construction also contradicts the specification of the '896 patent, which expressly discloses that the setup process needs an earlier communication path and that this earlier path may be a hard wire—just like the cable of the cd3o. In the specification, the claimed "first message indicating that a given playback device is available for setup" is the "Alive" message. The Alive message is "a message indicating that a named ZP is available for configuration." '896 patent at 13:10-13. As the '896 patent teaches, the playback device is immediately capable of broadcasting "probe" messages (*i.e.*, the "Alive" messages) over "the **wired** network segments" **before** the claimed "initial communication path" is established *Id.* at 10:18-33.

Sonos' infringement and domestic industry theories—which the ID adopted for these claim limitations—also require a different, earlier communication path that transmits Wi-Fi or Bluetooth messages to indicate that the speakers are available for setup before the accused "initial communication path" is established. CX-0012C.533-36 (Weissman) at Q818-21. If the ID's construction for cd3o were correct, then neither the Google Home app nor Sonos' domestic industry products would infringe claim 1 because there would be an "initial communication path" as soon as those messages are received and thus before even the earliest "user inputs" alleged by Sonos. The ID suggests that the difference between cd3o and the '896 Accused Products is that the cd3o uses a cable connection and the '896 Accused Products use wireless connections. ID at 161. But Claim 1 does not require sending the "first message" over a wireless connection. In fact, the '896 patent teaches that the "first message" may be sent over "**wired** network segments." JX-0005 at 10:18-33.

The ID thus committed legal error when it disqualified the UDP communication path in cd3o from being the "initial communication path" simply because a cable was connected earlier in the setup process. If the Commission agrees that the "initial communication path" need not be the very first communication path, cd3o indisputably satisfies this claim limitation.

### (b)    Cd3o Renders the Asserted Claims Obviousness

The ID relied solely on the same flawed "initial communication path" theory for obviousness. Google also presented an obviousness theory that is not based on the UDP communication path and

instead relies on the existing TCP communication path in the cd3o. The ID does not dispute that this TCP connection is a defined "logical communication path identified by a pair of sockets" that is "establish[ed]" through a "three-way hand shake." RPost at 255-56 (quoting RX-0321 at 12, 31, 79). Because this three-way hand shake occurs *after* the cd3o software receives the claimed "user input," the TCP communication path is established after the claimed "user input." It would be obvious to modify the cd3o to use this already-existing TCP connection (instead of the UDP connection) to transmit network configuration parameters instead of the UDP connection, rendering the asserted claims invalid. RPost at 255-56; RReply at 125-26.

The ID rejected Google's obviousness theory allegedly because Google's expert "d[id] not actually opine that switching to a TCP protocol would prevent an initial communication path from being established when the player was connected to the computing device." ID at 176. As explained above, there is no such requirement in the claim language—the claimed "initial communication path" need not be the very first mechanism available to a device for receiving or sending data. Thus, the ID's decision on obviousness was erroneous.

## 2. Linksys

The ID did not address whether Linksys invalidated the asserted claims because it concluded that Google had not shown that its demonstration of the Linksys qualified as prior art. Because Google provided clear and convincing evidence that Linksys was prior art, the ID's determination should be vacated and remanded.

### (a) The Record Proves That Linksys Qualifies As Prior Art

The Linksys WMA11B was first announced on July 14, 2003, and both the Linksys playback device and the accompanying CD with software were publicly sold in the United States by August 2003. RX-1478C.78-83 (Shoemake) at Q149-55; RX-0262; RX-0503C; JX-0085C; JX-231; JX-0329C; JX-0330C; JX-232; JX-423C; RXP-038; RPX-040; RPX-04. The specific Linksys software relied on by Google as invalidating prior art was last modified by September 18, 2003, and there is no dispute that this piece of software was prior art. RPost at 247-48. Google also presented physical Linksys playback

█████████████████████████████████████████████

because one must "demonstrate that the integrity of the testing procedures or the handling of the tested samples was indisputably flawed or unreliable" to have it excluded).

The ID also faulted Dr. Shoemake for not "stating unequivocally that the age of the computer would not affect the way the software operates." ID at 171. Dr. Shoemake did testify in deposition that using an older computer there **could** be minor differences in what was displayed (e.g., new fonts or new icons based on the size of the display), But as for Linksys's set up process, Dr. Shoemake unequivocally testified that "there's no reason to believe that if the operating system were a slightly newer version, we would see any different behavior." *Id.* And when Dr. Weissman was confronted with the minor differences discussed in Dr. Shoemake's deposition, he admitted that Dr. Shoemake was "referring to display fonts, *which is not at issue in the present case*." Tr. (Weissman) at 918:11-919:20 .

Other than speculation, there is no evidence that the Linksys software would have operated any differently on an older computer—much less operated differently in a material way—and assuming with no basis such differences may exist flies in the face of how software and the Windows operating system operates. For those reasons, Linksys invalidates the '896 patent and the ID should be reversed, or at least remanded to the CALJ for fully considering Google's invalidity arguments based on Linksys.

## V.     THE '949 PATENT

The '949 patent is directed to a "user interface" for a "player group" comprised of "independent playback devices," such that the players in the group offer "synchronized playback" but may also have their volumes controlled either separately or as a group. JX-3, claim 1. The ID incorrectly found that the accused Google players are "independent" playback devices based on a legally improper narrowing of a disclaimer issued by Sonos during prosecution. Both Google and the Staff contended that the accused Google players are not "independent playback devices" based on the undisputed fact that the Google devices

. Although Sonos' expert conceded at the hearing that Google's players are therefore "interdependent," Tr. (Weissman) at 279:4-15, the ID found that the accused players are nonetheless "independent" as required by the claims.

39

███████████████████████████████████████████████████████████

On the invalidity side, there is no dispute that that the Bose prior art system offers a user interface that allows users to group multiple players to play audio from the same source at the same time. Despite this, the ID found that Bose players are not "synchronized," on the ground that the plain meaning of "synchronized" requires the players to coordinate with one other. *See* ID at 134. However, Sonos' own expert admits that the patent describes at least one embodiment of synchronized players that "doesn't talk about the playback devices coordinating amongst each other." Tr. (Weissman) at 843:10-22. Thus, the ID's narrow "plain meaning" violates the well-known principle that claim terms should not be construed so as to exclude disclosed embodiments. The ID's finding is also flatly contradicted by the hearing testimony of the inventor of the '949 patent,

. The ID further erred by finding a second reference, Isely, to not anticipate, by incorrectly dismissing a disclosed embodiment as a "hypothetical scenario."

A. **The ID's Infringement Finding Is Based on a Misapplication of Federal Circuit Law Regarding Prosecution History Disclaimer**

The law of prosecution history disclaimer is well established and requires "that a patentee be held to what he declares during the prosecution of his patent." *Springs Window Fashions v. Novo Indus's.*, 323 F. 3d 989, 995 (Fed. Cir. 2003). That is because the prosecution history of a patent serves a "public notice function," pursuant to which a competitor is entitled to rely on statements the applicant made to distinguish his invention from the prior art. *Id.* Critically, the scope of disclaimer is defined by the words and arguments the applicant chose at the time of prosecution, not the words or arguments he **could have** used. *See Tech. Props. v. Huawei Techs.*, 849 F.3d 1349, 1359 (Fed. Cir. 2017) ("The question is what a person of ordinary skill would understand the patentee to have disclaimed during prosecution, not what a person of ordinary skill would think the patentee needed to disclaim during prosecution."). Otherwise, the public notice function would be rendered meaningless. *See Hockerson-Halberstadt v. Avia Group Intern.*, 222 F. 3d 951, 957 (Fed. Cir. 2000) ("Were we to accept HHI's position, we would undercut the

public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies.").

The ID violated these principles by narrowing the scope of prosecution history disclaimer for the asserted claims of the '949 patent. *See* ID at 123-124. The asserted claims require "a user interface for a player group … wherein each player in the group is an ***independent playback device***." JX-3 at claim 1 . Sonos added the "independent playback device" limitation to the claims during prosecution in order to distinguish the prior art and secure allowance of the '949 patent. JX-8 at 1749-1751. When Sonos made that amendment, it told the patent examiner—and the public—that its claimed invention was distinct from the "***tethered or interdependent***" operation of the prior art. *Id*. at 1751 ("Discussed support for the independent operation of the claimed individual player and Applicant distinguished the individual operation over the tethered or interdependent operation of Isley *[sic]*.").

The ID recognized that Sonos disclaimed subject matter through this amendment, but the ID erred in defining the scope of that disclaimer. *See* ID at 123-124. In particular, the ID found that Sonos disclaimed only what was necessary to overcome Isely, which the ID described as "a system in which the volume of one individual device could not be adjusted without also adjusting the volume of other devices in the group." *Id*. at 124.[4] This finding ran counter to the testimony of Sonos' own expert, who admitted that he did not understand Sonos' disclaimer to be limited to the subject matter of Isely:

> Q. "Question: Do you have an understanding of what the tethered or independent operation of Isley was?"
>
> A. "Answer: ***It's not clear from the written record. I can only speculate*** that it perhaps refers to the interdependent control of volume because that was the basis upon which Isley was overcome, but I'm not certain."

Tr. (Weissman) at 352:8-13.

Moreover, in the prosecution history, Sonos never characterized Isely as a system "in which the volume of one individual device could not be adjusted without also adjusting the volume of other devices

---

[4] Google disputes this interpretation because Isely discloses the ability to change the volume of one player without affecting the volumes of other players in the same group, as described below in Section V.C.

in the group." *See id*. Sonos argued that Isely was "tethered or interdependent"—and therefore distinct from the claimed invention—without further discussion or explanation of the reference. *Id*. at 1751.

The public is entitled to rely on the words Sonos chose when distinguishing its invention, and specifically to understand that the claims do ***not*** cover "tethered or interdependent" systems. The Federal Circuit's decision in *N. Amer. Container* is instructive in this regard. *See N. Amer. Container, Inc. v. Plastipak Pkg'g., Inc.*, 415 F.3d 1335, 1345-46 (Fed. Cir. 2005). There, the claims were directed to a blow-molded plastic bottle with a "generally convex" bottom surface. *Id*. at 1339-40. During prosecution, the applicant distinguished the claimed invention from a prior art reference called Dechenne because the walls of its bottom surface were "slightly concave." *Id*. at 1342-43. In view of that statement, the district court found that the applicant had disclaimed plastic bottles with ***any points of concavity*** along their bottom surface and granted summary judgment of non-infringement to the defendant. *Id*.

The patent owner, North American Containing ("NAC"), appealed and argued that the district court's disclaimer finding was too broad. *See id*. at 1344-45. According to NAC, the Dechenne reference and other prior art cited during prosecution disclosed plastic bottles with ***entirely concave*** bottom surfaces. *See id*. Thus, NAC argued, the scope of disclaimer should be ***limited*** to entirely concave surfaces and the claims should ***allow*** for some points of concavity. *See id*. The Federal Circuit rejected that argument and affirmed the district court's disclaimer finding. *See id*. at 1345-46. It explained that the scope of disclaimer is based on words the applicant chose during prosecution—not on NAC's *post-hoc* distinction over the prior art. *See id*. ("Although the inner walls disclosed in the Dechenne and Jakobsen patents may be viewed as entirely concave, that is not what the applicant argued during prosecution to gain allowance for his claims.") (footnote omitted). And because the applicant had distinguished Dechenne as "slightly concave," that statement dictated the scope of disclaimer. *See id*. ("The inescapable consequence of such an argument is that the scope of applicant's claims cannot cover inner walls that are 'slightly concave.'").

The same rationale applies here. The words that Sonos chose to distinguish Isely were "tethered

███████████████████████████████████████████████████

or interdependent." JX-8 at 1751. The "inescapable consequence" of that argument is that the claims of the '949 patent cannot cover tethered or interdependent systems. *See N. Amer. Container*, 415 F.3d at 1345-46. And that is true regardless of whether Sonos could have distinguished Isely on some narrower ground. *See id.*; *Tech. Props.*, 849 F.3d at 1359 ("The question is what a person of ordinary skill would understand the patentee to have disclaimed during prosecution, not what a person of ordinary skill would think the patentee needed to disclaim during prosecution."). Accordingly, the ID erred when it limited the scope of disclaimer to systems "in which the volume of one individual device could not be adjusted without also adjusting the volume of other devices in the group." ID at 124. The scope of disclaimer should be based on the words that Sonos chose during prosecution, and the claims should be found to exclude "tethered or interdependent" systems. JX-8 at 1751.

Under the correct scope of disclaimer, the accused products do not infringe the asserted claims of the '949 patent because Google's audio players operate in a "tethered or interdependent" manner. Specifically, in the accused products,

I would say they're

---
5

---

███████████████████████████████████████████████████

interdependent.

Tr. (Weissman) at 279:4-15.

Moreover, by improperly narrowing the scope of Sonos' disclaimer, the ID rendered meaningless the term "independent playback device," violating the long-held principle that claim terms should not be read as superfluous. *See, e.g.*, *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1576 (Fed. Cir. 1987); *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention."). Specifically, the ID found that the "independent playback device" limitation did not disclaim systems

. ID at 124. As a result, the ID found that "independent playback device," construed as "capable of independent operation," *id.* at 121, is satisfied by any device that "can play audio independently when not in a group and, when grouped, their individual volume can be independently adjusted without changing the volume of any other player." *Id.* at 124-25. But this interpretation renders meaningless the "independent playback device" term because the patent described and claimed such devices *before* that term was added to the claims. *See* JX-8 at 8 [0016] (describing players that can play audio independently or grouped: "One of the objects, features, and advantages of the present invention is to remotely control a plurality of multimedia players in a multi-zone system, playing and controlling the audio source synchronously if the players are grouped together, or playing and controlling the audio source individually if the players are disassociated with each other."), *id.* at 15 [0044] (disclosing individual volume adjustment of a grouped player: "[T]he controller 240 is used to control the volume of each of the zone players in a zone group individually or together."); *id.* at 67 (pre-amended claim requiring "wherein each player is configured to playback a multimedia output from a multimedia source; … for each of the plurality of players within the player group, accept via the user interface an input to adjust a volume associated with the player, wherein the input to adjust the volume associated with the player causes the player to adjust its volume").

Accordingly, Google respectfully requests that the Commission review and reverse the ID's

infringement finding for the '949 patent.

**B.** **The ID's Finding that Bose Does Not Anticipate Is Based on An Incorrect Construction of the Phrase "Player Group for Synchronized Playback"**

At the evidentiary hearing, Google presented clear and convincing evidence that the Bose LifeStyle 50 system ("Bose") meets each and every limitation of asserted claims 1 and 2 of the '949 patent. *See generally* RPost at 168-179. Bose was an award-winning consumer-audio product that allowed users to place audio players throughout their home, group and ungroup the audio players, and control the playback and volume of individual players or groups of players. *See id*. The only limitation the ID found missing from Bose was the requirement in claim 1 that the audio players are formed as a "player group for **synchronized** playback." *See* ID at 134; JX-3 at claim 1. That finding was legal error because it relied on an overly narrow construction of the term "player group for synchronized playback," and particularly the "synchronized" term, that is not supported in the patent specification or prosecution history of the '949 patent.

The ID adopted a "plain meaning" construction advanced by Sonos that requires "coordination" among the players in the group in order for playback to be "synchronized." *See* ID at 133-134.[6] The specification and prosecution history, however, never define synchronization to require coordination among players. *See*, *e.g.*, JX-3; JX-8. In fact, Sonos' expert conceded that that the embodiment described at column 7, lines 56-67 of the '949 patent "doesn't talk about the playback devices coordinating amongst each other." Tr. (Weissman) at 843:10-22. The absence of an under-the-hood "coordination" requirement is not surprising. The alleged invention of the '949 patent is a **user interface** that allows a user to group devices together and control their volume. *See* JX-3 at Abstract. The focus of the patent specification is the elements of the user interface (*e.g.*, slide bars and radio buttons) and how those

---

[6] Notably, Sonos did not raise its "coordination" construction during the *Markman* proceedings. *See* RPost at 171. Sonos came up with the construction after the fact in order to have some basis for disputing the Bose reference. *See id.*

anticipation analysis. *See Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1355 (Fed. Cir. 2008) ("The fact that a technology may be impractical does not undermine an otherwise anticipatory disclosure."). Thus, the ID's determination that the static embodiment of Isely is suboptimal should be rejected. *See id.*

Because Isely meets the requirements of limitation 1(c) under a proper anticipation analysis, the ID's finding of no anticipation for claims 1, 2, and 4 should be reviewed and reversed. The ID's finding of non-obviousness for claim 5 in view of Isely and Crestron / Farinelli should also be reversed because it was based solely on the ID's finding that Isely failed to meet the requirements of claim 1.

## VI.     THE '959 PATENT

The ID's finding of infringement for the '959 patent is predicated on a misapplication of Federal Circuit law. The finding should be reversed and the Commission should find no violation of Section 337. To the extent the Commission reaches the issue of invalidity for the '959 patent, the ID's finding of non-obviousness is contradicted by record evidence the ID failed to consider, including express disclosures of the prior art and detailed expert testimony. The finding should be reversed, or at a minimum remanded for consideration of the entire evidentiary record. The ID also failed to consider the full evidentiary record on the issue of inventorship. The ID credited uncorroborated inventor testimony that Sonos invented the claimed subject matter, but that testimony was contradicted by historical documents showing a material contribution by                .

### A.     The ID's Infringement Finding Contradicts Federal Circuit Law

Asserted claim 10 of the '959 patent requires a playback device configured to perform a "first equalization" of audio data for a first type of pairing (*e.g.*, stereo sound) and a "second equalization" of audio data for a second type of pairing (*e.g.*, surround sound). *See* JX-4 at claim 10. During the *Markman* proceedings, Google explained that the term "equalization" should be construed to require "alter[ing] the relative strength of certain frequency ranges in the audio data" by performing techniques described in the patent specification, such as adjusting driver output levels or applying one or more filters to the audio data. Order 20 at 42-43. The CALJ adopted Google's proposed construction and rejected

███████████████████████████████████████████████

Sonos' request for a broader construction that conflated equalization with any modification to the audio data, even if the modification did not alter the relative strength of frequency ranges. *Id*.

Applying the adopted construction, the ID correctly found that the '959 Accused Products do not infringe under Sonos' principal infringement theory, which focused on adjustments that the products make to their driver output levels when they transition from a non-paired state to a stereo-paired state. *See* ID at 93-100.[8] With respect to the Google Home Max, the ID found that

,

regardless of whether the devices are non-paired or stereo-paired. *See id*. at 96-98. With respect to the Nest Audio, the ID found that Sonos offered nothing more than conclusory expert testimony and thus failed to meet its burden of proof. *See id*. at 98-99. The ID also credited testimony from Google's expert that                                                                     , and therefore does not infringe under Sonos' principal theory. *See id*. at 99. Those findings were correct and consistent with the evidence that the accused products

. *See* RX-1521C (Jeffay) at Q56-57, Q109-111.

The ID erred, however, when it found that the Google Home Max and Nest Audio meet the claim requirements under Sonos' backup theory of infringement, which focused on how the devices synchronize user settings when they are joined as a stereo pair. *See* ID at 100-105. By way of background, the Home Max and Nest Audio devices allow a user to adjust bass or treble to suit their listening preference—just like any traditional home speaker system. RX-1521C.35 (Jeffay) at Q128. When two Home Max or Nest Audio devices are joined as a stereo pair, the leader device maintains its bass and treble settings. *Id*. The leader device then sends its settings to the follower device, which adopts the settings of the leader. *Id*. Importantly, however, when a Home Max or Nest Audio device is manufactured and imported, it has a

---

[8]  Sonos accused only two products of infringing the '959 patent: the Google Home Max and the Nest Audio. *See* ID at 93, 98.

██████████████████████████████████████████████

, they do not include instructions that, when executed, cause the device to alter the relative strength of frequency ranges in the audio data. RX-1521C.35 (Jeffay) at Q130.

. *See* CX-0011C.834 (Almeroth) at Q987; Hr. at 214:13-19. Rather, to allege infringement, Sonos had its expert, Dr. Almeroth, alter the default configuration of the device after importation, in order to force a change in the bass and treble settings upon pairing. *Id*.; RX-1521C.36-39 (Jeffay) at Q132-139. On cross-examination, Dr. Almeroth admitted that the only way he could force the settings to change was to modify the device from its default configuration, and that his infringement theory was predicated on that *capability* rather than how the products actually operate:

> Q.    The software is not configured by default to have those settings, is it?
>
> A.    Those aren't the settings that are the default settings.

Hr. (Almeroth) at 212:1-10.

> I understand that the relevant analysis is regarding the capability of the '959 Accused Products, which I demonstrated, and not regarding whether a user has actually operated the '959 Accused Products in a particular manner.

CX-0011C.840 (Almeroth) at Q839.

The ID erred when it relied on Dr. Almeroth's analysis to find infringement of the '959 patent. *See* ID at 101. Under Federal Circuit law, the fact "that a device is *capable* of being *modified* to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). In *Telemac*, the claims required a processor, memory, and program instructions to execute a billing algorithm based on various information, including international call data. *Id*. The plaintiff, Telemac, argued that "even though [the defendant] Topp has chosen not to permit direct dialing of international calls, the *capability* of billing for international rates is nonetheless present in the phone's source code." *Id*. Thus, a user could modify the

███████████████████████████████████

system to place and charge for international calls, which would cause them to infringe. *Id*. The Federal Circuit rejected that argument and held that the capability of being modified is not enough; the accused product must be configured to operate as claimed. *Id*.; *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011) (listing cases and explaining that infringement cannot be based on a finding that the accused product is merely capable of being modified in a manner that infringes).

As a matter of law, the ID should have rejected Dr. Almeroth's infringement analysis. *Id*. The analysis relied on his own modification to the default settings in the Home Max and Nest Audio devices in order to force a change in those settings upon pairing.

That is no different from the plaintiff in *Telemac*, who argued that the accused products were capable of being modified to place international calls. 247 F.3d at 1330. It is also important to note that

. CX-0011C.836-837 (Almeroth) at Q978. His failure to come forward with such evidence further confirms that his infringement analysis is based on mere capability, not how the devices are configured. *See Ball Aerosol & Spec. Container, Inc. v. Limited Brands*, 555 F.3d 984, 995 (Fed. Cir. 2009) (reversing infringement finding where "[plaintiff] concede[d] that it has no proof that the [accused product] was ever placed in the infringing configuration....").

The ID relied on two Federal Circuit cases to support its non-infringement finding: *Fantasy Sports Props., Inc. v. Sportsline, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002) and *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010). Neither case applies here. In *Fantasy Sports*, the Federal Circuit expressly rejected the rationale underlying the ID's infringement finding: "that infringement may be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a patent." 287 F.3d at 1117-18. The court found that certain

███████████████████████████████████████

limitations of the asserted claims were satisfied because the accused software, when executed, allowed users to perform the claimed functions like playing fantasy football and utilizing a scoring function that awarded bonus points. *Id*. But the court rejected the patentee's broader theory that infringement can be based on the capability of being modified. *Id*.

The court in *Fantasy Sports* also stressed that, unlike Sonos, the plaintiff had come forward with evidence to show that the accused software performed the claimed functions in the normal course of its operation by a user. *See* 287 F.3d at 1118-19. The evidence included webpages advertising the product as designed specifically to perform the claimed functions. *Id*. It also included a fact declaration from one of the plaintiff's employees, who testified that he used the software in a manner that performed the claimed steps. *Id*. Here, by contrast, Sonos and Dr. Almeroth presented no evidence of

.

*See* CX-0011C.836-837 (Almeroth) at Q978.

In *Finjan*, the accused products included software that could operate in two modes: one that infringed and another that did not. 626 F.3d at 1204. The defendant argued that because the infringing mode was locked or disabled, the products were not configured to perform the steps of the asserted system and apparatus claims at the time of sale. *Id*. The court disagreed and explained that the claims at issue were directed to software configured to perform specific functions. *Id*. at 1205 ("The system claims recite software components with specific purposes: 'a logical engine *for preventing* execution.'"). Thus, it did not matter if the software was ***active*** at the time of sale, only that it was on the products and configured to perform the claimed functions. *Id*. The court found that both requirements were satisfied for the products at issue. *Id*. ("Defendants admit that program code for proactive scanning is 'literally present' on all accused products. … [I]t is undisputed that software for performing the claimed functions existed in the products when sold."). Accordingly, the court affirmed the verdict of infringement. *Id*.

The Home Max and Nest Audio differ from the products at issue in *Finjan* because, at the time of importation or sale,

. RX-1521C.35 (Jeffay) at Q130. The software does the opposite: it

███████████████████████████████████████████████

. *Id*. Thus, this is not a case like *Finjan* where the software configured to infringe was on the device but turned off at the time of sale. *See* 626 F.3d at 1204-05.

. RX-1521C.35 (Jeffay) at Q130.

Accordingly, the ID erred when it found *Fantasy Sports* and *Finjan* applicable to the facts underlying the operation of the Home Max and Nest Audio devices. The ID should have followed the Federal Circuit's holding in *Telemac* and found that the mere capability of modifying the accused devices to change their bass and treble settings "is not sufficient, by itself, to support a finding of infringement." 247 F.3d at 1330 (Fed. Cir. 2001).[9] Google respectfully requests that the Commission review and reverse the ID's infringement finding.

### B. The ID's Finding of Non-Obviousness Contradicts Express Disclosures of the Prior Art and Ignores Detailed, Undisputed Testimony from Google's Expert

At the evidentiary hearing, Google presented clear and convincing evidence that claim 10 of the '959 patent was obvious based on the combination of U.S. Patent No. 8,423,893 ("Ramsay") and U.S. Patent No. 8,509,463 ("Goh 463"). *See generally* RX-1515C (Jeffay) at Q558-686. Ramsay discloses a flexible system of networked audio devices that can be used to form different pairing configurations, including stereo pairs and surround sound. *See* JX-447 at 6:39-59; RX-1515C.184-187 (Jeffay) at Q667-680. Goh 463 teaches the benefit of applying different equalizations for stereo pairs and surround sound, and explains that its teachings are applicable to other multi-speaker systems. *See* RX-200 at 4:58-5:34; RX-1515C.175 (Jeffay) at Q632-635. Thus, as Dr. Jeffay explained, a person of ordinary skill in the art would have been motivated to apply the teachings of Goh 463 to the multi-speaker system of Ramsay to

---

[9] The ID attempted to distinguish *Telemac* because it purportedly involved "modifying the ***underlying source code*** to ***add*** infringing functionality." *See* ID at 103, n. 46 (quoting CReply at 58) (emphasis in original). That is simply incorrect. In *Telemac*, the plaintiff argued that "the capability of billing for international rates is nonetheless ***present in the phone's source code***." 247 F.3d at 1330. The Federal Circuit agreed but explained that the software included a restriction that prevented a user from placing international calls. *Id*. It further held that the fact that a user could modify the restriction and place international calls was not enough to show infringement. *Id*. The same is true here:

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

In the Matter of

**CERTAIN AUDIO PLAYERS AND
CONTROLLERS, COMPONENTS
THEREOF, AND PRODUCTS
CONTAINING SAME**

**Investigation No. 337-TA-1191**

## GOOGLE'S RESPONSE TO COMPLAINANT'S PETITION FOR REVIEW OF THE
## INITIAL DETERMINATION ON VIOLATION OF SECTION 337

## 2. The CALJ Correctly Concluded that the Specification also Supports the CALJ's Construction

The specification confirms that claim 1 requires a message that contains network configuration parameters comprising both the "identifier" and the "security key." The *only* message disclosed by the specification that transmits an "identifier" or "security key" from the claimed "computing device" to the "playback device" is a single message that includes both the "identifier" and "security key"—*i.e.*, the "SetNetParams" message—which is entirely consistent with the claim language and the CALJ's construction. Specifically, "SetNetParams" is "*a command message*" that "includes *at least* . . . netConfig, where "netConfig includes *the new configuration parameters*," such as the claimed "identifier" and "security key." JX-10 at 13:29-37; *see also* Fig. 3B. The SetNetParams message contains both the "identifier" and "security key" such that when the "playback device" "receives *a* SetNetParams message, it reconfigures its own HHID [the "identifier"] and WEP key [the "security key"] to match those contained in *the network packet*." *Id.* at 14:15-17. The specification describes no embodiments where the "identifier" and the "security key" are split into separate messages when transmitted from the "computing device" to the "playback device."

Sonos does not dispute this. Rather, Sonos argues that it is "improper to read limitations from a preferred embodiment" into the claim and this embodiment is not a disclaimer. CPet at 37. But Sonos' disclaimer argument is a *non sequitur* because the CALJ's construction does not rely on any "disclaimer." The claim language itself requires "at least a message containing" the "identifier" and "security key."

Tellingly, Sonos cites no instance where the patentee used the phrase "one or more additional messages that collectively contain" (or anything like it) in the intrinsic record. Sonos quotes the specification's discussion of "'several messages' sent during configuration, 'some of the messages carry information pertaining to an appropriate transmission channel, an identifier of the network and a security key for subsequent communication.'" CPet at 32. But that refers to the entire process for connecting a playback device to a secure WLAN and does not describe breaking up the claimed "second message" into

Appx2074

multiple messages. These passages also discuss sending additional information beyond just the "identifier" and "security key"—namely the "appropriate transmission channel." And the specification describes the "appropriate transmission channel" as being set by the computing device and playback device exchanging "Alive" and "QueryNetParams" messages (JX-10 at 16:31-51), whereas the "identifier" and "security key" are sent in a separate, single "SetNetParams" message (*id.* at 13:29-37). Thus, the specification's discussion that "some of the messages carry information pertaining to an appropriate transmission channel, an identifier of the network and a security key for subsequent communication'" is entirely consistent with the CALJ's construction because the CALJ's construction permits the "appropriate transmission channel" to be send in a different message. The '896 patent specification never says that the identifier and security key themselves can be broken into separate messages.

Sonos argues that the phrase "at least a" "adds meaning only under Sonos's reading, where it makes clear that the network configuration parameters may be contained in a single message or spread among separate messages." CPet at 35. Sono is mistaken. First, Sonos leaves out key language from the rest of the claim limitation. The full phrase is "at least *a* second message *containing*" two parameters. The full phrase teaches that there is at least one second message that contains the identifier and the security key and the phrase "at least a" leaves open the possibility that there may be more than one such message. Thus, "at least a" is not "meaningless" under the CALJ's construction. Second, Sonos' argument is based on an incorrect presumption that "there is no role left for additional messages" under the CALJ's construction. CPet at 35. Sonos' presumption has no merit. The specification explains that the SetNetParams message, which includes the "identifier" and "security key," also sends other information: "SetNetParams…includes at least a zpUU/O, netConfig and tid." JX-10 at 13:29-33. The CALJ's construction does not preclude additional messages with this additional information from being sent by the claimed computing device to the playback device. As Staff also explains "[b]ecause the second message can contain additional information beyond the 'network configuration parameters,' the claim language 'at least a second message containing network configuration parameters' is not rendered

Appx2075

meaningless and superfluous, as Sonos contends." Staff Initial Markman Brief at 48-49. Even if Sonos were correct that "at least a" was meaningless under the CALJ's construction—it is not—that does not trump the clear language of claim 1. *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("while interpretations that render some portion of the claim language superfluous are disfavored, where neither the plain meaning nor the patent itself commands a difference in scope" the plain meaning must be adopted).

In an effort to undermine the CALJ's explanation of the role of the phrase "at least a," Sonos also argues that "the ID concluded that its construction still allows multiple messages—just with each message independently containing the network name and password. The ID offered no reason why such redundant messages would be part of Sonos's invention." CPet at 35. First, Sonos fails to cite any case law to support its assertion that the plain meaning of a claim must be rejected when it might result in "redundant," unclaimed functions. That is not the law. Second, the specification itself teaches that these allegedly "redundant" messages could be resent because the original message may not have made it to the recipient the first time. After a "SetNetParams" message with the identifier and security key is sent, the recipient of that message sends back an "acknowledgement" message ("AckNetParams") "indicat[ing] that the SetNetParams message was received." JX-10 at 13:38-41, Figure 3B (steps 4-5). As the 802.11 standard (cited throughout the '896 patent) explains: "Many circumstances may cause an error" in transmitting messages due to, for example, message "collision" or "interference in the channel." 802.11-1999 § 9.2.5.3. The "AckNetParams" message lets the sender know when transmission failed and the "SetNetParams" message (*i.e.*, the claimed "second message") should be resent.

The CALJ fully considered and rejected Sonos' arguments and correctly construed "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" as "at least one second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN." The Commission should deny Sonos' Petition to review the CALJ's construction.

███████████████████████████████████████████████████████████

Sonos goes so far as to argue that "clock time information" in limitation 17.7 may be "entirely unrelated" to "clock time information" in limitation 17.2. CPet at 74. Sonos points to the "DAC clock 34" in the specification and states that "the clock time information sent by the zone player is actually information generated by the '*DAC* clock 34' rather than information generated by the '*device* clock 43.'" CPet at 75 n.23 (citing JX-1 at FIG. 3, 23:1-9). But this disclosure actually contradicts Sonos' theory. As undisputed evidence showed, a DAC (digital-to-analog converter) clock does not generate independent "clock time information" that is unrelated to the "clock time information" generated by the device clock, as Sonos' argument assumes. Rather, a DAC clock simply takes the high-frequency signal generated by a device clock and converts it into a digital representation that a computer can recognize. Tr. (Schonfeld) at 1045:15-1048:1 ("[A.] All clocks are generated by a device clock. . . . [A] person of skill would understand that that information came to the DAC. It didn't generate it out of the blue; it generated it from the device clock. . . . [T]he device clock itself is a crystal. It just generates a high-frequency signal, and that has to be converted into a number that can be used by a computer. . . . Q. Okay. So the DAC clock, you're saying . . . it takes the input from the device clock and converts it to a number, right? . . . A. That's . . . how a person of skill would understand what's going on."). So, contrary to Sonos' attorney argument, the "time as indicated by [the DAC clock]" (JX-1 at 23:1-9) represents the time generated by the device clock, and is thus very much "related" to the clock time information generated by the device clock.

Continuing with its mistaken "DAC clock" argument, Sonos alleges that 258 NIA No. 1 works in a "nearly identical" way as disclosed in the specification because ███████████████████████ ██████████████████████████████ CPet at 75 n.23. Putting aside Sonos' fundamental misunderstanding of a DAC clock, its characterization of the operation of 258 NIA 1 is factually incorrect. ██████████ in 258 NIA No. 1 has no such conversion ability; ████████████████████ ████████████████████████████████ Unlike the "DAC clock" (which as discussed above converts the information from the device's clock into a digital representation of time recognized by a

76

████████████████████████████████████████████████████████

computer), ████████████████████ in 258 NIA No. 1 does not represent the clock time information generated by the device clock.

***Third***, Sonos now makes a new—and incorrect—argument that the "surrounding language" of the claim confirms that the later two instances of "clock time information" limitations do not have to be the same "clock time information" generated by the device clock of limitation 17.2. *Id*. Sonos argues that, in contrast to the bare recitation of "clock time information" in limitation 17.7, several other claim terms use the word "the." *Id*. As an initial matter, the Commission should not consider this argument, as it is a new argument that was never presented before and is therefore waived. G. R. 13.1. This argument is not only new but incorrect. The mere fact that the claim uses the word "the" in other places[16] does not mean that the second-recited "clock time information" refers to something different from the first-recited "clock time information." Sonos disguises this argument as claim differentiation, but it is still asking the Commission to adopt the same erroneous rule of construction that the term "the" must be used for there to be an antecedent basis relationship.

Sonos contends that "[s]uperfluity should be avoided by giving significance to the lack of the 'the' in limitation 17.7's recitation of 'clock time information.'" CPet at 76. But this is a non-starter because the ID's interpretation does not render any term meaningless. If anything, Sonos' interpretation would create superfluity by rendering limitation 17.2 meaningless because under this new interpretation the "clock time information" generated by a device clock is never used for ***any*** purpose.

*Creative Internet Advertising Corp. v. Yahoo! Inc.*, 476 F. App'x 724, 729 (Fed. Cir. 2011), does not apply here. In that case, the Federal Circuit reasoned that meaning should be given to all terms and held that an antecedent basis relationship was required where the claim used the adjective "said." Like

---

[16] Contrary to Sonos' suggestion, "clock time information" is not the only term where the claim omits the word "the" in a later instance. The second instance of the term "audio" in limitation 17.7 (the zone players "remain independently clocked while playing back ***audio*** in synchrony") is not preceded with the word "the," even though it plainly refers to the earlier-recited "audio" (the two zone players are "configured to playback ***audio*** in synchrony"). Sonos has not argued otherwise.

77

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Charles E. Bullock
Chief Administrative Law Judge

In the Matter of

CERTAIN AUDIO PLAYERS AND
CONTROLLERS, COMPONENTS
THEREOF, AND PRODUCTS
CONTAINING SAME

Inv. No. 337-TA-1191

RESPONDENTS' RESPONSE TO
THE COMPLAINT AND NOTICE OF INVESTIGATION

**_Respondents:_**

Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043
Tel.: (650) 253-0000

Alphabet Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043
Tel.: (650) 253-0000

**_Counsel for Respondents:_**

S. Alex Lasher
Marissa R. Ducca
Jared W. Newton
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000

Charles K. Verhoeven
Sean S. Pak
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel.: (415) 875-6600

Justin Griffin
Lance Yang
Quinn Emanuel Urquhart & Sullivan, LLP
865 S Figueroa St, 10th Floor
Los Angeles, CA 90017
Tel.: (213) 443-3000

Patrick D. Curran
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel.: (617) 712-7100

# TABLE OF CONTENTS

Page

RESPONSE TO THE COMPLAINT ....................................................................................1

I.     INTRODUCTION ..................................................................................................4

II.    COMPLAINANT ...................................................................................................6

SONOS'S CLAIMED INNOVATION ...............................................................................6

III.   RESPONDENTS .....................................................................................................8

       A.     Google LLC ...................................................................................................8

GOOGLE'S ALLEGED INFRINGEMENT .....................................................................8

       B.     Alphabet Inc. ...............................................................................................10

IV.    THE PRODUCTS AT ISSUE ..............................................................................11

V.     THE ASSERTED PATENTS ...............................................................................12

       A.     Background ..................................................................................................12

       B.     U.S. Patent No. 9,195,258............................................................................14

              1.     Identification of the '258 Patent and Ownership by Complainant ............14

              2.     Foreign Counterparts to the '258 Patent ..................................................15

              3.     Non-Technical Description of the '258 Patent .........................................15

       C.     U.S. Patent No. 10,209,953..........................................................................17

              1.     Identification of the '953 Patent and Ownership by Complainant ............17

              2.     Foreign Counterparts to the '953 Patent ..................................................17

              3.     Non-Technical Description of the '953 Patent .........................................18

       D.     U.S. Patent No. 8,588,949............................................................................18

              1.     Identification of the '949 Patent and Ownership by Complainant ............18

              2.     Foreign Counterparts to the '949 Patent ..................................................19

              3.     Non-Technical Description of the '949 Patent .........................................20

       E.     U.S. Patent No. 9,219,959............................................................................21

              1.     Identification of the '959 Patent and Ownership by Complainant ............21

              2.     Foreign Counterparts to the '959 Patent ..................................................22

              3.     Non-Technical Description of the '959 Patent .........................................23

       F.     U.S. Patent No. 10,439,896..........................................................................24

              1.     Identification of the '896 Patent and Ownership by Complainant ............24

              2.     Foreign Counterparts to the '896 Patent ..................................................25

              3.     Non-Technical Description of the '896 Patent .........................................25

i

VI.     SPECIFIC INSTANCES OF IMPORTATION AND SALE ............................................27

VII.    UNLAWFUL AND UNFAIR ACTS ...............................................................28

VIII.   HARMONIZED TARIFF SCHEDULE .........................................................30

IX.     LICENSES.................................................................................................30

X.      THE DOMESTIC INDUSTRY ....................................................................30

      A.     Technical Prong of the Domestic Industry Requirement.....................30

      B.     Economic Prong of the Domestic Industry Requirement .....................31

           1.     Investments in Plant and Equipment.........................................32

           2.     Investments in Plant and Equipment.........................................32

           3.     Exploitation of the Asserted Patents Through Engineering and
                  Research and Development.......................................................33

XI.     RELATED LITIGATION .............................................................................33

XII.    RELIEF REQUESTED.................................................................................34

RESPONDENTS' ADDITIONAL AFFIRMATIVE DEFENSES ...............................35

RESPONDENTS' PRAYER FOR RELIEF .................................................................37

RESPONSE TO THE NOTICE OF INVESTIGATION................................................38

STATEMENT PURSUANT TO COMMISSION RULE 210.13(B) ...........................39

Pursuant to 19 C.F.R. § 210.13, Respondents Google LLC ("Google") and Alphabet Inc. ("Alphabet") (collectively, "Respondents"), submit this response ("Response") to the Complaint Under Section 337 of the Tariff Act of 1930, as Amended ("Complaint"), filed by Complainant Sonos, Inc. ("Sonos" or "Complainant") on January 7, 2020, and to the Notice of Investigation issued by the United States International Trade Commission on February 6, 2020 ("Notice"). This Response further contains Respondents' preliminary affirmative defenses, prayer for relief, and statement pursuant to 19 C.F.R. § 210.13(b).

## RESPONSE TO THE COMPLAINT

Google was founded in 1998 with the goal of organizing the world's information and making it universally accessible and useful. Over the past two decades, in service of that goal, Google has become one of the world's most innovative companies. Google's revolutionary advances in search, mobile computing, machine learning, artificial intelligence, and voice-assisted technologies have changed millions of lives. Google continues to make information universally accessible and useful at the household level, through advanced voice recognition, search, and media playback technologies in its Google Home, Google Nest, and Chromecast products.

Sonos's complaint uses revisionist history to attack Google's innovative software and hardware products. Google did not obtain "deep" access to Sonos technology and then develop the Google products at issue; in fact, Google launched Chromecast *before* Google and Sonos ever agreed to collaborate. When Google and Sonos did collaborate, *Sonos asked Google* for assistance, so that *Sonos could employ Google technology* to improve Sonos's products– not the other way around.

In 2013, Sonos asked for Google's assistance integrating Sonos directly with Google's popular Play Music service. Google gave Sonos that assistance, and provided significant

engineering resources, technical support, and other resources to integrate Sonos's products with Google's Play Music service in 2014. As *Wired* observed in 2014, this was a huge benefit to Sonos, whose products were suffering from a lack of integration with easy-to-use software interfaces: the collaboration was "a strong indicator of how vital it is these days for hardware [to] be imbued with relevant, easy-to-use software," because"[i]t's not enough that Sonos can connect to the Internet over your home Wi-Fi network. *It needs to work seamlessly with your favorite music streaming apps*." Complaint Exhibit 83 (emphasis added).

In 2016, Sonos again asked for Google's assistance – this time to integrate Google's innovative Assistant software with Sonos devices. And again, Google was willing to help. Google gave Sonos significant assistance designing, implementing, and testing a solution that would bring Google's voice recognition software to Sonos's devices. This effort again involved significant Google engineering resources, including significant months of employee work time, for the initial launch of Google's Assistant on Sonos's products in May 2019.

Sonos seems to think no good deed should go unpunished. In exchange for the assistance Sonos received from Google to help improve Sonos's products, Sonos now asks the Commission to impose sweeping remedial orders barring the importation of multiple Google products. But there is no basis for Sonos's claims. The technologies Google uses were all independently developed by Google. They are not technologies Google took from Sonos, and they are not the technologies described in the five patents Sonos asserts. The five asserted patents describe older technologies – not the advanced technologies Google uses. In fact, the technologies described in Sonos's five asserted patents were not even first developed by Sonos. The ideas in those patents were not new; they were already known in the field, and were obvious and dated by the time Sonos applied for each of these five patents. The technologies in these five patents do not reflect

2

the design of modern wireless audio devices. Indeed, it appears Sonos *itself* does not even use these technologies in its modern devices. Sonos has not shown a "domestic industry" in these technologies, or an act of infringement, and the dated and obvious approaches described in its five patents are no basis to exclude Google's products from the marketplace.

<p style="text-align:center">*    *    *</p>

Respondents deny that they have engaged in unfair competition or violated Section 337 of the Tariff Act of 1930, as amended, by importing, selling for importation, or selling within the United States after importation any products that infringe any valid and enforceable intellectual property rights at issue in this investigation. Respondents further deny that any patent claims asserted against them in this investigation are valid or enforceable. The responses below reflect the current status of Respondents' knowledge and beliefs regarding the subject matter of the allegations to which they respond. Respondents reserve the right to supplement, modify, and/or amend their responses based on any additional facts or developments that become available or that arise after the filing of this Response.

Respondents deny each and every allegation averred in the Complaint that is not expressly admitted below. Any factual allegation admitted below is admitted as to only the specific admitted facts, and not as to any purported conclusions, characterizations, implications, or speculations that might follow from the admitted facts. Respondents respond to the numbered paragraphs of the Complaint as follows. The paragraph numbering in these responses corresponds to the numbered paragraphs in the Complaint.

# I.     INTRODUCTION[1]

1.     Respondents admit that Complainant purports to have filed the Complaint pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337").  Respondents further admit that Complainant purports to base its Complaint on the alleged unlawful importation into the United States, sale for importation into the United States, and/or sale within the United States after importation of certain audio players and controllers, components thereof, and products containing same.[2]  Except as specifically admitted, Respondents deny any remaining allegations and characterizations contained in Paragraph 1 of the Complaint.

2.     Respondents admit that the Complaint purports to name as proposed Respondents Alphabet Inc. and Google LLC, but deny that Alphabet Inc. is involved in developing, manufacturing, importing, and/or selling the accused products.

3.     Respondents admit that the Complaint purports to be directed to certain of Google's devices, components thereof, and products containing the same.  Respondents further admit that the Complaint purports to assert infringement of all of the Asserted Patents.  Respondents deny that such an assertion is correct or proper.  Respondents deny that it infringes any of the Asserted Patents.  Respondents deny any characterizations relating to the Asserted Patents to the extent they purport to attribute to the Asserted Patents anything that is not stated

---

[1]  For ease of reference, Respondents repeat the headings set forth in the Complaint.  In doing so, Respondents make no admissions regarding the substance of the headings or any other allegations of the Complaint.  Unless explicitly otherwise stated, to the extent that a particular heading can be construed as an allegation, Respondents specifically deny all such allegations.

[2]  Throughout this document, Respondents reference the Complaint's use of the vague terms "audio players and controllers," "components thereof," and/or "products containing same."  In doing so, Respondents make no admissions about the scope or accuracy of those terms as descriptions of the accused products and/ or features.

therein. Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 3 of the Complaint.

4.     To the extent Paragraph 4 of the Complaint contains conclusions of law, no response is necessary. To the extent Paragraph 4 of the Complaint contains allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

5.     Respondents admit that certain of its audio players and controllers, components thereof, and/or products containing the same are manufactured and/or sold for importation into the United States, imported into the United States, and/or sold after importation into the United States by or on behalf of Google. To the extent Paragraph 5 of the Complaint contains conclusions of law, no response is necessary. Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 5 of the Complaint.

6.     Respondents acknowledge that Complainant purports to seek a permanent limited exclusion order prohibiting entry into the United States certain audio players and controllers, components thereof, and products containing the same. Respondents further acknowledge that Complainant purports to seek cease and desist orders stopping Google and various other persons and entities from conducting any of the following activities in the United States: importing, selling, marketing, advertising, distributing, transferring (except for exportation), or soliciting U.S. agents or distributors for various audio players and controllers, components thereof, and products containing the same. Respondents further acknowledge that Complainant purports to seek the imposition of a bond pursuant during a Presidential review period, and any additional relief that the Commission deems just and proper under the law. Respondents deny that Complainant is entitled to any form of remedy and/or relief based on the allegations set forth in

the Complaint.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 6 of the Complaint.

## II.  COMPLAINANT

7.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 7 of the Complaint, and therefore deny them.

<div align="center">

**SONOS'S CLAIMED INNOVATION**

</div>

8.  Respondents admit that Exhibits 76 and 77 purport to be articles from *NBC News* and *Men's Journal*.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in Paragraph 8 of the Complaint, and therefore deny them.

9.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 9 of the Complaint, and therefore deny them.

10.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 10 of the Complaint, and therefore deny them.

11.  Respondents admit that Exhibit 78 purports to be an article from *PC Magazine*. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in Paragraph 11 of the Complaint, and therefore deny them.

12.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 12 of the Complaint, and therefore deny them.

13.     Respondents admit that Exhibit 79 purports to be a Sonos User Guide. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in Paragraph 13 of the Complaint, and therefore deny them.

14.     Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 14 of the Complaint, and therefore deny them.

15.     Respondents admit that Exhibits 80 and 81 purport to be news articles from *Digital Trends* and *What Hi-Fi*.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in Paragraph 15 of the Complaint, and therefore deny them.

16.     Respondents admit that Exhibit 82 appears to be a print-out of a webpage and Exhibit 83 purports to be a news article from *Wired*.  Respondents admit that some of Sonos's products are compatible with certain third-party music streaming services. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in Paragraph 16 of the Complaint, and therefore deny them.

17.     Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 17 of the Complaint, and therefore deny them.

### III.    RESPONDENTS

#### A.    Google LLC

18.    Respondents admit that Google LLC is a Delaware limited liability company with its principal place of business and headquarters at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

### GOOGLE'S ALLEGED INFRINGEMENT

19.    Respondents admit that Google has a product called "Chromecast Audio," and admits that Exhibit 98 purports to be a September 2015 news article from The Guardian.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 19 of the Complaint.

20.    Respondents admit that Exhibit 99 purports to be a December 2015 posting from a webpage entitled "Chrome Blog."  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 20 of the Complaint.

21.    Respondents admit that Exhibit 100 purports to be a copy of a December 2015 Variety article entitled "Google's Chromecast Audio Adapter Gets Multi-Room Support Similar to Sonos."  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 21 of the Complaint.

22.    Respondents admit that Exhibit 101 purports to be a copy of a December 2015 article from *Pocket-Lint*.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 22 of the Complaint.

23.    Respondents deny the allegations and characterizations contained in Paragraph 23 of the Complaint.

24.    Respondents deny the allegations and characterizations contained in Paragraph 24 of the Complaint.

25.     Respondents deny the allegations and characterizations contained in Paragraph 25 of the Complaint.

26.     Respondents admit that Google launched a Chromecast Audio wireless adapter in 2015, and that in 2016 Google launched a Google Home app.  Respondents deny the remaining allegations and characterizations contained in Paragraph 26 of the Complaint.

27.     Respondents admit that Exhibit 102 purports to be a copy of an October 2016 article from *The Register*.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 27 of the Complaint.

28.     Respondents admit that Exhibit 103 purports to be a copy of a November 2016 article from *the Verge*.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 28 of the Complaint.

29.     Respondents deny the allegations and characterizations contained in Paragraph 29 of the Complaint.

30.     Respondents admit that Exhibit 104 purports to be a copy of an October 2017 article from *Gizmodo*, and that Exhibit 105 purports to be a copy of a December 2017 article from *Android Central*.  Respondents admit that in 2017 Google released the Google Home Max and the Google Home Mini.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 30 of the Complaint.

31.     Respondents deny the allegations and characterizations contained in Paragraph 31 of the Complaint.

32.     Respondents admit that Exhibits 86-94 appear to be print-outs of various webpages.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 32 of the Complaint.

33.     Although the image contained within Paragraph 33 is grainy, Respondents admit that it is possible it may display several Google products.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 33 of the Complaint.

34.     Respondents admit that Exhibits 95-97 appear to be print-outs of various webpages.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 34 of the Complaint.

35.     Respondents deny the allegations and characterizations contained in Paragraph 35 of the Complaint.

36.     Respondents admit that Google markets various products to consumers in the United States, and that it imports into the United States, sells for importation, and/or sells within the United States after importation, various products.  Respondents deny that these products are infringing.  The approximate statistical data related to quantity and value of imports of the accused Google products is set forth in **Confidential Appendix A** hereto.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 36 of the Complaint.

**B.     Alphabet Inc.**

37.     Respondents admit that Alphabet Inc. is a Delaware corporation with its principal place of business and headquarters at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

38.     Respondents deny that Alphabet Inc. is involved in developing, manufacturing, importing, and/or selling the accused products.  Respondents further deny the allegations and characterizations contained in Paragraph 38 of the Complaint.

**Appx2513**

## IV. THE PRODUCTS AT ISSUE

39. Respondents admit that the Complaint purports to assert infringement based on a set of accused products. Respondents deny that such an assertion is correct or proper, and deny that the scope of the accused products is appropriate. Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 39 of the Complaint.

40. Respondents admit that various products are sold in the United States, sold for importation into the United States, and/or sold within the United States after importation by or on behalf of Google, and that it maintains various products in inventory in the United States. Respondents deny that these products are infringing. The approximate statistical data related to quantity and value of imports of the accused Google products is set forth in **Confidential Appendix A** hereto. Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 40 of the Complaint.

41. Respondents admit that the Complaint purports to identify One, One SL, Play:5, Move, Beam, Playbar, Playbase, Port, Sub, and Amp, as well as the Sonos app. as domestic articles. Except as specifically admitted, Respondents lack sufficient knowledge to admit or deny the remaining allegations and characterizations contained in Paragraph 41 of the Complaint, and therefore deny them.

42. Respondents admit that, pursuant to Commission Rule 210.12(b), 19 C.F.R. §210.12(b), the Complaint purports to submit physical samples of representative purported domestic articles and purported infringing products that are the subject of the Complaint. Respondents admit that the Complaint purports to accuse certain Google products of infringing the asserted patents. Except as specifically admitted, Respondents lack sufficient knowledge to

admit or deny the remaining allegations and characterizations contained in Paragraph 42 of the Complaint, and therefore deny them.

## V.     THE ASSERTED PATENTS

### A.     Background

43.     Respondents deny the allegations in Paragraph 43 of the Complaint insofar as they purport to attribute to the '949 and '959 patents anything that is not stated therein. Respondents admit that early technology for multi-zone audio systems sometimes relied upon hard-wiring with dedicated speaker wires to different audio players in different rooms. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

44.     Respondents deny the allegations in Paragraph 44 of the Complaint insofar as they purport to attribute to the '949 patent anything that is not stated therein.  Respondents admit that early technology for multi-zone audio systems sometimes relied upon hard-wiring with dedicated speaker wires to different audio players in different rooms.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

45.     Respondents deny the allegations in Paragraph 45 of the Complaint insofar as they purport to attribute to the '949 and '959 patents anything that is not stated therein. Respondents admit that early technology for multi-zone audio systems sometimes relied upon hard-wiring with dedicated speaker wires to different audio players in different rooms. Respondents are currently without knowledge or information sufficient to form a belief as to the

Appx2515

truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

46.     Respondents deny the allegations in Paragraph 46 of the Complaint insofar as they purport to attribute to the asserted patents anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

47.     Respondents deny the allegations in Paragraph 47 of the Complaint insofar as they purport to attribute to the '949 and '258 patents anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

48.     Respondents deny the allegations in Paragraph 48 of the Complaint insofar as they purport to attribute to the '949 and '258 patents and claims 1, 8, and 15 (as to the '949 patent) and claims 1, 11, and 17 (as to the '258 patent) anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

49.     Respondents deny the allegations in Paragraph 49 of the Complaint insofar as they purport to attribute to the '949 and '258 patents and claims 1, 8, and 15 (as to the '949 patent) and 1, 11, and 17 (as to the '258 patent) anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

50. Respondents deny the allegations in Paragraph 50 of the Complaint insofar as they purport to attribute to the '949 and '258 patents anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

51. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 51 of the Complaint, and therefore deny them.

**B. U.S. Patent No. 9,195,258**

**1. Identification of the '258 Patent and Ownership by Complainant**

52. Respondents deny the allegations in Paragraph 52 of the Complaint insofar as they purport to attribute to the '258 patent anything that is not stated therein. Respondents admit that the '258 patent is titled "System and Method For Synchronizing Operations Among A Plurality Of Independently Clocked Digital Data Processing Devices"; that it names Nicholas A.J. Millington as the inventor; that its application was filed February 20, 2014; that it purports to claim priority to a provisional application filed July 28, 2003; and that the patent issued November 24, 2015. Respondents deny that the '258 patent is entitled to the filing date of the provisional application filed July 28, 2003. Respondents admit that the '258 patent, to the extent it is valid, will expire no later than April 1, 2024. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

53.     Respondents admit that Exhibit 1 to the Complaint purports to be a certified copy of the '258 patent; that Exhibit 2 purports to be a copy of the Certificate of Correction for the '258 patent excerpted from the certified file wrapper for the '258 patent; that Appendix A purports to be one certified copy of the prosecution history for the '258 patent, plus three additional copies thereof; and that Appendix H purports to contain each patent and the applicable pages of each technical reference mentioned in the prosecution history of the '258 patent, plus three additional copies thereof.

### 2.     Foreign Counterparts to the '258 Patent

54.     Respondents deny the allegations in Paragraph 54 of the Complaint insofar as they purport to attribute to the asserted patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

### 3.     Non-Technical Description of the '258 Patent

55.     Respondents deny the allegations in Paragraph 55 of the Complaint insofar as they purport to attribute to the '258 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

56.     Respondents deny the allegations in Paragraph 56 of the Complaint insofar as they purport to attribute to the '258 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

57.     Respondents deny the allegations in Paragraph 57 of the Complaint insofar as they purport to attribute to the '258 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

58.     Respondents deny the allegations in Paragraph 58 of the Complaint insofar as they purport to attribute to the '258 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

59.     Respondents deny the allegations in Paragraph 59 of the Complaint insofar as they purport to attribute to the '258 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

60.     Respondents deny the allegations in Paragraph 60 of the Complaint insofar as they purport to attribute to the '258 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

61.     Respondents deny the allegations in Paragraph 61 of the Complaint insofar as they purport to attribute to the '258 patent anything that is not stated therein.  Respondents admit that Exhibits 106, 110, 111, and 76 purport to be articles from *PC Magazine*, the *Wall Street*

**Appx2519**

*Journal*, *Macworld*, and *NBC News*, respectively. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

  **C.**  **U.S. Patent No. 10,209,953**

    **1.**  **Identification of the '953 Patent and Ownership by Complainant**

  62.  Respondents deny the allegations in Paragraph 62 of the Complaint insofar as they purport to attribute to the '953 patent anything that is not stated therein. Respondents admit that the '953 patent is titled "Playback Device"; that it names Nicholas A.J. Millington as the inventor; that its application was filed August 31, 2018; and that it purports to claim priority to a provisional application filed July 28, 2003. Respondents deny that the '953 patent is entitled to the filing date of the provisional application filed July 28, 2003. Respondents admit that the '953 patent, to the extent it is valid, will expire no later than April 1, 2024. Respondents admit that Exhibits 3, 13, and 14 purport to be documents reflecting a certified copy of the '953 patent and the assignment of that patent to Sonos, Inc. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

  63.  Respondents admit that Exhibit 3 to the Complaint purports to be a certified copy of the '953 patent; that Appendix B purports to be one certified copy of the prosecution history for the '953 patent, plus three additional copies thereof; and that Appendix H purports to contain each patent and the applicable pages of each technical reference mentioned in the prosecution history of the '953 patent, plus three additional copies thereof.

    **2.**  **Foreign Counterparts to the '953 Patent**

  64.  Respondents deny the allegations in Paragraph 64 of the Complaint insofar as they purport to attribute to the asserted patent anything that is not stated therein. Respondents

are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

### 3. Non-Technical Description of the '953 Patent

65. Respondents deny the allegations in Paragraph 65 of the Complaint insofar as they purport to attribute to the '953 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

66. Respondents deny the allegations in Paragraph 66 of the Complaint insofar as they purport to attribute to the '953 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

### D. U.S. Patent No. 8,588,949

### 1. Identification of the '949 Patent and Ownership by Complainant

67. Respondents deny the allegations in Paragraph 67 of the Complaint insofar as they purport to attribute to the '949 patent anything that is not stated therein. Respondents admit that the '949 patent is titled "Methods And Apparatus For Adjusting Volume Levels In A Multi-Zone System"; that it names Robert A. Lambourne and Nicholas A.J. Millington as the inventors; that its application was filed September 14, 2012; that it purports to claim priority to a provisional application filed July 28, 2003; and that it issued on November 19, 2013. Respondents admit that the '949 patent, to the extent it is valid, will expire no later than April 1, 2024. Respondents admit that Exhibits 4 and 10 purport to be, respectively, a certified copy of

the '949 patent and a document reflecting the assignment of the '949 patent to Sonos, Inc. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

68.     Respondents admit that Exhibit 5 to the Complaint purports to be an Ex Parte Reexamination Certificate for the '949 patent and that it states that "Claims 1, 3, 4, 6, 7, 8, 10, 11, 13, 14, 15, and 17-20 are determined to be patentable as amended. Claims 2, 5, 9, 12, and 16, dependent on an amended claim, are determined to be patentable." Respondents deny that the Ex Parte Reexamination Certificate indicates that any of the original claims were determined to be patentable in their entirety and without modification. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations, and therefore deny them.

69.     Respondents admit that Exhibit 4 to the Complaint purports to be a certified copy of the '949 patent; that Exhibit 5 to the Complaint purports to be an Ex Parte Reexamination Certificate for the '949 patent; that Appendix C purports to be one certified copy of the prosecution history for the '949 patent, plus three additional copies thereof; that Appendix D purports to be one certified copy of the prosecution history for Reexamination Request No. 90/013,423, plus three additional copies thereof; and that Appendix H purports to contain each patent and the applicable pages of each technical reference mentioned in the prosecution history of the '949 patent, plus three additional copies thereof.

        **2.      Foreign Counterparts to the '949 Patent**

70.     Respondents deny the allegations in Paragraph 70 of the Complaint insofar as they purport to attribute to the asserted patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

### 3. Non-Technical Description of the '949 Patent

71.     Respondents deny the allegations in Paragraph 71 of the Complaint insofar as they purport to attribute to the '949 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

72.     Respondents deny the allegations in Paragraph 72 of the Complaint insofar as they purport to attribute to the '949 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

73.     Respondents deny the allegations in Paragraph 73 of the Complaint insofar as they purport to attribute to the '949 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

74.     Respondents deny the allegations in Paragraph 74 of the Complaint insofar as they purport to attribute to the '949 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

75. Respondents deny the allegations in Paragraph 75 of the Complaint insofar as they purport to attribute to the '949 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

76. Respondents deny the allegations in Paragraph 76 of the Complaint insofar as they purport to attribute to the '949 patent anything that is not stated therein. Respondents admit that Exhibits 106-109 to the Complaint purport to be articles from, respectively, *PC Magazine*, *Playlist*, *Gizmodo*, and *Pocket-lint*. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

**E.    U.S. Patent No. 9,219,959**

**1.    Identification of the '959 Patent and Ownership by Complainant**

77. Respondents deny the allegations in Paragraph 77 of the Complaint insofar as they purport to attribute to the '959 patent anything that is not stated therein. Respondents admit that the '959 patent is titled "Multi-Channel Pairing In A Media System"; that it names Christopher Kallai, Michael Darrell Andrew Ericson, Robert A. Lambourne, Robert Reimann, and Mark Triplett as the inventors; that its application was filed June 9, 2014; and that it issued on December 22, 2015. Respondents admit that the '959 patent, to the extent it is valid, will expire no later than September 11, 2027. Respondents admit that Exhibits 6 and 11 to the Complaint purport to be, respectively, a certified copy of the '959 patent and a document reflecting the assignment of the '959 patent to Sonos, Inc. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

78.     Respondents admit that Exhibit 7 to the Complaint purports to be an Ex Parte

Reexamination Certificate for the '959 patent and that it states that "Claims 1 and 14 are

cancelled," "Claims 2-13 and 15-22 are determined to be patentable as amended," and "New

claims 23-48 are added and determined to be patentable. Respondents deny that the Ex Parte

Reexamination Certificate indicates that any of the original claims were determined to be

patentable in their entirety and without modification. Respondents are currently without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

and characterizations, and therefore deny them.

79.     Respondents admit that Exhibit 6 to the Complaint purports to be a certified copy

of the '959 patent; that Exhibit 7 to the Complaint purports to be an Ex Parte Reexamination

Certificate for the '959 patent; that Appendix E purports to be one certified copy of the

prosecution history for the '959 patent, plus three additional copies thereof; that Appendix F

purports to be one certified copy of the prosecution history for Reexamination Request No.

90/013,756, plus three additional copies thereof; and that Appendix H purports to contain each

patent and the applicable pages of each technical reference mentioned in the prosecution history

of the '959 patent, plus three additional copies thereof.

### 2.     Foreign Counterparts to the '959 Patent

80.     Respondents deny the allegations in Paragraph 80 of the Complaint insofar as

they purport to attribute to the asserted patent anything that is not stated therein. Respondents

are currently without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations and characterizations contained in this Paragraph of the Complaint, and

therefore deny them.

### 3. Non-Technical Description of the '959 Patent

81.     Respondents deny the allegations in Paragraph 81 of the Complaint insofar as they purport to attribute to the '959 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

82.     Respondents deny the allegations in Paragraph 82 of the Complaint insofar as they purport to attribute to the '959 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

83.     Respondents deny the allegations in Paragraph 83 of the Complaint insofar as they purport to attribute to the '959 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

84.     Respondents deny the allegations in Paragraph 84 of the Complaint insofar as they purport to attribute to the '959 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

85.     Respondents deny the allegations in Paragraph 85 of the Complaint insofar as they purport to attribute to the '959 patent anything that is not stated therein.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

86.     Respondents admit that Exhibits 112-116 of the Complaint purport to be, respectively, articles from *SlashGear*, *Trusted Reviews*, *Consumer Reports*, *Businessweek*, and *What Hi-Fi*.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

### F.     U.S. Patent No. 10,439,896

#### 1.     Identification of the '896 Patent and Ownership by Complainant

87.     Respondents deny the allegations in Paragraph 87 of the Complaint insofar as they purport to attribute to the '896 patent anything that is not stated therein.  Respondents admit that the '896 patent is titled "Playback Device Connection"; that it names Nicholas A.J. Millington and Paul V. Hainsworth as the inventors; that its application was filed March 11, 2019; that it purports to claim priority to an application filed June 5, 2004; and that it issued October 8, 2019.  Respondents deny that the '896 patent is entitled to the filing date of the provisional application filed June 5, 2004.  Respondents admit that the '896 patent, to the extent it is valid, will expire no later than June 6, 2025.  Respondents admit that Exhibits 8 and 12 to the Complaint purport to be, respectively, a certified copy of the '896 patent and a document reflecting the assignment of the '896 patent to Sonos, Inc.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

88.     Respondents admit that Exhibit 8 to the Complaint purports to be a certified copy of the '896 patent; that Appendix G purports to be one certified copy of the prosecution history for the '896 patent, plus three additional copies thereof; and that Appendix H purports to contain

each patent and the applicable pages of each technical reference mentioned in the prosecution history of the '896 patent, plus three additional copies thereof.

### 2. Foreign Counterparts to the '896 Patent

89. Respondents deny the allegations in Paragraph 89 of the Complaint insofar as they purport to attribute to the asserted patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

### 3. Non-Technical Description of the '896 Patent

90. Respondents deny the allegations in Paragraph 90 of the Complaint insofar as they purport to attribute to the '896 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

91. Respondents deny the allegations in Paragraph 91 of the Complaint insofar as they purport to attribute to the '896 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

92. Respondents deny the allegations in Paragraph 92 of the Complaint insofar as they purport to attribute to the '896 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

**Appx2528**

93. Respondents deny the allegations in Paragraph 93 of the Complaint insofar as they purport to attribute to the '896 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

94. Respondents deny the allegations in Paragraph 94 of the Complaint insofar as they purport to attribute to the '896 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

95. Respondents deny the allegations in Paragraph 95 of the Complaint insofar as they purport to attribute to the '896 patent anything that is not stated therein. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

96. Respondents deny the allegations in Paragraph 96 of the Complaint insofar as they purport to attribute to the '896 patent anything that is not stated therein. Respondents admit that Exhibits 117-118 and 48 of the Complaint purport to be, respectively, articles from *Ars Technica*, *Gizmodo*, and *Consumer Reports*. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in this Paragraph of the Complaint, and therefore deny them.

## VI.  SPECIFIC INSTANCES OF IMPORTATION AND SALE

97.  Respondents admit that certain of Google's audio players and controllers, components thereof, and/or products containing same are imported, sold for importation, and/or sold within the United States by or on behalf of Google.  To the extent Paragraph 97 of the Complaint contains conclusions of law, no response is necessary.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 97 of the Complaint.

98.  Respondents admit that certain of Google's audio players and controllers, components thereof, and/or products containing same are imported by or on behalf of Google. To the extent Paragraph 98 of the Complaint contains conclusions of law, no response is necessary.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 98 of the Complaint.

99.  Respondents admit that certain of Google's Home Max products have been imported, sold for importation, and/or sold after importation by Google.  Respondents admit that Exhibit 54 of the Complaint purports to be a copy of an email reflecting the shipment of a Google Home Max.  To the extent Paragraph 99 of the Complaint contains conclusions of law, no response is necessary.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 99 of the Complaint.

100.  Respondents admit that certain of Google's Pixel 3 XL products have been imported, sold for importation, and/or sold after importation by Google.  Respondents admit that Exhibit 55 of the Complaint purports to be a copy of an email reflecting the shipment of a Google Pixel 3 XL.  To the extent Paragraph 100 of the Complaint contains conclusions of law,

no response is necessary.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 100 of the Complaint.

## VII.  UNLAWFUL AND UNFAIR ACTS

101.    Respondents admit that certain of Google's audio players and controllers, components thereof, and/or products containing same are imported, sold for importation, and/or sold within the United States by or on behalf of Google.  Respondents admit that the Complaint purports to accuse certain of these products of infringing the asserted patents.  Respondents deny that they infringe any of the asserted patents.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 101 of the Complaint.

102.    Respondents admit that the chart contained in Paragraph 102 of the Complaint purports to list the asserted claims of the asserted patents.  Respondents deny the remaining allegations and characterizations contained in Paragraph 102 of the Complaint.  To the extent Paragraph 102 of the Complaint contains conclusions of law, no response is necessary.

103.    Respondents admit that Exhibits 16-20 to the Complaint purport to contain claim charts and that the Complaint purports to assert the independent and dependent claims asserted therein, but denies the remaining allegations and characterizations contained in Paragraph 103 of the Complaint.  To the extent Paragraph 103 of the Complaint contains conclusions of law, no response is necessary.

104.    Respondents deny the allegations and characterizations contained in Paragraph 104 of the Complaint.  To the extent Paragraph 104 of the Complaint contains conclusions of law, no response is necessary.

105.     Respondents deny the allegations and characterizations contained in Paragraph 105 of the Complaint.  To the extent Paragraph 105 of the Complaint contains conclusions of law, no response is necessary.

106.     Respondents admit that they have had notice of the asserted patents and Sonos's claims of infringement of each since no later than the service of the Complaint.  Respondents deny the remaining allegations and characterizations contained in Paragraph 106 of the Complaint.

107.     Respondents acknowledge that Exhibits 50 and 86 of the Complaint appear to be printouts of webpages discussing Google products.  Respondents deny the remaining allegations and characterizations contained in Paragraph 107 of the Complaint.  To the extent Paragraph 107 of the Complaint contains conclusions of law, no response is necessary.

108.     Respondents acknowledge that Exhibit 49 of the Complaint appears to be a printout of a webpage discussing a Google product.  Respondents deny the remaining allegations and characterizations contained in Paragraph 108 of the Complaint.  To the extent Paragraph 108 of the Complaint contains conclusions of law, no response is necessary.

109.     Respondents acknowledge that Exhibits 51 and 52 of the Complaint appear to be printouts of webpages discussing Google products.  Respondents deny the remaining allegations and characterizations contained in Paragraph 109 of the Complaint.  To the extent Paragraph 109 of the Complaint contains conclusions of law, no response is necessary.

110.     Respondents acknowledge that Exhibit 53 of the Complaint appears to be a printout of a webpage discussing a Google product.  Respondents deny the remaining allegations and characterizations contained in Paragraph 110 of the Complaint.  To the extent Paragraph 110 of the Complaint contains conclusions of law, no response is necessary.

111.    Respondents deny the allegations and characterizations contained in Paragraph 111 of the Complaint.

112.    Respondents deny the allegations and characterizations contained in Paragraph 112 of the Complaint.

## VIII.  HARMONIZED TARIFF SCHEDULE

113.    Respondents admit that certain of Google's products have been imported into the United States under Harmonized Tariff Schedule numbers 8471300100, 8517120050, and 8517620090.  Except as specifically admitted, Respondents deny the allegations and characterizations contained in Paragraph 113 of the Complaint.

## IX.    LICENSES

114.    Respondents admit that Exhibit 26 of the Complaint purports to contain licenses relating to the asserted patents.  To the extent Paragraph 114 of the Complaint contains conclusions of law, no response is necessary.  Respondents deny the remaining allegations and characterizations contained in Paragraph 114 of the Complaint.

## X.     THE DOMESTIC INDUSTRY

115.    To the extent Paragraph 115 of the Complaint contains conclusions of law, no response is necessary.  To the extent this Paragraph of the Complaint contains allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

### A.     Technical Prong of the Domestic Industry Requirement

116.    To the extent Paragraph 116 of the Complaint contains conclusions of law, no response is necessary.  Respondents admit that Exhibits 21-25 and 64-75 purport to reflect claim charts and additional information about Sonos's products.  To the extent this Paragraph of the

Complaint contains additional allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

**B.      Economic Prong of the Domestic Industry Requirement**

117.     To the extent Paragraph 117 of the Complaint contains conclusions of law, no response is necessary.  To the extent this Paragraph of the Complaint contains allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

118.     To the extent Paragraph 118 of the Complaint contains conclusions of law, no response is necessary. To the extent this Paragraph of the Complaint contains allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

119.     To the extent Paragraph 119 of the Complaint contains conclusions of law, no response is necessary. To the extent this Paragraph of the Complaint contains allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

120.     To the extent Paragraph 120 of the Complaint contains conclusions of law, no response is necessary. To the extent this Paragraph of the Complaint contains allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

121.     To the extent Paragraph 121 of the Complaint contains conclusions of law, no response is necessary. To the extent this Paragraph of the Complaint contains allegations of fact,

Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

122. To the extent Paragraph 122 of the Complaint contains conclusions of law, no response is necessary. To the extent this Paragraph of the Complaint contains allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

123. To the extent Paragraph 123 of the Complaint contains conclusions of law, no response is necessary. Respondents admit that Exhibit 27 of the Complaint purports to reflect the Declaration of Christine Squarey. Respondents deny the allegations in Paragraph 123 of the Complaint insofar as they purport to attribute additional investments to Sonos not stated in the Complaint. To the extent this Paragraph of the Complaint contains additional allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

### 1. Investments in Plant and Equipment

124. To the extent Paragraph 124 of the Complaint contains conclusions of law, no response is necessary. Respondents admit that Exhibit 27 of the Complaint purports to reflect the Declaration of Christine Squarey. To the extent this Paragraph of the Complaint contains additional allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

### 2. Investments in Plant and Equipment

125. To the extent Paragraph 125 of the Complaint contains conclusions of law, no response is necessary. Respondents admit that Exhibit 27 of the Complaint purports to reflect the Declaration of Christine Squarey. To the extent this Paragraph of the Complaint contains

additional allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

### 3. Exploitation of the Asserted Patents Through Engineering and Research and Development

126. To the extent Paragraph 126 of the Complaint contains conclusions of law, no response is necessary. To the extent this Paragraph of the Complaint contains allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

127. To the extent Paragraph 127 of the Complaint contains conclusions of law, no response is necessary. Respondents admit that Exhibit 27 of the Complaint purports to reflect the Declaration of Christine Squarey. To the extent this Paragraph of the Complaint contains additional allegations of fact, Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

## XI. RELATED LITIGATION

128. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 128 of the Complaint, and therefore deny them.

129. Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations contained in Paragraph 129 of the Complaint, and therefore deny them.

130. Respondents admit that Exhibit 7 of the Complaint purports to be a copy of an Ex Parte Reexamination Certificate. Respondents deny that the Ex Parte Reexamination Certificate indicates that any of the original claims were determined to be patentable in their entirety and without modification. Respondents are currently without knowledge or information sufficient to

form a belief as to the truth of the remaining allegations and characterizations contained in Paragraph 130 of the Complaint, and therefore deny them.

131.    Respondents admit that Exhibit 5 of the Complaint purports to be a copy of an Ex Parte Reexamination Certificate.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in Paragraph 131 of the Complaint, and therefore deny them.

132.    Respondents admit that Exhibit 2 of the Complaint purports to be a copy of a Certificate of Correction.  Respondents are currently without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and characterizations contained in Paragraph 132 of the Complaint, and therefore deny them.

## XII.    RELIEF REQUESTED

133.    To the extent a response is necessary, Respondents deny that Complainant is entitled to any relief whatsoever, including without limitation the relief requested in Paragraph 133 of the Complaint, including subparagraphs (a) through (f) of the section entitled "Relief Requested," *i.e.*, Paragraph 133.

Appx2537

## RESPONDENTS' ADDITIONAL AFFIRMATIVE DEFENSES[3]

1.      Respondents assert the following additional affirmative defenses.  Respondents' inclusion of these affirmative defenses in this Response is not a concession that Respondents bear the burden of proof with respect to any of them.  Discovery is ongoing as of the time of this Response and thus Respondents have not fully collected and reviewed all of the information that may be relevant to the matters and issues raised herein.  Accordingly, pursuant to 19 C.F.R. §§ 210.14(b) and 210.14(c), Respondents reserve the right to seek amendment of, modify, and/or expand these defenses, and to take further positions as discovery proceeds in this investigation.

## FIRST AFFIRMATIVE DEFENSE
### (Invalidity)

2.      The asserted claims of the Asserted Patents are each invalid for failure to meet the requirements set forth in 35 U.S.C. §§ 101, 102, 103, 112, 116, and/or 256.

3.      All asserted claims of the Asserted Patents are invalid under 35 U.S.C. § 102 and/or § 103 in view of at least the prior art identified in **Appendix B**, either alone or in combination.  As discovery is ongoing, Respondents reserve the right to rely on additional prior art.

## SECOND AFFIRMATIVE DEFENSE
### (Non-Infringement)

4.      Respondents do not directly infringe, indirectly infringe, contribute to infringement, or induce infringement of any valid or enforceable claim of the Asserted Patents, either literally or under the doctrine of equivalents, and have not otherwise committed any acts in violation of 35 U.S.C. § 271 or 19 U.S.C. § 1337.

---

[3]  The following headings and numbered paragraphs do not correspond to the headings and numbered paragraphs in the Complaint.

## THIRD AFFIRMATIVE DEFENSE
### (Lack of Domestic Industry)

5.     To the extent that Respondents determine through discovery and investigation that no protectable industry exists or is being established in the United States as defined under Section 337 with respect to any of the claims of the patents asserted against Respondents, Respondents reserve the right to assert the lack of domestic industry as a defense.

## FOURTH AFFIRMATIVE DEFENSE
### (Relief Not in the Public Interest)

6.     The exclusion order and other relief requested by Complainant are not in the public interest as they would adversely affect the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers.

## FIFTH AFFIRMATIVE DEFENSE
### (Lack of Unfair Act)

7.     Respondents have committed no unfair act.

## SIXTH AFFIRMATIVE DEFENSE
### (Unenforceability)

8.     On information and belief, Complainant is not entitled to any relief against Respondents in this investigation because the Asserted Patents are unenforceable.

## SEVENTH AFFIRMATIVE DEFENSE
### (Patent Exhaustion and/or License)

9.     On information and belief, Complainant's claims against Respondents are barred as a result of patent exhaustion and/or a license to the Asserted Patents.

## EIGHTH AFFIRMATIVE DEFENSE
### (Implied License)

10.     On information and belief, Complainant's claims against Respondents are barred by the doctrine of implied license.

## NINTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

11. On information and belief, Complainant's claims against Respondents are barred because Complainant lacks standing to assert the Asserted Patents.

## TENTH AFFIRMATIVE DEFENSE
### (Equitable Estoppel)

12. On information and belief, Complainant's claims against Respondents are barred by the doctrine of equitable estoppel.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Waiver)

13. On information and belief, Complainant's claims against Respondents are barred by the doctrine of waiver.

## TWELFTH AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel)

14. On information and belief, due to admissions and statements made to the United States Patent and Trademark Office during the prosecution of the applications that resulted in the Asserted Patents or related patent applications, Complainant is estopped from construing a valid and enforceable claim, if any, of the Asserted Patents as infringed literally or under the doctrine of equivalents by the Accused Products.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Other Defenses)

15. Respondents reserve the right to amend their Response to include other additional defenses that Respondents may learn of during the course of this investigation.

## RESPONDENTS' PRAYER FOR RELIEF

16. WHEREFORE, Respondents request that the Commission issue an order:

17. Denying all relief against Respondents requested in the Complaint;

**Appx2540**

18. Finding that Respondents have not violated Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337;

19. Finding that Respondents have not directly infringed, contributorily infringed, and/or induced infringement of any of the asserted claims of the Asserted Patents;

20. Finding that the asserted claims of the Asserted Patents are invalid and/or unenforceable;

21. Finding that there is no domestic industry for any of the Asserted Patents;

22. Awarding Respondents their attorneys' fees and costs incurred in responding to the Complaint and defending themselves in this investigation;

23. Finding that it is not in the public interest to grant any relief to Complainant;

24. Dismissing the present Complaint and terminating the present investigation; and

25. Awarding such other and further relief as the Commission deems just and proper.

## RESPONSE TO THE NOTICE OF INVESTIGATION

26. Respondents acknowledge that the Commission has instituted an investigation as set forth in the Commission's Notice of Investigation, dated February 6, 2020, and published in the Federal Register on February 11, 2020. Respondents deny that they are in violation of 19 U.S.C. § 1337 and that they have engaged in the unlawful importation into the United States, the sale for importation, or the sale within the United States after importation of certain audio players and controllers, components thereof, and products containing same, that infringe the asserted claims of the Asserted Patents.

27. Respondents admit that, as set forth in the Summary in the Commission's Notice of Investigation, the Complaint alleges that an industry in the United States exists, but Respondents lack sufficient information and knowledge to form a belief as to the truth of

Complainant's allegation that it meets the domestic industry requirement, and Respondents deny such allegation on that basis.

28.     Respondents deny that Complainant is entitled to, or that the Commission should issue, any kind of exclusion order, cease and desist order, or any other form of relief based on the allegations set forth in the Complaint.

## STATEMENT PURSUANT TO COMMISSION RULE 210.13(b)

29.     Pursuant to Commission Rule 210.13(b), Respondents provide the following information with the sole intention of supplying statistical and other data required by the rule. Respondents specifically deny that any of the supplied data refers or relates to any unlawful act under Section 337 or otherwise.  Respondents also deny that Alphabet was or is involved in importing any of the accused Google products.

30.     The approximate statistical data related to quantity and value of imports of the accused Google products is set forth in **Confidential Appendix A** hereto.

31.     Google's accused products have been imported under item numbers 8471300100, 8517120050, and 8517620090 of the Harmonized Tariff Schedule of the United States.

32.     **Confidential Appendix A** also sets forth Google's statement on manufacturing capacity.

33.     The United States market is significant to Google's operations.

Dated:  February 27, 2020

Respectfully submitted,

*/s/ S. Alex Lasher*

S. Alex Lasher
Marissa R. Ducca
Jared W. Newton
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000

Charles K. Verhoeven
Sean S. Pak
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel.: (415) 875-6600

Justin Griffin
Lance Yang
Quinn Emanuel Urquhart & Sullivan, LLP
865 S Figueroa St, 10th Floor
Los Angeles, CA 90017
Tel.: (213) 443-3000

Patrick D. Curran
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel.: (617) 712-7100

*Counsel for Respondents Google LLC and Alphabet Inc.*

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Charles E. Bullock
Chief Administrative Law Judge

In the Matter of

CERTAIN AUDIO PLAYERS AND
CONTROLLERS, COMPONENTS
THEREOF, AND PRODUCTS
CONTAINING THE SAME

Inv. No. 337-TA-1191

**VERIFICATION**

I, _Kathryn Hall_ , am authorized to make this verification on behalf of

Respondents Google LLC ("Google") and Alphabet Inc. ("Alphabet") (collectively,

"Respondents"). I have read **RESPONDENTS' RESPONSE TO THE COMPLAINT AND**

**NOTICE OF INVESTIGATION**, and am familiar with its contents.

I am informed and believe that the matters stated herein are true, and on that ground only,

and not based upon personal knowledge of the matters stated herein, I declare under penalty of

perjury that the same are true and correct.

Dated: February 27, 2020

Signature: _____

Name: _Kathryn Hall_____

Title: _Assistant Secretary_   _Assistant Secretary_

Company: _Google LLC_ .  _Alphabet, Inc._

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

In the Matter of

**CERTAIN AUDIO PLAYERS AND
CONTROLLERS, COMPONENTS
THEREOF, AND PRODUCTS
CONTAINING THE SAME**

**Inv. No. 337-TA-1191**

## RESPONDENTS' INITIAL MARKMAN BRIEF

*capabilities*."); *see also Imperium (IP) Holdings, Inc. v. Apple, Inc.*, No. 4:11-cv-163, 2013 WL 322053, at *1 (E.D. Tex. Jan. 28, 2013) (adopting report and recommendation in relevant part).[9] The "while operating on a secure wireless local area network (WLAN)" limitation describes the state of the "computing device" during actual use, and not just its capabilities. For example, the "computing device" is not "operating" on the secure WLAN when first created. *See* Ex. 5 ('896 patent) at 14:1-14 (discussing scenarios where the computing device is "not configured" and joins a prior network or creates a new network). Accordingly, it is not enough to show the "computing device" *is capable of* "operating on a secure wireless local area network (WLAN)" (a system limitation), and limitation 1[f] instead requires showing that the "computing device" *is* "operating on a secure wireless local area network (WLAN)" (a method limitation). Thus, "it is unclear whether infringement . . . occurs when one creates a system . . . or whether infringement occurs when the user actually uses the [system]," rendering claim 1 of the '896 patent and its dependent claims indefinite and invalid. *See IPXL*, 430 F.3d at 1384 (Fed. Cir. 2005).

### C. "second message containing . . . an identifier . . . and a security key"

| Term | Respondents | Sonos | Staff |
|---|---|---|---|
| "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" | "at least one second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" | "one or more additional messages that collectively contain an identifier of the secure WLAN and a security key for the secure WLAN" | plain and ordinary meaning; no construction necessary |

[9] Indefiniteness was not considered by the Court in the *Imperium* in connection with the "configuration state" terms

The parties' dispute comes down to one issue: does the limitation "at least *a second message containing* . . . an identifier of the secure WLAN *and* a security key for the secure WLAN" require at least *one message containing both the "identifier" and the "security key"*? According to the plain meaning of claims, the specification, and the canons of claim construction, the answer is "yes." While claim 1 allows for the computing device to transmit multiple "messages" containing network configuration parameters, at least one of those messages must contain "network configuration parameters" comprising both the "identifier" and "security key." Respondents' construction reflects the plain meaning of the limitation and focuses the parties' dispute.

Sonos' proposed construction incorrectly broadens the limitation to eliminate the requirement that there must be at least one "second message containing" these two pieces of information. According to Sonos, any number of messages may "*collectively contain*" the "identifier" and "security key." Sonos' construction would impermissibly delete the phrase "at least a second message containing" and replace it with "one or more additional messages that collectively contain." There is no support for rewriting claim 1 as Sonos' proposes.

First, claim 1 explicitly requires transmitting (from the claimed "computing device" to the "playback device") a message that contains both the "identifier of the secure WLAN" and the "security key for the secure WLAN." Claim 1 requires "at least *a second message containing network configuration parameters*," where "*the* network configuration parameters *comprise* an identifier of the secure WLAN *and* a security key for the secure WLAN." Ex. 5 ('896 patent) at 18:19-24. Thus, claim 1 requires at least *one* second message that contains "network configuration parameters" (plural) that comprise both "an identifier" and "a security key."

The Federal Circuit, addressing similar claim limitations, has sided with Respondents' approach to claim construction. In *TiVo, Inc. v. EchoStar Commc'ns Corp.*, the Federal Circuit

addressed the limitation "assembles said video **and** audio components into **an** MPEG stream." 516 F.3d 1290, 1303 (Fed. Cir. 2008) (emphasis added). Similar to Respondents' position, "EchoStar argue[d] that the 'assembles' limitation covers only the assembly of audio and video components into a single, interleaved MPEG stream." *Id.* Like Sonos, "TiVo argue[d] that the 'assembles' limitation also covers the assembly of each component, audio and video, into its own separate stream." *Id.* While the Federal Circuit acknowledged that generally "the words 'a' or 'an' in a patent claim carry the meaning of 'one or more,'" the Federal Circuit nonetheless sided with Echostar. The Federal Circuit found that the "context clearly indicates that **two separate components are assembled into a single stream**, not that the video components are assembled into one stream and the audio components into a second stream." *Id.* (emphasis added). Here, claim 1 similarly makes clear that two pieces of information (the "identifier" and the "security key") are transmitted in "a second message."

Similarly, in *CoStar Realty Info., Inc. v. CIVIX-DDI, LLC*, the claim required "a request from one of a plurality of ports remotely located from the database, the request containing (a) at least one user-selected category and (b) a user-selected geographic vicinity." No. 12 C 4968, 12 C 7091 & 12 C 8632, 2013 WL 5346440, at *5 (N.D. Ill. Sept. 23, 2013). There, the district court held:

> Even assuming that "a" means "one or more" in this case, so that there can be more than one request in an infringing method, CIVIX's argument fails because the claim language unequivocally specifies what each request must contain, regardless of whether there is one or more of them. Thus, the claim language provides for "the request *containing*" both the category and geographic vicinity. ***There could be multiple requests in an infringing method, but each request must contain both the category and the geographic vicinity.***

*Id.* at *6 (emphasis added). The structure of the claim language in *CoStar* is virtually identical to the disputed limitation of claim 1 of the '896 patent, just replace "request" with "second message" and the "user-selected category" and "user-selected geographic vicinity" with an "identifier" and

a "security key," respectively. As the district court did in *CoStar*, the CALJ should find that claim 1 of the '896 patent requires "at least *one* second message containing" both the claimed "identifier" and "security key," as reflected in Respondents' proposed construction.

Second, the specification confirms that claim 1 requires at least one message that transmits network configuration parameters comprising both the "identifier" and the "security key." The *only* message disclosed by the specification that transmits network configuration parameters from the claimed "computing device" to the "playback device" is a single message that includes both the "identifier" and "security key"—*i.e.*, the "SetNetParams" message. Specifically, "SetNetParams" is "*a command message*" that "includes *at least* . . . netConfig, where "netConfig includes *the new configuration parameters*," such as the claimed "identifier" and "security key." Ex. 5 ('896 patent) at 13:29-37 (emphasis added); *see also* Fig. 3B. The SetNetParams message contains both the "identifier" and "security key" such that when the "playback device" "receives *a* SetNetParams message, it reconfigures its own HHID [the "identifier"] and WEP key [the "security key"] to match those contained in *the network packet*." *Id.* at 14:15-17 (emphasis added). Tellingly, the specification lacks any embodiments where the "identifier" and the "security key" are split up into separate messages to be transmitted from the "computing device" to the "playback device."

Accordingly, the plain language of claim 1, the specification, and case law all counsel in favor of adopting Respondents' proposed construction.

### D. "security key"

| Term | Respondents | Sonos | Staff |
|---|---|---|---|
| "a security key" | "a string of bits used in encryption to make data unreadable, or in decryption to render encrypted data readable" | Plain and ordinary meaning; no construction necessary | Plain and ordinary meaning; no construction necessary |



US 20050100174A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2005/0100174 A1**

Howard et al. (43) **Pub. Date:** **May 12, 2005**

(54) **AUTOMOBILE AUDIO SYSTEM**

(76) Inventors: **Damian Howard**, South Boston, MA (US); **Guy A. Torio**, Ashland, MA (US); **Douglas J. Holmi**, Marlborough, MA (US); **Michael W. Stark**, Acton, MA (US); **Hiroshi Miyazaki**, Framingham, MA (US); **Christopher Ludwig**, White Lake, MI (US)

Correspondence Address:
**FISH & RICHARDSON PC**
**225 FRANKLIN ST**
**BOSTON, MA 02110 (US)**

(21) Appl. No.: **10/956,831**

(22) Filed: **Oct. 1, 2004**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/290,989, filed on Nov. 8, 2002.

**Publication Classification**

(51) Int. Cl.$^7$ ............................... **H04B 1/00**; H04R 3/00
(52) U.S. Cl. ............................................. **381/86**; 381/302

(57) **ABSTRACT**

The invention features an audio system for a vehicle that includes an audio source. A controller modifies an audio signal from the audio source with one of a first and a second signal processing operation in response to a user input. The first signal processing operation configures the audio signal for listening inside the vehicle and the second signal processing operation configures the audio signal for listening outside the vehicle. A first plurality of transducers is driven by the audio signal that is configured for listening inside the vehicle by the first signal processing operation. A second plurality of transducers is driven by the audio signal that is configured for listening outside the vehicle by the second signal processing operation.

100



SYSTEM
TURNED
ON
102

PLACE SYSTEM IN
CONVENTION MODE
104

FIRST SYSTEM
CONFIGURATION
106

SWITCHING
EVENT?
108

NO

YES

PLACE SYSTEM IN
OPEN MODE
110

SECOND SYSTEM
CONFIGURATION
112

SWITCHING
EVENT?
114

NO

YES



FIG. 1A



FIG. 1B



100

SYSTEM
TURNED
ON
102

PLACE SYSTEM IN
CONVENTION MODE
104

FIRST SYSTEM
CONFIGURATION
106

NO    SWITCHING
EVENT?
108

YES

PLACE SYSTEM IN
OPEN MODE
110

SECOND SYSTEM
CONFIGURATION
112

NO    SWITCHING
EVENT?
114

YES

FIG. 2A



FIG. 2B



FIG. 3



FIG. 4



**FIG. 5A**



**FIG. 5B**



FIG. 5C



FIG. 5D



FIG. 6



FIG. 7



FIG. 8



FIG. 9

# AUTOMOBILE AUDIO SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001] This patent application is a continuation-in-part (CIP) of U.S patent application Ser. No. 10/290,989, filed on Nov. 8, 2002, entitled Automobile Audio System, the entire disclosure of which is incorporated herein by reference.

## BACKGROUND

[0002] Audio systems are included in virtually every automobile manufactured today. These audio systems are typically designed for use while the doors, tailgates, and other openings to the passenger compartment are closed. However, people often choose to listen to their automobile audio system while they are outside of their vehicle, such as while they are camping or "tailgating" at a sporting event. Because traditional automobile audio systems are not designed for this type of use, listeners may not enjoy as high a quality sound presentation as they could if the system were designed for outdoor use.

[0003] The acoustic characteristics of a typical vehicle with all of its doors closed will generally be significantly different than the acoustic characteristics of the same vehicle with its tailgate (or one of its doors) open. For example, the linear transfer function from each transducer element to various listening locations will be markedly different in each circumstance. Furthermore, opening or closing of the tailgate significantly alters the acoustic characteristics of the cabin space.

## SUMMARY

[0004] In one aspect, the invention is embodied in an audio system for a vehicle. The audio system includes an audio source that generates an audio signal. A controller is coupled to the audio source and modifies the audio signal with one of a first and a second signal processing operation in response to a user input. The first signal processing operation configures the audio signal for listening inside the vehicle and the second signal processing operation configures the audio signal for listening outside the vehicle. A first plurality of transducers is coupled to the controller. The first plurality of transducers is driven by the audio signal that is configured for listening inside the vehicle by the first signal processing operation. A second plurality of transducers is coupled to the controller. The second plurality of transducers is driven by the audio signal that is configured for listening outside the vehicle by the second signal processing operation.

[0005] In one embodiment, at least one of the transducers in the second plurality of transducers is positioned in a location that is external to a passenger compartment of the vehicle. For example, the transducer can be mounted to a body panel or mounted to a storage bin that is mechanically coupled to the vehicle.

[0006] The first and the second plurality of transducers can include at least one common transducer or different transducers. The first and the second plurality of transducers can also include different sets of transducers. The audio system can also include a visual indicator that indicates that the audio signal is driving the second plurality of transducers. The visual indicator can include a brake light, a lamp, a light emitting diode (LED), a strobe, a parking light, a directional light, and a reverse light.

[0007] In one embodiment, the first signal processing operation includes a different equalization parameter than the second signal processing operation. The first and/or the second signal processing operations can substantially attenuate the audio signal before it is coupled to one or more of the transducers in the first and the second plurality of transducers.

[0008] In one embodiment, the controller includes an amplifier. The amplifier can control at least one of a gain and an equalization of the audio signal. The controller can also be integrated with the audio source. The controller can be coupled to the audio source through a GPIO bus, a RS232 bus, a SCSI bus, a serial bus, a parallel bus, a fibre channel bus, an optical bus, a CAN bus, or a MOST bus.

[0009] The audio source can include an auxiliary input terminal for coupling an auxiliary device to the audio source. The auxiliary device can include a radio, a television, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a MD player, a hard drive, a PDA, a video player, a portable audio player, a microphone, and a musical instrument. A visual indicator can indicate that the auxiliary device is coupled to the audio source.

[0010] In one embodiment, the user input includes operating a switch. The switch can be a manual switch, an automatic switch, a sensor, a remote control switch, a switch that is integrated with the audio source, and a switch that is integrated with the controller. The user input could also include opening at least one of a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle.

[0011] The audio source can include an AM tuner, an FM tuner, a TV tuner, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a MD player, a video player, and/or a hard drive. In one embodiment, a video display is coupled to the audio source. The video display can be configured to direct a video image outside the vehicle. The video display can include a liquid crystal display (LCD), a light emitting diode (LED) display, a plasma display, a projection display, and a cathode ray tube (CRT) display.

[0012] The audio signal can include a stereo audio signal, a matrix surround sound audio signal, a 5.1 surround sound audio signal, a 6.1 surround sound audio signal, a 7.1 surround sound audio signal, and/or a two-channel downmixed audio signal. One of the first and the second plurality of transducers can include a pair of transducers and the audio source can provide complete surround information to the pair of transducers. The surround information is mixed prior to being provided to the pair of transducers.

[0013] The audio system also includes a remote control receiver. The remote control receiver is coupled to a remote control sensor that is located in a tail light assembly on the vehicle. The remote control receiver can be an infrared (IR) receiver or a radio-frequency (RF) receiver. The remote control receiver can be disabled when the vehicle is in motion. To determine the status of the vehicle, a sensor can be coupled to a tachometer in the vehicle. The sensor can detect a state of the engine in the vehicle. Another sensor can be coupled to a parking brake in the vehicle. That sensor can detect a state of the parking brake in the vehicle. In one embodiment, audio source determines a status of the vehicle from a vehicle communication bus. The system can also include a battery monitor that monitors a state of a battery in the vehicle.

[0014] A remote control transmitter can communicate with the remote control receiver. The remote control transmitter can have a unique transmitter signal. The remote control transmitter can control a door lock, a vehicle ignition, a window, a power door, a power seat, a power moon roof, a trunk lid, a communication system, a courtesy light, and/or a vehicle alarm in the vehicle. Additionally, the remote control transmitter can control a system configuration, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and/or a balance function of the audio source. The remote control transmitter can also control a garage door opener, an electric gate, a light, an appliance, and/or a home security system.

[0015] In another aspect, the invention is embodied in a method for operating an audio system in a vehicle. The method includes generating an audio signal. The method also includes modifying the audio signal with one of a first and a second signal processing operation in response to a user input. The first signal processing operation configures the audio signal for listening inside the vehicle and the second signal processing operation configures the audio signal for listening outside the vehicle. The method includes transducing the audio signal that is configured for listening inside the vehicle with a first plurality of transducers. The method further includes transducing the audio signal that is configured for listening outside the vehicle with a second plurality of transducers.

[0016] The first and the second plurality of transducers can include at least one common transducer. The method can include visually indicating when the audio signal is transmitted to the second plurality of transducers. The method can also include changing an equalization parameter in the audio signal in response to at least one of the first and the second signal processing operations. The method can also include remotely controlling the audio system. In one embodiment, the method includes coupling an auxiliary device to the audio system and visually indicating when the auxiliary device is coupled to the audio source.

[0017] The method can also include providing complete surround information to a pair of transducers in either the first or the second plurality of transducers. The surround information can be mixed prior to providing the surround information to the pair of transducers.

[0018] The user input can include opening at least one of a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle. The user input can include operating a switch. The method can also include remotely controlling a door lock, a vehicle ignition, an air conditioner, a heater, a defroster, trunk lid, a communication system, a window, a power door, a power seat, a power moon roof, a courtesy light, and/or a vehicle alarm in the vehicle. The method can also include remotely controlling a system configuration, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and/or a balance function of the audio system.

[0019] In one aspect, the invention is embodied in an audio system for a vehicle. The audio system includes an audio source that generates an audio signal. The audio source is integrated with the vehicle. The audio system also includes a remote control receiver that controls a function of the audio source. Also includes is a remote control sensor that receives a signal from a remote control transmitter to direct the remote control receiver to control the function of the audio source. The remote control sensor is positioned in a location that is external to the passenger compartment of the vehicle.

[0020] The remote control sensor can be mounted in an exterior light assembly of the vehicle. The exterior light assembly can be a left tail light assembly, a right tail light assembly, a left directional light assembly, a right directional light assembly, a parking light assembly, a reverse light assembly, a license plate illuminator assembly, a high-level brake light assembly, a courtesy light assembly, a running light assembly, a head light assembly, and/or a fog light assembly. The exterior light assembly can include a curved reflector that focuses the signal from the remote control transmitter. The remote control sensor can be an infrared (IR) sensor or a radio-frequency (RF) sensor. The remote control sensor can be mounted to a body panel of the vehicle.

[0021] The function can include a system configuration selection, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio source. The remote control transmitter can control a door lock, a vehicle ignition, a heater, an air conditioner, a defroster, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system, and/or a vehicle alarm in the vehicle. The remote control receiver can be disabled when the vehicle is in motion.

[0022] In another aspect, the invention is embodied in an apparatus for controlling an electrical component in a vehicle. The apparatus includes a remote control receiver that is coupled to the electrical component in the vehicle and a remote control sensor that is coupled to the remote control receiver. The remote control sensor is mounted in a light assembly and at least a portion of the light assembly is positioned on the exterior of the vehicle. A remote control transmitter communicates a control signal to the remote control sensor. The remote control receiver controls the electrical component in response to receiving the control signal from the remote control sensor.

[0023] The remote control sensor can be an infrared (IR) sensor or a radio-frequency (RF) sensor. The light assembly can include a left tail light assembly, a right tail light assembly, a left directional light assembly, a right directional light assembly, a parking light assembly, a reverse light assembly, a license plate illuminator assembly, a high-level brake light assembly, a courtesy light assembly, a running light assembly, a head light assembly, and/or a fog light assembly.

[0024] The electrical component can include an audio system, a door lock, a vehicle ignition, a heater, an air conditioner, a defroster, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system and/or a vehicle alarm.

[0025] The remote control transmitter can control a function of an audio system in the vehicle. The function can include a system configuration selection, a source selection,

a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and/or a balance function of the audio system.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0026] The above and further advantages of this invention may be better understood by referring to the following description in conjunction with the accompanying drawings, in which like numerals indicate like structural elements and features in various figures. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention.

[0027] FIG. 1A is a top view of an automobile having a dual-mode audio system.

[0028] FIG. 1B is a top view of an automobile having another dual mode audio system.

[0029] FIG. 2A is a flow-chart illustrating the operation of a mode detection process in a dual-mode audio system.

[0030] FIG. 2B is a flow-chart illustrating the operation of a mode detection process in a tri-mode audio system.

[0031] FIG. 3 is a flow-chart illustrating the operation of a battery monitoring process in a dual-mode audio system.

[0032] FIG. 4 is a diagram of a sport utility vehicle having a rear set of controls and rear transducers mounted on its tailgate.

[0033] FIG. 5A-D are side views of an automobile having rear transducers mounted in four different locations.

[0034] FIG. 6 illustrates a block diagram of an audio system according to the invention.

[0035] FIG. 7 illustrates a perspective view of a vehicle including an embodiment of the audio system of FIG. 6.

[0036] FIG. 8 illustrates a side view of a vehicle including an embodiment of the audio system of FIG. 6.

## DETAILED DESCRIPTION

[0037] A vehicle audio system, according to one aspect of the invention, is able to operate in two modes: one mode where one or more parameters of the audio system are configured to better optimize sound quality while the doors (e.g., including tailgates in sport utility vehicles, vans and pick-up trucks and hatches in hatch-backed vehicles) are closed and a second mode where one or more parameters of the audio system are configured to better optimize sound quality while one or more of the doors, such as a tailgate, are open.

[0038] Additionally, users can operate the automobile audio system while the engine is not running and thus, drain power from the vehicle's battery. It is therefore desirable for a vehicle audio system to monitor one or more operating conditions of the battery and adjust system performance in order to extend the maximum period of time the audio system can operate from battery power. It is also desirable to monitor one or more operating conditions of the battery to ensure operation of the audio system does not result in a condition where sufficient battery charge (to allow the vehicle to be restarted) is no longer available.

[0039] It should be noted that the terms automobile and vehicle are used synonymously in this description and refer

to any self-propelled passenger vehicle used for land transport, including cars, trucks, pick-up trucks, sport utility vehicles, and the like. Additionally, the term tailgate refers to a hinged door of a vehicle which provides access to a rear opening of the vehicle or provides access to a cargo area. A tailgate may be hingedly connected to the top, bottom, or side of the frame of the vehicle.

[0040] As shown in FIG. 1A, a vehicle (e.g., an SUV) 10 includes an audio system 20 that is configured to operate in two modes: a conventional mode and an open mode.

[0041] The audio system includes a first system configuration and a second system configuration. The first system configuration corresponds to the conventional mode. The conventional mode is a mode of operation in which audio system 20 is configured for play when all of the doors of the vehicle are closed and the primary listening position of interest is the seating area within the passenger compartment. In this mode, sound is radiated within the passenger compartment as in a conventional automobile audio system. The conventional mode includes a first plurality of transducers that are positioned to radiate sound for listening inside the vehicle.

[0042] The second configuration corresponds to the open mode or the tailgate mode. The open mode is a mode of operation in which audio system 20 is configured for play when the tailgate 11 is open. In this mode, sound is radiated through the open tailgate and/or through the vehicle's body panels or other openings to the outside environment. In one embodiment, a second plurality of transducers is located in the rear portion of the vehicle, such as on the tailgate, hatch, or rear door. The second plurality of transducers can also be located in the bed or the liner of a pick-up truck, for example. The open mode includes the second plurality of transducers that are positioned to radiate sound for listening outside the vehicle. In one embodiment, the first and second plurality of transducers can include one or more common transducers.

[0043] The primary listening position of interest in the open mode is outside of the vehicle, typically in line with the open tailgate 11. In other embodiments, the open mode of operation can be configured for play when one or more doors (including a tailgate) are open. In some embodiments, the open mode of operation can be configured to operate when a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle are in an open position.

[0044] Because the acoustic characteristics of the vehicle are significantly different when all of the doors are closed versus when one or more doors are opened, and because the listening positions of primary concern are different in the different modes, the audio system 20 adjusts system configuration in order to better optimize performance in each mode. As will be explained in greater detail below, adjustment of system configuration may include altering the system topology for each mode of operation, as well as performing different signal processing operations such as equalization, signal mixing, amplification, dynamic range control, spatial enhancement processes and other signal processing techniques on the channels of audio data in each mode of operation. The system topology defines how different signals provided by an audio source are routed to the different transducers of the audio system.

[0045] Additionally, audio system 20 features a battery monitoring process which monitors one or more operating conditions of the automobile battery 30 and takes one or

more actions based on whether the system **20** is primarily running off of the battery and the state of one or more of the monitored operating conditions. As will be explained in greater detail below, the battery monitoring process takes various actions including triggering an alarm and altering the system configuration in order to conserve battery power.

[0046] Referring again to FIG. 1A, audio system **20** includes one or more audio sources (not shown) such as a stereo radio, CD player, DVD player, and/or an MP3 player, which may be mounted in or near a front control console **21**, a rear control console **22**, or at another location within the automobile **10**. The front and rear control consoles **21**, **22** each may contain a set of controls (e.g., volume, source selection, track selection, play, pause, etc.) for the audio sources included within the system **20**.

[0047] The audio system **20** also includes two pairs of front transducers **24a-24b**, **24c-24d**, a pair of side transducers **26a-26b**, a pair of rear transducers **28a-28b**, and a woofer **29**. For example, a first plurality of transducers corresponding to the first system configuration can include the two pairs of front transducers **24a-24b**, **24c-24d**, the pair of side transducers **26a-26b**, the pair of rear transducers **28a-28b**, and the woofer **29**. A second plurality of transducers corresponding to the second system configuration can include the pair of rear transducers **28a-28b**, and the woofer **29**. However, any combination of transducers can be included in the first and/or the second system configurations.

[0048] It should be noted that the arrangement of elements including the transducers, as well as the number of elements shown in FIG. 1A, were chosen to illustrate the novel features of the invention. It should be understood that the invention is not limited to use of the particular configuration of transducers and placements shown. For example, as shown in FIG. 1B, another dual-mode audio system **20'** can include the same transducers shown in FIG. 1A as well as a front center transducer **25'** located proximate to the front console **21** or in the dashboard of the vehicle **10'** and a rear center transducer **23'** located proximate to the rear of the vehicle **10'**. The audio systems **20**, **20'** of FIG. 1A and FIG. 1B can be configured as surround sound audio systems. The surround sound audio system can be a matrix surround sound system, a 5.1 surround sound system, a 6.1 surround sound system, a 7.1 surround sound system, and a two-channel down-mixed surround sound system.

[0049] FIG. 2A and FIG. 3 illustrate an operation of the audio system **20** shown in FIG. 1A.

[0050] As shown in FIG. 2A, the audio system **20** includes a mode detection process **100** which detects when the system **20** is activated **102** and when a switching event **108**, **114** occurs that switches the system **20** between the first system configuration and the second system configuration. A switching event **108**, **114** occurs when a user changes the state of a switch provided within the system **20**. One or more manual switches may be located on the front control panel **21** (shown in FIG. 1A), rear control panel **22**, on a remote control device, on a key fob, or in another location. Since it is possible that significant changes would be made in system operation when the mode is changed, having a manual switch keeps from dramatically changing system operation while passengers remain inside the vehicle.

[0051] In other embodiments, a switching event may occur automatically. For example, a switching event may occur automatically when the system detects that a tailgate or door is open and the vehicle engine is not running (which can be sensed by the state of the ignition interlock, the RPM of the engine, or some other means). It may also be desirable to sense if passengers remain in the vehicle cabin, which could be done using seat switches, ultrasonic motion detectors, or some other method. Thus, in other embodiments, the system may automatically switch modes from the conventional mode to the open mode when the tailgate or door is open, the engine is off, and no passengers are occupying the vehicle cabin.

[0052] Referring again to FIG. 2A, when the mode detection process **100** detects that the system **20** has been turned on **102**, the process **100** will place the system **20** in a conventional mode of operation **104**. By automatically reverting to a conventional mode when the system **20** is turned on, the system **20** avoids a situation where the driver gets into the vehicle and turns on the system after it had been switched to open mode. However, in other embodiments, a mode detection process in a dual-mode audio system could be configured to start up in different modes depending on how the system was turned on or the state of a switch. For example, if the system was turned on using controls mounted in the front of the vehicle, the system may assume that someone would be inside the vehicle and the system should start in conventional mode. If the system were turned on using controls that were easily accessible from outside the vehicle (such as controls located in rear console **22**, or controls located on a remote control), the system may be configured to start up in open mode.

[0053] When the system **20** is placed in the conventional mode of operation **104**, the system **20** is in a first system configuration **106** which, as will be explained in more detail below, has a first system topology and performs a first set of signal processing operations which are configured for play with the doors of the vehicle closed and the primary listening position is within the passenger's compartment. The system **20** remains in its first system configuration **106** until a switching event is detected **108**.

[0054] If a switching event is detected **108**, mode detection process **100** places the system in the open mode of operation **110** and the system **20** is changed over to a second system configuration **112** which has a second system topology and performs a second set of signal processing operations that is configured for play with the tailgate of the vehicle opened and the primarily listening position being outside of the vehicle. In one embodiment, the position is proximate to a rear opening of the vehicle. In another embodiment, the position is proximate to a side opening of the vehicle.

[0055] If another switching event **114** is detected, then the mode detection process **100** reverts the system **20** back to the conventional mode of operation **104** and the system is placed in the first system configuration **106**.

[0056] In each system configuration, **106**, **112**, the system **20** has a certain system topology which defines how different signals provided by an audio source are routed to the various transducers in the system. In the first system configuration **106**, the system topology is arranged in order to better optimize the system for play with the doors of the automobile closed and the primary listening area is inside the passenger compartment of the vehicle. Similarly, in the second system configuration **112**, the system topology is arranged in order to better optimize the system for play with a window, door, moon roof, or rear tailgate opened and the primary listening position outside the vehicle near the opening. For example, in an audio system **20** having a transducer

configuration similar to the arrangement in FIG. 1A and an audio source which produces 5.1 channels of audio data (i.e., front left, front right, front center, left surround, and right surround of full bandwidth (20-20 kHz) audio data plus a sixth channel of low frequency audio data), the first and second system configuration **106, 112** can have a system topology as shown in Table I.

TABLE I

| Audio Data | System Topology in Conventional Mode (i.e., transducers (shown in FIG. 1A) which receive audio data in the Conventional mode) | System Topology in Open Mode (i.e., transducers (shown in FIG. 1A) which receive audio data in the Open mode) |
|---|---|---|
| Front left audio data | Front left transducers 24b, 24d | Rear left transducer 28b |
| Front right audio data | Front right transducers 24a, 24c | Rear right transducer 28a |
| Front center data | Provided equally to front left and right transducers 24a–24d | Provided equally to rear left and rear right transducers 28a–28b |
| Left Surround audio data | Side left transducer 26b and rear left transducers 28b | Side left transducer 26b and front left transducers 24a, 24d |
| Right Surround audio data | Side right transducer 26a and rear right transducer 28a | Side right transducer 26a and front right transducers 24a, 24c |
| Low Frequency data (i.e., the .1 channel) | Subwoofer transducer 29 | Subwoofer transducer 29 |

[0057] In other separate embodiments, many other transducer arrangements and routing of audio data are possible. For example, an audio system may have a transducer arrangement as shown in FIG. 1B and may have an audio source which produces 6.1 channels of audio data including a front left, front right, front center, left surround, and right surround, and center surround of full bandwidth (20-20 kHz) of audio data plus a sixth channel of low frequency audio data. In this example, the system configuration **106, 112** may have the system topology as shown in Table II.

TABLE II

| Audio Data | System Topology in Conventional Mode (i.e., transducers (shown in FIG. 1B) which receive audio data in the Conventional mode) | System Topology in Open Mode (i.e., transducers (shown in FIG. 1B) which receive audio data in the Open mode) |
|---|---|---|
| Front left audio data | Front left transducers 24b, 24d | Rear left transducer 28b |
| Front right audio data | Front right transducers 24a, 24c | Rear right transducer 28a |
| Front center data | Front center transducer 25 | Rear center transducer 23 |
| Left Surround audio data | Side left transducer 26b and rear left transducer 28b | Side left transducer 26b and front left transducers 24a, 24d |
| Right Surround audio data | Side right transducer 26a and rear right transducer 28a | Side right transducer 26a and front right transducers 24a, 24c |
| Center Surround audio data | Center rear transducer 23 | Center front transducer 25 |
| Low Frequency data (i.e., the .1 channel) | Subwoofer transducer 29 | Subwoofer transducer 29 |

[0058] In other embodiments, a system configuration may include a topology in which one or more transducers are shut off in different modes of operation. For example, referring again to FIG. 1A, the front left and right transducers 24a-24d may be shut off in the open mode of play leaving the side transducers to output left and right surround sound. Alternatively, the side transducers may be shut off in the open mode, leaving the front transducers to output the left and right surround sound. Similarly, the rear transducers

28a-28b may be shut off in the conventional mode leaving the side transducers to output the surround sound.

[0059] Other embodiments may shut off front transducers 24a-24d (shown in FIG. 1A) and side transducers 26a-26b in open mode. In this arrangement, left, right and center front signals would be mixed with the left, right and center front signals that are fed to transducers 28a-28b.

[0060] In some embodiments, the audio source can provide complete surround information to the rear front 28a and the rear left transducers 28b. In one embodiment, the audio source is a DVD source and a digital video disk (DVD) includes a two-channel down-mixed audio track that is fed to the rear right 28a and the rear left transducers 28b. Alternatively, the audio source can down-mix the surround information into two channels that are fed to the rear right 28a and the rear left transducers 28b.

[0061] In addition to changing the system topology in each mode of operation, the first and second system configuration **106, 112** can also perform different signal processing operations in each mode. Signal processing operations may include operations such as equalization, amplification, signal mixing, spatial enhancement, dynamic range control and other signal processing techniques on one or more channels

of audio data in order to alter the frequency response (both magnitude and phase as a function of frequency), polarity, and the magnitude of the voltage level of the signals delivered to each of the transducer channels in each mode of operation.

[0062] The first and second system configurations **106, 112**, may perform different equalization signal processing operations in order to provide for a different frequency response of the system **20** in each mode of operation. Equalization signal processing may be performed using any of the various techniques known in the art. For example, equalization signal processing may be performed on each channel of audio data by passing the data through one or more digital filters whose filter coefficients are stored in memory and provided to the digital signal processor. Sets of filter coefficients corresponding to each mode of operation would be stored in memory, and the system could switch sets of coefficients according to commands issued by the mode detection process **100 (FIG. 2A)**.

[0063] Equalization processing operations may also be implemented in the analog domain by providing physically separate circuits with separate sets of filters for each mode of operation. Different circuits would be switched into or out of the signal path in accordance with commands issued by the mode control process **100**. Alternatively, there may be one physical circuit in which the performance can be dynamically adjusted through use of variable gain circuits, voltage controlled filters, switchable electrical component values, switched capacitor filters, or any other form of adjustable or programmable analog filters or signal processors.

[0064] Equalization signal processing operations, whether implemented in the digital or analog domain, should be designed to provide a smoother frequency response of the audio system in each mode of play as compared to the frequency response of the system with no equalization. Furthermore, the frequency response of the system measured at the desired listening position for the open mode of operation (outside of the vehicle in line with the open door or tailgate) should be smoother using the signal processing designed for operation in the open mode than the response would be if the conventional mode signal processing were used. For each mode of operation, the overall measured frequency response of the system measured at each desired listening position will generally be similar in character. However, the frequency response of the signal processing used for each mode will generally be significantly different. For purposes of discussion, it should be noted that we will sometimes refer to signal processing used for equalization as a 'channel of equalization' in this specification. The channel of equalization may be accomplished using either analog or digital techniques. We will also sometimes refer to the frequency response of the signal processing as the 'frequency response of the channel of equalization'.

[0065] First and second system configurations **106, 112**, may include different amplification processing operations of the audio signals applied to a transducer for each mode of operation. In other words, the first system configuration **106** may include signal processing operations which adjust the amplification of the audio signals in one manner, and the second system configuration may include signal processing operations which adjust the amplification of the audio sig-

nals in a different manner. Adjusting the amplification of the audio signals may be performed using any of the techniques known in the art. Adjusting gain can be done in multiple places within the signal path of an audio signal, and the system is not limited in the locations where gain adjustment occurs. For example, the amplification of an audio signal applied to a transducer may be adjusted by changing the gain of an amplifier in the signal path of a particular transducer. In a digital system, the gain for each channel for each mode of operation may be determined by a multiplication coefficient or set of filter coefficients stored in memory and supplied to a digital signal processor in order to control the level of the signal supplied to one or more transducers in each mode of operation. The gain may also be adjusted in the analog domain by controlling a variable gain analog amplifier (or other known methods of controlling gain in an analog system) located in the signal path of each channel of audio data.

[0066] The first and second system configurations **106, 112** may perform different signal mixing signal processing functions in each mode of operation. Signal mixing operations involve summing various signals together in various proportions. Mixing may occur in one or both modes of operation. Summing can be accomplished using op amp summer circuitry in the analog domain, or data values can be directly summed by a microprocessor or digital signal processor.

[0067] The first and second system configuration **106, 112** may include different spatial enhancement signal processing in each mode of operation. Spatial enhancement signal processing generally improves the spatial character of the sound field created by the system and may be implemented using any of the techniques known in the art. One spatial enhancement technique for two-channel audio involves determining first sum and difference signals by alternately adding and subtracting first and second signals from each other (hereinafter referred to as a matrix operation). Next, some form of signal processing is applied at least to the difference signal (or possibly to both the sum and difference signals, where the processing applied to the sum and difference signals is different), then a second matrix operation (take sum and difference of processed sum and difference signals) is performed to generate third and fourth signals. These third and fourth signals are now spatially enhanced versions of the first and second signals. Other enhancement techniques might only operate on a difference signal. In these methods, a difference of two signals is taken. The difference signal is modified in some manner, then added back to one of the original channels and subtracted from the other of the original channels.

[0068] In the open mode of operation, spatial enhancement may be performed on the signals provided to the rear transducers (e.g., transducers **28a-28b** in **FIG. 1A**) since these transducers will most likely be the primary transducers providing sound to listeners outside the vehicle. Spatial enhancement may be performed on the complete signals applied to the rear transducers, or may be applied to only a portion of the signals applied to the rear transducers. For example, for reproduction of a surround sound signal source, center channel information may be applied to each rear transducer equally, without any spatial enhancement processing. Simultaneously, left and right channel signals may be applied to left and right transducers respectively. These

could be applied with or without spatial enhancement processing. Similarly, left and right surround signals could be applied with or without spatial enhancement processing to left and right transducers respectively, where the spatial enhancement processing used could either be the same as or different from that applied to the left and right channel signals. In one particular embodiment, the second configuration feeds center channel signals equally to rear transducers 28a-28b (shown in FIG. 1A) without spatial enhancement, front left and right signals to left and right rear transducers 28a-28b respectively without spatial enhancement, and spatially enhanced left and right surround signals to left and right rear transducers 28a-28b, respectively.

[0069] Other combinations of performing spatial enhancement processing of various signals are also possible. For example, a system such as that described in co-pending application titled "Audio Signal Processing" having U.S. Ser. No. 09/886,868 filed on Jun. 21, 2001 and assigned to Bose® Corporation, which is herein incorporated by reference, could be used in the rear of the vehicle, where spatial enhancement processing is used with the configuration of transducers disclosed.

[0070] It should be understood that spatial enhancement is not limited to the second system configuration during the open mode of operation, but may also be performed on the audio signals provided to one or more sets of transducers (e.g., the front sets of transducers 24a-24b, 24c-24d or rear sets of transducers 26a-b, 28a-28b shown in FIG. 1A) in first system configuration during the conventional mode of operation.

[0071] It should be noted that other signal processing operations which affect system functions or performance attributes may change in the conventional and open mode of operation. For example, dynamic range of the audio signal supplied to one or more transducers may be changed depending on the mode of operation. Additionally, balance/fade settings may be changed depending on the operation (e.g., fade control may be shut off or set to some fixed position in the open mode).

[0072] Equalization processes, amplification, spatial enhancement, signal mixing, dynamic range adjustment, and other signal processes may take place in either the digital domain with a device such as digital signal processor, microprocessor, digital amplifier, or other suitable digital device, or in the analog domain with separate physical circuits or a single physical circuit with dynamically adjustable elements (e.g., variable gain amplifiers, voltage controlled filters, etc.).

[0073] Additionally, while a dual-mode audio system is illustrated in FIG. 2A, the concept may be extended to audio systems which operate in three or more modes of operation. For example, as shown in FIG. 2B, when the mode detection process 150 detects that the system 20 has been turned on 151, the process 150 will place the system 20 in a first mode of operation 152. The audio system may have a first system configuration 154 (with a first topology and a first set of signal processing operations) in a conventional mode when all of the doors of the vehicle are closed, a second system configuration 162 (with a second topology and second set of signal processing operations) when one of the doors (e.g., a tailgate only) are open, and a third system configuration 168 (with a third topology and a third set signal processing operations) when a different door (e.g., a side door) is open.

[0074] When the first switching event occurs 156, the mode detection process 150 determines which mode of operation the system should transition to 158. The next mode of operation 152, 160, 166 is determined based on the state of a switch and/or the state of one or more physical conditions of the automobile (e.g., whether doors are opened/closed, engine is off/running, passenger in/out of driver's seat, etc.) and modifies the audio data accordingly. When another switching event occurs 156, 164, 170, the mode detection process 150 determines the next mode of operation 152, 160, 166.

[0075] As shown in FIG. 3, audio system 20 also may include a battery monitoring process 200 which may receive input 202 from the automobile 10 that indicates whether the engine of the automobile is running, which tells the audio system whether the primary power supply is the automobile's battery or another power source such as an alternator. Numerous possible signals could be provided to indicate whether or not the engine is running, such as a tachometer signal indicating the RPM of the engine (i.e., if RPM is zero, then the engine is not running and power is being drawn primarily from the battery), a signal indicating the state of the ignition lock (i.e., if the ignition is locked then the automobile is not running), or any of a number of digital signals that may be available on a communications bus which may be included in a vehicle electrical system.

[0076] If the battery condition monitoring process 200 detects that the engine is running 203 (and thus power is not being primarily drawn from the battery), then there is no adjustment to the system configuration in order to conserve battery power 204.

[0077] When the battery condition monitoring process 200 detects that the engine is not running 203 (and thus power is being drawn from the battery), the system 20 may adjust system configuration (i.e., system topology, signal processing operations or both) to conserve battery power 206 using a variety of techniques without substantially degrading system performance. For example, since the front transducers (e.g., 24a-b, 24c-24d in FIG. 1A) consume power but do not appreciably affect system performance outside the rear of the vehicle, the system may be configured to shut off the front pair transducers when operating under battery power in open mode. Similarly, the rear transducers (28a-28b in FIG. 1A) may be shut off when operating in the conventional mode. Thus, it should be understood that the adjustment to signal processes to conserve power 206 may differ depending on the mode of operation of the audio system 20. By adjusting system configuration in order to conserve power when the battery monitoring process detects that the engine is not running, the system is able to extend the length of time it may operate under battery power.

[0078] Transducers may be shut off in a variety of ways, including by muting the output of the amplifier feeding a particular transducer, placing the amplifier in a standby mode (many commercially-available amplifier integrated circuits, such as the TDA 8567Q amplifier manufactured by Philips® Semiconductor, are configured with both mute and standby modes), reducing the audio signal fed into an amplifier to substantially zero, interrupting the signal path between an amplifier and a transducer, or removing power from an amplifier feeding a particular circuit or transducer.

[0079] Since a significant amount of power is concentrated in the low frequency portion of music, the system may the

raise cutoff frequencies (or increase the order of attenuation as a function of frequency, or both) of high pass filters that may be located in the signal path of one or more of the signals delivered to the transducers in order to conserve power.

[0080] Power may also be conserved by reducing the magnitude of the voltage of the audio signal applied to one or more transducers. One technique for reducing the magnitude of the voltage is to reduce the gain in the signal path of the audio signal (which can be done by changing the gain of an amplifier, or the attenuation of a passive attenuator in analog implementations, or by changing coefficients in digital filters or digital multiplication operations in digital systems). Another technique for reducing the magnitude of the voltage of audio signals is through the use of a dynamic range control device in the signal path of the audio signal. A dynamic range control device is a device which limits, compresses, expands or otherwise changes the dynamic range of an audio signal.

[0081] One use of dynamic range control devices in audio systems is to keep a device (typically a power amplifier) from clipping its output. A dynamic range control device used in this type of application is commonly known as a limiter and is configured to keep the maximum voltage applied to the amplifier below a set minimum value under all operating conditions.

[0082] Dynamic range control devices are typically constructed using a variable gain element (such as an amplifier in an analog implementation or a multiplier in a digital implementation), a control element, and a signal detector of some type (typically a level detector to detect, peak, average or RMS level of a signal, although other types of detectors are also possible), where the gain of the variable gain element is varied as some function of the detected signal of interest by the control element. The function defines the relationship between the gain of the variable gain element and the detected quantity of the signal of interest. The nature of the function may change depending on the detected quantity, or may remain constant over the entire range of detected values. For example, a threshold value for the detected quantity may be determined, where the gain of the variable gain element is not changed as long as the detected quantity remains below the threshold value, but the gain is changed according to the specified function if the detected quantity exceeds the threshold level. Limiters work by reducing the gain of the variable gain element when the sensed parameter of the signal exceeds some set threshold value, which is usually chosen to allow maximum output of a device (such as a power amplifier) without clipping. Thus, in one embodiment the battery monitoring process may reduce the maximum voltage of an audio signal applied to one or more transducers by lowering the threshold value of a limiter when the battery monitoring process 200 detects that the audio system 20 is primarily running off of the battery.

[0083] Referring again to FIG. 3, the battery condition monitoring process 200 receives input 208 about various operating conditions of the battery and estimates the approximate amount of energy remaining in the battery, in order to ensure that there is sufficient charge remaining in the battery to re-start the automobile. If the estimated battery capacity reaches or falls below a predetermined threshold

value 209, then the system 20 may notify the user that battery energy is getting low 210 and may take further power conservations measures 212.

[0084] The battery condition monitoring process 200 receives input 208 indicating various factors related to the current operating condition of the battery. These conditions may include the discharge current magnitude and rate, the accumulated time discharging has been occurring, the ambient temperature, battery output voltage, and other conditions that one skilled in the art might wish to monitor in order to estimate the remaining capacity of the battery. From these conditions, process 200 estimates the remaining capacity of the battery.

[0085] The voltage profile of a battery is the relationship between the battery output voltage and the discharge conditions (length of time the battery has been discharging, rate of discharge, magnitude of discharge current, and temperature). The output voltage of a secondary (re-chargeable) battery decreases over time according the discharge conditions. Batteries, like lead-acid batteries commonly used in automobiles, do not have a singular discharge curve over all operating temperatures and discharge currents. Rather, a particular battery's voltage profile curve is a function of the operating conditions described above. The set of battery voltage profile curves for a particular battery are readily available from the manufacturer. Manufacturers also provide curves showing battery capacity as a function of operating conditions. One technique for estimating the remaining capacity of the battery involves determining where the battery is operating on its appropriate discharge (profile) curve, given the (monitored) operating conditions. From this information and the capacity information available from the manufacturer, the remaining battery capacity can be estimated.

[0086] Another technique for estimating the remaining capacity of the battery is to estimate the state of charge of the battery by measuring how much energy is put into it during charging and how much energy is drained from it when it is in use. This is sometimes called coulomb counting. In a separate embodiment, a battery monitoring process may monitor the amount of current being discharged from the battery as well as the amount of current that charges the battery and, from these measurements, estimate the remaining charge in the battery.

[0087] When the estimated capacity reaches a predetermined value above the minimum level necessary for normal re-starting of the vehicle (which is set as the battery capacity threshold value), the battery condition monitoring process 200 will inform the user 210 by issuing an alarm, which can be audible (e.g., output through the audio system) or visual (e.g., on a visual display) or tactile (e.g., actuate a vibrating device such as a pager). In other separate embodiments, the battery condition monitoring process 200 may shut down the audio system or place the system in a standby (or sleep) mode in which all unnecessary components, including all amplifiers, are shut off when the estimated capacity reaches the battery capacity threshold value. Also, in a vehicle equipped with remote starting capability, a battery condition monitoring process may trigger the remote starting process to periodically start the vehicle to recharge the battery when the estimated capacity reaches the battery capacity threshold value.

9

[0088] In other separate embodiments, a battery condition monitoring process may have several predetermined thresholds which cause the system to take different power conservation measures (e.g., shutting off transducers, adjusting equalization, automatically starting the automobile, reducing the magnitude of voltage of the audio signals applied to a transducer, placing the system in a standby mode, shutting off the system, etc.) at different predetermined thresholds.

[0089] In another embodiment, an audio system may include a battery monitoring process which does not estimate the remaining capacity of the battery, but which monitors one or more operating conditions of the battery such as the discharge current, current drawn by the audio system, temperature, or the battery's voltage. The battery monitoring process which monitors the operating condition of the battery may take one or more actions, such as triggering an alarm, reducing power consumption, placing the system in a standby mode, or completely shutting down the system, if the operating condition of the battery reaches a predetermined state. The predetermined state may be the state of one or more of the monitored conditions such as the battery voltage, discharge current, and ambient temperature, or a combination of conditions.

[0090] It should be noted that any number of the known techniques for estimating the remaining capacity of a battery or monitoring the operating condition of a battery may be utilized in other embodiments and the invention is not limited to the particular embodiments described above.

[0091] In other separate embodiments, an audio system may raise the cut-off frequencies of the high pass filters, shut off transducers, limit the gain of the amplifiers, reduce the dynamic range of audio signals, or take other energy conservation measures either whenever operation on battery power is detected (as shown in FIG. 2A), or when remaining battery energy decreases to a predetermined threshold. It should be understood that a battery monitoring process may be implemented in a dual mode audio system (as in audio system 20 shown in FIG. 1A-1B) or in a purely conventional audio system.

[0092] The circuitry implementing the mode selection, battery condition monitoring processes, and system configurations 100, 200, 106, 112, 206, 210, 212 illustrated in FIG. 2A, FIG. 2B and FIG. 3 may be implemented in hardware, software, firmware or the like in one or more locations in the audio system 20. For example, the circuitry for all of the processes may be physically located in the front control console 21 or rear control console 22 (in FIG. 1A) or the circuitry may be distributed across several devices of the system.

[0093] In a conventional vehicle audio system, the audio sources are typically located in front of the vehicle or at least a control interface for the audio sources is located in the front. When the audio system is operating in the open mode, for convenience, the audio sources or at least a set of controls for the audio sources can be accessible from the open tailgate (or door), which would normally be at the rear of the vehicle where the listeners are located. As shown in FIG. 4, a duplicate set of user controls in the rear console 22 is provided within the vehicle 10 cabin near the opening of the rear tailgate 50. This may be a complete set of duplicate controls, such as source selection, volume, and source transport controls (e.g., play, stop, pause, skip forward, skip

backwards, fast forward, fast reverse, preset selection, tune up or down, etc.). Alternatively, the rear console may be some subset of the complete control interface present in the front of the vehicle. Additionally, FIG. 4 shows a set of transducers 64 mounted on the vehicle's tailgate 50 such that their primary axis of radiation 70 is directed at an angle of approximately 45 degrees relative to the plane of the ground on which the vehicle 10 sits when the tailgate 50 is opened, and the primary axis of radiation 70 substantially faces into the passenger compartment of the vehicle 10 when the tailgate 50 is closed.

[0094] An additional way of controlling the audio sources from the rear of the vehicle is to implement the control functions using a remote control. A separate remote control may be used, or audio system control functions could be integrated onto a vehicle key fob remote, similar to those for remote keyless entry. Using a key fob remote, a plurality of buttons can be added to the key fob to provide limited audio function controls such as volume and source selection. Alternatively, existing key fob remote buttons that operate normal functions such as lock and unlock with the vehicle operating in conventional mode, can be re-mapped to operate audio functions when the vehicle is operating in open mode. Re-mapping could occur by activating a switch, button, or a sequence of buttons to change the remote function from normal vehicle functions to audio system functions. For example, one method to do this is by adding a shift button that changes the functions of other buttons on the remote. Alternatively, the vehicle could sense the mode, and change its interpretation of the commands sent by the key fob remote. For example, lock and unlock could become volume up and down when the system was operating in open mode.

[0095] Additionally, one or more external audio system inputs may be provided in the rear of the vehicle. For example, one input may be optimized to accept the output of a microphone. In this case, additional pre-amplification (and possibly a separate volume control) may be required. This would allow the vehicle to be used as a portable public address system. A line level input may also be provided. This would allow additional sources, such as a portable MP3 or CD player, to be connected to the system and be easily accessible from the rear.

[0096] Other features may be included in a rear control panel. For example, when the vehicle is equipped with an integrated video source (DVD-video, VHS, etc), a video output jack can be made accessible from the rear of the vehicle, so a video display may be attached.

[0097] FIG. 5A-FIG. 5D illustrate several locations where rear transducers may be mounted in order to provide high quality sound for both modes of operation. It should be noted that the transducers illustrated in FIG. 5A-FIG. 5D may be upper frequency transducers (e.g., tweeters, midranges), or may be substantially full range transducers (which radiate sound over the majority of the audible frequency range of the human auditory system). Additionally, although transducers 60, 62, 64, and 66 shown in FIGS. 5A, 5B, 5C, and 5D, respectively, are shown as individual transducers, it should be understood that the transducers may also be mounted within enclosures.

[0098] The primary axis of radiation of a transducer is the direction in which the transducer radiates maximum energy

over the majority of its operating range. This direction is typically in line with physical center axis of symmetry of an axi-symmetric transducer. For ease of understanding, axi-symmetric transducers are assumed to be used here, and the axis of primary radiation is assumed to be aligned with the center axis of symmetry of the transducer and points away from the front surface of the primary radiating surface of the transducer, where the front surface is the surface that is coupled to the listening environment. It should be noted, however, that the invention is not limited to use of axi-symmetric transducers. The orientations described can be adjusted as needed such that sound radiation is directed in the desired directions.

[0099]    As shown in FIG. 5A, an automobile 10 includes a rear tailgate 50 having an upper hinge 51 which is shown as open. A pair of rear transducers 60 (e.g., mid-range transducers) are mounted within the automobile cabin near the opening of the tailgate 50 such that the pair of transducers 60 are outwardly directed from the cabin when the tailgate 50 is opened. When the tailgate 50 is closed, sound from transducer pair 60 is reflected off of the tailgate back into the automobile cabin. There are numerous locations in the rear portion of the cabin of the automobile where transducers 60 may be mounted and the invention is not limited to the specific location illustrated in FIG. 5A. Additionally the transducer pair 60 may be oriented such that they do not point directly at the tailgate 50 when the tailgate is closed, but may be angled with respect to the tailgate 50. For example, in separate embodiments, transducer pair 60 may be mounted on the cabin floor, cabin ceiling, cabin sidewalls, rear cabin deck, or back of the rearmost seat in the automobile 10. Finally, an additional transducer, such as a subwoofer, may also be mounted within the passenger compartment near the tailgate.

[0100]    FIG. 5B and FIG. 5C illustrate additional separate embodiments of where pairs of rear transducers may be mounted on an automobile 10 having a tailgate 50. Specifically, FIG. 5B shows a pair of rear transducers 62 mounted within the automobile cabin near the top hinge 51 of the tailgate 50.

[0101]    FIG. 5C shows a pair of rear transducers 64 mounted on the tailgate 50 such that the left transducer is located in the upper left-hand side of the tailgate and a right transducer is located in the upper right-hand side of the tailgate. The transducers 64 may be mounted within the trim of the tailgate 50. The transducers may also be mounted on a window on the tailgate 50 using methods similar to those used to attach a rear view mirror to a front windshield. The window mounted transducers may additionally be attached to the trim surrounding the window for additional structural support. The rear transducers 64 can also be oriented such that the primary axis of radiation 70 of the transducers 64 face substantially towards the rear of the automobile 10 and are angled at an angle of approximately 45 degrees relative to a plane parallel to the ground when the tailgate is open. Similarly, the primary axis of radiation 70 of the transducers 64 is pointed substantially towards the passenger cabin when the tailgate is closed. This transducer orientation may be particularly advantageous because it directs sound into the vehicle when the tailgate is closed and also outwardly directs sound from the vehicle when the tailgate is open.

Thus, this transducer orientation is particularly well-suited for accommodating both modes of operation of the audio system.

[0102]    FIG. 5D shows another pair of rear transducers 66 mounted on the tailgate 50 approximately midway between the upper hinge 51 and lower edge 52 of the tailgate 50. While this transducer orientation is well-suited for operation in the conventional mode of operation because sound is directed into the passenger cabin when the tailgate is closed, this orientation may not be optimal for listeners that are located behind the automobile 10, away from the tailgate, as these listeners will be significantly off-axis to the main axis of radiation of the transducers 66.

[0103]    While FIG. 5A–FIG. 5D illustrate various locations of a single pair of rear transducers, additional separate embodiments may include audio systems where multiple pairs of rear transducers are mounted at multiple locations in automobile cabin and tailgate. Additionally, note that transducers 60, 62, 64, and 66 shown in FIG. 5A, 5B, 5C and 5D, respectively, represent a pair of transducers symmetrically located within the automobile, where the axis of symmetry is the centerline of the automobile 10.

[0104]    FIG. 6 illustrates a block diagram of an audio system 300 according to the invention. The audio system 300 includes an audio source 302 and a controller 304. The controller 304 can be an amplifier. The audio source 302 generates an audio signal. The controller 304 modifies the audio signal. For example, in a first system configuration, the controller 304 can route the audio signal to a first plurality of transducers 306. The first plurality of transducers 306 corresponds to the audio system 300 operating in the conventional mode. The controller 304 can also modify the audio signal by adjusting signal processing operations, such as equalization parameters of the audio signal and/or amplifying the audio signal. Skilled artisans will appreciate that the partitioning between the audio source 302 and the controller 304 shown in FIG. 6 is an illustrative embodiment. Various elements in the audio source 302 and the controller 304 can be moved and/or modified. In one embodiment, the controller 304 is integrated with the audio source 302.

[0105]    In a second system configuration, the controller 304 can route the audio signal to a second plurality of transducers 308. The second plurality of transducers 308 corresponds to the audio system 300 operating in the open mode. In one embodiment, the first plurality of transducers 306 is the same as the second plurality of transducers 308 and the signal processing operations, (e.g., equalization parameters of the audio signal) are modified depending on the mode of operation. For example, the equalization parameters of the audio system 300 in the first system configuration can be different than the equalization parameters of the audio system 300 in the second system configuration.

[0106]    The audio source 302 includes a micro-controller 310. The micro-controller 310 is coupled to a display 312 through an electrically conductive path 314. The display 312 can be any suitable display such as a liquid crystal display (LCD), a light emitting diode (LED) display, a plasma display, or a cathode ray tube (CRT) display. The display can indicate the status of the audio system 300, including but not limited to the status of the audio source, the operating mode of the system (e.g., conventional mode or open mode, in a

dual mode system), and/or additional information, such as the frequency band or the title of an audio track, for example. The micro-controller 310 can be coupled to a set of user controls 316 that control the audio system 300. For example, the user controls 316 can be buttons, switches, knobs, a microphone, a keypad, or any other suitable control mechanism. In one embodiment, the display 312 is a touch-screen display and the user controls 316 are soft-keys in the touch-screen display. The user controls 316 can be used to select the mode of operation, such as the conventional mode or the open mode based on a user input.

[0107] The micro-controller 310 is also coupled to one or more sources 318 of audio data such as compact disk (CD), digital video disk (DVD), mini disk (MD), hard disk (HD), and/or MPEG1, layer 3 (MP3). The sources 318 of audio data are controlled by the micro-controller 310 through a transmission path 320. The transmission path 320 can be a bus, such as a GPIO bus, a RS232 bus, a SCSI bus, a serial bus, a parallel bus, a fibre channel bus, an optical bus, a CAN bus, a MOST bus, or any other suitable communication method for transmitting control information. In one embodiment, the transmission path 320 can transmit data as well as control information.

[0108] The micro-controller 310 is also coupled to one or more tuners 322. The tuners 322 can include an amplitude modulated (AM) tuner, a frequency modulated (FM) tuner, a television (TV) tuner, a XM tuner, and a satellite tuner. The tuners 322 are controlled by the micro-controller 310 through a transmission path 324. The transmission path 324 can be a bus, such as a GPIO bus, a RS232 bus, a SCSI bus, a serial bus, a parallel bus, a fibre channel bus, an optical bus, a CAN bus, a MOST bus, or any other suitable communication method for transmitting control informa-tion.

[0109] The micro-controller 310 is also coupled to the controller 304 through a control interface 326. One or more functions of the controller 304 are controlled by the micro-controller 310. For example, in response to a user input, the micro-controller 310 can transmit a command to the con-troller 304 to select the first system configuration or the second system configuration. The micro-controller 310 can also transmit commands to the controller 304 to adjust a set of signal processing operations, such as equalization param-eters in the first and/or the second system configuration.

[0110] An infrared (IR) receiver circuit 328 is coupled to the micro-controller 310 through a transmission path 330. The IR receiver circuit 328 is coupled to an IR sensor 332 through a transmission path 334. Alternatively, the IR sensor 332 can be integrated with the IR receiver circuit 328. The IR sensor 332 receives IR signals from a remote control transmitter 336. The remote control transmitter 336 can control various functions of the audio system 300 and/or the vehicle. For example, the remote control transmitter 336 can select the system configuration, select a source (e.g., CD, stereo radio, DVD, etc.), control a volume, control an equalization function, control a tuning function, select a band, select a track, control a seek function, control a scan function, control a fast forward function, control a rewind function, control a skip forward function, control a skip back function, control a fader function, control a balance function, and/or control any other function of the audio system 300. In an embodiment including a video source, the remote

control transmitter 336 can control functions of the video source, such as chapter select, search, skip, fast forward, rewind, zoom, pause, etc. The remote control transmitter 336 can also control functions related to the vehicle. For example, the remote control transmitter 336 can control a door lock, a vehicle ignition, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, a vehicle alarm, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system, or any other desired function, such as controlling a climate setting with a heater, an air conditioner, or a defroster, in the vehicle. The remote control transmitter 336 can also be used to control systems that are external to the vehicle, such as a garage door opener, electric gate, lights, appliances, or a home security system, for example. In one embodiment, the functions of the remote control transmitter 336 are user programmable.

[0111] Skilled artisans will appreciate that other types of remote control transmitters and receivers could be used in the audio system 300. For example, a radio-frequency (RF) transmitter and a RF receiver could be used instead of the IR remote control transmitter 336 and the IR receiver circuit 328. In one embodiment, each audio system 300 can include a remote control transmitter that transmits a unique transmitter signal such that no two transmitters can control the same audio system 300. In other embodiments, the audio system 300 can include a remote control transmitter having trans-mitter codes that are user selectable. Various techniques for programming communication protocols between remote control transmitters and remote control receivers can be used.

[0112] In one embodiment, a sensor 338 is coupled between the micro-controller 310 and the IR receiver circuit 328. The sensor 338 can be used to disable the IR receiver circuit 328 in specific situations. For example, the IR receiver circuit 328 can be disabled when the vehicle is in motion. This can prevent the second system configuration corresponding to the open mode from being inadvertently selected while the vehicle is moving. In this embodiment, the sensor 338 can be coupled to a tachometer 340 in the vehicle to sense a state of the engine. Alternatively, the sensor can be coupled to a speedometer in the vehicle to sense a speed of the vehicle. In another example, the sensor 338 can be coupled to a parking brake in the vehicle to sense a state of the parking brake. The sensor 338 can be coupled to any combination of these, or can be coupled to other systems in the vehicle that indicate that the vehicle is moving. For example, in one embodiment, audio system 300 obtains the status of the vehicle through a vehicle data bus (not shown) that is integrated into the electrical system of the vehicle.

[0113] A selection of the second system configuration can also be disabled in various other ways including manually disabling the selection of the second system configuration through a head unit in the audio system 300 or through a switch coupled to the audio system 300. In another embodi-ment, the selection of the second system configuration can be disabled automatically by closing a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a convertible top, a trunk, and/or a storage bin on the vehicle.

[0114] The selection of the second system configuration can be automatically enabled by opening a door, a window,

a tailgate, a hatch, a moon roof, a sunroof, a convertible top, a trunk, and/or a storage bin on the vehicle. Alternatively, the selection of the first system configuration can be automatically enabled by closing a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a convertible top, a trunk, and/or a storage bin on the vehicle. There are various other methods that can be used for selecting the first or the second system configuration. For example, the selection of the second system configuration can be made by operating a switch. The switch can be a manual switch, an automatic switch, a sensor, a remote control switch, a switch that is integrated with the audio source **302**, and/or a switch that is integrated with the controller **304**.

[0115] The audio system **300** can also include a visual indicator **342** that is coupled to the audio source **302** and/or the controller **304**. The visual indicator **342** visually indicates when the second system configuration is selected. The visual indicator **342** can be a brake light, a lamp, a light emitting diode (LED), a strobe, a parking light, a directional light, a reverse light, and/or any other visual indicator.

[0116] The visual indicator **342** can be coupled to a relay **344** through a diode **346**. In one embodiment, the relay **344** powers the visual indicator **342** using the battery **348** from the vehicle. In the case in which a brake light shares functionality with the visual indicator **342**, a switch **350** that is coupled to the brake pedal is connected via diode **352** and the relay **344** is coupled via diode **346** to protect each circuit. Skilled artisans will appreciate that various other arrangements can also be used.

[0117] The relay **344** is coupled to a relay control unit **354** through a transmission path **356**. The relay control unit **354** is coupled to the micro-controller **310** through a transmission path **358**. The micro-controller **310** instructs the relay control unit **354** to activate the visual indicator **342** when the second system configuration is selected.

[0118] The audio system **300** can also include at least one auxiliary input **360**. The auxiliary input **360** can be used to couple an auxiliary or external device to the audio source **302**. The auxiliary input **360** can be a line level input, for example. The auxiliary device can be a radio, a television, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a hard drive, a mini-disk (MD) player, a personal digital assistant (PDA), a video player, a portable audio player, a microphone and/or a musical instrument. Other devices, such as a karaoke machine, a turntable, and/or a drum machine can also be coupled to the auxiliary input **360**. The auxiliary input **360** is coupled to an audio buffer **362** in the audio source **302**. The audio buffer **362** is generally referred to as an impedance buffer. The audio buffer **362** is coupled to a multiplexer **364**.

[0119] The multiplexer **364** is configured to receive audio input from the sources **318** of audio data, the tuners **322** and the auxiliary input **360**. The multiplexer **364** transmits the selected audio data to an output buffer **366**. The output buffer **366** is an impedance buffer.

[0120] The controller **304** includes an input buffer **368** that is coupled to the output buffer **366**. The controller **304** also includes a control interface **370** that is coupled to the control interface **326** in the audio source **302**. The control interface **370** receives commands from the micro-controller **310**. The commands control various functions of the controller **304**.

For example, the micro-controller **310** can command the controller **304** to adjust various parameters **372** of the audio signal generated by the audio source **302** such as the volume, the bass level, the treble level, the fader, and the balance.

[0121] The controller **304** can include amplification circuitry having multiple channels and switching circuitry to switch different channels on and off. In one embodiment, the controller **304** includes at least two blocks EQ A **374** and EQ B **376** of equalization processing circuitry, which can include a plurality of individual channels. The controller **304** can include any desired number of blocks of equalization processing circuitry or other signal processing circuitry that can configure an audio signal depending on the configuration of the audio system **300**. The first equalization block **374** corresponds to the first system configuration and configures the audio signal with a first set of signal processing operations. The second equalization block **376** corresponds to the second system configuration and configures the audio signal with a second set of signal processing operations. For example, the audio signal in the first system configuration can require a different set of equalization parameters than the audio signal in the second system configuration. An A/B switch **378** switches the audio system **300** between the first and the second system configuration. Although this example illustrates two system configurations, the audio system **300** can support any desired number of system configurations.

[0122] The outputs of the A/B switch **378** are coupled to power amplifiers **380**, **382**. The first power amplifier **380** is coupled to the first plurality of transducers **306**. The second power amplifier **382** is coupled to the second plurality of transducers **308**. It should be noted that the power amplifiers **380**, **382** can include multiple channels, each of which can be coupled to one or more transducers in the first **306** and the second plurality of transducers **308**.

[0123] In another embodiment, the system is implemented using a programmable filter structure (not shown) in which different equalization parameters are applied to different signals depending on the system configuration, instead of blocks of equalization circuitry that are switched "in" and "out" depending on the system configuration.

[0124] In one embodiment, the first **306** and the second plurality of transducers **308** can each include at least one common transducer. For example, the first **306** and the second plurality of transducers **308** can include the same transducers. In this embodiment, the signal processing operations, such as the equalization parameters from the two channels of equalization circuitry **374**, **376** can be different between the first system configuration and the second system configuration.

[0125] FIG. 7 illustrates a perspective view of a vehicle **400** including an embodiment of the audio system **300** of FIG. 6. The audio system **300** includes a pair of transducers **402** that are mounted to the rear seats **404** of the vehicle **400**. The pair of transducers **402** is positioned so that the primary axis of radiation of each of the transducers **402** is facing toward to rear of the vehicle **400**. In this embodiment, each of the transducers **402** radiate maximum energy over a majority of the operating range of the transducers **402**. The energy is directed to an area **405** behind the vehicle **400** when the tailgate **406** is in the open position. Another pair of transducers **408** can be positioned on an interior-facing panel **410** of the tailgate **406**. The primary axis of radiation

of the pair of transducers 408 is directed inside the passenger compartment when the tailgate 406 is in the closed position and is directed to the area 405 behind the vehicle 400 when the tailgate is in the open position.

[0126] The vehicle 400 also includes a control panel 412 that is located in the interior of the vehicle 400 near the tailgate 406. The control panel 412 can include user controls, such as control knobs, a push buttons, and/or a keypad that can control the audio system. The control panel 412 can also include an auxiliary input 414, such as an auxiliary jack for coupling an auxiliary source to the audio system. The auxiliary sources can be a radio, a television, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a MD player, a PDA, a video player, a hard drive, a portable audio player, a microphone and/or a musical instrument.

[0127] The audio system 300 includes the remote control receiver 328 described with reference to FIG. 6. An infrared (IR) sensor 416 is coupled to the remote control receiver 328. In one embodiment, the IR sensor 416 is located in a tail light assembly 418 on the vehicle 400. For clarity, the IR sensor 416 is not drawn to scale. A tail light assembly can be the left and right tail light/directional light assemblies, the reverse light assemblies, a license plate illuminator assembly, a running light assembly, a courtesy light, or the high-level brake light assembly, for example. In some embodiments, the IR sensor 416 is mounted in a head light assembly, a fog light assembly or any other exterior light assembly. The sensor 416 can also be located in exterior mirror assemblies, such as side view mirror assemblies. The IR sensor 416 receives signals from the IR remote control transmitter 336 (FIG. 6). The signals are transmitted to the remote control receiver 328 and direct the remote control receiver 328 to control functions of the audio system 300 as previously described. The functions can include selecting a system configuration, selecting a source, controlling a volume, controlling an equalization function, controlling a tuning function, selecting a band, selecting a track, controlling a seek function, controlling a scan function, controlling a fast forward function, controlling a rewind function, controlling a skip forward function, controlling a skip back function, controlling a fader function, and controlling a balance function of the audio system 300.

[0128] The IR remote control transmitter 336 can also be used to control functions of the vehicle 400 such as opening a door lock, activating a vehicle ignition, opening or closing a window, opening or closing a power door, moving a power seat, opening or closing a power moon roof, operating a convertible top, activating a courtesy light, and activating or deactivating a vehicle alarm in the vehicle 400. The remote control transmitter 336 can also be used to control systems that are external to the vehicle, such as a garage door opener, electric gate, lights, appliances, or a home security system, for example. In an embodiment including a video source, the remote control transmitter 336 can control functions of the video source, such as chapter select, search, skip, fast forward, rewind, zoom, pause, etc.

[0129] The IR sensor 416 can be mounted to a body panel of the vehicle 400 or within the tail light assembly 418. The red colored lens 420 of the tail light assembly 418 can provide an ambient light filter for the IR sensor 416. Additionally, the tail light assembly 418 can include a

curved reflector, such as a parabolic mirror that is used to defocus and reflect light out of the tail light assembly 418. This parabolic mirror can be used to focus signals from the IR remote control transmitter 336 onto the IR sensor 416. This focusing feature can improve the distance range of the IR transmitter 336. Additionally, the focusing feature can improve the peripheral range of the IR transmitter 336.

[0130] In one embodiment, the audio system 300 includes a visual indicator 422. The visual indicator 422 can be used to indicate when the system is operating in the open mode previously described. The visual indicator 422 can be the high level brake light as shown in FIG. 7. However, the visual indicator 422 can also be a different brake light, a lamp, a light emitting diode (LED), a strobe, a parking light, a directional light, a reverse light, or any other suitable visual indicator. In one embodiment, the visual indicator 422 can also indicate the operation of the auxiliary input.

[0131] The vehicle 400 can include a video display 424 that can be attached to a headliner in the vehicle 400. The video display 424 can also include a pair of transducers 426. The transducers 426 can be configured to output a center channel audio signal to align the video image from the video display 424 with the audio output. The video display 424 can be positioned so that the video image is viewable to viewers in the listening area 405 outside of the vehicle. The video display 424 can also be re-positioned such that passengers in the vehicle can view the display when the tail gate 406 is in the closed position. The video display 424 can include any suitable video display such as a liquid crystal display (LCD), a light emitting diode (LED) display, a plasma display, a projection display, or a cathode ray tube (CRT) display.

[0132] FIG. 8 illustrates a side view of a vehicle 450 including an embodiment of the audio system 300 of FIG. 6. The vehicle 450 includes a pickup bed 452 having a tailgate 453. One or more transducers 454 are positioned in the pickup bed 452. In one embodiment, the transducers 454 are mounted in a storage bin 456 that is mechanically coupled to the pickup bed 452. The transducers 454 can be oriented such that their primary axis of radiation is facing toward to rear of the vehicle 450. In this embodiment, the transducers 454 radiate maximum energy over a majority of their operating range to an area 458 behind the vehicle 450 when the second system configuration is selected and the system is operating in the open mode.

[0133] The vehicle 450 also includes a visual indicator 460, which can be a high level brake light, for example. The visual indicator 460 can indicate when the second system configuration is selected and the system is operating in the open mode. The audio system 300 can also include an infrared sensor 462 that is mounted in a tail light assembly 464 of the vehicle 450.

[0134] In the embodiment shown in FIG. 8, it is not necessary to open a door 466 or the tailgate 453 in the vehicle 450 in order to operate in the open mode. The audio system can transition to the second system configuration in response to a user input, since the transducer 454 is positioned in a location that is external to the passenger compartment 468 of the vehicle 450. In another embodiment, a transducer 470 can be mounted to a body panel 472 of the vehicle 450. In this embodiment, the transducer 470 is oriented such that its primary axis of radiation is facing toward to rear of the vehicle 450. Other locations on and

around the vehicle 450 that are external to the passenger compartment 468 can also be used to mount the transducers 454, 470.

[0135] FIG. 9 illustrates a side view of a vehicle 480 including an embodiment of the audio system 300 of FIG. 6. The vehicle 480 is a minivan-type vehicle having at least one side door 482 that slides open towards the rear 484 of the vehicle 480. The vehicle 480 includes at least one transducer 486 that is positioned in the passenger compartment 487 so that its primary axis of radiation is directed to a listening area 488 that is outside of the vehicle 480 when the side door 482 is in the open position.

[0136] Other embodiments can be realized with transducers being positioned so that the primary axis of radiation of each of the transducers is directed to a listening area that is outside the vehicle 480. For example, if a listening area 490 is located behind the rear 484 of the vehicle 480, the primary axes of radiation of the transducers 486 are not directed towards the listening area 490. However, another transducer 492 is positioned in the vehicle 480 such that its primary axis of radiation is directed to the listening area 490 that is outside of the vehicle 480 when a rear door 494 of the vehicle 480 is in the open position. Although this embodiment is shown with an open side door 482 leading to the listening area 488, the system can be also used with windows, moon roofs, or any opening in the passenger compartment 487 of the vehicle 480.

[0137] The infrared sensor 496 is mounted to the side door 482 of the vehicle 480. In some embodiments, multiple infrared sensors can be mounted at various positions around the vehicle 480 depending upon the specific location of the listening area.

[0138] The audio system 300 (FIG. 6) can be configured in at least two different configurations. In a first configuration, the audio system 300 is operated in the conventional mode. This mode is characterized by a first set of signal processing operations that are configured for listening to the audio system 300 in the passenger compartment 487 of the vehicle 480. The audio system 300 uses a first plurality of transducers in the conventional mode of operation. The first plurality of transducers can be positioned at various locations in the passenger compartment 487.

[0139] In a second configuration, the audio system 300 is operated in the open mode. This mode is characterized by a second set of signal processing operations that are configured for listening to the audio system 300 in a listening area 488, 490 that is external to or outside of the passenger compartment 487 of the vehicle 480. The audio system 300 uses a second plurality of transducers in the open mode of operation. The second plurality of transducers can be positioned at various locations inside the passenger compartment 487 and/or external to the passenger compartment 487.

[0140] In one embodiment, the first and the second plurality of transducers include at least one common transducer. In other embodiments, the first and the second plurality of transducers include unique transducers. The audio system 300 can be configured such that at least one of the transducers in the second plurality of transducers has its primary axis of radiation directed outside of the passenger compartment 487 of the vehicle 480.

[0141] A number of embodiments have been described, however, it is evident that those skilled in the art may make numerous modifications of the departures from the specific apparatus and techniques disclosed herein without departing from the inventive concepts. Consequently, the invention is to be construed as embracing each and every novel feature and novel combination of features present in or possessed by the apparatus and techniques disclosed herein and limited solely by the spirit and scope of the appended claims.

What is claimed is:

1. An audio system for a vehicle, comprising:

a) an audio source that generates an audio signal;

b) a controller that is coupled to the audio source, the controller modifying the audio signal with one of a first and a second signal processing operation in response to a user input, the first signal processing operation configuring the audio signal for listening inside the vehicle and the second signal processing operation configuring the audio signal for listening outside the vehicle;

c) a first plurality of transducers that is coupled to the controller, the first plurality of transducers being driven by the audio signal that is configured for listening inside the vehicle by the first signal processing operation; and

d) a second plurality of transducers that is coupled to the controller, the second plurality of transducers being driven by the audio signal that is configured for listening outside the vehicle by the second signal processing operation.

2. The audio system of claim 1 wherein at least one transducer in the second plurality of transducers is positioned in a location that is external to a passenger compartment of the vehicle.

3. The audio system of claim 2 wherein the at least one transducer is mounted in a body panel on the vehicle.

4. The audio system of claim 2 wherein the at least one transducer is mounted to a storage bin that is mechanically coupled to the vehicle.

5. The audio system of claim 1 wherein the first and the second plurality of transducers comprises at least one common transducer.

6. The audio system of claim 1 wherein the first signal processing operation comprises a different equalization parameter than the second signal processing operation.

7. The audio system of claim 1 further comprising a visual indicator that indicates that the audio signal is driving the second plurality of transducers.

8. The audio system of claim 7 wherein the visual indicator is chosen from the group comprising a brake light, a lamp, a light emitting diode (LED), a strobe, a parking light, a directional light, and a reverse light.

9. The audio system of claim 1 wherein the controller comprises an amplifier.

10. The audio system of claim 1 wherein the controller is integrated with the audio source.

11. The audio system of claim 1 wherein at least one of the first and the second signal processing operations substantially attenuates the audio signal.

12. The audio system of claim 1 wherein the audio source further comprises an auxiliary input terminal for coupling an auxiliary device to the audio source.

13. The audio system of claim 12 wherein the auxiliary device is chosen from the group comprising a radio, a television, an XM tuner, a SAT tuner, a CD player, a DVD

player, a cassette player, a MP3 player, a MD player, a hard drive, a PDA, a video player, a portable audio player, a microphone, and a musical instrument.

**14**. The audio system of claim 12 further comprising a visual indicator that indicates that the auxiliary device is coupled to the audio source.

**15**. The audio system of claim 1 wherein the user input is chosen from the group comprising opening at least one of a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle.

**16**. The audio system of claim 1 wherein the user input comprises operating a switch.

**17**. The audio system of claim 16 wherein the switch comprises at least one of a manual switch, an automatic switch, a sensor, a remote control switch, a switch that is integrated with the audio source, and a switch that is integrated with the controller.

**18**. The audio system of claim 1 further comprising an amplifier that controls at least one of a gain and an equalization of the audio signal.

**19**. The audio system of claim 1 wherein the controller is coupled to the audio source through at least one of a GPIO bus, a RS232 bus, a SCSI bus, a serial bus, a parallel bus, a fibre channel bus, an optical bus, a CAN bus, and a MOST bus.

**20**. The audio system of claim 1 wherein the audio source comprises at least one of an AM tuner, an FM tuner, a TV tuner, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a MD player, a video player, and a hard drive.

**21**. The audio system of claim 1 further comprising a video display that is coupled to the audio source.

**22**. The audio system of claim 21 wherein the video display is configured to direct a video image outside the vehicle.

**23**. The audio system of claim 21 wherein the video display is chosen from the group comprising a liquid crystal display (LCD), a light emitting diode (LED) display, a plasma display, a projection display, and a cathode ray tube (CRT) display.

**24**. The audio system of claim 1 wherein the audio signal comprises one of a stereo audio signal, a matrix surround sound audio signal, a 5.1 surround sound audio signal, a 6.1 surround sound audio signal, a 7.1 surround sound audio signal, and a two-channel down-mixed audio signal.

**25**. The audio system of claim 1 wherein at least one of the first and the second plurality of transducers comprises a pair of transducers and the audio source provides complete surround information to the pair of transducers.

**26**. The audio system of claim 25 wherein the surround information is mixed prior to being provided to the pair of transducers.

**27**. The audio system of claim 1 further comprising a remote control receiver.

**28**. The audio system of claim 27 wherein a remote control sensor that is coupled to the remote control receiver is located in a tail light assembly on the vehicle.

**29**. The audio system of claim 27 wherein the remote control receiver comprises one of an infrared (IR) receiver and a radio-frequency (RF) receiver.

**30**. The audio system of claim 27 wherein the remote control receiver is disabled when the vehicle is in motion.

**31**. The audio system of claim 30 further comprising a sensor that is coupled to a tachometer in the vehicle, the sensor detecting a state of the engine in the vehicle.

**32**. The audio system of claim 30 further comprising a sensor that is coupled to a parking brake in the vehicle, the sensor detecting a state of the parking brake in the vehicle.

**33**. The audio system of claim 1 wherein the audio source determines a status of the vehicle from a vehicle communication bus.

**34**. The audio system of claim 27 further comprising a remote control transmitter that communicates with the remote control receiver.

**35**. The audio system of claim 34 wherein the remote control transmitter comprises a unique transmitter signal.

**36**. The audio system of claim 34 wherein the remote control transmitter controls at least one of a door lock, a vehicle ignition, a window, a power door, a power seat, a power moon roof, a trunk lid, a communication system, a courtesy light, and a vehicle alarm in the vehicle.

**37**. The audio system of claim 34 wherein the remote control transmitter controls at least one of a system configuration, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio source.

**38**. The audio system of claim 34 wherein the remote control transmitter controls at least one of a garage door opener, an electric gate, a light, an appliance, and a home security system.

**39**. The audio system of claim 1 further comprising a battery monitor that monitors a state of a battery in the vehicle.

**40**. A method for operating an audio system in a vehicle, the method comprising:

a) generating an audio signal;

b) modifying the audio signal with one of a first and a second signal processing operation in response to a user input, the first signal processing operation configuring the audio signal for listening inside the vehicle and the second signal processing operation configuring the audio signal for listening outside the vehicle;

c) transducing the audio signal that is configured for listening inside the vehicle with a first plurality of transducers; and

d) transducing the audio signal that is configured for listening outside the vehicle with a second plurality of transducers.

**41**. The method of claim 40 wherein the first and the second plurality of transducers comprises at least one common transducer.

**42**. The method of claim 40 further comprising visually indicating when the audio signal is transmitted to the second plurality of transducers.

**43**. The method of claim 40 further comprising changing at least one equalization parameter in the audio signal in response to at least one of the first and the second signal processing operations.

**44**. The method of claim 40 further comprising remotely controlling the audio system.

**45**. The method of claim 40 further comprising coupling an auxiliary device to the audio system.

**46**. The method of claim 40 further comprising visually indicating when the auxiliary device is coupled to the audio source.

**47**. The method of claim 40 further comprising providing complete surround information to a pair of transducers in at least one of the first and the second plurality of transducers.

**48**. The method of claim 47 further comprising mixing the surround information prior to providing the surround information to the pair of transducers.

**49**. The method of claim 40 wherein the user input is chosen from the group comprising opening at least one of a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle.

**50**. The method of claim 40 wherein the user input comprises operating a switch.

**51**. The method of claim 40 further comprising remotely controlling at least one of a door lock, a vehicle ignition, an air conditioner, a heater, a defroster, trunk lid, a communication system, window, a power door, a power seat, a power moon roof, a courtesy light, and a vehicle alarm in the vehicle.

**52**. The method of claim 40 further comprising remotely controlling at least one of a system configuration, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio system.

**53**. An audio system for a vehicle, comprising:

a) an audio source that generates an audio signal, the audio source being integrated with the vehicle;

b) a remote control receiver that is coupled to the audio source, the remote control receiver controlling a function of the audio source; and

c) a remote control sensor that receives a signal from a remote control transmitter to direct the remote control receiver to control the function of the audio source, the remote control sensor being positioned in a location that is external to the passenger compartment of the vehicle.

**54**. The audio system of claim 53 wherein the remote control sensor is mounted in an exterior light assembly.

**55**. The audio system of claim 54 wherein the exterior light assembly is chosen from the group comprising a left tail light assembly, a right tail light assembly, a left directional light assembly, a right directional light assembly, a parking light assembly, a reverse light assembly, a license plate illuminator assembly, a high-level brake light assembly, a courtesy light assembly, a running light assembly, a head light assembly, and a fog light assembly.

**56**. The audio system of claim 54 wherein the exterior light assembly comprises a curved reflector that focuses the signal from the remote control transmitter.

**57**. The audio system of claim 53 wherein the remote control sensor is one of an infrared (IR) sensor and a radio-frequency (RF) sensor.

**58**. The audio system of claim 53 wherein the remote control sensor is mounted to a body panel of the vehicle.

**59**. The audio system of claim 53 wherein the function comprises at least one of a system configuration selection, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio source.

**60**. The audio system of claim 53 wherein the remote control transmitter controls at least one of a door lock, a vehicle ignition, a heater, an air conditioner, a defroster, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system, and a vehicle alarm in the vehicle.

**61**. The audio system of claim 53 wherein the remote control receiver is disabled when the vehicle is in motion.

**62**. An apparatus for controlling an electrical component in a vehicle, the apparatus comprising:

a) a remote control receiver that is coupled to the electrical component in the vehicle;

b) a remote control sensor that is coupled to the remote control receiver, the remote control sensor being mounted in a light assembly and at least a portion of the light assembly being positioned on the exterior of the vehicle; and

c) a remote control transmitter that communicates a control signal to the remote control sensor, the remote control receiver controlling the electrical component in response to receiving the control signal from the remote control sensor.

**63**. The apparatus of claim 62 wherein the remote control sensor comprises one of an infrared (IR) sensor and a radio-frequency (RF) sensor.

**64**. The apparatus of claim 62 wherein the light assembly is chosen from the group comprising a left tail light assembly, a right tail light assembly, a left directional light assembly, a right directional light assembly, a parking light assembly, a reverse light assembly, a license plate illuminator assembly, a high-level brake light assembly, a courtesy light assembly, a running light assembly, a head light assembly, and a fog light assembly.

**65**. The apparatus of claim 62 wherein the electrical component is chosen from the group comprising an audio system, a door lock, a vehicle ignition, a heater, an air conditioner, a defroster, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system and a vehicle alarm.

**66**. The apparatus of claim 62 wherein the remote control transmitter controls at least one function of an audio system in the vehicle.

**67**. The apparatus of claim 66 wherein the function comprises at least one of a system configuration selection, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio system.

\* \* \* \* \*



US 20050100174A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2005/0100174 A1
Howard et al. (43) Pub. Date: **May 12, 2005**

(54) **AUTOMOBILE AUDIO SYSTEM**

(76) Inventors: **Damian Howard**, South Boston, MA
(US); **Guy A. Torio**, Ashland, MA
(US); **Douglas J. Holmi**, Marlborough,
MA (US); **Michael W. Stark**, Acton,
MA (US); **Hiroshi Miyazaki**,
Framingham, MA (US); **Christopher
Ludwig**, White Lake, MI (US)

Correspondence Address:
**FISH & RICHARDSON PC
225 FRANKLIN ST
BOSTON, MA 02110 (US)**

(21) Appl. No.: **10/956,831**

(22) Filed: **Oct. 1, 2004**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/290,989,
filed on Nov. 8, 2002.

**Publication Classification**

(51) Int. Cl.$^7$ .............................. **H04B 1/00; H04R 3/00**
(52) U.S. Cl. ............................................. **381/86; 381/302**

(57) **ABSTRACT**

The invention features an audio system for a vehicle that
includes an audio source. A controller modifies an audio
signal from the audio source with one of a first and a second
signal processing operation in response to a user input. The
first signal processing operation configures the audio signal
for listening inside the vehicle and the second signal pro-
cessing operation configures the audio signal for listening
outside the vehicle. A first plurality of transducers is driven
by the audio signal that is configured for listening inside the
vehicle by the first signal processing operation. A second
plurality of transducers is driven by the audio signal that is
configured for listening outside the vehicle by the second
signal processing operation.



100

SYSTEM
TURNED
ON
102

PLACE SYSTEM IN
CONVENTION MODE
104

FIRST SYSTEM
CONFIGURATION
106

SWITCHING
EVENT?
108
NO
YES

PLACE SYSTEM IN
OPEN MODE
110

SECOND SYSTEM
CONFIGURATION
112

SWITCHING
EVENT?
114
NO
YES

Appx3121



FIG. 1A



**FIG. 1B**



100

SYSTEM
TURNED
ON
102

PLACE SYSTEM IN
CONVENTION MODE
104

FIRST SYSTEM
CONFIGURATION
106

NO ← SWITCHING
EVENT?
108

YES

PLACE SYSTEM IN
OPEN MODE
110

SECOND SYSTEM
CONFIGURATION
112

NO ← SWITCHING
EVENT?
114

YES

FIG. 2A



FIG. 2B

200



**FIG. 3**



FIG. 4



**FIG. 5A**



**FIG. 5B**



**FIG. 5C**



**FIG. 5D**



**FIG. 6**



FIG. 7



FIG. 8



FIG. 9

# AUTOMOBILE AUDIO SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001] This patent application is a continuation-in-part (CIP) of U.S patent application Ser. No. 10/290,989, filed on Nov. 8, 2002, entitled Automobile Audio System, the entire disclosure of which is incorporated herein by reference.

## BACKGROUND

[0002] Audio systems are included in virtually every automobile manufactured today. These audio systems are typically designed for use while the doors, tailgates, and other openings to the passenger compartment are closed. However, people often choose to listen to their automobile audio system while they are outside of their vehicle, such as while they are camping or "tailgating" at a sporting event. Because traditional automobile audio systems are not designed for this type of use, listeners may not enjoy as high a quality sound presentation as they could if the system were designed for outdoor use.

[0003] The acoustic characteristics of a typical vehicle with all of its doors closed will generally be significantly different than the acoustic characteristics of the same vehicle with its tailgate (or one of its doors) open. For example, the linear transfer function from each transducer element to various listening locations will be markedly different in each circumstance. Furthermore, opening or closing of the tailgate significantly alters the acoustic characteristics of the cabin space.

## SUMMARY

[0004] In one aspect, the invention is embodied in an audio system for a vehicle. The audio system includes an audio source that generates an audio signal. A controller is coupled to the audio source and modifies the audio signal with one of a first and a second signal processing operation in response to a user input. The first signal processing operation configures the audio signal for listening inside the vehicle and the second signal processing operation configures the audio signal for listening outside the vehicle. A first plurality of transducers is coupled to the controller. The first plurality of transducers is driven by the audio signal that is configured for listening the vehicle by the first signal processing operation. A second plurality of transducers is coupled to the controller. The second plurality of transducers is driven by the audio signal that is configured for listening outside the vehicle by the second signal processing operation.

[0005] In one embodiment, at least one of the transducers in the second plurality of transducers is positioned in a location that is external to a passenger compartment of the vehicle. For example, the transducer can be mounted to a body panel or mounted to a storage bin that is mechanically coupled to the vehicle.

[0006] The first and the second plurality of transducers can include at least one common transducer or different transducers. The first and the second plurality of transducers can also include different sets of transducers. The audio system can also include a visual indicator that indicates that the audio signal is driving the second plurality of transducers. The visual indicator can include a brake light, a lamp, a light emitting diode (LED), a strobe, a parking light, a directional light, and a reverse light.

[0007] In one embodiment, the first signal processing operation includes a different equalization parameter than the second signal processing operation. The first and/or the second signal processing operations can substantially attenuate the audio signal before it is coupled to one or more of the transducers in the first and the second plurality of transducers.

[0008] In one embodiment, the controller includes an amplifier. The amplifier can control at least one of a gain and an equalization of the audio signal. The controller can also be integrated with the audio source. The controller can be coupled to the audio source through a GPIO bus, a RS232 bus, a SCSI bus, a serial bus, a parallel bus, a fibre channel bus, an optical bus, a CAN bus, or a MOST bus.

[0009] The audio source can include an auxiliary input terminal for coupling an auxiliary device to the audio source. The auxiliary device can include a radio, a television, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a MD player, a hard drive, a PDA, a video player, a portable audio player, a microphone, and a musical instrument. A visual indicator can indicate that the auxiliary device is coupled to the audio source.

[0010] In one embodiment, the user input includes operating a switch. The switch can be a manual switch, an automatic switch, a sensor, a remote control switch, a switch that is integrated with the audio source, and a switch that is integrated with the controller. The user input could also include opening at least one of a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle.

[0011] The audio source can include an AM tuner, an FM tuner, a TV tuner, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a MD player, a video player, and/or a hard drive. In one embodiment, a video display is coupled to the audio source. The video display can be configured to direct a video image outside the vehicle. The video display can include a liquid crystal display (LCD), a light emitting diode (LED) display, a plasma display, a projection display, and a cathode ray tube (CRT) display.

[0012] The audio signal can include a stereo audio signal, a matrix surround sound audio signal, a 5.1 surround sound audio signal, a 6.1 surround sound audio signal, a 7.1 surround sound audio signal, and/or a two-channel down-mixed audio signal. One of the first and the second plurality of transducers can include a pair of transducers and the audio source can provide complete surround information to the pair of transducers. The surround information is mixed prior to being provided to the pair of transducers.

[0013] The audio system also includes a remote control receiver. The remote control receiver is coupled to a remote control sensor that is located in a tail light assembly on the vehicle. The remote control receiver can be an infrared (IR) receiver or a radio-frequency (RF) receiver. The remote control receiver can be disabled when the vehicle is in motion. To determine the status of the vehicle, a sensor can be coupled to a tachometer in the vehicle. The sensor can detect a state of the engine in the vehicle. Another sensor can be coupled to a parking brake in the vehicle. That sensor can detect a state of the parking brake in the vehicle. In one embodiment, audio source determines a status of the vehicle from a vehicle communication bus. The system can also include a battery monitor that monitors a state of a battery in the vehicle.

[0014] A remote control transmitter can communicate with the remote control receiver. The remote control transmitter can have a unique transmitter signal. The remote control transmitter can control a door lock, a vehicle ignition, a window, a power door, a power seat, a power moon roof, a trunk lid, a communication system, a courtesy light, and/or a vehicle alarm in the vehicle. Additionally, the remote control transmitter can control a system configuration, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and/or a balance function of the audio source. The remote control transmitter can also control a garage door opener, an electric gate, a light, an appliance, and/or a home security system.

[0015] In another aspect, the invention is embodied in a method for operating an audio system in a vehicle. The method includes generating an audio signal. The method also includes modifying the audio signal with one of a first and a second signal processing operation in response to a user input. The first signal processing operation configures the audio signal for listening inside the vehicle and the second signal processing operation configures the audio signal for listening outside the vehicle. The method includes transducing the audio signal that is configured for listening inside the vehicle with a first plurality of transducers. The method further includes transducing the audio signal that is configured for listening outside the vehicle with a second plurality of transducers.

[0016] The first and the second plurality of transducers can include at least one common transducer. The method can include visually indicating when the audio signal is transmitted to the second plurality of transducers. The method can also include changing an equalization parameter in the audio signal in response to at least one of the first and the second signal processing operations. The method can also include remotely controlling the audio system. In one embodiment, the method includes coupling an auxiliary device to the audio system and visually indicating when the auxiliary device is coupled to the audio source.

[0017] The method can also include providing complete surround information to a pair of transducers in either the first or the second plurality of transducers. The surround information can be mixed prior to providing the surround information to the pair of transducers.

[0018] The user input can include opening at least one of a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle. The user input can include operating a switch. The method can also include remotely controlling a door lock, a vehicle ignition, an air conditioner, a heater, a defroster, trunk lid, a communication system, a window, a power door, a power seat, a power moon roof, a courtesy light, and/or a vehicle alarm in the vehicle. The method can also include remotely controlling a system configuration, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and/or a balance function of the audio system.

[0019] In one aspect, the invention is embodied in an audio system for a vehicle. The audio system includes an audio source that generates an audio signal. The audio source is integrated with the vehicle. The audio system also

includes a remote control receiver that controls a function of the audio source. Also includes is a remote control sensor that receives a signal from a remote control transmitter to direct the remote control receiver to control the function of the audio source. The remote control sensor is positioned in a location that is external to the passenger compartment of the vehicle.

[0020] The remote control sensor can be mounted in an exterior light assembly of the vehicle. The exterior light assembly can be a left tail light assembly, a right tail light assembly, a left directional light assembly, a right directional light assembly, a parking light assembly, a reverse light assembly, a license plate illuminator assembly, a high-level brake light assembly, a courtesy light assembly, a running light assembly, a head light assembly, and/or a fog light assembly. The exterior light assembly can include a curved reflector that focuses the signal from the remote control transmitter. The remote control sensor can be an infrared (IR) sensor or a radio-frequency (RF) sensor. The remote control sensor can be mounted to a body panel of the vehicle.

[0021] The function can include a system configuration selection, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio source. The remote control transmitter can control a door lock, a vehicle ignition, a heater, an air conditioner, a defroster, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system, and/or a vehicle alarm in the vehicle. The remote control receiver can be disabled when the vehicle is in motion.

[0022] In another aspect, the invention is embodied in an apparatus for controlling an electrical component in a vehicle. The apparatus includes a remote control receiver that is coupled to the electrical component in the vehicle and a remote control sensor that is coupled to the remote control receiver. The remote control sensor is mounted in a light assembly and at least a portion of the light assembly is positioned on the exterior of the vehicle. A remote control transmitter communicates a control signal to the remote control sensor. The remote control receiver controls the electrical component in response to receiving the control signal from the remote control sensor.

[0023] The remote control sensor can be an infrared (IR) sensor or a radio-frequency (RF) sensor. The light assembly can include a left tail light assembly, a right tail light assembly, a left directional light assembly, a right directional light assembly, a parking light assembly, a reverse light assembly, a license plate illuminator assembly, a high-level brake light assembly, a courtesy light assembly, a running light assembly, a head light assembly, and/or a fog light assembly.

[0024] The electrical component can include an audio system, a door lock, a vehicle ignition, a heater, an air conditioner, a defroster, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system and/or a vehicle alarm.

[0025] The remote control transmitter can control a function of an audio system in the vehicle. The function can include a system configuration selection, a source selection,

a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and/or a balance function of the audio system.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0026] The above and further advantages of this invention may be better understood by referring to the following description in conjunction with the accompanying drawings, in which like numerals indicate like structural elements and features in various figures. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention.

[0027] FIG. 1A is a top view of an automobile having a dual-mode audio system.

[0028] FIG. 1B is a top view of an automobile having another dual mode audio system.

[0029] FIG. 2A is a flow-chart illustrating the operation of a mode detection process in a dual-mode audio system.

[0030] FIG. 2B is a flow-chart illustrating the operation of a mode detection process in a tri-mode audio system.

[0031] FIG. 3 is a flow-chart illustrating the operation of a battery monitoring process in a dual-mode audio system.

[0032] FIG. 4 is a diagram of a sport utility vehicle having a rear set of controls and rear transducers mounted on its tailgate.

[0033] FIG. 5A-D are side views of an automobile having rear transducers mounted in four different locations.

[0034] FIG. 6 illustrates a block diagram of an audio system according to the invention.

[0035] FIG. 7 illustrates a perspective view of a vehicle including an embodiment of the audio system of FIG. 6.

[0036] FIG. 8 illustrates a side view of a vehicle including an embodiment of the audio system of FIG. 6.

## DETAILED DESCRIPTION

[0037] A vehicle audio system, according to one aspect of the invention, is able to operate in two modes: one mode where one or more parameters of the audio system are configured to better optimize sound quality while the doors (e.g., including tailgates in sport utility vehicles, vans and pick-up trucks and hatches in hatch-backed vehicles) are closed and a second mode where one or more parameters of the audio system are configured to better optimize sound quality while one or more of the doors, such as a tailgate, are open.

[0038] Additionally, users can operate the automobile audio system while the engine is not running and thus, drain power from the vehicle's battery. It is therefore desirable for a vehicle audio system to monitor one or more operating conditions of the battery and adjust system performance in order to extend the maximum period of time the audio system can operate from battery power. It is also desirable to monitor one or more operating conditions of the battery to ensure operation of the audio system does not result in a condition where sufficient battery charge (to allow the vehicle to be restarted) is no longer available.

[0039] It should be noted that the terms automobile and vehicle are used synonymously in this description and refer

to any self-propelled passenger vehicle used for land transport, including cars, trucks, pick-up trucks, sport utility vehicles, and the like. Additionally, the term tailgate refers to a hinged door of a vehicle which provides access to a rear opening of the vehicle or provides access to a cargo area. A tailgate may be hingedly connected to the top, bottom, or side of the frame of the vehicle.

[0040] As shown in FIG. 1A, a vehicle (e.g., an SUV) 10 includes an audio system 20 that is configured to operate in two modes: a conventional mode and an open mode.

[0041] The audio system includes a first system configuration and a second system configuration. The first system configuration corresponds to the conventional mode. The conventional mode is a mode of operation in which audio system 20 is configured for play when all of the doors of the vehicle are closed and the primary listening position of interest is the seating area within the passenger compartment. In this mode, sound is radiated within the passenger compartment as in a conventional automobile audio system. The conventional mode includes a first plurality of transducers that are positioned to radiate sound for listening inside the vehicle.

[0042] The second configuration corresponds to the open mode or the tailgate mode. The open mode is a mode of operation in which audio system 20 is configured for play when the tailgate 11 is open. In this mode, sound is radiated through the open tailgate and/or through the vehicle's body panels or other openings to the outside environment. In one embodiment, a second plurality of transducers is located in the rear portion of the vehicle, such as on the tailgate, hatch, or rear door. The second plurality of transducers can also be located in the bed or the liner of a pick-up truck, for example. The open mode includes the second plurality of transducers that are positioned to radiate sound for listening outside the vehicle. In one embodiment, the first and second plurality of transducers can include one or more common transducers.

[0043] The primary listening position of interest in the open mode is outside of the vehicle, typically in line with the open tailgate 11. In other embodiments, the open mode of operation can be configured for play when one or more doors (including a tailgate) are open. In some embodiments, the open mode of operation can be configured to operate when a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle are in an open position.

[0044] Because the acoustic characteristics of the vehicle are significantly different when all of the doors are closed versus when one or more doors are opened, and because the listening positions of primary concern are different in the different modes, the audio system 20 adjusts system configuration in order to better optimize performance in each mode. As will be explained in greater detail below, adjustment of system configuration may include altering the system topology for each mode of operation, as well as performing different signal processing operations such as equalization, signal mixing, amplification, dynamic range control, spatial enhancement processes and other signal processing techniques on the channels of audio data in each mode of operation. The system topology defines how different signals provided by an audio source are routed to the different transducers of the audio system.

[0045] Additionally, audio system 20 features a battery monitoring process which monitors one or more operating conditions of the automobile battery 30 and takes one or

more actions based on whether the system **20** is primarily running off of the battery and the state of one or more of the monitored operating conditions. As will be explained in greater detail below, the battery monitoring process takes various actions including triggering an alarm and altering the system configuration in order to conserve battery power.

[0046] Referring again to FIG. 1A, audio system **20** includes one or more audio sources (not shown) such as a stereo radio, CD player, DVD player, and/or an MP3 player, which may be mounted in or near a front control console **21**, a rear control console **22**, or at another location within the automobile **10**. The front and rear control consoles **21**, **22** each may contain a set of controls (e.g., volume, source selection, track selection, play, pause, etc.) for the audio sources included within the system **20**.

[0047] The audio system **20** also includes two pairs of front transducers **24a-24b**, **24c-24d**, a pair of side transducers **26a-26b**, a pair of rear transducers **28a-28b**, and a woofer **29**. For example, a first plurality of transducers corresponding to the first system configuration can include the two pairs of front transducers **24a-24b**, **24c-24d**, the pair of side transducers **26a-26b**, the pair of rear transducers **28a-28b**, and the woofer **29**. A second plurality of transducers corresponding to the second system configuration can include the pair of rear transducers **28a-28b**, and the woofer **29**. However, any combination of transducers can be included in the first and/or the second system configurations.

[0048] It should be noted that the arrangement of elements including the transducers, as well as the number of elements shown in FIG. 1A, were chosen to illustrate the novel features of the invention. It should be understood that the invention is not limited to use of the particular configuration of transducers and placements shown. For example, as shown in FIG. 1B, another dual-mode audio system **20'** can include the same transducers shown in FIG. 1A as well as a front center transducer **25'** located proximate to the front console **21** or in the dashboard of the vehicle **10'** and a rear center transducer **23'** located proximate to the rear of the vehicle **10'**. The audio systems **20**, **20'** of FIG. 1A and FIG. 1B can be configured as surround sound audio systems. The surround sound audio system can be a matrix surround sound system, a 5.1 surround sound system, a 6.1 surround sound system, a 7.1 surround sound system, and a two-channel down-mixed surround sound system.

[0049] FIG. 2A and FIG. 3 illustrate an operation of the audio system **20** shown in FIG. 1A.

[0050] As shown in FIG. 2A, the audio system **20** includes a mode detection process **100** which detects when the system **20** is activated **102** and when a switching event **108**, **114** occurs that switches the system **20** between the first system configuration and the second system configuration. A switching event **108**, **114** occurs when a user changes the state of a switch provided within the system **20**. One or more manual switches may be located on the front control panel **21** (shown in FIG. 1A), rear control panel **22**, on a remote control device, on a key fob, or in another location. Since it is possible that significant changes would be made in system operation when the mode is changed, having a manual switch keeps from dramatically changing system operation while passengers remain inside the vehicle.

[0051] In other embodiments, a switching event may occur automatically. For example, a switching event may occur automatically when the system detects that a tailgate or door is open and the vehicle engine is not running (which

can be sensed by the state of the ignition interlock, the RPM of the engine, or some other means). It may also be desirable to sense if passengers remain in the vehicle cabin, which could be done using seat switches, ultrasonic motion detectors, or some other method. Thus, in other embodiments, the system may automatically switch modes from the conventional mode to the open mode when the tailgate or door is open, the engine is off, and no passengers are occupying the vehicle cabin.

[0052] Referring again to FIG. 2A, when the mode detection process **100** detects that the system **20** has been turned on **102**, the process **100** will place the system **20** in a conventional mode of operation **104**. By automatically reverting to a conventional mode when the system **20** is turned on, the system **20** avoids a situation where the driver gets into the vehicle and turns on the system after it had been switched to open mode. However, in other embodiments, a mode detection process in a dual-mode audio system could be configured to start up in different modes depending on how the system was turned on or the state of a switch. For example, if the system was turned on using controls mounted in the front of the vehicle, the system may assume that someone would be inside the vehicle and the system should start in conventional mode. If the system were turned on using controls that were easily accessible from outside the vehicle (such as controls located in rear console **22**, or controls located on a remote control), the system may be configured to start up in open mode.

[0053] When the system **20** is placed in the conventional mode of operation **104**, the system **20** is in a first system configuration **106** which, as will be explained in more detail below, has a first system topology and performs a first set of signal processing operations which are configured for play with the doors of the vehicle closed and the primary listening position is within the passenger's compartment. The system **20** remains in its first system configuration **106** until a switching event is detected **108**.

[0054] If a switching event is detected **108**, mode detection process **100** places the system in the open mode of operation **110** and the system **20** is changed over to a second system configuration **112** which has a second system topology and performs a second set of signal processing operations that is configured for play with the tailgate of the vehicle opened and the primarily listening position being outside of the vehicle. In one embodiment, the position is proximate to a rear opening of the vehicle. In another embodiment, the position is proximate to a side opening of the vehicle.

[0055] If another switching event **114** is detected, then the mode detection process **100** reverts the system **20** back to the conventional mode of operation **104** and the system is placed in the first system configuration **106**.

[0056] In each system configuration, **106**, **112**, the system **20** has a certain system topology which defines how different signals provided by an audio source are routed to the various transducers in the system. In the first system configuration **106**, the system topology is arranged in order to better optimize the system for play with the doors of the automobile closed and the primary listening area is inside the passenger compartment of the vehicle. Similarly, in the second system configuration **112**, the system topology is arranged in order to better optimize the system for play with a window, door, moon roof, or rear tailgate opened and the primary listening position outside the vehicle near the opening. For example, in an audio system **20** having a transducer

configuration similar to the arrangement in FIG. 1A and an audio source which produces 5.1 channels of audio data (i.e., front left, front right, front center, left surround, and right surround of full bandwidth (20-20 kHz) audio data plus a sixth channel of low frequency audio data), the first and second system configuration **106, 112** can have a system topology as shown in Table I.

TABLE I

| Audio Data | System Topology in Conventional Mode (i.e., transducers (shown in FIG. 1A) which receive audio data in the Conventional mode) | System Topology in Open Mode (i.e., transducers (shown in FIG. 1A) which receive audio data in the Open mode) |
|---|---|---|
| Front left audio data | Front left transducers 24b, 24d | Rear left transducer 28b |
| Front right audio data | Front right transducers 24a, 24c | Rear right transducer 28a |
| Front center data | Provided equally to front left and right transducers 24a–24d | Provided equally to rear left and rear right transducers 28a–28b |
| Left Surround audio data | Side left transducer 26b and rear left transducers 28b | Side left transducer 26b and front left transducers 24a, 24d |
| Right Surround audio data | Side right transducer 26a and rear right transducer 28a | Side right transducer 26a and front right transducers 24a, 24c |
| Low Frequency data (i.e., the.1 channel) | Subwoofer transducer 29 | Subwoofer transducer 29 |

[0057] In other separate embodiments, many other transducer arrangements and routing of audio data are possible. For example, an audio system may have a transducer arrangement as shown in FIG. 1B and may have an audio source which produces 6.1 channels of audio data including a front left, front right, front center, left surround, right surround, and center surround of full bandwidth (20-20 kHz) of audio data plus a sixth channel of low frequency audio data. In this example, the system configuration **106, 112** may have the system topology as shown in Table II.

TABLE II

| Audio Data | System Topology in Conventional Mode (i.e., transducers (shown in FIG. 1B) which receive audio data in the Conventional mode) | System Topology in Open Mode (i.e., transducers (shown in FIG. 1B) which receive audio data in the Open mode) |
|---|---|---|
| Front left audio data | Front left transducers 24b, 24d | Rear left transducer 28b |
| Front right audio data | Front right transducers 24a, 24c | Rear right transducer 28a |
| Front center data | Front center transducer 25 | Rear center transducer 23 |
| Left Surround audio data | Side left transducer 26b and rear left transducer 28b | Side left transducer 26b and front left transducers 24a, 24d |
| Right Surround audio data | Side right transducer 26a and rear right transducer 28a | Side right transducer 26a and front right transducers 24a, 24c |
| Center Surround audio data | Center rear transducer 23 | Center front transducer 25 |
| Low Frequency data (i.e., the.1 channel) | Subwoofer transducer 29 | Subwoofer transducer 29 |

[0058] In other embodiments, a system configuration may include a topology in which one or more transducers are shut off in different modes of operation. For example, referring again to FIG. 1A, the front left and right transducers **24a-24d** may be shut off in the open mode of play leaving the side transducers to output left and right surround sound. Alternatively, the side transducers may be shut off in the open mode, leaving the front transducers to output the left and right surround sound. Similarly, the rear transducers

**28a-28b** may be shut off in the conventional mode leaving the side transducers to output the surround sound.

[0059] Other embodiments may shut off front transducers **24a-24d** (shown in FIG. 1A) and side transducers **26a-26b** in open mode. In this arrangement, left, right and center surround signals would be mixed with the left, right and center front signals that are fed to transducers **28a-28b**.

[0060] In some embodiments, the audio source can provide complete surround information to the rear front transducer **28a** and the rear left transducers **28b**. In one embodiment, the audio source is a DVD source and a digital video disk (DVD) includes a two-channel down-mixed audio track that is fed to the rear **28a** and the rear left transducers **28b**. Alternatively, the audio source can down-mix the surround information into two channels that are fed to the rear right **28a** and the rear left transducers **28b**.

[0061] In addition to changing the system topology in each mode of operation, the first and second system configuration **106, 112** can also perform different signal processing operations in each mode. Signal processing operations may include operations such as equalization, amplification, signal mixing, spatial enhancement, dynamic range control and other signal processing techniques on one or more channels

of audio data in order to alter the frequency response (both magnitude and phase as a function of frequency), polarity, and the magnitude of the voltage level of the signals delivered to each of the transducer channels in each the mode of operation.

[0062] The first and second system configurations 106, 112, may perform different equalization signal processing operations in order to provide for a different frequency response of the system 20 in each mode of operation. Equalization signal processing may be performed using any of the various techniques known in the art. For example, equalization signal processing may be performed on each channel of audio data by passing the data through one or more digital filters whose filter coefficients are stored in memory and provided to the digital signal processor. Sets of filter coefficients corresponding to each mode of operation would be stored in memory, and the system could switch sets of coefficients according to commands issued by the mode detection process 100 (FIG. 2A).

[0063] Equalization processing operations may also be implemented in the analog domain by providing physically separate circuits with separate sets of filters for each mode of operation. Different circuits would be switched into or out of the signal path in accordance with commands issued by the mode control process 100. Alternatively, there may be one physical circuit in which the performance can be dynamically adjusted through use of variable gain circuits, voltage controlled filters, switchable electrical component values, switched capacitor filters, or any other form of adjustable or programmable analog filters or signal processors.

[0064] Equalization signal processing operations, whether implemented in the digital or analog domain, should be designed to provide a smoother frequency response of the audio system in each mode of play as compared to the frequency response of the system with no equalization. Furthermore, the frequency response of the system measured at the desired listening position for the open mode of operation (outside of the vehicle in line with the open door or tailgate) should be smoother using the signal processing designed for operation in the open mode than the response would be if the conventional mode signal processing were used. For each mode of operation, the overall measured frequency response of the system measured at each desired listening position will generally be similar in character. However, the frequency response of the signal processing used for each mode will generally be significantly different. For purposes of discussion, it should be noted that we will sometimes refer to signal processing used for equalization as a 'channel of equalization' in this specification. The channel of equalization may be accomplished using either analog or digital techniques. We will also sometimes refer to the frequency response of the signal processing as the 'frequency response of the channel of equalization'.

[0065] First and second system configurations 106, 112, may include different amplification processing operations of the audio signals applied to a transducer for each mode of operation. In other words, the first system configuration 106 may include signal processing operations which adjust the amplification of the audio signals in one manner, and the second system configuration may include signal processing operations which adjust the amplification of the audio sig-

nals in a different manner. Adjusting the amplification of the audio signals may be performed using any of the techniques known in the art. Adjusting gain can be done in multiple places within the signal path of an audio signal, and the system is not limited in the locations where gain adjustment occurs. For example, the amplification of an audio signal applied to a transducer may be adjusted by changing the gain of an amplifier in the signal path of a particular transducer. In a digital system, the gain for each channel for each mode of operation may be determined by a multiplication coefficient or set of filter coefficients stored in memory and supplied to a digital signal processor in order to control the level of the signal supplied to one or more transducers in each mode of operation. The gain may also be adjusted in the analog domain by controlling a variable gain analog amplifier (or other known methods of controlling gain in an analog system) located in the signal path of each channel of audio data.

[0066] The first and second system configurations 106, 112 may perform different signal mixing signal processing functions in each mode of operation. Signal mixing operations involve summing various signals together in various proportions. Mixing may occur in one or both modes of operation. Summing can be accomplished using op amp summer circuitry in the analog domain, or data values can be directly summed by a microprocessor or digital signal processor.

[0067] The first and second system configuration 106, 112 may include different spatial enhancement signal processing in each mode of operation. Spatial enhancement signal processing generally improves the spatial character of the sound field created by the system and may be implemented using any of the techniques known in the art. One spatial enhancement technique for two-channel audio involves determining first sum and difference signals by alternately adding and subtracting first and second signals from each other (hereinafter referred to as a matrix operation). Next, some form of signal processing is applied at least to the difference signal (or possibly to both the sum and difference signals, where the processing applied to the sum and difference signals is different), then a second matrix operation (take sum and difference of processed sum and difference signals) is performed to generate third and fourth signals. These third and fourth signals are now spatially enhanced versions of the first and second signals. Other enhancement techniques might only operate on a difference signal. In these methods, a difference of two signals is taken. The difference signal is modified in some manner, then added back to one of the original channels and subtracted from the other of the original channels.

[0068] In the open mode of operation, spatial enhancement may be performed on the signals provided to the rear transducers (e.g., transducers 28a-28b in FIG. 1A) since these transducers will most likely be the primary transducers providing sound to listeners outside the vehicle. Spatial enhancement may be performed on the complete signals applied to the rear transducers, or may be applied to only a portion of the signals applied to the rear transducers. For example, for reproduction of a surround sound signal source, center channel information may be applied to each rear transducer equally, without any spatial enhancement processing. Simultaneously, left and right channel signals may be applied to left and right transducers respectively. These

could be applied with or without spatial enhancement processing. Similarly, left and right surround signals could be applied with or without spatial enhancement processing to left and right transducers respectively, where the spatial enhancement processing used could either be the same as or different from that applied to the left and right channel signals. In one particular embodiment, the second configuration feeds center channel signals equally to rear transducers 28a-28b (shown in FIG. 1A) without spatial enhancement, front left and right signals to left and right rear transducers 28a-28b respectively without spatial enhancement, and spatially enhanced left and right surround signals to left and right rear transducers 28a-28b, respectively.

[0069] Other combinations of performing spatial enhancement processing of various signals are also possible. For example, a system such as that described in co-pending application titled "Audio Signal Processing" having U.S. Ser. No. 09/886,868 filed on Jun. 21, 2001 and assigned to Bose® Corporation, which is herein incorporated by reference, could be used in the rear of the vehicle, where spatial enhancement processing is used with the configuration of transducers disclosed.

[0070] It should be understood that spatial enhancement is not limited to the second system configuration during the open mode of operation, but may also be performed on the audio signals provided to one or more sets of transducers (e.g., the front sets of transducers 24a-24b, 24c-24d or rear sets of transducers 26a-b, 28a-28d shown in FIG. 1A) in first system configuration during the conventional mode of operation.

[0071] It should be noted that other signal processing operations which affect system functions or performance attributes may change in the conventional and open mode of operation. For example, the dynamic range of the audio signal supplied to one or more transducers may be changed depending on the mode of operation. Additionally, balance/fade settings may be changed depending on the operation (e.g., fade control may be shut off or set to some fixed position in the open mode).

[0072] Equalization processes, amplification, spatial enhancement, signal mixing, dynamic range adjustment, and other signal processes may take place in either the digital domain with a device such as digital signal processor, microprocessor, digital amplifier, or other suitable digital device, or in the analog domain with separate physical circuits or a single physical circuit with dynamically adjustable elements (e.g., variable gain amplifiers, voltage controlled filters, etc.).

[0073] Additionally, while a dual-mode audio system is illustrated in FIG. 2A, the concept may be extended to audio systems which operate in three or more modes of operation. For example, as shown in FIG. 2B, when the mode detection process 150 detects that the system 20 has been turned on 151, the process 150 will place the system 20 in a first mode of operation 152. The system may have a first system configuration 154 (with a first topology and a first set of signal processing operations) in a conventional mode when all of the doors of the vehicle are closed, a second system configuration 162 (with a second topology and second set of signal processing operations) when one of the doors (e.g., a tailgate only) are open, and a third system configuration 168 (with a third topology and a third set signal processing operations) when a different door (e.g., a side door) is open.

[0074] When the first switching event occurs 156, the mode detection process 150 determines which mode of operation the system should transition to 158. The next mode of operation 152, 160, 166 is determined based on the state of a switch and/or the state of one or more physical conditions of the automobile (e.g., whether doors are opened/closed, engine is off/running, passenger in/out of driver's seat, etc.) and modifies the audio data accordingly. When another switching event occurs 156, 164, 170, the mode detection process 150 determines the next mode of operation 152, 160, 166.

[0075] As shown in FIG. 3, audio system 20 also may include a battery monitoring process 200 which may receive input 202 from the automobile 10 that indicates whether the engine of the automobile is running, which tells the audio system whether the primary power supply is the automobile's battery or another power source such as an alternator. Numerous possible signals could be provided to indicate whether or not the engine is running, such as a tachometer signal indicating the RPM of the engine (i.e., if RPM is zero, then the engine is not running and power is being drawn primarily from the battery), a signal indicating the state of the ignition lock (i.e., if the ignition is locked then the automobile is not running), or any of a number of digital signals that may be available on a communications bus which may be included in a vehicle electrical system.

[0076] If the battery condition monitoring process 200 detects that the engine is running 203 (and thus power is not being primarily drawn from-the battery), then there is no adjustment to the system configuration in order to conserve battery power 204.

[0077] When the battery condition monitoring process 200 detects that the engine is not running 203 (and thus power is being primarily drawn from the battery), the system 20 may adjust system configuration (i.e., system topology, signal processing operations or both) to conserve battery power 206 using a variety of techniques without substantially degrading system performance. For example, since the front transducers (e.g., 24a-b, 24c-24d in FIG. 1A) consume power but do not appreciably affect system performance outside the rear of the vehicle, the system may be configured to shut off the front pair transducers when operating under battery power in open mode. Similarly, the rear transducers (28a-28b in FIG. 1A) may be shut off when operating in the conventional mode. Thus, it should be understood that the adjustment to signal processes to conserve power 206 may differ depending on the mode of operation of the audio system 20. By adjusting system configuration in order to conserve power when the battery monitoring process detects that the engine is not running, the system is able to extend the length of time it may operate under battery power.

[0078] Transducers may be shut off in a variety of ways, including by muting the output of the amplifier feeding a particular transducer, placing the amplifier in a standby mode (many commercially-available amplifier integrated circuits, such as the TDA 8567Q amplifier manufactured by Philips® Semiconductor, are configured with both mute and standby modes), reducing the audio signal fed into an amplifier to substantially zero, interrupting the signal path between an amplifier and a transducer, or removing power from an amplifier feeding a particular circuit or transducer.

[0079] Since a significant amount of power is concentrated in the low frequency portion of music, the system may the

8

raise cutoff frequencies (or increase the order of attenuation as a function of frequency, or both) of high pass filters that may be located in the signal path of one or more of the signals delivered to the transducers in order to conserve power.

[0080] Power may also be conserved by reducing the magnitude of the voltage of the audio signal applied to one or more transducers. One technique for reducing the magnitude of the voltage is to reduce the gain in the signal path of the audio signal (which can be done by changing the gain of an amplifier, or the attenuation of a passive attenuator in analog implementations, or by changing coefficients in digital filters or digital multiplication operations in digital systems). Another technique for reducing the magnitude of the voltage of audio signals is through the use of a dynamic range control device in the signal path of the audio signal. A dynamic range control device is a device which limits, compresses, expands or otherwise changes the dynamic range of an audio signal.

[0081] One use of dynamic range control devices in audio systems is to keep a device (typically a power amplifier) from clipping its output. A dynamic range control device used in this type of application is commonly known as a limiter and is configured to keep the maximum voltage applied to the amplifier below a set minimum value under all operating conditions.

[0082] Dynamic range control devices are typically constructed using a variable gain element (such as an amplifier in an analog implementation or a multiplier in a digital implementation), a control element, and a signal detector of some type (typically a level detector to detect, peak, average or RMS level of a signal, although other types of detectors are also possible), where the gain of the variable gain element is varied as some function of the detected signal of interest by the control element. The function defines the relationship between the gain of the variable gain element and the detected quantity of the signal of interest. The nature of the function may change depending on the detected quantity, or may remain constant over the entire range of detected values. For example, a threshold value for the detected quantity may be determined, where the gain of the variable gain element is not changed as long as the detected quantity remains below the threshold value, but the gain is changed according to the specified function if the detected quantity exceeds the threshold level. Limiters work by reducing the gain of the variable gain element when the sensed parameter of the signal exceeds some set threshold value, which is usually chosen to allow maximum output of a device (such as a power amplifier) without clipping. Thus, in one embodiment the battery monitoring process may reduce the maximum voltage of an audio signal applied to one or more transducers by lowering the threshold value of a limiter when the battery monitoring process 200 detects that the audio system 20 is primarily running off of the battery.

[0083] Referring again to FIG. 3, the battery condition monitoring process 200 receives input 208 about various operating conditions of the battery and estimates the approximate amount of energy remaining in the battery, in order to ensure that there is sufficient charge remaining in the battery to re-start the automobile. If the estimated battery capacity reaches or falls below a predetermined threshold

value 209, then the system 20 may notify the user that battery energy is getting low 210 and may take further power conservations measures 212.

[0084] The battery condition monitoring process 200 receives input 208 indicating various factors related to the current operating condition of the battery. These conditions may include the discharge current magnitude and rate, the accumulated time discharging has been occurring, the ambient temperature, battery output voltage, and other conditions that one skilled in the art might wish to monitor in order to estimate the remaining capacity of the battery. From these conditions, process 200 estimates the remaining capacity of the battery.

[0085] The voltage profile of a battery is the relationship between the battery output voltage and the discharge conditions (length of time the battery has been discharging, rate of discharge, magnitude of discharge current, and temperature). The output voltage of a secondary (re-chargeable) battery decreases over time according the discharge conditions. Batteries, like lead-acid batteries commonly used in automobiles, do not have a singular discharge curve over all operating temperatures and discharge currents. Rather, a particular battery's voltage profile curve is a function of the operating conditions described above. The set of battery voltage profile curves for a particular battery are readily available from the manufacturer. Manufacturers also provide curves showing battery capacity as a function of operating conditions. One technique for estimating the remaining capacity of the battery involves determining where the battery is operating on its appropriate discharge (profile) curve, given the (monitored) operating conditions. From this information and the capacity information available from the manufacturer, the remaining battery capacity can be estimated.

[0086] Another technique for estimating the remaining capacity of the battery is to estimate the state of charge of the battery by measuring how much energy is put into it during charging and how much energy is drained from it when it is in use. This is sometimes called coulomb counting. In a separate embodiment, a battery monitoring process may monitor the amount of current being discharged from the battery as well as the amount of current that charges the battery and, from these measurements, estimate the remaining charge in the battery.

[0087] When the estimated capacity reaches a predetermined value above the minimum level necessary for normal re-starting of the vehicle (which is set as the battery capacity threshold value), the battery condition monitoring process 200 will inform the user 210 by issuing an alarm, which can be audible (e.g., output through the audio system) or visual (e.g., on a visual display) or tactile (e.g., actuate a vibrating device such as a pager). In other separate embodiments, the battery condition monitoring process 200 may shut down the audio system or place the system in a standby (or sleep) mode in which all unnecessary components, including all amplifiers, are shut off when the estimated capacity reaches the battery capacity threshold value. Also, in a vehicle equipped with remote starting capability, a battery condition monitoring process may trigger the remote starting process to periodically start the vehicle to recharge the battery when the estimated capacity reaches the battery capacity threshold value.

[0088] In other separate embodiments, a battery condition monitoring process may have several predetermined thresholds which cause the system to take different power conservation measures (e.g., shutting off transducers, adjusting equalization, automatically starting the automobile, reducing the magnitude of voltage of the audio signals applied to a transducer, placing the system in a standby mode, shutting off the system, etc.) at different predetermined thresholds.

[0089] In another embodiment, an audio system may include a battery monitoring process which does not estimate the remaining capacity of the battery, but which monitors one or more operating conditions of the battery such as the discharge current, current drawn by the audio system, temperature, or the battery's voltage. The battery monitoring process which monitors the operating condition of the battery may take one or more actions, such as triggering an alarm, reducing power consumption, placing the system in a standby mode, or completely shutting down the system, if the operating condition of the battery reaches a predetermined state. The predetermined state may be the state of one or more of the monitored conditions such as the battery voltage, discharge current, and ambient temperature, or a combination of conditions.

[0090] It should be noted that any number of the known techniques for estimating the remaining capacity of a battery or monitoring the operating condition of a battery may be utilized in other embodiments and the invention is not limited to the particular embodiments described above.

[0091] In other separate embodiments, an audio system may raise the cut-off frequencies of the high pass filters, shut off transducers, limit the gain of the amplifiers, reduce the dynamic range of audio signals, or take other energy conservation measures either whenever operation on battery power is detected (as shown in FIG. 2A), or when remaining battery energy decreases to a predetermined threshold. It should be understood that a battery monitoring process may be implemented in a dual mode audio system (as in audio system 20 shown in FIG. 1A-1B) or in a purely conventional audio system.

[0092] The circuitry implementing the mode selection, battery condition monitoring processes, and system configurations 100, 200, 106, 112, 206, 210, 212 illustrated in FIG. 2A, FIG. 2B and FIG. 3 may be implemented in hardware, software, firmware or the like in one or more locations in the audio system 20. For example, the circuitry for all of the processes may be physically located in the front control console 21 or rear control console 22 (in FIG. 1A) or the circuitry may be distributed across several devices of the system.

[0093] In a conventional vehicle audio system, the audio sources are typically located in front of the vehicle or at least a control interface for the audio sources is located in the front. When the audio system is operating in the open mode, for convenience, the audio sources or at least a set of controls for the audio sources can be accessible from the open tailgate (or door), which would normally be at the rear of the vehicle where the listeners are located. As shown in FIG. 4, a duplicate set of user controls in the rear console 22 is provided within the vehicle 10 cabin near the opening of the rear tailgate 50. This may be a complete set of duplicate controls, such as source selection, volume, and source transport controls (e.g., play, stop, pause, skip forward, skip

backwards, fast forward, fast reverse, preset selection, tune up or down, etc.). Alternatively, the rear console may be some subset of the complete control interface present in the front of the vehicle. Additionally, FIG. 4 shows a set of transducers 64 mounted on the vehicle's tailgate 50 such that their primary axis of radiation 70 is directed at an angle of approximately 45 degrees relative to the plane of the ground on which the vehicle 10 sits when the tailgate 50 is opened, and the primary axis of radiation 70 substantially faces into the passenger compartment of the vehicle 10 when the tailgate 50 is closed.

[0094] An additional way of controlling the audio sources from the rear of the vehicle is to implement the control functions using a remote control. A separate remote control may be used, or audio system control functions could be integrated onto a vehicle key fob remote, similar to those for remote keyless entry. Using a key fob remote, a plurality of buttons can be added to the key fob to provide limited audio function controls such as volume and source selection. Alternatively, existing key fob remote buttons that operate normal functions such as lock and unlock with the vehicle operating in conventional mode, can be re-mapped to operate audio functions when the vehicle is operating in open mode. Re-mapping could occur by activating a switch, button, or a sequence of buttons to change the remote function from normal vehicle functions to audio system functions. For example, one method to do this is by adding a shift button that changes the functions of other buttons on the remote. Alternatively, the vehicle could sense the mode, and change its interpretation of the commands sent by the key fob remote. For example, lock and unlock could become volume up and down when the system was operating in open mode.

[0095] Additionally, one or more external audio system inputs may be provided in the rear of the vehicle. For example, one input may be optimized to accept the output of a microphone. In this case, additional pre-amplification (and possibly a separate volume control) may be required. This would allow the vehicle to be used as a portable public address system. A line level input may also be provided. This would allow additional sources, such as a portable MP3 or CD player, to be connected to the system and be easily accessible from the rear.

[0096] Other features may be included in a rear control panel. For example, when the vehicle is equipped with an integrated video source (DVD-video, VHS, etc), a video output jack can be made accessible from the rear of the vehicle, so a video display may be attached.

[0097] FIG. 5A-FIG. 5D illustrate several locations where rear transducers may be mounted in order to provide high quality sound for both modes of operation. It should be noted that the transducers illustrated in FIG. 5A-FIG. 5D may be upper frequency transducers (e.g., tweeters, midranges), or may be substantially full range transducers (which radiate sound over the majority of the audible frequency range of the human auditory system). Additionally, although transducers 60, 62, 64, and 66 shown in FIGS. 5A, 5B, 5C, and 5D, respectively, are shown as individual transducers, it should be understood that the transducers may also be mounted within enclosures.

[0098] The primary axis of radiation of a transducer is the direction in which the transducer radiates maximum energy

over the majority of its operating range. This direction is typically in line with physical center axis of symmetry of an axi-symmetric transducer. For ease of understanding, axisymmetric transducers are assumed to be used here, and the axis of primary radiation is assumed to be aligned with the center axis of symmetry of the transducer and points away from the front surface of the primary radiating surface of the transducer, where the front surface is the surface that is coupled to the listening environment. It should be noted, however, that the invention is not limited to use of axisymmetric transducers. The orientations described can be adjusted as needed such that sound radiation is directed in the desired directions.

[0099] As shown in FIG. 5A, an automobile 10 includes a rear tailgate 50 having an upper hinge 51 which is shown as open. A pair of rear transducers 60 (e.g., mid-range transducers) are mounted within the automobile cabin near the opening of the tailgate 50 such that the pair of transducers 60 are outwardly directed from the cabin when the tailgate 50 is opened. When the tailgate 50 is closed, sound from transducer pair 60 is reflected off of the tailgate back into the automobile cabin. There are numerous locations in the rear portion of the cabin of the automobile where transducers 60 may be mounted and the invention is not limited to the specific location illustrated in FIG. 5A. Additionally the transducer pair 60 may be oriented such that they do not point directly at the tailgate 50 when the tailgate is closed, but may be angled with respect to the tailgate 50. For example, in separate embodiments, transducer pair 60 may be mounted on the cabin floor, cabin ceiling, cabin sidewalls, rear cabin deck, or back of the rearmost seat in the automobile 10. Finally, an additional transducer, such as a subwoofer, may also be mounted within the passenger compartment near the tailgate.

[0100] FIG. 5B and FIG. 5C illustrate additional separate embodiments of where pairs of rear transducers may be mounted on an automobile 10 having a tailgate 50. Specifically, FIG. 5B shows a pair of rear transducers 62 mounted within the automobile cabin near the top hinge 51 of the tailgate 50.

[0101] FIG. 5C shows a pair of rear transducers 64 mounted on the tailgate 50 such that the left transducer is located in the upper left-hand side of the tailgate and a right transducer is located in the upper right-hand side of the tailgate. The transducers 64 may be mounted within the trim of the tailgate 50. The transducers may also be mounted on a window on the tailgate 50 using methods similar to those used to attach a rear view mirror to a front windshield. The window mounted transducers may additionally be attached to the trim surrounding the window for additional structural support. The rear transducers 64 can also be oriented such that the primary axis of radiation 70 of the transducers 64 face substantially towards the rear of the automobile 10 and are angled at an angle of approximately 45 degrees relative to a plane parallel to the ground when the tailgate is open. Similarly, the primary axis of radiation 70 of the transducers 64 is pointed substantially towards the passenger cabin when the tailgate is closed. This transducer orientation may be particularly advantageous because it directs sound into the vehicle when the tailgate is closed and also outwardly directs sound from the vehicle when the tailgate is open.

Thus, this transducer orientation is particularly well-suited for accommodating both modes of operation of the audio system.

[0102] FIG. 5D shows another pair of rear transducers 66 mounted on the tailgate 50 approximately midway between the upper hinge 51 and lower edge 52 of the tailgate 50. While this transducer orientation is well-suited for operation in the conventional mode of operation because sound is directed into the passenger cabin when the tailgate is closed, this orientation may not be optimal for listeners that are located behind the automobile 10, away from the tailgate, as these listeners will be significantly off-axis to the main axis of radiation of the transducers 66.

[0103] While FIG. 5A-FIG. 5D illustrate various locations of a single pair of rear transducers, additional separate embodiments may include audio systems where multiple pairs of rear transducers are mounted at multiple locations in automobile cabin and tailgate. Additionally, note that transducers 60, 62, 64, and 66 shown in FIG. 5A, 5B, 5C and 5D, respectively, represent a pair of transducers symmetrically located within the automobile, where the axis of symmetry is the centerline of the automobile 10.

[0104] FIG. 6 illustrates a block diagram of an audio system 300 according to the invention. The audio system 300 includes an audio source 302 and a controller 304. The controller 304 can be an amplifier. The audio source 302 generates an audio signal. The controller 304 modifies the audio signal. For example, in a first system configuration, the controller 304 can route the audio signal to a first plurality of transducers 306. The first plurality of transducers 306 corresponds to the audio system 300 operating in the conventional mode. The controller 304 can also modify the audio signal by adjusting signal processing operations, such as equalization parameters of the audio signal and/or amplifying the audio signal. Skilled artisans will appreciate that the partitioning between the audio source 302 and the controller 304 shown in FIG. 6 is an illustrative embodiment. Various elements in the audio source 302 and the controller 304 can be moved and/or modified. In one embodiment, the controller 304 is integrated with the audio source 302.

[0105] In a second system configuration, the controller 304 can route the audio signal to a second plurality of transducers 308. The second plurality of transducers 308 corresponds to the audio system 300 operating in the open mode. In one embodiment, the first plurality of transducers 306 is the same as the second plurality of transducers 308 and the signal processing operations, (e.g., equalization parameters of the audio signal) are modified depending on the mode of operation. For example, the equalization parameters of the audio system 300 in the first system configuration can be different than the equalization parameters of the audio system 300 in the second system configuration.

[0106] The audio source 302 includes a micro-controller 310. The micro-controller 310 is coupled to a display 312 through an electrically conductive path 314. The display 312 can be any suitable display such as a liquid crystal display (LCD), a light emitting diode (LED) display, a plasma display, or a cathode ray tube (CRT) display. The display can indicate the status of the audio system 300, including but not limited to the status of the audio source, the operating mode of the system (e.g., conventional mode or open mode, in a

dual mode system), and/or additional information, such as the frequency band or the title of an audio track, for example. The micro-controller 310 can also be coupled to a set of user controls 316 that control the audio system 300. For example, the user controls 316 can be buttons, switches, knobs, a microphone, a keypad, or any other suitable control mechanism. In one embodiment, the display 312 is a touch-screen display and the user controls 316 are soft-keys in the touch-screen display. The user controls 316 can be used to select the mode of operation, such as the conventional mode or the open mode based on a user input.

[0107] The micro-controller 310 is also coupled to one or more sources 318 of audio data such as compact disk (CD), digital video disk (DVD), mini disk (MD), hard disk (HD), and/or MPEG1, layer 3 (MP3). The sources 318 of audio data are controlled by the micro-controller 310 through a transmission path 320. The transmission path 320 can be a bus, such as a GPIO bus, a RS232 bus, a SCSI bus, a serial bus, a parallel bus, a fibre channel bus, an optical bus, a CAN bus, a MOST bus, or any other suitable communication method for transmitting control information. In one embodiment, the transmission path 320 can transmit data as well as control information.

[0108] The micro-controller 310 is also coupled to one or more tuners 322. The tuners 322 can include an amplitude modulated (AM) tuner, a frequency modulated (FM) tuner, a television (TV) tuner, a XM tuner, and a satellite tuner. The tuners 322 are controlled by the micro-controller 310 through a transmission path 324. The transmission path 324 can be a bus, such as a GPIO bus, a RS232 bus, a SCSI bus, a serial bus, a parallel bus, a fibre channel bus, an optical bus, a CAN bus, a MOST bus, or any other suitable communication method for transmitting control information.

[0109] The micro-controller 310 is also coupled to the controller 304 through a control interface 326. One or more functions of the controller 304 are controlled by the micro-controller 310. For example, in response to a user input, the micro-controller 310 can transmit a command to the controller 304 to select the first system configuration or the second system configuration. The micro-controller 310 can also transmit commands to the controller 304 to adjust a set of signal processing operations, such as equalization parameters in the first and/or the second system configuration.

[0110] An infrared (IR) receiver circuit 328 is coupled to the micro-controller 310 through a transmission path 330. The IR receiver circuit 328 is coupled to an IR sensor 332 through a transmission path 334. Alternatively, the IR sensor 332 can be integrated with the IR receiver circuit 328. The IR sensor 332 receives IR signals from a remote control transmitter 336. The remote control transmitter 336 can control various functions of the audio system 300 and/or the vehicle. For example, the remote control transmitter 336 can select the system configuration, select a source (e.g., CD, stereo radio, DVD, etc.), control a volume, control an equalization function, control a tuning function, select a band, select a track, control a seek function, control a scan function, control a fast forward function, control a rewind function, control a skip forward function, control a skip back function, control a fader function, control a balance function, and/or control any other function of the audio system 300. In an embodiment including a video source, the remote

control transmitter 336 can control functions of the video source, such as chapter select, search, skip, fast forward, rewind, zoom, pause, etc. The remote control transmitter 336 can also control functions related to the vehicle. For example, the remote control transmitter 336 can control a door lock, a vehicle ignition, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, a vehicle alarm, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system, or any other desired function, such as controlling a climate setting with a heater, an air conditioner, or a defroster, in the vehicle. The remote control transmitter 336 can also be used to control systems that are external to the vehicle, such as a garage door opener, electric gate, lights, appliances, or a home security system, for example. In one embodiment, the functions of the remote control transmitter 336 are user programmable.

[0111] Skilled artisans will appreciate that other types of remote control transmitters and receivers could be used in the audio system 300. For example, a radio-frequency (RF) transmitter and a RF receiver could be used instead of the IR remote control transmitter 336 and IR receiver circuit 328. In one embodiment, each audio system 300 can include a remote control transmitter that transmits a unique transmitter signal such that no two transmitters can control the same audio system 300. In other embodiments, the audio system 300 can include a remote control transmitter having transmitter codes that are user selectable. Various techniques for programming communication protocols between remote control transmitters and remote control receivers can be used.

[0112] In one embodiment, a sensor 338 is coupled between the micro-controller 310 and the IR receiver circuit 328. The sensor 338 can be used to disable the IR receiver circuit 328 in specific situations. For example, the IR receiver circuit 328 can be disabled when the vehicle is in motion. This can prevent the second system configuration corresponding to the open mode from being inadvertently selected while the vehicle is moving. In this embodiment, the sensor 338 can be coupled to a tachometer 340 in the vehicle to sense a state of the engine. Alternatively, the sensor can be coupled to a speedometer in the vehicle to sense a speed of the vehicle. In another example, the sensor 338 can be coupled to a parking brake in the vehicle to sense a state of the parking brake. The sensor 338 can be coupled to any combination of these, or can be coupled to other systems in the vehicle that indicate that the vehicle is moving. For example, in one embodiment, audio system 300 obtains the status of the vehicle through a vehicle data bus (not shown) that is integrated into the electrical system of the vehicle.

[0113] A selection of the second system configuration can also be disabled in various other ways including manually disabling the selection of the second system configuration through a head unit in the audio system 300 or through a switch coupled to the audio system 300. In another embodiment, the selection of the second system configuration can be disabled automatically by closing a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a convertible top, a trunk, and/or a storage bin on the vehicle.

[0114] The selection of the second system configuration can be automatically enabled by opening a door, a window,

a tailgate, a hatch, a moon roof, a sunroof, a convertible top, a trunk, and/or a storage bin on the vehicle. Alternatively, the selection of the first system configuration can be automatically enabled by closing a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a convertible top, a trunk, and/or a storage bin on the vehicle. There are various other methods that can be used for selecting the first or the second system configuration. For example, the selection of the second system configuration can be made by operating a switch. The switch can be a manual switch, an automatic switch, a sensor, a remote control switch, a switch that is integrated with the audio source 302, and/or a switch that is integrated with the controller 304.

[0115] The audio system 300 can also include a visual indictor 342 that is coupled to the audio source 302 and/or the controller 304. The visual indicator 342 visually indicates when the second system configuration is selected. The visual indicator 342 can be a brake light, a lamp, a light emitting diode (LED), a strobe, a parking light, a directional light, a reverse light, and/or any other visual indicator.

[0116] The visual indicator 342 can be coupled to a relay 344 through a diode 346. In one embodiment, the relay 344 powers the visual indicator 342 using the battery 348 from the vehicle. In the case in which a brake light shares functionality with the visual indicator 342, a switch 350 that is coupled to the brake pedal is connected via diode 352 and the relay 344 is coupled via diode 346 to protect each circuit. Skilled artisans will appreciate that various other arrangements can also be used.

[0117] The relay 344 is coupled to a relay control unit 354 through a transmission path 356. The relay control unit 354 is coupled to the micro-controller 310 through a transmission path 358. The micro-controller 310 instructs the relay control unit 354 to activate the visual indicator 342 when the second system configuration is selected.

[0118] The audio system 300 can also include at least one auxiliary input 360. The auxiliary input 360 can be used to couple an auxiliary or external device to the audio source 302. The auxiliary input 360 can be a line level input, for example. The auxiliary device can be a radio, a television, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a hard drive, a mini-disk (MD) player, a personal digital assistant (PDA), a video player, a portable audio player, a microphone and/or a musical instrument. Other devices, such as a karaoke machine, a turntable, and/or a drum machine can also be coupled to the auxiliary input 360. The auxiliary input 360 is coupled to an audio buffer 362 in the audio source 302. The audio buffer 362 is generally referred to as an impedance buffer. The audio buffer 362 is coupled to a multiplexer 364.

[0119] The multiplexer 364 is configured to receive audio input from the sources 318 of audio data, the tuners 322 and the auxiliary input 360. The multiplexer 364 transmits the selected audio data to an output buffer 366. The output buffer 366 is an impedance buffer.

[0120] The controller 304 includes an input buffer 368 that is coupled to the output buffer 366. The controller 304 also includes a control interface 370 that is coupled to the control interface 326 in the audio source 302. The control interface 370 receives commands from the micro-controller 310. The commands control various functions of the controller 304.

For example, the micro-controller 310 can command the controller 304 to adjust various parameters 372 of the audio signal generated by the audio source 302 such as the volume, the bass level, the treble level, the fader, and the balance.

[0121] The controller 304 can include amplification circuitry having multiple channels and switching circuitry to switch different channels on and off. In one embodiment, the controller 304 includes at least two blocks EQ A 374 and EQ B 376 of equalization processing circuitry, which can include a plurality of individual channels. The controller 304 can include any desired number of blocks of equalization processing circuitry or other signal processing circuitry that can configure an audio signal depending on the configuration of the audio system 300. The first equalization block 374 corresponds to the first system configuration and configures the audio signal with a first set of signal processing operations. The second equalization block 376 corresponds to the second system configuration and configures the audio signal with a second set of signal processing operations. For example, the audio signal in the first system configuration can require a different set of equalization parameters than the audio signal in the second system configuration. An A/B switch 378 switches the audio system 300 between the first and the second system configuration. Although this example illustrates two system configurations, the audio system 300 can support any desired number of system configurations.

[0122] The outputs of the A/B switch 378 are coupled to power amplifiers 380, 382. The first power amplifier 380 is coupled to the first plurality of transducers 306. The second power amplifier 382 is coupled to the second plurality of transducers 308. It should be noted that the power amplifiers 380, 382 can include multiple channels, each of which can be coupled to one or more transducers in the first 306 and the second plurality of transducers 308.

[0123] In another embodiment, the system is implemented using a programmable filter structure (not shown) in which different equalization parameters are applied to different signals depending on the system configuration, instead of blocks of equalization circuitry that are switched "in" and "out" depending on the system configuration.

[0124] In one embodiment, the first 306 and the second plurality of transducers 308 can each include at least one common transducer. For example, the first 306 and the second plurality of transducers 308 can include the same transducers. In this embodiment, the signal processing operations, such as the equalization parameters from the two channels of equalization circuitry 374, 376 can be different between the first system configuration and the second system configuration.

[0125] FIG. 7 illustrates a perspective view of a vehicle 400 including an embodiment of the audio system 300 of FIG. 6. The audio system 300 includes a pair of transducers 402 that are mounted to the rear seats 404 of the vehicle 400. The pair of transducers 402 is positioned so that the primary axis of radiation of each of the transducers 402 is facing toward to rear of the vehicle 400. In this embodiment, each of the transducers 402 radiate maximum energy over a majority of the operating range of the transducers 402. The energy is directed to an area 405 behind the vehicle 400 when the tailgate 406 is in the open position. Another pair of transducers 408 can be positioned on an interior-facing panel 410 of the tailgate 406. The primary axis of radiation

of the pair of transducers 408 is directed inside the passenger compartment when the tailgate 406 is in the closed position and is directed to the area 405 behind the vehicle 400 when the tailgate is in the open position.

[0126] The vehicle 400 also includes a control panel 412 that is located in the interior of the vehicle 400 near the tailgate 406. The control panel 412 can include user controls, such as control knobs, a push buttons, and/or a keypad that can control the audio system. The control panel 412 can also include an auxiliary input 414, such as an auxiliary jack for coupling an auxiliary source to the audio system. The auxiliary sources can be a radio, a television, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a MD player, a PDA, a video player, a hard drive, a portable audio player, a microphone and/or a musical instrument.

[0127] The audio system 300 includes the remote control receiver 328 described with reference to FIG. 6. An infrared (IR) sensor 416 is coupled to the remote control receiver 328. In one embodiment, the IR sensor 416 is located in a tail light assembly 418 on the vehicle 400. For clarity, the IR sensor 416 is not drawn to scale. A tail light assembly can be the left and right tail light/directional light assemblies, the reverse light assemblies, a license plate illuminator assembly, a running light assembly, a courtesy light, or the high-level brake light assembly, for example. In some embodiments, the IR sensor 416 is mounted in a head light assembly, a fog light assembly or any other exterior light assembly. The sensor 416 can also be located in exterior mirror assemblies, such as side view mirror assemblies. The IR sensor 416 receives signals from the IR remote control transmitter 336 (FIG. 6). The signals are transmitted to the remote control receiver 328 and direct the remote control receiver 328 to control functions of the audio system 300 as previously described. The functions can include selecting a system configuration, selecting a source, controlling a volume, controlling an equalization function, controlling a tuning function, selecting a band, selecting a track, controlling a seek function, controlling a scan function, controlling a fast forward function, controlling a rewind function, controlling a skip forward function, controlling a skip back function, controlling a fader function, and controlling a balance function of the audio system 300.

[0128] The IR remote control transmitter 336 can also be used to control functions of the vehicle 400 such as opening a door lock, activating a vehicle ignition, opening or closing a window, opening or closing a power door, moving a power seat, opening or closing a power moon roof, operating a convertible top, activating a courtesy light, and activating or deactivating a vehicle alarm in the vehicle 400. The remote control transmitter 336 can also be used to control systems that are external to the vehicle, such as a garage door opener, electric gate, lights, appliances, or a home security system, for example. In an embodiment including a video source, the remote control transmitter 336 can control functions of the video source, such as chapter select, search, skip, fast forward, rewind, zoom, pause, etc.

[0129] The IR sensor 416 can be mounted to a body panel of the vehicle 400 or within the tail light assembly 418. The red colored lens 420 of the tail light assembly 418 can provide an ambient light filter for the IR sensor 416. Additionally, the tail light assembly 418 can include a

curved reflector, such as a parabolic mirror that is used to defocus and reflect light out of the tail light assembly 418. This parabolic mirror can be used to focus signals from the IR remote control transmitter 336 onto the IR sensor 416. This focusing feature can improve the distance range of the IR transmitter 336. Additionally, the focusing feature can improve the peripheral range of the IR transmitter 336.

[0130] In one embodiment, the audio system 300 includes a visual indicator 422. The visual indicator 422 can be used to indicate when the system is operating in the open mode previously described. The visual indicator 422 can be the high level brake light as shown in FIG. 7. However, the visual indicator 422 can also be a different brake light, a lamp, a light emitting diode (LED), a strobe, a parking light, a directional light, a reverse light, or any other suitable visual indicator. In one embodiment, the visual indicator 422 can also indicate the operation of the auxiliary input.

[0131] The vehicle 400 can include a video display 424 that can be attached to a headliner in the vehicle 400. The video display 424 can also include a pair of transducers 426. The transducers 426 can be configured to output a center channel audio signal to align the video image from the video display 424 with the audio output. The video display 424 can be positioned so that the video image is viewable to viewers in the listening area 405 outside of the vehicle. The video display 424 can also be re-positioned such that passengers in the vehicle can view the display when the tail gate 406 is in the closed position. The video display 424 can include any suitable video display such as a liquid crystal display (LCD), a light emitting diode (LED) display, a plasma display, a projection display, or a cathode ray tube (CRT) display.

[0132] FIG. 8 illustrates a side view of a vehicle 450 including an embodiment of the audio system 300 of FIG. 6. The vehicle 450 includes a pickup bed 452 having a tailgate 453. One or more transducers 454 are positioned in the pickup bed 452. In one embodiment, the transducers 454 are mounted in a storage bin 456 that is mechanically coupled to the pickup bed 452. The transducers 454 can be oriented such that their primary axis of radiation is facing toward to rear of the vehicle 450. In this embodiment, the transducers 454 radiate maximum energy over a majority of their operating range to an area 458 behind the vehicle 450 when the second system configuration is selected and the system is operating in the open mode.

[0133] The vehicle 450 also includes a visual indicator 460, which can be a high level brake light, for example. The visual indicator 460 can indicate when the second system configuration is selected and the system is operating in the open mode. The audio system 300 can also include an infrared sensor 462 that is mounted in a tail light assembly 464 of the vehicle 450.

[0134] In the embodiment shown in FIG. 8, it is not necessary to open a door 466 or the tailgate 453 in the vehicle 450 in order to operate in the open mode. The audio system can transition to the second system configuration in response to a user input, since the transducer 454 is positioned in a location that is external to the passenger compartment 468 of the vehicle 450. In another embodiment, a transducer 470 can be mounted to a body panel 472 of the vehicle 450. In this embodiment, the transducer 470 is oriented such that its primary axis of radiation is facing toward to rear of the vehicle 450. Other locations on and

14

around the vehicle **450** that are external to the passenger compartment **468** can also be used to mount the transducers **454**, **470**.

[0135] FIG. 9 illustrates a side view of a vehicle **480** including an embodiment of the audio system **300** of FIG. 6. The vehicle **480** is a minivan-type vehicle having at least one side door **482** that slides open towards the rear **484** of the vehicle **480**. The vehicle **480** includes at least one transducer **486** that is positioned in the passenger compartment **487** so that its primary axis of radiation is directed to a listening area **488** that is outside of the vehicle **480** when the side door **482** is in the open position.

[0136] Other embodiments can be realized with transducers being positioned so that the primary axis of radiation of each of the transducers is directed to a listening area that is outside the vehicle **480**. For example, if a listening area **490** is located behind the rear **484** of the vehicle **480**, the primary axes of radiation of the transducers **486** are not directed towards the listening area **490**. However, another transducer **492** is positioned in the vehicle **480** such that its primary axis of radiation is directed to the listening area **490** that is outside of the vehicle **480** when a rear door **494** of the vehicle **480** is in the open position. Although this embodiment is shown with an open side door **482** leading to the listening area **488**, the system can be also used with windows, moon roofs, or any opening in the passenger compartment **487** of the vehicle **480**.

[0137] The infrared sensor **496** is mounted to the side door **482** of the vehicle **480**. In some embodiments, multiple infrared sensors can be mounted at various positions around the vehicle **480** depending upon the specific location of the listening area.

[0138] The audio system **300** (FIG. 6) can be configured in at least two different configurations. In a first configuration, the audio system **300** is operated in the conventional mode. This mode is characterized by a first set of signal processing operations that are configured for listening to the audio system **300** in the passenger compartment **487** of the vehicle **480**. The audio system **300** uses a first plurality of transducers in the conventional mode of operation. The first plurality of transducers can be positioned at various locations in the passenger compartment **487**.

[0139] In a second configuration, the audio system **300** is operated in the open mode. This mode is characterized by a second set of signal processing operations that are configured for listening to the audio system **300** in a listening area **488**, **490** that is external to or outside of the passenger compartment **487** of the vehicle **480**. The audio system **300** uses a second plurality of transducers in the open mode of operation. The second plurality of transducers can be positioned at various locations inside the passenger compartment **487** and/or external to the passenger compartment **487**.

[0140] In one embodiment, the first and the second plurality of transducers include at least one common transducer. In other embodiments, the first and the second plurality of transducers include unique transducers. The audio system **300** can be configured such that at least one of the transducers in the second plurality of transducers has its primary axis of radiation directed outside of the passenger compartment **487** of the vehicle **480**.

[0141] A number of embodiments have been described, however, it is evident that those skilled in the art may make numerous modifications of the departures from the specific apparatus and techniques disclosed herein without departing from the inventive concepts. Consequently, the invention is to be construed as embracing each and every novel feature and novel combination of features present in or possessed by the apparatus and techniques disclosed herein and limited solely by the spirit and scope of the appended claims.

What is claimed is:

1. An audio system for a vehicle, comprising:

a) an audio source that generates an audio signal;

b) a controller that is coupled to the audio source, the controller modifying the audio signal with one of a first and a second signal processing operation in response to a user input, the first signal processing operation configuring the audio signal for listening inside the vehicle and the second signal processing operation configuring the audio signal for listening outside the vehicle;

c) a first plurality of transducers that is coupled to the controller, the first plurality of transducers being driven by the audio signal that is configured for listening inside the vehicle by the first signal processing operation; and

d) a second plurality of transducers that is coupled to the controller, the second plurality of transducers being driven by the audio signal that is configured for listening outside the vehicle by the second signal processing operation.

2. The audio system of claim 1 wherein at least one transducer in the second plurality of transducers is positioned in a location that is external to a passenger compartment of the vehicle.

3. The audio system of claim 2 wherein the at least one transducer is mounted in a body panel on the vehicle.

4. The audio system of claim 2 wherein the at least one transducer is mounted to a storage bin that is mechanically coupled to the vehicle.

5. The audio system of claim 1 wherein the first and the second plurality of transducers comprises at least one common transducer.

6. The audio system of claim 1 wherein the first signal processing operation comprises a different equalization parameter than the second signal processing operation.

7. The audio system of claim 1 further comprising a visual indicator that indicates that the audio signal is driving the second plurality of transducers.

8. The audio system of claim 7 wherein the visual indicator is chosen from the group comprising a brake light, a lamp, a light emitting diode (LED), a strobe, a parking light, a directional light, and a reverse light.

9. The audio system of claim 1 wherein the controller comprises an amplifier.

10. The audio system of claim 1 wherein the controller is integrated with the audio source.

11. The audio system of claim 1 wherein at least one of the first and the second signal processing operations substantially attenuates the audio signal.

12. The audio system of claim 1 wherein the audio source further comprises an auxiliary input terminal for coupling an auxiliary device to the audio source.

13. The audio system of claim 12 wherein the auxiliary device is chosen from the group comprising a radio, a television, an XM tuner, a SAT tuner, a CD player, a DVD

player, a cassette player, a MP3 player, a MD player, a hard drive, a PDA, a video player, a portable audio player, a microphone, and a musical instrument.

**14.** The audio system of claim 12 further comprising a visual indicator that indicates that the auxiliary device is coupled to the audio source.

**15.** The audio system of claim 1 wherein the user input is chosen from the group comprising opening at least one of a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle.

**16.** The audio system of claim 1 wherein the user input comprises operating a switch.

**17.** The audio system of claim 16 wherein the switch comprises at least one of a manual switch, an automatic switch, a sensor, a remote control switch, a switch that is integrated with the audio source, and a switch that is integrated with the controller.

**18.** The audio system of claim 1 further comprising an amplifier that controls at least one of a gain and an equalization of the audio signal.

**19.** The audio system of claim 1 wherein the controller is coupled to the audio source through at least one of a GPIO bus, a RS232 bus, a SCSI bus, a serial bus, a parallel bus, a fibre channel bus, an optical bus, a CAN bus, and a MOST bus.

**20.** The audio system of claim 1 wherein the audio source comprises at least one of an AM tuner, an FM tuner, a TV tuner, a XM tuner, a SAT tuner, a CD player, a DVD player, a cassette player, a MP3 player, a MD player, a video player, and a hard drive.

**21.** The audio system of claim 1 further comprising a video display that is coupled to the audio source.

**22.** The audio system of claim 21 wherein the video display is configured to direct a video image outside the vehicle.

**23.** The audio system of claim 21 wherein the video display is chosen from the group comprising a liquid crystal display (LCD), a light emitting diode (LED) display, a plasma display, a projection display, and a cathode ray tube (CRT) display.

**24.** The audio system of claim 1 wherein the audio signal comprises one of a stereo audio signal, a matrix surround sound audio signal, a 5.1 surround sound audio signal, a 6.1 surround sound audio signal, a 7.1 surround sound audio signal, and a two-channel down-mixed audio signal.

**25.** The audio system of claim 1 wherein at least one of the first and the second plurality of transducers comprises a pair of transducers and the audio source provides complete surround information to the pair of transducers.

**26.** The audio system of claim 25 wherein the surround information is mixed prior to being provided to the pair of transducers.

**27.** The audio system of claim 1 further comprising a remote control receiver.

**28.** The audio system of claim 27 wherein a remote control sensor that is coupled to the remote control receiver is located in a tail light assembly on the vehicle.

**29.** The audio system of claim 27 wherein the remote control receiver comprises one of an infrared (IR) receiver and a radio-frequency (RF) receiver.

**30.** The audio system of claim 27 wherein the remote control receiver is disabled when the vehicle is in motion.

**31.** The audio system of claim 30 further comprising a sensor that is coupled to a tachometer in the vehicle, the sensor detecting a state of the engine in the vehicle.

**32.** The audio system of claim 30 further comprising a sensor that is coupled to a parking brake in the vehicle, the sensor detecting a state of the parking brake in the vehicle.

**33.** The audio system of claim 1 wherein the audio source determines a status of the vehicle from a vehicle communication bus.

**34.** The audio system of claim 27 further comprising a remote control transmitter that communicates with the remote control receiver.

**35.** The audio system of claim 34 wherein the remote control transmitter comprises a unique transmitter signal.

**36.** The audio system of claim 34 wherein the remote control transmitter controls at least one of a door lock, a vehicle ignition, a window, a power door, a power seat, a power moon roof, a trunk lid, a communication system, a courtesy light, and a vehicle alarm in the vehicle.

**37.** The audio system of claim 34 wherein the remote control transmitter controls at least one of a system configuration, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio source.

**38.** The audio system of claim 34 wherein the remote control transmitter controls at least one of a garage door opener, an electric gate, a light, an appliance, and a home security system.

**39.** The audio system of claim 1 further comprising a battery monitor that monitors a state of a battery in the vehicle.

**40.** A method for operating an audio system in a vehicle, the method comprising:

a) generating an audio signal;

b) modifying the audio signal with one of a first and a second signal processing operation in response to a user input, the first signal processing operation configuring the audio signal for listening inside the vehicle and the second signal processing operation configuring the audio signal for listening outside the vehicle;

c) transducing the audio signal that is configured for listening inside the vehicle with a first plurality of transducers; and

d) transducing the audio signal that is configured for listening outside the vehicle with a second plurality of transducers.

**41.** The method of claim 40 wherein the first and the second plurality of transducers comprises at least one common transducer.

**42.** The method of claim 40 further comprising visually indicating when the audio signal is transmitted to the second plurality of transducers.

**43.** The method of claim 40 further comprising changing at least one equalization parameter in the audio signal in response to at least one of the first and the second signal processing operations.

**44.** The method of claim 40 further comprising remotely controlling the audio system.

**45.** The method of claim 40 further comprising coupling an auxiliary device to the audio system.

**46.** The method of claim 40 further comprising visually indicating when the auxiliary device is coupled to the audio source.

**47.** The method of claim 40 further comprising providing complete surround information to a pair of transducers in at least one of the first and the second plurality of transducers.

**48.** The method of claim 47 further comprising mixing the surround information prior to providing the surround information to the pair of transducers.

**49.** The method of claim 40 wherein the user input is chosen from the group comprising opening at least one of a door, a window, a tailgate, a hatch, a moon roof, a sunroof, a trunk, and a storage bin on the vehicle.

**50.** The method of claim 40 wherein the user input comprises operating a switch.

**51.** The method of claim 40 further comprising remotely controlling at least one of a door lock, a vehicle ignition, an air conditioner, a heater, a defroster, trunk lid, a communication system, a window, a power door, a power seat, a power moon roof, a courtesy light, and a vehicle alarm in the vehicle.

**52.** The method of claim 40 further comprising remotely controlling at least one of a system configuration, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio system.

**53.** An audio system for a vehicle, comprising:

  a) an audio source that generates an audio signal, the audio source being integrated with the vehicle;

  b) a remote control receiver that is coupled to the audio source, the remote control receiver controlling a function of the audio source; and

  c) a remote control sensor that receives a signal from a remote control transmitter to direct the remote control receiver to control the function of the audio source, the remote control sensor being positioned in a location that is external to the passenger compartment of the vehicle.

**54.** The audio system of claim 53 wherein the remote control sensor is mounted in an exterior light assembly.

**55.** The audio system of claim 54 wherein the exterior light assembly is chosen from the group comprising a left tail light assembly, a right tail light assembly, a left directional light assembly, a right directional light assembly, a parking light assembly, a reverse light assembly, a license plate illuminator assembly, a high-level brake light assembly, a courtesy light assembly, a running light assembly, a head light assembly, and a fog light assembly.

**56.** The audio system of claim 54 wherein the exterior light assembly comprises a curved reflector that focuses the signal from the remote control transmitter.

**57.** The audio system of claim 53 wherein the remote control sensor is one of an infrared (IR) sensor and a radio-frequency (RF) sensor.

**58.** The audio system of claim 53 wherein the remote control sensor is mounted to a body panel of the vehicle.

**59.** The audio system of claim 53 wherein the function comprises at least one of a system configuration selection, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio source.

**60.** The audio system of claim 53 wherein the remote control transmitter controls at least one of a door lock, a vehicle ignition, a heater, an air conditioner, a defroster, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system, and a vehicle alarm in the vehicle.

**61.** The audio system of claim 53 wherein the remote control receiver is disabled when the vehicle is in motion.

**62.** An apparatus for controlling an electrical component in a vehicle, the apparatus comprising:

  a) a remote control receiver that is coupled to the electrical component in the vehicle;

  b) a remote control sensor that is coupled to the remote control receiver, the remote control sensor being mounted in a light assembly and at least a portion of the light assembly being positioned on the exterior of the vehicle; and

  c) a remote control transmitter that communicates a control signal to the remote control sensor, the remote control receiver controlling the electrical component in response to receiving the control signal from the remote control sensor.

**63.** The apparatus of claim 62 wherein the remote control sensor comprises one of an infrared (IR) sensor and a radio-frequency (RF) sensor.

**64.** The apparatus of claim 62 wherein the light assembly is chosen from the group comprising a left tail light assembly, a right tail light assembly, a left directional light assembly, a right directional light assembly, a parking light assembly, a reverse light assembly, a license plate illuminator assembly, a high-level brake light assembly, a courtesy light assembly, a running light assembly, a head light assembly, and a fog light assembly.

**65.** The apparatus of claim 62 wherein the electrical component is chosen from the group comprising an audio system, a door lock, a vehicle ignition, a heater, an air conditioner, a defroster, a window, a power door, a power seat, a power moon roof, a convertible top, a courtesy light, vehicle telematics, a communication system, a trunk lid, a suspension load leveling system and a vehicle alarm.

**66.** The apparatus of claim 62 wherein the remote control transmitter controls at least one function of an audio system in the vehicle.

**67.** The apparatus of claim 66 wherein the function comprises at least one of a system configuration selection, a source selection, a volume, an equalization function, a tuning function, a band selection, a track selection, a seek function, a scan function, a fast forward function, a rewind function, a skip forward function, a skip back function, a fader function, and a balance function of the audio system.

\* \* \* \* \*

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C. 20436

### Before the Honorable Charles E. Bullock
### Chief Administrative Law Judge

|  |  |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1191** |

## COMPLAINANT SONOS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

| | |
|---|---|
| Dated: July 2, 2020 | Clement S. Roberts, Esq. |
| | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| George I. Lee, Esq. | The Orrick Building |
| Sean M. Sullivan, Esq. | 405 Howard Street |
| Rory P. Shea, Esq. | San Francisco, CA 94105-2669 |
| J. Dan Smith, Esq. | Tel.: (415) 773-5700 |
| Cole B. Richter, Esq. | Email: Sonos-1191-service@orrick.com |
| Michael P. Boyea, Esq. | |
| Jae Y. Pak, Esq. | Bas de Blank, Esq. |
| LEE SULLIVAN SHEA & SMITH LLP | Lillian J. Mao, Esq. |
| 656 W Randolph St, Floor 5W | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| Chicago, IL 60661 | 1000 Marsh Road |
| Tel.: (312) 754-0002 | Menlo Park, CA 94025-1015 |
| Email: Sonos-1191-service@orrick.com | Tel.: (650) 614-7400 |
| | Email: Sonos-1191-service@orrick.com |
| Jordan L. Coyle, Esq. | |
| ORRICK, HERRINGTON & SUTCLIFFE LLP | Alyssa M. Caridis, Esq. |
| Columbia Center | Geoffrey Moss, Esq. |
| 1152 15th Street, NW | Shane D. Anderson, Esq. |
| Washington, DC 20005 | Margaret Abernathy, Esq. |
| Tel.: (202) 339-8400 | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| Email: Sonos-1191-service@orrick.com | 777 South Figueroa Street, Suite 3200 |
| | Los Angeles, CA 90017-5855 |
| | Tel.: (213) 629-2020 |
| | Email: Sonos-1191-service@orrick.com |
| | |
| | ***Attorneys for Complainant Sonos, Inc.*** |

<u>**TABLE OF CONTENTS**</u>

I.  INTRODUCTION ............................................................................................. 1

    A.  Procedural History ............................................................................... 1

    B.  The Parties ........................................................................................... 2

    C.  Overview of the Technology ................................................................ 3

    D.  The Patents at Issue ............................................................................ 6

    E.  The Products at Issue .......................................................................... 7

II. LEGAL STANDARDS ..................................................................................... 8

    A.  Claim Construction ............................................................................. 8

    B.  Indefiniteness ..................................................................................... 12

III. AGREED-TO CONSTRUCTIONS ................................................................ 12

IV. THE "LOCAL AREA NETWORK" TERM .................................................. 13

    A.  The Claim Language Supports Sonos's Construction ......................... 15

    B.  The Specifications Support Sonos's Construction .............................. 16

    C.  Sonos's Extrinsic Evidence Is Consistent with the Intrinsic
        Evidence ............................................................................................. 21

V.  THE '896 PATENT CLAIM TERMS ............................................................ 22

    A.  Construction of "security key" ........................................................... 22

        1.  The Claim Language Supports Sonos and the Staff's
            Construction .......................................................................... 23

        2.  The Specification Supports Sonos and the Staff's
            Construction .......................................................................... 24

        3.  Sonos's Extrinsic Evidence Is Consistent with the Intrinsic
            Evidence ................................................................................ 26

    B.  Construction of "while operating . . ." ................................................ 27

    C.  Construction of "receiving . . . user input indicating that a user
        wishes to set up a playback device . . ." ............................................. 29

i

|   | 1. | The Claim Language Supports Sonos and the Staff's Position | 30 |
|   | 2. | The Specification Supports Sonos and the Staff's Position | 31 |
| D. | | Construction of "At Least a Second Message . . ." | 32 |
|   | 1. | The Claim Language Supports Sonos's Construction | 33 |
|   | 2. | The Specification Supports Sonos's Construction | 35 |

VI. THE '949 PATENT CLAIM TERM ........................................... 36

| A. | | Construction of "independent playback device" | 36 |
|   | 1. | The Claim Language Supports Sonos's Construction | 37 |
|   | 2. | The Specification Supports Sonos's Construction | 38 |
|   | 3. | The Prosecution History Supports Sonos's Construction | 40 |
|   | 4. | Sonos's Extrinsic Evidence Is Consistent with the Intrinsic Evidence | 42 |

VII. THE '959 PATENT CLAIM TERMS ......................................... 43

| A. | | Construction of "equalization [of the audio data]" | 44 |
|   | 1. | The Claims Support Sonos and the Staff's Construction | 45 |
|   | 2. | The Specification Supports Sonos and the Staff's Construction | 46 |
|   | 3. | The Prosecution History Supports Sonos and the Staff's Construction | 48 |
| B. | | Construction of "type of pairing" / "first type of pairing" / "second type of pairing" | 48 |
|   | 1. | The Claims Support Sonos's Construction | 49 |
|   | 2. | The Specification Supports Sonos's Construction | 50 |

VIII. CONCLUSION ........................................................................ 50

ii

**Appx3589**

<u>**TABLE OF AUTHORITIES**</u>

<span style="font-variant: small-caps;">Cases</span>

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A,*
 657 F.3d 1264 (Fed. Cir. 2011) ..................................................................... 9

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
 314 F.3d 1313 (Fed. Cir. 2003) ............................................................ 11, 46

*Bicon, Inc. v. Straumann Co.,*
 441 F.3d 945 (Fed. Cir. 2006) ..................................................................... 34

*Callicrate v. Wadsworth Mfg., Inc.,*
 427 F.3d 1361 (Fed. Cir. 2005) ................................................................... 49

*Chamberlain Grp., Inc. v. Lear Corp.,*
 516 F.3d 1331 (Fed. Cir. 2008) ................................................................... 45

*DDR Holdings, LLC v. Hotels.com, L.P.,*
 773 F.3d 1245 (Fed. Cir. 2014) ............................................................ 31, 32

*Electro Med. Sys. S.A. v. Cooper Life Scis. Inc.,*
 34 F.3d 1048 (Fed. Cir. 1994) ..................................................................... 10

*Forest Labs., Inc. v. Abbott Labs.,*
 239 F.3d 1305 (Fed. Cir. 2001) ................................................................... 49

*Glaxo, Inc. v. Novopharm, Ltd.,*
 110 F.3d 1562 (Fed. Cir. 1997) ..................................................................... 9

*ICU Med., Inc. v. Alaris Med. Sys., Inc.,*
 558 F.3d 1368 (Fed. Cir. 2009) ..................................................... 10, 18, 20

*In re Abbott Diabetes Care Inc.,*
 696 F.3d 1142 (Fed. Cir. 2012) ..................................................... 10, 18, 20

*In re Katz Interactive Call Processing Patent Litig.,*
 639 F.3d 1303 (Fed. Cir. 2011) ................................................................... 47

*In re Power Integrations, Inc.,*
 884 F.3d 1370 (Fed. Cir. 2018) ................................................................... 33

*In the Matter of Certain Vision-Based Driver Assistance Sys. Cameras,*
 *Components Thereof, & Prod. Containing the Same Comm'n Opinion,*
 USITC Inv. No. 337-TA-907 (Dec. 1, 2015) .............................................. 37

*In the Matter of Certain Wiper Blades Order No. 69: Construing Certain Terms*
 *of U.S. Patent Nos. 6,836,926 & 6,973,698,*
 USITC Inv. No. 337-TA-816 (May 22, 2013) ................................................. 23

*Interactive Gift Express, Inc. v. Compuserve, Inc.,*
 256 F.3d 1323 (Fed. Cir. 2001) ..................................................................... 29

*Interval Licensing LLC v. AOL,*
 766 F.3d 1364 (Fed. Cir. 2014) ..................................................................... 12

*Kara Tech. Inc. v. Stamps.com Inc.,*
 582 F.3d 1341 (Fed. Cir. 2009) ..................................................................... 23

*KIS, S.A. v. Foto Fantasy, Inc.,*
 60 F. App'x 319 (Fed. Cir. 2003) ................................................................... 29

*Laryngeal Mask Co. v. Ambu,*
 618 F.3d 1367 (Fed. Cir. 2010) ....................................................................... 9

*Markman v. Westview Instruments, Inc.,*
 52 F.3d 967 (Fed. Cir. 1995) ................................................................. 8, 9, 11

*Merck & Co. v. Teva Pharms. USA, Inc.,*
 395 F.3d 1364 (Fed. Cir. 2005) ..................................................................... 34

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
 133 F.3d 1473 (Fed. Cir. 1998) ....................................................................... 8

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
 572 U.S. 898 (2014) ................................................................................. 12, 37

*O.I. Corp. v. Tekmar Co., Inc.,*
 115 F.3d 1576 (Fed. Cir. 1997) ..................................................................... 12

Ormco Corp. v. Align Tech., Inc.,
 498 F.3d 1307 (Fed. Cir. 2007) ..................................................................... 30

*Pennwalt Corp. v. Durand-Wayland, Inc.,*
 833 F.2d 931 (Fed. Cir. 1987) ....................................................................... 10

*Phillips v. AWH Corp.,*
 415 F.3d 1303 (Fed. Cir. 2005) .............................................................. passim

*Resonate Inc. v. Alteon Websystems, Inc.,*
 338 F.3d 1360 (Fed. Cir. 2003) ..................................................................... 10

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.,*
 563 F.3d 1358 (Fed. Cir. 2009) ..................................................................... 38

iv

**Appx3591**

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001)......................................................................... 26, 49

*Riverbed Tech., Inc. v. Silver Peak Sys., Inc.*,
Case No. 11-cv-484, 2013 WL 3830416 (D. Del. July 23, 2013) .................................... 38

*Schoenhaus v. Genesco, Inc.*,
440 F.3d 1354 (Fed. Cir. 2006)........................................................................... 9

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017)........................................................................... 32

*Sonos, Inc. v. D&M Holdings, Inc.*,
Case No. 14-cv-1330, 2017 WL 123456 (D. Del. Jan. 12, 2017)............................... 13, 45

*Sonos, Inc. v. D&M Holdings, Inc.*,
Case No. 14-cv-1330, 2017 WL 3433691 (D. Del. Aug. 10, 2017) .................................. 13

*Standard Oil Co.* v. *Am. Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985)........................................................................... 11

*Tinnus Enterprises, LLC v. Telebrands Corporation*,
846 F.3d 1190 (Fed. Cir. 2017)........................................................................... 32

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)........................................................................... 49

*Unwired Planet L.L.C. v. Google, Inc.*,
660 F. App'x 974 (Fed. Cir. 2016) ...................................................................... 26

*Vederi, LLC v. Google, Inc*,
744 F.3d 1376 (Fed. Cir. 2014)........................................................................... 34

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)........................................................................ 9, 11

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017)........................................................................... 26

# I. INTRODUCTION

## A. Procedural History

This is an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"), to remedy the unlawful importation into the U.S., the sale for importation into the U.S., and/or the sale within the U.S. after importation by Respondents, Alphabet Inc. and Google LLC (collectively, "Google"), of certain audio players and controllers, components thereof, and products containing the same that infringe U.S. Patent Nos. 8,588,949 ("the '949 Patent"), 9,195,258 ("the '258 Patent"), 9,219,959 ("the '959 Patent"), 10,209,953 ("the '953 Patent"), and 10,439,896 ("the '896 Patent") (collectively, "the Asserted Patents"[1]), which are owned by Complainant, Sonos, Inc. ("Sonos").

Pursuant to the Scheduling Order entered in this Investigation on March 26, 2020, fact discovery is set to close on September 18, 2020 and trial is scheduled for February 22-26, 2021.

The parties are now seeking the Chief Administrative Law Judge's assistance with construing the following eight claim terms for the Asserted Patents:[2]

| Term | Patent(s) |
|---|---|
| "local area network" / "LAN" / "[wireless] local area network" / "[W]LAN" | 8,588,949 9,195,258 10,209,953 10,439,896 |
| "security key" | 10,439,896 |
| "while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup; after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication | 10,439,896 |

---

[1] The Asserted Patents are attached hereto as Exhibits 1-5.
[2] For convenience, Sonos has attached as Exhibit 6 a listing of all Asserted Claims, with the disputed terms highlighted.

| Term | Patent(s) |
|---|---|
| path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point" | |
| "program instructions stored on the non-transitory computer- readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising: while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup" | 10,439,896 |
| "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" | 10,439,896 |
| "independent playback device" | 8,588,949 |
| "equalization [of the audio data]" | 9,219,959 |
| "type of pairing" "first type of pairing" "second type of pairing" | 9,219,959 |

Consistent with the principles set forth in *Phillips v. AWH Corp.*, Sonos proposes constructions that are firmly based on the intrinsic evidence. 415 F.3d 1303 (Fed. Cir. 2005). For the most part, the Staff's constructions are the same or similar to Sonos's. In contrast, Google's approach to claim construction here is to propose whatever definitions best serve its defenses. As a result, Google repeatedly violates the principles set forth in *Phillips*. For example, in many instances, Google imports limitations into the claims that are unsupported by the intrinsic evidence. In other instances, Google ignores the intrinsic evidence altogether and defines terms in a vacuum. Thus, Sonos respectfully requests that the Chief Administrative Law Judge adopt Sonos's constructions and reject Google's constructions as legally improper.

**B.     The Parties**

Sonos began in 2002 as an American start-up consumer electronics company with a goal of reinventing home audio for the digital age. To achieve this goal, Sonos pioneered what is known as wireless multi-room audio, bringing its first commercial products to market in 2005.

Sonos's wireless multi-room audio system was based on new audio players called "zone players" (or "playback devices"), which are "smart" devices that connect to a local data network and can be placed in any room throughout a user's home or office. Once connected to the local data network, each zone player has the ability to independently access any audio source that is available on either the local data network or the Internet. As a result, each zone player can play different audio independently from other zone players, or multiple zone players can be grouped together to play the same audio in synchrony. Each zone player can also be controlled from anywhere in the user's home or office via a "controller" device that is also connected to the local data network.

By as early as 2013, Google gained knowledge of Sonos's patented multi-room technology through a partnership with Sonos to integrate Google Play Music into the Sonos platform. However, just two years later in 2015, Google began infringing Sonos's patents when it launched its first wireless multi-room audio product – Chromecast Audio. Since 2015, Google's misappropriation of Sonos's patented technology has only proliferated, as Google has expanded its wireless multi-room audio system to more than a dozen different infringing products, including, for example, the Google Home Mini, Google Home, Google Home Max, and Pixel phones, tablets, and laptops.

C.    **Overview of the Technology**

Sonos was founded to solve various shortcomings in existing conventional audio technology. At the time, a "conventional" audio system was based on a "centralized" device, such as an AV receiver, that was "hard-wired" to passive speakers with dedicated speaker wire. *See, e.g.*, '949 Patent at 1:41-47, 1:57-60;'959 Patent at 6:54-61. These "audio players" were passive speakers that merely outputted audio as received from the "centralized" device. *See,*

*e.g.*, '949 Patent at 1:41-60.

In this conventional "hard-wired" configuration, each audio player relied on a "centralized" device that managed and controlled the audio system. Under this approach, audio sources were either hard-wired to the "centralized" device, which made playing different audio sources at different audio players difficult (if not impossible), or hard-wired locally to a given audio player, which "[made] source sharing difficult." *See, e.g.*, '949 Patent at 1:45-56. For example, before an audio player could play audio from a source, a user had to configure the centralized device to route audio to the audio player from the common source. *See, e.g., id.* at 1:50-60.

In these conventional "hard-wired" systems, it was difficult or impossible to play different audio sources on different audio players, "group" and control audio players, access and play network-based audio sources (*e.g.*, Internet radio), and install and configure the system in the first instance, which required physically connecting every device to the "centralized" device. *See, e.g.*, '949 Patent at 1:34-2:13; '959 Patent at 6:52-61.

Sonos developed and patented a series of new technologies to solve the many shortcomings of conventional hard-wired audio systems, thereby revolutionizing the field. In turn, Sonos's introduction of paradigm-shifting technology created new technological opportunities and/or challenges that Sonos further solved.

For starters, Sonos provided an unconventional system architecture comprising "zone players" (also referred to as "playback devices") on a data network that were controlled by physical "controller" devices. *See, e.g.*, '949 Patent at FIG. 1; '258 Patent at FIG 1.[3] The

---

[3] The '258 and '953 Patents share a common specification, and thus, citations to the '258 Patent also apply to the corresponding portions of the '953 Patent.

following figure illustrates a simplified diagram of an exemplary Sonos audio system in accordance with this new system architecture, which comprises "zone players" 102, 104, and 106 and "controllers" 140 and 142 coupled to one another by a local data network 108 and two local audio sources 110 and 112, along with a connection to the Internet:



FIG. 1

'949 Patent at FIG. 1; *see also, e.g.*, '258 Patent at FIG. 1.

Unlike prior art audio players in conventional "centralized," "hard-wired" multi-zone audio systems, Sonos's "zone players" were each equipped with a data network interface and processing intelligence enabling each "zone player" to independently access and play back any audio source available on a local data network or another data network coupled thereto (*e.g.*, the Internet) without a centralized device. *See, e.g.*, '949 Patent at 4:60-64, 5:2-36, 9:50-52; '258 Patent at 1:33-44, 2:40-3:22.

The new, unconventional nature of Sonos's "zone players" introduced additional technological challenges to Sonos's system, which required Sonos's "zone players" to have new intelligence enabling the "zone players" to "share information" with one another so that they could "reproduce audio information synchronously," among other unconventional capabilities. *See, e.g.*, '258 Patent at 31:34-41. Thus, Sonos's new system featured "zone players" that were

5

capable of playing different audio from different sources or being "grouped" together to play the same audio source in a synchronized manner. *See, e.g.*, '258 Patent at FIG. 1, 3:50-61, 4:22-50, 5:10-6:64; '949 Patent at 2:28-48, 9:49-59.

Sonos also invented "controllers" used to setup and control Sonos's "zone players." Unlike the "pre-configured and pre-programmed controller[s]" used to control conventional "centralized," "hard-wired" audio systems, Sonos's novel "controller" devices were capable of remotely controlling any "zone player" in a Sonos audio system from anywhere in a user's house or the like via a local data network. *See, e.g.*, '949 Patent at 6:43-60; *see also, e.g.*, '258 Patent at 5:27-29, 5:38-40, 6:37-46. Building on the intelligence of Sonos's new "zone players," Sonos's "controllers" had new capabilities, including dynamically "grouping the zone players" and "control[ling] the volume of each of the zone players in a zone group individually or together." '949 Patent at 6:43-60; *see also, e.g.*, '258 Patent at FIG. 1, 3:50-61, 4:22-50, 5:10-6:64, 9:17-26.

Thus, Sonos's audio system comprising networked "zone players" controlled by physical "controllers" over a data network provided an entirely new paradigm in home audio that overcame the technological deficiencies of conventional audio systems. Moreover, Sonos's unconventional system architecture created new technological challenges that needed to be solved and provided a new platform for further innovation. Sonos's Asserted Patents are directed to overcoming these technological challenges and building on this new platform.

### D. The Patents at Issue

The Asserted Patents are directed to important aspects of Sonos's wireless multi-room audio system. Specifically, the Asserted Patents are directed to technology for setting up a playback device on a wireless local area network (the '896 Patent), managing and controlling groups of playback devices (the '949 Patent), synchronizing the play back of audio within groups

6

of playback devices (the '258 and '953 Patents), and pairing playback devices together for multi-channel sound (the '959 Patent).

### E. The Products at Issue

Sonos launched its first commercial products in 2005 and has since released a wide variety of wireless multi-room audio products, including, for example, the Play:1, Play:3, Play:5 (Gen 1 and Gen 2), One (Gen 1 and Gen 2), One SL, Move, Playbar, Playbase, Beam, Sub, Connect, Port, Connect:Amp, and Amp. Sonos's products can be set up and controlled by the Sonos app.

A sampling of Sonos's product lineup is shown below.



The following video provides an overview of Sonos's commercial system.

https://www.youtube.com/watch?v=eLoxSS1PN24.

Google's infringing products include the Chromecast, Chromecast Ultra, Chromecast Audio, Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, and Nest Wifi Point (individually or collectively, "Google Audio Player(s)"), all of which can be controlled by, for example, the Google Home app, Google Play Music app, and YouTube Music app (individually or collectively, "Google App(s)"). In addition to providing the various software Google Apps for controlling the Google Audio Players, Google also offers various infringing hardware controller devices that are pre-installed with the Google Play Music app or YouTube

Music app (and capable of downloading and executing the Google Apps that are not pre-installed). These infringing hardware controller devices include, for example, Google's "Pixel" phones, tablets, and laptops (*e.g.*, the Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, and Pixel 4 XL phones, the Pixel Slate tablet, and the Pixelbook and Pixelbook Go laptops) (individually or collectively, "Google Pixel Device(s)").

The image below shows a few of the infringing Google Audio Players.



## II.  LEGAL STANDARDS

### A.  Claim Construction

The proper determination of the meaning and scope of patent claims is a question of law. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995). Patent claims should be construed as they would be by a person of ordinary skill in the pertinent art ("POSITA").[4] *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

---

[4] Sonos submits that a person of ordinary skill in the art has the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or an equivalent thereof, and approximately 2-4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience. While Google appears to be asserting a slightly different level of skill in the art, the differences between the parties' standards are not material to claim construction.

**Appx3600**

The three primary sources considered in claim construction are: (1) the claim language, (2) the patent specification, and (3) the prosecution history. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1565 (Fed. Cir. 1997); *Markman*, 52 F.3d at 979. First, one looks to the words of the claims themselves to define the scope of the invention. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Second, the claims must be read in view of the specification. *Markman,* 52 F.2d at 979-80. Finally, one should consider the patent's prosecution history. *Id.*

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention when read in the context of the specification and prosecution history." *Laryngeal Mask Co. v. Ambu*, 618 F.3d 1367, 1370 (Fed. Cir. 2010) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)). In this respect, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Moreover, one cannot ignore claim limitations. *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 935 (Fed. Cir. 1987).

Further, a construction that renders a claim nonsensical cannot be correct. *See, e.g.*, *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006) (finding that plaintiff's construction "renders [the asserted claim] nonsensical" and therefore "cannot be correct"); *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011) ("We strive, where possible, to avoid nonsensical results in construing claim language.") (citing *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1370 (Fed. Cir. 2008) ("We decline to adopt a construction that would effect this nonsensical result.")).

9

After considering the claims themselves, the analysis turns to the specification, which is "always highly relevant" and "the single best guide to the meaning of a disputed term," and "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1315-16. Moreover, a term may be construed to include certain features when the specification "repeatedly and uniformly" described the term to include such features. *See, e.g., In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149-50 (Fed. Cir. 2012) (finding that a claimed "sensor" included a specific feature where the specification "repeatedly, consistently, and exclusively" disclosed a "sensor" having the specific feature while disparaging prior art sensors lacking that feature); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374-75 (Fed. Cir. 2009) (construing a term to include certain features because the specification "repeatedly and uniformly" described the term to include such features).

"However, the written description is not a substitute for, nor can it be used to rewrite, the chosen claim language." *Resonate Inc. v. Alteon Websystems, Inc.,* 338 F.3d 1360, 1364 (Fed. Cir. 2003). Although an understanding of the claim language can be aided by the explanations provided in the written description, it is improper to import limitations from the specification into a claim that are not a part of that claim. *Id.* "For example, a particular embodiment appearing in the written description may not be read into the claim when the claim language is broader than the embodiment." *Id.* at 1364-65 (citing *Electro Med. Sys. S.A. v. Cooper Life Scis. Inc.*, 34 F.3d 1048 (Fed. Cir. 1994)).

It is also proper to look at the prosecution history in interpreting claim terms. *Markman*, 52 F.3d at 980. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Moreover, "all express

10

representations made by or on behalf of the applicant to the examiner to induce a patent grant" limit the interpretation of the claims "so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co.* v. *Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

The Chief Administrative Law Judge also may, but is not obligated to, consider "extrinsic" evidence in order to determine the meaning of claim language. *Markman*, 52 F.3d at 980-81. However, "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1583. In this respect, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Moreover, "extrinsic evidence in general . . . may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language. Nor may it contradict the import of other parts of the specification." *Vitronics*, 90 F.3d at 1584 (citation omitted).

Finally, the doctrine of claim differentiation provides that "when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003). "There is a rebuttable presumption that different claims are of different scope." *Id.*; *see also Univ. of Tex. Sys.*, 533 F.3d at 1371 ("Different claim terms are presumed to have different meanings."). But this doctrine of claim differentiation "cannot alter a definition that is otherwise clear from the claim language, description, and prosecution history." *O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1582 (Fed. Cir. 1997).

## B. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). While "reasonable certainty" is the standard, a modicum of uncertainty may be tolerated and absolute precision is not required. *Id*. at 909-10; *Interval Licensing LLC v. AOL*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).

## III. AGREED-TO CONSTRUCTIONS

The parties have agreed to the constructions for the following claim terms.

| Term | Patent(s) | Agreed-To Constructions |
|---|---|---|
| "zone player" / "playback device" / "player" | 8,588,949 9,195,258 9,219,959 10,209,953 10,439,896 | "data network device configured to process and output audio" |
| "network interface" | 9,195,258 9,219,959 10,209,953 10,439,896 | "physical component of a device that provides an interconnection with a data network" |
| "playback timing information" | 9,195,258 10,209,953 | "information indicating when the audio information [content] is to be played back" |
| "clock time information" / "clock timing information" | 9,195,258 10,209,953 | "information representing a time value indicated by a device's clock" |
| "a synchrony group" | 9,195,258 10,209,953 | "a set of two or more zone players that are to play the same audio program synchronously" |
| "independently clocked" | 9,195,258 | "operating in accordance with their own respective clocks during synchronous playback" |
| "multimedia" | 8,588,949 | "any type of media that comprises audio (including audio alone)" |
| "pairing" | 9,219,959 | "configuration involving two or more playback devices that have different playback roles" |

Notably, the agreed-to constructions for all of these terms except for "a synchrony group" are the constructions adopted by the district court in Sonos's litigation against D&M Holdings Inc.

12

*Sonos, Inc. v. D&M Holdings, Inc.*, Case No. 14-cv-1330, 2017 WL 123456 (D. Del. Jan. 12, 2017) (attached as Ex. 7); *Sonos, Inc. v. D&M Holdings, Inc.*, Case No. 14-cv-1330, 2017 WL 3433691 (D. Del. Aug. 10, 2017) (attached as Ex. 8).

## IV. THE "LOCAL AREA NETWORK" TERM

Sonos's Asserted Patents disclose a "network audio system" comprised of "zone players" (also referred to as "playback devices"), which are "digital data processing devices" that connect to a "local area network." *See, e.g.*, '258 Patent at FIG. 1, 1:33-43, 2:40-48, 3:49-5:37; '949 Patent at FIG. 1, 3:36-39, 4:60-5:31. Consistent with the intrinsic evidence, a "local area network" is a term of art that was (and still is) commonly understood to mean a ***data*** network (or ***computer*** network). Declaration of Dr. Jon Weissman ("Weissman Decl."; attached as Ex. 9) at ¶¶ 40-44; Declaration of Dr. Kevin Almeroth ("Almeroth Decl."; attached as Ex. 10) at ¶¶ 52-62; Rebuttal Declaration of Dr. Matthew Shoemake ("Shoemake Rebuttal Decl."; attached as Ex. 11) at ¶ 19. It was also commonly understood that a data network was (and still is) a network for transferring digital data packets between networked devices. Weissman Decl. at ¶¶ 40-43; Almeroth Decl. at ¶¶ 52, 58-59; Shoemake Rebuttal Decl. at ¶ 34. Further, it was commonly understood that the term "local area network" does not cover a non-data "network," such as a "network" for transferring analog audio between a conventional audio receiver and passive speakers over dedicated speaker wire. *See* Weissman Decl. at ¶ 41; Almeroth Decl. at ¶ 54. The Asserted Patents use the term "local area network" consistent with this common understanding.

In addition to "zone players" being "digital data processing devices" that operate on a "local area network," Sonos's Asserted Patents also disclose that the "zone players" function to process and output audio and are controlled by physical "controller" devices (also referred to as "user interface modules"). *See, e.g.*, '258 Patent at FIG. 1, 1:33-43, 2:40-48, 3:49-5:58; '949

Patent at FIG. 1, 3:36-39; 4:60-5:36, 6:43-60, 9:50-59. In light of such disclosure, the parties have agreed that the construction of "zone player"/"playback device"/"player" is "***data network device*** configured to process and output audio" and that the construction of "network interface" is "physical component of a device that provides an ***interconnection with a data network***," as noted above.[5]

For the common claim term "local area network" ("LAN"), however, the parties disagree over the construction, as set forth below:

| Term | Patent(s) | Sonos Construction | Google & Staff Construction |
|---|---|---|---|
| "local area network" / "LAN" / "[wireless] local area network" / "[W]LAN" | 8,588,949 9,195,258 10,209,953 10,439,896 | "data network that links devices within a limited area, such as a home or office" | Plain and ordinary meaning; no construction necessary |

While Sonos believes that its proposed construction is the plain and ordinary meaning, Google and the Staff dispute whether the plain and ordinary meaning of "local area network" is a "***data***" network (*i.e.*, a network for transferring digital data packets between devices). Instead, Google and the Staff are taking the position that a "local area network" can be ***any*** "network" that links devices regardless of whether that "network" constitutes a "***data*** network."[6] However, this position is not consistent with how a POSITA would understand the plain and ordinary meaning of the term "local area network" in the context of the Assert Patents, and there is no support in the intrinsic or extrinsic evidence for Google and the Staff's construction.

[5] Any emphasis added herein unless otherwise noted.
[6] There is no dispute between the parties with respect to the "limited area" portion of Sonos's proposed construction for "local area network."

### A. The Claim Language Supports Sonos's Construction

The claim language of the Asserted Patents confirms that the claimed "local area network" is a "*data* network," which is directly in line with the plain and ordinary meaning of the term "local area network." For instance, in addition to reciting a "local area network," the Asserted Claims of each of the '949, '896, '248, and '953 Patents also recite one or both of a "zone player"/"playback device"/"player" and a "network interface." As noted above, the parties have already agreed that, in the context of the Asserted Patents, (i) a "zone player"/"playback device"/"player" is a "*data network device* configured to process and output audio" and (ii) a "network interface" is a "physical component of a device that provides an *interconnection with a data network*." Accordingly, when the claimed "local area network" is interpreted in the context of the surrounding "data network" claim language, it is clear that the claimed "local area network" must be a "*data* network."

For example, the claim language in the '949 Patent recites "a plurality of *players* in a *local area network*." *E.g.*, '949 Patent, claim 1. Given that the claimed "players" are "data network" devices and the claims recite that the "players" are in a "local area network," the claimed "local area network" must be a "data network." Similarly, the claim language of the '896 Patent recites a "computing device" that is operable to "communicat[e]" with a "*playback device* via the secure *WLAN*." *E.g.*, '896 Patent, claim 1. Because that the claimed "playback device" is a "data network" device and the claims recite that the "computing device" is operable to communicate with the "playback device via the secure WLAN," the claimed "[W]LAN" must be a "data network." The claim language in the '258 and '953 Patents likewise recites a "*zone player*" that is operable to communicate over a "*LAN*." *E.g.*, '258 Patent, claim 17; '953 Patent, claim 7. Given that the claimed "zone player" is a "data network" device and the claims recite

that the "zone payer" is operable to communicate over a "LAN," the claimed "LAN" must be a "data network."

If the "local area network" in the Asserted Patents was a non-data "network," as Google and the Staff assert, the agreed-to construction requiring a "zone player"/"playback device"/"player" to be a "data network" device would be nonsensical. *See, e.g.*, *Schoenhaus*, 440 F.3d at 1357; *AIA Eng'g*, 657 F.3d at 1276; *Univ. of Tex. Sys.*, 533 F.3d at 1370.

The claim language of the '258 Patent also recites a "zone player" that comprises "a ***network interface*** configured to interface the first zone player with at least a ***local area network***." *E.g.*, '258 Patent, claim 17. Because the claimed "network interface" of the "zone player" provides an interconnection with a "data network" and the claims recite that the "network interface" of the "zone player" is configured to interface with a "local area network," the claimed "local area network" must be a "data network."

If the "local area network" in the '258 Patent was a non-data "network," as Google and the Staff asserts, the agreed-to construction requiring "network interface" to provide an interconnection with a "data network" would be nonsensical. *See, e.g.*, *Schoenhaus*, 440 F.3d at 1357; *AIA Eng'g*, 657 F.3d at 1276; *Univ. of Tex. Sys.*, 533 F.3d at 1370.

**B.     The Specifications Support Sonos's Construction**

The teachings in the specifications of the Asserted Patents further confirm that, consistent with the plain and ordinary meaning, the claimed "local area network" in the '949, '896, '258, and '953 Patents is a "***data*** network" (*i.e.*, a network for transferring digital data packets between devices) and does not encompass non-data "networks" (*e.g.*, a "network" for transferring analog audio between a conventional audio receiver and passive speakers over dedicated speaker wire). For example, the specification of the '949 Patent explains that one or more "zone players" are coupled to a "***data network***" that takes the form of a "***local area network*** that communicates

16

with a wide area network (*e.g.*, the Internet)," that a "zone player" has a "network interface" that

"facilitates a ***data*** flow between a ***data network***" and the "zone player" in the form of data

"***packets***," and that the "audio sources" that can be retrieved and played back by "zone players"

"are in ***digital format*** and can be transported or streamed across a ***data network***." *See, e.g.*, '949

Patent at 5:5-18:

> All of the zone players 102, 104 and 106 are coupled directly or indirectly to a
> ***data network*** 108. . . . The network 108 may be a wired network, a wireless
> network or a combination of both. In one example, all devices including the zone
> players 102, 104 and 106 are coupled to the network 108 by wireless means based
> on an industry standard such as IEEE 802.11. In yet another example, all devices
> including the zone players 102, 104 and 106 are part of a ***local area network*** that
> communicates with a wide area network (e.g., the Internet).

'949 Patent at 5:37-63:

> The zone player 200 includes a network interface 202 . . . . The network interface
> 202 facilitates a ***data*** flow between a ***data network*** (i.e., the ***data network*** 108 of
> FIG. 1) and the zone player 200 and typically executes a special set of rules (i.e., a
> protocol) to send ***data*** back and forth. One of the common protocols used in the
> Internet is TCP/IP (Transmission Control Protocol/Internet Protocol). In general,
> a network interface manages the assembling of an audio source or file into smaller
> ***packets*** that are transmitted over the ***data network*** or reassembles received
> ***packets*** into the original source or file. In addition, the network interface 202
> handles the ***address part of each packet*** so that it gets to the right destination or
> intercepts ***packets*** destined for the zone player 200. . . . The wireless interface
> 216 . . . provides network interface functions by a wireless means for the zone
> player 200 to communicate with other devices in accordance with a
> communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or
> 802.11g). The wired interface 217 provides network interface functions by a
> wired means (e.g., an Ethernet cable).

'949 Patent at 4:65-67 ("As used herein, unless explicitly stated otherwise, an audio source or

audio sources are in ***digital format*** and can be transported or streamed over a ***data network***.");

*see also, e.g.*, '949 Patent at 3:36-39 ("As a result, the selected players are synchronized to play a

multimedia that is in a ***digital formal*** and retrieved from a source over a network."), 5:28-31

("The analog audio sources can be converted to ***digital audio sources***. . . . the audio source may

be shared among the devices on the network 108."), 6:32-34 ("[T]he audio processing circuit 210 may include necessary circuitry to process analog signals as inputs to produce ***digital signals*** for sharing with other devices on a network."), FIG. 1.

Like the specification of the '949 Patent, the specification of the '896 Patent also discloses that one or more "zone players" are coupled to a "***data network***" that takes the form of a "***local area network*** that communicates with a wide area network (*e.g.*, the Internet)," that a "zone player" has a "network interface" that "facilitates a ***data*** flow between a ***data network***" and the "zone player" in the form of data "***packets***," and that the "audio sources" that can be retrieved and played back by "zone players" "are in ***digital format*** and can be transported or streamed across a ***data network***." *See, e.g.*, '896 Patent at 5:51-54, 5:59-6:5, 6:16-20, 6:36-61, 6:21-25, 7:16-19, 7:26-38, 8:43-46, 9:1-10:8, FIG. 1, FIGS. 2A-2C, FIG. 3A.

Thus, by repeatedly and consistently describing a "local area network" as a "data network" that transfers "digital" data "packets," the specifications of the '949 and '896 Patents demonstrate that the claimed "local area network" is a "***data*** network." *See, e.g., In re Abbott Diabetes Care Inc.*, 696 F.3d at 1149-50; *ICU Med.*, 558 F.3d at 1374-75.

Turning to the '258 and '953 Patents, the common specification discloses a "network audio system" comprising one or more "zone players" and one or more controllers (or "user interface modules") that communicate with one another over a "local network," which is a synonym for the phrase "local area network," as used in the claims of the '258 and '953 Patents. *See, e.g.*, '258 Patent at FIG. 1, 2:17-48, 3:49-5:58, 4:14-18 ("[T]he ***local network*** may include one or more network interface devices . . . that are configured to connect the ***local network*** 12 to other networks, including a wide area network such as the Internet . . . ."), 4:61-63 ("[T]he ***local network*** 12 may also have an interface (not shown) to a wide area network, over which the

network audio system 10 can obtain audio information."), 10:53-54 ("[A] source [of audio may be] accessible over the wide area network via the network 12."), 15:31-36, 15:54-60, 16:48-57, 18:32-38; Almeroth Decl. at ¶ 71.

The common specification of the '258 and '953 Patents then repeatedly and uniformly describes that the communications between the "zone players" (which as described above are "*digital data* processing devices") and the "controllers" over the "local network" are in the form of "*digital*" data "*packets*." *See, e.g.*, '258 Patent at 2:40-48 ("The invention provides . . . for synchronizing operations among . . . *digital data processing devices* . . . in connection with any type of information for which synchrony among devices connected to a network is desired. The invention is described in connection with . . . audio playback devices that receive *digital audio information* that is to be played back in synchrony . . . ."), 10:16-20 ("[I]f the audio information is not in digital form," it will be converted to "*digital form*," and the "*digitized audio information*, along with the playback timing information," will be provided to devices over the network), 18:11-22 ("[T]he audio information buffer 31 buffers audio information, in *digital form*, along with playback timing information . . . the information that is buffered in the audio information buffer 31 will include the audio and playback timing information that will be provided" over the network to other members of the synchrony group), 20:58-21:9 ("[I]n addition to dividing the *digital audio information* into frames, the audio information source interface 30 also aggregates and/or divides the frames 51(f) as necessary into *packets*, each of which will be of a length that would fit into a message for transmission over the network . . . ."), 22:49-67 ("The network communications manager 40 controls network communications over the network 12, and the network interface 41 transmits and receives message *packets* over the network 12. The network communications manager 40 generates and receives messages to

facilitate the transfer of the various types of information described above in connection with FIG. 2 . . . ."), 31:34-41 ("[T]he invention provides a network audio system in which a number of devices share information can reproduce audio information synchronously, notwithstanding the fact that **packets**, which may contain ***digital audio information***, transmitted over the network to the various zone players connected thereto may have differing delays and the zone players operate with independent clocks."); *see also, e.g.*, *id.* at FIGS. 2-2A, 4; 7:58-8:18, 10:63-11:65, 12:13-13:6, 16:28-47, 17:22-37, 18:59-21:9, 23:22-24:31, 25:1-26:14, 27:1-31:27, 31:49-32:22.

Moreover, the provisional application (attached as Ex. 12), incorporated by reference into the '258 and '953 Patents, clearly depicts that the audio "players" of the "network audio system" are linked by a "digital network":



Ex. 12 at FIG. 1, ¶ [0009]; *see also, e.g.*, Ex. 12 at FIG. 4.

Thus, by repeatedly and consistently describing that the "local network" transfers "digital" data "packets," the common specification of the '258 and '953 Patents provides further support that the claimed "local area network" is a "***data*** network." *See, e.g., In re Abbott Diabetes Care Inc.*, 696 F.3d at 1149-50; *ICU Med.*, 558 F.3d at 1374-75.

Neither the specification of the '949 Patent, '896 Patent, '258 Patent, nor '953 Patent describes a "local area network"/"local network" as a type of network that is not a "data network." Notably, there is no disclosure in these specifications of a "local area network"/"local network" for transferring analog signals.

## C. Sonos's Extrinsic Evidence Is Consistent with the Intrinsic Evidence

Sonos has provided declarations from two independent experts, Dr. Weissman and Dr. Almeroth, that explain how a POSITA would have understood the claim term "local area network" in the context of the '949, '896, '258, and '953 Patents. *See* Weissman Decl.; Almeroth Decl. The testimony of these two experts is consistent with the intrinsic evidence. *See* Weissman Decl. at ¶¶ 45-57; Almeroth Decl. at ¶¶ 64-73.

As explained by Dr. Weissman and Dr. Almeroth, "local area network" is a term of art that a POSITA would understand refers to a ***data*** network that links devices within a limited area (*e.g.*, a home or office). Weissman Decl. at ¶¶ 40-41; Almeroth Decl. at ¶¶ 52-54. According to these experts, to the extent that devices within a limited area are connected to one another via something other than a ***data*** network (*i.e.*, a link that does not transfer digital data packets), a POSITA would not have considered that interconnection to fall within the commonly understood meaning of "local area network." *Id.*

As set forth in the declarations of Dr. Weissman and Dr. Almeroth, various technical dictionary definitions of "local area network" support their opinion that a POSITA would have understood the term "local area network" in the Asserted Claims of the '949, '896, '258, and '953 Patents to refer specifically to a "***data*** network" and to not encompass other types of "networks" that are not "data networks." Weissman Decl. at ¶¶ 42-44; Almeroth Decl. at ¶¶ 55-63. Below is a list of such technical definitions:

*Modern Dictionary of Electronics* (Appendix B to Weissman and Almeroth Decls.) defining "local area network" as "[a] ***data communications network*** spanning a limited geographical area, such as an office, an entire building, or industrial park."

*The Telecommunications Illustrated* (Appendix C to Weissman and Almeroth Decls.) defining "local area network" as "[a] ***computer network*** within a specified geographical space, such as a building or region, or within an institutional entity such as a classroom or department."

Google's own dictionary (Appendix D to Weissman Decl. and Appendix F to Almeroth Decl.) defining "local area network" as "a ***computer network*** that links devices within a building or group of adjacent buildings."

*Webster's New World Telecom Dictionary* (Appendix E to Weissman and Almeroth Decls.) defining "local area network" as "a ***packet network*** designed to interconnect host computers, peripherals, storage devices, and other computing resources within a local area, *i.e.*, limited distance."

*Packet Broadband Network Handbook* (Appendix F to Weissman Decl. and Appendix D to Almeroth Decl.) defining "local area network" as "a high-speed ***data network*** that covers a relatively small geographic area."

As explained by Dr. Weissman and Dr. Almeroth, these definitions confirm that a POSITA would have understood that, in the context of the '949, '896, '258, and '953 Patents, a "local area network" refers to a "***data*** network."[7]  Weissman Decl. at ¶ 43; Almeroth Decl. at ¶ 62.

Accordingly, consistent with the intrinsic evidence and the plain and ordinary meaning, the Chief Administrative Law Judge should construe the "local area network" terms to mean a "data network that links devices within a limited area, such as a home or office.

## V.    THE '896 PATENT CLAIM TERMS

### A.    Construction of "security key"

| Claim Term | Sonos & Staff Construction | Google Construction |
|---|---|---|
| "security key" | Plain and ordinary meaning; | "a string of bits used in encryption to |

---

[7] As explained by Dr. Weissman and Dr. Almeroth, a POSITA would have understood that "***computer*** network" and "***packet*** network" are other terms for "***data*** network" (*i.e.*, they are networks for transferring digital data packets between devices).  Weissman Decl. at ¶ 43; Almeroth Decl. at ¶¶ 57 and 59.

| | no construction necessary | make data unreadable, or in decryption to render encrypted data readable" |
|---|---|---|

The '896 Patent recites a "computing device" operable to transmit a message containing a "security key" "for the secure WLAN." *E.g.*, '896 Patent at claim 1. Both Sonos and the Staff agree that no construction is necessary for "security key" because the meaning of "security key" is readily apparent from this claim language. *See, e.g.*, *In the Matter of Certain Wiper Blades*, Inv. No. 337-TA-816, Order No. 69, 2013 WL 2708250 at *5 (May 22, 2013) (construing a term "according to its plain and ordinary meaning" because the meaning of the term "is apparent from the language of the limitation."); *Phillips*, 415 F.3d at 1314 (noting that when the ordinary meaning of a term is "readily apparent even to lay judges," claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."). Nevertheless, Google proposes a narrow construction of "security key" that would limit the term to a "string of bits" "used in encryption . . . or in decryption." Google's overly-narrow proposed construction is inconsistent with the intrinsic evidence.

### 1.    *The Claim Language Supports Sonos and the Staff's Construction*

Claim 1 of the '896 Patent makes clear that "security key" refers to any information for facilitating access to, or subsequent communication on, a secure network, such as a secure WLAN. For instance, the claim language of the '896 Patent places no limitation on the type of "security key" "for the secure WLAN." *E.g.*, '896 Patent at claim 1.

In contrast, Google's construction limits "security key" to "encryption" or "decryption" key that is in binary format (*i.e.*, "a string of bits"), which imports a limitation into the claims of the '896 Patent that is plainly not required by the claim language itself. Under well-established principles of claim construction, however, this is improper. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his

claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

## 2.    *The Specification Supports Sonos and the Staff's Construction*

The teachings of the '896 Patent place no limit on the type of "security key," and thus, confirm that "security key" refers to any information that facilitates access to, or subsequent communication on, a secure network and is not limited to an "encryption" or "decryption" key that is in binary format (*i.e.*, "a string of bits"). In this respect, the specification explains that the "automatic configuration process causes several messages to be exchanged between the first device and one of the other devices" and that these messages "carry information pertaining to . . . an identifier of the network and *a security key for subsequent communication*. . . ." '896 Patent at 3:24-29; *see also, e.g.*, *id.* 3:46-53; 4:12-23. In the context of the '896 Patent, this "subsequent communication" refers merely to communication between the "controller" and the "zone player" via the secure WLAN and does not require that the "security key" be used for encryption or decryption, as Google contends. *See, e.g.*, *id.* at 14:32-35.

In fact, when referring to the specific act of encryption, the specification does not use the claim term "security key" but instead, uses narrower terms, such as "*public key*" or "*private key*." *See, e.g.*, *id.* at 13:21-23, 13:31-32, 13:62-63, 14:59-61, 15:13-32. In this regard, while terms like "public key" and "private key" may refer to "a string used in encryption to make data unreadable, or in decryption to render encrypted data readable," the term "security key" is broader and merely refers to any information that facilitates access to, or subsequent communication on, a secure network, like a WLAN. The fact that the specification uses different terms, such as "public" and "private key," when discussing encryption and decryption definitively establishes that the term "security key" is not limited to an "encryption" or

"decryption" key. Google's construction, which limits "security key" to an "encryption" or "decryption" key is therefore inconsistent with the terminology used in the '896 Patent specification and thus improper. *See, e.g.*, *Kara Tech. Inc.*, 582 F.3d at 1348.

Further yet, neither the '896 Patent specification nor its provisional application (attached as Ex. 12) uses the words "binary," "bit" or "bits" – let alone limits the format of the "security key" to binary (or any other) format. Instead, the '896 Patent specification discloses that one embodiment of a "security key" is a "WEP key," which can exist in many forms including hexadecimal form. *See* Rebuttal Declaration of Dr. Jon Weissman Regarding "Security Key" ("Weissman Rebuttal Decl. Re 'Security Key'"; attached as Ex. 13) at ¶¶ 31-34. For instance, the specification describes one example embodiment of network configuration parameters, which may take the form of (1) a respective frequency band, (2) an SSID, and (3) a WEP key:

> [T]he network 310 may be characterized by a unique HHID and a unique set of configuration variables or parameters, such as Channels (*i.e.*, respective frequency bands), SSID (a sequence of alphanumeric characters as a name of a wireless network), and WEP keys (wired equivalent privacy, or simply security keys).

*Id.* at 11:30-35; *see also id.* at 11:44-46 (explaining that one example of a network parameter is a WEP key: "Control Point (CP)-it controls the overall network setup process and sequencing, including an automatic generation of required network parameters (*e.g.*, WEP keys).").

However, nowhere in the entire specification of the '896 Patent (or its provisional application) does it specify a precise format (*e.g.*, a binary format) for "WEP key" or "security key." Rather, a POSITA would have understood that any format could have been used for the "security key," including but not limited to a string of characters, hexadecimal digits, or bits, among other possible formats. In fact, the specification of the '896 Patent places no limitation on the format of the "security key," which could take any form, including a password or

25

passphrase (or other information), that allows for subsequent communication on a secure network. *See, e.g., id.* at 3:24-29; 3:46-53; 4:12-23; 14:32-35; *see also, e.g., id.* at FIG. 5 (depicting "[p]assphrase" as example of "security key").

Given the foregoing, Google's construction limiting "security key" to binary format (*i.e.*, "a string of bits") is improper because it is inconsistent with the '896 Patent insofar as it would exclude other possible formats of a "WEP key" from being a "security key." *See, e.g., Unwired Planet L.L.C. v. Google, Inc.*, 660 F. App'x 974, 983 (Fed. Cir. 2016) (finding that "the district court erred by incorrectly limiting the term 'user account'" to "exclude[ ] at least one disclosed embodiment in the specification."); *see also, e.g., Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1281 (Fed. Cir. 2017) (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001)) ("If the intrinsic record supports several definitions of a term, the term may be construed to encompass all such consistent meanings.").

### 3. *Sonos's Extrinsic Evidence Is Consistent with the Intrinsic Evidence*

Sonos has provided a rebuttal declaration from an independent expert, Dr. Weissman, which confirm that a POSITA would have understood that the term "security key" in the context of the '896 Patent would ***not*** have been limited to an "encryption" or "decryption" key that is in binary format. *See* Weissman Rebuttal Decl. Re "Security Key." The testimony of Dr. Weissman is consistent with the intrinsic evidence above. *See* Weissman Rebuttal Decl. Re "Security Key" at ¶¶ 14-44.

For instance, as set forth in his declaration, Dr. Weismann provides various technical dictionary definitions of "security key" that support his opinion that a POSITA would have understood that the term "security key" refers to any information that facilitates access to a secure network. *Id.* at ¶¶ 22-24.

*Internet Simplified* (Appendix A of Weissman Rebuttal Decl. Re "Security Key") explaining that "most wireless access points have security enabled, so **to connect to the network you must know the correct password or security key**."

*Windows XP Student Edition Complete* (Appendix B of Weissman Rebuttal Decl. Re "Security Key") explaining that one can "manually connect to [a] wireless network, provided you know the network name or SSID and the network **security key**."

*Technopedia Dictionary* (Appendix C of Weissman Rebuttal Decl. Re "Security Key") disclosing that a "network security key usually refers to the **password** or alphanumeric key that end users enter **to access a local area network**."

*HomeNetworkAdmin Article* (Appendix D of Weissman Rebuttal Decl. Re "Security Key") disclosing that a "network security key is the **password or pass phrase that you use to authenticate with your home network**. In order to establish a secure connection with your wireless router, you have to provide the key to prove that you are authorized to do so."

*Lifewire Article* (Appendix E of Weissman Rebuttal Decl. Re "Security Key") disclosing that "[a] network security key is a code or **passphrase that lets you connect** your computer or mobile device to a private network."

*Standard Office Systems Article* (Appendix F of Weissman Rebuttal Decl. Re "Security Key") disclosing that "[a] 'network security key,' also known as your WiFi password, is a phrase that can confuse those outside of technical industries. . . . In simple terms, a network security key is another name for your WiFi password. **A network security key is a kind of network password/digital signature that one enters as authorization to gain access to a wireless network.**"

As explained by Dr. Weissman, these definitions confirm that a POSITA would have understood the term "security key" to be broader than "encryption" or "decryption" keys in binary format. *Id.* at ¶ 22.

Accordingly, the Chief Administrative Law Judge should decline to construe "security key" and allow its plain and ordinary meaning to govern.

### B. Construction of "while operating . . ."

| Claim Term | Sonos & Staff Construction | Google Construction |
|---|---|---|
| "while operating on a secure wireless local area network (WLAN) that is defined by an | Plain and ordinary meaning; no | "while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) |

| | | |
|---|---|---|
| access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup; after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point" | construction necessary | receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup" ***must happen before*** "after receiving the user input and receiving the first message, transmitting a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point" |

The parties have a dispute over the first two functional elements recited in the '896 Patent claims, which are as follows:

- while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) ***receiving***. . . user input indicating that a user wishes to set up a playback device to operate on the secure WLAN, and (b) ***receiving*** a first message indicating that a given playback device is available for setup; [and]

- after receiving the user input and receiving the first message, ***transmitting*** a response to the first message that facilitates establishing an initial communication path with the given playback device, wherein the initial communication path with the given playback device does not traverse the access point[.]

*E.g.,* '896 Patent at Claim 1.

Sonos and the Staff contend that no construction of these functional elements is necessary because the meaning of these functional elements is readily apparent from the claim language itself. *See, e.g.*, *In the Matter of Certain Wiper Blades*, 2013 WL 2708250 at *5 (construing a term "according to its plain and ordinary meaning" because

the meaning of the term "is apparent from the language of the limitation."); *Phillips*, 415 F.3d at 1314 (noting that when the ordinary meaning of a term is "readily apparent even to lay judges," claim construction "involves little more than the application of the widely accepted meaning of commonly understood words.").

On the other hand, Google has proposed a construction that improperly adds an unnecessary limitation— namely that the "receiving" functions recited above "***must happen before***" the "transmitting" function recited above.

However, the claim language of the '896 Patent is clear on its face, and the specification of the '896 Patent does not deviate from the clear language of the claims. *See, e.g.,* '896 Patent at claim 1. Thus, Google's attempt to import this "must happen before" limitation is improper. *See, e.g.*, *KIS, S.A. v. Foto Fantasy, Inc.*, 60 F. App'x 319, 321 (Fed. Cir. 2003) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1406-07 (Fed. Cir. 2001)) ("[I]f the claim language is clear on its face, then a court's consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified."); *In the Matter of Certain Wiper Blades*, 2013 WL 2708250 at *5 (construing a disputed term according to its plain and ordinary meaning when respondents "improperly attempt[ed] to import limitations").

For at least the foregoing reasons, the Chief Administrative Law Judge should decline to construe this term and allow its plain and ordinary meaning to govern.

### C. Construction of "receiving . . . user input indicating that a user wishes to set up a playback device . . ."

| Claim Term | Sonos & Staff Construction | Google Construction |
|---|---|---|
| "program instructions stored on the non-transitory computer- readable medium that, when executed by the at least one processor, cause the computing device to | Plain and ordinary meaning; no | Indefinite |

| | | |
|---|---|---|
| perform functions comprising: while operating on a secure wireless local area network (WLAN) that is defined by an access point, (a) receiving, via a graphical user interface (GUI) associated with an application for controlling one or more playback devices, user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup" | construction necessary | |

Asserted claim 1 of the '896 Patent recites that the claimed "computing device" is operable to "receiv[e] . . . user input indicating that a user wishes to set up a playback device to operate on the secure WLAN." Sonos and the Staff both contend that no construction is necessary here because the meaning of the term is readily apparent from the claim language itself. *See, e.g.*, *In the Matter of Certain Wiper Blades*, 2013 WL 2708250 at *5; *Phillips*, 415 F.3d at 1314. On the other hand, Google appears to contend that the use of the phrasing "user input indicating that a user *wishes* to set up a playback device to operate on the secure WLAN" renders this claim term indefinite. Google is incorrect.

### 1.     *The Claim Language Supports Sonos and the Staff's Position*

As noted above, the claim language of the '896 Patent requires that the claimed "computing device" be operable to receive "user input" that "indicat[es] that a user wishes to set up a playback device to operate on the secure WLAN." *E.g.,* '896 Patent at claim 1. In this regard, the claim language provides an objectively verifiable indication, which is the receipt by the claimed "computing device" of a particular type of "user input" (i.e., "user input indicating that a user wishes to setup a playback device to operate on the secure WLAN."). *Id.*

Google appears to contend, however, that the claim term depends on the subjective opinion of a "user" who may or may not wish to set up a "playback device." Google's apparent contention is illogical. As an initial matter, references to what a user wishes or desires does not result in *per se* indefiniteness. *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.,* 498 F.3d 1307, 1316-

30

17 (Fed. Cir. 2007) (construing claims reciting "desired" tooth positions). A claim term that is allegedly subjective is indefinite only when it "depends solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention," without "provid[ing] objective direction to one of skill in the art." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260 (Fed. Cir. 2014). This is not the case here.

As noted above, the claim language of the '896 Patent does not require a POSITA to make any subjective determination about the mental state of the user providing the "user input," just that the "user input" of a particular type is received. In this respect, the claim language of the '896 Patent is abundantly clear that the claimed "computing device" is operable to receive a particular type of "user input" (i.e., "user input indicating that a user wishes to setup a playback device"), which provides an objectively verifiable indication to a POSITA.

### 2. *The Specification Supports Sonos and the Staff's Position*

In addition to the claim language itself, the teachings in the specification of the '896 Patent further confirm that the claimed functionality of receiving "user input" does not depend on any subjective opinion of a user, just that the "user input" of a particular type is received. *See, e.g.*, '896 Patent at 12:59-62 ("All devices, including those previously configured, will enter an 'activation state' when the user indicates that this is desired."); 16:21-24 ("[S]hould the user desire to start the automatic configuration process . . . the user activates the process manually."); 12:25-30 ("[T]he activation process may be manually activated on each [controller or zone player] by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously."); *see also id.* at 15:65-16:4 (disclosing "a graphical user interface" that "allows a user to perform many tasks"); 12:67-13:3. In this respect, user input to activate the configuration process provides an objective guidepost to a POSITA that a user

provided input that indicates he or she wished to setup a "playback device."

For at least the foregoing reasons, the term is definite, and the Chief Administrative Law Judge should allow its plain and ordinary meaning to govern. *See, e.g.*, *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1205-206 (Fed. Cir. 2017) (ruling that term "substantially filled" was not indefinite as a POSITA would have known that the term was not subjective, where the specification provided objective guideposts to know when something was "substantially filled"); *see also Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377-81 (Fed. Cir. 2017); *DDR Holdings, LLC*, 773 F.3d at 1260-61.

### D. Construction of "At Least a Second Message . . ."

| Term | Sonos Construction | Staff | Google Construction |
|---|---|---|---|
| "at least a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" | "one or more additional messages that collectively contain an identifier of the secure WLAN and a security key for the secure WLAN" | Plain and ordinary meaning; no construction necessary | "at least one second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN" |

Sonos and Google's dispute over the construction of the term "at least a second message . . ." is centered on whether the "identifier of the secure WLAN" and the "security key for the secure WLAN" can be transmitted in ***one or more*** messages (per Sonos), or whether such "network configuration parameters" must be transmitted in a ***single*** "second message" (per Google). The claim construction proposed by Sonos is consistent with how a POSITA would have understood the term "at least a second message . . . ," in the context of the '896 Patent, because Sonos's construction properly gives meaning to all the claim language and is consistent with the intrinsic evidence, which allows for the "network configuration parameters," such as the "identifier of the secure WLAN" and the "security key for the secure WLAN," to be transmitted

in more than one message.  In contrast, the claim construction sought by Google improperly renders the claim language "at least" meaningless and is inconsistent with the intrinsic evidence.

### 1. The Claim Language Supports Sonos's Construction

Asserted claim 1 of the '896 Patent confirms that the two "network configuration parameters" (*i.e.*, the secure WLAN identifier and the security key) are sent in "one or more additional messages" that collectively contain such parameters.  The claim makes this clear by specifying that "at least a second message" contains this information.  From this, a POSITA would have understood that the network configurations parameters could be transmitted in either a single message or divided between one or more messages.  For example, a second message may contain the secure WLAN identifier, and a third message may contain the security key.

In contrast, Google's construction, which requires the two "network configuration parameters" to be transmitted in a single message, impermissibly vitiates the claim language "at least."  For instance, if the "network configuration parameters" were required to be in a single "second message," as Google contends, there would be no reason to have any other messages beyond the second message, as they would all be redundant and contain the exact same thing.  In other words, Google's construction essentially means that there is not *at least* a second message (*i.e.*, one or more additional messages) that contains the two "network configuration parameters," but rather, only a *single* message that contains both such parameters.  Thus, under Google's construction, the claim language "at least" would be meaningless and superfluous.

Under well-established principles of claim construction, however, claims should be interpreted so that no term becomes "meaningless" or "superfluous."  *See, e.g., In re Power Integrations, Inc.,* 884 F.3d 1370, 1376 (Fed. Cir. 2018) (rejecting claim construction because it rendered claim language meaningless); *Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950-51 (Fed.

Cir. 2006) ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration.  For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim."); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

This is not the first time that Google has sought to improperly render a claim term meaningless during claim construction.  For example, in *Vederi, LLC v. Google, Inc.*, Google and Vederi filed competing motions for summary judgment on the issue of infringement that centered on the claim term "substantially elevations."  744 F.3d 1376, 1381 (Fed. Cir. 2014).  In its opinion on summary judgment, the district court in *Vederi* stated that it adopted Google's construction of "substantially elevations," and based on this construction, entered summary judgment of non-infringement in favor of Google.  *Id*.  In rejecting the district court's construction, the Federal Circuit held that:

> The operative language in this case is "substantially elevations."  The district court's construction requiring elevation, and "elevation" alone in the strict sense, gives no effect to the "substantially" modifier contained in the claims. "A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."  ***By effectively reading "substantially" out of the claims, the district court erred***.  The term "substantially" takes on important meaning in light of the rest of the intrinsic evidence in this record.

*Id.* at 1382-83 (internal citation omitted).

For the same reasons here, the Chief Administrative Law Judge should not permit a construction, like Google's, that reads "at least" out of the claims.

### 2.     *The Specification Supports Sonos's Construction*

In addition to the claim language itself, the teachings in the specification of the '896 Patent further confirm that the claimed "at least a second message . . ." is not limited to a single second message, but rather, properly encompasses "one or more additional messages that collectively contain an identifier of the secure WLAN and a security key for the secure WLAN." For example, the '896 Patent specification states that "[t]he necessary parameters in the second device are subsequently configured in ***several exchanges of messages*** with the first device." '896 Patent at 2:45-47.  As another example, the specification states that "the automatic configuration process causes ***several messages*** to be exchanged between the first device and one of the other devices, ***some of the messages carry information pertaining to an appropriate transmission channel, an identifier of the network and a security key*** for subsequent communication, the some of the messages are encrypted."  *Id*. at 3:24-30.

Other teachings in the specification likewise confirm that the claimed "at least a second message . . ." is not limited to a single second message. *See, e.g.*, *id.* at 3:46-54 ("[T]he automatic configuration process causes several messages to be exchanged between the access device and any one of the controller and the remaining zone players that have been activated for the automatic configuration process, some of the messages carry information pertaining to a transmission channel, an identifier of the network and a security key for subsequent communication, at least some of the messages are encrypted"); 4:17-24 ("[E]xchanging several messages between the access device and any one of the controller and the remaining zone players that have been activated for the automatic configuration process, wherein some of the messages carry information pertaining to a transmission channel, an identifier of the network and

a security key for subsequent communication, and at least some of the messages are encrypted.").

Just as importantly, there is no disclosure in the '896 Patent specification (or prosecution history) that the "network configuration parameters" (*i.e.*, "identifier of the secure WLAN" and the "security key for the secure WLAN") ***must be*** transmitted in a ***single*** message.

Accordingly, the Chief Administrative Law Judge should adopt Sonos's construction for the "at least a second message . . ." term in the '896 Patent claims.

## VI.    THE '949 PATENT CLAIM TERM

### A.    Construction of "independent playback device"

| Claim Term | Sonos Construction[8] | Staff Construction | Google Construction |
|---|---|---|---|
| "independent playback device" | "data network device configured to process and output audio that is capable of playing multimedia separately from other players" | "data network device configured to process and output audio that is capable of independent operation" | Indefinite |

Asserted claim 1 of the '949 Patent recites a "player group" in which "each player is an independent playback device configured to playback a multimedia output from a multimedia source."  Consistent with the intrinsic evidence, Sonos and the Staff's proposed constructions provide that an "independent playback device" is a "playback device" with certain "independent" ***capabilities***.  Specifically, Sonos's construction requires that a "player"/"playback device" be

---

[8] As noted above, the parties have agreed that "playback device" means "data network device configured to process and output audio."  Thus, Sonos does not address this portion of its construction herein.

"capable of playing multimedia separately from other players" while the Staff's construction requires that a "player"/"playback device" be "capable of independent operation."[9]

In contrast, Google appears to be taking the position that (i) the claim term "independent playback device" refers to a "player"/"playback device" that is required to be "simultaneously" playing audio independently from other "players"/"playback devices" and playing audio synchronously with other "players"/"playback devices," and (ii) this interpretation renders the claims "internally inconsistent" and indefinite. *See, e.g.*, Declaration of Dr. Martin Rinard ("Rinard Decl."; attached as Ex. 14) at ¶¶ 37-41 and 51. Google is wrong because when the term "independent playback device" is properly interpreted in light of the specification and prosecution history, the claims of the '949 Patent "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910.

    1.    ***The Claim Language Supports Sonos's Construction***

The Asserted Claims of the '949 Patent recite "[a] multimedia controller . . . configured to: provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is an independent playback device configured to playback and multimedia output from a multimedia source . . . ." '949 Patent at claim 1. This claim language supports Sonos's construction: "data network device configured to process and output audio that is capable of playing multimedia separately from other players."

For example, the claims explicitly recite that each "independent playback device" is "***configured to*** playback a multimedia output from a multimedia source." The use of "***configured to***" illustrates that the term "independent" within the phrase "independent playback

---

[9] Sonos does not believe there is a conflict between these two proposals; however, Sonos's construction seeks to provide further clarification by defining "independent" instead of repeating that term as the Staff's construction does.

device" refers to the "independent" *capability* of a "player"/"playback device" to play

multimedia independently/separately from other "players"/"playback devices." *See, e.g.*, *In the*

*Matter of Certain Vision-Based Driver Assistance Sys. Cameras, Components Thereof, & Prod.*

*Containing the Same Comm'n Opinion*, USITC Inv. No. 337-TA-907 (Dec. 1, 2015) (equating

"configured to" and "capable of" in explaining that "Federal Circuit precedent is clear that when

a first structure is 'capable of' or 'configured to' interact with a second component, the claim

may be infringed even in the <u>absence</u> of the second component.") (citing *Revolution Eyewear,*

*Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1363 (Fed. Cir. 2009)) (emphasis in original);

*Riverbed Tech., Inc. v. Silver Peak Sys., Inc.*, No. 11-484, 2013 WL 3830416, at *1-2 (D. Del.

July 23, 2013) (agreeing with the patentee that "configured to" claim language is met "so long as

the system is designed to be capable of performing the function, the claim limitation is met").

Contrary to Google, the claim language does *not* require a "player"/"playback device" to

"simultaneously" play audio both independently and synchronously in a group, which are

conflicting functions. *See, e.g.*, Rinard Decl. at ¶¶ 37-39, 51. Not only does Google's

interpretation lack support in the claim, Google's own expert acknowledged that this

interpretation makes the claims "internally inconsistent" (*i.e.*, nonsensical). *Id.* at ¶ 41. Google's

interpretation of "independent playback device" cannot be correct. *See, e.g.*, *Schoenhaus*, 440

F.3d at 1357; *AIA Eng'g*, 657 F.3d at 1276; *Univ. of Tex. Sys.*, 533 F.3d at 1370.

### 2. *The Specification Supports Sonos's Construction*

Consistent with Sonos's construction, the '949 Patent specification describes "zone

players" (also referred to as "playback devices") with various *capabilities*, including (i) the

capability to play back audio independently/separately from the other "zone players" when

ungrouped and (ii) while having this "independent" capability, also having the capability to be

38

dynamically grouped for synchronized audio playback with other "zone players." For example, with reference to the exemplary user interface in Figure 3C, the specification explains that "[e]ach zone player **can play** a type of media (such as music, photographs and video) **independently**." '949 Patent at 9:49-50, Fig. 3C. In addition to this "independent" capability, the specification also explains that each "zone player" also has "group" capability as a user may "link players in some rooms together to form a group so that players in these rooms are playing the same media in a synchronized fashion." *Id.* at 9:55-59. As shown below, Figure 3C illustrates the "independent" capability of "zone players" (*see* BEDROOM, KITCHEN, PATIO, DINING ROOM, and STUDY playing audio separately from one another) while Figure 3E illustrates the "group" capability (*see* BEDROOM, PATIO, DINING ROOM, and LIVING ROOM playing audio synchronously together):



FIG. 3C                    FIG. 3E

The dual capability of "zone players" to play audio independently/separately from one another when ungrouped and synchronously with one another when grouped is also described elsewhere in the specification. *See, e.g.*, '949 Patent at 3:40-45 ("One of the objects, features, and advantages of the present invention is to remotely control a plurality of multimedia players in a multi-zone system, **playing** and controlling the audio source **synchronously** if the players are grouped together, **or playing** and controlling the audio source **individually** if the players are disassociated with each other."); *see also* '949 Patent at 2:46-48, 8:63-67, FIGS. 3A, 3B, 5A, 5B.

The specification does not disclose any embodiment where a "zone player" is "simultaneously" playing audio both independently and synchronously in a group, as Google has interpreted the claims. *See, e.g.*, Rinard Decl. at ¶¶ 37-39, 51. In fact, as noted above, such an embodiment would be nonsensical.

### 3. The Prosecution History Supports Sonos's Construction

The prosecution history further confirms that "independent playback device" refers to the capability of a "player"/"playback device" to play multimedia independently/separately from other "players," while also having the capability to be dynamically grouped for synchronized playback. For example, during original prosecution of the '949 Patent, Sonos added the term "independent playback device" to the claims to distinguish prior art cited by the Examiner, including the primary reference, U.S. Patent Pub. No. 2004/0131192 ("Metcalf"). *See* Rebuttal Declaration of Dr. Jon Weissman Regarding "Independent Playback Device" ("Weissman Rebuttal Decl. Re 'Independent Playback Device'"; attached as Ex. 15) at Weissman Ex. A, pp. 109--118. Unlike the "independent playback devices" of the '949 Patent, the "amplifier systems"/"loudspeaker systems" in Metcalf are ***not*** capable of playing multimedia independently/separately from each other. Instead, Metcalf's "amplifier systems"/"loudspeaker systems" are conventional audio components that are all hard-wired back to a centralized "annunciator module" and configured to work together to reproduce a single "sound event," such as a concert or a movie. *See, e.g.*, Weissman Rebuttal Decl. Re "Independent Playback Device" at Weissman Ex. C, Abstract, ¶¶ [0002], [0027], [0074], [0095], [0160]. Given that Metcalf does not disclose the claimed "independent playback device," the Examiner found Sonos's amendment to add the "independent playback device" limitation to the claims sufficient to overcome the Metcalf rejections. *See* Weissman Rebuttal Decl. Re "Independent Playback

Device" at Weissman Ex. A, pp. 121-123 (Examiner's interview summary referencing Sonos's proposed claim amendments to add "independent playback device" to the claims and stating that "[Sonos] presented draft amendments sufficent [*sic*] to obviate the anticipation rejections over Metcalf and the obviusness [*sic*] rejection over Metcalf in view of Aiso.").

As another example, during reexamination of the '949 Patent, Sonos consistently described the claimed "independent playback devices" as having both "independent" and "group" capability. *See, e.g.*, Weissman Rebuttal Decl. Re "Independent Playback Device" at Weissman Ex. B, pp. 170-171 (Sonos's interview summary stating: "During the Interview, Mr. Butts conducted a demonstration involving multiple Sonos players (i.e., ***independent playback devices***), multiple audio sources, and a controller-provided user interface presented by Sonos's smartphone application. . . . Mr. Butts used the user interface to cause different respective players—which were ungrouped initially—to play back different audio content from different respective audio sources at the same time.  Mr. Butts then used the user interface to dynamically form a player group that included multiple players, and then caused the players in the group to play back the same audio content from the same audio source in a synchronized fashion."), 172-17334 (Sonos's Response to Non-Final Office Action describing Sonos's system as being "built on a network of ***independent playback devices***" and, with reference to Figure 1 of the '949 Patent, explaining that "[e]ach of ***independent playback devices*** 102, 104, and 106 can play content from a different audio source or can be dynamically grouped together to play content from the same audio source in synchrony.").

This prosecution history also contradicts Google's position that the "independent playback device" limitation renders the claims indefinite because it confirms that the Examiner understood the meaning "independent playback device" and applied it in view of the prior art

For instance, as noted above, "independent playback device" was added to the claims during original prosecution to overcome prior art rejections based on Metcalf and, as a result, the Examiner specifically evaluated this limitation vis-à-vis Metcalf and determined that Metcalf did not teach the claimed "independent playback device." *See* Weissman Rebuttal Decl. Re "Independent Playback Device" at Weissman Ex. A, pp. 109-118, 121-12388-90. The prosecution history also shows that the Examiner evaluated this limitation at least a second time vis-à-vis another prior art reference, Patent U.S. Pub. No. 2002/0124097 ("Isely"), and found that Isely "is enabling for an individually addressable independent playback device" but nevertheless allowed the claims over Isely because "where Isley controls volume in an interdependent manner the instant ['949 Patent] teaches the system functional to provide groupwise and individual control of each of the groupwise addressable and independently addressable playback devices." *See* Weissman Rebuttal Decl. Re "Independent Playback Device" at Weissman Ex. A, pp. 130-131. The Examiner never objected to the "independent playback device" language or otherwise indicated that he could not determine the scope of the invention as a result of this limitation.

Likewise, during the reexamination of the '949 Patent, neither the third party requesting reexamination, the Primary Examiner, nor any other Examiner involved in the reexamination raised any concern regarding the scope of the "independent playback device" limitation. *See* Weissman Rebuttal Decl. Re "Independent Playback Device" at Weissman Ex. B.

### 4. *Sonos's Extrinsic Evidence Is Consistent with the Intrinsic Evidence*

Sonos has provided a rebuttal declaration from independent expert, Dr. Jon Weissman, which confirm that how a POSITA would have understood the claim term "independent playback device" in the context of the '949 Patent to refer to a "playback device" having

"independent" *capability*. *See* Weissman Rebuttal Decl. Re "Independent Playback Device."

The testimony of Dr. Weissman is entirely consistent with the intrinsic evidence above. *See*

Weissman Rebuttal Decl. Re "Independent Playback Device" at ¶¶ 15-87. As explained by Dr.

Weissman:

> [A] POSITA would understand the term "independent playback device" in the context of the '949 Patent to have the same meaning proposed by Sonos, which is a "data network device configured to process and output audio that is capable of playing multimedia separately from other players" (i.e., the "player"/"playback device" has "independent" capability) but is not required to "simultaneously" operate in both an "independent" state and a "grouped" state. Further, it is my opinion that, when the term "independent playback device" is properly interpreted in this manner, the claims clearly inform a POSITA as to the scope of the claimed invention with reasonable certainty and thus are not indefinite.

*Id*. at ¶ 17; *see also id*. at ¶ 87.

The Chief Administrative Law Judge should adopt Sonos's construction for "independent playback device" and find that this term does not render the claims of the '949 Patent indefinite.

## VII. THE '959 PATENT CLAIM TERMS

The '959 Patent discloses that two or more "playback devices" can dynamically enter into a "pairing," which is a configuration involving a set of "playback devices" that have different playback roles. For example, two "playback devices" may be "paired" to create a "stereo pair" in which a first "playback device" outputs only the left channel of audio and the second "playback device" outputs only the right channel of audio. *See, e.g.*, '959 Patent at 3:16-31, 16:58-51. To facilitate this functionality, each "playback device" is operable to determine its "type of pairing" and then configure itself to perform a particular "equalization" of audio data according to its determined "type of pairing." *See, e.g.*, *id.* at 4:15-25, 4:61-67, 15:48-16:47. Thus, returning to the "stereo pair" example, the first "playback device" initially configures itself to perform a first "equalization" of audio data according to a "no pairing" "type of pairing" such

that the first "playback device" is configured to output both the left and right channel of audio. *See, e.g.*, *id.* at 14:18-29, 15:48-16:56. Subsequent to being "paired," the first "playback device" reconfigures itself to perform a second "equalization" of audio data according to the "stereo pair" "type of pairing" such that the first "playback device" is configured to output just one of the left or right channels of audio. *See, e.g.*, *id.*

### A. Construction of "equalization [of the audio data]"

| Claim Term | Sonos & Staff Construction | Google Construction |
|---|---|---|
| "equalization [of the audio data]" | "modifying the output audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" | "alteration of the relative strength of certain frequency ranges in the audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters" |

The parties agree on the functions ("adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters") that could be performed to achieve "equalization of the audio data." The dispute, however, is whether performing an "equalization" of audio data covers any "modifying the output audio data" that is achieved by performing one of these functions (as Sonos and Staff propose and the patent describes) or whether performing an "equalization" of audio data requires an "alteration of the relative strength of certain frequency ranges in the audio data" (as proposed by Google's construction). As set forth below, Google's attempt to limit "equalization" in this manner is directly contrary to the intrinsic evidence of the '959 Patent.

As an initial matter, Sonos and the Staff's proposed construction for "equalization [of the audio data]" is the construction adopted by the district court in Sonos's litigation against D&M

Holdings Inc.[10] *Sonos, Inc.*, 2017 WL 123456 at *12. Although the D&M Holdings, like Google here, proposed a dictionary-based construction that focused on frequency, the court rejected that proposal as "too narrow" in light of the teachings of the '959 Patent Sonos discussed below. *Id.* Google's expert- and dictionary-driven construction should be rejected for the same reasons. *See, e.g.*, *Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008) ("Intrinsic evidence, that is the claims, written description, and the prosecution history of the patent, is a more reliable guide to the meaning of a claim term than are extrinsic sources like technical dictionaries, treatises, and expert testimony.").

### 1.    The Claims Support Sonos and the Staff's Construction

The asserted claims of the '959 Patent each require a "playback device" that is operable to "configure [itself] to perform a [first/second] *equalization of the audio data* before outputting audio based on the audio data from the [playback device's] plurality of speaker drivers when the [playback device's] type of pairing is determined to comprises [a first/second] type of pairing." *See, e.g.*, '959 Patent at claim 10. This is consistent with Sonos's construction, which provides that the "playback device" is operable to modify the audio data by performing at least one of the specified processes, before it outputs audio based on that the audio data.

Although not asserted, dependent claims 2, 26, and 34 further support Sonos's construction and contradict Google's construction. Those claims recite that "performing the first equalization comprises using a first type of pass filter to *modify the audio data* before outputting audio based on the audio data" and "performing the second equalization comprises using a second type of pass filter to *modify the audio data*." These dependent claims confirm that (1) performing an "equalization" involves modifying the audio data, as provided in Sonos's

---

[10] As noted above, Google agrees with all the other constructions adopted by that district court.

construction, (2) using a filter is one example of the processes by which to achieve such a modification, as all parties agree, and (3) "equalization of the audio data" is **not** limited to altering frequency characteristics of the audio data, let alone limited to "alter[ing]" "the relative strength of certain frequency ranges," as Google contends. *See, e.g.*, *Univ. of Tex. Sys.*, 533 F.3d at 1371 ("Different claim terms are presumed to have different meanings."); *Amgen*, 314 F.3d at 1326 ("There is a rebuttable presumption that different claims are of different scope.").

## 2. The Specification Supports Sonos and the Staff's Construction

Consistent with Sonos's construction, the '959 Patent specification broadly describes functions by which a "playback device" can "configure [itself] to perform [an] equalization of the audio data" (*i.e.*, change the equalization of the "playback device") according to its "type of pairing." As one set of such example functions, the specification states:

> Changing the equalization of the playback device **might include any of**: turning on or off (or effectively muting) one or more specific speaker drivers, changing the channel output of one or more speaker drivers, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, changing the amplifier gain of the playback device as a whole.

'959 Patent at 16:20-27.

As another set of such example processes, the specification describes functions that may "affect frequency dependent parameters":

> **In certain embodiments**, changing the equalization of a playback device (*e.g.*, changing the equalization of one or more speaker drivers of the playback device) **may affect** frequency dependent parameters. **Examples might include** the adjustment of the strength of frequencies within the audio data, a phase adjustment, and time-delay adjustment. In addition, a particular equalization **may use** a first type of pass filter, such as one that attenuates high, middle, or low frequencies, for example, while allowing other frequencies to pass unfiltered (or substantially unfiltered).

*Id.* at 16:28-47.

By repeated use of non-limiting language like "might" and "may," the '959 Patent makes clear that the inventors intended for "equalization of the audio data" to have broad scope and that no particular one of the listed functions was required. The common factor, however, is that the example functions result in modification of the audio data before the "playback device" outputs audio based on the audio data—as Sonos's construction provides.

The specification's non-limiting language confirms that Google's construction is improperly restrictive. In this regard, while Google's construction *requires* "alteration of the relative strength of certain frequency ranges in the audio data," (1) the '959 specification clearly explains that affecting a "frequency dependent parameter" is merely *one* possible way to "perform [an] equalization of the audio data,"[11] (2) the '959 specification clearly explains that adjusting the "strength of frequencies within the audio data" is merely *one example* of this *one* possible way to "perform [an] equalization of the audio data,"[12] and (3) the '959 specification does not even describe an example way to "perform [an] equalization of the audio data" that involves Google's narrow requirement of an "alteration of the *relative* strength of *certain* frequency ranges in the audio data," much less limit the claims of the '959 Patent by Google's narrow requirement. Thus, Google's construction improperly reads out numerous (if not virtually all) of the disclosed embodiments. *See, e.g.*, *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment.").

---

[11] '959 Patent at 16:28-31 ("*In certain embodiments*, changing the equalization of a playback device . . . *may* affect frequency dependent parameters.").

[12] '959 Patent at 16:31-33 ("*Examples might include* the adjustment of the strength of frequencies within the audio data, *a phase adjustment*, and *time-delay adjustment*.")

### 3. The Prosecution History Supports Sonos and the Staff's Construction

The prosecution history for the '959 Patent also supports Sonos's Construction for the claim term "equalization [of the audio data]." For example, the reexamination prosecution history of the '959 Patent demonstrates that the USPTO understanding of "equalization [of the audio data]" was consistent with Sonos's and the Staff's proposed construction. In particular, the Examiner stated the following in the first office action:

> In the specification of the '959 Patent, the subject matter "equalization" is defined as including "turning on or off (or effectively muting) one or more specific speaker drivers, changing the channel output of one or more speaker drivers, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, changing the amplifier gain of the playback device as a whole" at col. 16, lines 20-27.

Rebuttal Declaration of Dr. Kevin Almeroth (attached as Ex. 17) at Almeroth Ex. B, p. 70 fn.2.

This is yet further confirmation that Google's proposed construction is overly restrictive and inconsistent with the '959 Patent's intrinsic record.

### B. Construction of "type of pairing" / "first type of pairing" / "second type of pairing"

| Claim Term | Sonos Construction | Staff Construction | Google Construction |
|---|---|---|---|
| "type of pairing"<br><br>"first type of pairing"<br><br>"second type of pairing" | A "type of pairing" can be either a pairing configuration involving two or more playback devices that have different playback roles, such as a stereo pair or home theater configuration, or a 'no pairing' in which the playback device is not part of a pairing configuration involving two or more playback devices | Plain and ordinary meaning; no construction necessary | "type", "first type", and "second type" should have their plain an ordinary meaning |

Consistent with the '959 Patent's teachings, the parties have agreed that the term "pairing" means a "configuration involving two or more playback devices that have different

playback roles," as noted above. However, Google is attempting to use this agreed construction of "pairing" to improperly limit the '959 claim's recitation of a "type of pairing," which is a different claim term, to exclude a "no pairing" "type of pairing" (i.e., a configuration where a "playback device" is not paired together with any other "playback device") – which is expressly recited in the claims and disclosed in the specification as one specific "type of pairing." Thus, Sonos's construction of "type of pairing" clarifies, consistent with the claims and clear teachings of the '959 specification, that "no pairing" constitutes a "type of pairing" in the context of the '959 Patent. Adopting Sonos's construction resolves this dispute by clarifying the definition of "type of pairing" in accordance with the intrinsic evidence.

### 1.    *The Claims Support Sonos's Construction*

The claim language confirms that Sonos's construction is correct. For instance, non-asserted dependent claim 3, which depends from asserted claim 10, plainly recites "wherein the first *type of pairing comprises no pairing* with another playback device and the second type of pairing comprises pairing with one or more additional playback devices."

This language makes clear that "no pairing" constitutes a "type of pairing"—not only in claim 3 but wherever that term is used. *See Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1371-72 (Fed. Cir. 2005) ("[T]his court interprets claim terms consistently throughout various claims of the same patent." (citing *Rexnord*, 274 F.3d at 1342)); *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1309-10 (Fed. Cir. 2001) ("We . . . construe independent claims consistently with the claims that depend from them.").

In contrast, under Google's position that "no pairing" is not a "type of pairing," claim 10 would improperly exclude the scope of dependent claim 3. *See Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016) ("[C]onstruing the

independent claim to exclude material covered by the dependent claim would be inconsistent.").

Further, contrary to Google's assertion, construing "type of pairing" to encompass a "no pairing" (or "unpaired"/"non paired" configuration) is also consistent with the parties' agreed construction of "pairing," which is a "configuration involving two or more playback devices that have different playback roles." In ordinary language, the concept of "type" frequently covers both (1) a category of possible variations and (2) the alternative "none of the above." For example, if someone were asked, "What type of immigration visa do you have?" The answer could be one of the various available visas, or the answer could be "none." Similarly, "types" of dietary restriction include vegetarian, vegan, gluten-free, and also "no restriction." In the same manner, "no pairing" is a "type of pairing" because it is not a "configuration involving two or more playback devices that have different playback roles."

### 2. The Specification Supports Sonos's Construction

Like the claims, the specification explicitly describes "no pairing" as a "type of pairing":

> Further, it is understood that going from a configuration of **no pairing (unpaired or non paired)** to a configuration of pairing or from one kind of pairing (*e.g.*, a pairing used in a type of stereo mode or theater mode) to a different kind of pairing (*e.g.*, another pairing used in a type of stereo mode or theater mode) are **all various types of 'pairing' that can occur according to certain embodiments**. In addition, disengaging a pairing between multiple playback devices might go from pairing to no pairing or from pairing of a first kind back to pairing of a previous kind, for example. In one example, **a first type of pairing might include 'no pairing' with another playback device** and a second type of pairing might include pairing with one or more additional playback devices.

'959 Patent at 15:48-61. Sonos's construction is consistent with the clear teachings of the '959 specification, while Google's proposed construction would exclude these express examples.

## VIII. CONCLUSION

For the reasons discussed herein, Sonos respectfully requests that the Chief Administrative Law Judge adopt Sonos's constructions.

50

Dated:  July 2, 2020

Respectfully,

George I. Lee, Esq.
Sean M. Sullivan, Esq.
Rory P. Shea, Esq.
J. Dan Smith, Esq.
Cole B. Richter, Esq.
Michael P. Boyea, Esq.
Jae Y. Pak, Esq.
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St, Floor 5W
Chicago, IL  60661
Tel.: (312) 754-0002
Email: Sonos-1191-service@orrick.com

Jordan L. Coyle, Esq.
ORRICK, HERRINGTON & SUTCLIFFE  LLP
Columbia Center
1152 15th Street, NW
Washington, DC  20005
Tel.: (202) 339-8400
Email: Sonos-1191-service@orrick.com

 */s/ Jordan L. Coyle*
Jordan L. Coyle

Clement S. Roberts, Esq.
ORRICK, HERRINGTON & SUTCLIFFE  LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Tel.: (415) 773-5700
Email: Sonos-1191-service@orrick.com

Bas de Blank, Esq.
Lillian J. Mao, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Tel.: (650) 614-7400
Email: Sonos-1191-service@orrick.com

Alyssa M. Caridis, Esq.
Geoffrey Moss, Esq.
Shane D. Anderson, Esq.
Margaret Abernathy, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017-5855
Tel.: (213) 629-2020
Email: Sonos-1191-service@orrick.com

**Attorneys for Complainant Sonos, Inc.**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C. 20436**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | Investigation No. 337-TA-1191 |

## COMPLAINANT SONOS, INC.'S APPENDIX OF EXHBITS IN SUPPORT OF OPENING CLAIM CONSTRUCTION BRIEF

| Exhibit | Title |
|---|---|
| 1 | U.S. Patent No. 8,588,949 ("'949") |
| 2 | U.S. Patent No. 9,195,258 ("'258") |
| 3 | U.S. Patent No. 9,219,959 ("'959") |
| 4 | U.S. Patent No. 10,209,953 ("'953") |
| 5 | U.S. Patent No. 10,439,896 ("'896") |
| 6 | Listing of all Asserted Claims, with the disputed terms highlighted |
| 7 | *Sonos, Inc. v. D&M Holdings, Inc.*, No. 14-1330, 2017 WL 123456 |
| 8 | *Sonos, Inc. v. D&M Holdings, Inc.*, No. 14-1330, 2017 WL 3433691 |
| 9 | Declaration of Jon B. Weissman dated June 1, 2020 (exhibits included) |
| 10 | Declaration of Kevin C. Almeroth dated June 1, 2020 (exhibits included) |
| 11 | Rebuttal Declaration of Matthew B. Shoemake, Ph.D. dated June 8, 2020 (exhibits omitted) |
| 12 | U.S. Provisional Application No. 60/490,768 |
| 13 | U.S. Provisional Application No. 60/577,284 |
| 14 | Rebuttal Declaration of Jon B. Weissman Regarding "Security Key" dated June 8, 2020 (exhibits included) |
| 15 | Declaration of Martin C. Rinard, Ph.D. dated June 1, 2020 (exhibits omitted) |
| 16 | Rebuttal Declaration of Jon B. Weissman Regarding "Independent Playback Device" dated June 8, 2020 (exhibits included) |
| 17 | Rebuttal Declaration of Kevin C. Almeroth Regarding "Equalization" dated June 8, 2020 (exhibits included) |

## <u>CERTIFICATE OF SERVICE</u>

I, Amy Maruska, hereby certify that the foregoing was served on July 2, 2020 upon the following parties as indicated:

| | |
|---|---|
| The Honorable Lisa R. Barton<br>Secretary to the Commission<br>**U.S. International Trade Commission**<br>500 E Street, S.W., Room 112<br>Washington, DC 20436 | ☐ Via First Class Mail<br>☐ Via Overnight Courier (2 copies)<br>☐ Via Hand Delivery (2 copies)<br>☒ Via EDIS Electronic Filing |
| The Honorable Charles E. Bullock<br>Chief Administrative Law Judge<br>**U.S. International Trade Commission**<br>500 E Street S.W., Room 317<br>Washington, DC 20436<br>Email: Bullock337@usitc.gov<br><br>Irina Kushner, Attorney Advisor<br>Email: Irina.Kushner@usitc.gov | ☐ Via First Class Mail<br>☐ Via Express Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail |
| Cortney Hoecherl, Esq.<br>Office of Unfair Import Investigations<br>**U.S. International Trade Commission**<br>500 E Street, S.W., Suite 401<br>Washington, DC 20436<br>Email: cortney.hoecherl@usitc.gov | ☐ Via First Class Mail<br>☐ Via Express Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail<br>☒ Via OUII Box site |
| ***Counsel for Respondents Google LLC and Alphabet Inc.***<br><br>S. Alex Lasher, Esq.<br>**QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>1300 I Street, NW, Suite 900<br>Washington, D.C. 20005<br>Email: qe-google-sonos-1191@quinnemanuel.com | ☐ Via First Class Mail<br>☐ Via Express Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail |
| ***Counsel for Respondent Google LLC***<br><br>Shamita Etienne-Cummings, Esq.<br>**WHITE & CASE LLP**<br>701 Thirteenth Street, NW<br>Washington, DC 20005-3807<br>Email: setienne@whitecase.com | ☐ Via First Class Mail<br>☐ Via Express Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail |

/s/ *Amy Maruska*
Amy Maruska

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C. 20436

### Before the Honorable Charles E. Bullock
### Chief Administrative Law Judge

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1191** |

## <u>COMPLAINANT SONOS, INC.'S REBUTTAL CLAIM CONSTRUCTION BRIEF</u>

| | |
|---|---|
| Dated: July 20, 2020 | Clement S. Roberts, Esq. |
| | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| George I. Lee, Esq. | The Orrick Building |
| Sean M. Sullivan, Esq. | 405 Howard Street |
| Rory P. Shea, Esq. | San Francisco, CA 94105-2669 |
| J. Dan Smith, Esq. | Tel.: (415) 773-5700 |
| Cole B. Richter, Esq. | Email: Sonos-1191-service@orrick.com |
| Michael P. Boyea, Esq. | |
| Jae Y. Pak, Esq. | Bas de Blank, Esq. |
| LEE SULLIVAN SHEA & SMITH LLP | Lillian J. Mao, Esq. |
| 656 W Randolph St, Floor 5W | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| Chicago, IL 60661 | 1000 Marsh Road |
| Tel.: (312) 754-0002 | Menlo Park, CA 94025-1015 |
| Email: Sonos-1191-service@orrick.com | Tel.: (650) 614-7400 |
| | Email: Sonos-1191-service@orrick.com |
| Jordan L. Coyle, Esq. | |
| ORRICK, HERRINGTON & SUTCLIFFE LLP | Alyssa M. Caridis, Esq. |
| Columbia Center | Geoffrey Moss, Esq. |
| 1152 15th Street, NW | Shane D. Anderson, Esq. |
| Washington, DC 20005 | Margaret Abernathy, Esq. |
| Tel.: (202) 339-8400 | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| Email: Sonos-1191-service@orrick.com | 777 South Figueroa Street, Suite 3200 |
| | Los Angeles, CA 90017-5855 |
| | Tel.: (213) 629-2020 |
| | Email: Sonos-1191-service@orrick.com |
| | |
| | ***Attorneys for Complainant Sonos, Inc.*** |

# TABLE OF CONTENTS

I.    THE TERM "LOCAL AREA NETWORK" IN THE '896, '949, '258, & '953 PATENTS MUST BE A TRUE "DATA NETWORK" ........................................... 1

    A.    Google & Staff's Construction Is Contrary to the History of the Term "Local Area Network" and Google's Own Dictionary Definitions ............................................................................................... 2

    B.    Google & Staff's Interpretation Is Inconsistent with Previous Positions Taken by Google & Its Experts Regarding "Local Area Network" ................................................................................................... 3

    C.    Google & Staff's Interpretation Is Contrary to the Intrinsic Evidence ......................................................................................... 4

II.    THE '896 PATENT CLAIM TERMS .................................................. 5

    A.    "Security Key" Is Not Limited to Binary Format or Encryption/Decryption ................................................................... 5

    B.    Google's *IPXL* Argument Ignores the Claim Language Reciting Capability ........................................................................................ 9

    C.    The Claimed Temporal Relationship Between the "Receiving" Functions & the "Transmitting a Response" Function Does Not Require Construction ...................................................................... 11

    D.    "A Second Message" Is Not Limited to a Single Message That Contains Both the "Identifier" & the "Security Key" .......................... 12

III.    "INDEPENDENT PLAYBACK DEVICE" IN THE '949 PATENT IS DEFINITE ....................................................................................... 15

IV.    THE '959 PATENT CLAIM TERMS ................................................ 19

    A.    "Equalization" Is Not Limited to "Alteration of the Relative Strength of Certain Frequency Ranges in the Audio Data" .................. 19

        1.    The Specification Establishes that Google's Construction is Too Limiting ...................................................................... 20

        2.    Google's Construction Reads Out Specification Embodiments ....................................................................... 21

        3.    The Other Intrinsic Evidence Cited by Google Does Not Support Google's Overly-Narrow Construction ......................... 22

    B.    "No Pairing" Is a "Type of Pairing" ............................................ 24

**Appx3682**

## TABLE OF AUTHORITIES

**CASES**

*Achates Reference Pub., Inc. v. Symantec Corp.*,
No. 2:11-CV-294-JRG-RSP, 2013 WL 2357172 (E.D. Tex. Jan. 3, 2013)........................ 6

*Advanced Software Design Corp. v. Fiserv, Inc.*,
641 F.3d 1368 (Fed. Cir. 2011)........................................................................ 6

*Allen Eng'g Corp. v. Bartell Indus.*,
299 F. 3d 1336 (Fed. Cir. 2002)........................................................................ 19

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008)........................................................................ 15

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed. Cir. 2004)........................................................................ 12

*Certain Unmanned Aerial Vehicles*,
Inv. No 337-TA-1133, Order No. 15 (June 21, 2019) .................................... 11

*CoStar Realty Info., Inc. v. CIVIX-DDI, LLC*,
2013 WL 5346440 (N.D. Ill. Sept. 23, 2013) .................................... 14

*HTC Corp. v. IPCom GmbH & Co., KG*,
667 F.3d 1270 (Fed. Cir. 2012)........................................................................ 10

*Imperium (IP) Holdings, Inc. v. Apple Inc.*,
Case No. 11-cv-163, 2012 WL 6949611 (E.D. Tex. July 2, 2012) ................................ 11

*In re Katz Interactive Call Processing Patent Litigation*,
639 F.3d 1303 (Fed. Cir. 2011)........................................................................ 14

*In the Matter of Certain Flash Memory Controllers, Drives, Memory Cards & Media Players, & Prod. Containing Same*,
Inv. No. 337-TA-619, 2009 WL 1265308 (Apr. 10, 2009) ................................ 10

*In the Matter of Certain Network Devices, Related Software & Components Thereof*,
Inv. No. 337-TA-944, 2019 WL 4010953 (June 1, 2019) .................................. 9

*In the Matter of Certain Wiper Blades*,
Inv. No. 337-TA-816, Order No. 51, 2012 WL 4750231 (Oct. 2, 2012) ........................ 25

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
381 F.3d 1111 (Fed. Cir. 2004)........................................................................ 8, 14

ii

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005)........................................................................ 11

*Mars Inc. v. H.J. Heinz Co.*,
    377 F.3d 1369 (Fed. Cir. 2004)........................................................................ 13

*MasterMine Software, Inc. v. Microsoft Corp.*,
    874 F.3d 1307 (Fed. Cir. 2017)........................................................................ 10

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005).......................................................................... 6

*Nautilus, Inc. v. Biosig Instr., Inc.*,
    572 U.S. 898 (2014)......................................................................................... 15

*Neology, Inc. v. Fed. Signal Corp.*,
    Case No. 11-cv-672, 2012 WL 2308202 (D. Del. June 18, 2012)..................... 7

*Seal-Flex, Inc. v. Athletic Track and Court Const.*,
    172 F.3d 836 (Fed. Cir. 1999)......................................................................... 23

*Storage Technology Corp. v. Cisco Systems, Inc.*,
    329 F.3d 823 (Fed. Cir. 2003)......................................................................... 22

*TiVo, Inc. v. EchoStar Commc'ns Corp.*,
    516 F.3d 1290 (Fed. Cir. 2008).................................................................. 14, 15

*Tristrata, Inc. v. Microsoft Corp.*,
    Case No. 11-cv-3797, 2013 WL 5645984 (N.D. Cal. Oct. 16, 2013) ............ 6, 7

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)....................................................................... 12

*UltimatePointer, L.L.C. v. Nintendo Co.*,
    816 F.3d 816 (Fed. Cir. 2016)......................................................................... 10

*Walker Digital, LLC v. Google, Inc.*,
    66 F. Supp. 3d 501 (D. Del. 2014)..................................................................... 6

**ABBREVIATIONS**

| | |
|---|---|
| Sonos | Complainant Sonos, Inc. |
| Google | Respondents Google LLC and Alphabet Inc. |
| Staff | The Commission Investigative Staff |
| Sonos Br. | Complainant Sonos, Inc.'s Opening Claim Construction Brief (EDIS 713881) |
| Google Br. | Respondents' Initial Markman Brief (EDIS 713880) |
| Staff Br. | Commission Investigative Staff's Initial *Markman* Brief (EDIS 714442) |
| '258 Patent | U.S. Patent No. 9,195,258 |
| '953 Patent | U.S. Patent No. 10,209,953 |
| '896 Patent | U.S. Patent No. 10,439,896 |
| '949 Patent | U.S. Patent No. 8,588,949 |
| '959 Patent | U.S. Patent No. 9,219,959 |
| POSITA | Person of ordinary skill in the art at the time of the relevant invention |
| CALJ | Chief Administrative Law Judge |

# I.  THE TERM "LOCAL AREA NETWORK" IN THE '896, '949, '258, & '953 PATENTS MUST BE A TRUE "<u>DATA</u> NETWORK"

In its Opening Brief, Sonos presented intrinsic and extrinsic evidence establishing that the plain and ordinary meaning of "local area network" (or "LAN") does ***not*** encompass ***any*** conceivable "network," as asserted by Google and Staff. Rather, this term of art was coined in the 1970s and refers to a specific class of networks that exchange digital data packets between computing devices. These networks are commonly referred to as ***data*** networks, ***computer*** networks, or ***packet*** networks. Sonos Ex. 9 (Weissman Decl.) at ¶¶ 40-44; Sonos Ex. 10 (Almeroth Decl.) at ¶¶ 52-62; Sonos Ex. 11 (Shoemake Reb. Decl.) at ¶ 19.[1]

Google and Staff concede that the claimed "local area network" is a "data network." Google Br. at p. 5 ("Respondents do not object to Sonos' addition of the term 'data' in front of network"); Staff Br. at p. 7 fn. 1 ("The Staff (and Google) would not object to describing the LAN as a 'data network' . . . ."). But, they immediately seek to undermine the consequence of this admission by arguing that the CALJ should ignore the word "data" so that any conceivable "network" could satisfy the claim. *Id.* This is contrary to the intrinsic and extrinsic evidence and improperly renders the word "data" meaningless and superfluous. A POSITA would understand that a "data network" distinguishes non-data "networks," such as conventional speaker wires carrying analog audio.

Contrary to Google and Staff's assertions, Sonos is not trying to read a "digital packet" limitation into the construction of "local area network." Instead, as Sonos correctly recognizes, a POSITA would understand that, in the context of the Asserted Patents, the plain and ordinary meaning of "local area network" – *i.e.*, a "data network" – requires digital data packets. It is

---

[1] While Sonos has used the term "data network" in its construction to remain consistent with the constructions of "player" and "network interface," Sonos is amenable to using a different term from the applicable dictionary definitions, such as "computer network" or "packet network."

Google and Staff (not Sonos) who seek to modify the plain and ordinary meaning by reading out this fundamental aspect and asserting that a "local area network" covers all conceivable types of "networks" that communicate data among devices in a "local area." Google Br. at p. 5 ("'data networks' are simply networks that communicate data…."). But merely "communicating data" could be performed by a telegraph, a set of pneumatic tubes, or a group of teenagers with walkie-talkies. That is *not* how a POSITA would understand the term in the context of the Asserted Patents. In fact, such a construction is contrary to Google's dictionary definitions, own patents, and own expert testimony. It is also counter to the intrinsic evidence and the core teachings of the Asserted Patents because, *inter alia*, it does not distinguish conventional speaker wires carrying analog audio to passive speakers, which is the exact type of prior art that Sonos's invention was intended to replace. *See, e.g.*, '949 Patent at 1:41-2:16.

Accordingly, the CALJ should reject Google and Staff's expansive interpretation and adopt Sonos's construction, which reflects the meaning of the term.

### A. Google & Staff's Construction Is Contrary to the History of the Term "Local Area Network" and Google's Own Dictionary Definitions

The history of the term "local area network" provides important context for how it would be understood by a POSITA. Specifically, this term of art did not even exist until the 1970s, when the term was coined to describe new "packet access network" technologies that emerged with the Internet itself. *See, e.g.*, Sonos Ex. 9 (Weissman Decl.) at Appendix F, p. 73 ("LAN is a type of broadband packet access network that carries packet data traffic of an organization. . . . The basis of LAN technologies and standards was defined in the late 1970s and early 1980s. LAN technologies really emerged with the Internet itself . . . ."); Sonos Ex. 18 ("A number of experimental and early commercial LAN technologies were developed in the 1970s."). Google's expert, Dr. Shoemake, acknowledged this important fact. Sonos Ex. 19 (Shoemake Dep.) at

186:20-24 (confirming that "LAN" is a term of art that "goes back to at the 1970s"). This historical context confirms that the term "local area network" refers to a computer or data network and distinguishes non-data "networks" that existed well before the 1970s, such as the analog audio "networks" that are encompassed by Google and Staff's construction. *See, e.g.*, Sonos Exs. 20, 21.

Consistent with this history, the definitions cited by Google and its expert also confirm that a "local area network" refers specifically to a computer or data network and does not encompass any type of "network." For instance, at least four of Google's dictionaries define a "local area network" as a "***computer*** network," and a fifth defines it as a "***data communications*** network . . . used to ***link computers*** and peripheral devices." Sonos Ex. 11 (Shoemake Reb. Decl.) at ¶ 19.[2] Google and Staff ignore this critical language demonstrating that a "local area network" is a computer or data network that exchanges digital data packets between computing devices. Sonos Ex. 9 (Weissman Decl.) at ¶¶ 40-44; Sonos Ex. 10 (Almeroth Decl.) at ¶¶ 52-62.

**B.    Google & Staff's Interpretation Is Inconsistent with Previous Positions Taken by Google & Its Experts Regarding "Local Area Network"**

Google and Staff's construction is also inconsistent with previous positions that Google and its expert, Dr. Jeffay, have taken regarding the meaning of "local area network." For instance, Google has filed numerous patents acknowledging that a "local area network" is a ***computer*** (or ***data*** or ***packet***) network that exchanges digital data packets between computing devices. *See, e.g.*, Sonos Ex. 22 at 42:5-18 (describing a "***local area network***" as a "form or medium of ***digital data communication***" that interconnects components of a "***computing*** system"); Sonos Ex. 23 at 32:54-66 (same); Sonos Ex. 24 at ¶ [0025] (stating that communications may be conducted over "at least one ***packet-switched network such as a local***

---

[2] All emphases added herein unless otherwise noted.

*area network (LAN)*" so that the communications "utilize ***packets to communicate data***
therebetween").

Likewise, Dr. Jeffay has testified multiple times that the plain and ordinary meaning of
"local area network" is a computer network that exchanges digital data packets between devices.
Sonos Ex. 25 at ¶ 18 (testifying that "[a] LAN is a ***computer*** network" on which computers
communicate using "***special software***"); Sonos Ex. 26 at ¶¶ 33, 35, 37, 52, 53 (testifying that the
"definition of a LAN is the set of ***computers*** that are 'reachable' from one another (can
communicate with one another) via a layer-2 protocol (and only a layer-2 protocol)" that
exchanges data using "layer-2 frames," which are generically referred to as "***packets***"). These
admissions were part of a background discussion of computer networking (*i.e.,* how a POSITA
understands the term) rather than a discussion of any specific claim term, and, thus, apply
equally here. *Id.*

C. **Google & Staff's Interpretation Is Contrary to the Intrinsic Evidence**

As explained in Sonos's Opening Brief, the intrinsic evidence repeatedly and consistently
uses the term "local area network" in accordance with its plain and ordinary meaning – which is
a ***computer*** (or ***data*** or ***packet***) network, *i.e.*, a network that exchanges digital data packets
between computing devices.[3] Google and Staff's overbroad construction, in contrast, reads on a
speaker wire's transmission of analog audio from an AV receiver to a passive speaker in a

---

[3] *See, e.g.*, '949 Patent at 5:5-18 ("All of the zone players 102, 104 and 106 are coupled directly
or indirectly to a ***data network*** 108. . . . all devices including the zone players 102, 104 and 106
are part of a ***local area network*** . . . .") and 5:37-63 ("The zone player 200 includes a network
interface 202 . . . [that] facilitates a ***data*** flow between a ***data network*** (i.e., the ***data network*** 108
of FIG. 1) . . . a network interface manages the assembling of an audio source or file into smaller
***packets*** that are transmitted over the ***data network*** . . . ."); '258 Patent at 4:61-63 ("[T]he ***local
network*** 12 may also have an interface (not shown) to a wide area network, over which the network
audio system 10 can obtain audio information.") and 2:40-48 ("The invention provides . . . for
synchronizing operations among . . . ***digital data processing devices*** . . . that receive ***digital audio
information*** that is to be played back in synchrony . . . .").

4

conventional, hard-wired audio system – which, as noted above, is the exact type of prior art that Sonos's networked audio system advanced upon. *See, e.g.*, '949 Patent at 1:41-2:16.

Google and Staff try to justify their expansive construction by citing references in the Asserted Patents to "analog" audio sources they say transmit audio information over a "local area network." But, the Asserted Patents never say that such audio information is ***transmitted in analog form*** over a "local area network." To the contrary, the Asserted Patents repeatedly and consistently disclose that analog audio information is converted into "digital" form before being sent over the "local area network." *See, e.g.*, '258 Patent at 10:16-20 ("[I]f the audio information is not in digital form," it will be converted to "***digital form***," and the "***digitized audio information***, along with the playback timing information," will be provided to devices over the network); '949 Patent at 4:65-67 ("As used herein, unless explicitly stated otherwise, an audio source or audio sources are in ***digital format*** and can be transported or streamed over a ***data network***."). Neither Google nor Staff identify any disclosure in the Asserted Patents of data transmitted in analog form over a "local area network" – because no such disclosure exists.[4]

## II.     THE '896 PATENT CLAIM TERMS

### A.     "Security Key" Is Not Limited to Binary Format or Encryption/Decryption

Google's construction relies heavily on extrinsic evidence to improperly import narrow limitations requiring that the claimed "security key" must (1) be used in "encryption" or "decryption" and (2) be formatted as a "string of bits." As Staff correctly notes, Google's

---

[4] Google also says that its interpretation of "local area network" is supported by the '258 Patent's disclosure that "the local network may include one or more network interface devices . . . that are configured to connect the local network 12 to other networks," including "the public switched telephony network (PSTN)," which transfers data in analog form. *See* '258 Patent at 4:14-18. However, this disclosure of some "other," entirely different "network" that can transmit data in analog form does nothing to change the fact that the disclosed and claimed "local [area] network" is a ***data*** network that exchanges data in the form of digital data packets.

construction "is inconsistent with the intrinsic evidence (and pertinent extrinsic evidence)," which demonstrates that the broad term "security key" covers "information that allows access to a secure network" (including passwords or passphrases), regardless of format (binary, hexadecimal, string of characters, etc.).[5] *See, e.g.*, Staff Br. at pp. 39-41.

For example, Google relies on four cases to argue that "courts regularly construe 'security key' to be bits actually used to encrypt or decrypt data." Google Br. at p. 43. As the Federal Circuit has cautioned, however, "[a] particular term used in one patent need not have the same meaning when used in an entirely separate patent" because "there are many situations in which the interpretations will necessarily diverge." *See, e.g.*, *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005). This is particularly true here since none of Google's cases even construe the specific term "security key" at issue in the '896 Patent.[6]

Moreover, contrary to Google's assertion, its cases actually confirm that "security key" in the '896 Patent claims is *not* limited to "encryption" or "decryption." In each of Google's cases, the claims at issue explicitly recited "encryption" and/or "decryption" using a "key," which is

---

[5] Contrary to Google's assertion, the plain and ordinary meaning of "security key" proposed by Sonos and Staff does not cover an SSID or channel because, although "network configuration parameters," an SSID and channel are necessary for both *secure and non-secure* networks. In contrast, the claimed "*security* key" is used to *access* a *secure* network and is not necessary to access a non-secure network. *See* Sonos Ex. 14 (Weissman Reb. Decl.) at ¶¶ 15, 20, 23, 24, 27. Dr. Weissman, did not testify to the contrary at his deposition, but rather simply explained the embodiment in the '896 Patent where an HHID, SSID, WEP key, and channel are all described as "network configuration parameters." *See* Sonos Ex. 27 (Weissman Dep.) at 108:1-110:9.

[6] *See Tristrata, Inc. v. Microsoft Corp.*, Case No. 11-cv-3797, 2013 WL 5645984, at *5 (N.D. Cal. Oct. 16, 2013) (construing "key"); *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1373 (Fed. Cir. 2011) (construing "key information"); *Achates Reference Pub., Inc. v. Symantec Corp.*, No. 2:11-CV-294-JRG-RSP, 2013 WL 2357172 (E.D. Tex. Jan. 3, 2013) (construing "key"); *Walker Digital, LLC v. Google, Inc.*, 66 F. Supp. 3d 501, 513 (D. Del. 2014) (construing "cryptographic key").

precisely why the "key" terms were construed to require such a limitation.[7]  In contrast, the '896 Patent claims do not recite anything about "encryption" or "decryption," and thus, should not be limited in this manner.

To the extent the CALJ finds constructions in other cases helpful, *Neology, Inc. v. Fed. Signal Corp.* is relevant because, unlike Google's cases, *Neology* construed the same "security key" term at issue here in claims that, like the '896 Patent claims, do not expressly recite "encryption" or "decryption."  Case No. 11-cv-672, 2012 WL 2308202, at *8-9 (D. Del. June 18, 2012).  There, the court rejected defendant's attempt to limit "security key" to a "cryptographic key" because "encryption is not mentioned in the asserted claims[.]"  *Id*. at *9.

The intrinsic evidence likewise does not justify Google's narrow construction.  For example, Google begins its analysis by arguing that the claims should be limited to the preferred embodiment in the specification where the "security key" is a "WEP key."  Google Br. at p. 44.  However, as correctly noted by Staff, "Google's improper attempts to read this particular embodiment into the claims as a limitation should be rejected by the CALJ" because it is contrary to basic claim construction principles.  Staff Br. at p. 40.

In making this argument, Google also incorrectly states that a "WEP key" is "the only instance of the 'security key'" in the '896 Patent and that "Sonos's expert agrees that there is no other disclosure of the claimed 'security key.'"  Google Br. at pp. 44-45.  As explained by Dr.

---

[7] *Tristrata*, 2013 WL 5645984 at *5 (claim language reciting "sending said key to the requestor so that ***the key can be used*** by the requestor ***to encrypt*** the document" and "***encrypting*** said seal ***using a unique key*** at a server"); *Advanced Software*, 641 F.3d at 1373 (claim language reciting that "selected information" is "***encrypted*** in combination ***with key information***"); *Achates Reference*, 2013 WL 2357172 at *4-5 (claim language reciting "***decrypting*** said encrypted launch code ***with*** a string, R, as ***the key***" and "***encrypting*** a first authentication code . . . ***with*** said string, R, as ***the key***); *Walker Digital*, 66 F. Supp. 3d at 513 (claim language reciting "executing ***a cryptographic operation using a cryptographic key***").

7

**Appx3692**

Weissman, however, Figure 5 of the '896 Patent discloses two different types of "security keys" that allow access to a secure network – (1) a WEP "passphrase" and (2) a WEP "key." Sonos Ex. 27 (Weissman Dep.) at 120:11-124:16; Sonos Ex. 14 (Weissman Reb. Decl.) at ¶¶ 41-42. Google's argument that Figure 5 "expressly distinguishes a 'security key' from a 'passphrase'" is unsupported. Figure 5 does not use the term "security key," let alone "expressly distinguish" a "security key" from a "passphrase." Staff agrees. Staff Br. at p. 41.

Moreover, even if a "WEP key" were the only embodiment in the specification, Google's importation would still be legally improper unless there were a clear disclaimer in the intrinsic record, which there is not. *See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.").

Google also argues that the use of "security password" in a related grandparent patent somehow proves that "security key" in the '896 Patent does not cover passwords or passphrases. Google Br. at pp. 48-49. This is incorrect. As explained by Dr. Weissman, a POSITA would understand that a "password" is an example of a type of "security key." Sonos Ex. 14 (Weissman Reb. Decl.) at ¶ 42. As such, the "password" in the grandparent patent's claims might exclude security keys that are not passwords, but the claims of the '896 Patent that more broadly recite a "security key" include both passwords and other types of security keys. *Id.*

Finally, Google's attempt to limit the format of the claimed "security key" to a "string of bits" (*i.e.*, binary format) is completely unsupported by the intrinsic evidence and contrary to its own expert's testimony. As explained by Dr. Weissman, "nowhere in the entire '896 Patent or the '284 Provisional Application does it specify a precise format for . . . the 'security key,'" nor

does it even "use[] the words 'binary,' 'bit' or 'bits.'" *Id*. at ¶ 30. As such, Google relies on

extrinsic evidence for this argument, including Dr. Shoemake's expert testimony. *See, e.g.*,

Google Br. at p. 43. However, Dr. Shoemake contradictorily and confusingly testified at his

deposition that Google's construction "does ***not*** require the security key . . . to be specifically

formatted as a string of bits" or be in "binary format." Sonos Ex. 19 (Shoemake Dep.) at 100:22-

102:8, 106:11-15. There is no reason to limit the format of the claimed "security key."

### B. Google's *IPXL* Argument Ignores the Claim Language Reciting Capability

Google's *IPXL* argument that the '896 Patent claims are indefinite ignores the express

claim language and should be rejected. In fact, the first paragraph of Google's argument uses an

ellipses to omit the claim language "when executed" from the clause "program instructions . . .

that, ***when executed*** by the at least one processor, ***cause*** the computing device to perform

functions comprising . . . ." *See* Google Br. at p. 38. When this claim language is properly

considered, however, the claims clearly cover a "computing device" with the ***capability*** to

perform the recited functions, including the "receiving" functions challenged by Google.

When faced with apparatus or system claims that use functional language like that of the

'896 Patent, the ITC and the Federal Circuit consistently reject *IPXL* arguments like Google's,

because such claims merely require the ***capability*** to perform the recited functions but do not

require actual performance or that the device be operating in an active state. *See, e.g.*, *In the*

*Matter of Certain Network Devices, Related Software & Components Thereof*, Inv. No. 337-TA-

944, 2019 WL 4010953, at *337 (June 1, 2019) (rejecting *IPXL* argument because "it is settled

law that apparatus or system claims may properly claim recited components by describing their

function or capabilities, and that the use of such functional language does not render them

indefinite" because such claims "do not require that the device or a user actually perform any

method steps"); *In the Matter of Certain Flash Memory Controllers, Drives, Memory Cards &*

*Media Players, & Prod. Containing Same*, Inv. No. 337-TA-619, 2009 WL 1265308, at *58-59

(Apr. 10, 2009) (rejecting *IPXL* argument because the apparatus claim "indicates a structure . . .

capable of" performing functions); *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d

1307, 1315-16 (Fed. Cir. 2017) (rejecting *IPXL* argument because "the claims merely use

permissible functional language to describe the capabilities of the claimed system, [and thus] it is

clear that infringement occurs when one makes, uses, offers to sell, or sells the claimed

system."); *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826-27 (Fed. Cir. 2016)

(rejecting *IPXL* argument because "[u]nlike *IPXL* and similar cases, the claims at issue here

make clear that the 'generating data' limitation reflects the capability of that structure rather than

the activities of the user."); *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277 (Fed.

Cir. 2012) (rejecting *IPXL* argument because the claims "merely establish . . . functions as the

underlying network environment in which the mobile station operates").

Applying these holdings confirms that Claim 1 of the '896 Patent is infringed by a

"computing device" with the ***capability*** to perform the claimed "receiving" functions "while

operating on a secure wireless local area network (WLAN)." *MasterMine*, 874 F.3d at 1316

("Because the claims merely use permissible functional language to describe the capabilities of

the claimed system, it is clear that infringement occurs when one makes, uses, offers to sell, or

sells the claimed system.").  In other words, contrary to Google's assertion, it is clear that

infringement occurs when a device is "first created" if it is programmed with the ***capability*** to

perform the claimed "receiving" functions while operating on a secure WLAN.  On the other

hand, if a device is not programmed with such capability when "first created" (*e.g.*, it is

programmed with the ***capability*** to perform the recited "receiving" functions only while not

operating on a secure WLAN), then infringement does not occur when the device is "first

created" (but may subsequently infringe if and when this functionality is added).

Google's *IPXL* cases are inapposite because, unlike the '896 Patent claims, the indefiniteness findings in Google's cases were based on claims **explicitly requiring user action**. *See IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) (finding indefiniteness where claim specifically required that "the user uses the input means to . . ."); *Certain Unmanned Aerial Vehicles*, Inv. No 337-TA-1133, Order No. 15, at p. 24 (June 21, 2019) (finding indefiniteness because the claims "specifically require activities performed by the user" and do "not merely describe capability"). In contrast, the '896 Patent claims are unequivocally directed to a "computing device" with the **capability** to perform the recited functions and do not require any user action or actual performance by the device.

Google's reliance on *Imperium (IP) Holdings, Inc. v. Apple Inc.*, Case No. 11-cv-163, 2012 WL 6949611 (E.D. Tex. July 2, 2012) is further misplaced as it does not even address indefiniteness, which Google acknowledged in a footnote. Google Br. at p. 39 fn. 9. Nevertheless, Google makes a novel *IPXL* indefiniteness argument based on the assertion that the "while operating" language of the '896 Patent claims "does not describe a capability, it specifies a state . . . ." *Id.* at p. 38. *Imperium*, however, does not support Google's interpretation of the "while operating" language of the '896 Patent, because, unlike the '896 Patent claims, the claim at issue in *Imperium* did not use the same "when executed . . . cause" language (or any other similar capability language like "configured to") to recite a device with certain functional **capability**. *See Imperium*, 2012 WL 6949611 at *27-28.

C. **The Claimed Temporal Relationship Between the "Receiving" Functions & the "Transmitting a Response" Function Does Not Require Construction**

Google fails to explain why the temporal relationship that is already expressly recited in Claim 1 of the '896 Patent needs to be rewritten using different words that are not found in the

claims. In fact, to the contrary, Google acknowledges that the parties are in agreement that the claims recite a "computing device" operable to perform the "transmitting a response" function "***after***" "receiving the user input and receiving the first message." Google Br. at p. 35. Nevertheless, Google still asks the CALJ to rephrase this clear claim language using the unclaimed phrase "must happen before." *Id.* This is improper. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004) ("[M]erely rephrasing. . . the plain language of a claim by substituting synonyms does not represent genuine claim construction"); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (finding that claim construction "is not an obligatory exercise in redundancy" and is only necessary "when the meaning or scope . . . is unclear and in dispute and requires resolution").

Even more concerning, however, Google's construction requiring that the "receiving" functions "***must happen*** before" the "transmitting a response" runs the risk of improperly importing a limitation into the claims that requires the claimed "receiving" functions to actually "happen," *i.e.*, be performed by the "computer device." This is incorrect because, as explained above, the '896 Patent claims cover a "computing device" that is merely ***capable*** of performing the claimed "receiving" functions and do not require their actual performance.

**D.** **"A Second Message" Is Not Limited to a Single Message That Contains Both the "Identifier" & the "Security Key"**

Google and Staff's assertion that the "at least a second message" term requires a ***single*** message having ***both*** the claimed "identifier" and "security key" should be rejected because it renders the claim language "at least" meaningless and superfluous, excludes an embodiment in the specification, and is unsupported by the Federal Circuit case that Google and Staff rely on.

Claim 1 of the '896 Patent recites "***at least*** a second message containing network configuration parameters, wherein the network configuration parameters comprise an identifier

. . . and a security key." As explained in Sonos's Opening Brief, by using the phrase "at least,"

this claim language expressly recites that the "identifier" and "security key" can be sent together

or separately in "at least" one message, *i.e., **one or more messages***. Sonos Br. at p. 33. Google

and Staff's attempt to limit these parameters to a single message improperly deletes the "at least"

language from the claim. *Id*. at pp. 33-34.

Staff recognizes that a construction that would render the "at least" language superfluous

is incorrect. *See* Staff Br. at pp. 48-49. Instead, Staff argues that the "at least" language is given

effect under Google and Staff's construction because "the plain language of the claims allows for

the second message to ***contain*** additional information beyond the 'network configuration

parameters,'" such as the "command . . . to adopt the network configuration parameters" of

dependent Claim 10. *Id*. Contrary to Staff's assertion, however, it is not the "at least" language

in Claim 1 that allows for the "second message" to "***contain***" such "additional information," but

rather the open-ended "***containing***" term that is elsewhere in Claim 1: "at least a second message

***containing*** network configuration parameters." *See Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369,

1376 (Fed. Cir. 2004) ("like the term 'comprising,' the term[] 'containing' . . . [is] open-

ended."). Thus, Staff's argument does not remedy the fact that Google and Staff's construction

renders "at least" superfluous.

Google and Staff's construction also improperly excludes the disclosed embodiment in

the specification where "an appropriate transmission channel, an identifier of the network and a

security key" are transmitted in multiple "***messages***" (plural). *See* Sonos Br. at pp. 35-36 (citing,

*e.g.*, '896 Patent at 3:24-30 ("some of the ***messages*** carry information pertaining to an

appropriate transmission channel, an identifier of the network and a security key for subsequent

communication")).[8]  Thus, their construction should be rejected.  *See, e.g.*, *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment . . . .").

In its Opening Brief, Google ignores this embodiment where the parameters are sent in multiple "messages" and, instead, focuses on another embodiment where an "HHID," "SSID," "WEP key," and "Channel" are sent in a single "SetNetParams message."  *See* '896 Patent at 14:15-30.  Google misleadingly states that this is the "***only***" embodiment disclosed.  *See* Google Br. at p. 42 (emphasis in original).  Even if true, however, it would still be legally improper to read this embodiment into the claims absent a clear disclaimer in the intrinsic record, which does not exist.  *See, e.g., Innova/Pure Water*, 381 F.3d at 1117.  Thus, the claims must cover both embodiments.  While the configuration parameters may be sent in a single second message, the "at least" language makes clear they can also be separately sent in multiple messages.

Finally, Google and Staff's reliance on the *TiVo* case is misplaced.  As set forth in *TiVo, Inc. v. EchoStar Commc'ns Corp.*, "[a]s a ***general rule***, the words 'a' or 'an' in a patent claim carry the meaning of '***one or more***'" and "[t]hat is particularly true when those words are used in combination with the open-ended antecedent 'comprising.'"  516 F.3d 1290, 1303 (Fed. Cir. 2008).  In departing from the general rule and finding that "an MPEG stream" requires "a single stream" with both "video and audio components," the Federal Circuit in *TiVo* relied on specific claim language requiring "***assembl[ing]*** said video and audio components ***into an MPEG stream***," which the Federal Circuit found "***clearly indicates*** that ***two*** separate components are

---

[8] These express teachings in the specification of the '896 Patent distinguish *CoStar Realty Info., Inc. v. CIVIX-DDI, LLC* because, unlike the specification of the '896 Patent, "the specification [in *CoStar Realty*] never discusses the possibility of multiple requests each containing part of the information transmitted to the database."  2013 WL 5346440, *6-7 (N.D. Ill. Sept. 23, 2013).

*assembled* into a *single* stream." *TiVo*, 516 F.3d at 1303. Unlike the language in *TiVo*, the language of the '896 Patent claims does not recite that the "identifier" and "security key" are "assembled" into a single message or otherwise clearly indicate that these two network configuration parameters must be transmitted in a single message. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ("The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'").

III.    **"INDEPENDENT PLAYBACK DEVICE" IN THE '949 PATENT IS DEFINITE**

Sonos submits that the Staff's construction and analysis of this term is consistent with that of Sonos. Thus, Sonos would not object to the adoption of the Staff's construction requiring an "independent playback device" to have "the capability to . . . play back audio independently/separately from other players when ungrouped," "the capability to be dynamically grouped for synchronized audio playback with other players," and "the capability of adjusting its volume based on individual and groupwise volume control." Staff Br. at p. 27.

Unlike the constructions proposed by Sonos and the Staff, Google's interpretation is nonsensical and unsupported by the intrinsic and extrinsic evidence. For instance, Google begins its analysis by asserting that a POSITA would understand that the "independent playback device" term "*impossibly* requires the devices to be in two distinct states at the same time." Google Br. at p. 26.[9] However, Google's admittedly nonsensical interpretation cannot be

---

[9] It is unclear whether Google's argument would even lead to a finding of indefiniteness because Google admits that a POSITA *would understand the scope of "independent playback device" with reasonable certainty*. *See* Google Br. at pp. 26, 31. A patent is only invalid for indefiniteness "if its claims, read in light of the specification delineating the patent, and the prosecution history, *fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention*." *Nautilus, Inc. v. Biosig Instr., Inc.*, 572 U.S. 898, 901 (2014).

correct, especially when the term can be construed according to Sonos's or the Staff's proposals, which are sensical and consistent with the claims, specification, and prosecution.

Google's interpretation is also based on a flawed analysis of the intrinsic evidence. For instance, Google purports to properly analyze the claim language, but Google fails to consider the entirety of the clause in which "independent playback device" appears. Instead, Google uses an ellipses to ignore the highly relevant language describing an "independent playback device" as "**configured to playback** a multimedia output from a multimedia source." *See* Google Br. at p. 26.[10] When this claim language is properly considered, the "independent" characteristic of a "playback device" clearly refers to the "independent" **capability** to play multimedia separately from other playback devices. *See* Sonos Br. at pp. 37-38.

Further, Google fails to explain how "independent playback device" could be indefinite when both the original and the reexamination prosecution show that multiple Examiners, the third party that requested reexamination, and Sonos all understood the scope of the term and were able to compare it to numerous prior art references. *See* Sonos Br. at pp. 40-42; Staff Br. at pp. 28-34. As just one example, during original prosecution the Examiner considered Sonos's amendment adding "independent playback device" to the claims and determined that this specific limitation was "sufficient to obviate" the Metcalf rejections, because Metcalf **does not** disclose playback devices capable of playing different multimedia separately from each other. *See* Sonos Br. at pp. 40-41; Sonos Ex. 16 (Weissman Reb. Decl.) at ¶¶ 29-34, 74-77, Weissman Ex. A at pp. 109-118, 121-123; Sonos Ex. 27 (Weissman Dep.) at 163:22-164:18; Staff Br. at pp. 29-30.

---

[10] Google's construction improperly rewrites the claims to, *inter alia*, delete the "configured to" language. *See* Sonos Ex. 16 (Weissman Reb. Decl.) at ¶ 59.

Google tries to avoid this prosecution history by arguing that Metcalf discloses "amplifiers" and "loudspeakers" that "are each separately controllable" and incorrectly concluding that Metcalf therefore "disclose[s] playback devices capable of playing media separately from other players." Google Br. at p. 30 (emphasis and citation omitted). Google then relies on its flawed reading of Metcalf to argue that "the claims cannot be rewritten as Sonos and the Staff propose [because] 'the claims would lose their distinction over the prior art Sonos purported to distinguish' . . . ." *Id.*

The Examiner was right and Google is wrong. As Dr. Weissman explained, the mere fact that devices are capable of being "***separately controllable***" does not mean they are "independent playback devices" capable of ***playing multimedia separately*** from each other. Sonos Ex. 16 (Weissman Reb. Decl.) at ¶ 76. When Metcalf is properly understood, Sonos's and Staff's constructions distinguish Metcalf, which is consistent with the Examiner's determination.

Similarly, with respect to Isely, Google's argument ignores the fact that the Examiner found the claimed "individual and groupwise volume control" of "independent playback devices" to distinguish Isely because "Isley controls volume in an ***interdependent*** manner." *See* Sonos Ex. 16 (Weissman Reb. Decl.) at Weissman Ex. A, pp. 130-131; Staff Br. at pp. 30-31. Thus, contrary to Google's position, Sonos's construction does not cause the claims to "lose their" distinction over Isely because the claims still separately require the "individual and groupwise volume control" limitations. Likewise, the claims would also distinguish Isely under Staff's construction because Staff's construction expressly requires an "independent playback device" to have the "capability of adjusting its volume based on individual and groupwise volume control." Staff. Br. at p. 27.

Google also incorrectly argues that the "independent" playback characteristic of the "playback devices" somehow "evaporates as soon as a player joins a group and begins playing in synchrony with other devices." Google Br. at p. 29. This is not true. As explained by Dr. Weissman, even after entering into a "player group," the claimed "playback devices" are still "independent" in that they continue to have the capability to play different audio separately from other "playback devices," despite the fact that they are not actively doing so while in the "player group." Sonos Ex. 16 (Weissman Reb. Decl.) at ¶ 61. In this way, the terms "independent" and "playback" in "independent playback device" are similar – both describe characteristics (or capabilities) of the "device," not active states of the "device." *Id.* at ¶ 62. A POSITA would understand that a "playback device" does not refer only to devices that are actively in a state of playing back audio – otherwise, that device would cease to be a "playback device" as soon as it stops actively playing audio, which makes no sense. *Id.*

The CALJ should also reject Google's misleading citations to Dr. Weissman's deposition testimony. For example, Google claims that "Dr. Weissman admitted that whether a device is 'independent' is 'an extremely broad question' that is 'difficult to answer without more context.'" Google Br. at p. 27. However, this question asked Dr. Weissman to "set[] aside the '949 patent," hence the request for "more context." Sonos Ex. 27 (Weissman Dep.) at 56:3-7. What "independent" means divorced from the '949 Patent is "extremely broad" and totally irrelevant. As another example, Google ignores Dr. Weissman's testimony (both oral and written) to contend that "Dr. Weissman could not determine 'whether Metcalf discloses independent playback devices' under his proposed construction." Google Br. at p. 27. To the contrary, Dr. Weissman clearly testified that "one distinction between Metcalf and the ['949] patent" is that "the audio components of Metcalf are not able to play audio independently and

separately from one another." Sonos Ex. 27 (Weissman Dep.) at 164:12-18; *see also* Sonos Ex. 16 (Weissman Reb. Decl.) at ¶¶ 30-31, 74-77; Staff Br. at pp. 30, 34-35.

Finally, Google's attempt to analogize the facts here to those in *Allen* should be rejected because the claim construction issues are very different. In *Allen Eng'g Corp. v. Bartell Indus.*, the Federal Circuit rejected the argument that "the term 'perpendicular' in the claim should be read to mean 'parallel.'" 299 F. 3d 1336, 1349 (Fed. Cir. 2002). Unlike the patentee in *Allen*, Sonos is not asking the CALJ to rewrite the term "independent playback device" to mean something opposite from and contrary to its plain and ordinary meaning.

## IV. THE '959 PATENT CLAIM TERMS

### A. "Equalization" Is Not Limited to "Alteration of the Relative Strength of Certain Frequency Ranges in the Audio Data"

Sonos and Staff agree that, in the context of the '959 Patent, the claim term directed to performing an "equalization of the audio data" should be construed to mean "modifying the output audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters."[11] This is identical to the construction adopted by U.S. District Court Judge Richard Andrews in Sonos's prior litigation after considering the same issues and closely tracks the definition used by Examiner Lee during the *ex parte* reexamination proceedings. *See* Sonos Br. at pp. 44-45, 48.

However, despite the fact that Sonos, Staff, Judge Andrews, and Examiner Lee all agree that this is the proper construction of the "equalization" term, Google now disputes this construction and attempts to limit the "modifying" of the "audio data" to require an "alteration of

---

[11] Google argues that the phrase "output audio data" in Sonos and Staff's construction proposed is "ambiguous." While Sonos disagrees, like Staff, Sonos has no objection to dropping the word "output" if the CALJ believes that this would help clarify the construction. Staff Br. at 20.

the relative strength of certain frequency ranges in the audio data." Google's attempt to import this additional limitation into the "equalization" claim term is improper and should be rejected.

### 1. The Specification Establishes that Google's Construction is Too Limiting

As explained in Sonos's Opening Brief, the '959 specification clearly articulates what it means to perform an "equalization of the playback device" in the context of the '959 Patent:

> Changing the equalization of the playback device *might include any of*: turning on or off (or effectively muting) one or more specific speaker drivers, changing the channel output of one or more speaker drivers, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, changing the amplifier gain of the playback device as a whole.

> *In certain embodiments*, changing the equalization of a playback device (e.g., changing the equalization of one or more speaker drivers of the playback device) *may affect* frequency dependent parameters. *Examples might include* the *adjustment of the strength of frequencies within the audio data*, a phase adjustment, and time-delay adjustment. In addition, a particular equalization *may use* a first type of pass filter . . . .

'959 Patent at 16:20-35.

By disclosing that performing "equalization" "include[s] any of" the disclosed functions (and might include others), these passages establish that "equalization" is performed when *any* of these functions is performed. Moreover, by disclosing that "adjustment of the strength of frequencies within the audio data" is only *one example* of *one possible way* that "equalization" might be performed, these passages establish that "equalization" is not limited to only "alteration of the relative strength of certain frequency ranges in the audio data," as proposed by Google.

Google is now trying to rewrite this clear disclosure in the '959 specification to treat the "example" functionality of adjusting the "strength of frequencies within the audio data" as though it is a necessary requirement of every other disclosed way to perform "equalization," such that "equalization" would only be achieved if (1) one of the disclosed functions is performed *and* (2) the "strength of frequencies within the audio data" is also adjusted. However,

this litigation-inspired reading is contrary to how a POSITA would understand these passages. *See* Sonos Ex. 17 (Almeroth Reb. Decl.) at ¶¶ 22-31 (Dr. Almeroth testifying as to a POSITA's understanding of these passages). This is confirmed by the fact that Staff, Judge Andrews, and Examiner Lee have all interpreted these passages to mean that "equalization" is necessarily performed when **any one** of these functions is performed. *See* Staff Br. at pp. 16-18; Google Ex. 17 (Judge Andrews interpreting the specification to mean that "equalization" is performed when any of the disclosed functions is performed); Sonos Ex. 17 (Almeroth Reb. Decl.) at Almeroth Ex. B, p. 71 fn. 2 (Examiner Lee stating that "[i]n the specification of the '959 Patent, the subject matter 'equalization' is **defined as including**" the disclosed functions).

## 2. *Google's Construction Reads Out Specification Embodiments*

By importing the limitation that "equalization" requires an "alteration of the relative strength of certain frequency ranges in the audio data," Google's construction also reads out disclosed embodiments for performing "equalization." For instance, the '959 Patent expressly discloses that one possible way to perform an "equalization" of audio data is by "changing the channel output of one or more speaker drivers," but such a channel output change would not involve any "alteration of the relative strength of certain frequency ranges in the audio data," as Google uses that phrase. Thus, Google's construction would improperly read this embodiment out of the specification.

Google tries to sidestep this fundamental flaw in its construction by suggesting that its expert, Dr. Jeffay, has identified hypothetical scenarios where "changing the channel output of one or more speaker drivers" might involve an "alteration of the relative strength of certain frequency ranges in the audio data." That is incorrect. In his declaration, the only example Dr. Jeffay gives in connection with changing channel output is a scenario where a playback device is originally playing a left channel out of two speaker drivers and not playing any audio out of a

third speaker driver, and then subsequently begins playing a center channel out of the third speaker driver.  Google Ex. 7 at ¶ 69.  However, this scenario does not involve a change to the *channel output* of any speaker driver.  To the contrary, this is an example of "***turning on or off***" a speaker driver, which the '959 specification expressly discloses as a separate and distinct embodiment from "changing the channel output" of a speaker driver.  '959 Patent at 16:20-23.

### 3. The Other Intrinsic Evidence Cited by Google Does Not Support Google's Overly-Narrow Construction

Despite Google's assertions to the contrary, none of the other intrinsic evidence it cites dictates that "equalization" must be limited as Google proposes.  For instance, the few isolated disclosures in the '959 Patent Google cites (*see* Google Br. at p. 12 (citing '959 Patent at 8:31-39, 12:15-16)) come from different sections of the '959 specification that are not describing the pairing-based "equalization" functionality that is the subject of the '959 Patent claims.[12]

Moreover, the isolated statements that "bass" and "treble" are possible examples of "equalization" and that speaker drivers being "sent the same frequencies" may be considered to have "the same equalization (or substantially the same equalization)" cannot be used to limit the function of performing an "equalization of the audio data," which is described elsewhere in the '959 Patent as being performed when any of the functions disclosed at col. 16:20-35 are performed.  *See, e.g., Storage Technology Corp. v. Cisco Systems, Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003) (ruling that it was improper to limit a disputed term to a subset of example functions that were presented in one portion of the specification, where another portion of the specification presented a full set of example functions); *Seal-Flex, Inc. v. Athletic Track and Court Const.*, 172

---

[12] In particular, the disclosure at col. 8:31-39 comes from a sub-section of the Detailed Description entitled "Example Playback Devices" and the disclosure at col. 12:15-16 comes from sub-section of the Detailed Description entitled "Example Controller," both of which precede the sub-section of the Detailed Description entitled "Example Multi-channel Environments" where the pairing-based "equalization" functionality that is the subject of the '959 Patent claims is described.

F.3d 836, 844-45 (Fed. Cir. 1999) (refusing to limit disputed term to a one-off example in the specification where the remaining portion of the specification did not limit the term).

Google also argues that Claim 5 of the '959 Patent describes "equalization" as an *additional step* to changing channel output. Google Br. at 15-16 (citing Claim 5 and col. 16:48-69). Google is wrong. Consistent with the rest of the '959 Patent, this claim make clear that changing a speaker driver's channel output is one possible function that may be carried out to perform a pairing-based "equalization." No additional step is necessary.

For example, the language of Claim 5 identified by Google is a "wherein" clause that follows the claim element of "determin[ing]" a playback device's "type of pairing" and recites:

> wherein in the first type of pairing, the playback device is configured to output audio comprising two channel sound via the plurality of speaker drivers, and wherein in the second type of pairing, the playback device is configured to output audio comprising no more than one channel of the two channel sound via the plurality of speaker drivers

'959 Patent at Claim 5. But contrary to Google's argument, this claim element does *not* recite that the playback device actually performs a function of "changing channel output" or "switching between two-channel sound and one-channel sound." Rather, it defines the different "type[s] of pairing" that can be determined by the playback device in terms of their associated channel output configurations, without reciting that the playback device actually *enters* into either of these channel output configurations at this point in the claim.

Put another way, the "determine" function of Claim 5 is directed to the playback device's *determination* of which channel output configuration to enter, but the functionality of actually entering into a determined channel output configuration is then captured by the subsequent claim elements of (1) "configur[ing] the playback device to perform a first equalization of the audio data . . . when the type of pairing is determined to comprise the first type of pairing" and (2) "configur[ing] the playback device to perform a second equalization of the audio data . . . when

the type of pairing is determined to comprise the second type of pairing." Thus, when read

properly, Claim 5 confirms that changing a speaker driver's channel output is one specific

function that is carried out to perform a pairing-based "equalization."

For similar reasons, Google is wrong that the disclosure at col. 16:48-69 of the '959

Patent describes "equalization" as an additional step to changing channel output. To the

contrary, this disclosure refers to an example embodiment where an "equalization" is performed

by both (1) changing the channel output of the speaker drivers and (2) "addition[ally]"

performing one or more of the other disclosed functions for performing "equalization" in order to

"reduce or eliminate certain constructive interference." *See* Sonos Ex. 17 at ¶¶ 44-46.[13] This

disclosure is consistent with the disclosure elsewhere in the '959 Patent that "equalization" is

performed when *any one or more* of the disclosed functions is performed.

### B. "No Pairing" Is a "Type of Pairing"

The intrinsic evidence explicitly discloses that "no pairing" is one possible "type of

pairing" in the context of the '959 Patent. *See* Sonos Br. at pp. 48-50; Staff Br. at pp. 21-22.

Google does not dispute this clear intrinsic evidence. *See* Google Br. at pp. 18-21. Instead,

Google argues that, because Sonos previously advocated for a construction of the term "pairing"

that requires a "configuration involving two or more playback devices that have different

playback roles," Sonos should be judicially estopped from advancing a construction of "*type of*

pairing" that covers "*no* pairing." Google's estoppel argument fails for several reasons.

---

[13] Google's argument that performing "equalization" is a separate step from changing channel output is also contrary to col. 14:10-15:33 of the '959 Patent. There, the '959 Patent introduces the function of "configur[ing] a [first/second] equalization of the output from speaker drivers in accordance with a [first/second] type of pairing," and then proceeds to describe "embodiments" of this functionality that are all focused on different ways that the *channel output* of a playback device's speaker drivers can be "configured," which again confirms that changing channel output is encompassed within the functionality of performing "equalization."

First, Google's argument that Sonos is "deviat[ing] from the construction it advanced and won in the *Denon* litigation" is factually wrong. The term at issue here is "***type of*** pairing." In the prior *Denon* litigation, however, the court construed the term "***pairing,***" and the parties here have agreed to adopt the district court's construction. *See* Google Br. at p. 2. As a matter of law, judicial estoppel cannot apply because Sonos is not seeking a different construction of a previously-construed term.[14]

Second, contrary to Google's assertion, there is no inconsistency between Sonos's prior position regarding the meaning of the term "pairing" and Sonos's current position regarding the meaning of the term "type of pairing." Specifically, the fact that the term "pairing" requires a configuration of two or more playback devices is not inconsistent with the fact that one possible configuration those devices may have is "no pairing." To the contrary, this is exactly how the terms "pairing" and "type of pairing" are used in the claims and specification of the '959 Patent. *See* '959 Patent at Claim 10 and 15:48-61.

Third, even if Sonos were judicially estopped from pursuing a construction for "type of pairing" that covers "no pairing" (it is not), that judicial estoppel against Sonos would not apply to Staff, who was not a party in the *Denon* litigation and is also separately proposing a construction of "type of pairing" that covers "no pairing." *See In the Matter of Certain Wiper Blades*, Inv. No. 337-TA-816, Order No. 51, 2012 WL 4750231, at *33 (Oct. 2, 2012).

---

[14] While the *Denon* court did not construe "type of pairing," Sonos's interpretation of that term in *Denon* is exactly the same as it is here – that "no pairing" is a type of pairing. Sonos Ex. 28 at p. 17. For this additional reason, there is no judicial estoppel here.

Dated:  July 20, 2020

Respectfully,

George I. Lee, Esq.
Sean M. Sullivan, Esq.
Rory P. Shea, Esq.
J. Dan Smith, Esq.
Cole B. Richter, Esq.
Michael P. Boyea, Esq.
Jae Y. Pak, Esq.
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St, Floor 5W
Chicago, IL  60661
Tel.: (312) 754-0002
Email: Sonos-1191-service@orrick.com

Jordan L. Coyle, Esq.
ORRICK, HERRINGTON & SUTCLIFFE  LLP
Columbia Center
1152 15th Street, NW
Washington, DC  20005
Tel.: (202) 339-8400
Email: Sonos-1191-service@orrick.com

 /s/ Jordan L. Coyle
Jordan L. Coyle

Clement S. Roberts, Esq.
ORRICK, HERRINGTON & SUTCLIFFE  LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Tel.: (415) 773-5700
Email: Sonos-1191-service@orrick.com

Bas de Blank, Esq.
Lillian J. Mao, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Tel.: (650) 614-7400
Email: Sonos-1191-service@orrick.com

Alyssa M. Caridis, Esq.
Geoffrey Moss, Esq.
Shane D. Anderson, Esq.
Margaret Abernathy, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017-5855
Tel.: (213) 629-2020
Email: Sonos-1191-service@orrick.com

**Attorneys for Complainant Sonos, Inc.**

26

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1191** |

## COMPLAINANT SONOS, INC.'S APPENDIX OF EXHBITS
## IN SUPPORT OF REBUTTAL CLAIM CONSTRUCTION BRIEF

| Exhibit | Title |
|---|---|
| 18 | "Local area network," WIKIPEDIA, https://en.wikipedia.org/wiki/Local_area_network (last visited July 20, 2020) |
| 19 | Deposition of Matthew B. Shoemake, Ph.D. dated June 26, 2020 (excerpts only) |
| 20 | "High fidelity," WIKIPEDIA, https://en.wikipedia.org/wiki/High_fidelity (last visited July 20, 2020) |
| 21 | "Speaker wire," WIKIPEDIA, https://en.wikipedia.org/wiki/Speaker_wire (last visited July 20, 2020) |
| 22 | U.S. Patent No. 10,143,018 (excerpts only) |
| 23 | U.S. Patent No. 10,334,306 (excerpts only) |
| 24 | U.S. Patent App. No. 2018/0146018 (excerpts only) |
| 25 | *Linksmart Wireless Technologies, LLC v. T-Mobile USA, Inc.,* Declaration of Kevin Jeffay, Ph.D. (E.D. TX. April 14, 2010) (excerpts only) |
| 26 | *Cisco Systems, Inc., Centripetal Networks, Inc.,* IPR2018-01513, Declaration of Kevin Jeffay, Ph.D. In Support of Petition for *Inter Partes* Review of U.S. Patent No. 9,560,077 (Aug. 8, 2018) (excerpts only) |
| 27 | Deposition of Dr. Jon B. Weissman dated June 25, 2020 (excerpts only) |
| 28 | *Sonos, Inc. v. D&M Holdings Inc. et al.,* C.A. No. 14-1330-RGA, Plaintiff Sonos, Inc.'s Opening Claim Construction Brief (D. Del. Sept. 9, 2016) |

<u>**CERTIFICATE OF SERVICE**</u>

I, Amy Maruska, hereby certify that the foregoing was served on July 20, 2020 upon the following parties as indicated:

| | |
|---|---|
| The Honorable Lisa R. Barton<br>Secretary to the Commission<br>**U.S. International Trade Commission**<br>500 E Street, S.W., Room 112<br>Washington, DC 20436 | ☐ Via First Class Mail<br>☐ Via Overnight Courier (2 copies)<br>☐ Via Hand Delivery (2 copies)<br>☒ Via EDIS Electronic Filing |
| The Honorable Charles E. Bullock<br>Chief Administrative Law Judge<br>**U.S. International Trade Commission**<br>500 E Street S.W., Room 317<br>Washington, DC 20436<br>Email: Bullock337@usitc.gov<br><br>Irina Kushner, Attorney Advisor<br>Email: Irina.Kushner@usitc.gov | ☐ Via First Class Mail<br>☐ Via Express Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail |
| Cortney Hoecherl, Esq.<br>Office of Unfair Import Investigations<br>**U.S. International Trade Commission**<br>500 E Street, S.W., Suite 401<br>Washington, DC 20436<br>Email: cortney.hoecherl@usitc.gov | ☐ Via First Class Mail<br>☐ Via Express Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail<br>☒ Via OUII Box site |
| ***Counsel for Respondents Google LLC and Alphabet Inc.***<br><br>S. Alex Lasher, Esq.<br>**QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>1300 I Street, NW, Suite 900<br>Washington, D.C. 20005<br>Email: qe-google-sonos-1191@quinnemanuel.com | ☐ Via First Class Mail<br>☐ Via Express Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail |
| ***Counsel for Respondent Google LLC***<br><br>Shamita Etienne-Cummings, Esq.<br>**WHITE & CASE LLP**<br>701 Thirteenth Street, NW<br>Washington, DC 20005-3807<br>Email: setienne@whitecase.com | ☐ Via First Class Mail<br>☐ Via Express Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail |

/s/ *Amy Maruska*
Amy Maruska

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Charles E. Bullock
Chief Administrative Law Judge

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME** | Investigation No. 337-TA-1191 |

COMPLAINANT SONOS, INC.'S PRE-HEARING BRIEF





231





233









398



**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

**In the Matter of**

**CERTAIN AUDIO PLAYERS AND
CONTROLLERS, COMPONENTS
THEREOF, AND PRODUCTS
CONTAINING SAME**

**Inv. No. 337-TA-1191**

**RESPONDENT GOOGLE'S POST-HEARING BRIEF**













179





238



239









UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Charles E. Bullock
Chief Administrative Law Judge

In the Matter of

CERTAIN AUDIO PLAYERS AND
CONTROLLERS, COMPONENTS
THEREOF, AND PRODUCTS
CONTAINING SAME

Inv. No. 337-TA-1191

RESPONDENT GOOGLE'S REPLY POST-HEARING BRIEF









114



**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Charles E. Bullock**
**Chief Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN AUDIO PLAYERS AND CONTROLLERS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME** | **Investigation No. 337-TA-1191** |

**COMPLAINANT SONOS, INC.'S REPLY POST-HEARING BRIEF**





