2022–1421, 2022–1573

———————————————

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———————————————

SONOS, INC.,

*Appellant*

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee*

GOOGLE LLC,

*Intervenor*

······················································

GOOGLE LLC,

*Appellant*

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee*

SONOS, INC.,

*Intervenor*

———————————————

Appeals from the United States International Trade Commission
in Investigation No. 337-TA-1191

———————————————

## PETITION FOR REHEARING EN BANC BY CROSS-APPELLANT GOOGLE LLC

———————————————

*[continued on inside cover]*

Sean S. Pak
Jeff Nardinelli
Ognjen Zivojnovic
QUINN EMANUEL URQUHART
    & SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Phone: (415) 875–6600
E-mail: seanpak@quinnemanuel.com
        jeffnardinelli@quinnemanuel.com
        ogizivojnovic@quinnemanuel.com

Lance Yang
QUINN EMANUEL URQUHART
    & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Phone: (213) 443–3360
E-mail: lanceyang@quinnemanuel.com

Jared W. Newton
QUINN EMANUEL URQUHART
    & SULLIVAN LLP
1300 I Street N.W., Suite 900
Washington, D.C. 20005
Phone: (202) 538–8108
E-mail: jarednewton@quinnemanuel.com

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, New Hampshire 03755
Phone: (602) 351–8250
E-mail: DBagatell@perkinscoie.com

Nathan K. Kelley
Jonathan I. Tietz
PERKINS COIE LLP
700 13th Street N.W., Suite 800
Washington, D.C. 20005
Phone: (202) 654–6200
E-mail: NKelley@perkinscoie.com
        JTietz@perkinscoie.com

Andrew T. Dufresne
PERKINS COIE LLP
33 E. Main Street, Suite 201
Madison, Wisconsin 53703
Phone: (608) 663–7492
E-mail: ADufresne@perkinscoie.com

Theresa H. Nguyen
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359–6068
E-mail: RNguyen@perkinscoie.com

Tara L. Kurtis
PERKINS COIE LLP
110 N. Wacker Drive, Suite 3400
Chicago, Illinois 60606
Phone: (312) 324–8607
E-mail: TKurtis@perkinscoie.com

Counsel for Google LLC

June 24, 2024

## CERTIFICATE OF INTEREST

I certify that the following information is accurate and complete to the best of my knowledge.

Date: June 24, 2024

Signature: /s/Dan L. Bagatell

Name: Dan L. Bagatell

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| Google LLC | none | XXVI Holdings Inc.; Alphabet Inc. |

| 4. Other Legal Representatives | | |
|---|---|---|
| from Quinn Emanuel Urquhart & Sullivan, LLP: | S. Alex Lasher Marissa R. Ducca | Justin Griffin Patrick D. Curran |
| from Allen & Overy LLP and White & Case LLP: | Shamita Etienne-Cummings | Emily Lipka James Gagen |

| 5. Related Case |
|---|
| see Notice of Related Case Information filed at Dkt. 96 |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| none |

## TABLE OF CONTENTS

Certificate of Interest ............................................................i

Table of Authorities ............................................................ iii

Table of Abbreviations and Conventions ................................... v

Circuit Rule 35(b)(2) Statement........................................... 1

Introduction .................................................................2

Statement of the Case........................................................3

    A.   The *Suprema* decision interpreting Section 337 under the *Chevron*-deference framework .........................................3

    B.   Sonos's complaint and the Commission's mixed decision ...............5

    C.   The panel's affirmance .........................................8

    D.   The Supreme Court's reconsideration of *Chevron* deference in *Loper Bright* and *Relentless* ...............................8

Argument........................................................................8

    A.   *Suprema* and the Commission's rulings here rested on a legal framework whose future is in grave doubt.......................9

    B.   Properly construed, the Commission's statutory authority is limited to cases where the accused articles infringe as imported and does not apply when, as here, the alleged infringement requires modification or further configuration after importation ............................................10

    C.   The issue is fundamental and even more important now than when this Court agreed to rehear *Suprema* en banc in 2014............13

Conclusion .....................................................................14

Addendum: The Panel's Opinion

Certificate of Compliance

## TABLE OF AUTHORITIES

**Cases**                                                                        **Pages**

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
    365 U.S. 336 (1961) ............................................................................11

*Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ................................................... 2, *passim*

*Comcast Corp. v. ITC*,
    951 F.3d 1301 (Fed. Cir. 2020) ..........................................5, 6

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ......................................................................13

*Loper Bright Enters. v. Raimondo*,
    No. 22-451 (U.S.) ..........................................................1, 3, 8

*Relentless, Inc. v. Dep't of Commerce*,
    No. 22-1219 (U.S.) ........................................................1, 3, 8

*Suprema, Inc. v. ITC*,
    796 F.3d 1338 (Fed. Cir. 2015) (en banc) ........................... 2, *passim*

*Tex. Instruments Inc. v. Cypress Semiconductor Corp.*,
    90 F.3d 1558 (Fed. Cir. 1996) ...............................................9

**Statutes and Regulations**

19 U.S.C. § 1337 ................................................................. 2, *passim*

19 U.S.C. § 1337(a)(1)(B)(i) ............................................. 1, *passim*

19 U.S.C. § 1337(a)(1)(B)(ii) .................................................12

35 U.S.C. § 271 ........................................................................11

35 U.S.C. § 271(a) ...................................................................11

35 U.S.C. § 271(b) ...........................................................11, 12, 13

35 U.S.C. § 271(c) .................................................................12, 13

35 U.S.C. § 271(g) ................................................................................12

## Other Authority

S. Rep. No. 100-71 (1988) ..................................................................12

https://ids.usitc.gov/ .............................................................................14

https://www.usitc.gov/intellectual_property/337_statistics_average_length_
     investigations.htm ........................................................................ 13, 14

https://www.usitc.gov/investigations/investigation_requests ..................14

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Add____ | page of the addendum to this brief (the panel's decision) |
| Appx_____ | appendix page_____ |
| CALJ | chief administrative law judge |
| Commission | U.S. International Trade Commission |
| Google | respondent Google LLC |
| NIA | non-infringing alternative |
| Sonos | complainant Sonos, Inc. |
| '896 patent | U.S. Patent No. 10,439,896 |
| '959 patent | U.S. Patent No. 9,219,959 |

## CIRCUIT RULE 35(b)(2) STATEMENT

Based on my professional judgment, I believe this appeal requires an answer to the following precedent-setting question of exceptional importance:

> Whether the International Trade Commission's authority under 19 U.S.C. § 1337(a)(1)(B)(i) is limited to articles that infringe a patent as imported, or instead extends to cases where infringement can occur only when additional features are added or additional steps are performed after importation.

Based on my professional judgment, I believe the panel decision is likely to be contrary to the forthcoming decisions of the Supreme Court of the United States in *Loper Bright Enterprises v. Raimondo*, No. 22-451 (U.S.), and *Relentless, Inc. v. Department of Commerce*, No. 22-1219 (U.S.).

/s/Dan L. Bagatell

Dan L. Bagatell

## INTRODUCTION

Section 337 of the Tariff Act of 1930 authorizes the International Trade Commission to redress

> [t]he importation into the United States, the sale for importation, or the sale within the United States after importation ... of *articles that ... infringe* a valid and enforceable United States patent.

19 U.S.C. § 1337(a)(1)(B)(i) (emphasis added). In *Suprema, Inc. v. ITC*, 796 F.3d 1338 (Fed. Cir. 2015) (en banc), a sharply divided Court held that this provision authorizes the Commission to ban importation of articles that do *not* infringe as imported if the respondent has induced post-importation infringement. Relying on the framework of *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the majority concluded that the statutory language was ambiguous and that the Commission's broad interpretation of Section 337 was reasonable.

Here, the Commission extended *Suprema* in a case in which the alleged infringement could occur only after importation and only when the accused articles are altered, configured, or used in particular ways. None of the accused Pixel® smartphones and tablets were alleged to infringe as imported, all have a host of substantial non-infringing uses, and they could infringe only if users elected to download and install a particular app after importation. For their part, none of the accused Nest Audio speakers were alleged to infringe as imported, all have many substantial non-

infringing uses, and they could infringe only if users bought and paired multiple speakers and altered default equalization settings after importation. Nevertheless, the Commission held that Section 337(a)(1)(B)(i) applies and issued exclusion and cease-and-desist orders.

But the *Chevron* doctrine on which *Suprema* and the rulings here depended may be short-lived. In *Loper Bright* and *Relentless*, the Supreme Court is considering whether to overrule *Chevron* and hold that courts should interpret statutes without deference to government agencies' interpretations. Decisions are expected by the end of this Term—this week or next. Because the foundational underpinning of *Suprema* may no longer be good law—indeed, deference to agencies may be unlawful—and because Section 337 proceedings are an increasingly popular intellectual-property-enforcement mechanism, this Court should grant rehearing en banc and reconsider *Suprema* in light of the Supreme Court's guidance in *Loper Bright* and *Relentless*.

## STATEMENT OF THE CASE

### A.    The *Suprema* decision interpreting Section 337 under the *Chevron*-deference framework

Suprema was a Korean company that supplied fingerprint scanners and a software development kit to Mentalix, an American company. Mentalix wrote software for the scanners and bundled it with the scanners for sale in the United States. The complainant, Cross Match, alleged that the sale of those bundles induced infringe-

ment of its patent on a method of capturing and processing fingerprint images. The Commission determined that Mentalix had directly infringed and that Suprema had induced that infringement, and it issued an exclusion order. *Suprema*, 796 F.3d at 1341-43.

On appeal, a divided panel of this Court vacated the Commission's order, noting that Section 337(a)(1)(B)(i) refers to "articles that infringe" and concluding that the Commission lacked authority to issue an exclusion order when, as there, the articles did not infringe as imported. But the Court granted rehearing en banc and, by a 6–4 vote, upheld the Commission's broader statutory interpretation covering inducement of post-importation infringement.

The majority reached that result by deferring to the Commission's statutory interpretation under *Chevron*'s familiar two-step test. 796 F.3d at 1340-53. At Step One, the majority concluded that the statutory language "'articles that infringe' does not unambiguously exclude inducement of post-importation infringement." *Id.* at 1346. At Step Two, it found that the Commission's interpretation was "reasonable" because it was "consistent with" the statutory text, policy, and legislative history. *Id.* at 1349. The four dissenting judges concluded that *Chevron* deference was inappropriate because Section 337 "unambiguously fail[ed] to provide the Commission with the authority" it asserted. *Id.* at 1354 (O'Malley, J., joined by Prost, C.J., and Lourie and Dyk, JJ.). Judge Dyk's separate dissent argued that there was no

– 4 –

historical practice of excluding articles that do not infringe as imported and may never be used to infringe. *Id.* at 1353-54.

The Court has followed *Suprema* since. *E.g.*, *Comcast Corp. v. ITC*, 951 F.3d 1301 (Fed. Cir. 2020) (affirming exclusion order even though the imported products did not infringe until combined with other products in this country).

### B.    Sonos's complaint and the Commission's mixed decision

In this case, Sonos filed an ITC complaint asserting that Google products were infringing five patents involving wireless audio players. Appx396-448. Because three of those patents expired earlier this year, this petition focuses on the two patents that remain in force, U.S. Patent Nos. 10,439,896 and 9,219,959.

The '896 patent claims a "computing device" (a controller) programmed to set up a separate "playback device" (such as a speaker) on a wireless local-area network using a particular sequence of steps. Appx10156-91. Sonos asserted the patent against Google's Pixel smartphones, tablets, and computers. Appx11-12. Sonos's infringement theory was based on certain features of the Google Home app, but Google did not pre-install that app on the accused products. Instead, individual users in this country had to download and install the app before using it. Appx58802-03. Sonos thus sought to bar importation of tens of millions of devices even though none infringed as imported, all had myriad substantial non-infringing uses, and only a fraction ever had the accused app installed after importation.

The '959 patent claims a "playback device configured to output audio in a multi-channel listening environment" that is programmed to use different "equalizations" (e.g., bass and treble levels) in different pairing configurations (e.g., stereo or surround-sound). Appx10112-53. The relevant accused products are Google's Nest Audio speakers, Appx10-11[1], and they were alleged to infringe only when multiple speakers are paired. Nest Audio speakers are not paired as imported. Appx60209-10. They are sold individually and can be paired only at users' direction after importation, if a user purchases more than one. *Id.* The vast majority are never paired. *See* Appx58792-801. Moreover, users must alter speakers' default settings after importation to change their equalization. Appx60205-07. Nevertheless, Sonos sought to bar importation of all Nest Audio speakers.

Google contended that Section 337 did not authorize exclusion orders in these circumstances. But the Commission disagreed, citing *Suprema* and *Comcast* and deeming it sufficient that the imported articles were *capable* of infringement after importation. Appx198, Appx229 (CALJ opinion) (citing Appx82-84); Appx13 (Commission affirmance).[2]

---

[1] Sonos also accused Google's Home Max speaker, but that product was discontinued in 2018.

[2] The Commission provided additional analysis regarding claim language in two patents that have since expired and are now moot. Appx14-22.

On the merits, Google denied infringement and argued that the claims were invalid. Appx2501-44. Google also identified non-infringing alternative (NIA) designs in case the originally accused products were found to infringe. The CALJ determined that some originally accused products infringed each patent but that a Google redesign avoided infringement of each patent. Appx58-256. In particular, the CALJ ruled that the originally accused smartphones and tablets infringed '896 claim 1 when loaded with the Google Home app, but that NIA 2 did not infringe. Appx217-32. He also ruled that the originally accused Nest Audio speakers infringed '959 claim 10 when they synchronized bass and treble settings of "leader" and "follower" speakers after pairing. He recognized that no equalization could occur unless a user deviates from the default bass and treble settings, but he nevertheless found infringement because the accused products were *capable* of infringement in post-importation use. Appx167-73. But he determined that NIA 4 did not infringe because it removed the synchronization-upon-pairing feature. Appx174-75.

Both sides petitioned for review, but the Commission affirmed the CALJ's rulings and issued cease-and-desist and exclusion orders as to the originally accused products only—Google was permitted to continue importing its non-infringing redesigns. Appx1-57.

### C.    The panel's affirmance

Both sides appealed to this Court, but the panel affirmed the Commission's mixed result. Add1-25. Google maintained that the Commission's authority under Section 337(a)(1)(B)(i) is limited to cases where the accused articles infringe as imported, but Google acknowledged that the panel was bound by the contrary ruling in *Suprema*, and the panel agreed. Add25.

### D.    The Supreme Court's reconsideration of *Chevron* deference in *Loper Bright* and *Relentless*

Last year, the Supreme Court granted petitions for certiorari by Loper Bright and Relentless that asked it to overrule *Chevron*. No. 22-451 (U.S. May 1, 2023); No. 22-1219 (U.S. Oct. 13, 2023). The Supreme Court heard oral argument in both cases on January 17, 2024, and decisions are expected by the end of the current Term—most likely this week or next. The consensus among Court-watchers is that the Supreme Court is likely to overrule *Chevron* or at least significantly narrow it.

### ARGUMENT

This Court should grant rehearing en banc to reconsider the scope of Section 337(a)(1)(B)(i) in light of the Supreme Court's reconsideration of *Chevron* deference in *Loper Bright* and *Relentless*.[3]

---

[3] Google is not asking the en banc Court to reconsider other issues addressed by the panel. Google disagrees with several of those rulings, including infringement
<span style="float:right">(footnote continued on next page)</span>

### A. *Suprema* and the Commission's rulings here rested on a legal framework whose future is in grave doubt

*Suprema* cannot survive an abolition or substantial narrowing of *Chevron* deference because this Court's analysis depended on the *Chevron* framework. The *Suprema* majority began from the premise that *Chevron* required it to defer to the Commission's interpretation of Section 337. 796 F.3d at 1345-46. The majority opinion did not determine the *best* interpretation of Section 337(a)(1)(B)(i) *de novo*, without deference. Instead, as *Chevron* required, it put a thumb on the scale throughout its analysis.

At *Chevron* Step One, the *Suprema* majority concluded only that the statutory language did not *unambiguously preclude* the Commission's view that the statute covers inducement of post-importation infringement. *Id.* at 1346-47; *see also id.* at 1349 (concluding that "Congress has not directly answered" the precise question before the Court). And at Step Two, the majority concluded only that the Commission's interpretation was *reasonable*. *Id.* at 1349-52. The majority evaluated the statutory text, the legislative history, and policy considerations only to determine whether the Commission's interpretation was reasonable. *Id.* Under the premise that a court "may not substitute its own interpretation of the statute for the agency's

---

and validity of the '896 claims, but it appreciates that those adverse rulings depended on case-specific facts and will not have preclusive effect under *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1568-70 (Fed. Cir. 1996).

– 9 –

reasonable interpretation," the majority refused to decide for itself the best reading of the statute. *Id.* at 1352.

But the Supreme Court now appears poised to hold that courts should *not* defer to an agency's statutory interpretation just because that reading is plausible. At a minimum, the Supreme Court is likely to alter the *Chevron* framework in a way that undercuts the reasoning of this Court's decision in *Suprema*.

**B.    Properly construed, the Commission's statutory authority is limited to cases where the accused articles infringe as imported and does not apply when, as here, the alleged infringement requires modification or further configuration after importation**

Under the correct interpretation of Section 337(a)(1)(B)(i), without deference to the Commission's expansive reading of its own powers, the Commission's remedial orders in this case cannot stand. Simply put, when imported products must be modified or further configured after importation to infringe, they are not "articles that infringe" capable of triggering the Commission's remedial authority. At a minimum, such products cannot qualify as "articles that infringe" when, as here, they have substantial non-infringing uses.

The statutory language weighs strongly against the Commission's interpretation. Section 337(a)(1)(B)(i) grants the Commission authority to "deal[ ] with"

> [t]he importation into the United States, the sale for importation, or the sale within the United States after importation of ... *articles that ... infringe a valid and enforceable United States patent.*

19 U.S.C. § 1337(a)(1)(B)(i) (emphasis added). All three prongs of that sentence address importation of "articles that infringe." That present-tense formulation indicates that the articles must infringe as imported. Nothing in the statutory language suggests that it encompasses articles that *might* infringe in the future *if* they are modified or further configured after importation. Nor does the statutory language suggest that Congress gave the Commission authority to exclude products that satisfy *some* limitations of a patent claim but not others. It speaks of "articles that infringe," and patent infringement requires that an accused product satisfy *every* claim limitation. *E.g.*, *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339-40 (1961).

When Congress enacted the current version of Section 337 in 1988, it chose not to incorporate the language of Section 271 of the Patent Act, 35 U.S.C. § 271. That was sensible because Section 271 is an *in personam* statute focusing on *actors* who perform certain *actions*, whereas Section 337 is an *in rem* statute focusing on infringing *articles* that are subject to exclusion at the border. Section 337 has a commensurately narrower scope.

Section 271(a) is pertinent to Section 337 because it defines direct infringement to include selling patented inventions within the United States and importing patented inventions into the United States. 35 U.S.C. § 271(a). But most of Section 271 has no analog in Section 337. Section 271(b) provides that "[w]hoever actively

induces infringement of a patent shall be liable as an infringer," and Section 271(c)

prohibits contributory infringement, defined as providing a component that "constitut[es] a material part of [an] invention" knowing it to be "especially made or

especially adapted for use in an infringement ... and not a staple article or commodity

or commerce." 35 U.S.C. § 271(b), (c). Section 337 does not address inducement of

post-importation modifications, and it does not address contribution to future

infringement by articles that do not themselves infringe as imported. It instead

focuses on exclusion of infringing *articles*.[4]

Nothing in the legislative history suggests that Congress intended to grant the

Commission authority to address all violations of Section 271, much less to exclude

products that do not infringe as imported and have substantial non-infringing uses.

*See* S. Rep. No. 100-71, at 127-30 (1987). And Congress could not have endorsed

an established Commission practice of excluding such products because there was

no such practice.

Reading Section 337(a)(1)(B)(i) as written does not create a statutory loophole because district courts remain available to enjoin and award damages for any

---

[4] Section 337(a)(1)(B)(ii) contains an analog to Section 271(g) because it authorizes the Commission to address "articles that ... are made ... [by] a process covered by the claims of a valid and enforceable United States patent." 19 U.S.C. § 1337(a)(1)(B)(ii). But that provision likewise focuses on articles that infringe as imported and does not cover articles that must be altered after importation to fall within the scope of a patent.

– 12 –

inducement of or contribution to direct infringement prohibited by Section 271(b) or (c). If the Commission desires broader authority, it can and should ask Congress to amend Section 337. This Court should not interpret a statute that addresses importation of "articles that infringe" to cover articles that *do not* infringe as imported and *cannot* infringe unless they are altered after importation.

### C.    The issue is fundamental and even more important now than when this Court agreed to rehear *Suprema* en banc in 2014

The scope of the Commission's authority under Section 337 is an extremely important and recurring issue because the Commission has become a favored forum for patent enforcement. District courts can provide a wider array of relief, including damages as well as injunctions. But many patent owners prefer to file in the Commission because it construes its purview so broadly, because it completes investigations very quickly (typically within eighteen months),[5] and because it routinely issues cease-and-desist and exclusion orders regardless of whether the complainant can satisfy the four-factor test for injunctive relief under *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

As a result, although the Commission is ostensibly a trade agency, it has become a popular forum for patent litigation. Nearly fifty Section 337 complaints

---

[5] https://www.usitc.gov/intellectual_property/337_statistics_average_length_investigations.htm.

were filed in the last 365 days,[6] the Commission currently has about sixty-five open Section 337 investigations,[7] and it completes twenty-five to thirty-five Section 337 investigations each year.[8] Some cases settle, of course, but this Court continues to hear many appeals from Section 337 determinations. According to PACER, twenty-eight were filed in the last two years alone.

Because Section 337 cases are increasingly common, the scope of the Commission's enforcement authority under that statute warrants the en banc Court's attention. The Court found the issue en banc-worthy in 2014, and it is even more important to the country and our legal system ten years later. With the legal framework underlying *Suprema* unlikely to survive, reconsideration en banc is not only warranted but imperative.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully submitted,

PERKINS COIE LLP
by /s/Dan L. Bagatell
Dan L. Bagatell
Counsel for Google LLC

---

[6] https://www.usitc.gov/investigations/investigation_requests.

[7] *See* https://ids.usitc.gov/ ("All Active Unfair Imports" link).

[8] https://www.usitc.gov/intellectual_property/337_statistics_average_length_investigations.htm.

# ADDENDUM: THE PANEL'S OPINION

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

———————————

**SONOS, INC.,**
*Appellant*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**GOOGLE LLC,**
*Intervenor*

------------------------------------------------

**GOOGLE LLC,**
*Appellant*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**SONOS, INC.,**
*Intervenor*

———————————

2022-1421, 2022-1573

———————————

Appeals from the United States International Trade Commission in Investigation No. 337-TA-1191.

_____

Decided: April 8, 2024

_____

E. JOSHUA ROSENKRANZ, Orrick, Herrington & Sutcliffe LLP, New York, NY, argued for appellant. Also represented by ALEXANDRA BURSAK, EDMUND HIRSCHFELD; ALYSSA MARGARET CARIDIS, Los Angeles, CA; ABIGAIL COLELLA, JORDAN COYLE, MARK S. DAVIES, ROBERT MANHAS, Washington, DC; BAS DE BLANK, Menlo Park, CA; CLEMENT ROBERTS, San Francisco, CA; GEORGE I. LEE, COLE BRADLEY RICHTER, RORY PATRICK SHEA, JOHN DAN SMITH, III, SEAN MICHAEL SULLIVAN, Lee Sullivan Shea & Smith LLP, Chicago, IL.

DAN L. BAGATELL, Perkins Coie LLP, Hanover, NH, argued for cross-appellant. Also represented by ANDREW DUFRESNE, Madison, WI; NATHAN K. KELLEY, JONATHAN IRVIN TIETZ, Washington, DC; TARA LAUREN KURTIS, Chicago, IL; THERESA H. NGUYEN, Seattle, WA; JEFFREY NARDINELLI, SEAN S. PAK, CHARLES KRAMER VERHOEVEN, OGNJEN ZIVOJNOVIC, Quinn Emanuel Urquhart & Sullivan, LLP, San Francisco, CA; JARED WESTON NEWTON, Washington, DC; LANCE YANG, Los Angeles, CA.

RICHARD P. HADORN, Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for appellee. Also represented by WAYNE W. HERRINGTON.

_____

Before DYK, REYNA, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

Sonos, Inc. ("Sonos") filed a complaint at the International Trade Commission ("Commission") alleging that Google LLC ("Google") was violating Section 337 of the

Tariff Act of 1930, 19 U.S.C. § 1337, by importing audio players and controllers that infringed five of Sonos' patents: U.S. Patent Nos. 10,439,896 ("'896 patent"), 9,195,258 ("'258 patent"), 9,219,959 ("'959 patent"), 10,209,953 ("'953 patent"), and 8,588,949 ("'949 patent"). The Commission instituted an investigation and ultimately issued a final determination, holding that certain originally-accused products infringed each of the asserted patents. The final determination also held, however, that certain non-infringing alternatives ("NIAs" or "redesigns") proposed by Google did not infringe any of the claims of the Sonos patents. Sonos timely appealed the Commission's findings of non-infringement by the redesigns, and Google cross-appealed the Commission's findings of infringement by the originally-accused products. We affirm.

## I

On January 7, 2020, Sonos filed a complaint with the Commission, alleging violations of Section 337 in the importation into the United States, the sale for importation, and the sale within the United States after importation of certain audio players and controllers, components thereof, and products containing the same. On February 11, 2020, the Commission instituted an investigation based on Sonos' complaint, to determine:

> whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products . . . by reason of infringement of one or more of claims 17, 21-24, and 26 of the '258 patent; claims 7, 12-14, and 22-24 of the '953 patent; claims 1, 2, 4, and 5 of the '949 patent; claims 5, 9, 10, 29, and 35 of the '959 patent; and claims 1, 3, 5, 6, and 12 of the '896 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337[.]

85 Fed. Reg. 7783 (Feb. 11, 2020).  The Commission named
Alphabet Inc. and Google as respondents, although Alpha-
bet Inc. was later terminated from the investigation.  The
Commission's Office of Unfair Import Investigations was
also named as a party.

On March 12, 2021, the Commission partially termi-
nated the investigation after Sonos withdrew allegations of
infringement as to certain claims in each of the asserted
patents.  The remaining patents and claims at issue at the
time of the Commission's evidentiary hearing were as fol-
lows:

| Asserted Patent | Remaining Asserted Claim(s) |
|---|---|
| '258 patent | 17, 21, 24, and 26 |
| '953 patent | 7, 14, and 22-24 |
| '959 patent | 10 |
| '949 patent | 1, 2, 4, and 5 |
| '896 patent | 1, 5, 6, and 12 |

J.A. 4.

After the evidentiary hearing, the chief administrative
law judge ("CALJ") made an initial determination that
each of the asserted patents was infringed by one or more
of the originally-accused Google products.  The CALJ also
found, however, that redesigns of each of these products
avoided infringement and were, hence, NIAs.  J.A. 58-255.
The Commission declined the parties' petitions for review
of the initial determination and issued a final determina-
tion adopting the CALJ's determination while also provid-
ing "supplemental reasoning" as to how Google's originally-

accused products infringed the '258 and '953 patents.[1]
J.A. 2, 18-22. The Commission then entered a limited ex-
clusion order, "precluding the importation of audio players
and controllers . . . that infringe one or more of [Sonos']
claims." J.A. 23; *see also* J.A. 37-40.

Sonos appealed the Commission's final determination
finding non-infringement of the '896 patent, '258 patent,
and '959 patent by Google's redesigns that were labelled
'896 NIA 2, '258 NIA 1, and '959 NIA 4, respectively.
Google cross-appealed the Commission's final determina-
tion that found infringement of each of the asserted patents
by certain of the originally-accused products. We have ju-
risdiction under 28 U.S.C. § 1295(a)(6).

## II

We review the Commission's legal determinations de
novo and its factual findings for substantial evidence. *See
Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936
F.3d 1353, 1358 (Fed. Cir. 2019). In particular, the
"[d]etermination of the meaning and scope of patent
claims" is a matter of law reviewed de novo (when based
entirely on intrinsic evidence) and "[i]nfringement of cor-
rectly construed claims" is "a question of fact" reviewed for
substantial evidence. *Kinik Co. v. Int'l Trade Comm'n*, 362
F.3d 1359, 1361 (Fed. Cir. 2004). Substantial evidence
"means such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion." *Consol. Edi-
son Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "[W]here two
different, inconsistent conclusions may reasonably be
drawn from the evidence in record, an agency's decision to

---

[1]    Because the Commission adopted the CALJ's ini-
tial determination in full, we do not distinguish between
the findings in the CALJ's initial determination and the
findings in the Commission's final determination. We treat
both as the findings of the Commission.

favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

"[W]e review the factual findings underlying the Commission's invalidity determinations for 'substantial evidence' by ascertaining whether those findings 'were established by evidence that a reasonable person might find clear and convincing,' and whether those findings 'form an adequate predicate for the legal determination of invalidity.'" *Guangdong*, 936 F.3d at 1359 (quoting *Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 761 n.5 (Fed. Cir. 1995)).

## III

## A

We first address issues in Sonos' appeal, which challenges the Commission's findings that certain Google redesigns do not infringe the '896 patent, '258 patent, and '959 patent. We are not persuaded by Sonos' contentions that the Commission misconstrued disputed claim terms or lacked substantial evidence for its findings. Accordingly, we affirm.

## 1

The '896 patent is directed to techniques enabling users to easily add new smart speakers to an existing home network in a way that requires a "minimum of human intervention and technical ability." '896 patent 2:48-50; *see also id.* at 2:16-27, 17:60-18:35. Pertinent to Sonos' appeal, claim 1 of the '896 patent requires, among other things, "transmitting, to the given playback device via the initial communication path, *at least a second message containing* network configuration parameters, wherein the network configuration parameters comprise *an identifier of the secure WLAN [i.e., wireless local area network] and security key for the secure WLAN*." *Id.* at 18:19-24 (emphasis

added).  The Commission construed this limitation as re-
quiring transmission of at least one single "second mes-
sage" containing both the claimed "identifier" and the
claimed "security key."  J.A. 304.  Because, in Google's re-
designed '896 NIA 2, the identifier and the security key are
transmitted in two separate messages, the Commission
found that the redesign does not infringe the '896 patent.
J.A. 230-32.

On appeal, the parties do not dispute that, in '896 NIA
2, the identifier and the security key are sent in two differ-
ent messages.  *See e.g.,* Google Br.[2] at 11 ("Google's '896
NIA 2 sends the two network configuration parameters in
separate messages rather than together."); Sonos Br. at 28.
Sonos' challenge on appeal is directed to the Commission's
construction of the "transmitting" step as requiring the
same "second message" to contain both the identifier and
the security key.  Sonos argues the correct construction
must permit the identifier and security key to be distrib-
uted among multiple second messages.  Specifically, Sonos
argues the "transmitting" limitation requires at least one
second message, where the one *or more* second messages
*collectively* contain the identifier and the security key.  *See*
Sonos Br. at 28-32; J.A. 3624-28 (Sonos proposing limita-
tion be construed as "one or more additional messages that
*collectively* contain an identifier of the secure WLAN and a
security key for the secure WLAN") (emphasis added).

---

[2]    We refer to the various briefs as follows: "Sonos
Br." (ECF No. 20) is  Sonos' principal brief; "Google Br."
(ECF No. 28) is Google's principal brief in its cross appeal
and response brief in Sonos' appeal; "ITC Br." (ECF No. 40)
is the Commission's response in both the Sonos appeal and
Google cross-appeal; "Sonos Reply Br." (ECF No. 42) is
Sonos' reply brief in its appeal and response brief in
Google's cross appeal; and "Google Reply Br." (ECF No. 48)
is Google's reply brief in its cross-appeal.

Google counters, citing both the plain language and the specification, that the claim limitation requires "a second message containing network configuration parameters," *each* of which contains *both* the identifier and the security key. In Google's view, "at least" indicates there can be more than one such "second message.[3] *See* Google Br. at 53 (advocating for construction where "a 'second message' must include both recited network configuration parameters even though there may be more than one such 'second message'").

Google has the better reading of the claim language, and much the better reading of the specification. The claim recites network configuration *parameters*, which are defined to include *both* an identifier of the WLAN and a security key. We agree with the CALJ that this language "makes clear that 'at least a second message' has the network configuration parameters and that the network configuration parameters include both" the identifier and the security key. J.A. 304 (quoting '896 patent cl. 1).

The specification provides strong support for this construction, and essentially none for Sonos' proposal. Google and the Commission point to the patent's Figure 3B and the patent's description of it, which both teach a single message containing both the identifier and the security key. *See* Google Br. at 54-57; ITC Br. at 18-20; *see also* '896 patent Figure 3B & 14:15-17; J.A. 3699 (Sonos conceding that specification describes sending network identifier and security key "in a single 'SetNetParams message'"). Google also identifies a passage in the specification that

---

[3]    The possibility of more than one "second message," provided that each "second message" contains the identifier and the security key, suggests that the "at least" portion of the disputed claim term is not superfluous, contrary to Sonos' contention. *See* Sonos Br. at 34-35.

contemplates resending a message containing both the identifier and the security key. *See* Google Br. at 56 (citing '896 patent Fig. 3B & 13:38-42, 19:5-7). A person of ordinary skill in the art would view these examples as evidence that the patentee understood the claims as involving one or more "second message," where each second message contains both the identifier and the security key.

By contrast, Sonos does not identify any passage or figure in the specification supporting its proposed construction. Sonos merely argues "[n]othing in the specification *modifies* the claim language," Sonos Br. at 33 (emphasis added), but this does not aid its case.

Rather than the specification, Sonos directs us to precedent, arguing that in *01 Communique Laboratory, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292 (Fed. Cir. 2012), we construed claim terms similar to the one at issue here as having their "ordinary meaning." Sonos Br. at 31. The issue in *LogMeIn* was whether the claim term "a locator server computer" encompassed multiple servers and, if so, whether the recited functions for the "location facility" software could be distributed among them. While we held there that the term "a computer" must be interpreted – as a matter of "ordinary meaning" – as "one or more computers," our holding that a "location facility" may be distributed among "more than one computer" was based on the express disclosure in the specification there, to the effect that "'such facilities can be sub-divided into separate facilities.'" *LogMeIn*, 687 F.3d at 1297 (quoting specification); *see also id.* ("[T]he disclosures that facilities may be subdivided . . . support a construction that the location facility may be distributed among multiple physical computers."). Here, however, Sonos does not identify any similar disclosure in the '896 patent.

We do not agree with Sonos that the Commission improperly imported a limitation from the specification into the claims. Instead, we agree with the Commission, and

Google, that the claim language and specification support the Commission's construction.[4]

Since Sonos does not dispute that the '896 NIA 2 sends the identifier and the security key in separate messages, and the proper construction of the "second message" term does not encompass such an embodiment, we affirm the Commission's finding that '896 NIA 2 does not infringe the '896 patent.

2

The '258 patent is directed to techniques for ensuring that multiple wireless speakers play in unison. Pertinent to Sonos' appeal, the patent claims a technique for synchronizing smart speakers with each other by transmitting "clock time information." '258 patent 40:14-21. The clock time information enables the wireless speakers to adjust for sound mismatches resulting from the speakers' independent internal clocks. At the Commission, Sonos and Google agreed that "clock time information" means "information representing a time value indicated by a device's clock," J.A. 280, a construction the Commission adopted, *see* J.A. 95-96. Based on this agreed-upon construction, the Commission found that one of Google's redesigns, '258 NIA 1, does not infringe the '258 patent because it used an incrementing counter. J.A. 95-97. In the Commission's view, this incrementing counter/integer is not information representing a time value and, thus, cannot be the claimed "clock time information." J.A. 95.

On appeal, Sonos challenges this finding, which it frames as a claim construction issue. It is not. Instead, "whether the accused device [or a redesign] infringes properly interpreted claims" is a factual issue – which is

---

[4]    Neither party argues that the prosecution history or any extrinsic evidence impact the proper construction.

just how it was presented to the Commission.[5] *Martin v. Barber*, 755 F.2d 1564, 1566 (Fed. Cir. 1985). Thus, we review the Commission's finding for substantial evidence, which we find.

In support of its non-infringement finding, the Commission cited testimony from one of Google's engineers and other testimony from Google's expert. *See* J.A. 94-96. Together, these individuals explain that the redesign transmits an incrementing counter and that such a counter does not represent a time value – and, therefore, cannot represent a time value indicated by a device's clock. This constitutes substantial evidence for the Commission's finding that the incrementing integer in '258 NIA 1 is not "clock time information" as that term was construed by the Commission, based on the parties' agreement. Thus, we affirm the Commission's finding of non-infringement.[6]

3

The '959 patent is directed to techniques for pairing individual playback devices to create a multi-channel listening environment and to performing equalization of audio data depending on the type of pairing. On appeal, Sonos challenges the Commission's construction of

---

[5]    Among the indications that this is a factual issue, and not a claim construction dispute, are that neither side sought to modify the agreed-upon construction but, instead, presented expert testimony on whether '258 NIA 1's transmitted integer satisfied the agreed-upon construction.

[6]    Given our conclusions, we need not reach Sonos' additional contention that the Commission erred in finding that the redesign would not infringe even if the incrementing integer were "clock time information." *See* Sonos Br. 49-58.

"equalization," recited in claim 10, as requiring "alteration of the relative strength of certain frequency ranges in the audio data by performing one or more of the following: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters." J.A. 312 (internal emphasis omitted). Sonos argues the Commission construed the term too narrowly. In Sonos' view, "equalization" includes any "modifying" of the output audio data, including changing of channel output without changing the strengths of a frequency range. Sonos Br. at 60-62.

We agree with the Commission's construction. Relying in part on Google's expert testimony and various dictionaries, the Commission found that "'[e]qualization' is a well-known technique that allows one to emphasize or diminish a specific range of frequencies." J.A. 307. The Commission's subsidiary factual finding on this point was not clearly erroneous. *See DeLorme Publ'g Co. v. Int'l Trade Comm'n*, 805 F.3d 1328, 1331 (Fed. Cir. 2015) ("We review claim construction de novo except for subsidiary facts based on extrinsic evidence, which we review for clear error.").[7]

The specification confirms that the patent is not using the term "equalization" in a way that departs from its well-known meaning. In particular, the specification discloses that, when "both mid-range drivers and both tweeters have the *same equalization* (or substantially the same equalization), . . . they are both sent the *same frequencies*, just from different channels of audio." '959 patent 8:36-39 (emphasis

---

[7]     Sonos did not meaningfully challenge this factual determination. *See* J.A. 307 (CALJ noting "[n]either Sonos nor Staff appear to dispute that 'equalization' has a well-known meaning to persons of ordinary skill in the art, at least outside the context of the patent itself").

added); *see also id.* at 16:57-59 ("[T]he equalization of each S5 device is changed in an attempt to reduce or eliminate certain constructive or destructive interference."); *id.* at 12:15-16 (describing equalization in terms of adjusting bass and treble). These passages suggest that "equalization" necessarily includes alteration of a speaker's frequencies and that changing the "channels of audio" does not necessarily result in "equalization."

The well-known meaning of the term "equalization" is also consistent with the specification passage Sonos argues "defines equalization to include changes to channel output and, separately, changes to frequency response." Sonos Br. at 22; *see also id.* at 63 (quoting '959 patent 16:20-27). That passage teaches:

> Changing the equalization of the playback device might include any of: turning on or off (or effectively muting) one or more specific speaker drivers, changing the channel output of one or more speaker drivers, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, [and] changing the amplifier gain of the playback device as a whole.

'959 patent 16:20-27. We do not read this passage as *defining* "equalization." "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and must "clearly express an intent to redefine the term." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The passage on which Sonos relies, instead, merely provides a list of operations that equalization "might include." This non-exclusive recitation does not evince the required clear intent to adopt a definition different from the term's ordinary meaning. *See* J.A. 305-12 (Commission construing "equalization" to mean "alteration of the relative strength of certain frequency ranges in the

audio data *by performing one or more of the following*: adjusting one or more parameters related to speaker drivers, such as gain, frequency response, channel output, phase, or time delay; adjusting amplifier gain of the playback device; or using one or more filters") (internal emphasis altered).

The language of other claims further supports the Commission's construction of "equalization." In particular, claims 2, 26, and 34 require "equalization" to be performed using a "pass filter to modify the audio data." J.A. 10149 (1:21- 29); J.A. 10151-52 (6:64-7:5, 7:50-59). Sonos agrees that a pass filter is a "mechanism for altering the relative strength of frequency ranges." Sonos Br. at 70 (citing J.A. 311 n.19). Thus, these dependent claims confirm that, while equalization can be performed using different mechanisms (e.g., pass filter), the process of equalization is about altering the relative strengths (i.e., emphasizing or diminishing) of certain frequencies in audio.

The prosecution history does not alter our conclusions. Sonos points to the examiner's statement that "the subject matter 'equalization' is defined as including" the five techniques listed in the specification. Sonos Br. at 66-67 (citing J.A. 17198 n.2). The examiner was required to apply the broadest reasonable interpretation standard, which is different from the *Philips v. AWH Corporation* standard the Commission and we apply. 415 F.3d 1303 (Fed. Cir. 2005); *see also MPHJ TECH. v. Ricoh Americas Corp.*, 847 F. 3d 1363, 1374 (Fed. Cir. 2017) (noting that at Patent Office "claims are given their broadest reasonable interpretation consistent with the specification") (internal quotation marks omitted). In any case, "arguments based on the prosecution history which allegedly shows that the examiner viewed claim [differently] . . . are insufficient . . . to overcome our strong sense" of claim scope based on claim

language and the specification. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1578 (Fed Cir. 1996).[8]

In sum, we agree with the Commission that the term "equalization" means "alteration of the relative strength of certain frequency ranges." Sonos does not dispute that, under this construction, '959 NIA 4 does not infringe claim 10. Thus, we affirm the Commission's finding that '959 NIA 4 does not infringe claim 10.

## B

We turn now to Google's cross-appeal, which challenges the Commission's findings relating to the '896 patent and '949 patent.

### 1

#### a

While Sonos' appeal with respect to the '896 patent involved the claim element "transmitting . . . at least a second message containing network configuration parameters," Google's cross-appeal – of the Commission's finding that its originally-accused products infringe – arises from the '896 patent's recitation of "receiving . . . user input indicating that a user wishes to set up a

---

[8]     Sonos also argues its construction is supported by the examiner's rejection of several proposed claims requiring "equalization," based on references teaching "changing channel output only, with no mention of altering frequency response." Sonos Br. 66-67. These rejections, Sonos asserts, indicate that the Patent Office understood equalization as requiring either "changing the channel output" or "changing the frequency response. *Id.* As Google and the Commission point out, however, Sonos did not present this argument to Commission, *see* Google Br. 80; ITC Br. 42, so it was forfeited, *see In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020).

playback device to operate on the secure WLAN." '896 patent 18:3-9. At the Commission, the parties agreed that "user input" means "an 'objectively verifiable indication' of the user's desire to use the controller's secure network." J.A. 60329-31; J.A. 70103. The claim also recites "transmitting a response . . . that facilitates establishing an initial communication path with the given playback device," which the parties agree must occur after the "receiving" step. '896 patent 18:14-16.

The Commission found that Google's originally-accused products practice the "receiving" step based on a screen called "Device Found Screen," which appears after a user selects on her mobile controller (e.g., a mobile phone, tablet, or laptop) a button that says "[s]et up new devices [i.e., speakers] in your home." J.A. 220-21; *see also* J.A. 225.



In the Device Found Screen, J.A. 221 (reproducing J.A. 60501), which is shown above, the user is asked, "Would you like to set up this device?" and given the options of choosing "Yes," "Skip," or "Set up a different device." J.A. 220-21.  If the user selects "Yes," the mobile controller retrieves "the Wi-Fi network that the mobile [controller] is connected to."  J.A. 227 (citing J.A. 70118 (452:7-453:5)).  This information is "save[d] . . . so it can be fetched later in the setup process."  *Id.*  Then, the mobile controller performs a step that the parties agree is the "transmitting" step, as it establishes the "initial communication path" with the new device (i.e., speaker) being added.  J.A. 223.

Thereafter, at a screen called "Connect to Wi-Fi Screen," the mobile controller lists the Wi-Fi networks that are available for the new speaker device to connect to. J.A. 70078 (299-300).



J.A. 222-23 (reproducing J.A. 60504).

As shown above, on this list, the network that was previously saved – that is, the network the mobile controller

was connected to when the user selected "Yes" at the Device Found Screen – is highlighted (in blue) and pre-selected among the list of available Wi-Fi networks. J.A. 70078-79; J.A. 70252.

Also pertinent to the Commission's analysis is a setup instruction that Google formerly provided to users, directing them to "[c]onnect your mobile [controller] device to the Wi-Fi network that you'll use for your speaker or display." J.A. 226 (reproducing J.A. 50706). In the Commission's view, this instruction confirmed that Google's originally-accused products "were designed to assume that the playback device [i.e., the new speaker] should be connected to the same network as the computing device[i.e., the mobile controller]." J.A. 226. It is undisputed that Google deleted this step from its published instruction prior to the Commission's hearing and that the Commission was presented with no evidence that any user of the accused devices (i.e., the mobile controllers) had ever seen the instruction. *See* J.A. 226 n.81.

The Commission's finding that Google's originally-accused products infringe the '896 patent is based on its determination that a user's selection of "Yes" at the Device Found Screen satisfies the "receiving" step. Substantial evidence supports the Commission's application of the claim construction to the Google accused product. As the Commission explained, when a user selects "Yes" on the Device Found Screen, the accused products are "designed to assume that the user wishes to set up the playback device on the same Wi-Fi network" the accused devices are actually connected to at that moment. J.A. 225.[9]  In

---

[9]    We are not persuaded by Google's insistence that the Commission clearly erred by allowing a mere "assumption" to serve as the objectively verifiable "indication." The Commission relied on substantial evidence to reach its

support of its conclusion, the Commission relied on testimony from Google's expert, who opined that after the user selects "Yes" on the Device Found Screen, and thereafter clicks "Next" on the Connect to Wi-Fi Screen, the user "confirm[s] that the network [he] wanted to use was highlighted or selected" and there is no need to "make another selection." J.A. 225-26 (citing J.A. 70252) (alterations in original). In other words, while the "receiving" step (including the required verifiable indication that the user wishes to set up a playback device on the controller's network) is completed at the Device Found Screen, further confirmation of the fact that step has been completed is provided in connection with the Device Connected and Connect to Wi-Fi Screens.

The Commission also cited Google's setup instructions, which provide further support for its finding. *See* J.A. 226 (reproducing J.A. 50706). The instruction expressly directed the user to "[c]onnect your mobile device to the Wi-Fi network that you'll use for your speaker or display," before launching the Google Home application and reaching the Device Found Screen. J.A. 226. In this way, the instruction to users is probative of the fact that a user's selection of "Yes" on the Device Found Screen is an indication that the user wishes to set up a playback device to operate the same network as the mobile controller.

Accordingly, we affirm the Commission's finding that Google's originally-accused products infringe the claims of the '896 patent.

---

conclusion that the user's selection of "Yes" at the Device Found Screen is an objectively verifiable indication that the user wishes to use the network to which the new device is then connected.

b

Google also challenges the Commission's conclusion that it failed to prove that the challenged claims of the '896 patent are invalid as obvious over the prior art "cd3o" system, which is "a portable, networked MP3 player, one or more of which could be placed anywhere throughout a residence and used to play audio streamed over a home network from a personal computer." J.A. 213 (internal quotation marks omitted). Once again, we affirm.

The Commission held that Google failed to identify in the cd3o system the "initial communication path" component of the '896 patent claims' "transmitting" step. The Commission did not expressly construe "initial communication path." But Google argues that the Commission "effectively," and erroneously, construed "initial communication path" as the *first-ever* communication path between the controller and the playback device. Google Br. at 38-39, 54. That erroneous construction, according to Google, led the Commission to overlook Google's contentions that, even after the user plugs in an ethernet cable between the controller and the playback device, there are "other, later-created paths provid[ing] that capability [i.e., enabling communication between the controller and device] and thus satisfied the 'initial communication path' limitation." Google Br. at 38. Specifically, Google argues that even if the prior art ethernet connection does not meet the "initial communication path" limitation (because the ethernet connection is made too soon, i.e., before the required "user input" and "first message" have been received) the Commission should have assessed whether other connections – specifically, a "point-to-point UDP" connection or a TCP connection – which are established at later times, might satisfy the "initial communication path"

requirement.  Google Br. at 42-44.[10]  In Google's view, how-
ever, the Commission never considered or discussed these
contentions.

   We disagree.  The Commission, in agreeing with Sonos
that the '896 patent claims do not "require connection with
a particular application or on a specific layer of the network
stack," J.A. 240 (internal quotation marks omitted), neces-
sarily had to have considered – and rejected – Google's con-
tention that UDP and TCP connections (made at non-
physical layers within a network stack) can create new
communication paths distinct from the communication
path formed when an ethernet cable is plugged in (a con-
nection that occurs at the physical layer of a computer net-
work).  *See* Oral Arg. at 19:46-20:04 (Commission counsel:
"[i]f by using an addressing protocol such as UDP or TCP,

---

   [10]  To the extent Sonos or the Commission are con-
tending that Google failed to adequately present these al-
ternative theories to the Commission, we disagree.  It is
clear from the record that Google repeatedly argued that
the connections at the UDP and TCP layers could satisfy
the "initial communication path" requirement even if the
ethernet connection did not.  *See, e.g.*, J.A. 1877 ( "[U]sing
point-to-point UDP messages . . . thereby establishing an
initial, point-to-point UDP communication path"); J.A.
1904 ("TCP SYN-ACK message facilitate[s] establishing a
TCP connection ('the initial communication path')"); J.A.
4635 ("cd3o discloses this limitation because it establishes
an initial point-to-point UDP path after receiving the re-
quired 'user input' and 'first message.'") (internal emphasis
omitted); J.A. 4637 ("If the CALJ finds that cd3o's point-to-
point UDP path is not 'an initial communication path,' it
would have been obvious to use a TCP connection . . . to
send network configuration parameters . . . and obvious to
replace cd3o's wired 'initial communication path' with a
wireless path . . . .").

if that doesn't create a new communication path, then we are left with what the communication path is – the plugging in of the ethernet cable"). That is, UDP and TCP are merely parts of the communication path established when the ethernet cable is plugged in, so when the Commission rejected the ethernet cable as being the claimed initial communication path it was likewise rejecting the UDP and TCP meeting this same requirement.

The '896 patent specification, as well as testimony from the co-founder of cd3o, provide substantial evidence support for the Commission's conclusion. *See* '896 patent 10:18-19 (explaining that "communication path" may operate over "Ethernet protocols"); *id.* at 6:39-52 (describing "TCP" as example of protocol (or special set of rules) that facilitates data flow); *id.* at 6:53-61 (describing "Ethernet cable" as means to provide network interface functions, where network interface functions are used to communicate with other devices using communication protocol); J.A. 70130 (cd3o co-founder testifying and rejecting characterization of UDP and TCP as communication paths).

Accordingly, we affirm the Commission's determination that the claims of the '896 patent are valid over the cd3o system.

2

The '949 patent is directed to techniques allowing both collective and individual adjustment of the volumes of players within a group. Pertinent to Google's cross-appeal, the original claims in the application that became the '949 patent required the ability to adjust player volumes individually and by group. *See* J.A. 58045. During prosecution, in view of a prior art reference, Isely,[11] Sonos amended the claims to require "independent" playback devices.

_____

[11] U.S. Patent Application Publication No. 2002/0124097 A1.

J.A. 58044-53.  After multiple discussions with Sonos, the examiner allowed the amended claims on the basis that Isely disclosed "tethered or interdependent" operation rather than "independent" operation.     J.A. 58066-69; J.A. 58145.  Google argues that Sonos disclaimed certain claim scope during prosecution.

Google's argument is predicated on a series of three statements contained in the prosecution history.  First, the examiner summarized his interview with Sonos as follows:

> Discussed support for the independent operation of the claimed individual player and Applicant distinguished the individual operation over the *tethered or interdependent operation*[]of [Isely].

J.A. 58069 (emphasis added).  Second, in his Reasons for Allowance, the Examiner discussed Isely's disclosure and clarified how Sonos had distinguished the reference:

> [T]he prior art is enabling for an individually addressable independent playback device, such as that depicted in Figure 2A of the instant application, functionally grouped into ad hoc networks for designation, receipt and playback of particular audio streams in concert with user directed characteristics such as volume (see at least [Isely]: 20020124097: ¶ 6, 60-64; Figure 2, 5, 6: zones are formed and volume control applied to a zone and thereby selectively to individual zone players based on a user determined relationship).  However where [Isely] controls volume in an interdependent manner *the instant application . . . teaches the system functional to provide groupwise and individual control of each of the groupwise addressable and independently addressable playback devices.*

J.A. 58066-58067 (emphasis added).  Third, Sonos summarized its telephone interview with the examiner as follows:

"Applicants' representative discussed the *Isely* reference and reiterated that the reference did not disclose or suggest independent playback devices." J.A. 58145.

Based on these statements, the Commission found:

> [w]hile the Examiner used the language "tethered or interdependent operation," there is not a clear intent to disavow all systems that can be characterized as either "tethered" or "interdependent." Rather, the patentee disclaimed the devices as described in Isely – a system in which the volume of one individual device could not be adjusted without also adjusting the volume of other devices in the group.

J.A. 191 (citing J.A. 58069). Google argues the Commission erred finding that Sonos only made a narrow disclaimer. Instead, in Google's view, Sonos broadly disclaimed all "tethered or interdependent operation."

"The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (internal quotation marks omitted). We review the Commission's assessment of a prosecution disclaimer de novo. *See id.* at 1372.

Undertaking such review here, we agree with the Commission that the three statements quoted above do not amount to a "clear and unmistakable disclaimer" of *all* "tethered or interdependent operation." The examiner's statement in the Reasons for Allowance indicates that both the examiner and Sonos understood that a system providing "groupwise and individual control of each of the groupwise addressable and independently addressable playback devices," which is a form of a "tethered or interdependent operation," was within the scope of the allowed claims.

J.A. 58066-67. This point alone is sufficient to cast doubt on the breadth of the disclaimer argued for by Google, as the record is far from "clear and unmistakable" as to such scope.

Google offers no argument for non-infringement if its broad disclaimer contention is rejected. Hence, we affirm the Commission's finding that Google's accused controllers installed with the Google Home application infringe the '949 patent.

## C

Finally, Google argues the originally-accused products do not infringe the '896, '949, '959, '258, and '953 patents because Sonos' infringement theories rely on features or steps that are added or performed by users after Google imports the devices into the United States. Google asserts that the Commission's authority under section 337 "is limited to cases in which the accused articles infringe at the time of importation, and that district courts are the proper forum for allegations of inducing post-importation infringement." Google Br. at 51. As Google concedes, however, we have already rejected this contention. *See Suprema, Inc. v. Int'l Trade Com'n*, 796 F.3d 1338 (Fed. Cir. 2015) (en banc); *see also* Google Br. at 50. We are bound by this precedent and, accordingly, reject Google's argument.

## IV

We have considered the parties' remaining arguments and find them unpersuasive. Because we reject each of the challenges raised by Sonos in its appeal and by Google in its cross-appeal, we affirm.

**AFFIRMED**

Costs

No costs.

## CERTIFICATE OF COMPLIANCE

1.     This petition complies with the type–volume limitation of Federal Circuit Rule 35(e)(4). The petition contains 2,910 words, excluding the portions exempted by Federal Circuit Rule 35(b)(2).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Times New Roman type.

Dated: June 24, 2024                    /s/Dan L. Bagatell

                                        Dan L. Bagatell